UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>                v.<br><br>H&R BLOCK, INC., *et al.*,<br><br>                Defendants. | Civil Action No. 11-00948 (BAH) |

### MEMORANDUM OPINION

Counsel on opposite sides of this pending motion both used the same terms to describe the merits of their respective positions as "not even a close call." While this may be a sign that the case is closer than either side will let on, in this case, the Court finds that the weight of the argument is against the movants. The United States, through the Antitrust Division of the Department of Justice, brought this civil case to enjoin the proposed acquisition of a digital do-it-yourself tax preparation company known as TaxACT by H&R Block, another company that sells digital do-it-yourself tax preparation products. The defendants have moved to transfer this case from the District of Columbia to the United States District Court for the Western District of Missouri, where H&R Block is headquartered. For the reasons that follow, the Court denies the motion to transfer venue.

### I. BACKGROUND

The United States, through the Antitrust Division of the Department of Justice (the "DOJ" or the "plaintiff"), filed this action on May 23, 2011. The DOJ seeks to enjoin Defendant H&R Block, Inc. from acquiring Defendant 2SS Holdings, Inc. ("TaxACT"), which sells digital do-it-yourself tax preparation products marketed under the brand name TaxACT. Compl. ¶ 10. H&R Block is a Missouri corporation headquartered in Kansas City, Missouri. *Id.* ¶ 9. 2SS

Holdings, or TaxACT, is a Delaware corporation headquartered in Cedar Rapids, Iowa. *Id.* ¶ 10. Defendant TA IX, L.P. ("TA"), a Delaware limited partnership headquartered in Boston, Massachusetts owns a two-thirds interest in TaxACT.[1] *Id.* ¶ 11.

According to the complaint, last year an estimated 35 to 40 million taxpayers filed their taxes using digital do-it-yourself tax preparation products ("Digitial DIY Tax Preparation Products"). *Id.* ¶ 1. In the U.S. Digital DIY Tax Preparation Product market, the three largest firms collectively have about 90% of the market share. *Id.* The leading company in the market is Intuit, Inc., the maker of "TurboTax." *Id.* ¶ 3. H&R Block's proposed acquisition of TaxACT, if allowed to proceed, would combine the second- and third-largest providers in the market – i.e., H&R Block and TaxACT, respectively. *Id.*

The complaint alleges that TaxACT is a "maverick" competitor that has a history of "disrupting" the Digitial DIY Tax Preparation market and has forced its competitors, including H&R Block and Intuit, "to offer free products and increase the quality of their products for American taxpayers." *Id.* ¶ 28. The first major instance of TaxACT's maverick behavior alleged in the complaint occurred in 2004 in relation to the Free File Alliance ("FFA"), a public-private partnership of digital DIY tax preparation companies and the Internal Revenue Service designed to offer qualified individuals the ability to prepare and e-file free federal income tax returns. *Id.* TaxACT aggressively pursued lower prices by introducing an offer through the FFA that was free to all individual U.S. taxpayers in 2004. *Id.* Other members of the FFA, including H&R Block and Intuit, then matched TaxACT's offering, but lobbied the government to limit the number of taxpayers to whom FFA members could offer free federal filing. *Id.* ¶ 29. In October

---

[1] 2nd Story Software, Inc. ("2SS") is a wholly-owned subsidiary of 2SS Holdings, Inc., which is the entity being purchased by H&R Block. Declaration of Lance Dunn, dated May 27, 2011 ("Dunn Decl."), ¶¶ 2, 4. Both 2SS and 2SS Holdings, Inc. share the same address in Cedar Rapids, Iowa.

