**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

    *Plaintiff,*

  v.

H&R BLOCK, INC.;
2SS HOLDINGS, INC.; and
TA IX L.P.,

    *Defendants.*

Civil Action No. 11-00948 (BAH)
Judge Beryl A. Howell

<u>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**</u>

# REDACTED VERSION
# FOR PUBLIC FILING*

*The United States files this non-confidential redacted version of its Memorandum pursuant to the Protective Order entered on June 15, 2011. The Protective Order requires all information designated "Confidential" or "Highly Confidential" to be redacted from the public version of the pleading filed with the court. Although Defendants designated all information and documents cited in this Memorandum as "Highly Confidential," most of the information does not appear to be commercial information, the disclosure of which would cause injury to Defendants' businesses.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ...............................................................................................................1

STATEMENT OF FACTS ..................................................................................................4

     I.     TaxACT's History as a Maverick .....................................................................5

          A.     TaxACT is the First to Offer Free Federal Tax Return Preparation
                 and E-Filing for All Taxpayers Through the Free File Alliance ................5

          B.     TaxACT is the First to Offer Free Federal Tax Return Preparation
                 and E-Filing for All Taxpayers Through its Website ..................................7

          C.     TaxACT Continues to Offer Robust Digital DIY Tax
                 Preparation Products at Lower Prices .........................................................9

          D.     TaxACT Competes Through Robust Offerings and Lower Prices............10

     II.     HRB and TaxACT Compete With One Another ...................................................10

          A.     Defendants' Internal Documents Reflect Aggressive
                 Competition Between HRB and TaxACT ..................................................11

          B.     Other Industry Participants and the Public Recognize the
                 Competition Between HRB and TaxACT ..................................................14

     III.     HRB's Acquisition of TaxACT ...........................................................................15

ARGUMENT .......................................................................................................................16

     I.     The Relevant Product Market is Digital DIY Tax Preparation.............................19

          A.     Digital DIY Products are Not Reasonably Interchangeable with
                 Unassisted Tax Preparation and Professional Tax Preparation ................20

          B.     All Digital DIY Products Compete in the Same Product Market.............23

          C.     Defendants' Claimed Distinction Between "Value" and
                   "Premium" Markets is Without Merit........................................................25

     II.     The Relevant Geographic Market is Worldwide ..................................................29

     III.     The Transaction is Likely to Result in Raised Prices and Lower Quality ............30

          A.     The Challenged Acquisition is Presumptively Unlawful Because

it Will Substantially Increase Concentration ...............................................31

B.      Removing TaxACT From the Market Would End Aggressive Head-to-
        Head Competition With HRB that Has Benefitted Consumers................33

C.      The Acquisition of TaxACT Will Eliminate a Maverick .........................34

D.      The Acquisition Will Increase the Likelihood of Actual or
        Tacit Collusion Between HRB and Intuit .................................................36

IV.     Defendants Cannot Rebut the United States' Case Through Claims of
        Easy Entry or Efficiencies Arising from the Transaction .....................................38

A.      Obstacles in the Digital DIY Market Prevent Companies from
        Sufficiently Entering or Expanding to Prevent Anticompetitive Harm.....38

B.      Defendants' Claimed Efficiencies Do Not Immunize This
        Anticompetitive Transaction.....................................................................42

V.      The Balance of Harms and the Public Interest Favor a Preliminary Injunction ....44

CONCLUSION.................................................................................................................45

# TABLE OF AUTHORITIES

## CASES:

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........................................................ *passim*

*Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008)............................................18

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) .....................................17, 18, 38

*FTC v. Coca-Cola Co.*, 641 F. Supp. 1128 (D.D.C. 1986)............................................................20

*FTC v. Dean Foods Co.*, 384 U.S. 597 (1966) ..............................................................................16

*\*FTC v. H.J. Heinz Co.*, 246 F.3d 703 (D.C. Cir. 2001) .................................................... *passim*

*FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34 (D.D.C. 2002)................................................................34

*\*FTC v. PPG Indus., Inc.*, 798 F.2d 1500 (D.C. Cir. 1986) ............................................... *passim*

*\*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ............................................17, 18, 19, 34

*FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000)...........................................18, 30, 32

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991)..............................................31, 36, 43

*FTC v. Weyerhaeuser Co.*, 665 F.2d 1072 (D.C. Cir. 1981) .......................................17, 31, 44, 45

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ....................................16, 18, 19

*FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) ........................................... *passim*

*Gordon v. Holder*, 632 F.3d 722 (D.C. Cir. 2011) .......................................................................16

*HDC Medical, Inc. v. Minntech Corp.*, 474 F.3d 543 (8th Cir. 2007)...........................................26

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986) .........................................................36

*Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008). ........................................................................................................................................20

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484 (9th Cir. 1991)................20

*Rebel Oil v. Atl. Richfield*, 51 F.3d 1421 (9th Cir. 1995) .............................................................39

*Rothery Storage & Van Co. v. Atlas Van Lines*, 792 F.2d 210 (D.C. Cir. 1986)..........................20

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)......................................................30

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964)................................................................26

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) .......................................19

*United States v. Ingersoll-Rand Co.*, 218 F. Supp. 530 (E.D. Pa. 1969) .....................................17

*United States v. Marine Bancorp.*, 418 U.S. 602 (1974)............................................................18

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ..................................................18, 30, 32

*\*United States v. Rockford Mem'l Corp.*, 898 F.2d 1278 (7th Cir. 1990)....................................36

*United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980) .......................................................17

**STATUTES:**

15 U.S.C. § 18...............................................................................................................2, 16, 18

15 U.S.C. § 25....................................................................................................................16

**OTHER AUTHORITIES:**

U.S. Dep't of Justice and Fed. Trade Comm'n, Horizontal Merger Guidelines (2010)........ *passim*

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ..............................................................30

Plaintiff United States of America ("Plaintiff" or "United States") respectfully submits this memorandum of points and authorities in support of its motion for a preliminary injunction, enjoining H&R Block, Inc. ("HRB") from closing its acquisition of 2SS Holdings, Inc. ("TaxACT"), which is partially owned by TA IX L.P. ("TA") (HRB, TaxACT and TA are collectively referred to herein as "Defendants"), until this Court's final disposition of the case.[1]

## INTRODUCTION

The United States brings this action to block an acquisition that will substantially lessen competition in the tax preparation industry. Currently, the three largest providers of digital do-it-yourself tax preparation products ("Digital DIY") dominate this market. The proposed acquisition would combine HRB and TaxACT, the second- and third-largest providers, and result in a duopoly with two companies controlling 90% of the Digital DIY market. Under the Government's merger guidelines and relevant case law, this extraordinary market concentration is presumptively anticompetitive, and Defendants bear a heavy burden to rebut this presumption.

They cannot meet this burden. To the contrary, Defendants' own documents and testimony prove that the transaction will hurt competition. Before this transaction was announced, Defendants' most senior executives readily admitted that:

- HRB and TaxACT fiercely compete head-to-head in the same market;

- TaxACT is a "maverick" competitor, competing aggressively with low prices and product innovation; and

- TaxACT has forced competitive responses leading to lower prices for millions of consumers.

Indeed, no other evidence beyond Defendants' admissions is necessary to prove that this transaction will substantially lessen competition in violation of Section 7 of the Clayton Act, 15

---

[1] In the exhibits submitted with the United States' Motion, the relevant portions of certain documents have been highlighted for the Court's convenience.

U.S.C. § 18, and must therefore be enjoined. For example, TaxACT's impact on the market is established by admissions of its own founder and CEO that TaxACT has been a "tax industry maverick" and a "catalyst for change in the tax preparation industry . . . . [that] has consistently forced the tax preparation industry to become more competitive, and in doing so [has] forced [its] competitors to change as well."[2]  And Defendants' pre-transaction internal documents refer to each other as direct competitors and track each other's product features and prices.  HRB even has an internal identification code, ▮Redacted▮ for campaigns specifically aimed at getting TaxACT digital customers to switch to HRB.[3]  For its part, TaxACT has publicly acknowledged that it competes with HRB, and touted to potential buyers that its ▮Redacted▮ ▮▮▮▮▮▮▮▮▮▮▮▮[4]  Before the transaction was disclosed publicly, HRB recognized that a merger of the second- and third-largest competitors would create antitrust concerns,[5] and when the deal was announced, HRB's Vice President of Marketing boasted in an email that ▮Redacted▮[6].

Since then, Defendants have engaged in a transparent attempt to rewrite history — disclaiming their own documents, criticizing their own executives and modifying public disclosures to pretend that the market realities and competitive dynamics (including direct competition between HRB and TaxACT) they previously admitted no longer exist.  HRB's senior executives have tried to "walk[] a little tightrope on this with [antitrust approval],"[7]  and have jettisoned their long-used market descriptions in favor of "the word[s] of choice to get

---

[2] Ex. 3 (2SS-GRECe-0028581, at -83); Ex. 4 (2SS-MARKe-0083230, at 18).

[3] Ex. 5 (HRB-DOJ-50184793); Ex. 6 (HRB-DOJ-00770275); ▮Redacted▮
▮▮▮▮▮▮▮▮▮

[4] Ex. 7 (2SS-CORPe-0025298, at -313).

[5] Ex. 8 (HRB-DOJ-00347049, at -52).

[6] Ex. 9 (HRB-DOJ-50452596).

[7] Ex. 10 (HRB-DOJ-00915524).

passed [sic] HSR approvals."[8]  Recognizing the same concern, HRB's attorneys rewrote the "Competitive Conditions" section of the company's annual Form 10-K filing in order to remove prior language that suggested a single digital market in which HRB and TaxACT competed.[9] And now, HRB even appears to be contradicting a decade's worth of clear public statements (as well as recent sworn testimony from its former CEO and current head of Digital), by indicating that it believes its digital products compete with its franchisees' brick and mortar stores.[10]

But the record of Defendants' pre-transaction admissions cannot be erased.  It is this record that demonstrates that this transaction would allow HRB to eliminate a vigorous competitor, and "regain control of industry pricing and avoid further price erosion," as suggested to HRB executives as early as 2009.[11]  The acquisition is intended to give Intuit and HRB control of the digital market and to prevent another competitor from taking market share through a "race to the bottom."[12]

Thus, Defendants' admissions establish the relevant market, the state of competition and the likely effect of the transaction; these admissions are sufficient without more to require that the transaction be blocked.  Of course, as with other merger cases, the United States is also submitting an economist's extensive expert report, applying standard economic analysis showing that the transaction will have anticompetitive effects.  But in this case, at least, the expert is not central to the Government's case; his report only confirms what the Defendants' admissions make clear:  This transaction will substantially lessen competition.

---

[8] Ex. 11 (HRB-DOJ-50258582).

[9] *Compare* Ex. 12 (H&R Block 10-K for Fiscal Year Ending April 30, 2011, at 4), *with* Ex. 13 (H&R Block 10-K for Fiscal Year Ending April 30, 2010, at 4).

