UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     *Plaintiff,*<br><br> v.<br><br>H&R Block, INC.<br>2SS HOLDINGS, INC.<br>TA IX L.P.<br><br>     *Defendants.* | Civil Action No. 1:11-cv-00948  (BAH)<br>Judge Beryl A. Howell |

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

# REDACTED VERSION

# FOR PUBLIC FILING

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................. 1

STATEMENT OF FACTS ................................................................... 5

I.     The Industry .......................................................................... 6

II.    The Transaction ..................................................................... 6

     a.     The Parties.................................................................... 6

     b..    The Business Rationale for the Transaction is ProCompetitive ........... 7

III.   Competition in Tax Preparation ............................................ 11

     a.     Value and Premium Products..................................... 12

     b.     The Evidence Shows Limited Competition Between TaxACT and HRB................................................................ 15

     c.     There is Substantial Competition for Manual and Assisted Tax Preparation .................................................. 17

IV.    TaxACT is not a Maverick ................................................... 20

     a.     The Rise of Free Tax Preparation ............................. 20

     b.     TaxACT's Historical Role in the Free Movement.................... 21

ARGUMENT...................................................................................... 24

I.     Plaintiff Cannot Establish a Likelihood of Success Because its Market Definition is Implausible .............................. 27

     a.     Manual Filing is a Significant Competitive Constraint on Defendants ......................................................... 29

     b.     Assisted Tax Preparation is a Major Competitive Constraint on Defendants .......................................... 31

II.    Plaintiff Cannot Establish Competitive Effects ............................................. 32

    a.    Plaintiff Has Failed to Demonstrate Undue Concentration.................... 32

    b.    The Transaction Will Not Result in Unilateral Effects......................... 34

    c.    Competitive Conditions in the Proposed Market Prevent
        Coordinated Effects ............................................................................. 35

        i.    Significant Competitors Combined with Low Barriers
            To Expansion And Entry Prohibit Profitable Coordination........ 35

        ii.    Plaintiff's Proposed Market is Not Conducive to
            Coordination ............................................................................... 39

        iii.    TaxACT Is Not an Antitrust Maverick...................................... 42

III.    Plaintiff Has Not Demonstrated Irreparable Harm ......................................... 42

IV.    Substantial Harm to Other Interested Parties................................................. 43

V.    Interests of the Public..................................................................................... 44

## TABLE OF AUTHORITIES

**Federal Cases**

*Allied Signal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568 (7th Cir. 1999)...............................70

*Brown Show Co. v. United States*, 370 U.S. 294 (1962)...............................................26

*Byers v. Intuit*, 564 F. Supp. 2d 385 (E.D. Pa. 2008)................................................59

*City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117 (D.D.C. 2006)...........40, 43, 69

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004)......................................................40

*Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009)..............................44

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004)........................................65

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998)...............................passim

*FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009)....................................51

*FTC v. H.J. Heinz*, 246 F.3d 708 (D.C. Cir. 2001)..............................................41, 44

*FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34 (D.D.C. 2002)........................................41, 44

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997)............................................27

*Morgan, Strand, Wheeler, & Biggs v. Radiology Ltd.* 924 F.2d 1484 (9th Cir. )...............57

*Munaf v. Geren*, 553 U.S. 674 (2008)...................................................................44

*New York v. Kraft General Foods, Inc.*, 926 F. Supp. 321 (S.D.N.Y. 1995).......................65

*Sherley v. Sebelius*, No. 10-5287, 2011 WL 1599685 (D.C. Cir. Apr. 29, 2011...................44

*Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256 (5th Cir. 1978)..................51

*United States v. ALCOA*, 148 F.2d 416 (2d Cir.1945)...............................................51

*United States v. Baker Hughes, Inc.*, (Baker Hughes II), 908 F.2d 981 (D.C. Cir. 1990)...........46

*United States v. Baker Hughes, Inc.*, (Baker Hughes I), 731 F. Supp. 3 (D.D.C. 1990).....44

*United States v. Gillette Co.*, 828 F. Supp. 78 (D.D.C. 1993).......................................41

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974)..........................44, 47

*United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004)....................47, 57, 63

*United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980).................................41, 44

*United States v. Sungard Data Sys. Inc.*, 172 F. Supp. 2d 172 (D.D.C. 2001)..............44, 47, 51

*Western Parcel Express v. UPS*, 65 F. Supp. 2d 1052, 1060-61 (N.D. Cal. 1998)..................57

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).......................................44

**<u>Federal Statutes</u>**

15 U.S.C. § 18…………………………………………………………………………2, 44

15 U.S.C. § 53(b)………………………………………………………………………41, 44

**<u>Other Authorities</u>**

U.S. Dep't of Justice and Fed Trade Comm'n, Horizontal Merger Guidelines (2010) ……*passim*

Philip E. Areeda , *et al*, IVA Antitrust Law ¶ 562a at 372 (2d ed. 2006) ……………..…… 31, 32l

## INTRODUCTION

H&R Block, Inc.[1] ("H&R Block" or "HRB") is acquiring 2SS Holdings, Inc. ("TaxACT" or "2nd Story") to enable H&R Block to offer a competitive low-cost product, to add "[m]eaningful synergies . . ., including [the] ability to utilize the low-cost TaxACT model," and to better "attract and retain clients using the 'free' model."[2]  Indeed, HRB's CEO, Bill Cobb, has publicly stated that HRB will use the low-cost TaxACT model to offer "low prices" and "enhanced functionality" to customers.[3]  He also testified that this deal is likely to lead to "lower prices" and/or "increased functions and features."[4]  Contrary to Plaintiff's claims, HRB has committed to Plaintiff, the public, and to this Court that it will not raise prices on TaxACT's products and will continue to offer TaxACT's free products for at least three years.  All the actual deal documents in this case – none of which Plaintiff cites – state clearly that the purpose of the deal is to use TaxACT's "free" model aggressively, not to raise prices.

This transaction makes sense for H&R Block because it will transfer management of its Digital business as well as all of its software products and web interfaces to TaxACT, which is an established software company with strong leaders who have managed TaxACT for over a decade. TaxACT runs on a cost-effective, efficient platform that can easily expand to run H&R Block's products.  Given the inconsistent past performance of H&R Block's digital products, past leadership turnover in its Digital business,[5] the multiple platforms H&R Block is using to support its digital

---

[1] H&R Block, Inc. and 2SS Holdings, Inc., do not sell tax preparation products or services.  For convenience, "HRB" and H&R Block are used to refer to H&R Block, Inc. and its subsidiaries.
[2] DX1008-0009.
[3] http://seekingalpha.com/news-article/1325196-h-r-block-says-feds-have-it-all-wrong-on-taxact-merger (providing quotes from an investor conference call with William Cobb) (last visited Aug. 12, 2011); DX1014-001.
[4] Cobb Tr. 89-90, 124.
[5] *See* Houseworth Inv. Dep. at 24:10-14 ███████████████████████████████
████████████████████████████████████.

products, and the fact that at its heart H&R Block is a tax company – not a software company, the acquisition of TaxACT and its complementary strengths makes strategic sense.  Indeed, the benefits of the TaxACT acquisition, which include over ███████ in annual synergies by year 3 and over ████████ in year 2, could not be achieved in the near future through any other acquisition or by HRB trying to do this on its own.  The transaction will make HRB's digital business stronger and will allow HRB to compete better in the digital space where Intuit is (and long has been) dominant. As a result, consumers will benefit from this deal and will be harmed if it cannot be consummated.

Plaintiff bears the burden of demonstrating that it is likely to succeed in proving that the effect of the "acquisition may be substantially to lessen competition,"[6] that Plaintiff will be irreparably injured if an injunction is not granted, that an injunction will not substantially injure Defendants, and that the public interest will be furthered by an injunction.  Nonetheless, Defendants have gathered significant evidence during the discovery period demonstrating that Plaintiff's theories, including its market definition and anticompetitive effects theories, are inconsistent with the facts. Rather than focus on the big picture, Plaintiff tries to develop its arguments using snippets from documents produced by Defendants and even disclaims the importance of its expert – "in this case...the expert is not central to the Government's case"[7] despite later noting that "[a]ssessments of the 'probable future' of the relevant market rely primarily on economic analysis conducted by expert witnesses."[8]  Plaintiff's reliance on those snippets is misplaced.

For instance, in trying to establish the alleged software market, Plaintiff relies on snippets from documents referring to HRB and TaxACT as competitors and suggests that Defendants are "attempting to rewrite history" when they argue that Plaintiff's purported market definition is

---

[6] 15 U.S.C. § 18.
[7] Plaintiff's Memorandum of Points and Authorities in Support of its Motion for a Preliminary Injunction ("Pl.") at 3.
[8] *Id.* at 31.

gerrymandered in the only way that Plaintiff can maintain its case.[9]  Plaintiff is wrong.  Defendants

and their expert rely on actual market dynamics and actual customer activity in explaining the

problems with Plaintiff's market definition.  Plaintiff ignores those facts because, without its

artificially drawn market, Plaintiff has no case.  As it stands, even in Plaintiff's purported market,

HRB and TaxACT have only a combined share of 28.4%.  In other words, Plaintiff's theory rests on

the fact that Intuit, HRB's biggest competitor in the digital space, has such a dominant position that

this combination will lead to a highly concentrated market.

In trying to construe comments by HRB and TaxACT calling one another "competitors" as

despositive, Plaintiff ignores its own *Horizontal Merger Guidelines*, which state that "[m]arket

definition focuses ***solely*** on demand substitution factors, i.e. customers' ability and willingness to

substitute away from one product to another in responding to a price increase . . . ."[10]  The Guidelines

suggest that in assessing customers' likely responses to higher prices, several things should be

considered, including past switching based on price increases, surveys about how customers would

respond, business documents "*concerning how customers would substitute among products in*

*response to relative changes in price*," how industry participants track and respond to price changes

by some or all rivals, and objective information about product characteristics and costs of

switching.[11]  These are not the types of evidence on which Plaintiff relies; they are, however, the

types of evidence on which Defendants have relied.

Simply put, Plaintiff's market is wrong.  It attempts to lump together segments of the

industry that customers do not view as close substitutes (value/low-end and premium products) while

excluding other closer substitutes such as manual preparation ("pencil-and-paper") and assisted

preparation.  In justifying its inclusion of all digital products in a single market, Plaintiff asks this

---

[9] Pl. at 2.

[10] U.S. Dep't of Justice and Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010), at 10, available at
http://www.justice.gov/atr/public/guidelines/hmg-2010.pdf (emphasis added).

[11] *Id.* at 14-15 (emphasis added).  There are other factors included in the list.  None involve looking at
whether a company refers to another company as a competitor.

Court to ignore extreme price and feature differences. Conversely, Plaintiff asks this Court to ignore price similarities and focus on feature differences in excluding pencil-and-paper and to ignore price and product similarities in excluding assisted preparation.

