**FILED**

**SEP 0 6 2011**

Clerk, U.S. District and
Bankruptcy Courts

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action No. 11-00948 (BAH) |
| H&R BLOCK, INC., *et al.*, | |
| Defendants. | **SEALED** |

## MEMORANDUM OPINION AND ORDER

The United States, through the Antitrust Division of the Department of Justice (the

"DOJ" or the "plaintiff"), brought this civil case to enjoin the proposed acquisition of a digital

do-it-yourself tax preparation company known as TaxACT by H&R Block, another company

that sells digital do-it-yourself tax preparation products as well as provides other tax preparation

services.[1] A preliminary injunction hearing in this case is scheduled for September 6, 2011, and

the plaintiff has filed a motion in limine to exclude evidence of an email survey commissioned

by the defendants and the portions of a defendants' expert opinion that relies upon the survey.

For the reasons that follow, the Court denies the motion in limine.[2]

### I.     BACKGROUND

The DOJ filed this action on May 23, 2011, seeking to enjoin Defendant H&R Block,

Inc. from acquiring Defendant 2SS Holdings, Inc. ("TaxACT"), which sells digital do-it-yourself

---

[1] The Court has subject matter jurisdiction to hear this suit under 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337 and 1345.

[2] The plaintiff initially filed an additional motion in limine to exclude evidence of defendants' guarantee to maintain TaxACT's current prices for three years following the acquisition. *See* ECF No. 44. The plaintiff withdrew that motion at oral argument on September 2, 2011.

tax preparation products marketed under the brand name TaxACT. Compl. ¶ 10. Defendant TA IX, L.P. ("TA"), owns a two-thirds interest in TaxACT.[3] *Id.* ¶ 11.

According to the Complaint, last year an estimated 35 to 40 million taxpayers filed their taxes using digital do-it-yourself tax preparation products ("Digitial DIY Tax Preparation Products"). *Id.* ¶ 1. In the U.S. Digital DIY Tax Preparation Product market, the three largest firms collectively have about 90% of the market share. *Id.* The leading company in the market is Intuit, Inc., the maker of "TurboTax." *Id.* ¶ 3. H&R Block's proposed acquisition of TaxACT, if allowed to proceed, would combine the second- and third-largest providers in the market – i.e., H&R Block and TaxACT, respectively. *Id.*

The Complaint alleges that TaxACT is a "maverick" competitor that has a history of "disrupting" the Digital DIY Tax Preparation market and has forced its competitors, including H&R Block and Intuit, "to offer free products and increase the quality of their products for American taxpayers." *Id.* ¶ 28. The Complaint alleges that TaxACT has aggressively competed with H&R Block and Intuit by providing high-quality products and services at low cost. *See id.* ¶¶ 30-40. The DOJ alleges that the acquisition of TaxACT by H&R Block would reduce competition in the industry and make anticompetitive coordination between the two major remaining market participants – H&R Block and Intuit – substantially more likely. *Id.* ¶¶ 40-49. The DOJ alleges that therefore the proposed acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and accordingly it seeks an injunction blocking H&R Block from acquiring TaxACT. *Id.* ¶¶ 53-55.

---

[3] 2nd Story Software, Inc. ("2SS") is a wholly-owned subsidiary of 2SS Holdings, Inc., which is the entity being purchased by H&R Block. Declaration of Lance Dunn, dated May 27, 2011 ("Dunn Decl."), ¶¶ 2, 4. Both 2SS and 2SS Holdings, Inc. share the same address in Cedar Rapids, Iowa.

The defendants dispute that the appropriate product market is Digital DIY Tax Preparation products, but argue that the relevant market instead consists of "all methods of tax preparation for the U.S. federal and state income taxes." Report of Dr. Christine Siegwarth Meyer, DX0017-006, at 2. Furthermore, even assuming *arguendo* that the plaintiff's alleged market definition were correct, the defendants deny that the transaction would result in anticompetitive effects because, *inter alia*, "H&R Block and TaxAct are not close substitutes and the merger is likely to lead to substantial, incremental, merger-specific efficiencies." Joint Pre-Hearing Statement at 4.

A pre-hearing conference in this matter, including oral argument on the motion in limine, was held on September 2, 2011.