2005, the IRS did limit the type and number of customers that could be offered a free product through the FFA. *Id.*

The complaint goes on to allege other areas in which TaxACT has aggressively competed with H&R Block and Intuit by providing high-quality products and services at low cost. *See id.* ¶¶ 30-40. The DOJ alleges that the acquisition of TaxACT by H&R Block would reduce competition in the industry and make anticompetitive coordination between the two major remaining market participants – H&R Block and Intuit – substantially more likely. *Id.* ¶¶ 40-49. The DOJ alleges that therefore the proposed acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and accordingly it seeks an injunction blocking H&R Block from acquiring TaxACT. *Id.* ¶¶ 53-55.

On May 27, 2011, four days after the DOJ filed its complaint, Defendants H&R Block, TaxACT, and TA moved for an expedited hearing and a transfer of venue from this Court to the United States District Court for the Western District of Missouri, the home district of H&R Block's headquarters in Kansas City, Missouri. *See* Defs.' Mot. for Expedited Hr'g, ECF No. 6; Mem. of Points and Authorities in Support of Defs.' Mot. to Transfer Venue ("Defs.' Mem."). The plaintiff opposes the transfer.

On May 31, 2011, the Court granted the defendants' motion for an expedited hearing on their motion to transfer venue. Minute Order dated May 31, 2011. On June 3, 2011, the Court heard oral argument on the defendants' motion, which is now before the Court.

## II. DISCUSSION

### A. Legal Standard

Under the federal venue transfer statute, 28 U.S.C. § 1404, a district court may transfer a case to another district "[f]or the convenience of parties and witnesses, in the interest of justice."

28 U.S.C. § 1404(a). The Court may only transfer a case to another district "where it might have been brought." *Id*. This statute "vests discretion in the District Court to adjudicate motions for transfer on an 'individualized, case-by-case consideration of convenience and fairness.'" *Otter v. Salazar*, 718 F. Supp. 2d 62, 63-64 (D.D.C. 2010) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). Courts evaluate a series of public and private interest factors in determining whether to grant a transfer of venue. *Bederson v. United States*, 756 F. Supp. 2d 38, 46 (D.D.C. 2010). "The private interest factors that are considered include: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to the sources of proof." *Id.* "The public interest factors . . . include: (1) the local interest in making local decisions regarding local controversies; (2) the relative congestion of the transferee and transferor courts; and (3) the potential transferee court's familiarity with the governing law." *Id.* "[C]ourts have imposed a heavy burden on those who seek transfer and a court will not order transfer unless the balance is strongly in favor of the defendant." *United States v. Microsemi Corp.*, No. 1:08cv1311, 2009 WL 577491, at *6 (E.D. Va. Mar. 4, 2009).

### B. Application of the Transfer Criteria

As a threshold issue, transfer of venue pursuant to Section 1404(a) is only permissible if the receiving district is one where the case could have been brought in the first instance. The Clayton Act's venue provision provides, in relevant part, that "[a]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought . . . in any district wherein it may be found or transacts business." 15 U.S.C. § 22. All the parties agree, as does the Court, that the plaintiff could have brought this case in either the Western District of Missouri or in this District because the defendants, who sell tax preparation products nationally, transact business in both

districts. Since the suit could have been brought in either district, the Court will now turn to an analysis of the relevant public and private interest factors.

### 1. Private Interest Factors

As noted above, the private interest factors that courts typically consider are: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to the sources of proof. In this case, these factors do not support transfer, particularly because of the substantial deference to which the plaintiff's choice of forum is entitled.

#### a. The Parties' Choice of Forum

"[A] plaintiff's choice of forum is ordinarily a 'paramount consideration' that is entitled to 'great deference' in the transfer inquiry." *F.T.C. v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 26 (D.D.C. 2008) (quoting *Thayer/Patricof Educ. Funding LLC v. Pryor Res.*, 196 F. Supp. 2d 21, 31 (D.D.C. 2002)). Some courts have also found "that the government's choice of venue in an antitrust case is 'entitled to heightened respect.'" *Id.* (quoting *United States v. Brown Univ.*, 772 F. Supp. 241, 242 (E.D. Pa.1991)). Deference to the plaintiff's chosen forum is minimized, however, where that forum has no meaningful connection to the controversy. *See id.* at 26-27; *Schmidt v. Am. Inst. of Physics*, 322 F. Supp. 2d 28, 33 (D.D.C. 2004) ("[D]eference is mitigated . . . where the plaintiff's choice of forum has no meaningful ties to the controversy and no particular interest in the parties or subject matter.") (internal quotation marks omitted).