[10] *See* Ex. 14 (Defendants' Response to Plaintiff's First Set of Requests for Admissions to All Defendants at 6-7); Ex. 15 (Defendants' Response to Plaintiff's First Set of Interrogatories to All Defendants at 1-6).

[11] Ex. 16 (HRB-DOJ-00319468, at 20); Ex. 17 (HRB-DOJ-00249335, at 3).

[12] Ex. 18 (HRB-DOJ-00355217).

## STATEMENT OF FACTS

There are three ways for individuals to prepare their federal and state income tax returns: (1) unassisted; (2) Digital DIY products; or (3) assistance from a tax professional.  In recent years, Digital DIY products have become an increasingly popular method of tax preparation — used last year by an estimated 35 to 40 million U.S. taxpayers.[13]

Digital DIY products are offered through three channels:  (1) online through an internet browser; (2) software for a personal computer downloaded from an Internet website; and (3) software for a personal computer on a disc, which is either sent directly to the consumer or purchased by the consumer from a third-party retailer.

Intuit (the maker of "TurboTax"), HRB and TaxACT, known in the trade as the "Big 3,"[14] collectively control approximately 90% of the Digital DIY market — Intuit with 62.2%, HRB with 15.6%, and TaxACT with 12.8%.[15]  The Big 3 provide their products through all three methods of digital distribution, while most of the fringe competitors do not.  TaxHawk and TaxSlayer, the next two largest competitors, each serve only about ▮ of the Digital DIY market, and no other competitor serves more than ▮ of the market.[16]

One unique aspect of the Digital DIY market is that virtually all of the competitors provide some product to consumers for free.  For example, a company may offer a basic federal tax return product for free, with the expectation that a consumer will pay for additional products, such as a state tax return or the ability to transport information from one year's return to the next year's return. The scope of a company's free product offerings is a significant competitive factor.

---

[13] Ex. 19 (HRB-DOJ-50842379, at 3).

[14] *See, e.g.*, Ex. 20 (HRB-DOJ-01003395, at 5); Ex. 21 (Newkirk Dep. 65:7-15); Ex. 22 (HRB-DOJ-00336019, at -22); Ex. 23 (HRB-DOJ-00347837); Ex. 24 (JTH-DOJ-000001 (Liberty Decl.) ¶ 7); Ex. 25 (THK-DOJ-000001 (TaxHawk Decl.) ¶ 10); Ex. 26 (WK-DOJ-000001 (CCH Decl.) ¶ 4).

[15] Ex. 27 (HRB-DOJ-00012327).

[16] *Id.*

## I.      TaxACT's History as a Maverick

Electronic filing of tax returns goes back as far as 1986.  However, it was not until the

passage of the Internal Revenue Service Restructuring and Reform Act of 1998 ("RRA98") —

which set a target that 80% of all tax U.S. returns eventually be e-filed — that Digital DIY

products began to be used widely by consumers.  At the time RRA98 was passed, Intuit and

HRB dominated the Digital DIY market and charged significant fees for their products.[17]  But

beginning in 1998, TaxACT entered and, over the course of several years, gained market share

by disrupting the status quo through unique product offerings at comparatively lower prices.

According to TaxACT's founder and CEO, Lance Dunn, TaxACT was created to [Redacted]

███████████████████████████████████████████████████████

███████████████████[18]

By 2004, through its aggressive strategy of offering consumers [Redacted] ████████████

█████████████████████████████████ TaxACT began to seriously

disrupt the two dominant market players, HRB and Intuit.[19]  This is a fact TaxACT fully

acknowledges:  it lauds itself to the public as [Redacted] ████████████████████████

█████████████████[20]

### A.      TaxACT is the First to Offer Free Federal Tax Return Preparation and E-Filing for All Taxpayers Through the Free File Alliance

One of the first instances of TaxACT's maverick behavior was in connection with the

Free File Alliance ("FFA"), a public-private partnership between the IRS and participating tax

---

[17] Ex. 28 (Dunn Dep. 86:18-21).

[18] Ex. 28 (Dunn Dep. 145:21-22; Dunn Dep. Ex. 10, at 2).

[19] Ex. 7 (2SS-CORPe-0025298, at -301).

[20] Ex. 3 (2SS-GRECe-0028581, at -83).

preparers to allow taxpayers to prepare and e-file their federal tax returns for free.[21]   The FFA

was formed in late 2002, and its members, including HRB, TaxACT and Intuit, agreed to offer

free federal tax preparation and e-filing to certain taxpayers, and the IRS agreed to link to these

offers from its website.[22]

Initially, FFA participants could offer free filing to any taxpayers.  In practice, however,

preparers generally limited free filing to taxpayers below certain income thresholds. [23]  As a

result, free filing was available to only a subset of all taxpayers.

From the outset, however, TaxACT disrupted the strategies of those other companies in

the FFA.  In the FFA's first year (2003), TaxACT set itself apart by offering its free product to

taxpayers with an income level at or <u>above</u> $100,000.[24]  The following year (2004), once

companies began matching this offer, TaxACT further ████████Redacted████████"[25] by

becoming the first FFA participant to offer all taxpayers the opportunity to prepare and e-file

their federal tax returns for free, regardless of their income.[26]  Referred to within HRB as a ██Redacted██

████████████"[27] TaxACT's maverick offer caused it to take market share at the expense

of its competitors, HRB and Intuit.[28]

TaxACT's strategy of providing free federal tax preparation and e-filing to all taxpayers

generally raised concerns in the industry that it would put pressure on profits.  Nonetheless,

---

[21] Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 8); Ex. 25 (THK-DOJ-000001 (TaxHawk Decl.) ¶ 16); Ex. 30 (FFA000097).

[22] *See* Ex. 30 (FFA000097, at -98).

[23] Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 8); Ex. 25 (THK-DOJ-000001 (TaxHawk Decl.) ¶ 16).

[24] Ex. 31 (IRS-DOJ-001006); Ex. 32 (IRS-DOJ-001013, at -15).

[25] Ex. 33 (HRB-DOJ-00503167, at -68).

[26] Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 8); Ex. 25 (THK-DOJ-000001 (TaxHawk Decl.) ¶ 16).

[27] Ex. 34 (HRB-DOJ-50687973); Ex. 35 (HRB-DOJ-00912870, at -71).

[28] Ex. 36 (HRB-DOJ-50682747); Ex. 29 (DOJ-INT-000001 (Intuit Decl.) at -33).

many of TaxACT's competitors, including HRB and Intuit, matched TaxACT,[29] and competition began to intensify around the quality of free offerings.  Again, TaxACT led the way by providing a more robust and high-quality free product.[30]

Internally, HRB feared that TaxACT's offer was not only impacting the FFA, but also "creat[ing] a huge disruption in the paid side of the business."[31]  Publicly, HRB complained that the industry movement to ████████████████████████████████████████."[32]  Seeking to limit this competitive threat, HRB and Intuit successfully lobbied for strict limitations on the number and kind of taxpayers eligible for free FFA filing.[33]  These limitations became effective in October 2005.[34]

**B.     TaxACT is the First to Offer Free Federal Tax Return Preparation and E-Filing for All Taxpayers Through its Website**

No longer able to make its free-for-all offer through the FFA website, TaxACT decided to pursue an even more aggressive strategy through, as Intuit referred to it, a ████████████ ████████████[35]  In December 2005, TaxACT became the first company to offer all taxpayers, regardless of income, the ability to prepare and e-file a federal tax return for free directly through its own website, bypassing the FFA website.[36]  According to TaxACT, this ████████████

---

[29] Ex. 37 (H&R Block Amended 10-K for Fiscal Year Ending April 30, 2005, at 4); Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 8).

[30] Ex. 38 (2SS-CORPe-0002404, at -07).

[31] Ex. 39 (HRB-DOJ-50704549, at -50).

[32] *See* Ex. 40 (Kirkham, Chris, *Online Tax Filing No Longer Free For All*, WashingtonPost.com, dated Jan. 26, 2006, available at http://www.washingtonpost.com/wp-dyn/content/article/2006/01/25/AR2006012501786.html (last visited July 30, 2011)).

[33] Ex. 25 (THK-DOJ-000001 (TaxHawk Decl.) ¶ 16); *see also* Ex. 41 (HRB-DOJ-50695185, at -86).

[34] Ex. 42 (FFA000091); Ex. 25 (THK-DOJ-000001 (TaxHawk Decl.) ¶ 16); Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 9).

[35] Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 11).

[36] Ex. 43 (Press Release, *TaxACT Users Can Now Prepare, Print and E-File Returns Without Charge*, dated Dec. 12, 2005, available at http://www.taxact.com/press/press-release-12-12-2005.asp (last visited July 30, 2011)).

Redacted [37].

TaxACT's competitors quickly followed.  In particular, HRB recognized that TaxACT's growth was the primary driver for "[t]he growth in Free Federal Offers Online" from other companies, resulting in "price compression" for tax preparation products.[38]  A few months after TaxACT introduced free-for-all on its website, HRB executives convened specifically Redacted [39]  This was only the beginning of active deliberations within HRB on how best to respond to the TaxACT threat.[40]

While HRB was considering the appropriate response, "TaxACT's success in gaining market share propelled Intuit to offer" its own free product.[41]  Finally, HRB, Redacted ,"[42] and in order "to stem online share loss to Intuit and TaxACT,"[43] introduced its own free online product outside of the FFA.  The year HRB introduced its free product, its average sale price per customer across all of its Digital DIY products declined by approximately Redacted .[44]

The launch of a free federal product even had a significant impact on prices and demand for HRB's downloadable and retail software.  According to HRB, the emergence of online free federal Digital DIY products Redacted

_____

[37] See id.; Ex. 28 (Dunn Dep. 135:21-136:4; 168:15-22); Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 12).

[38] Ex. 20 (HRB-DOJ-01003395, at 11-12).

[39] Ex. 44 (HRB-DOJ-50200815).

[40] See, e.g., Ex. 45 (HRB-DOJ-50098528); Ex. 46 (HRB-DOJ-50230434); Ex. 47 (HRB000833, at -46).

[41] Ex. 48 (HRB-DOJ-00182356, at -61); see also Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 13); Ex. 49 (HRB-DOJ-00524530, at 3).

[42] Ex. 50 (HRB-DOJ-00823783).

[43] Ex. 51 (HRB-DOJ-00902949, at -53); see also Ex. 52 (HRB-DOJ-00250069).

[44] Ex. 19 (HRB-DOJ-50842379, at 8).