Knowing that this "logic" is deficient, Plaintiff attempts to distract the Court by trying to paint Defendants' market definition arguments in a spurious light. To do this, Plaintiff selectively takes quotes from different documents and then suggests that HRB's senior executives attempted to mislead Plaintiff and this Court about their views on the market: "HRB's senior executives have tried to 'walk [] a little tightrope on this with [antitrust approval,]' and have jettisoned their long-used market descriptions in favor of the 'word[s] of choice to get passed [sic] HSR approvals."[12] It is Plaintiff, however, who walks a tightrope in this sentence. As Plaintiff knows, Alan Bennett, the former CEO who wrote the quoted portion of the sentence testified that the referenced tightrope regarded his need to announce the deal publicly, but his desire to avoid making public statements about deal synergies before getting antitrust approval because he feared that such statements might cause employees to fear that their jobs were in jeopardy.[13] The second snippet was written by Jennifer Love, former Vice-President of Communications, in regards to whether to use the words "online category" or "digital category" – the latter of which includes online and retail software. Her statement had nothing to do with the premium versus value distinction.[14] Such distractions should not carry the day. The evidence does not support Plaintiff's alleged market defiition.

That said, even if the Court accepts Plaintiff's market, Plaintiff's case still fails because there is substantial evidence that this transaction will not result in anticompetitive effects. Indeed, the transaction is pro-competitive and beneficial to consumers, in that it will enable HRB to better compete against Intuit and others through significant cost savings, lower prices and better products.

---

[12] Plaintiff's Memorandum of Points and Authorities in Support of its Motion for a Preliminary Injunction ("Pl.") at 3. (brackets in original).
[13] Bennett Dep. 303:21–308:18. Depositions transcripts have been attached to this brief in an appendix.
[14] Pl. Ex. 11.

To try to overcome these facts, Plaintiff again focuses on mischaracterized documentary fragments. For instance, Plaintiff argued in its Complaint that "H&R Block's internal documents acknowledge that acquiring TaxACT would result in the '[e]limination of [a] competitor," and would allow H&R Block to "regain control of industry pricing and avoid further price erosion."  Neither of the documents (plural) that Plaintiff cited in that sentence were written by H&R Block; nor did either of the documents pertain in any way to this transaction.  Both were written in 2009 by a third-party consultant who *rejected* the option of acquiring TaxACT to eliminate a competitor, calling the idea an "[u]nsustainable long-term strategy giving way for other players to enter and capture the low-cost segment."[15]  This is but one of many egregious mischaracterizations throughout the Complaint and Plaintiff's Brief.  While this Opposition highlights a few of them, Defendants encourage the Court to look beyond the sound bites and highlighted portions of Plaintiff's exhibits and at the substance of the materials on which Plaintiff's case rests.  Those documents do not support the propounded theories.

Outside of Plaintiff's sound bites there is little substance behind its anticompetitive effects claims.  Plaintiff ignores the contours of today's tax preparation industry, which even in Plaintiff's alleged market includes over seventeen competitors as well as an IRS-sponsored website promoting competition and free offers to the public.  Plaintiff also ignores the rivalry between HRB and Intuit and the fact that many of the smaller online providers are poised to take advantage of any mistakes that HRB makes.  Plaintiff further ignores the vast quantities of data, documents, and testimony that make clear that this deal is pro-competitive and will enable H&R Block to offer better services, more promotions and lower prices.

## STATEMENT OF FACTS

The facts, including relevant documents, data, and testimony, reveal that (1) the Transaction

---

[15] Compl. ¶ 2. The specific document referenced was Pl. Ex. 16, which expressly rejects eliminating TaxACT on page 25.  Likewise, that same consultant included the idea of buying TaxACT in its "Strategic Opportunities Graveyard" in a later presentation.  DX0039-028.

is pro-competitive and complementary; (2) TaxACT and HRB are not close competitors; (3) Plaintiff's proposed market is not plausible as it improperly excludes products and services that vigorously compete with Defendants and are closer substitutes to Defendants' products than Defendants' products are to one another; and (4) TaxACT is not a maverick. The facts, thus, demonstrate that a preliminary injunction should not issue.

## I.   The Industry.

Taxpayers have a wide array of choices for preparing their taxes, including:

- Hiring an accountant;
- Having their taxes prepared at a retail tax office, such as those operated by HRB, Liberty, or Jackson Hewitt;
- Preparing their taxes using one of several high end or premium tax software products, such as TurboTax or H&R Block At Home;
- Preparing their taxes using a lower end, value, discount or "free" tax software product, such as TaxACT, TaxSlayer, or FreeTaxUSA;
- Preparing their taxes manually, either by hand (often called "pencil & paper") or with free electronic forms provided by the IRS ("free fillable forms"); or
- Having friends or family prepare their taxes.

In addition, some competitors offer services that blend the methods set forth in the above categories. For example, HRB's "Best of Both" product and TurboTax's Premier Plus Professional Review ("ProReview"), include both online and assisted elements; Petz's "Full Tax Preparation" provides assisted tax preparation in a purely online environment by using online interfaces with customers to prepare their taxes; and numerous free and online tax preparation assistance sites provide guides and tips to facilitate manual tax preparation, including J.K. Lasser's online subscription service.

## II.   The Transaction.

### a.      The Parties.

H&R Block is a well-established name in the individual tax preparation business. HRB's principal business (94% of its revenue in tax year 2010) is to provide "assisted" tax preparation

services to consumers through its extensive network of professional preparers and franchised store-front offices (HRB's "assisted" business).[16]  HRB also offers digital tax preparation products (online and desktop software) under the brand name "H&R Block At Home," which  was previously called "TaxCut."

Second Story offers value-priced digital tax preparation products under the brand name "TaxACT."  The TaxACT business primarily offers customers do-it-yourself ("DIY") tax preparation capabilities through software hosted on TaxACT's Internet website.  Like HRB, TaxACT also sells tax preparation desktop software that can be downloaded by consumers or shipped on a CD.  TaxACT does not have an assisted tax preparation business.

### b.    The Business Rationale for the Transaction Is ProCompetitive.

HRB's proposed acquisition of TaxACT is HRB's "investment in a piece of the market in which we currently don't compete today."[17]  Specifically, HRB is attempting to purchase a company in the value segment because HRB does not offer any value-priced tax preparation products or services comparable to TaxACT's online products.[18]  Instead, HRB has built its brand around

---

[16] Pl. Ex. 12; DX0238-010(H&R Block's Response to Plaintiff's Third Set of Interrogatories, Ex. 1)
[17] DX0102-001; Housewoorth Dep. 195:22-196:4 ("I don't have a value brand today. Do I want one? Yes. I want TaxACT.").
[18] While Plaintiff suggests that the value/premium distinction is a concoction of the attorneys involved in this case, documents kept (and created) in the normal course of business make clear that HRB and TaxACT recognized this distinction long before lawyers got involved.  *See, e.g.*, DX1804-001 (noting that HRB's rational for the Transaction was its realization that "the most aggressive way to grow would be to enter the value space"); DX0243-012 ("We do not plan to utilize Block-branded DIY to compete in the lower-priced online space, so this [merger] provides an opportunity to grow share where we are not.") DX0001-096 ("Strategy Recommendation…[c]ontinue to run TaxACT with its pre-existing brand (outside Block) in order to aggressively acquire share in the FREE low price/value space."); DX1013-006 ("Recommendation… Continue to run TaxAct as a separate brand focused on low cost segment….Strategic Benefits… Allows HRB brand to focus on 'State of the Art' tax preparation experience."); DX1009-003 ("Option A (preferred)…TaxACT brand continues to be low cost value provider focused on free… HRB brand is the premium offering."); DX1002-006 (providing that post-merger, HRB will "Own CONTROL + ASSURANCE" in "Premium DIY" while TaxACT will "Own Easy/Free" in "Lowest Total Cost."); *see also* DX0150-011 (providing HRB's then-strategy of using "TaxCut by H&R Block" to compete with TurboTax, while using TaxNet – a now defunct HRB subsidiary – to "[c]ompete online with low-end [against] TaxACT [and] FFA").

personal service, expertise, and years of experience – attributes that characterize a premium product and complement HRB's franchisees' personalized retail office businesses.[19]

HRB decided to pursue the Transaction after several years of deliberation culminated with HRB's executives deciding that "we need to have a low end, discount online fighter brand in the tax preparation category independent of the HRB brand."[20]  TaxACT ultimately proved to be the best option because it not only provided HRB with a unique opportunity to rapidly break into the value segment, but also offered HRB a chance to reduce costs associated with its inefficient online and software programs, call center, and management bureaucracy.[21]

HRB's post-merger strategy logically flows from its rationale for the deal.  First Lance Dunn, the current CEO of TaxACT, will be at the helm of HRB's digital business, with the other founders of TaxACT continuing their roles at the merged company.[22]  Second, HRB will "continue to run TaxAct as a separate brand focused on the low cost segment" and will attempt to "aggressively acquire share in the FREE low price/value space."[23]  The "H&R Block at Home" brand will co-exist with the TaxACT brand as part of a dual-brand strategy wherein the HRB branded products will "continue to be the premium offering[s]."[24]  This dual-brand strategy was set out in public statements

---

[19] DX0041-001, 2, 7 (describing attributes that define the H&R Block brand).
[20] DX0344-014; *see also* DX0235 (describing HRB's "fighter brand" strategy).
[21] DX0236 (Defendant H&R Block Inc.'s Response to Plaintiff's First Set of Interrogatories to Defendant H&R Block, Inc., Exhibit A); DX600-006, 11, 18; DX0903-001; DX0904-002; DX0905-001; DX9525-001; DX0905; DX0345; DX1003-001; DX0346; DX0347.  While HRB also briefly considered building its own value brand, this did not offer the prospect of significant technological synergies and was inherently more risky.  DX1806-006; DX0235-001; DX1400-001.
[22] *See* DX1008-003 ("The TaxACT team will lead the combined digital businesses"); Housemworth Dep. 10:2-5; 93:1-3.
[23] DX1013-006; DX0001-096.
[24] DX1008-010; *see also* DX1004-002 (indicating that the dual brand option was recommended to the Board of Directors); DX1006-003 (providing that the dual brand approach was the "preferred option" of HRB management, including Jason Houseworth and the former CEO Alan Bennett); DX1005-001(providing in handwritten notes by Alan Bennett that this is the preferred approach); Houseworth Dep. 91:21-93:8 ("[The acquisition] provides an angle to attack it [TurboTax] on two fronts."); 181:1-9 ("Value brand, premium brand, I want to grow as a Digital business in both of those areas.").

made by HRB's current CEO, William Cobb,[25] and former CEO, Alan Bennett,[26] as well as in dozens

of internal documents authored by Mr. Bennett,[27] former CEO Russ Smyth,[28] and HRB's digital

management.[29]  In fact, while Plaintiff contends that HRB intends to destroy TaxACT or weaken its

products, Plaintiff has not been able to adduce a single document indicating such an intention –

relying instead on sentences created by quoting *single words* and phrases pulled from multiple

unrelated documents that explicitly *reject* the elimination of the TaxACT brand as an

"[u]nsustainable long-term strategy giving way for other players to enter and capture the low-cost

segment."[30]

     For HRB, promoting value products with a "fighter brand" instead of its flagship "H&R

Block" brand is essential to retaining the high-quality image associated with HRB's premium tax

preparation products and services, which ranged in Tax Season 2010 from Free for "Free Edition"

without state to $30.95 for "Free Edition" including state to over $100 for "Premium Edition," "Best

of Both," and certain store front tax preparation services.[31]  These products typically include

personalized service from tax professionals, substantial audit support, advanced import features, and

---

[25] *See* DX1014-001 ("Both brands would continue to operate in the marketplace").