## II.    DISCUSSION

The plaintiff has moved, pursuant to Federal Rules of Evidence 702 and 703, to exclude evidence of an email survey of defendants' customers and to limit defendants' expert opinion to the extent that it relies on this survey (the "2011 email survey"). Pl.'s Mem. in Supp. of Pl.'s Mot. to Exclude the 2011 Litigation Survey and Limit Defs.' Expert Report ("Pl.'s Mem.") at 1-2. The plaintiff contends the survey's "methodology falls far short of the requirements of Federal Rules of Evidence 703 and 702 because: (1) it fails to ask a question relevant to this proceeding; (2) it suffers from extraordinary non-response bias, with response rates far below what courts have found necessary to establish reliability; and (3) the response options provided are leading and fail to discourage guessing." *Id.* at 2. For the reasons below, the Court declines to exclude the evidence or to limit the expert's opinion.

3

## A. Standard of Review

"Under Rule 702, a trial court may only admit expert testimony that is both relevant and reliable." *Harris v. Koenig*, No. 02-618, 2011 WL 2531257, at *1 (D.D.C. June 27, 2011) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). "Courts take a flexible approach to deciding Rule 702 motions and have 'broad discretion in determining whether to admit or exclude expert testimony." *Id.* (quoting *U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 895 (D.C. Cir. 2010) (internal citation omitted). "In considering Rule 702 motions, the court assumes only a 'limited gate-keep[ing] role' directed at excluding expert testimony that is based upon 'subjective belief' or 'unsupported speculation.'" *Id.* (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 135-36 (D.C. Cir. 1996)). In addition, "the importance of the trial court's gatekeeper role is significantly diminished in bench trials . . . because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence." *Whitehouse Hotel Ltd. Partnership v. Comm'r of Internal Revenue*, 615 F.3d 321, 330 (5th Cir. 2010). "The party seeking to introduce expert testimony must demonstrate its admissibility by a preponderance of the evidence." *Harris*, 2011 WL 2531257, at *1 (citing *Daubert*, 509 U.S. at 592 n.10).

Under Rule 703, the facts or data underlying an expert's opinion "need not be admissible in evidence in order for the opinion or inference to be admitted" if the facts or data are "of a type reasonably relied upon by experts in the particular field." Fed. R. Evid. 703. In addition, such "facts or data that are otherwise inadmissible" may be disclosed by the proponent of the opinion if their probative value substantially outweighs any prejudicial effect. *Id.*

## B. Background Regarding the 2011 Email Survey

In late April 2011, following the 2011 tax season, the defendants commissioned Directions Research, a market research firm, to conduct an Internet-based survey of TaxACT's customers. GX 604. According to the defendants, during the investigation of the transaction, the DOJ did not accept the defendants' evidence of an "extremely low switching between the Defendants' products" as an appropriate proxy for diversion – i.e., the government contended that current switching rates are not necessarily predictive of how TaxACT customers would react to a price increase or functionality decrease. Defs.' Mem. in Opp'n to Pl.'s Mot. In Limine ("Defs.' Mem.") at 3. The survey was therefore initiated to respond to a question raised by the DOJ – namely, "how TaxAct consumers would react to a price increase, service decrease or functionality decrease in the TaxAct products." *Id.* The survey asked one primary question: "If you had become dissatisfied with TaxACT's price, functionality or quality, which of these products or services would you have considered using to prepare your federal taxes?" GX 604 (Results of the 2011 email survey); GX623 (App'x 2 to Report of Dr. Dhar). The survey then offered the respondents a list of eleven options, including other products or services, from which to choose and instructed them to select all applicable options. *Id.* The list of options that respondents were given varied somewhat depending on the respondents' filing status and the payments they had made for their 2011 tax returns.[4] *Id.* A follow-up question asked the respondents to narrow their selections to a single choice. *Id.*

---

[4] The response options varied among four different categories of filers, which are discussed further below. For example, the list of options presented to filers who completed a free federal tax return and no state return were: "I would prepare myself without help," "TurboTax Free Edition," "H&R Block at Home Free Edition," "Free TaxUSA Free Edition," "Complete Tax Free Basic," "An Accountant," "I would use a product on FFA [i.e., Free File Alliance]," "TaxSlayer Free Edition," "Jackson Hewitt Free Basic," "TaxSimple Free Basic," and "Other." GX604 at 2.