The defendants argue that the plaintiff's choice of venue here is not entitled to the usual high level of deference because "this matter has no meaningful ties to Washington, D.C." Defs.' Mem. at 9. According to the defendants, the only connection between this forum and this case is that "the DOJ and its attorneys reside in Washington, D.C." *Id.* The defendants contend that the

Western District of Missouri is a more appropriate venue because the "acquisition agreement that is being challenged in this action was negotiated, drafted, and executed in Missouri and Iowa," at the headquarters of H&R Block and TaxACT, respectively. Defs.' Mem. at 11.

The plaintiff responds that this matter does have some meaningful connection to this district, not only because this district contains the DOJ's headquarters and is where the investigation into the proposed transaction took place, but also because certain facts underlying the complaint took place here. *See* Pl.'s Mem. at 10. Specifically, the DOJ points to its allegations that the first major instance of TaxACT's maverick market activity that prompted a competitive reaction from H&R Block occurred through the Free File Alliance, the public-private partnership between the IRS, which is headquartered in Washington, D.C., and participating tax preparers. *Id.* at 11. The DOJ has alleged that TaxACT disrupted the FFA by making its free filing product offering available to everyone, and that, in response, other members of the FFA, including H&R Block and Intuit, lobbied the government to restrict the availability of free federal e-filing. *Id.* (citing Compl. ¶ 28). Ultimately, in October 2005, the IRS did restrict the availability of free product offerings through the FFA.[2] *Id.* (citing Compl. ¶ 29).

The DOJ alleges that the elimination of TaxACT's alleged maverick activities is a key motivation for H&R Block's proposed acquisition of the company and that the interactions among the FFA, IRS, and the defendants relating to TaxACT's activities within the FFA are likely to implicate disputed issues of fact in this case. *Id.* at 4, 11, 17. The DOJ has represented to the Court that current or former IRS employees based in or near this district would likely be called to testify about these issues. *Id.* at 17. The DOJ underscored this point at oral argument

---

[2] While the IRS is headquartered in Washington, D.C., the FFA itself is headquartered in Clifton, Virginia, which is in a neighboring district. *See* Pl.'s Mem. at 11 n.6.

by presenting the Court with a regulatory submission from the defendants in which they asserted that "If anyone has been a maverick in on-line tax preparation, it is the IRS . . . through the introduction of free, online tax preparation by the FFA—not TaxACT."

Given these factual allegations, the Court finds that it cannot conclude that this matter has "no meaningful ties" to this district. In *F.T.C. v. Cephalon*, a case relied upon heavily by the defendants, another court in this district granted a motion to transfer venue after finding that the case had no meaningful ties to this district. *Cephalon,* 551 F. Supp. 2d at 26-27. In *Cephalon*, however, the FTC did not "seriously contest that the District of Columbia ha[d] no meaningful connection to [the] action." *Id.* at 27. That is not so here, where the DOJ has identified at least some relevant factual issues that do relate to this district. *See U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, No. 04-280, 2011 WL 1048183, at *3 (D.D.C. Mar. 24, 2011) ("The [defendants] carry a weighty burden to demonstrate that the plaintiffs' forum choice should be disturbed . . . Since there is at least some meaningful relationship between the plaintiffs' claims and the parties and this district, the [defendants] have not carried that burden.").[3]

Since the defendants have not established that this case has no meaningful ties to this district, the Court must follow the ordinary rule and accord the plaintiff's choice of forum substantial deference in the transfer inquiry.