[45]  But

TaxACT's maverick conduct posed an even larger concern for HRB: ███████████

███████████████████████████████████████████████████████[46]

### C.   TaxACT Continues to Offer Robust Digital DIY Tax Preparation Products at Lower Prices

Over the years, TaxACT has continued to disrupt the market and gain share through its maverick behavior and strategy of offering highly functional products at comparatively low prices.  Most recently, TaxACT offered taxpayers the ability to use all federal e-fileable forms with its free federal product in January 2010.[47]  In presentations, HRB recognized that, "[h]aving disrupted the digital tax prep market with cheaper, lower-end solutions, TaxAct [was] surpassing [HRB's] TaxCut in market share and continuing to improve quality (surpassing TaxCut in some press reviews in 2009)."[48]  This sentiment was shared by key HRB executives who were



[49] [Redacted]

██████████████████████████████████████████████"[50].  In response,

HRB executives recommended ███████████████████████████████████

████████████████████████████[51]  Ultimately though, HRB

would determine that purchasing TaxACT was a better way to "eliminate" TaxACT's

---

[45] Ex. 53 (HRB-DOJ-50022313, at 2).

[46] Ex. 54 (HRB-DOJ-50196491, at 36).

[47] Ex. 55 (Grief Dep. 83:5-84:6); Ex. 56 (Press Release, *TaxACT 2009 Raises the Bar Higher on Free and Affordable Tax Preparation Solutions*, dated Jan. 7, 2010, available at http://www.taxact.com/press/2010/press-release-01-07-2010-affordable.asp (last visited July 30, 2011)).

[48] Ex. 57 (HRB-DOJ-00251349, at 6).  H&R Block's Digital DIY product in 2009 was called TaxCut.  It is now referred to as H&R Block at Home.

[49] Ex. 58 (HRB-DOJ-00348453).

[50] Ex. 59 (HRB-DOJ-50716606).

[51] Ex. 60 (HRB-DOJ-50564563).

"disrupt[ive]" maverick conduct.[52]

### D.   TaxACT Competes Through Robust Offerings and Lower Prices

In 2010, TaxACT continued its maverick behavior by entering the retail segment of the Digital DIY market, offering boxed software at Staples, HRB's ███████ retailer.[53] According to the partnership proposal between TaxACT and its distributor, ████████ ████████████████████████████████████████████████[54]   TaxACT sought to accomplish that goal by offering its customers free electronic filing of state returns, unlike Intuit and HRB who charge an additional fee for filing state returns.[55]

Though only in the first year, it appears that TaxACT's presence in Staples is impacting HRB's bottom line.   HRB noted internally that its "[r]etail volumes at Staples [were] at risk due to introduction of TaxACT Retail software on combined display."[56]   And, Intuit's analysis confirms that ████████████████████████████████████"[57]   If these trends continue, HRB will once again be forced to match TaxACT's offerings, or continue to lose market share.

## II.   HRB and TaxACT Compete With One Another

As the history of TaxACT's maverick conduct and the competitive responses by Intuit and HRB described above make clear, HRB and TaxACT have a long and deep history of competition.   This competition is evident not only from the documents and testimony of Defendants' current and former employees and executives, but also is clear from media reviews, industry analysts, and competitor statements.

---

[52] Ex. 16 (HRB-DOJ-00319468, at 20); Ex. 57 (HRB-DOJ-00251349, at 6).

[53] Ex. 28 (Dunn Dep. 383:18-384:4); Ex. 61 (Houseworth Dep. 252:9-253:7); Ex. 62 (2SS-PETK-0000267, at -323).

[54] Ex. 63 (2SS-ARALe-0016784).

[55] Ex. 64 (2SS-GREC-001358, at -404); Ex. 61 (Houseworth Dep. 270:17-271:8).

[56] Ex. 65 (HRB-DOJ-00337419, at -20).

[57] Ex. 66 (INT-DOJ0000038, at 5).

## A.    Defendants' Internal Documents Reflect Aggressive Competition Between HRB and TaxACT

HRB internally concluded that it was in direct competition for its Digital DIY tax preparation business with TaxACT no later than early 2005.[58]  In January 2006, HRB's ███████ explicitly stated that in the digital business, HRB's "[o]nly real direct competitors are turbotax in san diego and taxact in cedar rapids."[59]  In February of 2006, HRB's ██████ echoed Mr. ████████ statement when he commented that HRB was losing market share and that ████████████████████████."[60]

Within HRB, Intuit, HRB, and TaxACT were known as the "Big 3 Competitors" in the Digital DIY tax preparation market.[61]  HRB monitored the number of references to TaxACT on the internet,[62] tracked TaxACT's share of the Digital DIY market,[63] analyzed and compared TaxACT's customer base with its own[64] and studied why customers were switching from HRB's digital products to TaxACT.[65]  HRB specifically considered TaxACT's customers to be within HRB's ████████████,"[66] and at times lamented that TaxACT was surpassing HRB in the digital marketplace.[67]

---

[58] *See, e.g.*, Ex. 67 (HRB-DOJ-50698926) ███████████████████████████ Ex. 33 (HRB-DOJ-00503167, at -83); Ex. 68 (HRB-DOJ-50697962); Ex. 69 (HRB-DOJ-50758528).

[59] Ex. 70 (HRB-DOJ-00516352).

[60] Ex. 71 (HRB-DOJ-50094259).

[61] *See, e.g.*, Ex. 20 (HRB-DOJ-01003395, at 5); *see also* Ex. 21 (Newkirk Dep. 65:7-15); Ex. 22 (HRB-DOJ-00336019, at -22); Ex. 23 (HRB-DOJ-00347837) ████████████████

[62] Ex. 72 (HRB-DOJ-00431805).

[63] Ex. 49 (HRB-DOJ-00524530, at 3).

[64] Ex. 73 (HRB-DOJ-00999589) ████████████████████████████████████████████████████

[65] Ex. 74 (HRB-DOJ-00553898, at 6).

[66] Ex. 75 (HRB-DOJ-50009015, at -20); *see also* Ex. 76 (HRB-DOJ-50083822, at -30-32) ███████████

[67] Ex. 77 (HRB-DOJ-00971052) ███████████████████

Not only did HRB keep track of TaxACT and its products, it also frequently changed its business strategies, products, and prices in response to TaxACT.  For example, after TaxACT introduced its free federal product on its website, HRB soon began considering how it could respond.  The company began planning to test [Redacted] in February 2006,[68] and specifically modified the appearance of its website for these tests in order to better compete with TaxACT.[69]  The reason for HRB's response to TaxACT's free product was made clear by the then-head of the digital division: [Redacted] [70]

HRB's competitive responses to TaxACT were not limited to its offering of a free product.  For example, HRB brought in an internet marketing vendor to help craft its search term advertising strategy [Redacted] [71]  In 2008, HRB's Vice President of Marketing for its digital division recommended increasing its online advertising [Redacted] [72]  In fact, HRB even advertised on its website to TaxACT customers that [Redacted] "[73]  These are but a few of the hundreds of documented examples of HRB formulating its

---

[Redacted]

[68] Ex. 78 (HRB-DOJ-00187065, at 22).

[69] Ex. 79 (HRB-DOJ-01009830) [Redacted]

[70] Ex. 80 (HRB-DOJ-00516176).

[71] Ex. 81 (HRB-DOJ-50198834).

[72] Ex. 82 (HRB-DOJ-00952577); *see also* Ex. 83 (HRB-DOJ-00510602, at 21); Ex. 84 (HRB-DOJ-00255294, at 30); Ex. 85 (HRB-DOJ-00008519); Ex. 86 (HRB-DOJ-00105026); Ex. 87 (HRB-DOJ-00364310); Ex. 88 (HRB-DOJ-00339950, at 25).

[73] Ex. 89 (2SS-MARKe-0060278).

pricing decisions,[74] improving its products,[75] increasing its marketing,[76] making changes to its websites,[77] and competing aggressively to attract customers from TaxACT.[78]

Indeed, if the Court enjoins the transaction, there is no doubt that HRB will continue to compete aggressively against TaxACT.  Right before signing the deal, HRB's Redacted ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████,,[79]

TaxACT also focused heavily on HRB as a primary competitor.  As far back as 1999, TaxACT publicly claimed that Redacted ████████████████████████████████████████████[80]  Internal TaxACT presentations reflected this sentiment as well, including its "Competitive Analysis: TY 2009," where TaxACT discusses HRB's product offerings.[81]  TaxACT also made pricing decisions,[82] changed its marketing,[83] and competed

---

[74] *See, e.g.*, Ex. 90 (HRB-DOJ-00170956) Redacted ████████████████████████.

[75] *See, e.g.*, Ex. 91 (HRB-DOJ-00282548, at -55); Ex. 92 (HRB-DOJ-00012773, at -74); Ex. 93 (HRB-DOJ-00190106).

[76] *See, e.g.*, Ex. 94 (HRB-DOJ-50496362, at -63).

[77] *See, e.g.*, Ex. 95 (HRB-DOJ-50495449, at 10, 12).

[78] *See, e.g.*, Ex. 96 (HRB-DOJ-50184789); Ex. 89 (2SS-MARKe-0060278); Ex. 97 (HRB-DOJ-00457538, at -39); Ex. 98 (HRB-DOJ-00347829); Ex. 87 (HRB-DOJ-00364310); Ex. 99 (HRB-DOJ-50030902); Ex. 100 (HRB-DOJ-00155381, at -82).

[79] Ex. 101 (HRB-DOJ-00007730, at -31).

[80] Ex. 102 (2SS-GRECe-0038547); *see also* Ex. 103 (2SS-GRECe-0038731) Redacted ████████████████████████████

[81] Ex. 104 (2SS-PETKe-0314664); *see also* Ex. 105 (2SS-GRECe-0024871, at  9); Ex. 106 (2SS-MRKTe-0103983, at 4, 7, 8).

[82] *See, e.g.*, Ex. 107 (2SS-PETKe-0136388); Ex. 108 (2SS-MARKe-0017599, at 1, 9).

[83] *See, e.g.*, Ex. 28 (Dunn Dep. 306:8-307:20); Ex. 109 (2SS-MARKe-0012718) Redacted ████████████████████████████

aggressively to attract customers from HRB.[84]  And, in June of 2010, TaxACT even conducted a

"brand analysis" in which it specifically compared its brand to those of its ██████████[Redacted]

████████████████████████,"[85]

**B.    Other Industry Participants and the Public Recognize the Competition Between HRB and TaxACT**

HRB and TaxACT are not alone in believing they are in competition with one another

and Intuit.  Competitors, such as Intuit, also regularly monitored and responded to TaxACT,[86]

which Intuit characterized as ███████[Redacted]

███████████████████,"[87]  Indeed, Intuit makes it clear in its public filings with the SEC

that it faces "intense competition from H&R Block . . . [and] TaxACT" whose "competing offers

subject [Intuit] to significant price pressure."[88]  Other industry participants, including TaxSlayer,

TaxHawk and CCH, also recognize that HRB and TaxACT compete with one another.[89]  As

Liberty Tax Service[90] in particular notes, ████████[Redacted]

████████████████████████████████,"[91]

Moreover, independent product reviewers also believe that HRB and TaxACT compete

with one another.  For example, reviews of products available during this past tax season noted

that the products sold by Intuit, HRB and TaxACT are "the three leading programs," and

concluded that

---

[84] *See, e.g.*, Ex. 28 (Dunn Dep. 181:9-185:13, Ex. 12).