[26] *See* DX1000-012 ("This acquisition, when complete, will give us a fighter brand, TaxACT").

[27] *See* DX1005-001 (providing in handwritten notes that he prefers the two brand option that "keep[s] TA as price leader [with] Free Federal"); *see also* DX1006-003 ("Alan: likes 2-Brand approach (option 1)").

[28] *See* DX10042-001 (typed and handwritten notes of R. Smyth providing that HRB will "operate [TaxACT] as a separate brand,").

[29] *E.g.*, DX0600-010, 13; DX1008-010; DX0002-0001; DX1000-012; DX0601-019; DX0602-001; DX1002-005; DX1003-001; DX0001-0096; DX0001-0103; DX0002-0001; DX1005-0001; DX1006-003; DX0106-001; DX0601-002; DX1800-001; DX2101-001; DX0609-001-2; DX0109-002.

[30] The specific sentence in the Preliminary Injunction brief is  "Ultimately though, HRB would determine that purchasing TaxACT was a better way to "eliminate" TaxACT's "disrupt[ive]" maverick conduct." Pl. at 9-10.  The source of the word "eliminate" is Pl. Ex. 16, a document authored by third party consultants who expressly rejected eliminating TaxACT on page 25.  The source of the word "disrupt[ive]" is Pl. Ex. 57, a 2008 document also authored by consultants; it is unrelated to the present Transaction or the 2009 document cited above.  Plaintiff has also substantially altered the meaning of Pl. Ex. 57 by altering the tense of "having disrupted," which referred to TaxACT's growth in the years prior to 2008 and substantially before the most recent tax season, in which TaxACT has grown at a slower pace than HRB.  Finally, documents authored by HRB – not third party consultants – show that HRB believes that TaxACT's actions in years prior to 2008 *did not* reduce HRB's market share.  DX0117-007.

[31] While HRB offers products that are named "Free," "Basic," "Deluxe," and "Premium," it views all as being premium products.

intangible value associated with an almost universally recognized tax brand.[32]   Adding a value brand
to HRB's portfolio strengthens HRB by giving it access to customers who might decide to upgrade to
premium tax products or brick-and-mortar services that are better suited to their tax situations than
discount tax preparation products.[33]

      The Transaction will generate over ▉▉▉▉▉ in efficiencies by year 3 (and over ▉▉▉
▉▉▉ by year 2) by dramatically reducing HRB's costs of production by ▉▉▉▉▉▉



▉▉▉▉▉▉▉▉[34]   While these benefits will lead to substantial efficiencies, HRB
is confident that they can be implemented without diminishing the quality, services and reputation
associated with HRB's brand.[35]

---

[32] *See* DX1000-012 ("This acquisition, when complete, will give us a fighter brand, TaxACT in the
marketplace... and also enable us to better protect our H&R Block brand."); DX0602-001 (providing a
strategy chart showing options for acquiring TaxACT and favoring choice to continue to operate as a
separate business because it protects brand loyalty to TaxACT and the premium nature of HRB.
DX0602-001).
[33] *See* DX0038-010 (providing that HRB's free digital offerings could provide the company and
customers with unique benefits due to HRB's ability to provide digital customers with assisted prep).
[34] Cobb 89:17 – 22; DX0236-006 (Defendant H&R Block, Inc.'s Response to Plaintiff's First Set of
Interrogatories to Defendant H&R Block, Inc., Exhibit A).
[35] Houseworth Dep. 10:2-5; 93:1-3.

For consumers, the Transaction promises "aggressive" marketing of low-priced products. Indeed, pre-litigation documents make clear that HRB plans to use "TaxAct [to] aggressively target[] the low-ground," that "[HRB] will [a]ggressively market FREE and Online value pricing through [the] TaxACT brand," and that HRB will use TaxACT to "maintain a significant price advantage" as the "price leader."[36]  The Transaction will also benefit consumers because HRB will continue to innovate with the TaxACT brand ("[i]f we purchase [TaxACT], the other thing we *cannot* do is let their product rot on the vine....[TurboTax] continues to improve their product – even their Free product").[37]  For customers buying HRB branded products (as opposed to TaxACT products), the Transaction will lead to effective price reductions resulting from HRB's ability to exploit its reduced cost structure after the transaction.[38]  This Transaction also promises increased marketing and promotional expenditures, which will likely lead to lower ultimate prices for consumers.[39] ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████ ███████

███████████████████████████████████████████████████████

███████████████████████████

## III.   Competition in Tax Preparation.

As explained above, there are many different methods of tax preparation, including: (i) accountants, (ii) tax stores, (iii) premium tax software, (iv) value or "discount" tax software, and (v)

---

[36] DX1002-005; DX1004-002; DX0800-003, 4.
[37] DX9554.
[38] DX9521-006 - 9 ██████████████████████████████████████████
██████████████████ ; DX0240-15 (Defendants' Response to Plaintiff's First Set of Interrogatories to All Defendants, Response 3); Bennett Dep. 280:19-22 ("[W]e can reduce ███████████████
████████████ and plow [it] back into the marketplace").
[39] Jason Houseworth who is responsible for Digital Pricing testified that ████████████
██████████████████████████████████████ Houseworth Dep. 23:8-24:27; 26:3-12; 26:22-27:7.
[40] DX4000-009; DX4001-019.
[41] DX4001-004.

manual tax preparation (pencil-and-paper or free IRS electronic forms).  Each of these categories has

multiple vendors and products competing within it that serve as close substitutes for one another.

The pricing of products within a single category tends to be similar, while pricing between categories

can vary significantly.  In all instances, vendors of the different methods of tax preparation compete

with one another to convince customers that their product and service offers the right combination of

service, quality, and price for that customer.

### a.  Value and Premium Products.

HRB and TaxACT price their online products differently because the companies largely

compete for different customers.  Testimony from industry participants, documents from Defendants

and third parties, pricing data, and consumer preference data reveal that tax preparation customers

typically fall into one of two broad categories:  (i) "value" customers, *i.e.,* those that choose their

product primarily on price, and (ii) "premium" customers, *i.e.,* those that are willing to pay higher

prices for brand reputation, extra services, and expert support.  TaxACT targets value customers;

HRB targets premium customers.  While some customers switch between the two segments,

competition between these segments is relatively low.

While Plaintiff would have this Court believe that the distinction between premium and value

products was concocted for the purposes of this case, nothing could be further from the truth.  For

instance

---

[42] Edwards Dep. 8:21–25; 9:3–8.
[43] Petz Dep. 10:12–14.



Documents created years in advance of DOJ's merger review clearly show that the parties base their

customer acquisition strategies on distinct customers.[48]  For instance, when HRB acquired TaxNet in

2005, documents show that it hoped to position TaxNet in a value segment that it believed was

separate from the premium segment in which HRB competed.[49]  HRB noted at the time (six years

ago) that its high-priced TaxCut brand (the predecessor to H&R Block at Home) would compete in

---

[44] Petz Dep. 9:21-10:5.
[45] DX0033-007.
[46] DX0033-007.
[47] DX0033-002.
[48] HRB has not consistently used the words "value" and "premium," but has often referred to the distinction using terms like " lower-priced online space," DX0243-012 and the "low-end" DX0150-011. It has also referred to a "value brand" as a "fighter brand." *See, e.g.* DX1000-012.
[49] DX0150-009-11.

the premium segment with TurboTax,[50] while "TaxNet will compete directly with TaxACT and

FreeTaxUSA."[51]  While the TaxNet brand was ultimately abandoned, HRB continued (and continues)

to make the distinction between the value and premium segments.  Indeed, from 2009 to 2010, during

the course of negotiations with TaxACT, dozens of HRB's high level strategy documents show that

the TaxACT acquisition strategy focused on TaxACT and HRB brands largely attracting different

segments of customers.[52]  For example, in an internal October 8, 2010 email, HRB's Jason

Houseworth explained that HRB decided to purchase TaxACT because "[w]e determined [that] the

most aggressive way to grow would be to enter the value space."[53]  In a separate document, Mr.

Houseworth  stated that "[w]e do not plan to utilize Block-branded DIY to compete in the lower-

priced online space, so this [merger] provides an opportunity to grow share where we are not." [54]

Product reviewers also segment the market between value and premium offerings, reflecting

genuine product differences with respect to brand strength, support, and features. [55]  To that end,

reviews consistently rank TaxACT as the best value in tax preparation while noting that TurboTax

and HRB boast better support and overall higher quality products.[56]  For example, a CNET reviewer

---

[50] *Id.*

[51] DX0153-002.

[52] *See supra* n. 13.

[53] DX1804-001.

[54] DX0243-012.

[55] *See, e.g.*, 2SS-PETKe-0257089, 99 (providing that HRB, TurboTax, and CPAs have a similar level of brand awareness and consideration, ████████████████████████; http://www.hrblock.com/why-hr-block/index.html (last visited Aug. 11, 2011) (touting HRB's expertise); HRB-DOJ-00347049 at 3 (providing that post merger strategy will be to promote each brand's strength, including HRB's ability to offer live audit support).  HRB offers live assistance and support during the audit process with all online products, whereas TaxACT's "Audit Assistant" is a webpage of frequently-asked questions about the audit process. *Compare* http://www.hrblock.com/popups/pop_wfa_features.html (last visited Aug. 11, 2011) *with* http://www.taxact.com/tsupport/FAQDisplay.asp?Question=672 (last visited Aug. 11, 2011).

[56] Value alternatives to TaxACT and premium alternatives to Intuit and HRB also receive positive reviews that reinforce the distinction between value and premium products. *See* Kathy Yakal, PC Mag.com, CompleteTax Online (2010) (last visited Aug. 11, 2011), http://www.pcmag.com/article2/0,2817,2376886,00.asp (last visited Aug. 11, 2011); Exhibit 5, Joe Mont, TheStreet, *The Best Online Tax Services* (Feb. 8, 2010), DX0047-002-3 (ranking CompleteTax as the best service overall due to its ability to handle "potentially complex situations, such as home foreclosures, retirement plans and business income oddities"); TopTenREVIEWS, TaxSlayer, http://tax-software-

said "that TaxACT doesn't feature all the extras you'll find in more capable products and it's obviously designed for someone who wants to get their taxes filed as quickly and efficiently as possible. If you want to find obscure tax code topics, you won't find it in TaxACT. It's simply not that kind of preparation tool."[57] A reviewer at ABC News agreed, concluding that TaxACT "doesn't offer a lot of support, but it gets the job done."[58]

Pricing behavior over time is also telling.[59] Specifically, over the last several years, as the price of premium federal tax preparation products fluctuated wildly, the prices of value products offered by, for instance, TaxACT, FreeTaxUSA, TaxSlayer and OLT were static.[60]

### b. The Evidence Shows Limited Competition Between TaxACT and HRB.

Survey data on customers' potential responses to hypothetical price changes by TaxACT and HRB and data on historical switching among tax preparation methods show that Defendants are not close competitors. Indeed, the parties have conducted two large surveys studying the behavior of customers in response to price changes, including a survey prepared by Defendants during the DOJ's Merger Review and a survey prepared by HRB during the ordinary course of business. The survey prepared during DOJ's Merger Review sought to answer where TaxACT customers would go if TaxACT raised its price or reduced its quality.[61] The overwhelming answer was that they would not go to HRB. ███████████████████████████████████████

███████████████████████████████████████████████

---

review.toptenreviews.com/tax-slayer-software.html (last visited Aug. 11, 2011) ("TaxSlayer.com Classic Edition is the most price competitive online tax software.")