The research firm sent over 70,000 surveys via email to a statistically-random selection of TaxACT customers inviting them to participate in the survey. Declaration of Tina Ruddy, dated August 24, 2011 ("Ruddy Decl.") ¶¶ 9, 10. Survey respondents were asked screening questions to determine their membership in one of four categories of customers: (1) those who paid to use TaxAct's products for filing both federal and state tax returns (denominated in the survey report analysis by Directions Research as "Paid Fed/Paid State"); (2) those who paid to use TaxAct's federal return product but not for filing the state return ("Paid Fed/No State"); (3) those who used TaxAct's free product for filing a federal return and paid to use a TaxAct product to file a state return ("Free Fed/Paid State"); and (4) those who used TaxAct's free product for filing a federal return but not for filing the state return ("Free Fed/No State").[5] GX604 (Results of the 2011 email survey).

A total of 1,089 customers responded to the survey. *Id.* at 2-3. The response rates for the four categories of customers were: (1) 2.45% for paid federal / paid state filing (422); (2) 0.6% for paid federal / no state filing (182); (245); (3) 2.08% for free federal / paid state filing; and (4) 1.7% for free federal / no state filing (240). *Id.*; *see also* Pl.'s Mem. at 3.

Defendants' expert, Dr. Christine Siegwarth Meyer, summarized the results of the survey as follows:

> [A] survey of TaxACT customers indicates that few would switch to H&R Block At Home in the event that they were satisfied with TaxACT. In each of the four groups, the comparable HRB product was neither the first nor second most likely alternative tax products for the respondents. The percentage of TaxACT customers that would switch to H&R Block At Home ranged from 4 to 10 percent, with a weighted average of only 6 percent. Instead, in each group, pen-and-paper and TurboTax were the two options with the

---

[5] By contrast to federal tax returns, TaxAct does not provide free state return preparation software but does offer free electronic filing of state returns to those customers who purchase a TaxAct-branded desktop software product available at Staples retail stores. Report of Dr. Meyer ¶¶ 191-92. The Court understands the survey's category for "No State" to cover those respondents who did not purchase TaxAct's state return preparation software from Staples or any other source.

highest responses. In only one of the four groups was HRB the third response. Instead, Free TaxUSA (Tax Hawk) was a more prevalent choice than HRB for three of the four groups.

Report of Dr. Meyer, DX0017-042 (footnotes omitted). Based upon this analysis of the results, Dr. Meyer opined that:

> This further indicates that HRB is not a particularly close competitor to TaxACT. Following the merger, consumers who are dissatisfied with TaxACT will have numerous other choices to which they can and would turn, including TurboTax, pen-and-paper, other software products, and assisted tax preparation.

*Id.*

## C. Analysis

In order to admit expert testimony under Rule 702, the Court must find that it is "relevant and reliable." *Kumho Tire Co.*, 526 U.S. at 141; *Daubert*, 509 U.S. at 589. "In general, Rule 702 has been interpreted to favor admissibility." *Khairkhwa v. Obama*, No. 08-1805, 2011 WL 2490960, at *7 (D.D.C. May 27, 2011) (citing *Daubert*, 509 U.S. at 587; Fed. R. Evid. 702 Advisory Committee's Note (2000) ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.")). "The adversarial system remains the 'traditional and appropriate' mechanism for exposing 'shaky but admissible evidence.' *Id.* (citing Fed. R. Evid. 702 Advisory Committee's Note (2000) (quoting *Daubert*, 509 U.S. at 596)).

Facts or data underlying an expert's opinion that are "of a type reasonably relied upon by experts in the particular field" need not be admissible in evidence in order for the opinion or inference to be admitted. Fed. R. Evid. 703. Regarding survey results in particular, technical and methodological deficiencies in a survey generally go to the weight of the evidence, not the admissibility, unless the deficiencies are so substantial as to render the survey unreliable. *See Univ. of Kan. v. Sinks*, No. 06-2341, 2008 WL 755065, at *3 (D. Kan. Mar. 19, 2008) (discussing customer confusion survey in trademark case).