### b. Where the Claim Arose

This case involves allegations that a proposed business transaction would result in anticompetitive effects in violation of the antitrust laws. Since the defendants sell online tax

---

[3] In addition to the factual allegations linking this case to this district, the DOJ also notes that this district, as the location of DOJ's headquarters, is DOJ's home district. *See* Pl.'s Mem. at 9. In *United States v. Microsemi*, a case relied upon by the defendants, a district court in the Eastern District of Virginia granted a motion to transfer venue in an antitrust case in part because DOJ had failed to file in its home district. *See Microsemi*, 2009 WL 577491, at *7 ("DOJ is not located in Virginia, but has its headquarters in Washington, DC. . ."). Unlike in *Microsemi*, in this case, the DOJ has filed in its home district.

preparation software to taxpayers nationwide, any anticompetitive effects of the proposed transaction would be felt by consumers across the country and not in any district in particular. In some antitrust cases, motions to transfer venue have been granted, in part, because the market affected by alleged anticompetitive activity was located in a specific geographic area. *See F.T.C. v. Lab. Corp. of America*, No. 10 Civ. 2053, at Tr. 38 (D.D.C. Dec. 3, 2010). (hereinafter, "*LabCorp*") (identifying the relevant market that would suffer anticompetitive effects as located in southern California). Given the national market implicated by this case, no similar factor here weighs in favor of transfer to any particular district.

To the extent that the DOJ's claim can be said to arise from the conduct of the defendants in planning and negotiating the proposed acquisition, it appears that those activities emanated from the defendants' corporate headquarters in Kansas City, Missouri and Cedar Rapids, Iowa. The Court does not find that fact sufficient to override the substantial deference to which the plaintiff's choice of venue is entitled, however. In addition, since 28 U.S.C. § 1404 provides that the Court may transfer venue "[f]or the convenience of parties and witnesses, in the interest of justice," the consideration of where the claim arose is best viewed as a proxy for where the witnesses, parties, and evidence are likely to be located in a typical case. These factors are evaluated more directly below.

### c. Convenience of the Parties and Witnesses

Courts recognize that litigating in a particular forum is likely to inconvenience one party or another unless all the parties reside in the chosen district. *Second Chance Body Armor*, 2011 WL 1048183, at *4. For the convenience of the parties factor to weigh in favor of transfer, "litigating in the transferee district must not merely shift inconvenience to [another party], but rather should lead to an overall increase in convenience for the parties." *Id.* In evaluating the

convenience of the parties, courts therefore consider whether "litigating in a particular forum would cause a party to suffer a hardship, such as from significant expense." *Id.* (citing *Kotan v. Pizza Outlet, Inc.*, 400 F. Supp. 2d 44, 50 (D.D.C. 2005)). The defendants have not identified a compelling hardship that would result from litigating in this district rather than the Western District of Missouri.

The defendants express concern that requiring their employees to testify in Washington, D.C. "is likely to lead to a substantial disruption of the companies' business" since the "primary executives responsible for developing and testing the companies' digital tax products would be forced to spend much of their time traveling, absent from their offices, during the time period in which the companies are preparing for the next tax season." Defs.' Mem. at 13. While H&R Block employee-witnesses would be spared travel time were this case transferred to the Western District of Missouri, employee-witnesses for the other two defendants would still be burdened by having to travel to Kansas City, Missouri. As discussed below, the differences in both travel time and expense from Cedar Rapids, Iowa to Kansas City, Missouri or Washington, D.C. are insignificant. In practical terms, no matter where this case is pending, employee-witnesses from all the defendants will be distracted with counsel consultations, and preparation for and participation in proceedings in this case, particularly if this matter continues on a fast-paced schedule.