[85] Ex. 110 (2SS-KINJe-0002225, at -29).

[86] *See, e.g.*, Ex. 111 (INT-DOJ0018867, at 18, 39).

[87] Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 7).

[88] *See* Ex. 112 (Intuit Inc. 10-K for Fiscal Year Ending July 31, 2010, at 12).

[89] Ex. 113 (RHO-DOJ-000121 (TaxSlayer Decl.) ¶¶ 7-8); Ex. 25 (THK-DOJ-000001 (TaxHawk Decl.) ¶¶ 10-11); Ex. 26 (WK-DOJ-000001 (CCH Decl.) ¶ 4).

[90] Liberty, in addition to its brick-and-mortar tax preparation business, offers the eSmartTax digital DIY tax preparation product.  Ex. 24 (JTH-DOJ-000001 (Liberty Decl.) ¶ 3).

[91] Ex. 24 (JTH-DOJ-000001 (Liberty Decl.) ¶ 8).

[f]or people with straightforward finances — a salary and some investment income, a mortgage and common deductions — any of the leading ones should work.  All three — TurboTax, H&R Block at Home and TaxAct — use a question-and-answer format to guide you through your return and then plug your responses into the appropriate places on the I.R.S.'s many forms.[92]

Like the media, industry analysts — who are tasked with providing expertise on an industry and its competitors — view HRB and TaxACT as digital competitors.  [Redacted], for example, in covering HRB's acquisition of TaxACT, stated that the acquisition [Redacted] [Redacted] [Redacted]"[93]  HRB's own competitive monitoring reports, which it commissioned from [Redacted] entitled "Competitive Intelligence Monitoring Service," identify both Intuit and TaxACT as HRB's digital competitors.[94]  [Redacted] provided its own opinion on the impact of consolidating these two players in the Digital DIY tax preparation market:  [Redacted] [Redacted] [Redacted]"[95]

## III.    HRB's Acquisition of TaxACT

After a long history of aggressive competition between HRB and TaxACT that benefited millions of taxpayers, HRB and TaxACT declared a truce on October 13, 2010, with a $287.5

---

[92] Ex. 114 (Gray, Tim, *Tasting Three Flavors of Tax Software*, The New York Times, dated Feb. 13, 2011, BU11, available at http://www.nytimes.com/2011/02/13/business/yourtaxes/13review.html (last visited July 30, 2011)); *see also* Ex. 115 (Rosenberg, Eva, *Five Top Online Tax-Prep Services*, MarketWatch, dated Jan. 28, 2011, available at http://www.marketwatch.com/Story/story/print?guid=370EE742-2A61-11E0-A215-00212804637C (last visited July 30, 2011)); Ex. 116 (Carroll, Sean, *Online Tax Prep Services*, PC Magazine, dated Apr. 14, 2011, available at http://www.pcmag.com/article2/0,2817,2359077,00.asp (last visited July 30, 2011)).

[93] Ex. 117 (HRB-DOJ-00134903).

[94] *See, e.g.*, Ex. 118 (HRB-DOJ-00989633, at -33, -48, -55).

[95] Ex. 119 (HRB000210). [Redacted] Ex. 61 (Housewort Dep. 281:15-282:14).

million payment to TaxACT's shareholders.[96]  If the acquisition is permitted, HRB's 15.6%

market share would be consolidated with TaxACT's 12.8% market share, thus leaving the

combined company with over 28% of the market.[97]  With Intuit's 62.2% market share,[98] the two

companies would collectively control over 90% of the Digital DIY market.  As HRB's Chief

Information Officer remarked, ███████████████████████████████████████

████████████████████████████████[99]  The United States brought this

antitrust suit on May 23, 2011 to permanently enjoin HRB from acquiring TaxACT.  As the facts

above make clear, the proposed acquisition would substantially lessen competition in the Digital

DIY market in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## ARGUMENT

Section 15 of the Clayton Act authorizes courts to grant preliminary relief to prevent

violations of the antitrust laws.  15 U.S.C. § 25.  The purpose of preliminary relief is "to avoid

the need for intrusive relief later, since even with the considerable flexibility of equitable relief,

the difficulty of 'unscrambl[ing] merged assets' often precludes an effective order of

divestiture."  *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1034 (D.C. Cir. 2008) (quoting

*FTC v. Dean Foods Co.*, 384 U.S. 597, 607 n.5 (1966)).  The preferred relief in merger litigation

is a full stop injunction.  *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1506-07 (D.C. Cir. 1986).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest."  *Gordon v.*

---

[96] Ex. 120 (TA 3d-1).

[97] *See* Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part IV); Ex. 27 (HRB-DOJ-00012327).

[98] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part IV); Ex. 27 (HRB-DOJ-00012327).

[99] Ex. 122 (HRB-DOJ-00012401).

*Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).  Where, as here, the United States seeks to enjoin an antitrust violation, "irreparable harm [] should be presumed."[100]  Thus, preliminary relief should be granted where "the Government has shown a reasonable likelihood of success on the merits and whe[re] the balance of equities tips in its favor."  *United States v. Siemens Corp.*, 621 F.2d 499, 505 (2d Cir. 1980).

In assessing the reasonable likelihood of success, the Court's task is not to make a final determination on whether the proposed acquisition violates Section 7, but rather to make only a preliminary assessment of the acquisition's impact on competition.  *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1070-71 (D.D.C. 1997).  To make the sufficient showing, "it is well settled" that the United States need only show "a reasonable probability" that the proposed acquisition would substantially lessen competition.  *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 45 (D.D.C. 1998).

"The principal public equity weighing in favor" of injunctive relief "is the public interest in effective enforcement of the antitrust laws."  *FTC v. H.J. Heinz Co.*, 246 F.3d 703, 726 (D.C. Cir. 2001).  In contrast, private equities are afforded "little weight."  *Id.* at 727 n.25.  Where the United States shows a reasonable likelihood of success, "a countershowing of private equities alone would not suffice to justify denial of a preliminary injunction barring the merger."  *Id.*

Because HRB's proposed acquisition of TaxACT would eliminate a maverick in the Digital DIY market and substantially reduce competition, the United States has a substantial likelihood of succeeding on the merits of its claim.

---

[100] *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980); *see also FTC v. Weyerhaeuser*, 665 F.2d 1072, 1082 & n.22 (D.C. Cir. 1981 (R.B. Ginsburg, J.) (holding Section 13(b) of the Clayton Act, expressly disavowing irreparable harm requirement where case was brought by FTC, was a codification of existing law, including in merger cases brought by the United States); *United States v. Ingersoll-Rand Co.*, 218 F. Supp. 530, 545 (E.D. Pa. 1969) ("The Congressional pronouncement in section 7 [of the Clayton Act] embodies the irreparable injury of violations of its provisions.").

Under Section 7 of the Clayton Act, a merger is illegal "where in any line of commerce in any section of the country, the effect of such acquisition *may* be substantially to lessen competition or tend to create a monopoly." 15 U.S.C. § 18 (emphasis added). Under the law, the Court is charged with assessing the future effects of an acquisition and, accordingly, its assessment necessarily concerns "probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962). Thus, the United States need only show "that the merger create[s] an appreciable danger of [anticompetitive] consequences in the future." *Heinz*, 246 F.3d at 719.[101]

Merger analysis typically involves the determination of (1) the relevant markets and (2) the transaction's probable effect on competition in those markets. *See, e.g.*, *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 156 (D.D.C. 2000). Undue concentration and a significant market share in the relevant markets establish a presumption that the transaction is unlawful. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 365-66 (1963); *Swedish Match*, 131 F. Supp. 2d at 166-67. Once the presumption is established, the burden of rebutting Plaintiff's *prima facie* case shifts to Defendants. *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 613 (1974); *Whole Foods*, 548 F.3d at 1035; *Swedish Match*, 131 F. Supp. 2d at 167. To satisfy their burden, Defendants must show that the evidence of concentration "give[s] an inaccurate prediction of the proposed acquisition's probable effect on competition." *Id.* (quoting *Staples*, 970 F. Supp. at 1083). If Defendants offer sufficient evidence to rebut the presumption, the United States must prove that the acquisition is likely to substantially reduce competition. *Heinz*, 246 F.3d at 715.

---

[101] *See also Staples*, 970 F. Supp. at 1072 ("[T]he government need only show that there is a 'reasonable probability' that the challenged transaction will substantially impair competition."); U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010) § 1.0 ("Most merger analysis is necessarily predictive, requiring an assessment of what will likely happen if a merger proceeds as compared to what will likely happen if it does not."). While not binding on this Court, *PPG Indus.*, 798 F.2d at 1503 n.4, the Merger Guidelines have been considered by courts to be persuasive authority. *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 434 n.13 (5th Cir. 2008); *Cardinal Health, Inc.*, 12 F. Supp. 2d at 53.

I.       **The Relevant Product Market is Digital DIY Tax Preparation**

A relevant product market in an antitrust case includes those "commodities reasonably interchangeable by consumers for the same purposes."  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  More specifically, the pivotal question in product market definition is whether a price increase in the proposed market would "drive [enough] consumers to an alternate product" to render such a price increase unprofitable.  *Whole Foods Mkt.*, 548 F.3d at 1038.  To answer that question, courts frequently apply the hypothetical monopolist test from the U.S. Dep't of Justice and Fed. Trade Comm'n, Horizontal Merger Guidelines (2010), *available at* http://www.justice.gov/atr/public/guidelines/hmg-2010.pdf ("Merger Guidelines"), and ask whether a profit-maximizing monopolist likely would impose a "small but significant and nontransitory" price increase on at least one product sold by the merging firms.  *See, e.g.*, *Whole Foods Mkt.*, 548 F.3d at 1038; *Staples,* 970 F. Supp. at 1076 n.8; *see also* Merger Guidelines § 4.1.1.

Digital do-it-yourself tax preparation products for the preparation of U.S. federal and state individual tax returns (referred to herein as "Digital DIY") is a relevant product market. The market is no larger than Digital DIY products because consumers view neither unassisted tax preparation nor hiring tax professionals as reasonable alternatives to Digital DIY products. And the product market is no smaller than Digital DIY because all Digital DIY products provide similar functionality, are reasonably interchangeable, and compete with one another.  A hypothetical Digital DIY monopolist could impose a small but significant price increase for the products.

Courts also rely on various practical indicia to assess the appropriate market definition, *Brown Shoe Co.*, 370 U.S. at 324-28, including "the nature of the products" that the merging parties principally sell, "the outlets they employ" to distribute their product to the end-user, "how

- 19 -

the market is perceived" by the companies themselves, *FTC v. Coca-Cola Co.*, 641 F. Supp.