[57] Don Reislinger, Compared: Four Online tax filing services (Feb. 6, 2009), http://news.cnet.com/8301-17939_109-10158325-2.html (last visited Aug. 11, 2011).

[58] ABC News, *The Best Online Tax Prep Services* (Mar. 17, 2010), *available at* http://abcnews.com/Business/video/best-online-tax-prep-services-10124287 (last visited Aug. 11, 2011).

[59] Plaintiff's contention that HRB reduced the prices of its desktop products in 2008 and 2009 to compete with TaxACT is outlandish. The document cited by Plaintiff (Pl. Ex. 53) shows that HRB was responding to broader industry trends that included actions by HRB's largest premium competitor (TurboTax) as well as the general decline of the boxed software channel.

[60] Expert Rebuttal Report of Dr. Christine Siegwarth Meyer, Section VI ("List Prices for Online Federal Plus State DIY Products February 2006 to April 2010").

[61] DX0364-001-3.

███████████████████████████████████████████████████

████████████     ██████████████████████████████████

███████████████████████████████████

The survey performed in April 2009 by HRB for internal pricing purposes shows the same low level of competition between Defendants.  This large pricing study asked 6,119 survey respondents to select their tax preparation product preferences given a range of price scenarios.[62] Based on the survey responses, the study concluded that ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████ [63]  Thus, according to the survey, hypothetical price changes for HRB's product would have an almost negligible effect on demand for TaxACT with a significantly higher impact on alternatives that Plaintiff excludes from its proposed market.

Similarly, the data on historical customer purchasing trends produced by the IRS, Defendants, and third parties indicate that only 2.6% of TaxACT customers switched to HRB products between 2007 and 2008 (the years for which the parties have the most robust data), and only 2.7% of HRB customers switched to TaxACT products.[64]  This level of switching is substantially below the switching between Defendants' products and competitors outside of Plaintiff's proposed market.[65]

While some documents suggest that Defendants compete on some level, they do not show – as Plaintiff suggests – that Defendants are *close* competitors.  For instance, Plaintiff cites a 2006 email from Tom Allanson for the proposition that HRB's only direct competitors are TurboTax and TaxACT.  That email was between Tom Alanson and a *compensation consultant* seeking

---

[62] DX0032-002-7.
[63] DX0032-002-21 (TaxACT is listed in the chart below the text.).
[64] Expert Report of Dr. Siegwarth Meyer.
[65] *See infra* Section III.c.

compensation benchmarks and recruiting targets.[66]  Plaintiff also relies on another five-year old document suggesting that TurboTax and TaxACT were gaining share while HRB was losing share. While it is true that TaxACT was expanding in 2006, this does not show that TaxACT was gaining customers from HRB.  Indeed, the e-mail shows that HRB's unit sales grew ████ in 2006, confirming that its purported "share losses" were due to category expansion rather than customer losses.[67]

### c.   There Is Substantial Competition from Manual and Assisted Tax Preparation.

As discussed above in Section III.b, the survey data exploring the effects of potential price changes establish that (1) price changes on HRB products have a much more substantial effect on demand for paid (assisted) tax preparation services and manual (pencil-and-paper) filing than on TaxACT and (2) in response to a theoretical substantial price increase on TaxACT, ████████ ████████████ TaxACT customers would choose to fill out their tax returns by hand than would switch to HRB.

Similarly, the "Key Findings" section of an HRB document summarizing HRB studies notes that████████████████████████████████████████████████ ████████████████████████████ A June 2010 HRB analysis of switching between various tax preparation methods shows that (1) HRB's retail tax preparation offices get ████ of their volume from "Digital" products, ████████████ ████████████and (2)████████████████████████ ████████████████████████████████████████ ████████████████ Finally, HRB has publicly stated that its digital DIY tax preparation products "compete with in-office tax preparation services and a number of online and software

---

[66] Pl. Ex. 70.
[67] Pl. Ex. 71, at 2████████████████████████
[68] Pl. Ex. 74, at 5.████████████████████
████████████████████████████████████

[69] DX0030-16 (comments reflect an indexing for share because paid tax preparation methods have a larger share of the total tax preparation market than "DIY Digital" products).

companies, primarily on the basis of price and functionality."[70]

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[70] DX0358-026.

[71] Historical switching data also provides strong evidence that tax preparation methods that Plaintiff has excluded from the market compete closely with competitors within Plaintiff's proposed market.  For instance, the data shows that █████████████████████████████████████

██████████  Contrary to Plaintiff's contention, this switching between premium digital DIY products and other methods of tax preparation cannot be attributed to changes in filing complexity ("life events") because switching data limited to instances where filing complexity remains static show virtually the same level of switching noted above.

[72] DX0011-002████████████████████████████

██████████████████████████

[73] DX0079.

[74] Id. at DX0079-025.

[75] DX8021-59.

[76] DX0078-002-22.

[77] DX 0045.



Furthermore, documents show that the pricing and promotional behavior of Defendants is consistent with switching data, survey data, and testimony showing that pencil-and-paper preparation competes closely with value products while assisted tax preparation competes closely with premium products.[80]  For instance, TaxACT ████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████[81]  On the assisted preparation side, HRB's documents show ████████████████████

████████████████████████████████████████████████

## IV. **TaxACT is not a Maverick.**

### a. **The Rise of Free Tax Preparation.**

While TaxACT has successfully employed "Free" marketing to introduce customers to its value products in the hopes that these customers will ultimately become paying customers, TaxACT was by no means the first to use "Free" marketing (also called the "freemium" model) in the online space generally or in the tax preparation niche specifically.  Indeed, the rise of the freemium model in tax preparation was part of the broader explosion of "free" introductory products and services on the Internet from the mid-1990s to the present.[83]  Specifically, the development of the freemium model

---

[78] Maurer Dep. 14:24–15:8.
[79] Maurer Dep. 16:13–16.
[80] Although Plaintiff cites an HRB document for the proposition that "Free" product offerings caused "price compression" "across all Digital DIY," thereby suggesting pricing dynamics limited to "Digital DIY," the document actually reads "price compression across *all* tax prep." Pl. Br. 24 (citing Pl. Ex. 119) (emphasis added).
[81] DX0013-002.
[82] DX0040.
[83] *See* Chris Anderson, *Free* (2010) (exploring numerous free models that have emerged and been popularized in recent years).  "Adobe Acrobat" provides one of many examples of a product marketed through a free version ("Adobe Acrobat Reader") and monetized through upgrades and cross-sales of Adobe's paid software.

in tax preparation was a dynamic process that began with Intuit making the first free offers and had numerous additional players over the course of several years also choosing to use "Free" as a marketing tool for products across the tax preparation industry. This proliferation culminated in the widespread embrace of the model by the entire industry,[84] including in the assisted space.[85]

This adoption of "Free" in tax preparation began even before TaxACT existed. In fact, in 1998 TurboTax offered free returns through its Tax Freedom Project.[86] In more recent years, the freemium model has become so ingrained that at least seventeen companies currently market online tax preparation using "free" offers.[87] The IRS even helped establish a program by which industry participants can offer free tax preparation services through an IRS-sponsored link. The Free File Alliance ("FFA") has existed since 2002; today it offers free federal products through its seventeen members to about 70% of tax filers.[88]

### b. TaxACT's Historical Role in the Free Movement.

DOJ's allegation that TaxACT is a maverick because it was an early adopter of the freemium model in tax preparation is factually unsupported.[89] First, although TaxACT was admittedly an early

---

[84] *Id.* at 248 (2010) (mentioning Intuit's use (but not TaxACT's) of a free federal offer of TurboTax Online combined with a paid state product as a successful "Freemium Tactic"). The freemium model owes its popularity to its extraordinary effectiveness in attracting paying customers. As explained in an HRB email, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ DX0400-001-2. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[85] *See* Ben Steverman, *At H&R Block, 1040EZ is Free*, Businessweek, (Jan 20, 2011), available at http://www.businessweek.com/magazine/content/11_05/b4213023812682.htm (discussing HRB's free storefront offers) (last visited Aug. 12, 2011).

[86] *Cf.* Intuit, What is the Intuit Tax Freedom Project?, http://turbotax.intuit.com/taxfreedom/about_us (last visited August 12, 2011) ("Since the Tax Freedom Project's inception in 1998, Intuit has donated **more than 21 million returns** to qualified taxpayers.")

[87] http://www.freefilealliance.org/.

[88] *Id.*

[89] Plaintiff's attempt to construe a 2006 press release that uses the term "maverick," a 2006 TaxACT press kit boasting about TaxACT's effect on the market, and TaxACT's product promotion statements in

adopter of "Free," Intuit was the first adopter, and the IRS was the initial catalyst for widespread free federal tax preparation and filing.[90]  Indeed, the first widespread free offers in tax preparation arose in response to the IRS Restructuring and Reform Act of 1998 and instructions from the Office of Management and Budget's Quicksilver Task Force (2001), which collectively required that the IRS dramatically increase the rate of e-filing and establish some form of free tax preparation.[91]  The tax preparation industry feared in 2001 (and still fears) that these mandates would encourage the IRS to become the *de facto* provider of free tax preparation services.[92]  In 2002, the IRS, working with the tax preparation industry, determined that an efficient mechanism for complying with the mandate would be to have the IRS solicit free tax preparation services from private providers rather than having the IRS provide such tax preparation services on its own.[93]

This led to the  FFA.  The FFA's first tax season (2003) was chaotic, with thirteen independent companies making various different free offers and with some even setting up "clone" websites in order to broaden the number of offers they could make.[94]  Indeed, TaxACT's 2003 offers were not unique and were not as broad as those offered by others.  In fact, several other companies in January 2003 had *no income* restrictions, instead limiting offers by state and age.[95]  The broadest such offer was from my1040EZ.com, Inc. (FreeTaxUSA), which offered free tax preparation to all

---

[90] investor presentations as "admissions" is unavailing.  These sound bites do not show that TaxACT was (five years ago) or is an *antitrust* maverick.  A company aggressively pitching itself in public documents designed to elicit private investment and press mentions is not uncommon.  Such statements have little if any bearing on the antitrust analysis this Court is undertaking.

[90] Ciaramitaro Dep. 30:12- 31 ("In fact, even before this [the FFA], the whole industry was promoting try it for free, so free was not a new idea at all, and everyone knew the power of free . . . ."); 35:8-36:18 (". . . I think TaxACT was no different than anyone else, including Block.").

[91] DX0360-001-2; About the Free File Alliance, http://www.irs.gov/efile/article/0,,id=200979,00.html (last visited Aug. 12. 2011).

[92] DX0359-001-51 (providing the Industry's concerns regarding the President's FY2001 Budget Request that "[no] later than Tax Year 2002, the IRS would be required to offer one or more options to the public for preparing and filing individual income tax returns over the Internet at no cost to the taxpayer").

[93] DX0360.  Some continue to believe that the "IRS will enter the online tax preparation with a free product…only questions are when and with what offering."  HRB-DOJ-00455531, 3.

[94] *See* DX2204-003 (providing that there were 13 separate FFA competitors in 2003, or 17 competitors if companies licensing the products of other competitors are included).