As discussed in more detail below, having reviewed the report of defendants' expert, Dr. Christine Siegwarth Meyer, the Court finds that Dr. Meyer's anticipated testimony regarding the 2011 email survey meets the criteria for admissibility. Dr. Meyer is an accomplished economist with a Ph.D. in economics from the Massachusetts Institute of Technology. *See* DX0017, Ex. 1. Her conclusions regarding the level of competition between TaxACT and H&R Block, as expressed in her report, are not based solely upon the results of the survey to which the plaintiff objects. *See* DX0017-022-26, 28-42 (discussing various documents and data to support Dr. Meyer's conclusions regarding competition with manual filing and unilateral effects); Meyer Dep. 175:6-16 ("I think [the 2011 email survey] – it's an important data point. It's not the only data point to make any of the points that I use it to make.") (cited in Defs.' Mem. at 18 n.58).

As for the survey itself, the Court finds that Dr. Meyer's use of the survey as a datum in reaching her conclusions is not unreliable. While the plaintiff has identified cogent concerns about the wording and the methodology of the survey, the Court finds that these concerns go to the weight, not the admissibility, of the evidence, especially in this bench hearing where there is no concern about jury confusion or prejudice.[6] *See Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1301-02 (Fed. Cir. 2002) (noting that "concerns [about jury confusion] are of lesser import in a bench trial," although "*Daubert* standards of relevance and reliability" still apply).

---

[6] At oral argument and in its briefs, the plaintiff urged the Court to follow *United States v. Dentsply Int'l Inc.*, an antitrust case in which the district court excluded a survey. 277 F. Supp. 2d 387, 436 (D. Del. 2003), *rev'd on other grounds*, 399 F.3d 181 (3d Cir. 2005). The court excluded the survey in that case because it suffered from myriad flaws: "(1) the screening questionnaire failed to identify relevant respondents; (2) the questionnaire instructions were complex and confusing; (3) a pre-test was not conducted; (4) the response rate was low; (5) non-response bias was not addressed; (6) respondents were unwilling or unable to devote time to take the survey seriously; (7) the results could not be replicated; (8) a standard error measurement was not calculated; and (9) a key parameter estimate was arbitrarily changed." *Id.* at 453-54. As discussed herein, the Court finds that the deficiencies the plaintiff has identified regarding the 2011 email survey affect the weight the Court will accord the survey, but do not sufficiently undermine the methodology used to design, execute and analyze the survey's results to bar admissibility.

8

## 1. Relevance

The Court finds that the survey is relevant because it is probative of the degree to which TaxACT and H&R Block are competitors, whether the market is defined, as alleged by the plaintiff, to be Digital DIY tax preparation products or more broadly, as alleged by the defendants, to be all tax preparation products and services. The options provided to survey respondents encompassed both competing Digital DIY tax preparation products as well as alternative services.

The plaintiff argues that the survey is irrelevant because Dr. Meyer asserted in her report that "this survey is closer to the concept of a diversion ratio than are data on overall switching between products," Pl.'s Mem. at 5 (citing Dr. Meyer's Report at DX0017-024 n.85). According to the plaintiff, diversion refers to "a measured customer reaction to a measured increase in price." *Id.* Since the phrasing of the survey question conflates customer concerns about price, functionality, and quality, and does not actually ask about a change in price, the plaintiff argues that the survey cannot shed any light on customer reactions to price changes. *Id.* Even accepting the plaintiff's critique, however, would not obliterate the survey's relevance entirely. Further, Dr. Meyer's report, in the portion cited by the plaintiff, did not state that the survey provided direct evidence of diversion, but rather that "this survey is closer to the concept of a diversion ratio than are data on overall switching between products," which the Court understands as expressing a different idea. While the wording of the survey question may limit its relevance on specific issues, because the survey provides at least some indication of the products and services that compete with TaxACT, the Court cannot say that it does not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or

less probable than it would be without the evidence." Fed. R. Evid. 401 (defining relevant evidence).

### 2. Reliability

Customer surveys generally are a type of evidence that may be reasonably relied upon by experts in defining markets in antitrust cases. *See* GX622 (Christine Meyer, "Designing and Using Surveys to Define Relevant Markets," in *Economics of Antitrust: Complex Issues in a Dynamic Economy* 101, 108 (Lawrence Wu, ed. 2007)); GX624 (Shari Seidman Diamond, "Reference Guide on Survey Research," in Federal Judicial Center, *Reference Manual on Scientific Evidence*, hereinafter "Diamond," at 234-35).