Moreover, the defendants are sophisticated companies that transact business with consumers throughout the country. Indeed, the nature of the proposed acquisition illustrates the defendants' level of resources and sophistication. Under the Agreement and Plan of Merger, H&R Block would acquire TaxACT for $287.5 million in cash. Compl. ¶ 12. Further, that agreement contains a forum selection clause calling for any disputes over the merger agreement

between the defendants to be litigated in Delaware, which is relatively close to this district. Pl.'s Mem. at 13-14. While the merger agreement's Delaware forum selection clause is not at issue in this case, the fact that the defendants negotiated and agreed to such a clause indicates their ability to avail themselves of legal protections offered by different fora around the country – including fora remote from their home districts.

It would undoubtedly be more convenient for H&R Block to litigate in its home district, but the same is true for the plaintiff, and a transfer that would merely shift the inconvenience among the parties is not warranted.

The convenience of witnesses is the single factor that weighs in favor of transfer here, but, on the facts of this case, the Court finds that it alone does not overcome the deference to which the plaintiff's choice of venue is entitled.

The majority of anticipated witnesses in this case are current employees of H&R Block and TaxACT based in Kansas City, Missouri and Cedar Rapids, Iowa. Defs.' Mem. at 12. Some potential non-party witnesses are former H&R Block employees who also reside in the Kansas City area. *Id.* at 13. Other potential non-party witnesses include employees of the other major companies in the digital DIY tax preparation market, such as Intuit, based in Mountain View, California; FreeTaxUSA, based in Provo, Utah; OnlineTaxPros, based in Russellville, Arkansas; and TaxSlayer, based in Evans, Georgia. *Id.*; Affidavit of Tony Gene Bowen, sworn to May 27, 2011 ("Bowen Aff."), ¶ 10. Finally, some current and former IRS employees who are located in or near this district are also likely witnesses. Pl.'s Mem. at 17.

When considering the convenience of the witnesses, courts typically give greater weight to the convenience of non-party witnesses than to the convenience of party witnesses. *See Microsemi*, 2009 WL 577491, at *8. In this case, non-party witnesses are likely to come from

around the country, including retired H&R Block employees in Kansas City, retired IRS employees in this district, and employees from competitor companies based in California, Utah, Georgia, and Arkansas. While it might be inferred that a witness would prefer to testify in his or her home district, the defendants have not demonstrated that non-party witnesses located neither in this district nor in the Western District of Missouri would be more willing to testify in the Western District of Missouri than here. *See Cephalon*, 551 F. Supp. 2d at 28 ("Cephalon has not demonstrated that any of the third-party witnesses employed by the generic manufacturers-who are located in neither forum-would be unwilling to testify here but willing to do so in the Eastern District of Pennsylvania.")

Party witnesses, who make up the majority of the anticipated witnesses in this case, are likely to include H&R Block employees in Kansas City, TaxACT employees in Cedar Rapids, and current IRS employees from this district. Defs.' Mem. at 12; Pl.'s Mem. at 17; *see also* Bowen Aff. ¶¶ 6-8; Dunn Decl. ¶ 12. As noted above, however, the convenience of party witnesses is accorded less weight in the transfer analysis. *See Microsemi*, 2009 WL 577491, at *8; *see also United States v. Brown Univ.*, 772 F. Supp. 241, 243 (E.D. Pa. 1991) ("This factor does not warrant transfer when witnesses are employees of a party and their presence can be obtained by that party.").

In terms of witness travel time and expense, the Court finds that while the Western District of Missouri is obviously more convenient for the witnesses located there, the evidence does not show that the Western District of Missouri is substantially more convenient than this district for the witnesses from Cedar Rapids, Iowa. The driving time from TaxACT's headquarters in Cedar Rapids to the courthouse in Kansas City is approximately five and a half hours. Declaration of Lawrence E. Buterman, dated June 2, 2011 ("Buterman Decl."), ¶ 16.