1128, 1132 (D.D.C. 1986), *vacated as moot*, 829 F.2d 191 (D.C. Cir. 1987), and public or

industry perception of those markets.  *See, e.g.*, *Rothery Storage & Van Co. v. Atlas Van Lines,*

*Inc.*, 792 F.2d 210, 218 n.4 (D.C. Cir. 1986) ("[P]ublic recognition . . . of the [market] as a

separate economic unit matters because we assume that economic actors usually have accurate

perceptions of economic realities.").  Because market definition can be a "highly technical

economic question," *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490

(9th Cir. 1991), courts also regularly look to expert testimony to define the scope of, and

delineate the participants in, a relevant product market, *see, e.g.*, *Hynix Semiconductor Inc. v.*

*Rambus Inc.*, No. CV-00-20905, 2008 WL 73689, at \*10 (N.D. Cal. Jan. 5, 2008).

    Here, Defendants' admissions as to their own perception of the market establish that the

relevant market is all Digital DIY products and not some recently concocted subset of

"premium" and "value" products.  Our expert's similar conclusion leaves no doubt that the

relevant market is Digital DIY products.

### A.    Digital DIY Products are Not Reasonably Interchangeable with Unassisted Tax Preparation and Professional Tax Preparation

    Digital DIY products greatly simplify the tax return process compared to unassisted

preparation, such as the "pen-and-paper" method.[102]  Digital DIY products walk customers

through an easy-to-understand interview process that uses layman's terms.  They request

---

[102] Pen-and-paper includes both tax preparation by hand, and preparation with the IRS's free file fillable forms and any state equivalents.  Free file fillable forms are simply electronic versions of paper tax forms, allowing individuals the ability to fill out their tax returns manually on the computer.  *See* Ex. 123 (*Free File Fillable Forms*, *available at* https://www.freefilefillableforms.com/FFA/Gateway/FED.htm (last accessed July 30, 2011) ("These online forms are electronic versions of paper IRS tax forms.")).  Because free file fillable forms do not offer any of the advantages of Digital DIY products, such as guidance and generally understandable instructions, they are more appropriately categorized as unassisted tax preparation.  *See* Ex. 124 (*Free File Fillable Forms: Frequently Asked Questions*, *available at* http://www.irs.gov/efile/article/0,,id=226829,00.html (last accessed July 30, 2011)) ("The Fillable Forms option is the tool for you if you are comfortable filling out tax forms and schedules without software help.  This FREE forms-based program provides you with an experience comparable to paper forms . . . .").

information customers might not otherwise realize was relevant (such as information for certain

tax deductions), perform and error check necessary calculations, and fill in the appropriate tax

forms.  Digital DIY customers need not comprehend the tax code, know which forms to file, or

understand how to complete them.  For most taxpayers, filing tax returns unassisted is a much

more complicated, time-consuming, and error-prone process than using Digital DIY products.[103]

[Redacted]

,,[104]  Defendants'

internal documents and communications reflect little, if any, concern that consumers would

switch to pen-and-paper in response to an increase in Digital DIY prices.  Finally, industry

executives, participants, and empirical evidence make clear that unassisted tax preparation is not

in the same product market as Digital DIY products.[105]  As a result, too few consumers would

switch to pen-and-paper to prevent a small but significant non-transitory increase in price for

Digital DIY goods.

Having considered the market conditions, Dr. Warren-Boulton has also concluded that

unassisted tax preparation is not in the same product market as Digital DIY products.[106]  Dr.

Warren-Boulton bases this conclusion in his expert report on several different factors.  First, he

notes the shift of a significant number of taxpayers over the past several years from pen-and-

paper to Digital DIY products, suggesting that this method of tax preparation does not pose a

---

[103] Ex. 125 (TA 4c-9, at 6).

[104] [Redacted] Ex. 126 (HRB-
DOJ-00138815, at -27).

[105] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Parts III.C.i & iii). [Redacted]
*See, e.g.*, Ex. 113 (RHO-DOJ-
000121 (TaxSlayer Decl.) ¶ 9).

[106] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part III.C.i).

competitive constraint on Digital DIY products.[107]  He also highlights the testimony of industry executives stating that they do not perceive any competitive threat to Digital DIY products from pen-and-paper.[108]  Next, Dr. Warren-Boulton recognizes that, to the extent switching occurs between these two methods of tax preparation, it occurs often due to changes in the complexity of an individual's tax return, rather than for competitive reasons such as price.[109]  Finally, Dr. Warren-Boulton noted that changes in the price of Digital DIY products over time do not correspond to switching by taxpayers between the tax preparation methods, again failing to indicate that these products are in the same product market.[110]

Similarly, hiring professional tax preparers, such as certified public accountants (CPAs) and tax professionals in HRB's brick-and-mortar stores, is not a reasonable substitute for Digital DIY products and is not in the same product market.[111]  Professional tax preparation provides customers with one-on-one professional tax guidance, which is generally unavailable with Digital DIY products.  Professional tax preparation is therefore typically much more expensive than Digital DIY products, and consumers are unlikely to switch to assisted tax preparation in sufficient numbers to prevent a small but significant non-transitory increase in price for Digital DIY products.[112]  Indeed, HRB has consistently made clear both publicly and internally that assisted tax preparation and Digital DIY products do not compete with one another.[113]  As HRB explained in an internal presentation, Redacted

---

[107] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part III.C.i.1).

[108] *Id.*

[109] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part III.C.i.2).

[110] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part III.C.i.3).

[111] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part III.C.ii).

[112] Consumers sometimes switch from Digital DIY to professional assistance, though usually because of a change in life events that has made their taxes more complicated (*e.g.*, buying a home or having a child), rather than the prices of the products.  Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part III.C.ii.3).

[113] *See, e.g.*, Ex. 127 (Bennett Dep. 98:9-99:9); Ex. 61 (Houseworth Dep. 35:1-36:3).

Redacted [114]

Dr. Warren-Boulton has also concluded that assisted tax preparation is not in the relevant product market with Digital DIY products.[115]  He again bases this conclusion on several factors. The first is that HRB and other industry players, through their testimony and ordinary business documents, have frequently come to the conclusion that Digital DIY products are not taking share from assisted tax preparation products, and that assisted is therefore not a competitive constraint on Digital DIY products.[116]  And as with pen-and-paper, Dr. Warren-Boulton recognizes both that switching between Digital DIY products and assisted products occurs primarily due to changes in the complexity of an individual's tax return,[117] and that absence of a correlation between consumer switching across Digital and assisted and the relative changes in price of these products suggest that they are not in the same product market.[118]

### B.   All Digital DIY Products Compete in the Same Product Market

The "boundaries of the relevant market must be drawn . . . to recognize competition where, in fact, competition exists."  *Brown Shoe Co.*, 370 U.S. at 326; *see also Heinz*, 246 F.3d at 718 (product market definition "focuses solely on demand substitution").  Defendants' business decisions, internal documents, and public statements make clear that HRB and TaxACT compete in a single Digital DIY product market.  Thus, the relevant product market is Digital DIY products.

As discussed above, TaxACT and HRB have engaged in vigorous head-to-head competition for years.  Both companies have identified each other as competitors, made pricing

---

[114] Ex. 128 (HRB-DOJ-00359542, at 9).

[115] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part III.C.ii).

[116] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part III.C.ii.1).

[117] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part III.C.ii.2).

[118] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part III.C.ii.3).

decisions, improved their products, and increased their marketing in efforts to attract one another's customers.  TaxACT's innovative and aggressive price cutting has reduced HRB's Digital DIY market share while causing price compression across all Digital DIY products.[119] HRB's acquisition of TaxACT aims to undo this damage:  HRB views this acquisition as a ███████████████████████████████████████████████████████████████,"[120] Simply put, HRB is seeking to acquire TaxACT *because* they compete in the same product market.[121]

Indeed, TaxACT competes with HRB because, ████████████████████████████ ██████████████████████████████████████████,"[122] TaxACT's President, Lance Dunn, agreed, saying that his company's ███████████████████ ███████████████████████████████[123]  It is not surprising, then, that there are no observable differences in characteristics between the customers of various Digital DIY providers, such as adjusted gross income, tax complexity, or age.[124]

Thus, while TaxACT's Digital DIY products are less expensive than those of HRB and Intuit, their quality is just as good.  TaxACT's lower prices reflect its innovative and aggressive competition, by offering products with ████████████████████████████████ ██████████████████████████████████[125]  By offering such high-quality

---

[119] Ex. 20 (HRB-DOJ-01003395, at 12).

[120] Ex. 129 (HRB-DOJ-00576608, at 6).

[121] ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████

[122] Ex. 131 (HRB 30(b)(6) Dep. 123:17-22); *see also* Ex. 132 (HRB 4c-02, at 18).

[123] Ex. 28 (Dunn Dep. 152:20-153:12); *see also* Ex. 28 (Dunn Dep. 266:15-267:13; 303:13-20).

[124] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part V.A.iii).

[125] Ex. 131 (HRB 30(b)(6) Dep. 222:14-223:3); *see also* Ex. 104 (2SS-PETKe-0314664).

products with such aggressive pricing, TaxACT has caused "price compression" across all Digital DIY products.[126]  With HRB, TaxACT, and other digital firms engaging in direct competition, the product market in this case is Digital DIY products.[127]

Not surprisingly, HRB's and TaxACT's documents are confirmed by the empirical studies conducted by Dr. Warren-Boulton.  For example, Dr. Warren-Boulton calculated a hypothetical Digital DIY monopolist's critical loss for a 10% increase in price and compared that to the aggregate diversion ratio for each of the Big 3 firms.  Based on this study, Digital DIY is a relevant product market.[128]

## C.   Defendants' Claimed Distinction Between "Value" and "Premium" Markets is Without Merit

Defendants claim that the transaction will not substantially lessen competition because HRB is in a "premium" segment of the market and TaxACT is in a separate "value" segment of the market.[129]  This contention is without merit and is simply a construct for this case.

Throughout their many years of vigorous competition — starting in 2004 with TaxACT's free-for-all FFA offer and continuing through 2010, when TaxACT offered free state e-filing through Staples — Defendants have recognized that their products compete in a single Digital DIY market.  Defendants' public statements, internal analyses and business decisions have been based on that understanding of the market.  The fact that HRB and TaxACT have different strategies in appealing to consumers, such as different prices, does not mean that Defendants are not in competition.  On the contrary, TaxACT itself recognized that its Redacted

---

[126] Ex. 20 (HRB-DOJ-01003395, at 12).

[127] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part III.B).

[128] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part III.C.iii).

[129] Ex. 133 (Defs.' Answer at 2-3).  It is not clear to the United States what a "segment" of the market is.



,,[133]  Regardless of their strategy, HRB, Intuit, and TaxACT all offer similar products to the same group of customers,[134] ultimately seeking to be more effective competitors in the Digital DIY market.