[95] DX0046-001.

persons aged 20 or younger and all persons aged 45 or older. [96]   Ultimately, the free offers on FFA

covered 94% of all taxpayers. [97]

      In tax season 2004, companies continued to experiment with "free" offers.  For instance,

FreeTaxUSA made a completely free offer in 2004 included all taxpayers in all states for which

FreeTaxUSA had state products regardless of age or income. [98]   Ultimately, TaxACT and three other

companies made "free for all" offers (i.e., a free offer without any restrictions) which marginally

broadened the total offering of the FFA that year (from 94% of taxpayers in 2003 to 100% of

taxpayers in 2004). [99]   During the course of the following tax season, 10 out of the 20 then-members

of the FFA ultimately offered "free for all" products, with "[s]everal Alliance

participants…enthusiastically embrac[ing] unrestricted free service because they found the Free File

program to be an effective method of cross-selling their paid goods and services." [100]   Other

companies also pursued unique free offers on the FFA, including free state filing, free Spanish-

language filings, and free extensions. [101]

      As free-for-all proliferated on the FFA, companies began to offer similar offers on their

websites.  For instance, in 2005 (that same tax season), FreeTaxUSA offered a free federal income

tax product on its website to all customers regardless of age or income in all of the states noted above

---

[96] *Id.*
[97] DX2205-002.
[98] http://web.archive.org/web/20040203115235/http://www.irs.gov/app/freeFile/jsp/index.jsp (last visited Aug. 11. 2010).  The FreeTaxUSA states at the time included California, New York, Pennsylvania, New Jersey, Ohio, Illinois, Georgia, North Carolina, Virginia, Indiana, Louisiana, Arizona, Colorado, and Utah.
[99] DX2205-002. (providing that 94% of taxpayers could already use the FFA).
[100] DX2205-003.  This raised concerns by some FFA members and the IRS that the FFA was no longer focused on low income taxpayers and that free-for-all could lead to less monetization by tax preparation companies, which in turn could lead to fewer FFA competitors and the downfall of the FFA.  To avoid this (and the potential of the IRS creating its own offering), the IRS and FFA created rules to prevent free-for-all offers.  This was similar to how the IRS and FFA had dealt with similar destructive/abusive FFA practices such as offering clone websites, advertising non-tax related products (such as deals on leather jackets) and offering high cost RALs to low income consumers.  Dumar Dep. 109:3-109:7.
[101] DX2207-006.

plus Michigan.[102]   Similarly, in 2006, TaxACT started offering an unqualified free offer that was

marginally broader than FreeTaxUSA's offer.  In the past five years, TaxACT has only slightly

modified its free offer and has not made any notable changes since 2008.[103]   Indeed, TaxACT has not

participated in the most recent innovations in "Free," including the offering of free state preparation

products (which began as early as 2006 in online) and free brick-and-mortar products, which began

in the 2010 tax season.

Plaintiff's only claim of innovation by TaxACT in the past half decade is that TaxACT

offered free state e-File in its retail software.  This was not innovation by TaxACT.  First,



Second, the offer was in only one chain

(Staples) in only one tax season (2010-11).  Third, the same offer was made in boxed software by

both CompleteTax and HRB in tax season 2008-09.[105]

## ARGUMENT

A preliminary injunction is "an extraordinary remedy," available only if the movant, upon a

clear showing, carries the burden of proof and persuasion.[106]   In assessing motions for a preliminary

---

[102] http://web.archive.org/web/20050406035429/http://www.freetaxusa.com/ (last visited Aug. 11, 2011).
[103] Like the 2009 and 2008 products, the 2010 free product includes all fall e-fileable forms and all other major forms except 1040X.  DX0349 (Response of TA I.X. L.P. to the Request for Additional Information and Documentary Material Issued by the Antitrust Division of the Department of Justice ("TA's Second Request Response"), specification 2(a).
[104] DX0335 & DX0336 (Software Distribution Agreement between 2nd Story Software & Avanquest North America Inc. § 4.5 (June 15, 2010), ▮▮▮▮▮▮▮▮▮▮▮▮ Indeed, Avanquest has recently demonstrated its complete independence by trying to use the Complaint in this case, which overstates the significance of the TaxACT product at Staples last year ▮▮▮▮▮▮ DX0334.
[105] Simone Dep. 308:22-310:16 (stating "H&R Block, as well as CompleteTax" were the first companies "to offer free state e-files in a retail boxed product.").
[106] *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004); *see also City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 127 (D.D.C. 2006) ("The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised.").

injunction based on Section 15 of the Clayton Act,[107] a court "must apply this circuit's fundamental four-part preliminary injunction standard."[108]  The test provides that a preliminary injunction is warranted only when the plaintiff has shown that "(1) there is a substantial likelihood the party will succeed on the merits; (2) the party will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure other parties; and (4) the public interest will be furthered by the injunction."[109]  As the Supreme Court recently made clear, a plaintiff must affirmatively demonstrate all four elements to obtain a preliminary injunction, including both a substantial likelihood of success and a likelihood of irreparable injury.[110]  And, as this Circuit has explained:

---

[107] Plaintiff improperly relies on cases brought pursuant to the Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), in hopes that this Court will apply a substantially lesser standard.  The text of the FTC Act provides a unique, congressionally-mandated balancing test to determine the propriety of preliminary injunctions awarded pursuant to the FTC Act. 15 U.S.C. § 53(b) ("Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest . . . a preliminary injunction may be granted."); *FTC v. H.J. Heinz*, 246 F.3d 708, 714 (D.C. Cir. 2001) ("Section 13(b) provides for the grant of a preliminary injunction where such action would be in the public interest . . . The Congress intended this standard to depart from what it regarded as the then-traditional equity standard.").  Section 15 of the Clayton Act, under which the DOJ proceeds in this case, has no such language; it relies entirely on the traditional preliminary injunction standard used by courts in equity.  *See Gillette*, 828 F. Supp. at 80 (analyzing standard for cases brought under the FTC Act but stating "[t]his case, however, is not brought pursuant to § 53(b) and therefore the court must apply this circuit's fundamental four-part preliminary injunction standard.").  Thus, Plaintiff's authority for the suggestion that irreparable harm is presumed and that it need only show "a reasonable probability that the proposed acquisition would substantially lessen competition" to obtain a preliminary injunction is entirely inapposite. *See e.g. FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 45 (D.D.C. 1998) (explicitly discussing the standard "the Commission" must meet "pursuant to its statutory authority" to obtain a preliminary injunction); *H.J. Heinz*, 246 F.3d at 713-14 (considering congressional intent embodied in FTC Act); *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 43-44 (D.D.C. 2002) ("[Section 13(b) of the FTC Act] is broader than the traditional equity standard that is normally applicable to requests for injunctive relief."); *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980) (creating presumption for Second Circuit Court without consideration of any D.C. Circuit cases, but nonetheless conceding that "the Government must do far more than merely raise sufficiently serious questions with respect to the merits" to merit a preliminary injunction).

[108] *United States v. Gillette Co.*, 828 F. Supp. 78, 80 (D.D.C. 1993).

[109] *City of Moundridge*, 429 F. Supp. 2d at 127 (quoting *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1317-18 (D.C. Cir. 1998)).

[110] *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008) (reversing the lower court's holding that "when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm."); *Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits." (internal citations omitted)).

"[U]nder the Supreme Court's precedents, a movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm, among other things."[111]

The standard for Plaintiff's "likelihood of success" is established by Section 7 of the Clayton Act, which prohibits acquisitions "where . . . the effect of such acquisition... may be substantially to lessen competition or to tend to create a monopoly."[112]  This requires Plaintiff to show that "a substantial market effect [is] reasonably likely before an injunction is warranted."[113]  Plaintiff must further demonstrate that the substantial lessening of competition is "sufficiently probable and imminent."[114]  "A showing of a fair or tenable chance of success on the merits will not suffice for injunctive relief.'"[115]

At all times, "[t]he United States has the ultimate burden of proving a Section 7 violation by a preponderance of the evidence."[116]  To carry its burden, Plaintiff may establish a presumption of illegality by "showing that a transaction will lead to undue concentration in the market for a particular product in a particular geographic area."[117]  Defendants may rebut this presumption by presenting evidence to show that the market-share statistics give an inaccurate account of the merger's probable effects on competition and/or that the transaction is not likely to lessen competition.[118]  A variety of factors may overcome a structural presumption, including but not limited to the likelihood of entry into the relevant market, the insignificance of market shares and

---

[111] *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J. and Henderson, J., concurring); *see also Sherley v. Sebelius*, No. 10–5287, 2011 WL 1599685, (D.C. Cir. Apr. 29, 2011) ("[W]e read Winter at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.").

[112] 15 U.S.C. § 18.

[113] *United States v. Baker Hughes Inc.* (Baker Hughes I), 731 F. Supp. 3, 11 (D.D.C. 1990).

[114] *Marine Bancorporation, Inc.,* 418 U.S. at 623 n. 22 (1974); *Gillette*, 828 F. Supp. at 85 (requiring a showing that anti-competitive effects are "probable").

[115] *FTC v. Arch Coal, Inc.* 329 F. Supp. 2d 109, 116 (D.D.C 2004) (quoting *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999)).

[116] *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 180 (D.D.C. 2001).

[117] *United States v. Baker Hughes* (Baker Hughes II), 908 F.2d 981, 982 (D.C. Cir. 1990).

[118] *Id.* at 985.

concentration, the likelihood of express or tacit collusion, and the prospect of efficiencies from

merger.  If the presumption is rebutted, the burden shifts back to Plaintiff to produce evidence

demonstrating that the merger will have anticompetitive effects.[119]

## I.   Plaintiff Cannot Establish a Likelihood of Success Because its Product Market Definition is Implausible.

A *prima facie* Section 7 case rests on "show[ing] that the merger would produce 'a firm

controlling an undue percentage share of the relevant market, and [would] result [ ] in a significant

increase in the concentration of firms in that market.'"[120]  The first step in this analysis is defining the

relevant market.[121]  "Not only is the proper definition of the relevant product market the first step in

this case, it is also the key to the ultimate resolution of this type of case, since the scope of the market

will necessarily impact any analysis of the anticompetitive effects of the transaction."[122]  A relevant

market consists of: (1) the relevant product market and (2) the relevant geographic market.[123]  The

"relevant product market" includes the products and services against which the defendants' products

compete.  Plaintiff bears the burden of proof and persuasion in defining the relevant market.[124]

Courts traditionally consider two factors in establishing a relevant market: "(1) the reasonable

interchangeability of use and (2) the cross-elasticity of demand between the product itself and

substitutes for it."[125]  The relevant market must include all competitive alternatives that "have the

ability to take significant business from each other."[126]

Recognizing that without a market definition under which the combination of the Defendants

would result in an undue percentage of share (typically at least at or above 30%) and/or an undue

---

[119] *Id.* at 983.
[120] *Sungard*, 172 F. Supp. 2d at 180 (internal citations omitted).
[121] *See, e.g., Marine Bancorp.*, 418 U.S. at 618-23; *Sungard*, 172 F. Supp. 2d at 181.
[122] *Sungard*, 172 F. Supp. 2d at 181; *see also United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1110 (N.D. Cal. 2004).
[123] Defendants do not contest the "relevant geographic market" alleged by Plaintiff.
[124] *Arch Coal*, 329 F. Supp. 2d at 119.
[125] *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).
[126] *Arch Coal*, 329 F. Supp. 2d at 119.

increase in concentration level (an increase in the HHI of more than 200), its structural case falls apart, Plaintiff argues that tax preparation methods and products ranging between "Free" and over $100 are in the same market.  Plaintiff also argues, however, that other tax preparation products and methods ranging between "Free" (manual DIY or pencil-and-paper) and over $100 (assisted preparation) are not in the same market.  In so arguing, Plaintiff asks this Court to ignore extensive price and feature differentials by including all Digital DIY products, but to consider feature differences (ease of preparation) when excluding manual DIY and to consider price differences when excluding assisted preparation.  Plaintiff cannot have it both ways.