In determining whether a particular survey may be admissible under Rule 703, courts examine the validity of the survey's methods and ask "Was the poll or survey conducted in accordance with generally accepted survey principles, and were the results used in a statistically correct way?" Diamond at 233-34. The methodological validity of a survey is necessarily a question of degree. As discussed above, technical deficiencies that can be adequately explored on cross-examination generally go to the weight, rather than the admissibility, of the evidence, unless the methodological deficiencies are so sweeping or fundamental as to render the survey wholly unreliable and therefore inadmissible.

### a. Response Rate

The plaintiff argues that the survey is not reliable because it suffers from an "extraordinary level of non-response bias" due to its low response rate. Pl.'s Mem. at 7. The plaintiff cites authority indicating that a response rate below 50% "should be regarded with significant caution as a basis for precise quantitative statements from which the sample was drawn." Pl.'s Mem. at 7 (citing Diamond at 245). The plaintiff's rebuttal expert, Dr. Ravi Dhar,

has concluded that the "level of nonresponse . . . is extremely high (more than 98%)" and that the "extremely low response rates makes it difficult to determine whether the results were impacted by a certain segment who were systematically more likely to respond to the survey (e.g., those who were price sensitive or time insensitive) in relation to those who did not respond." GX 623 (Report of Dr. Dhar at 10).

The defendants respond by citing authority indicating that web-based surveys typically have significantly lower response rates than other types of surveys. Defs.' Mem. at 7-8. They also point to jury trials in which courts have admitted surveys with response rates of 10% or lower. Defs.' Mem. at 7-8 (citing *Sinks*, 2008 WL 755065, at *4; *Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, No. SA-03-CA-0832, 2006 WL 6505346, at *6 (W.D. Tex. Aug. 11, 2006)).

The defendants further argue that the survey's sample size and response rate comply with industry standards for market research. A declaration from the Vice President of the market research firm that performed the survey affirms that large national companies commonly use similar survey results "to make business and pricing decisions." Ruddy Decl. ¶¶ 3-4. This declaration also states that "[t]he standard, industry-expected response rate for surveys of this kind is generally between 1% - 2%" and that, for web-based email surveys, "a response rate above 50% is so improbable as to be considered entirely unavailable." Ruddy Decl. ¶¶ 13, 16.

While the Court agrees with the plaintiff that the survey's response rate "appears, by any standard, to be quite low," *Sinks*, 2008 WL 755065, at *4, this concern goes to the weight, not the admissibility, of the evidence because the survey is not so unreliable as to be deemed inadmissible. The Court finds that the survey's sample size of over 1,000 TaxACT customers from the most recent tax season, the testimony of Dr. Meyer in relying on the survey, and the

11

testiff that the survey's sample size and response rate are in line with industry standards for similar surveys establish sufficient reliability to allow admission of the survey evidence. The Court is cognizant of the detailed critique of the survey's response rate presented by the plaintiff's expert, Dr. Dhar, and the Court is fully capable of taking this critique into account in determining how much weight to accord the survey's results in its analysis. *See Sinks*, 2008 WL 755065, at *4 (admitting survey despite low response rate); *Kinetic Concepts, Inc.*, 2006 WL 6505346, at *6 (same).

### b. Closed-Ended Questions and Discouragement of Guessing

The plaintiff also contends that the survey is fatally flawed because it asks only "closed-ended, leading questions" and that it failed to discourage guessing by not including a "no opinion" or "I don't know" option.

The plaintiff contends that the survey's closed-ended response options are "severely flawed because they are not exhaustive and fail to take into account that some people may not switch [products] even though they are dissatisfied." Pl.'s Mem. at 9 (citing GX 623, Report of Dr. Dhar, ¶¶ 18-19). The plaintiff also argues that, by providing survey respondents with a list of options from which to choose, the survey "hardly mirrors competition in the marketplace where the Big Three competitors spend millions of dollars annually to get their message in front of potential customers. In contrast, the [survey] counterfactually de-emphasizes the significance of brand and the millions spent building and maintaining it." *Id.* at 10. In addition, the plaintiff contends that the survey questions are leading because the response options vary depending on the product the respondent stated he or she used during the prior tax year. *Id.*

The defendants respond that the questions in the survey were not inappropriately leading and that authority cited by the plaintiff's expert actually establishes that "closed-ended questions

are more suitable for assessing choices between well-identified options or obtaining ratings on a clear set of alternatives." Defs.' Mem. at 8-9 (citing Diamond at 253). The defendants also note that the questions were not wholly closed-ended in that "Other" was an option that respondents could select. *Id.* at 9.