11

Based on a discount airfare database search for September 2011 flights, the flying time from Cedar Rapids to Kansas City is approximately three and a half hours, including a layover. *Id.* ¶ 15. The flying time from Cedar Rapids to Washington, D.C., is also approximately three and a half hours, including a layover. *Id.* The defendants suggest, however, that the complete travel time for air travel from Cedar Rapids to Washington may be six or seven hours. Dunn Decl. ¶ 14. Based on the airfare database search, flying to Kansas City from Cedar Rapids was over $200 more costly than flying to Washington, D.C. Buterman Decl. ¶ 15. Considering all the evidence before the Court, the Court does not find traveling from Cedar Rapids to Washington, D.C. to be substantially more inconvenient than traveling to Kansas City.

Overall, the convenience of the witnesses factor favors transfer, since there appear to be several important party and non-party witnesses located in the Western District of Missouri. *See* Bowen Aff. ¶¶ 6-8. This fact alone, however, is not sufficient to oust the plaintiff's chosen venue. Even in the *Cephalon* case where, unlike here, the court found that there were no meaningful ties with the plaintiff's selected district, the convenience of the witnesses factor still did not compel a transfer. *See Cephalon*, 551 F. Supp. 2d at 28-29. To the contrary, the *Cephalon* court observed that "[t]aken alone, this factor would not warrant transferring the case," and concluded merely that when "viewed collectively it modestly aids Cephalon's showing." *Id.* Instead, the *Cephalon* court found the "most compelling point" in favor of transfer in that case to be "the risk of inconsistent judgments that would arise" absent transfer due to the existence of a related case pending in the transferee district. *Id.* at 29. Indeed, the *Cephalon* court found the plaintiff to have been "rather openly shopping for a circuit split" with respect to one of the issues in that case. *Id.* at 30. Similarly, in *LabCorp*, another case relied upon by the defendants in which a court in this district granted a transfer, related litigation in the transferee district was

12

likewise an important factor favoring transfer. *See LabCorp*, No. 10 Civ. 2053, at Tr. 39-40. In this case, there are no comparable compelling factors favoring transfer.

To sum up, the convenience of the witnesses factor does slightly favor transfer, but not overwhelmingly so, because non-party witnesses, whose convenience carries the most weight in the analysis, are likely to be drawn from various districts around the country. In this case, the convenience of the witnesses factor alone is insufficient to warrant transfer, especially since the plaintiff's choice of venue is entitled to deference and since the case lacks other factors that strongly favor a transfer.

### d. Ease of Access to Sources of Proof

In this digital age of easy and instantaneous electronic transfer of data, the Court does not find that the "ease of access to sources of proof" factor should carry too much weight in the transfer analysis, particularly in a case such as this, where both sides are sophisticated litigants and have the necessary resources to manage and exchange documents electronically. *See Nat'l R.R. Passenger Corp. v. R. & R. Visual, Inc.*, No. 05-822, 2007 WL 2071652, at *6 (D.D.C. July 19, 2007) ("[T]echnological advances have significantly reduced the weight of the ease-of-access-to-proof factor."). While many documents underlying the proposed acquisition undoubtedly originated in Kansas City and Cedar Rapids, they can easily be transmitted to this district and, indeed, the plaintiff points out that the defendants electronically produced all of the documents provided to the government during its regulatory investigation of the transaction. *See* Pl.'s Mem. at 18. Further, during discovery, the defendants are likely to seek the plaintiff's documents, which are located in this district. *See id.* at 19. Accordingly, the Court gives little weight to this factor.

## 2. Public Interest Factors

The three public interest factors that courts typically consider on a motion to transfer venue are (1) the local interest in making local decisions regarding local controversies; (2) the potential transferee court's familiarity with the governing law; and (3) the relative congestion of the transferee and transferor courts. In this case, none of these factors clearly favor transfer.