At its heart, Defendants' argument that they compete in separate "value" and "premium" segments of the market is based entirely on the fact that HRB and TaxACT offer their products at different prices.[135]  However, the Supreme Court has held that a price differential alone is insufficient to infer two separate product markets.  "[P]rice is only one factor in a user's choice between one [product] or the other.  That there are price differentials between the two products . . . are relevant matters but not determinative of the product market issue."  *United States v. Cont'l Can Co.*, 378 U.S. 441, 455 (1964); *see also Brown Shoe Co.*, 370 U.S. at 326; *HDC Medical, Inc. v. Minntech Corp.*, 474 F.3d 543, 547-48 (8th Cir. 2007) (rejecting proposed product market where market definition was based solely on a "substantial price differential" between two

[130] Ex. 134 (2SS-CORPe-0001833, at -51) (emphasis added).

[131] *Id.*

[132] *Id.*

[133] *Id.* at -35.

[134] Ex. 61 (Houseworth Dep. 38:20-39:2); Ex. 127 (Bennett Dep. 115:12-19).

[135] *See, e.g.*, Ex. 61 (Houseworth Dep. 186:9-21) Redacted

products).  Indeed, antitrust law expressly recognizes that "[p]roducts competing against one
another in a differentiated product market may have widely different prices." *FTC v. CCC
Holdings Inc.*, 605 F. Supp. 2d 26, 42 (D.D.C. 2009) (internal quotation omitted).  This is
because inherent in the definition of a differentiated product market like Digital DIY tax
preparation is that sellers of the product "compete along more dimensions than price." *Id.* at 42
n.19 (internal quotation omitted).  Thus, it is hardly surprising that Defendants' own business
documents, as opposed to their arguments in this case, recognize that each Defendant is a
primary competitor of the other.  Indeed, far from being in a distinct premium separate segment
of the market, HRB internally admits ████████████████████████████████████████

████████████████████████████████████████[136]

　　　Only in 2010, when it became clear to HRB that its acquisition would face close antitrust
scrutiny, did Defendants start referring to these separate "value" and "premium" markets.  As
noted above, on October 11, 2010 — a few days before the deal was announced — HRB's ██████
████████████████████████ though not yet identifying these "value" and "premium" markets,
began formulating how to describe the market:  "Are we calling this the digital category or
online category.  I was thinking online category were [sic] the word of choice to get passed [sic]
HSR approvals, so you'll notice those changes within the docs."[137]

　　　After the United States opened an investigation into the acquisition, Defendants
repeatedly sought to articulate proposed market definitions that, though frequently inconsistent,
had one common factor — each market definition indicated that the competition between HRB
and TaxACT was limited or even nonexistent. ██████████████████████████████

████████████████████████████████████████

---

[136] Ex. 51 (HRB-DOJ-00902949, at 14).

[137] Ex. 11 (HRB-DOJ-50258582).



[141] Defendants have been unable, however, to explain what functional differences there are between value and premium products,[142] let alone why Defendants have repeatedly referred to one another as competitors over the years if they do not compete.[143]

HRB's lawyers, as well as its executives, have been struggling to recast the market to support its claims in this case.  When HRB released its most recent 10-K filing to its investors

---

[138] *See* Ex. 135, at 15.

[139] See Ex. 136, at 2.

[140] Redacted

[141] Ex. 28 (Dunn Dep. 25:21-26:2).

[142] Ex. 137, at 7-8.  Redacted

[143] Redacted

five weeks ago, it included new language embracing the "value" and "premium" distinction.  In prior years, the "Competitive Conditions" section of HRB's 10-K contained standard language referring to competition with "a number of companies" and increasing competition due to, *inter alia*, "offers of free tax preparation services."[144]  When HRB released its most recent 10-K in June, these passages no longer appeared.  Instead, a new passage was included for the first time referring to competition "among value and premium products."[145] ██████████████████

████████████████████████████████████████████ [146]

Obviously, Defendants' current argument about "value" and "premium" markets cannot be squared with the extensive pre-transaction record;[147] ultimately, the extensive competitive interactions between HRB and TaxACT documented in that record speak for themselves.  A market definition that placed HRB and TaxACT in different markets would ignore the competitive dynamics of the Digital DIY market and, as a result, the substantial lessening of competition that would occur if HRB acquired TaxACT.

## II.    The Relevant Geographic Market is Worldwide

The relevant products, Digital DIY products, are used to prepare U.S. federal and state tax returns.  Digital DIY products cannot be used to file tax returns for foreign jurisdictions, nor can similar products designed for foreign jurisdictions be used to prepare U.S tax returns.  However, Digital DIY products (which are often provided online) can be supplied from outside

---

[144] *See, e.g.*, Ex. 13 (H&R Block 10-K for Fiscal Year Ending April 30, 2010, at 4); Ex. 139 (H&R Block 10-K for Fiscal Year Ending April 30, 2009, at 4).

[145] Ex. 12 (H&R Block 10-K for Fiscal Year Ending April 30, 2011, at 4).

[146] Ex. 140 (Defendant H&R Block, Inc.'s Response to Plaintiff's Second Set of Interrogatories to Defendant H&R Block, Inc.).

[147] For example, the entire foundation of Defendants' argument — that people choose to pay more for HRB's products because of the brand's reputation and features — is dubious ███████████████████████ ████████████████████████████████████████████ Ex. 141 (HRB-DOJ-00551872, at 4).

the United States, and the customer base includes taxpayers who are in the U.S. and those who are filing U.S. tax returns from abroad.  Thus, "the area of effective competition," *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961), is worldwide.  We do not understand Defendants to contest the validity of the proposed geographic market.

## III.   The Transaction is Likely to Result in Raised Prices and Lower Quality

A showing that a firm controls an "undue percentage share of the relevant market" establishes a "presumption that the merger will substantially lessen competition."  *Heinz*, 246 F.3d at 715.  Mergers that significantly increase concentration "must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *United States v. Phila. Nat'l Bank*, 374 U.S. at 363 (a merger giving one single firm 30% of the market and four firms 78% is "inherently likely to lessen competition substantially").

Courts generally analyze the likely anticompetitive effects from a proposed acquisition using one of two frameworks:  coordinated and unilateral effects.

Unilateral effects analysis examines whether the acquiring firm will have the incentive to raise prices or reduce quality after the acquisition, independent of the competitive response from rival firms.  *See, e.g.*, *Swedish Match*, 131 F. Supp. 2d at 169.  For a unilateral price increase to be profitable, the brands at issue need not be the closest substitutes for all consumers.  *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 914 ("[U]nilateral effects theories do not require that the output of the two merging firms be the closest possible substitutes for one another.").  Instead, "[e]conomic theory [] suggests that [the acquiring firm] will raise prices as long as the profit gained by the higher prices of the [acquiring firm's] products in addition to the profit diverted to the [acquired firm's] brands is greater than the profit lost through diversion" to other suppliers.  *Swedish Match*, 131 F. Supp. 2d at 169.

Coordinated effects refer to the tendency of "oligopolistic market structures" to result in "tacit coordination." *Heinz*, 246 F.3d at 725. An acquisition is likely to result in coordinated interaction where: (1) the merger would significantly increase concentration and lead to a moderately or highly concentrated market; (2) that market shows signs of vulnerability to coordinated conduct; and (3) there is a credible basis to conclude that the acquisition may enhance that vulnerability. Merger Guidelines § 7.1.

To assess whether either type of anticompetitive effects are likely, courts examine the "structure, history, and probable future" of the market in question." *Brown Shoe*, 370 U.S. at 322 n.38. The first two are assessed primarily through fact evidence — predominantly the testimony of industry participants and company documents. *Weyerhaeuser Co.*, 665 F.2d at 1080. Assessments of the "probable future" of the relevant market rely primarily on economic analysis conducted by expert witnesses. *Id.* Both types of evidence in this case indicate that HRB's acquisition of TaxACT will likely lead to higher prices and lower quality Digital DIY products for taxpayers. The Defendants' documents, testimony from the Defendants and other industry participants, and the overall structure of the market are clear: Prior to the acquisition, Defendants engaged in substantial head-to-head competition that benefitted consumers, and if this transaction is allowed to go forward, that competition will not be replaced. The result will be higher prices and lower quality products for consumers. Dr. Warren-Boulton's expert report comes to the same conclusion. The elimination of TaxAct – the market's maverick – is likely to result in both HRB and Intuit raising prices.

### A.    The Challenged Acquisition is Presumptively Unlawful Because it Will Substantially Increase Concentration

A central concern of antitrust law and policy is that "increased concentration raises a likelihood of interdependent anticompetitive conduct." *PPG*, 798 F.2d at 1503; *see also FTC v.*

*Univ. Health, Inc.*, 938 F.2d 1206, 1218 n.24 (11th Cir. 1991) ("Significant market concentration makes it easier for firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level.").   The proposed acquisition will significantly increase the already high level of concentration in the Digital DIY market.   In 2010, the Big Three had 90% of the market — Intuit (62.2%), HRB (15.6%), and TaxACT (12.8%).[148]  Market concentration as measured by the Herfindahl-Hirschman Index ("HHI") is currently 4,291, indicating a highly concentrated market.[149]

The proposed acquisition will give HRB and Intuit collectively 90% of the market.[150]  It will increase the HHI by approximately 400, resulting in a post-acquisition HHI of 4,691.   The merger should therefore be presumed to have anti-competitive effects.   *See*, *e.g.*, *Phila. Nat'l Bank*, 374 U.S. at 363; *Heinz*, 246 F.3d at 716 (3 to 2 merger that would have increased HHI by 510 points from 4,775 created by "wide margin" presumption of anticompetitive effects); *PPG*, 798 F.2d at 1502-03, 1506 (53% market share and post-merger HHI of 3,295 left "no doubt that . . . Commission [was entitled] to some preliminary relief"); *Swedish Match*, 131 F. Supp. 2d at 166-67 (60% market share and 4,733 HHI established presumption).

---

[148] *See* Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part IV); Ex. 27 (HRB-DOJ-00012327).  2010 is the most recent year for which accurate data on market shares and concentration currently is available.  E-filing figures are used for purposes of calculating market share and concentration because they are the most accurate figures currently available industry-wide.  *See* Ex. 21 (Newkirk Dep. 126:7-19) Redacted

[149] The HHI for a market is calculated by summing the squares of the individual market shares of all firms participating in the market.  Under the Merger Guidelines, markets with an HHI above 2,500 are considered "highly concentrated."  Merger Guidelines at ¶ 5.3.  In cases where the post-merger market is "highly concentrated," and the acquisition would result in an increase of more than 200 points in the HHI, the transaction is "presumed to be likely to enhance market power."  *Id.* ¶ 5.3.