Indeed, Plaintiff's market definition fails because (1) manual tax preparation is "reasonably interchangeable" with and "take[s] significant business from" "Digital DIY" companies and methods, particularly value "Digital DIY" companies and methods and (2) assisted tax preparation is "reasonably interchangeable" with and "take[s] significant business from" "Digital DIY" companies and methods, particularly premium "Digital DIY" companies.  The evidence shows cross-elasticity of demand between these methods and also clearly shows less price/demand interaction between TaxACT and HRB than between HRB and either manual tax preparation or assisted tax preparation.[127]  In fact, Plaintiff's proposed market violates the methodology set forth in its own *Horizontal Merger Guidelines* because the methods of tax preparation included in Plaintiff's proposed market compete more closely with methods excluded from that market than with one another.[128]  The fact that Defendants at times refer to one another as competitors does not change this

---

[127] Cross-elasticity of demand refers to the "'responsiveness of the sales of one product to price changes of the other.'" *Staples*, 970 F. Supp. at 1074 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 400 (1956)).

[128] "When applying the hypothetical monopolist test to define a market around a product offered by one of the merging firms, if the market includes a second product, the Agencies will normally also include a third product if that third product is a closer substitute for the first product than is the second product." *Horizontal Merger Guidelines* (2010).

fact.[129]

### a.   Manual Filing is a Significant Competitive Constraint on Defendants.

"Courts have generally recognized that when a customer can replace the services of [an external product] with an internally-created [ ] system, this 'captive output' (i.e. the self-production of all or part of the relevant product) should be included in the same market."[130]  Thus, as a matter of law, manual preparation should be included in the same market as digital products because there is no debate that consumers can and do prepare their own taxes using pencil-and-paper or free online forms.  Plaintiff's argument that manual tax preparation is not a close substitute for products in Plaintiff's alleged market is factually incorrect for two primary reasons.

First, the data and testimony reveal that federal tax preparation customers consider manual filing a close substitute for products offered by Intuit, HRB, and especially TaxACT.



---

[129] "[S]eparate markets are not indicated by documents within A firms that are preoccupied with other A firms. After all, a given producer of A cannot charge more than other A firms and thus may focus entirely on them even though a hypothetical monopolist of product A firms would focus entirely on the price of a close substitute B." *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 41 n.18 (D.D.C. 2009) (citing Phillip E. Areeda , *et al*, IVA Antitrust Law ¶ 562a at 372 (2d ed. 2006)).
[130] *Sungard*, 172 F. Supp. 2d at 186, (citing *Cardinal Health*, 12 F. Supp. 2d at 48); *see also Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 278 (5th Cir. 1978); *United States v. ALCOA*, 148 F.2d 416, 424 (2d Cir.1945); 2B Areeda et al., Antitrust Law ¶ 535e st 281 (3d ed. 2007).
[131] Edwards Dep. 57:14–20.
[132] Maurer Dep. at 15.

███████████████████████████████████

Survey data also show that TaxACT's paying federal customers consider manual filing to be a better substitute than HRB products.  When asked about their response to a hypothetical price increase, more ██████████████ paying TaxACT customers █████████ stated that they would choose to fill out their tax returns by hand than would choose to use HRB.[134]  Moreover, pricing analyses done internally by HRB and separately by Dr. Meyer unequivocally show that demand for manual preparation is a larger constraint on HRB's price than TaxACT and Intuit.[135]  Indeed, Dr. Meyer's pricing simulator analysis indicates that in the event of a price increase by HRB, the second largest diversion (after assisted preparation) is to pencil-and-paper.

Second, Plaintiff's Complaint and Brief completely ignore manual preparation and filing of state tax returns ("state manual prep") despite proposing a market that includes "the preparation of U.S. federal and state tax returns."[136]  Indeed, Plaintiff has failed to allege any facts about competition between "Digital DIY" state preparation and other forms of state tax preparation, including manual preparation.  This is a glaring omission because Plaintiff stakes its arguments against the inclusion of manual preparation is Plaintiff's belief that filers will not turn to manual preparation because of the purported "complexity" of federal tax filings.  State tax filings, which comprise a significant portion of the alleged market, are typically much simpler than federal filings, a fact that obviously undermines Plaintiff's complexity argument.  Furthermore, competition between manual state preparation and "Digital DIY" state preparation is an inextricable part of the "Free" competitive landscape.  As Dr. Warren-Boulton acknowledged, "[f]irms generate revenue from the provision of free federal product by selling complimentary product to customers," and "[t]he most notable source of that additional revenue is a charge to prepare and e-file the corresponding state

---

[133] *Id.* at 192-93.
[134] DX0364-001-3.
[135] DX0032-002-21; Expert Report of Dr. Siegwarth Meyer, Section V.
[136] Compl. at ¶23.

income tax return."[137]  In other words, firms offer "Free" federal products in large part to sell state

tax preparation products.  For the large pool of "Free" federal customers who also file state returns,

one of the primary alternatives to a paid state product is manual state preparation.  As a result,

████████████████████████████████████████████████████████████████

███████████████████████████████████████[138]

### b.   Assisted Tax Preparation is a Major Competitive Constraint on Defendants.

Plaintiff insists that providers of premium and value digital tax preparation tools compete in

the same market notwithstanding that there is little or no price competition between these segments,

but nonetheless excludes assisted tax preparation because it is "typically much more expensive than

Digital DIY products."  Plaintiff thus ignores its own contention elsewhere in its brief that tax

preparation methods can and do "compete along more dimensions than price."  Plaintiff also seeks to

distinguish assisted preparation from Digital DIY preparation because "[p]rofessional tax preparation

provides customers with one-on-one professional tax guidance, which is *generally* unavailable with

Digital DIY products."[139]  This is factually incorrect with regard to many premium Digital DIY

products.[140]  It also ironically suggests that assisted preparation is purportedly *too good* to be a

competitive constraint on Digital DIY preparation.

The reality is that assisted tax preparation is very competitive with premium digital tax

preparation and is also competitive with value tax preparation.  In fact, documents and data

conclusively show that assisted tax preparation exerts a significant competitive constraint on all

"Digital DIY" products.  For instance, a large pricing study used by HRB during the ordinary course

---

[137] Pl. Ex. 121 at 14.
[138] DX0013-002.
[139] Pl. 22 (emphasis added).
[140] *See* http://www.taxbrain.com/professional-services/ (providing expert one-on-one tax guidance to TaxBrain customers) (last visited Aug. 11, 2011); http://www.hrblock.com/index.html (providing one session of "free live tax advice" from a tax professional for H&R Block "Premium" customers) (last visited Aug. 11, 2011); http://www.hrblock.com/online-tax-preparation/best-of-both.html (providing unlimited guidance from a tax professional for H&R Block "Best of Both" customers) (last visited Aug. 11, 2011).

of business shows that reducing the price of HRB's digital products has a vastly more significant effect on the demand for assisted preparation (and manual preparation) than for TaxACT's digital products.[141]   Another HRB strategy document shows that as many people switched from HRB's digital products to ███████████████████████████████████████████   A June 2010 HRB analysis of switching between various tax preparation methods shows that (1) HRB's retail tax preparation offices get ███████ of their volume from "DIY Digital" products and (2) TaxACT ranks below HRB's major brick and mortar tax preparation competitors, including Liberty Tax and Jackson Hewitt, for switching to and from HRB's "DIY Digital" products (after indexing for market share).[143]

_____

[141] DX0032-002-21.

[142] Pl. Ex. 74, at 5.

[143] DX0030-16.

[144] *See supra* Section III.c ████████████████████████████████████████
████████████.

[145] Pl. Ex. 128 (emphasis added).

[146] Similarly, Coke and Pepsi's shares may remain consistent over time such that they are not incrementally pulling share from one another.  That does not mean that they are not competing and that customers are not switching back and forth.

[147] Pl. Ex. 128, at 41. ████████████████████████████████████████████████
████████████ with premium digital options from Intuit ranging from $49.95 to $149.95, *see* Intuit TurboTax, http://turbotax.intuit.com/ (last visited August 11, 2011).

## II.   Plaintiff Cannot Establish Competitive Effects.

Plaintiff's carefully crafted market definition is the linchpin to its case and to the present
motion.  Nonetheless, Plaintiff cannot prevail even if this Court adopts that market definition because
(1) Plaintiff has failed to adequately allege undue market concentration to establish a presumption; (2)
Plaintiff has not shown that HRB and TaxACT are close substitutes as is necessary to establish a
unilateral effects claim;[118] and (3) the structure of Plaintiff's proposed market and efficiencies from
the transaction undermine Plaintiff's coordinated effects case.

### a.   Plaintiff Has Failed to Demonstrate Undue Concentration.

Plaintiff cannot satisfy its burden to establish market concentration in a product market
consisting of "Digital do-it-yourself tax preparation products for the preparation of U.S. federal and
*state individual tax returns*"[149] because it has neither proffered evidence nor made a single share
claim concerning state tax preparation.  Instead, Plaintiff derives its market share figures solely from
IRS data on federal returns without mention of any state return numbers.[150]  Indeed, Plaintiff has not
even *alleged* that its share figures for federal returns are indicative of shares in state filings or in
Plaintiff's proposed overall market.  Moreover, sales data show that many of Defendants' federal
customers do not purchase Defendants' state products (*e.g.*, ███ of TaxACT's federal customers in
2009 did not purchase TaxACT's state products); this obviously means that the shares alleged by
Plaintiff are not representative of the actual shares in the alleged combined federal and state market.

---

[118] Plaintiff suggests that the brands at issue "need not be *the closest* substitutes for *all* consumers." Pl.
Brief at 30 (emphasis added).  This may be true, but there is no question that they must be especially close
substitutes. U.S. Dep't of Justice & Fed. Trade Comm'n, Commentary on the Horizontal Merger
Guidelines (2006) ("Commentary"), 26.

[149] Pl. 19 (emphasis added).

[150] Pl. 32, n. 148.  Plaintiff bases its allegations of market concentration on (1) Dr. Warren-Boulton's
assessment of market share, which was calculated using "IRS efiled returns," Pl. Ex., 36; (2) an H&R
Block document only purporting to show IRS ERO data (IRS electronic returns online), Pl. Ex. 27; and (3)
testimony about that H&R Block documents, Pl. Ex. 21.