By providing survey respondents with a pre-selected list of alternative options, rather than letting respondents respond organically, the survey does lead respondents to think about the market for tax preparation services in the same terms that the defendants do, which may have led respondents to select options they otherwise would not have selected. This effect is not so inherently suggestive as to render the survey's results wholly unreliable and therefore inadmissible, however. The survey does not appear to lead respondents to select any particular answer; the response choices included the major market participants under both parties' views of the market; and it also included an "Other" option. Moreover, the survey question cannot be considered to be as "leading" as the questions identified as problematic in the plaintiff's cited authority.[7] Accordingly, this critique goes to the weight of the evidence and not to admissibility.

The same is true of plaintiffs' concerns about the survey's failure to discourage guessing by not including an "I don't know" option. The plaintiff argues that "[s]urveys should explicitly mention that it is completely appropriate for respondents to have no opinion [on] a given question" and that failure to include an "I don't know" opinion skews the results by failing to

---

[7] In *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,*290 F.3d 578, 591 (3d Cir. 2002), cited by the plaintiff, the Court discussed a case in which the Third Circuit identified a highly suggestive survey question. In that case, the party offering the survey evidence sought to defend an advertisement claiming that its medicine, Maalox, was "the strongest." The survey at issue asked respondents the following question: "In the commercial you just saw, they said Maalox tablets are the strongest. What does that mean to you?" The Third Circuit held that this question improperly led respondents to answer that "strongest" meant something other than its ordinary, obvious meaning. *See id.* at 593 (discussing *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharms., Inc.,* 19 F.3d 125 (3d Cir. 1994)).

provide an adequate answer for respondents who have no opinion on the question. Pl.'s Mem. at 10-11. While this concern is valid and the absence of such an "I don't know" option does diminish the weight the Court should accord this survey, the failure to include this option is partially mitigated here by the inclusion of the "Other" option. The Court does not find that this defect so undermines the survey as to require it to be deemed inadmissible. *See Kinetic Concepts*, 2006 WL 6505346, at \*6 (admitting survey that did not have an "I don't know" option and concluding that any objections went to the weight of the survey rather than to admissibility).

### 3. Consideration of All Critiques

In sum, the plaintiff has identified a number of aspects about the methodology and wording of the defendants' 2011 email survey that will impact the weight that the Court gives this survey in its analysis. These defects do not undermine the survey and the expert's reliance on it so overwhelmingly that they render the survey wholly irrelevant or unreliable—and therefore inadmissible. While the admissibility of this survey might be a closer question in the context of a jury trial, since this hearing is not before a jury, "the importance of the trial court's gatekeeper role is significantly diminished . . . because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence." *Whitehouse Hotel Ltd. Partnership*, 615 F.3d at 330; *accord United States v. Oracle Corporation*, 331 F. Supp. 2d 1098, 1158 (N.D. Cal. 2004) (court at injunction hearing considered government's expert witness testimony on product market definition despite "shortcomings" in cited statistics and "sketchy" statistical tabulations based in part on "tiny sample" of Oracle customer surveys). Accordingly, the Court will deny the motion in limine to exclude the survey and to preclude defendant's expert from expressing opinions based upon the survey.

## III.    CONCLUSION

For the reasons explained above, the plaintiff's motion in limine is DENIED.  This

Memorandum Opinion and Order shall be filed under seal.  On or before September 12, 2011,

the parties shall advise the Court regarding whether any portion of this Memorandum Opinion

should be redacted before public filing because it contains confidential information.   In addition,

if the parties have not already filed versions of their legal memoranda that may be filed publicly,

they shall do so by September 12, 2011.

DATED: September 6, 2011                           /s/ *Beryl A. Howell*
                                                                  BERYL A. HOWELL
                                                                  United States District Judge