The local interest in making decisions regarding local controversies is a neutral factor here because, as defendants concede, this case has national economic significance and does not present an essentially local matter. *See* Defs.' Mem. at 19; *see also Cephalon*, 551 F. Supp. 2d at 31 (finding that the local interest factor was not applicable to a case of "nationwide significance, the resolution of which will have the same effect if rendered by this Court or the" transferee court).

The potential transferee court's familiarity with governing law is also a neutral factor here because this case presents issues of federal antitrust law with which federal courts in both districts are presumed to have equal familiarity. *See Demery v. Montgomery Cnty., MD*, 602 F. Supp. 2d 206, 211 (D.D.C. 2009).

The Court also finds that the relative congestion of the transferee and transferor courts does not clearly weigh in favor of transfer. According to December 2010 statistics published by the Administrative Office of the United States Courts, the District of Columbia has 267 cases pending per judge, a median time of 8 months from filing to disposition in civil cases, and a median time of 39.7 months from filing to trial. For the Western District of Missouri, the same statistics show 417 cases pending per judge, a median time of 7.9 months from filing to disposition in civil cases, and a median time of 36.2 months from filing to trial.[4] These statistics

---

[4] These statistics are based on the Federal Court Management Statistics for December 2010, *available at* http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics.aspx. *See Signode v. Sigma Technologies*

14

do not indicate any substantial differences in disposition times between the districts and, if anything, show that the judges in the Western District of Missouri carry a significantly larger number of pending cases per judge.

In any event, these statistics provide, at best, only a rough measure of the relative congestion of the dockets in the two districts. They do not, for example, reflect the differences in the caseloads carried by different individual judges in each district. Any disparities between the lengths of time from filing to trial may also reflect differences other than congestion, such as differences in the types of cases that are likely to be tried in each district and the level of discovery and pre-trial motion practice required in those cases. Significantly, these statistics may also rapidly become outdated, particularly in this district where four new judges joined the Court during the first six months of 2011. Accordingly, the Court finds it appropriate to treat the relative congestion of the dockets in the two districts as a neutral factor in the transfer analysis.

### III. CONCLUSION

The defendants have not met their burden to show that a transfer of this case to the Western District of Missouri is warranted in the interests of justice. Apart from the convenience of the witnesses factor, which tips slightly in the defendants' favor, none of the other factors typically considered by courts clearly favors transfer. Moreover, the precedents upon which the defendants chiefly rely all involve circumstances favoring transfer that are absent here. For example, *Cephalon* and *LabCorp* involved pending litigation in the transferee district that created a risk of inconsistent judgments, while in *Microsemi*, the government plaintiff filed

---

*Int'l, LLC*, No. 09 C 7860 (N.D. Ill. Mar. 24, 2010) (taking judicial notice of the Administrative Office of the United States Courts' statistics). The defendants rely upon outdated March 31, 2010 statistics showing that, compared with the District of Columbia, the Western District of Missouri has a slightly shorter length of time from filing to disposition of civil cases (7.1 months versus 8.4 months) and shorter length of time from filing to trial (17.0 versus 41.2 months). Defs.' Mem. at 17 (citing Federal Court Management Statistics 2010, available at http://www.uscourts.gov/Viewer.aspx?doc= /uscourts/Statistics/ FederalJudicialCaseloadStatistics/2010/tables/C05Mar10.pdf).

neither in its home district nor in the district preferred by the defendants. Given the deference to which the plaintiff's choice of venue is ordinarily entitled, and which the Court has found applies here, transfer would be inappropriate in this case. The defendants have not met their "heavy burden" to demonstrate that the balance of transfer factors is strongly in their favor. *Microsemi*, 2009 WL 577491, at *6.

For the reasons stated above, in exercise of its discretion under 28 U.S.C. § 1404, the Court denies the defendants' motion to transfer venue to the United States District Court for the Western District of Missouri.


DATED: June 6, 2011                             /s/ *Beryl A. Howell*
                                                            BERYL A. HOWELL
                                                            United States District Judge