[150] Redacted

**B.      Removing TaxACT From the Market Would End Aggressive Head-to-Head Competition With HRB that Has Benefitted Consumers**

Beyond the presumptions that arise from the HHI calculations, the acquisition of TaxACT would eliminate head-to-head competition between these two companies, leading to higher prices and lower-quality Digital DIY products.  As discussed above, HRB and TaxACT have fiercely competed over the past several years, resulting in substantial benefits for consumers, including their current ability to prepare and e-file their federal tax returns for free. With this acquisition, HRB is specifically considering actions that would reverse those benefits, including using TaxACT to Redacted ."[151]

In his analysis of the proposed transaction, Dr. Warren-Boulton has concluded that eliminating the head-to-head competition between HRB and TaxACT will likely result in higher prices and lower quality Digital DIY products.  In particular, HRB will have the independent incentive to raise prices of its Digital DIY products by a significant amount if it acquires TaxACT.[152]  Intuit will likely respond by increasing its own prices, providing HRB with an even greater incentive to raise prices or lower the quality of its Digital DIY products even further.[153] Based on Dr. Warren-Boulton's merger simulation analysis, the combined HRB/TaxACT and Intuit will raise prices, likely resulting in an aggregate loss to consumers, before offsetting for any claimed efficiencies, of tens of millions of dollars annually.[154]  This amount does not take into account the loss to consumers associated with the elimination of TaxACT as a maverick, including the value of a robust free product offering, or other coordinated effects of the merger.

---

[151] Ex. 143 (HRB-DOJ-50819576).

[152] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part V.A.v.2).

[153] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part V.A.v.3).

[154] *Id.*

### C.     The Acquisition of TaxACT Will Eliminate a Maverick

As courts have recognized, an "important consideration when analyzing possible anti-competitive effects" is whether the acquisition "would result in the elimination of a particularly aggressive competitor in a highly concentrated market." *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 47 (D.D.C. 2002) (quoting *Staples*, 970 F. Supp. at 1083).  HRB's acquisition of TaxACT would eliminate the driving force behind every major competitive development in the Digital DIY market over the past seven years, leaving two incumbent companies to control almost 90% of the Digital DIY market.

As described above, since 2004, TaxACT has been the "tax industry maverick"[155] and a "catalyst for change"[156] in the Digital DIY market.  Intuit has characterized TaxACT as ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,"[157]

And HRB referred to TaxACT's conduct on multiple occasions as having a "disrupt[ive]" effect on the Digital DIY market,[158] by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,"[159]

Defendants are already considering the possibility of reducing the impact of TaxACT's maverick behavior. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[155] Ex. 3 (2SS-GRECe-0028581, at -83).

[156] Ex. 4 (2SS-MARKe-0083230, at 18).

[157] Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 7).

[158] *See, e.g.*, Ex. 57 (HRB-DOJ-00251349, at 6); Ex. 35 (HRB-DOJ-00912870, at -71).

[159] Ex. 144 (HRB-DOJ-00529134, at -41).

[160] Ex. 55 (Grief Dep. 317:16-318:16). ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Ex. 131 (HRB 30(b)(6) Dep. 55:22-56:6)).



**Redacted** [161] These examples are only hints of the likely effects of the transaction. **Redacted**

,,[162]

**Redacted**

,,[163]

This evidence is supported by economic theory and market data. **Redacted**

.[164] **Redacted**

Accordingly, Dr. Warren-Boulton believes the merger "will threaten the benefits consumers have already gained as well as benefits consumers may receive in the future from [TaxACT] . . . because there will no longer be a firm in the market to play the role of the market maverick.[165]

---

[161] Ex. 28 (Dunn Dep. 60:4-17).

[162] Ex. 119 (HRB000210).

[163] Ex. 16 (HRB-DOJ-00319468, at 20).

[164] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part VI.E.i.2).

[165] Ex. 121 (Expert Report of Dr. Fredrick Warren-Boulton, Part VI.E, at 68).

**D.     The Acquisition Will Increase the Likelihood of Actual or Tacit Collusion Between HRB and Intuit**

This acquisition would give two firms — Intuit and HRB — 90% of the market for Digital DIY products.  Such significant market concentration makes it "easier for the firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level."  *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1282-83 (7th Cir. 1990) (Posner, J.) (quoting *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986)); *see also Univ. Health*, 938 F.2d at 1218 n.24.  And "[w]ith only two dominant firms left in the market, the incentives to preserve market shares would be even greater, and the costs of price cutting riskier, as an attempt by either firm to undercut the other may result in a debilitating race to the bottom."  *CCC Holdings*, 605 F. Supp. 2d at 67.

HRB executives quickly saw that buying TaxACT would change incentives in the market.  As one HRB executive observed, Intuit and HRB would have significant incentives to raise prices and no longer increase the quality of their products in the absence of the industry maverick:  "Intuit and HRB together would have 84% of the digital market and we both obviously have great incentive to keep this channel profitable.  Other potential TA purchasers could decide to cut their prices even further to see if they could make large market share gains & build short-term profitability by 'winning the race to the bottom.'"[166]  Another HRB executive agreed:  "One could also argue that there is value in taking control of this 'segment' by not encouraging a race to free, which Intuit would have no interest in doing, and therefore has value to HRB by preventing it through the acquisition."[167]  HRB's Chief Information Officer summed up the advantages of the acquisition for his company: Redacted

---

[166] Ex. 18 (HRB-DOJ-00355217).

[167] *Id.*

[Redacted]"[168]  In contrast to all of the benefits HRB could expect from the deal, its

internal documents reflect a swift assessment of the benefits consumers could expect:  "None."[169]

Indeed, post-acquisition, coordination between Intuit and HRB would be fairly simple.

The companies already have ample opportunities to meet and communicate.  The Digital DIY

market has a fairly small number of products, with similar functionality, which are sold at a

small number of price points.  Furthermore, the current prices of Digital DIY products are

available on the websites of the various providers,[170] allowing providers to monitor and enforce

coordinated pricing.  *See Heinz*, 246 F.3d at 724 (expressing concern that firms could use

industry-wide scanner data to monitor coordination); *cf. CCC Holdings*, 605 F. Supp. 2d at 62-64

(assessing transparency of prices in industry); Merger Guidelines § 7.2.  Indeed, HRB already

closely tracks the prices offered by Intuit.  [Redacted]

[Redacted]"[171]  More importantly, some internal HRB

communications already suggest there have been attempts by HRB at coordination with Intuit.[172]

Finally, the market for Digital DIY products provides little check on coordinated

behavior because sales are made to millions of individual consumers making relatively small

individual purchases.  Because Digital DIY can only be used for a single tax year, consumers

must pay for a new product for each tax season, resulting in tens of millions of yearly

---

[168] Ex. 122 (HRB-DOJ-00012401).

[169] Ex. 16 (HRB-DOJ-00319468, at 24).

[170] Pricing for retail software sold through third-party retailers is somewhat less transparent, as providers do not make public the wholesale price charged to the third-party retailers.  However, providers can easily determine the retail price paid by consumers by, for example, visiting a Staples, reviewing a Staples circular, or monitoring the product prices on http://www.staples.com.

[171] Ex. 127 (Bennett Dep. 216:18-19).

[172] *See* Ex. 145 (HRB-DOJ-00187146) [Redacted]

transactions.  Thus, there are no powerful buyers of Digital DIY who can constrain the ability of

Intuit and HRB to raise prices, and the benefits of departing from a collusive agreement in any

single transaction are likely to be small relative to the potential costs.  The risk of collusion is

therefore significant.  *See Cardinal Health,* 12 F. Supp. 2d at 61 ("Given the large number of

customers and the interchangeability of contracts, it is unclear just how important each individual

customer, particularly each individual small to medium-sized customer, is to the Defendants.");

Merger Guidelines at ¶ 7.2.

**IV.    Defendants Cannot Rebut the United States' Case Through Claims of Easy Entry or
Efficiencies Arising from the Transaction**

By proving that the acquisition will increase concentration significantly in the Digital

DIY market, the United States establishes its *prima facie* justification for injunctive relief.  *See*

*Heinz*, 246 F.3d at 716 (likelihood of success demonstrated by showing that market

concentration would increase substantially).  Defendants therefore bear the burden of production

to rebut this presumption of anticompetitive effects.  *Id.* at 715.  As discussed above, the

evidence of increasing concentration in the relevant market is compelling, which increases the

quantum of evidence Defendants are required to demonstrate in order to rebut the presumption.

*Id.* at 725 ("The more compelling the *prima facie* case, the more evidence the defendant must

present to rebut it successfully.").   Defendants cannot make this showing.

**A.    Obstacles in the Digital DIY Market Prevent Companies from Sufficiently
Entering or Expanding to Prevent Anticompetitive Harm**

Entry by new firms or expansion by existing firms will not defeat an acquisition's

anticompetitive effects unless that entry or expansion is likely to occur in a timely manner and is

sufficient to deter those anticompetitive effects.  *See Cardinal Health*, 12 F. Supp. 2d at 55

(adopting "timely, likely, sufficient" test).  In order for entry to be likely, it must be profitable

and at a sufficient scale to replace the competition lost by the acquisition.  Merger Guidelines §

9.2.  There are substantial barriers to entry by new firms and expansion by existing firms, and therefore HRB and Intuit need not fear that timely entry or expansion would make a price increase unprofitable.  *See Heinz*, 246 F.3d at 717 n.13.

*Barriers To Entry.*   But even for companies with the necessary technology and tax expertise, entry and expansion are difficult and take a long time, as success requires ,"[173] ,"[174]  And, as TaxACT recognized, taxpayers will not use a Digital DIY product unless they have ,"[175]  *See, e.g.*, *Rebel Oil v. Atl. Richfield*, 51 F.3d 1421, 1439 (9th Cir. 1995) ("[A] main source of entry barriers" is "entrenched buyer preferences for established brands.").

---

[173] Ex. 38 (2SS-CORPe-0002404, at -19); Ex. 28 (Dunn Dep. 507:21-508:17); *see also* Ex. 134 (2SS-CORPe-0001833, at -44); Ex. 28 (Dunn Dep. 503:4-13, 503:14-504:4; 504:5-12; 506:1-19).  *See CCC Holdings*, 605 F. Supp. 2d at 49 (recognizing need for specialized knowledge as significant barrier to entry).

[174] Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 27).

[175] Ex. 125 (TA 4c-9, at 12).

[176] Ex. 113 (RHO-DOJ-000121 (TaxSlayer Decl.) ¶ 13); *see also* Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 27).

[177] Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 27); *see also* Ex. 25 (THK-DOJ-000001 (TaxHawk Decl.) ¶ 13)

Redacted

█████ ,"[178]   In other words, the very fact that a company is a new entrant or a fringe competitor, with a small or non-existent customer base, makes it difficult for that company to grow quickly.

HRB itself concluded that new entry into the Digital DIY market is very difficult and would take many years to gain a substantial amount of share.  Redacted

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ ,"[182]   And unlike TaxACT's experience, new entrants would be trying to expand in a market that has become significantly more mature since the time period when TaxACT captured its market share.[183]   Marketing costs, in particular, have risen dramatically,[184] Redacted ███████████████████████████ [185]

---

Redacted

[178] Ex. 25 (THK-DOJ-000001 (TaxHawk Decl.) ¶ 13); *see also* Ex. 29 (DOJ-INT-000001 (Intuit Decl.) ¶ 27)
Redacted

[179] Ex. 146 (HRB-DOJ-00319797, at 20) Redacted

[180] Ex. 130 (HRB-DOJ-00918192, at -270).