As a result, Plaintiff has not established a *prima facie* case.[151]

### b.   The Transaction Will Not Result in Unilateral Effects.

Plaintiff's unilateral effects argument fails legally because Plaintiff admits that the alleged market is a "differentiated product market."[152]   "To prevail on a differentiated products unilateral effects claim, a plaintiff must prove a relevant market in which the merging parties would have essentially a monopoly or dominant position."[153]   The Defendants' combined share (28.4%)[154] of the differentiated market alleged by Plaintiff, is thus well below the threshold necessary to establish a *prima facie* case of unilateral effects.[155]

Plaintiff's unilateral effects argument is also factually deficient.  Relying almost entirely on its expert, Plaintiff fails to provide any real evidence that HRB and TaxACT are close substitutes. They are not.  The customer data from the IRS and various companies as well as the data from surveys conducted pre and post Transaction make clear that customers do not view HRB and TaxACT as close substitutes.[156]   In fact, data from a survey conducted by H&R Block during the ordinary course of business show that, in the event of a price increase, H&R Block customers would be significantly more likely to switch to assisted tax preparation or manual tax preparation than to

---

[151] *Arch Coal*, 329 F. Supp. 2d at 123. (stating that the government has the burden of proving "undue concentration in the relevant market," which "is a function of the number of firms in a market and their respective market shares"); *cf. Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd*, 924 F.2d 1484 (9th Cir. ) (finding that plaintiff failed to establish market power where "market share [could] not be calculated from the evidence [the plaintiff] provided"); *L & J Crew Station, LLC v. Banco Popular de Puerto Rico*, 278 F. Supp. 2d 547, 558 (D.V.I. 2003) (holding that market power cannot be proved where plaintiff "offers no affidavits or other evidence to establish the supposed market share of the [defendants]"); *Western Parcel Express  v. UPS*, 65 F. Supp. 2d 1052, 1060-61 (N.D. Cal. 1998) ("And a showing of market share is one of the requirements for a circumstantial showing of market power. Market share data must reflect the actual circumstances in a relevant market and must not be extrapolated from separate or parallel markets.").

[152] Pl. Brief at 27.

[153] *Oracle*, 331 F. Supp. 2d at 1123.

[154] Compl. at ¶ 39.

[155] *See, e.g., id.* ("A presumption of anticompetitive effects from a combined share of 35% in a differentiated products market is unwarranted. Indeed, the opposite is likely true.").

[156] Expert Report of Dr. Siegwarth Meyer.

TaxACT.[157]

### c.  Competitive Conditions in the Proposed Market Prevent Coordinated Effects.

Even if Plaintiff could establish a presumption in its favor, Plaintiff's coordinated effects argument would fail because (1) competition from the dozens of competitors in Plaintiff's alleged market, combined with low barriers to entry and expansion, would prohibit HRB and Intuit from profitably coordinating; (2) the admitted prevalence of non-price competition in this market makes coordination impractical; (3) TaxACT is not an antitrust maverick; and (4) efficiencies and the resulting benefits to customers, outweigh any potential competitive effects.[158]

> i.  *Significant competitors combined with low barriers to expansion and entry prohibit profitable coordination.*

"Even in highly concentrated markets," expansion by existing firms *or* entry by new firms defeats an acquisition's potential anticompetitive effects if that expansion or entry is "proven to be *timely, likely,* and *sufficient* in its magnitude, character and scope to deter or counteract the competitive effects of concern."[159] Expansion or entry need not be effortless, and even "significant" barriers to expansion or entry may be overcome. "In analyzing the probabilities of entry or expansion in the future, it is critical to maintain a dynamic view of the relevant market."[160] Expansion or entry is *timely* if it can "plausibly occur" "*within two years* from initial planning to significant market impact."[161] Expansion or entry is *likely* "if it would be profitable at premerger prices, and if such prices could be secured by the entrant."[162] Expansion or entry is *sufficient* if it would "return market prices to their premerger levels."[163]

---

[157] Expert Report of Dr. Siegwarth Meyer, Section V.
[158] For the sake of brevity (in an already long brief), the efficiencies are discussed in the sections discussing the private and public equities. They are, however, relevant here as well.
[159] *Cardinal Health, Inc.*, 12 F. Supp. 2d at 54–55 (internal quotation omitted).
[160] *Id.* at 58.
[161] *Id.* at 55–56 (internal quotation omitted).
[162] *Id.* at 56–57 (internal quotation omitted).
[163] *Id.* at 58.

The record here establishes that expansion by existing firms will be timely, likely, and sufficient. First, greenfield entry is not necessary in this industry because there are already at least seventeen viable competitors who have the incentive and ability to expand. Indeed, "timely" expansion has been the norm in this industry for years, and Plaintiff's red herring arguments about the difficulty of developing *an entirely new program* are moot because "[t]axpayers have many choices for preparing and electronically filing their federal income tax returns." *Byers v. Intuit, Inc.*, 564 F. Supp. 2d 385 (E.D. Pa. 2008) (citing representations to the court from the IRS). The IRS acknowledges that the seventeen companies offering products through the FFA are "fast," allow customers to file "safely and securely," and "provide[] step-by-step guidance" to "get a more accurate tax return."[164]  In fact, the alleged digital tax preparation industry is unique in that a government agency provides competitors with access to customers on its own website in an effort to "encourage further growth in electronic filing by providing taxpayers the option to file their tax return on-on-line [sic] without charge, using cooperation with, and encouraging competition within, the private sector to increase e-filing."[165]

Moreover, two companies in particular – TaxSlayer and TaxHawk (FreeTaxUSA) – have been growing in revenue and prominence over the past few years.[166]



timely entry/expansion is possible because, in this era of cloud computing and industrial server farms for

---

[164] http://apps.irs.gov/app/freeFile/jsp/index.jsp?Freefile=PCbutton; http://www.freefile.irs.gov/.
[165] DX0365-001. By Plaintiff's own telling of the facts, TaxACT itself gained a foothold in the industry through the IRS' Free File webpage.
[166] The recent success of TaxSlayer and FreeTaxUSA is demonstrated in part by internal references to the "Big Five," DX1400-001, and to internal documents more and more frequently monitoring their success, *see e.g.,* DX1413 ("Here's some feedback that I received on FreeTaxUSA – IT makes me wonder if we need to be more aware of competitor organic search . . . . FreeTaxUSA.com was up year-over-year in both traffic and units.").

rent, any infrastructure or technology improvements necessary to serve a larger number of customers can be achieved in well under a year and at relatively low cost, particularly as firms in the industry already experience rapid changes in customer volume due to the highly seasonal nature of tax preparation. ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

Expansion by competitors is also highly *likely*, as evidenced by testimony and documents. For instance, in undated, handwritten notes about a potential acquisition of TaxACT, former HRB CEO Russ Smyth noted, "Risks–low barriers of entry to online?"[168]  An HRB presentation titled "Digital Tax Solutions FY06 Tax Preview," dated December 2005, similarly noted, regarding the Free File Alliance, "New competitors will continue to emerge."[169]  Moreover, "[t]he history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future."[170]  As Bert DuMars, former Director of the Electronic Tax Administration of the IRS, acknowledged during his deposition, at least seven new companies joined the FFA in the two years in which he was involved.[171]

---

[167] John Dep. 15:5-9.
[168] DX0362-002.
[169] DX0363-004.
[170] "The history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future." *Cardinal Health*, 12 F. Supp. 2d at 56.
[171] DuMars Dep. 127:24-129:10.

Plaintiff suggests that brand recognition would limit firms' ability to expand.[172]  A 2008 TaxACT study clearly demonstrates that this is wrong as it showed that brand recognition is unimportant ████████████ respondents cited it as their primary reason for choosing TaxACT.[173] In any event, TaxACT's and others' success over the past several years proves the viability of inexpensive, in-house marketing, including online advertising and direct mail via e-mail.[174]  Social media is also an increasingly successful method of increasing brand recognition.  TaxSlayer has a Facebook page with over 18,000 "likes,"[175] and ██████████████████████████ ████████████████████████  Other creative advertising and marketing strategies have already proved successful.  For example, TaxSlayer sponsors a NASCAR race car[177] and has used viral YouTube advertising campaigns.[178]

███████████████████████████
████████████████████████████████
████████████████████████████
████████████████████████████████
██████████████████████████████
███████████████████████████

---

[172] While Plaintiff rejects the notion that that there are distinct "value" and "premium" providers of digital tax services, Plaintiff counter-intuitively argues that brand recognition, which no value player (including TaxACT) has, is necessary to expand.  As Phyllis Gatos, an IRS employee on Plaintiff's initial witness list noted after Intuit and HRB they all sound the same to her.  CITE and change to quote
[173] TaxACT, *2008 Marketing Strategy Research* (Apr. 28, 2008), 2SS-GRECe-0031471–511, 546.
[174] For TY 2004–TY 2009, ██████████████████████████████████ ████████████████ DX0349 TA' Second Request Response, Response to Specification 6(d).
[175] *See* TaxSlayer.com, http://www.facebook.com/taxslayer1 (last visited Apr. 28, 2011).
[176] Premkumar Decl., OLT-DOJ-000001.
[177] Rhodes Decl. ¶ 12.  TaxSlayer has partnered with JR Motorsports to sponsor a NASCAR stock car. *See* TaxSlayer.com, TaxSlayer Racing, http://www.taxslayerracing.com/ (last visited Apr. 28, 2011).
[178] *See* RHO-DOJ-000008 ████████████████████
[179] Thomson Reuters is the largest provider of tax and accounting software to the accounting industry in the United States, with annual revenue above $13 billion.  *See* http://thomsonreuters.com/about/.
[180] DX0033-007.

37



Entry by new firms will also be *sufficient*. Indeed, according to Plaintiff's own narrative, a company in the Digital DIY Tax Preparation market -- like TaxACT -- can rapidly expand from one of many small competitors offering products on the IRS homepage to becoming one of the "Big Three." If post-acquisition Defendants attempted to eliminate the TaxACT brand, raise prices, and/or undermine the "Free" model, TaxSlayer, TaxHawk, or others could easily follow the TaxACT roadmap to success.

### ii. *Plaintiff's Proposed Market is Not Conducive to Coordination.*

"Factors that increase the likelihood of coordination include product homogeneity, pricing standardization and pricing transparency."[183] Where "products are heterogeneous, the products compete with one another with respect to their product characteristics, as well as on the basis of price and the other forms of competition, anticompetitive coordinated effects [are] difficult and unlikely."[184] Plaintiff's brief specifically disclaims product homogeneity and pricing standardization by arguing that premium and value products compete in a "differentiated product market...on more

---

[181] *Id.*

[182] Petz Dep. at 19:19-23:12.

[183] *Oracle*, 331 F. Supp. 2d at 1113 (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 238 (1993)).

[184] *New York v. Kraft General Foods, Inc.*, 926 F. Supp. 321, 342 (S.D.N.Y. 1995); *see also Arch Coal, Inc.*, 329 F. Supp. 2d at140 ("heterogeneity of products and producers limit or impede the ability of firms to reach terms of coordination."); U.S. Dep't of Justice and Fed. Trade Comm'n, Horizontal Merger Guidelines (2010) §§ 5.1, 5.2, 6.3, 7.2 (discussing various reasons markets with homogenous products are more likely to have anticompetitive effects than markets of heterogenous products)

dimensions than price."[185]  Defendants' and their competitors' descriptions of their respective

products confirm that Digital DIY products are highly heterogenous, varying based on brand

recognition, support, and features.[186]  Furthermore, value and premium products vary in price by

more than 1000% (even excluding Free) ($9.95 for TaxACT Deluxe ($17.95 including state) versus

$99.95 for TurboTax Home and Business($130.90 including state)).