[181] Ex. 148 (HRB-DOJ-00007735).

[182] Ex. 28 (Dunn Dep. 507:11-20).

[183] *See, e.g.,* Ex. 149 (HRB-DOJ-00354158, at -59); Ex. 150 (HRB-DOJ-00347097, at -100).

[184] Redacted

*Barriers To Expansion.*  Current fringe players recognize the difficulty building share through increased marketing.[186] Redacted

[Redacted]

Redacted

[185] Ex. 21 (Newkirk Dep. 434:19-435:2).

[186] Redacted

[187] Redacted

[188] Redacted

[189] Redacted

[190] Redacted

[191] Redacted

**Redacted**

,,192

## B.   Defendants' Claimed Efficiencies Do Not Immunize This Anticompetitive Transaction

Defendants have claimed that efficiencies from the acquisition will outweigh any anticompetitive effects.[193]   Courts, however, "have rarely, if ever, denied a preliminary injunction solely based on the likely efficiencies."   *CCC Holdings*, 605 F. Supp. 2d at 72.   In a market like Digital DIY products, which is "highly concentrated" and "characterized by high barriers to entry," Defendants "must provide proof of extraordinary efficiencies [] to rebut" Plaintiff's *prima facie* case.   *Id.*   Defendants have the burden to prove efficiencies as an affirmative defense.[194]



Redacted

Redacted

[192] Redacted

[193] Ex. 133 (Defs.' Answer ¶ 58); *see also* Ex. 157 (Memorandum of Points and Authorities in Support of Defendants' Motion to Transfer Venue, at 4).

[194] Ex. 133 (Defs.' Answer, at ¶ 58).

[195] Ex. 158 (HRB-DOJ-50264283); Ex. 159 (HRB 4c-01, at 2).



[197]

Defendants must show that the efficiencies are "merger specific to be cognizable as a defense" and that they "cannot be achieved by either company alone, because if they can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor." *Heinz*, 246 F.3d at 722; *see also* Merger Guidelines § 10. Redacted

[199] *See Heinz*, 246 F.3d at 722 (D.C. Cir. 2001) (key issue is whether "Heinz could obtain the benefit of better recipes by investing more money in product development and promotion — say, by an amount less than the amount Heinz would spend to acquire Beech-Nut"). Redacted

["200]

Further, to the extent an efficiencies defense is viable, there must be a showing that the savings generated would be passed on to consumers. *See, e.g.*, *Univ. Health*, 938 F.2d at 1223 (A defendant asserting efficiency defense "must demonstrate that the intended acquisition would

---

[196] Ex. 131 (HRB 30(b)(6) Dep. 60:8-61:18) Redacted

[197] Redacted

[198] Redacted

[199] Ex. 131 (HRB 30(b)(6) Dep. 144:6-145:9).

[200] Ex. 161 (HRB-DOJ-00281972, at -73).

result in significant economies and that these economies ultimately would benefit competition and, hence, consumers"); *CCC Holdings*, 605 F. Supp. 2d at 74 (Defendant required to show that a "sufficient percentage of [] savings will accrue to the benefit of consumers to offset the potential for increased prices). HRB's incentive post-acquisition will be to increase, not decrease its prices. Therefore, it can not show that any savings generated by the transaction will benefit its customers, and its efficiency defense can not rebut the United States' *prima facie* case.

That Defendants' efficiencies arguments are weak is not surprising. A month before Defendants announced the acquisition, a former head of HRB's digital division explained ██<sub>Redacted</sub>

███████████████████████████████████████

██████████████████████████,,201

## V.     The Balance of Harms and the Public Interest Favor a Preliminary Injunction

Although the harm to competition from consummation of the merger would be irreparable, a preliminary injunction would not substantially injure HRB or TaxACT. This is not a hostile takeover, and Defendants can continue to operate as independent firms until a full trial on the merits can be held.[202] At most, Defendants can claim only a private harm to their respective businesses that may result from a delay in merging, in the unlikely event they ultimately prevail on the merits. But such private interests yield to the public interest in competition. *Cf. Heinz*, 246 F.3d at 727 n.25 ("'Private equities do not outweigh effective enforcement of the antitrust laws. When the Commission demonstrated a likelihood of ultimate success, a countershowing of private equities alone would not suffice to justify denial of a preliminary injunction barring the merger.'" (quoting *Weyerhaeuser*, 665 F.2d at 1083)).

---

[201] Ex. 162 (HRB-DOJ-00277958). ██<sub>Redacted</sub>███████████████

████████████████████

[202] The Government's experience in merger cases is that Defendants who lose a preliminary injunction almost always abandon their deal, rather than litigate post-preliminary injunction.

Finally, there is a significant "public interest in effective enforcement of the antitrust laws." *Heinz*, 246 F.3d at 726.  Because the acquisition violates the antitrust laws, issuance of a preliminary injunction clearly serves the public interest.  *See generally PPG*, 798 F.2d at 1508; *Weyerhaeuser*, 665 F.2d at 1083, 1085.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court grant the United States' Motion for a Preliminary Injunction and prevent H&R Block from consummating its acquisition of TaxACT pending a full trial on the merits.

Dated this 1st day of August 2011.

Respectfully Submitted,

FOR PLAINTIFF UNITED STATES:


____/s/ Joseph F. Wayland_____
Joseph F. Wayland
Deputy Assistant Attorney General
Antitrust Division



____/s/ James J. Tierney_____
James J. Tierney (D.C. Bar #434610)
Chief
Networks and Technology Section




____/s/ Scott A. Scheele_____
Scott A. Scheele (D.C. Bar #429061)
Assistant Chief
Networks and Technology Section

____/s/ Lawrence E. Buterman_____
Lawrence E. Buterman (D.C. Bar #998738)
Sanford Adler
Kent Brown
Jessica Butler-Arkow
Mary N. Strimel
Aaron Comenetz
Adam T. Severt
Danielle G. Hauck
Anthony D. Scicchitano
David Gringer
H. Joseph Pinto
    Trial Attorneys

U.S. Department of Justice
Antitrust Division
Networks and Technology Section
450 Fifth Street, NW
Washington, DC 20530
Telephone: (202) 307-6200
Facsimile: (202) 616-8544
lawrence.buterman@usdoj.gov

**CERTIFICATE OF SERVICE**

I, Anthony D. Scicchitano, hereby certify that on August 1, 2011, I caused Plaintiff's

Motion for a Preliminary Injunction, and all supporting documents, to be served by hand on the

following counsel:


FOR DEFENDANTS H&R BLOCK, INC.;
2SS HOLDINGS, INC.; AND TA IX L.P.:

J. Robert Robertson, Esq.                      Corey William Roush, Esq.
Hogan Lovells US LLP                           Hogan Lovells US LLP
Columbia Square                                Columbia Square
555 Thirteenth Street, NW                      555 Thirteenth Street, NW
Washington, DC 20004                           Washington, DC 20004
robby.robertson@hoganlovells.com               corey.roush@hoganlovells.com

Benjamin F. Holt, Esq.                         Logan Michael Breed, Esq.
Hogan Lovells US LLP                           Hogan Lovells US LLP
Columbia Square                                Columbia Square
555 Thirteenth Street, NW                      555 Thirteenth Street, NW
Washington, DC 20004                           Washington, DC 20004
benjamin.holt@hoganlovells.com                 logan.breed@hoganlovells.com




                                        Anthony D. Scicchitano, Esq.
                                        Trial Attorney
                                        Networks & Technology Section
                                        U.S. Department of Justice
                                        Antitrust Division
                                        450 Fifth Street, NW
                                        Suite 7100
                                        Washington, DC 20530
                                        Telephone: (202) 532-4531
                                        Facsimile: (202) 532-4656
                                        anthony.scicchitano@usdoj.gov

## INDEX OF EXHIBITS BY CATEGORY

### UNPUBLISHED DECISIONS

*Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905, 2008 WL 73689
    (N.D. Cal. Jan. 5, 2008) ............................................................................1
*Sherley v. Sebelius*, __ F.3d __, 2011 WL 1599685 (D.C. Cir. Apr. 29, 2011) ..................2


### PRESS RELEASES

Press Release, TaxACT 2009 Raises the Bar Higher on Free and Affordable Tax
    Preparation Solutions, dated Jan. 7, 2010, available at
    http://www.taxact.com/press/2010/press-release-01-07-2010-affordable.asp (last
    visited July 30, 2011)...............................................................................56
Press Release, TaxACT Users Can Now Prepare, Print and E-File Returns Without
    Charge, dated Dec. 12, 2005, available at http://www.taxact.com/press/press-release-
    12-12-2005.asp (last visited July 30, 2011) .................................................43


### WEBSITES AND ARTICLES

Carroll, Sean, Online Tax Prep Services, PC Magazine, dated Apr. 14, 2011,
    available at http://www.pcmag.com/article2/0,2817,2359077,00.asp
    (last visited July 30, 2011) .....................................................................116
Free File Fillable Forms, available at
    https://www.freefilefillableforms.com/FFA/Gateway/FED.htm
    (last accessed July 30, 2011)..................................................................123
Free File Fillable Forms: Frequently Asked Questions, available at
    http://www.irs.gov/efile/article/0,,id=226829,00.html
    (last accessed July 30, 2011)..................................................................124
Gray, Tim, Tasting Three Flavors of Tax Software, The New York Times,
    dated Feb. 13, 2011, BU11, available at
    http://www.nytimes.com/2011/02/13/business/yourtaxes/13review.html
    (last visited July 30, 2011) .....................................................................114
Kirkham, Chris, Online Tax Filing No Longer Free For All, WashingtonPost.com,
    dated Jan. 26, 2006, available at http://www.washingtonpost.com/wp-
    dyn/content/article/2006/01/25/AR2006012501786.html
    (last visited July 30, 2011) .......................................................................40
Rosenberg, Eva, Five Top Online Tax-Prep Services, MarketWatch,
    dated Jan. 28, 2011, available at
    http://www.marketwatch.com/Story/story/print?guid=370EE742-2A61-11E0-A215-
    00212804637C (last visited July 30, 2011) ...............................................115


### 10-K FILINGS

H&R Block 10-K for Fiscal Year Ending April 30, 2009 .............................................139
H&R Block 10-K for Fiscal Year Ending April 30, 2010 ...............................................13
H&R Block 10-K for Fiscal Year Ending April 30, 2011 ...............................................12
H&R Block Amended 10-K for Fiscal Year Ending April 30, 2005................................37
Intuit Inc. 10-K for Fiscal Year Ending July 31, 2010 ................................................112

C̲OURT̲ F̲ILINGS̲
Memorandum of Points and Authorities in Support of Defendants'
    Motion to Transfer Venue..........................................................................................157

F̲REE̲ F̲ILE̲ A̲LLIANCE̲ D̲OCUMENTS̲
FFA000091 ..............................................................................................................42
FFA000097 ..............................................................................................................30