Plaintiff's clips from the 1.3 million documents that were produced cannot overcome

structural barriers to coordination in the market.  Indeed, the documents upon which Plaintiff

primarily relies do not reflect the thoughts, opinions or plans of HRB's current or past management

and do not reflect the current thinking regarding the proposed transaction.  Yes, in 2009 an HRB

employee, Adam Newkirk, sent an e-mail that said that HRB and Intuit "have great incentive to keep

this channel profitable."  The comment was not made to any executive involved in the deal, did not

go to any such executive, and does not reflect the actual rationale for the Transaction.  Moreover, the

deal that was being considered at the time of the comment was abandoned before later being re-

considered by different management.  Similarly, the 2009 consultant documents on which Plaintiff

relies for its conclusion that consumers will not receive any benefits from the transaction actually do

outline at least one benefit – the "[a]bility to receive all preparation needs in one network."[187]

More recent (but still pre-dating DOJ's Merger review) documents spell out HRB's plans to

have "TaxAct . . . aggressively target the low-ground," to "[a]ggressively market FREE and Online

value pricing through [the] TaxACT brand," and to "maintain a significant price advantage" as the

"price leader."[188]  Most importantly, the consistent testimony of the executives responsible for

current and future pricing (as well as their past actions) make clear that consumers will benefit in the

form of better pricing and better products.  As Bill Cobb, the current CEO of HRB, explained, HRB

---

[185] Pl. 27.
[186] See supra. n. 56.
[187] Pl. Ex. 16, HRB-DOJ-00319468 at 24.
[188] DX1002-005; DX1004-002; DX0800-003, 4.

will use the low-cost TaxACT model to offer "low prices" and "enhanced functionality" to customers.[189]



### iii.   *TaxACT is Not an Antitrust Maverick.*

TaxACT cannot be considered an antitrust maverick for behavior that occurred over five years ago and that had no real impact on the pricing and innovation of competitors who are allegedly in the same market like Intuit and HRB.  Despite TaxACT's rise in popularity, aggressive marketing, sustained low prices, and its introduction of an entirely free product in 2005, HRB and Intuit have continuously and profitably increased prices over the past six years and over the course of any given season.[193]  Furthermore, as the 2006 Commentary on the agencies' Merger Guidelines stated, a maverick is a firm that is "competitively unique."[194]  There is nothing competitively unique about TaxACT today. TaxACT's free marketing in 2004-2006—the period to which nearly all of Plaintiff's claims of TaxACT's maverick behavior refers—is old news.  In the five to seven years since TaxACT first made its free-for-all offers, there has been nothing unique about the way that TaxACT

---

[189] *See* DX0348 (providing quotes from an investor conference call with William Cobb) (last visited Aug. 12, 2011); DX1014-001 (quoting William Cobb in a press release).
[190] Maurer at 18:17-122:10; DX0702.
[191] Maurer at 110-120; DX0086.
[192] Maurer at 117:22-118:3; DX0085.
[193] Expert Rebuttal Report of Dr. Christine Siegwarth Meyer, Section VI ("List Prices for Online Federal Plus State DIY Products February 2006 to April 2010")
[194] Commentary at 24.

has been selling or pricing its products.  Indeed, as discussed above, other competitors, not TaxACT, have carried the baton of making unique and innovative pricing and marketing decisions.[195]

To the extent that Plaintiff wants to hinge its coordination theory on TaxACT being a maverick six and seven years ago, it is important to note that even then TaxACT was not a maverick. It made offers on the FFA and its own website that were very similar to those already being offered by others, including FreeTaxUSA.  Moreover, as explained by Mark Ciaramataro, the then-head of Digital at HRB, TaxACT did not do anything that was outside part the natural continuum of "Free."[196]  Indeed, Bert DuMars, one of the individuals on Plaintiff's initial witness list and the Director of the relevant division of the IRS at the time TaxACT made its offers, noted that he did not view TaxACT as unique or as being a change-agent.[197]

**III.    Plaintiff Has Not Demonstrated Irreparable Harm.**

Plaintiff must do more than establish a likelihood of success on the merits to obtain injunctive relief.  It must also "demonstrate irreparable harm absent immediate judicial intervention."[198]  Irreparable harm is "an imminent injury that is both great and certain, and that legal remedies cannot repair."[199]  To make this showing, a plaintiff must, "in addition to demonstrating a substantial injury, . . . demonstrate that the injury has already taken place or is going to take place in the near future."[200]  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of

---

[195] *See* supra Section IV.b,
[196] Ciaramataro Dep at 30:12-31:7 ("In fact, even before this [the FFA], the whole industry was promoting try it for free, so free was not a new idea at all, and everyone knew the power of free . . . ."). *See also* HRB-DOJ-50695186 (noting that HRB was considering making a free offer on its website *before* TaxACT went free for everyone off FFA).
[197] DuMars Dep. at 61:15-67:11 (discussing prevalence of "free for everyone" among Free File Alliance members).
[198] *Goings v. Court Servs. and Offender Supervision Agency for D.C.*, No. 11-501, Slip op. at 43 (D.D.C. May 3, 2011) (Howell, J.).
[199] *City of Moundridge*, 429 F. Supp. 2d at 127.
[200] *Id.*

irreparable harm."[201]

Plaintiff cites a thirty-year old case from the Second Circuit and several cases applying FTC Section 13(b) law[202] for the proposition that irreparable harm "should be presumed" "[w]here, as here, the United States seeks to enjoin an antitrust violation." However, this Circuit has not abandoned the "irreparable harm" standard. Although proving irreparable harm is Plaintiff's burden, Defendants note that that the evidence shows that Defendants will maintain TaxACT as a separate brand with its management and infrastructure entirely intact after closing. Defendants also note that they have publicly agreed not to "raise any prices on 2SS' tax preparation products for at least three years and would continue offering 2SS' free tax preparation product to all taxpayers for at least three years."[203] Accordingly, there is no likelihood of irreparable harm to competition.

## IV.    Substantial Harm to Other Interested Parties.

Plaintiff also has the burden of establishing that any proposed substantial harm "will in fact" occur and that it balances in its favor."[204] That a significant transaction will not take place if a preliminary injunction is entered is a harm the court "cannot ignore."[205] Moreover, the substantial efficiencies that will occur if an acquisition is allowed to proceed weigh against granting an injunction under this prong.[206]

On the first point, Defendants have already represented to the Court (and further now confirm)

████████████████████████████████████████

████████████████████████████████████████

---

[201] *Gillette*, 429 F. Supp. 2d at 127 (quoting *Virginia Petroleum Jobbers Ass'n v. Fed Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).
202 Plaintiff's brief includes a cryptic citation to "Section 13(b) of the Clayton Act," Pl. 17, n. 100, which Defendants assume was an innocent typo.
[203] Defs' Ans. at 4.
[204] *City of Moundridge*, 429 F. Supp. 2d at 138.
[205] *Gillette*, 828 F. Supp. at 86.
[206] *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 577 (7th Cir. 1999) (discussing trial court's consideration of the defendant's argument that unrealized efficiencies constitute a harm to the market that weighs in its favor).

delayed for another year or more without any guarantee of actually being able to close on the

transaction.  On the second point, Defendants have established that over ████████ in efficiencies

will be generated by year three if the transaction is allowed to go forward.  As Tony Bowen and

Lance Dunn will testify at the hearing, Defendants' efficiency estimates are actually conservative, in

part because Mr. Dunn's estimates on what will be needed to achieve the projected efficiencies were

high (and built in ██████████ contingencies) and in part because they focus narrowly on

very specific, achievable tasks.[207]  Moreover, the efficiencies could not be achieved absent this

merger.  The complementary nature of TaxACT's and HRB's businesses (and what each currently

outsources because of the costs and risks of insourcing) as well as the fact that TaxACT's platform is

simple, efficient, and can scale to cover HRB's products make the achievable efficiencies unique to

this deal.[208]  As a result, significant harm to the private interests of Defendants in the loss of a

transaction and the accompanying efficiencies will occur if the deal is not permitted to go forward.

## V.   Interests of the Public.

Unlike under the FTC Act, there is no presumption that this factor weighs in favor of the

Government "even though the case is brought by the United States to enforce federal anti-trust

laws."[209]  Plaintiff has done nothing to demonstrate or prove that the preliminary injunction is in the

best interest of the public other than quoting language from the *Heinz* decision that there is "public

interest in effective enforcement of the antitrust laws."  This, of course, raises the question of what is

"effective enforcement" and assumes that any case that the United States brings is by definition

"effective enforcement."  Plaintiff's argument essentially reads this prong out of the Court's analysis.

---

[207] *See supra* n. 45, 46 (detailing the expected efficiencies).

[208] ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

[209] *Gillette*, 828 F. Supp. at 86.

That is insufficient from an evidentiary standpoint. Conversely (and despite not bearing the burden to do so), Defendants have proffered significant evidence in support of their contention that this transaction is in the public interest. To that end, Defendants' documents and testimony have made clear that the efficiencies discussed above will enable Defendants to "[a]ggressively market FREE and Online value pricing through [the] TaxACT brand,"[210] to reduce prices,[211] and to increase innovation.[212] Defendants have also provided sworn testimony from the relevant decision-makers that the efficiencies will inure to the benefit of consumers in the form of lower prices, increased discounts, and more innovative products.[213] All of the evidence regarding this prong demonstrates that granting a preliminary injunction will harm the public. The preliminary injunction motion should therefore be denied.

---

[210] DX1004-002.
[211] DX1004-002; DX0800-003, 4 DX9521-006 - 9 (showing that HRB's financial models for the transaction assume flat average prices until at least TY 2015); DX0240-15 (Defendants' Response to Plaintiff's First Set of Interrogatories to All Defendants, Response 3); Bennett Dep. 280:19-22 ("[W]e can reduce 35 to 45 million in cost from our platform, which is essentially what we earn, and plow [it] back into the marketplace").
[212] DX9554 .
[213] Cobb Dep. 89:17 – 90:19; 230:20 – 323:7; 233:5 – 233:21.

Dated:  August 12, 2011

Respectfully submitted,

/s/ J. Robert Robertson
J. Robert Robertson (DC Bar #501873)
(DDC Bar #IL0001)
Corey W. Roush (DC Bar #466337)
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Tel: 202 637 5600
Fax: 202 637 5910
*Attorneys for Defendants H&R BLOCK, INC., 2SS*
*Holdings, Inc. and TA IX L.P.*

45

J. Robert Robertson
Corey W. Roush
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
Telephone: (202) 637-5600
robby.robertson@hoganlovells.com
corey.roush@hoganlovells.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>H&R BLOCK, INC., )<br>2SS HOLDINGS, INC., and )<br>TA IX L.P. )<br><br>*Defendants*. )<br> ) | Civil Action No. 1:11-cv-00948 (BAH)<br>Judge Beryl A. Howell |

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of Defendants' memorandum of points and authorities and

exhibits in opposition to Plaintiff's motion for preliminary injunction has been served on

opposing counsel.

Dated: August 12, 2011                                 Respectfully Submitted,

_s/ Corey W. Roush_____

Corey W. Roush
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
Telephone: (202) 637-5600
robby.robertson@hoganlovells.com
corey.roush@hoganlovells.com

Attorney for Defendants