1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA,      :  Civil Action
                                   :  No. 1:11-cv-00948
4             Plaintiff,           :
                                   :  September 6, 2011
5   v.                             :  Morning Session
                                   :
6   H&R BLOCK, INC., et al.,       :  Washington, D.C.
                                   :
7             Defendants.          :
    ............................:
8

9

10        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING - DAY 1
               BEFORE THE HONORABLE BERYL A. HOWELL
11              UNITED STATES DISTRICT COURT JUDGE

12

13  APPEARANCES:

14  For the Government:      Mr. Joseph Wayland
                            U.S. Department of Justice
15                          950 Pennsylvania Avenue, NW
                            Washington, D.C. 20530
16                          (202) 514-1157
                            joseph.wayland@usdoj.gov
17
                            Mr. Lawrence E. Buterman
18                          U.S. Department of Justice
                            450 Fifth Street, NW
19                          Washington, D.C. 20530
                            (202) 532-4575
20                          lawrence.buterman@usdoj.gov

21  For the Defendants:     Mr. J. Robert Robertson
                            Mr. Corey W. Roush
22                          Hogan Lovells
                            555 Thirteenth Street, NW
23                          Washington, D.C. 20004
                            (202) 637-5600
24                          robby.robertson@hoganlovells.com

25

                                                                    1

1    APPEARANCES (Continued):

2    Court Reporter:              Ms. Lisa Schwam, CSR, CRR, RMR
                                  Official Court Reporter
3                                 Room 4702-A, U.S. Courthouse
                                  Washington, D.C. 20001
4                                 (202) 354-3238
                                  LisaSchwam@aol.com
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by machine shorthand, transcript
     produced by computer-aided transcription.

1                              I N D E X

2    WITNESS                  DIRECT    CROSS    REDIRECT    RECROSS

3

4    ALAN BENNETT

5    By Mr. Wayland              93

6

7                          E X H I B I T S

8       NUMBER                        MARKED FOR IDEN    ADMITTED

9    GOVERNMENT EXHIBIT:

10      Trial Exhibit 2                          100

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1                      

2        THE DEPUTY CLERK:  This is Civil Action 11-948, United

3    States of America v. H&R Block, et al.

4        Will the attorneys come up and state your appearances

5    for the record.

6        MR. WAYLAND:  Joseph Wayland, Deputy Assistant Attorney

7    General for the United States.

8        MR. BUTERMAN:  Good morning, your Honor.  Lawrence

9    Buterman for the United States.

10        THE COURT:  Good morning.

11        MR. ROBERTSON:  Good morning, your Honor.  Robby

12    Robertson on behalf of defendants.

13        THE COURT:  Good morning, Mr. Robertson.

14        MR. ROUSH:  Corey Roush also on behalf of defendants.

15        THE COURT:  You were busy this weekend.  I got your

16    brief.  Who else is here?

17        MR. BREED:  Logan Breed also on behalf of defendant.

18        THE COURT:  Welcome.

19        MR. ROBERTSON:  I have two of my clients here with me

20    so you know who they are.  I have Mr. Derek Gamble from H&R

21    Block.  I also have with me Lance Dunn from 2nd Story Software.

22        THE COURT:  Thank you.  There are a couple preliminary

23    matters I wanted to take up and then hear from counsel, if there

24    are any other preliminary matters on your lists.  First I hope

25    everybody's now settled into their witness rooms.

1          MR. ROBERTSON:  Yes, your Honor.

2          THE COURT:  Everybody got the locks and have been able

3     to get their stuff in?

4          MR. WAYLAND:  Yes, your Honor.  Thank you.

5          THE COURT:  Okay.  Second of all, I did not hear from

6     you all last Friday afternoon so were the parties able to reach

7     agreement on how to handle confidential business information

8     during the hearing?

9          MR. WAYLAND:  Yes, your Honor, we were.

10         THE COURT:  Could you advise me about what your

11    agreement is.

12         MR. WAYLAND:  Yes.  As it turns out, your Honor, there

13    will be a lot of materials, but very little of it actually

14    touches on the kind of confidential materials that the parties

15    are concerned about.  And we have arrived at an agreement that

16    we provide copies of what we're going to use in the morning or

17    the day before, if we can -- we've tried to do that -- they

18    advise us of materials that they think need to be protected from

19    public disclosure.  And for the most part today, there is very

20    little of that.  I think at the end of Mr. Newkirk's testimony,

21    there might be ten minutes where we need to close the courtroom

22    and address it.

23         Other than that, I think we're in good shape, your

24    Honor.

25         THE COURT:  Okay.  Is that consistent with your

1    understanding, Mr. Robertson?

2         MR. ROBERTSON:  Absolutely, your Honor.  And I think

3    just so you can see a foreshadowing of what's going to happen,

4    the areas that are more confidential have to do with the numbers

5    of internal finances of the company -- for example, the details

6    of efficiencies -- that will need to be kept in camera.

7         And just a few things.  As counsel mentioned, maybe

8    with Mr. Newkirk, some of the reporting he does has some of the

9    numbers on them.  We're trying very hard, because we're dealing

10   with general principles here, that even if a document is

11   confidential, that we're going to figure out a way to talk about

12   it without getting into the numbers that are in maybe page 78 or

13   something that might be super secret.

14        So I think that's what we're trying to do.

15        THE COURT:  Okay.  Are you going to -- I really don't

16   want to have a procedure where I'm closing the courtroom and

17   having everybody walking in and out several times during the

18   day.

19        So you're going to cluster any conversation about

20   confidential information at one point?

21        MR. WAYLAND:  Yes.

22        THE COURT:  Okay.

23        MR. ROBERTSON:  We'll do our very best to do that.

24        THE COURT:  All right.  Okay.  The next thing left over

25   from our prehearing conference has to do with use of certain

1     snapshots from Web pages.  And I've received the defense brief.

2     I have not received any papers from the government.

3           MR. WAYLAND:  Yes, your Honor.  It turned out when we

4     received their papers last night, they had substantially reduced

5     what they were seeking so we need to revise what our brief is.

6     We'll get it to you today; is that right?

7           Yeah, we'll get it to you this morning.  It's not going

8     to be an issue today.

9           THE COURT:  It's not going to be an issue today?

10          MR. WAYLAND:  I don't think.

11          MR. ROBERTSON:  I don't think it matters that much.  I

12    do have, I believe, one slide which I mentioned the other day

13    that I'm using in opening.

14          MR. WAYLAND:  I don't object to that, your Honor.

15          MR. ROBERTSON:  But that's all.  I don't think it's

16    going to come up this morning anyway.

17          THE COURT:  Okay.  Well, it also seems from reading

18    your papers, Mr. Robertson and Mr. Roush, that you're now

19    limiting the snapshots of Web pages to only those from Intuit's

20    Web site, not any other third parties?  Am I correct on that

21    understanding?

22          MR. ROUSH:  With the exception of two slides that were

23    asked about in deposition of an individual who testified about

24    those snapshots.  The rest are all Intuit, yes, ma'am.

25          MR. ROBERTSON:  That's correct, your Honor.

```
 1              THE COURT:  Okay.  The final matter that I probably
 2    should have taken up on Friday but didn't, and that has to do
 3    with consolidating, you know, the trial, the merits of this
 4    matter, with this preliminary injunction hearing.  Your briefing
 5    didn't really address that issue.
 6              Do you have objections to that kind of consolidation
 7    under Rule 65(a)2?
 8              MR. ROBERTSON:  No, your Honor.  I think we spent a
 9    year doing discovery.  And I can't imagine a bigger record on
10    any case.
11              THE COURT:  Well, that was my impression from the boxes
12    of bankers boxes sitting in my jury room.
13              MR. WAYLAND:  The standard is different, your Honor,
14    but I agree that, practically, there's not going to be any
15    different evidence developed over the next six months if you
16    were to enjoin the transaction and then ask us to do something
17    more.  We'd come back for the same trial.
18              THE COURT:  Right.  I would not hear any of the same
19    evidence so why don't we just do that --
20              MR. WAYLAND:  Practically, I don't know if the result
21    would be different if you issue the injunction, the transaction
22    will die anyway on its own.  But the standard is slightly
23    different.
24              But I don't actually worry about that.  I think we'll
25    meet any burden of any standard, your Honor.
```

| | |
|---|---|
| 1 | THE COURT:  Okay.  So under Federal Rules of Civil |
| 2 | Procedure 65(a)2, I'm going to consolidate this injunction |
| 3 | hearing with the trial on the merits. |
| 4 | MR. ROBERTSON:  Thank you, your Honor. |
| 5 | THE COURT:  Okay.  Anything that any counsel would like |
| 6 | to bring up before we begin? |
| 7 | MR. WAYLAND:  Just to foreshadow one scheduling issue, |
| 8 | your Honor.  There -- because the Court is out of session next |
| 9 | week Tuesday and Wednesday, we have an issue with two of our |
| 10 | experts who teach and are trying to arrange their schedule. |
| 11 | Looks like we may finish by Monday but I'm not sure.  They are |
| 12 | not available Thursday.  It could be that they can't come till |
| 13 | Friday. |
| 14 | We're doing everything we can to -- they actually have |
| 15 | to change their schedules to come on Friday, but I don't know if |
| 16 | we're going to have enough court to fill up Thursday.  So I'm |
| 17 | just laying that out now so it's not a surprise next week. |
| 18 | MR. ROBERTSON:  Your Honor, except for a similar |
| 19 | scheduling problem with H&R Block's CEO, he'll probably be here |
| 20 | on Friday.  But I think we can work it out.  I don't care about |
| 21 | the order of who goes in when because, frankly, they are calling |
| 22 | some of our witnesses in their case who are putting their |
| 23 | directs on in their case anyway, so I don't think it really |
| 24 | matters. |
| 25 | We'll work with them on that. |

```
 1              THE COURT:  Okay.  Right.

 2              Well, if you have a scheduling issue, please just let

 3    me know.  And I apologize that I've got to be someplace else for

 4    two days next week.  My sentencing commission meetings are

 5    actually going through Thursday, at least the morning, so if

 6    you're having witness difficulties, it would actually enable me

 7    to attend the final part of my sentencing commission meetings

 8    also, which I was going to cut short because of this hearing.

 9              So why don't we, you know, take stock at the end of the

10    week about what the schedule looks like for next week.

11              MR. ROBERTSON:  Your Honor, I have one logistical

12    thing, and it's only because I noticed we got an extra table

13    here (indicating), which was wonderful.  If it's okay from time

14    to time if I could sit over there so I could see better.  I wear

15    hearing aids and if I can watch this gentleman's lips move, I

16    can see what he's saying a lot easier than trying to listen to

17    him.

18              THE COURT:  Okay.  That's fine.  I don't think we're

19    going to have anybody sitting over there.

20              MR. ROBERTSON:  Thank you, your Honor.

21              THE COURT:  Sure.

22              All right.  Please call your first witness.  I'm sorry.

23    You have your opening.  I'm ready to get to the witnesses

24    already.  I think I feel like with all of your briefing, I have

25    an idea of what you're going to say now.
```

1          MR. WAYLAND:  I'm sure you do, your Honor.  And we

2    appreciate the fact that you are well prepared, as we know.

3                          OPENING STATEMENT

4          MR. WAYLAND:  Good morning, your Honor.  Joseph

5    Wayland, Deputy Assistant Attorney for the United States.

6       For individual taxpayers, there used to be just two ways to

7    prepare your taxes.  You could get the appropriate forms

8    yourself, fill in the blanks with pen and then mail them off.

9    You were completely on your own to figure out how to do that,

10   trying to understand and find your way through the forms,

11   determining appropriate deductions, checking calculations.  This

12   obviously doesn't cost money.  It doesn't involve the sale of a

13   product other than perhaps pens and paper.  Maybe a calculator.

14          The other option was to spend money and to choose from

15   among competitors who offered trained professionals or

16   accountants to do your taxes for you, provide assistance in

17   understanding of tax codes, identifying the appropriate

18   deductions, filling in the forms correctly, asking the right

19   questions of you, helping you understand the process.

20          Beginning in the late 1990s, a third alternative became

21   widely available.  This is digital do-it-yourself tax

22   preparation.  Digital tax products essentially consist of

23   software that allows a taxpayer to follow a programmed path

24   through the completion of a tax return.  The programs are

25   targeted to specific returns and ask questions about filing

1    status, deductions and income in a systematic way to build the

2    information necessary to complete a return.

3           There are three ways to do digital tax preparation.

4    You can buy software, put it in your computer, you can download

5    it off the Web, or you can go online through the virtual world.

6    Digital tax preparation turned out to be a good idea.  It's a

7    better way of doing a necessary task, and many taxpayers are

8    willing to pay money for that product.  So now there are three

9    companies that are in the business of -- well, there are many

10   companies that are in the business of selling digital software

11   products.  The three biggest providers are Intuit, H&R Block and

12   2nd Story Software.  I'm going to call 2nd Story Software

13   "TaxACT" throughout the morning, your Honor.

14          The fundamental question in this case is whether these

15   three ways of doing your taxes -- pen and paper, which isn't a

16   product at all, hiring a professional, or using software on your

17   computer -- are so similar that they can be considered to be in

18   a single product market for antitrust purposes.  This question

19   is critical because if the United States is correct that the

20   relevant product market is limited to digital do-it-yourself tax

21   preparation, then there really can be no serious doubt about the

22   outcome here because H&RB's proposed acquisition of TaxACT will

23   likely substantially lessen competition and the United States is

24   therefore entitled to preliminary injunctive relief that would

25   block the merger -- or permanent relief, your Honor, as we've

 1    decided to do.

 2           If digital tax preparation is the right product market,

 3    the transaction will result in the elimination of one of only

 4    three significant players.  It's a merger to duopoly.  The two

 5    remaining firms, a now much bigger H&R Block and Intuit, will

 6    have a nearly 90 percent market share, while eliminating an

 7    industry innovator, an innovator in price and quality, which in

 8    antitrust parlance we call a "maverick."  Antitrust theory and

 9    jurisprudence have long recognized that competitors often seek

10    to eliminate disruptive maverick firms through merger or

11    otherwise, but try to take share and carve out a place in the

12    market by aggressively engaging in price and quality

13    competition.

14           The potential competitive harm from this result from a

15    merger to duopoly is obvious.  When you eliminate a low-cost,

16    high-quality competitor in a three-firm market, leaving behind

17    the two higher priced competitors, you are likely to lessen

18    competition substantially.  Again, in antitrust parlance, that

19    means it results in anticompetitive effects.  To prevail on this

20    motion, we must show that there is a likelihood of lessened

21    competition, and that's what the evidence shows without any

22    doubt.

23           Here, the defendants' own documents demonstrate that

24    they understand precisely what the possible effects of the

25    transaction are likely to be.  Early on in the consideration of

1    the transaction, your Honor, there was a candid exchange at H&R

2    Block about the potential benefits of the transaction.  In this

3    exchange, which involved Adam Newkirk, who will be on the

4    witness stand later today, the defendants recognized exactly the

5    same market that the government is alleging here and their

6    anticompetitive incentive from this transaction.  We put it up

7    on the screen, your Honor.  This is from October of 2009.

8         This is Mr. Newkirk.  They are talking about the

9    transaction.  "The other possible strategic consideration is

10   that Intuit and H&R Block together would have 84 percent of the

11   digital market" -- that's the market we're alleging -- "and we

12   both obviously have great incentive to keep this channel

13   profitable."  Other potential TaxACT purchasers could decide to

14   cut their prices even further if they could make large market

15   share gains and build short-term profitability by, quote,

16   "winning the race to the bottom."

17        That's what this case is all about, your Honor.

18   Digital market and the risk that these two duopolists, who

19   already charged much higher prices, are trying to prevent price

20   competition, preventing a race from the bottom, challenging

21   their high-priced positions.

22        A few months later, your Honor, when the companies's

23   executives were evaluating the strategic implications of the

24   transaction, they recognized that, quote, "the two dominant

25   players in the space" -- that space is the digital market --

1    "that invest heavily in marketing, will create a barrier to

2    enter the category.  The marketing costs for a startup to break

3    through in the category would be substantial and viral marketing

4    takes too long to generate scale even in the online world."

5         So there have ever it, your Honor.  Two documents being

6    candid about this transaction, admitting the market, admitting

7    the risk of competitive effect.

8         The likely anticompetitive effects acknowledged by H&R

9    Block in these documents are also confirmed by economic theory

10   and economic analysis.  As our expert, Dr. Rick Warren-Bolton,

11   will explain, when you apply standard merger analysis models,

12   and those are models that economists using not looking at

13   somebody else's documents and not doing your own model, as their

14   expert did, those models show that the merger will likely lead

15   to price increases.  And of course, the merger would also lead

16   to a loss of innovation and increase the likelihood of

17   anticompetitive coordination between the remaining competitors.

18        So because the anticompetitive effects of this merger

19   to duopoly are so clear, defendants' primary objective is to

20   contest the relevant market.  They have chosen this tactic for

21   an obvious reason:  If the market is as broad as they now

22   suggest, there is no merger to duopoly.  In order to prevail,

23   though, defendants require that the Court accept the product

24   market is as broad as broad could possibly be every way you can

25   file a tax return.  Not surprisingly, such a broad and illogical

1    product market was not where defendants started out.  It has

2    evolved as it became clear that the transaction could not pass

3    muster if digital products compete in their own market.  This

4    moving target is evident in the changing and mutating arguments

5    that defendants have asserted over the last several months.

6            As recently as May 2011, defendants were asserting to

7    the government in a white paper that our digital market was too

8    broad, too big, and their, quote, "first" reason why our

9    definition was implausible, was because, quote, "H&R Block and

10   TaxACT largely compete in separate premium and value markets."

11   That's what they said in May.

12           But by the time they filed their preliminary injunction

13   papers, your Honor, they had to admit in a footnote that they

14   haven't really used those terms consistently, and their expert

15   had subsequently testified that H&R Block competed in the murky

16   middle between Intuit and TaxACT, and that she could not tell

17   which of H&R Block's products fell into either the alleged

18   premium or the alleged value market.  So in their table of

19   contents in their PI brief, they now say our market is too

20   narrow because the market is pen and paper and manual.

21           50 years ago, your Honor, in *Brown Shoe*, the Supreme

22   Court instructed courts to look at, quote, "The nature of the

23   products in determining the relevant product markets."  When you

24   simply consider the nature of the products the defendants are

25   proposing to include in the same market as digital products,

1    it's obvious that pen and paper and assisted preparation are

2    fundamentally different and don't belong in the same market.

3           Of course, pen and paper, it isn't even a product.

4    There's no market in the sense that people are competing making

5    pen and paper.  It's simply the description of a task that

6    people undertake to fulfill their obligation to file tax

7    returns.  There's no economic exchange associated with this

8    task.

9           Now, assisted prep is face-to-face human contact.  It

10   costs more and it's provided either by companies who don't even

11   sell digital products or who, like H&R Block, do so through a

12   completely separate business unit.

13          Now, your Honor, a few years ago H&R Block sued Intuit,

14   its competitor, for false and misleading advertising because its

15   advertisements suggested that digital tax prep and H&RB's

16   assisted products were similar.

17          We've put up on the screen, your Honor, the complaint

18   in this case.  So Intuit went out and said, "TurboTax asked me

19   questions just like H&R Block does."  H&R Block didn't like

20   that.  They said, "This language is false, deceptive and

21   misleading to consumers as it implies the pre-programmed

22   prompts" -- that's what happens on a digital products -- "from

23   TurboTax computer programs are, quote, 'just like the

24   interaction with an H&R Block tax professional, each of whom

25   have more than 60 hours of tax preparation training and who can

1    interact with and respond to fact-specific questions from each

2    customer.   The personalized customer attention that H&R Block

3    customers enjoy is simply not duplicated by TurboTax's

4    software."

5            This judicial admission goes directly to the nature of

6    the products, your Honor.   H&R Block sued for money damages

7    asserting that digital is fundamentally different from pen and

8    paper and from assisted prep.

9            The claim asserted in that lawsuit, at least, your

10   Honor, was consistent with H&R Block's statements and course of

11   conduct.   Indeed, the first thing that we will do is to call the

12   defendants' own executives to the witness stand, and we will

13   review their admissions regarding competition and the relevant

14   product market.   We will see defendants' own description of H&R

15   Block, Intuit and TaxACT, as the big three, their own

16   compilation of market share for digital do-it-yourself products,

17   their own description of TaxACT as a maverick.

18           These are not our characterizations:   These are the

19   parties own words taken from their own documents.   We didn't

20   make this up.   We didn't have to fabricate a market.   We didn't

21   have to rewrite history.   We just took the parties at their word

22   before they tried to justify this merger to duopoly.

23           And that's what we'll ask the Court to do:   To take the

24   parties at their word when they identified each other as the

25   principal competitors, when they tracked each other's pricing,

1   when they responded to each other's competitive acts.

2           Now, defendants have said in their preliminary

3   injunction papers that our summary of these admissions consist

4   of, quote, "snippets" and "egregious mischaracterizations,"

5   which they say will be evident if the Court will, quote, "look

6   at the substance of the materials."

7           We'll take defendants up on their offer on that one,

8   your Honor.  Obviously, we can't burden you with all of the

9   documents in the case.  We've provided extensive citation to

10  numerous documents in our preliminary injunction briefs and in

11  the expert's report.  What we'll show during the hearing is

12  representative of the entire record.  These are ordinary course

13  business documents.  They are the type of documents which

14  executives discuss candidly who their competitors are, how their

15  business operates and what challenges they face.

16          These documents come in every variety imaginable, board

17  presentations, CFO and CEO reviews, competitive intelligence

18  reports, financial reports, offering materials described in

19  their business to potential investors, and marketing materials

20  signed by Mr. Dunn.  These are the substance of the materials,

21  to use defendants' words, that provide the best evidence of

22  determining the relevant product market.

23          With respect to H&R Block, your Honor, we will see, for

24  example, the May 2007 Competitive Intelligence Review,

25  identifies and focuses on, quote, "the big three competitors."

1    These aren't our characterizations, your Honor, they are their

2    words.  We'll see a document.  This is the same document.  It

3    measures the strengths and weaknesses of TaxACT and TurboTax,

4    but nobody else.  Maximized impact of marketing dollars,

5    weaknesses, impact.  At page 11, it describes how TaxACT has

6    forced competitive response.  It's redefined the pay sector.

7    The growth in free federal online was driven primarily by the

8    growth of TaxACT standard and TaxAct standard in state both

9    include free federal units.  TaxACT's success in gaining market

10   share propelled Intuit to offer their free edition on its own

11   home page at one point, et cetera, et cetera, your Honor.

12            Next page.  Recognition that TaxACT, all of this

13   creates price compression across all tax preparation.  By the

14   way, your Honor, this document and all the documents we're going

15   to look at, they don't make a distinction between premium and

16   value markets.  They don't talk about pen and paper.  They don't

17   identify assisted as any kind of competitive restraint on this

18   market.

19            And by the way, your Honor, as you'll see with all the

20   documents, there will be no testimony that anybody objected to

21   this presentation when it was made.  Nobody objected to the way

22   that the business people described the markets year after year

23   after year.  The way they identify their competitors.  Nobody

24   took issue with it.

25            We'll see a digital business review that was prepared

1    for the CEO and the CFO in 2009.  Decision:  Launch of free

2    online.  This is why, when they had to launch their own free

3    product, quote, "To match competitor offerings and stem online

4    share loss to Intuit and TaxACT."  That's the reason.  It's got

5    nothing to do with assisted.  Identifies the two competitors

6    that did it and TaxACT was first.

7         It acknowledges that TaxACT -- let me back up a moment,

8    your Honor.  We'll see references to TaxCut.  That's H&R Block's

9    product.  They now have H&R Block At Home.  So anyway, we'll see

10   this.  Clearly customers see TaxACT in the murky middle.  It's

11   caught in the murky middle between TaxACT and Intuit, competing

12   with both, and it's not doing so well.  It's No. 3 in this

13   three-team race.  We're No. 3 in the online market space.

14        We'll see a board presentation from June of 2010, just

15   recently, where H&R Block's position is, quote, a "value

16   provider" with a "medium price."  Value provider in the middle,

17   your Honor.  Up on the right-hand side, medium price.  Medium

18   price.  I don't know if that's a premium or a value.  I don't

19   know what it is, but it's a medium price.

20        HRB identifies separate markets for assisted and

21   digital shares.  See this chart, your Honor, it's separate

22   markets so when you see the share of 17.6 on top, that's the

23   share of assisted, and underneath it it's 11.7, the share of

24   digital.  It's not combining them; it's recognizing two distinct

25   markets, calculating market share for each separately.

1            It identifies competitors in each of the separate

2    markets, so we have a page that lists out the assisted

3    competitors.  These are people who actually provide human

4    contact when you go and get your taxes done.  It doesn't include

5    Intuit, it doesn't include TaxACT.

6            Next page, it's the digital competitor analysis.  It's

7    a different page.  It has different competitors.  Which two?

8    TurboTax and TaxACT.  It tracks average sale price, your Honor.

9    We're going to talk about that quite a bit a little bit later

10   on.  But it's tracking the average sales price in the digital

11   market.  Tracks only TurboTax, H&R Block and TaxACT.

12           And when you look at it, your Honor, it's interesting,

13   you'll see the average price is actually coming down for H&R

14   Block and that's because of the advent of free.  And look at how

15   much closer the price of H&R Block is to TaxACT than it is to

16   TurboTax.  We'll talk about the importance of average price a

17   little bit later, as I said.

18           So these are just a few samples of the high-level

19   business documents describing TaxACT as direct competitors.

20   There are many more.  We'll see some more when we talk to the

21   witnesses.  We've set forth many more citations in our papers.

22   But I want to spend just a few minutes this morning on a

23   different kind of evidence.  This is the day-to-day

24   communications of the business people on the line who are

25   competing for share every single day.  I'll move through these

1    very quickly, your Honor, but even as we do, there will be no

2    doubt about the direct competition between Intuit, H&R Block and

3    TaxACT.

4            There are three groups of materials, your Honor.

5    Again, I'll do them quickly.  The first one is simply

6    chronology; showing in the last few years various ways of

7    competing, and then we'll talk about some pricing and then some

8    merger-specific issues.  January 2006, objective is to switch

9    TaxACT and TurboTax users to TaxCut, H&RB's product.  Let's do

10   this pretty quickly.

11           July 2006, the purpose of this meeting is to start

12   active discussions about how best to compete with TaxACT, as

13   well as disrupt the Free File Alliance.  And that's the alliance

14   that really got the whole free thing started.  They didn't like

15   it.  They hated it.  You'll hear testimony that they hated it.

16   They need to compete about it and they need to disrupt it.

17           Next year March 2007, TaxACT released their numbers for

18   3/22.  They're growing.  TaxACT is upset about it.  They use

19   some profanity and some -- they are not happy about their

20   competitor getting the market share.

21           January 2008, they retained a firm called "Stax, Inc."

22   And the purpose of Stax was to go out and do competitive

23   intelligence analysis.  Who did they tell them to go after?

24   Digital competitors, Intuit and TaxACT.  And they had a separate

25   study of assisted and identified competitors differently.

1      Now we're in 2008.  "If we're going to compete

2  aggressively against TaxACT and others, I would keep the

3  additional funding for online marketing.  They are spending

4  money directly to compete with TaxACT."  That's pretty much the

5  definition of a competitor, your Honor.

6      Here it is 2008.  You hear about how H&R Block is after

7  different people.  "Their customer base seems to match our

8  customer base better than they match Turbo's, but we already

9  knew that."  No surprise there.

10     2009, your Honor.  "Looks like TaxACT beat us to the

11  punch on Mint."  Now, Mint is a personal finance site and they

12  are teaming up on marketing.  "Both of our primary competitors,

13  Intuit and Mint, either loan or have direct links to personal

14  finance software products."  So they care about what is TaxACT

15  doing.  And you know what, the funny thing about this, your

16  Honor, is Intuit bought Mint.  They bought Mint.  So Tax didn't

17  even have it anymore.

18     March 2009, "TurboTax and TaxACT are kicking our butt

19  again."  October 2009, "TaxACT is a very serious competitor in

20  the online space.  We only need to look at market share to see

21  that they are the No. 2."  The only market in which they are the

22  market is the digital market, your Honor.

23     Now we're in February 2010.  "Based on share of traffic

24  to tax prep sites, TaxACT is taking share, share in the digital

25  space, a little from us, a ton from TurboTax."

1        February 2010.  It's a long discussion about what's

2   going on in the market, and they are concerned both about

3   TurboTax and TaxACT.  And what do they conclude?  "We can't

4   outspend them, outfree them and we can't yet outproduct them.

5   We need a stronger way to offer a real differentiated position

6   that resonates."  Not just TurboTax, but TaxACT act as well.

7        March 2010.  "As TurboTax and TaxACT continue to

8   increase their advertising spend, we gotta keep up.  Otherwise,

9   we'll lose filers."

10        When I asked Adam why clients could be significantly

11   lower for H&RB online if we use white label, he mentioned, "It

12   wouldn't take long for customers to find out that H&R Block was

13   running, essentially, the same product as TaxACT at a higher

14   price via blogs, tweets, etc."  That's what this case is about.

15   There is a secret here, which is the products aren't very

16   different, but they are somehow able to get a good higher price.

17   And we'll talk about why that is a little bit later and why they

18   are trying to protect that.

19        Last in this series, your Honor, this is a small little

20   incident, but I think it tells us a lot about who is a

21   competitor and who isn't.  This is -- one of the issues is for

22   the parties all the time is how good is our product and how good

23   is it versus another player?  So this issue is just the log-in.

24   When you go on the site, what happens?  And it turns out that if

25   your log-in is better than your competitor's log-in, it gives

1  you a little advantage.

2         So who do they look at in July of 2010 when they are

3  trying to decide whether our log-ins are any better?  Their

4  log-in isn't very good so they look at TaxACT and say, "We

5  should use this model."  That's what's competition is all about,

6  your Honor.  Innovation, better product, looking at your

7  competitor and trying to do the same thing.  A few -- your

8  Honor, you'll hear a lot about they don't compete on pricing,

9  and we'll talk about why that's completely false as well.

10        Let's go back to 2005.  What are they doing?  They are

11 tracking TaxACT's pricing.  Very early on in this story,

12 tracking pricing.  2009, they are very upset because TaxACT has

13 a lower price on a certain combination of goods.  "They are

14 really undercutting the market."  There is only one market, your

15 Honor, that they could be undercutting, your Honor.  It's

16 digital.

17        January 2010.  You're going to hear a story about how

18 H&R Block didn't really know what it was doing for a long time,

19 and now suddenly they realize they are competing in the premium

20 section and they are not competing in the value section anymore.

21 And how that, by the way, fits in with their idea that they are

22 competing with everybody -- and we'll talk about why that makes

23 no sense either.

24        But anyway, it turns out that they are competing at the

25 low-priced level.  January 2010, they are very happy because

```
 1    they have got a program which allows you to do a state filing

 2    for 9.95, and it's cheaper than TurboTax and TaxACT.

 3            Last two e-mails we're going to look at this morning,

 4    your Honor.  Again, these have to do with thinking about the

 5    transaction, and they really had to focus on what this means.

 6    Last sentence here, "When TaxACT is off the market, all players

 7    remaining make up less than 10 percent of the digital share."

 8    It's the digital market, your Honor.

 9            And lastly, you know, we won't see very many

10    handwritten notes in this case, your Honor.  I like handwritten

11    notes.  This is a great one.  This is a schedule, the timeline

12    for the transaction.  When companies do mergers, they have these

13    process timelines.  So at the top, somebody wrote,

14    "Hart-Scott-Rodino" -- that's the antitrust process -- digital

15    precedence for two and three merging."  Well, there are only two

16    and three in the digital market so I think they understood very

17    early on exactly what their documents say they've understood for

18    many, many years.  The digital market is separate.

19            You can call these snippets, your Honor, but they

20    reflect market reality as recorded by the line business people

21    in their day-to-day activities.  And it's the same market

22    reality that we will see reflected in TaxACT's documents and

23    hear described by their CEO, who will explain how TaxAct's

24    central business proposition from day one has been to be a

25    fierce competitor shaking up the digital market with low prices
```

1    and innovation.  Mr. Dunn is very proud of this story, and he's

2    eager to put his name behind it in messages to customers.

3          Here's a company marketing brochure from 2008.  Like

4    H&R Block, TaxACT identifies and tracks the big three as key

5    competitors.  You see on the right hand of this page, your

6    Honor, they are tracking Web traffic.  And the only three they

7    identify are TurboTax, Tax Cut and then all others.

8          Second page, this is a comparison of product, your

9    Honor.  Again, it only lists TurboTax, Intuit, TaxACT --

10   TurboTax, H&R Block and TaxACT.  Features, prices.  And it's

11   great.  At the top, your Honor, it says -- on the left side is

12   "standard entry level."  On the right side is "deluxe/premium."

13   TaxACT lists products on both sides.

14         At the end, there is a letter from the CEO.  And he's

15   sure about this, and he's going to tell the world, and he's

16   going to sign his name to it, because he's proud of it and he

17   should be.  "Since that time" -- that's the beginning of

18   TaxACT -- "it's been a catalyst for change in the tax

19   preparation industry.  We have forced our competitors to change

20   as well.  We've made sure TaxACT has consistently forced the tax

21   preparation industry to become more competitive.  We're willing

22   to push the limits to make changes that will benefit customers."

23   This is the story of a maverick, a maverick that's proud of

24   being a maverick.  A maverick that's very good at being a

25   maverick.

1          Here's a brand analysis from just last year, your

2     Honor, June of 2010.  The question was asked quite directly,

3     "How are the major direct competitors positioning the above

4     items?"  Who do they identify?  TurboTax, H&R Block.  These

5     aren't our mischaracterizations, your Honor.  When we say

6     "direct competitors," these are the words that come from their

7     documents.

8          Competitive price comparison, 2009.  Who do they list?

9     I think it's getting repetitive.

10          Now, TaxACT has wanted to tell its story not only to

11     potential customers, but also to the capital markets, to

12     investors, so that they could raise money in financing.  In

13     order to do so, TaxACT has put together offering memoranda.  And

14     as the Court is well aware, there are extensive legal

15     requirements concerning the candor that apply to such documents.

16          I'm not going to take the time this morning, your

17     Honor, but when Mr. Dunn is on the stand, we're going to spend a

18     lot of time looking at those documents.  And what you'll see is

19     the recognition of TaxACT's maverick role.  Its two principal

20     competitors are Intuit and H&R Block.  And repeatedly,

21     repeatedly, because they are trying to get money from the

22     market, a description of the high barriers to entry that are

23     going to protect them going forward.  So what they swore in

24     their papers that are going out to investors, higher barriers to

25     entry.

1          Again, you can call these snippets, but there's a

2     pretty big pile of snippets, your Honor.   They are throughout

3     the defendants' files and they are consistent.   In their own

4     words, TaxAct and H&R Block are direct competitors in the

5     digital market.   We ask the Court to take them at their word.

6          And we're also going to offer the testimony of our

7     expert, Dr. Warren-Boulton, who has applied the standard

8     economists test.   It's called the SSNIP test; Small But

9     Significant Nontransitory Increase in Price.   Which focuses on

10    what would happen as a result of a small price increase.   Not

11    surprisingly, Dr. Warren-Boulton concludes that digital is in

12    its own market.

13         But I can tell you this, your Honor:   If you have any

14    doubt about that, by the time Dr. Warren-Boulton gets on the

15    stand, I'll be surprised.   I think the evidence from the

16    parties' own documents will make pretty clear what the market

17    is.

18         So how will the defendants respond to our evidence?

19    First, I assume they'll continue to insist that manual and

20    assisted need to be included in the same market.   To do that,

21    they'll need to repudiate or explain away or ignore what they

22    said before the transaction.   And they may do that.   They've

23    been doing it in the last several months.   Let's go through a

24    few things that we've heard.

25         So prior management identified TaxACT as a competitor,

1    tracked their marketing share and pricing, believed free prep

2    risked erosion.  What do they say now?  Those people are dopes.

3    They didn't understand the business.  I don't have respect for

4    these leaders.

5         Next page.  Confusion.  What should we call this

6    category because they know it's a problem to get HSR approval.

7    Well, she didn't know what she was talking about either.  She

8    left.  She doesn't know anything.

9         Next page.  Let's migrate tax cut into the higher

10   segment with less focus on free.  This is talking about what

11   they might do.  This guy doesn't understand the business either.

12   He didn't understand that much about either TaxACT or pricing,

13   okay.  We may hear this again.  I don't know.

14        TaxACT, H&R Block are the big three.  This is the guy

15   who doesn't know anything either.  He's only worked a few weeks.

16   Who can trust him?  If we purchase TaxACT, I think we could

17   squeeze the bottom out of the market.  There's another guy who

18   doesn't know anything, according to the current management.  He

19   had an awful year.  Don't listen to him.

20        Oh, let's order some competitive intelligence.  Well,

21   she chased everything.  Don't pay attention to her.

22        Let's see.  We matched free -- we did something to

23   match TaxACT/Intuit.  I never understand what she was saying

24   what she told me that.  I didn't ask her, but I never understood

25   it.  H&R Block's in the murky middle.  I didn't understand that

1    either.  Adam Newkirk will be on later today because he is the

2    one we saw earlier with the 84 percent market share.  He is not

3    a decisionmaker, he's not a policy maker.  By the way, he had a

4    large responsibility for doing the transaction, he just has

5    musings at this point.

6         Jason Houseworth, he is going to -- I think he may

7    contradict himself.  You know, he now says, "I didn't have a

8    good understanding when I said what I said before the

9    transaction."  Anyway, that's enough of that.  There's plenty of

10   have them.  We'll hear them all the next couple of days.

11        Okay.  Apart from that, apart from denying what they

12   have said before, what else will they do?  I think with respect

13   to digital, your Honor, we expect the defendants' expert

14   Dr. Christine Meyer will claim to find support in her conclusion

15   that digital and assisted in the same market by pointing to what

16   they call a "pricing study" or a "simulator."  That's really all

17   she has.  Dr. Warren-Boulton looked at that when he did his

18   first report, and he saw it as a document that simply proved

19   that when they look at pricing, they look at both TaxACT and H&R

20   Block and everybody else together.

21        Dr. Meyer didn't stop there.  She purported to see a

22   lot of other things in this document.  She didn't do any of her

23   own econometric analysis or modeling.  That's very important to

24   understand, your Honor, because that's what economists do.  They

25   do a merger stimulation.  They do their own SSNIP test.  They

1    don't just take somebody else's study and put it on there and

2    say, "I can make something of it."  She just interprets a single

3    document to say that the users of digital products would move to

4    assisted in response to an unspecified price increase.  The

5    simulator was created by H&R Block several years ago.  It's not

6    an econometric study that she conducted.  And defendants will

7    not put on the person who actually created the simulator.  They

8    are not coming.

9         And even assuming that it was appropriate for Dr. Meyer

10   to rely on the conclusion of a study, if that's what it was,

11   that she didn't do, and even assuming that the underlying

12   calculating function actually worked, which it doesn't, the

13   fundamental factual truth is that defendants have never viewed

14   assisted as any significant threat to digital.  So Dr. Myers's

15   conclusions about competition based on a simulation created by

16   someone who will not be here to testify, are directly

17   contradicted by the defendants' admissions about the real world

18   and by their sworn testimony already in this case.

19        In May, your Honor, when they were claiming that

20   premium and value were in separate markets, they filed a paper

21   in which they admitted that, quote, "digital tax preparation

22   business serves do-it-yourself customers and does not adversely

23   affect its much larger assisted tax preparation business."

24        We put the quote up on the board, your Honor.  It's

25   from a paper they filed to us.  I don't know how Dr. Meyer

1    explains this one.  "Digital tax preparation does not adversely

2    affect its much larger assisted tax preparation business."

3    That's because they're fundamentally different products.  H&R

4    Block competes in two businesses.  They don't want digital to

5    take business away from assisted.  They know that.  If there was

6    any risk of that, they wouldn't be doing the transaction.

7          That's why H&R Block sued when Intuit claimed they were

8    saying the same.  There is no mystery.  The only mystery is why

9    they think they can walk away from these admissions.  And it's

10   what their CEO at the time, Mr. Bennett, will have to admit

11   later today; that assisted has no impact on H&R Block's digital

12   business.  He is already said it.  He'll have to say it again

13   today.  So Dr. Meyer's conclusions based on a simulation that

14   she didn't conduct, simply cannot stand in the face of these

15   real-world facts and omissions.

16         What about pen and paper?  You will certainly see

17   references to pen and paper in the parties' documents.  That's

18   because pen and paper is the pool from which they attract

19   customers.  The sellers of digital product competing with each

20   other to sell product go after these people.  They are not

21   competing with pen and paper.  There's no such animal.  It's

22   simply a description of a task.  No one makes it, no one sells

23   it.  So the sellers of digital product look to the competitors

24   to see what prices they are charging and what innovations they

25   are offering as they seek to attract customers.

1          Now, you may hear -- and I'm going to ask Mr. Bennett

2     to explain his fishing analogy that he uses to describe the

3     market.  What he says is there's a pond or a sea full of

4     potential customers for digital preparation and in that sea,

5     there are people who are using pen and paper.  So according to

6     Mr. Bennett, all of the companies that sell digital

7     do-it-yourself product cast their nets out in the sea -- fishing

8     poles, nets, whatever -- to try and attract customers into their

9     nets.

10         As Mr. Bennett will admit, each of the competitors is

11    seeking business from the same group of potential customers.

12    They are all out swimming.  We're all throwing out nets out

13    there.  Let's see who we get in, okay.  They are competing.  One

14    of the ways they compete is to get people into the net is free

15    product.  I want to take a minute to talk about what "free"

16    means.

17         Competitors all give away free product, but, of course,

18    they are not charities.  They are in the business of making

19    money by selling as much product as they can, all of them.  One

20    of the ways that they attract paying customers is to give away

21    some product and hope that they can get the free customers to

22    buy other products.  For example, they give away a free -- your

23    Honor understands this, I think.  They give away a free basic

24    federal, but they charge money for state returns or more

25    complicated federal or for different functions on the tax

1  return.

2        Since at least 2004, the big three providers have

3  engaged in direct and aggressive competition through free

4  offerings to the benefit of consumers.  The relevant fact for

5  now is that free product is one way of attracting customers into

6  the nets that the sellers of digital product are casting about.

7  And some consumers who take up the free product are

8  pen-and-paper users.  "Try this if you like it," say the

9  competitors.  We have a great product.  That's how they sell it.

10  That's how they all do it.

11        So what more will the defendants say about pen and

12  paper?  Their expert cites a 2011 survey.  She didn't do it.

13  But H&R Block did to support this transaction.  The Court's

14  fully aware of the problems with that survey from our papers so

15  I won't belabor it today.

16        One last point on pen and paper, your Honor, if there's

17  any doubt about whether it's a competitor.  And that's what's

18  happening.  So what's happening is there are very few

19  pen-and-paper people left.  As people shift over, the number of

20  people who actually use pen and paper is shrinking.  We've just

21  put a chart, your Honor, that shows this.

22        So from 2002 to 2011, there's basically no one left in

23  pen and paper.  They are competing with pen and paper.  They are

24  trying to get those people to be users of their product.  And no

25  one's going back the other way.  It's a one-way street.

1          In short, your Honor, the evidence shows that the
2     relevant product market is digital tax preparation.  And that
3     really should be sufficient for the government to enjoin this
4     transaction.  The resulting concentration, two firms with more
5     than 90 percent of the market and the increase in concentration
6     of 400 points using the standard index is sufficient under the
7     case law to create a presumption of anticompetitive effect.

8          Defendants, therefore, have the burden of coming
9     forward in response to the evidence of concentration to show
10    that competition will not be harmed.  They can't meet this
11    burden.

12         Let me take 30 seconds to talk about this idea that we
13    didn't prove concentration because we didn't break it out into
14    state and federal.  That's not how anybody tracks share in this
15    industry, your Honor.  You'll see hundreds of documents today.
16    You know, I'd offer them the opportunity to show you how many
17    times they break it down into state and federal.  And they don't
18    do it that way because people file the same tax returns with the
19    same people.

20         If you go on the H&R Block Web site and get free
21    federal, you're likely to buy their state tax product.  That's
22    the way it works.  So anyway, you won't see any market share
23    calculations that break down federal and state.  It's not how
24    they look at it.

25         Now, concentration alone would be enough for us to win

1    the case because they don't have a response, but there's a lot

2    more evidence.   First is the fact that TaxACT is being acquired

3    by a competitor that charges higher prices, has reluctantly

4    matched TaxACT's innovations and faces continuing threat of

5    price and quality pressures from TaxACT.   We can eliminate a

6    maverick competitor.

7        There's no doubt that TaxACT fits the description of a

8    maverick.   It's a textbook example.   Indeed, it's been

9    positioning itself as a maverick all along.   It's been its

10   consistent, self-proclaimed business model.   We can track

11   TaxACT, and we will, maverick behavior and see its competitors'

12   responses.   Its about an maverick on price, on product

13   innovation and on marketing.   It's hard to imagine a clearer

14   example.

15       For the last seven years, TaxACT has followed a

16   disruptive business model with two primary components:   The

17   aggressive use of free product and significantly lower prices

18   than its competitors.   Let's just review a few highlights.

19       They offered free to all taxpayers in the Fee File

20   Alliance.   They offered free on their Web site.   They were the

21   first one to do that after the Free File Alliance tried to limit

22   who could get free.   They continued to expand the range and

23   functionality of free.   They continued to be an aggressive

24   competitor with free forms.   They partnered with a personal

25   finance site.   They were the first to support all E-filable

1    forms.   They entered the software market recently, 2010, your

2    Honor.   The software market is the stuff you go to the store and

3    buy, and you bring it home and stick it in your computer.

4         It's a declining market, but even in the face of the

5    declining market, your Honor, they were aggressive and they have

6    gone in there.   And you'll see that H&R Block is not happy about

7    it because they are taking market share away from them.

8         And they have been an aggressive price cutter all

9    along.   One of the theories here, as I get it, is that, okay, on

10   day one you were an aggressive price cutter, and that's the only

11   day you get credit for that.   You don't get credit for it if you

12   keep being an aggressive price cutter all along because everyone

13   knows you're an aggressive price cutter.

14        But that's not the way the theory of maverick works.

15   That's what makes them a maverick.   They continue to offer lower

16   prices undercutting them for year after year after year.   Thus,

17   the evidence of TaxACT's maverick behavior and its competitors'

18   response is sufficient by itself, apart from industry

19   concentration, to show anticompetitive effect.

20        In addition, we'll offer the opinion of Dr. Rick

21   Warren-Boulton, who has spent much of his 40-year career

22   analyzing mergers on his own, as well as directing the

23   government economists in merger analysis.   Dr. Warren-Boulton

24   will explain that one of the economist's standard tools of

25   merger analysis is the use of a merger simulation model.   His

1    expert report, which we submitted with our PI papers, explains

2    in detail the methods and assumptions that he used to perform

3    his merger simulation.

4         Merger simulations aren't perfect, and he'll tell you

5    that, but they are what economists use.  And they are something

6    that Dr. Meyer didn't use.  His model predicts that the

7    transaction is likely to result in increased prices.

8         Dr. Warren-Boulton will also explain that this amount

9    that he calculates does not take into account additional

10   competitive harm that would be expected as a result of the loss

11   of innovation and from the increased likelihood of coordination

12   between the remaining duopolists.  Let me just get a drink, your

13   Honor.

14        Let me just sum up, your Honor, the evidence that the

15   transaction is like to substantially lessen competition.

16   Extreme concentration.  Elimination of a maverick competitor

17   that competed directly with the acquiring party.  The

18   application of standard economic models showing that a

19   substantial price increase is likely.  The likelihood of

20   coordinated effects as the remaining duopolists have an

21   increased ability and incentive to restrict price and quality

22   competition.  And H&R Block's admissions recognizing that the

23   elimination of TaxACT provides an opportunity to limit price

24   competition in a market with high barriers to entry.

25        Apparently, having abandoned the claim that there are

1    separate value and premium markets, defendants will now attempt

2    to convince the Court that TaxACT and H&R Block and Dr. Meyer's

3    rather imprecise formulation, do not compete particularly

4    closely.  I don't know what that means, and we'll have to ask

5    her, but that's what she says.

6            This conclusion, of course, is dramatically at odds

7    with the defendants' own actions and the identification of

8    TaxACT as a direct competitor, their competitive responses to

9    TaxACT.  But they'll try to gloss over the admissions by

10   focusing on differences in competitive strategy.  TaxACT has

11   been an aggressive low-priced competitor, and we will see how

12   Intuit and H&R Block have tried to use the power of their brands

13   to get away with higher price.

14           Incredibly, defendants will try to use TaxACT's

15   competitive hallmark -- aggressive pricing -- to show the

16   absence of competition.  They charge lower prices, your Honor,

17   so they must not be competing with these guys who are charging

18   higher prices.  That's the essence of what you're going to hear

19   a lot of.  We'll hear a lot about the difference in price

20   points.  Intuit's got a $100 product, TaxACT's got an $8

21   product.  A big gap.  Intuit and H&R Block have increased prices

22   on individual products more than TaxACT.

23           We are likely to see charts and graphs that emphasize

24   individual price points.  "Look," the defendants will say, "we

25   have a product that sells for many multiples of TaxACT prices."

1    But as the parties' documents make clear, the fact that TaxACT,

2    Intuit and H&R Block have chosen different competitive

3    strategies does not mean they are not competing against each

4    other.  To the contrary, as we saw in the documents that I

5    reviewed earlier, they admit that they are direct competitors

6    and the evidence shows they are competing fiercely.

7         And you know, there's this -- I call it a "conceptual

8    flaw" in defendants' pricing story.  It's sort of a threshold

9    issue that's trying to get through.  If they had the courage of

10   their conviction on this one, your Honor, they would be arguing

11   that premium and value are in separate markets, which is the

12   usual argument you make when you're trying to say that products

13   don't have an effect on each other or that they don't compete.

14   You say they are in separate markets.  That's the point of

15   market definition.

16        And that's how they started out, remember.  They

17   started out telling the antitrust division that they were in

18   separate markets.  But they can't do that anymore because their

19   documents don't support it, their testimony doesn't support it,

20   their experts can't support it.

21        So their prior admissions, the fact that H&R Block does

22   compete for value customers, those are just facts that get in

23   the way of this story of premium and value in being in separate

24   markets.  So to have a product market story, they had to allege

25   that digital competes with assisted and pen and paper.  So now

1    they want the Court to believe that TaxACT is competing more

2    vigorously with assisted and pen and paper, but not with the two

3    companies that actually sell the same product.

4          It's a fuzzy story, your Honor, a very fuzzy story.

5    They are saying TaxACT is competing in this big market so -- you

6    know, big, big markets so we're all together, but not really

7    competing with the two people who seem to be the closest with

8    them.  Don't worry about that, your Honor.  Let's focus a little

9    bit more on these individual price points comparisons, and I'll

10   talk a little bit about why they are misleading, apart from the

11   conceptual problem.

12         First, the price point on a chart says nothing about

13   what is actually happening in the market, and tells you nothing

14   about consumer welfare.  For example, if it turns that you have

15   a product with a list price of a hundred dollars but only a few

16   people buy it, and most of your product is sold at a much lower

17   price or given away for free, then the $100 price point doesn't

18   tell us very much at all.  In fact, I showed examples earlier

19   where H&R Block was selling product at a much lower prior,

20   including examples where it was underpricing TaxACT.

21         So scatterpoint price points don't tell us a lot.  And

22   the advertised price, by the way, may not be the sales price.

23   H&R Block offers various discounts and promotions to move

24   product.  So as a general matter, making comparisons about

25   price, focusing on individual list prices, doesn't tell you

1   much.

2          And that's particularly true in this market where so

3   much and an increasing amount of product is provided to

4   consumers for free.  If I give away a lot of product for free,

5   the mix of my high prices with my free prices, the average

6   price, tells us what consumers are truly paying.  It's a measure

7   of consumer welfare.

8          In fact, contrary to the odd assertion that TaxACT is

9   not engaged in price competition with Intuit and H&R Block,

10  offering free product is a pricing strategy.  Indeed, as Intuit

11  explained in a declaration that it filed in this case, TaxACT

12  has been, quote, "one of the most aggressive competitors in the

13  provision of digital products," close quote, and it cites

14  TaxACT's free strategy as, quote, "a very aggressive pricing

15  strategy."

16         Intuit says it has to adopt this pricing strategy, and

17  it had to compete in the free market by adding value to its

18  product to address the customer perception of a lack of

19  differentiation from TaxACT.  Indeed, Intuit found that 40

20  percent of lost customers switched from Intuit to TaxACT.  And

21  as Intuit notes, The competitive product development efforts of

22  TurboTax, H&R Block and TaxACT -- they identified the three

23  together -- have benefited consumers, quote, "as competition has

24  driven innovations which have significantly reduced taxpayer

25  burden while increasing return accuracy."

1    And that's why individual pricing points don't tell you

2    very much about competition, other than the fact that TaxACT

3    competes by using low prices.  And that's why H&R Block and

4    other competitors calculate the average price for their

5    products.  That measure tells us a lot more about what's

6    happening to a company and what's happening to consumers.

7    The evidence here is that the average price that Intuit

8    and H&R Block have been receiving has been declining.  If you

9    look at the chart earlier, but before we get there, your Honor,

10   we have a chart on the board right now which shows the breakdown

11   of H&R Block's product distribution.  Look how much is free:

12   Free Filing Alliance, Basic, Free.  A huge amount of their

13   product goes out the door at free or a much lower rate than the

14   premium and deluxe.  Not to take that into account by throwing

15   up on the board some scatterpoint pictures of what the

16   high-priced premium product would be just simply misunderstands

17   how to understand the market.

18   Anyway, back to the average price.  Let's put up the

19   average price chart.  We looked at this earlier, your Honor.

20   You can see, again, H&R Block is closer to TaxACT.  H&R Block is

21   coming down because the free product.  That's how they look at

22   the market.  That's what they care about because individual

23   scatterpoints on a graph don't tell you anything about consumer

24   welfare.

25   In any event, what is crystal clear is that consumers

1    are better off.  More of them can do their taxes for free

2    because competition has forced competitors to offer more

3    functionality for free.  And so the decline in average price is

4    a measure of the benefit to consumers.  Remember, your Honor,

5    that neither H&R Block nor Intuit wanted the expansion of free.

6    They fought it because it threatens their high prices as the

7    decline in average price is revealing.  They hated free because

8    it threatens to cannibalize their high-paying clients.  They

9    would stop free if they could.

10            And one way to do that is to slow down the expansion of

11   free.  Be less aggressive in new product offerings, for example.

12   Indeed, remember the candid e-mail we saw at the beginning about

13   the need for Intuit and H&R Block to stop the race to the

14   bottom.  That free is threatening.

15           H&R Block will have a very different incentive to

16   promote and innovate in a free product -- with free product than

17   TaxACT.  It's very important, your Honor.  H&R Block will have a

18   very different incentive.  H&R Block is trying to protect the

19   high-price branded product, and that will still be the case

20   after they eliminate TaxACT.

21           On the other hand, TaxACT doesn't have that high-priced

22   branded product, and its basic competitive strategy is to sell

23   quality product at a lower price.  As you'll hear from

24   Mr. Bennett later today, branded marketing is a very important

25   part of H&R Block's strategy.  Both Intuit and H&R Block have

1    convinced consumers that there is value in their brand.  You get

2    something more when you see the name H&R Block or Intuit or

3    TurboTax on the box.

4         But it turns out, your Honor, that there isn't that

5    much difference in the actual product that you get from TaxACT

6    or from Intuit and H&R Block, so the high-priced brand model is

7    at risk from the expansion of free and what is likely to be an

8    increasingly more difficult effort to differentiate the branded

9    product from a high-quality, low-cost competitor like TaxACT.

10        So when you see the higher price points that you're

11   likely to see here, your Honor, that Intuit and H&R Block

12   advertise, you will see exactly what it is that H&R Block wants

13   to protect.  They want to avoid a race to the bottom.  They

14   don't want to put those high prices at risk.

15        Defendants claim that their promise not to raise

16   TaxACT's prices eliminates that risk.  It's not legally

17   sufficient, as we've explained, your Honor.  But practically,

18   you don't cure anticompetitive merger by a price-fixing

19   agreement or the imposition of a regulatory burden on the

20   government.  And you can see why it doesn't make sense in this

21   case, your Honor.  TaxACT is a more than a price leader.  It's

22   an innovator.  It's aggressive use of free product.  It's

23   willingness to expand into software, for example, in a declining

24   market.  It's innovation in product.  Those kinds of activities

25   can't be protected with a price-fixing agreement.

1          Nor, of course, is it relevant that they have a

2    business plan that purports to be pro-competitive.  You're

3    likely to hear a lot about that, lots of testimony about what

4    great plans they have for TaxACT.  How they are going to be

5    better competitors.  In fact, their expert relied on those plans

6    in concluding that consumers have nothing to fear.  Here comes

7    the fox into the hen house, your Honor, but don't worry, he's

8    promised to be good.

9          There are two other arguments that we'll hear about

10   competitive effects.  It should not be a concern.  First, that

11   the duopolists who hold a 90 percent market share will be

12   constrained by new entrance and expansion by existing

13   competitors.  The evidence will show that neither entry nor

14   expansion will occur any time soon.  And once again, we'll have

15   the parties' own words to prove this point.

16         Here's what they said.  Both H&R Block and TaxACT have

17   admitted that there are high barriers to entry that will get

18   higher as a result of this transaction.  Let's create even more

19   barriers to entry.  TaxACT's CEO has said it would take 11 years

20   for a competitor to replicate the success that TaxACT has had

21   with its brand.

22         And Mr. Bennett, H&R Block's former CEO, will tell the

23   Court later today about how hard it is to develop a brand in

24   this business.  It costs millions and millions of dollars.

25   He'll tell you that TaxACT right now has a strong brand.

1          We'll also have in the record the statements of

2     competitors that lack the resources or intent to compete in any

3     significant way with the duopolists.  So entry or expansion will

4     not provide a check on the duopolists any time soon.

5          Defendants will also claim that there are significant

6     efficiencies that's overcome any harm that may arise as a result

7     of this transaction.  While it is the case, your Honor, that

8     cognizable efficiencies can sometimes offset competitive harm,

9     sometimes, there is no reported case in which a court permitted

10     in an otherwise anticompetitive merger to duopoly based on

11     efficiencies standing alone.  And there will be no basis in the

12     record for this one to be the first case, your Honor.

13          Efficiencies where there are high-market concentration

14     levels have to be extraordinary.  And we've put a cite up on the

15     board, your Honor.  The Court has to make a rigorous analysis,

16     and they have to be efficiencies that can't be achieved by

17     either company alone.  Here you'll see the efficiencies, the

18     calculations are nothing more than back of the envelope kind of

19     efficiencies.  We'll have an expert that comes on and explains

20     all of that.  I think you've read the preliminarily report, your

21     Honor.

22          In any event, they are not merger specific.  I'm not

23     going to take more time this morning.  I don't think it's a very

24     serious issue in this case.

25          Now, much of the justification that the parties have

1    offered so far, and that you are likely to hear from their

2    witnesses, is that this transaction will allow H&R Block to be a

3    stronger competitor.   That TaxACT is better at many things that

4    H&R Block is.   You will likely hear, as defendants' expert has

5    claimed in her report, and as H&R Block's former president will

6    testify, that H&R Block struggled for a long time to be an

7    effective competitor, and that H&R Block has had particular

8    difficulty in dealing with TaxACT's aggressive free-product,

9    low-priced strategy.

10          Answer, eliminate TaxACT.   That's not the kind of

11   efficiency that you can get credit for in merger analysis.

12   H&R Block doesn't need to eliminate one of its principal

13   competitors in order to improve its own competitive

14   effectiveness.   That's what their president promised the board

15   he would do.

16          Here's what he said to the board:   "If we do not reach

17   agreement with TaxACT, I will operate our digital business as a

18   separate business unit and move them to another part of our

19   building and execute on our own plan, which is to improve our

20   Web site, to convert more visits to customers, drive more costs

21   out and more aggressively market our free product."

22          And that is exactly what he should be doing.   He should

23   be vigorously competing instead of eliminating a competitor that

24   is forcing him to take those actions.

25          And if you look at what H&R Block's justifications for

1    the transaction have been, they match almost exactly what their

2    CEO said he could do on his own.  Here's what they said:  "H&R

3    Block plans to use TaxACT to aggressively target the low

4    ground."  What's he promised to do?  Aggressively market.  H&R

5    Block's going to aggressively market free and online value

6    pricing through TaxACT brand.  H&R Block will use TaxACT to

7    maintain a significant price advantage as the price leader.

8    That's what he promised he could do on his own.  Drive more

9    costs out, aggressively market.

10         Nothing at H&R Block can't do on its own.  And all of

11   this is being done right now by TaxACT.  They don't need H&R

12   Block to make them target the low ground.  That's what they're

13   doing.  They don't H&R Block to aggressively market free.

14   That's what they're doing.  And they don't need H&R Block to

15   have them maintain a significant price advantage as the price

16   leader.  That's what they are doing, and that's what's at threat

17   by this transaction.

18         THE COURT:  Thank you, Mr. Wayland.

19         Mr. Robertson.

20         MR. ROBERTSON:  Yes, your Honor.  If I can move my

21   computer over there.

22         Your Honor, may I proceed?

23         THE COURT:  Yes, please.

24                    OPENING STATEMENT

25         MR. ROBERTSON:  Thank you, your Honor.  In the real

1    world, the world in which we all actually live -- and the

2    documents will show this -- tax preparation companies help

3    people do their taxes; whether it's in a store, whether it's in

4    software.  And some people do it pen and paper.

5         It is a broader market.  What I just heard is that this

6    broader market theory just arose in the last couple months.  The

7    evidence will show it's been there for years.  It's in the

8    company's products.  It's in their annual reports since 2009.

9    There was apparently this lawsuit.  First, frankly, I heard

10   about it was just a minute ago in 2006.  The company didn't win.

11        And the issue -- the main issue -- in the case that

12   they were trying to resolve was that Intuit said it was the

13   largest and what H&R Block, my client said, was that, you know,

14   we were larger.  Well, since 2006, actually, that's reversed.

15   Intuit actually is larger now.  So they are, as we'll see in

16   this case, making lots of claims against H&R Block and its tax

17   stores.

18        In the real world, Block's board agreed to pay $287

19   million for TaxACT after a significant analysis by its staff and

20   by Bank of America because it needed to lower its costs and

21   become more competitive in the face of a changing landscape.

22   More people are starting to use computers.  Younger people are

23   more used to using a computer than someone as old as me.  I'm

24   trying as you can see, but younger people are moving towards

25   "why don't I try to do what I just did in the H&R Block store at

1    home on a computer."  And so these markets have come together

2    since 2006.  A lot of the documents they are citing are from way

3    back then.  And things have changed quite a bit over the last

4    few years.

5           Now, TurboTax is the largest provider of tax returns in

6    the entire market.  H&R Block is not.  Intuit actually is

7    winning the battle.  After tax stores.  That's what they are

8    attacking.  They are not trying to get as much of the online

9    providers.  They are harder to shift.  They are going after H&R

10   Block's tax stores, as we'll see.  The evidence shows that Block

11   is trying to be more competitive across all the methods that

12   customers choose to do their taxes, including tax stores,

13   assisted preparation, which is 95 percent of its tax business,

14   premium software products, which include all the ones that

15   counsel split up into those four little bars, by the way.  You

16   have to add them together to get all the premium products, not

17   just put them out the way he did on that chart.

18          But also on the value market where it has not competed

19   well.  Used to have a value product, a different name product,

20   it doesn't exist anymore.  They were not very successful.  Why?

21   Because their costs were way too high.  And this is a very key

22   fact in this case.  I can't give you the exact numbers because

23   we're in a public session, but the fact is that at the 40, 50,

24   60 -- counsel mentioned a hundred dollars.  I wasn't going to

25   say a hundred dollars, I was going to say 40, 60, which is what

1    you see on counsel's chart.

2        But at that level, and TaxACTs having its price at

3    9.95, they are making more money than H&R Block is at the higher

4    priced product, because their costs are so low.  It's a software

5    company.  Block is not a software company.  And it needs to get

6    stronger in software in order to compete across all the ways

7    that people do their taxes in this changing world where people

8    are looking more to a computer.

9        When we go into a tax store, what you see, contrary to

10   what you saw in 2006 in the complaint, you actually do see

11   software.  You have a person in their helping you, but he's

12   going through questions just like you would see at home if

13   you're doing it on a computer.  Except that person's done it a

14   few more times than hopefully you have.

15       So that is the main difference.  But still, people do

16   it at home.  They often do it at home, then take it to a tax

17   store to have them check it.  That's one of the big things that

18   Block promotes.  They also have a product called "Best of Both,"

19   which merges the two together.  You'll see in the documents that

20   for years, the companies have been addressing the entire market.

21   What better way to solve the cost problem and to solve the

22   inability of Block to compete in this lower end of the market in

23   value software at the $9, $7, $8 price where TaxSlayer, Free Tax

24   USA, which is TaxHawk.  TaxHawk has about 18 different names

25   they use on the Web.  The most common one is Free Tax USA or Tax

1   Free USA.

2           To compete at that level, they can't do it unless they

3   have a low-cost product.  They can't make one.  They tried.

4   They can't do it.  What better way to solve the cost problems so

5   they can compete better with the premium product at a lower

6   price with more features and a value product to compete there

7   and give TaxACT more features that Block has that TaxACT doesn't

8   have.  Block has its own bank, for example.

9           TaxACT doesn't have a bank.  Counsel's answer to that

10  was they told Mr. Dunn to go buy a bank.  Well, that's kind of

11  hard to do.  Block's had a bank for a number of years, and it

12  gives him features to his customers that he can't get on his

13  own.

14          Now, Block has tax stores all across America.  That's

15  their main business.  And they do offer -- counsel didn't

16  mention this -- they have a free product.  You can go into an

17  H&R Block store and get your taxes done for free.  It's not

18  always way expensive as he says.

19          And it does go up from there.  Premium products tend to

20  be around $30 or so, up to, as counsel said, $100.  Some of the

21  Intuit's products actually go much higher than that, to $149.

22  Block's Best of Both product is actually more expensive than

23  Intuit's, but that's a combination of an in-tax store and a home

24  software product.  But most of the ones that Block sells are in

25  the 40 to $60 range for both a state and a federal tax return.

1    Some people have more than one state unfortunately.   I do.   But

2    most people don't; they just have one state.

3         So how do you solve this problem?   The best way to do

4    it is to take the software division at Block and let a software

5    company run it.   That's what Mr. Dunn does.   He's been doing it

6    for over 20 years.   He's going to run the entire operation, both

7    the Block brand and the TaxACT brand.   This is a fellow that

8    everybody's afraid of because he is so competitive.   He is the

9    one that's going to run the operation, not the people at H&R

10   Block in Kansas City.   It's going to be Lance Dunn.   He knows

11   how to make money at low prices.   That's what Block wants him to

12   do.

13        And 2nd Story Software in Cedar Rapids by combining

14   what is now in three different places in the U.S. and across the

15   world for Block, combining those together and sending him out

16   Cedar Rapids where he can run it, it's not only cost effective,

17   it reduces costs tremendously, but helps him be more competitive

18   and offer more features for customers.

19        That's what this is all about.   Why does Block care?

20   Because it would prefer that if people don't go to a tax store,

21   they'd stay within the family of H&R Block because one day they

22   will go back.   Because the customers switch back and forth

23   between tax stores and software all the time.   Some of the

24   quotes that were put up there were talking about the net change.

25   The net change isn't very much between Block and Block, but that

1    doesn't mean that you don't have 21 million customers in the

2    market shifting back and forth all the time.

3         The net change between Block and TurboTax is not very

4    much.  The net change between block and TaxACT is nothing.  But

5    that doesn't mean that customers don't switch.  They do and we

6    have the switching data from the IRS, which is irrefutable.  And

7    we also have our own to show what happens there.

8         Counsel mentioned that TaxACT's price is $9.95.  It is

9    much lower than anything else you see out there except for

10   TaxSlayer or Free Tax USA and the other 15 or so players that

11   are out there.  The largest player, though, is Intuit, and they

12   are out there competing.  And they are competing across all

13   methods, as we'll see.

14        Now, what counsel mentioned in the premium versus

15   value, we did have a big dispute over that during the

16   investigation.  Only for one reason:  He made it sound like it's

17   unusual that we would say that they weren't closest competitors.

18   That's what they were asking us to prove under the merger

19   guidelines under unilateral effects.  If market shares are

20   fairly low, you want to know are they closest competitors so you

21   would see unilateral effects.

22        We were trying to show them, and we'll show this Court

23   too, that we're not between TaxACT and H&R Block software.

24   They're just not.  And the data proves that.  Even the IRS data

25   shows that.  And much other -- a lot of other people come in

1    between TaxACT and Block in terms of closest competitors,

2    including pen and paper and assisted preparation.  Counsel's

3    right about that.  That is what the switching data actually

4    shows.

5           So it was no surprise that that's what we showed them

6    back during the investigation.  They didn't show everything.

7    They didn't know what Mr. Dunn actually showed them what he made

8    the premium value discussion with them.  He started off by

9    saying the market is everything.  He actually showed the market

10   including assisted preparation.  And we'll see that during his

11   testimony.

12          So they left that out.  Yes, we don't like the snippet

13   routine when they pull things out.  Some of the same documents

14   they showed your Honor, on the same documents they talk about

15   the market being everything.  They just don't want to show you

16   those pages, but that's why we have a trial.  We'll show these

17   to your Honor so you can see them.

18          We will have Mr. Alan Bennett who is the CEO.  He is

19   the government's first witness.  He will testify.  And also

20   Mr. Bill Cobb, who is the current CEO who will testify.  That

21   they have said publicly and directly to the plaintiff and now to

22   this Court that they will not raise prices.  They have made that

23   commitment.  They have told their shareholders.  They're a

24   public company.  They can't say, "Oh, we're not going to raise

25   prices for three years," and next year say, "Oh, we were only

1    fooling you."

2         Well, then we'll see another one of these lawsuits, I'm

3    sure.  They have made a commitment that they have to stick by.

4    And I'm not going to go into that -- we'll do that at the end of

5    the case which I think works more appropriate -- but we have

6    made that commitment.  And it was a very easy commitment for the

7    board to make.  There was also another commitment, which was

8    they would allow the independent distributor to keep selling the

9    product that's a shrink-wrapped, small-box product.  It was only

10   done for one year.  Hasn't done very well.

11        But the contract currently goes out to 2013, and we've

12   said they can keep doing it.  We made that commitment in writing

13   to the Justice Department.  We made that commitment in writing

14   now twice, because it's so small, nobody cares.  And that market

15   is shrinking rapidly.  People aren't going to the Staples to buy

16   a box disk when they can just go on the computer and download it

17   and do it online.  So it's not much of anything.

18        But we're willing to make that offer.  We made that

19   offer.  But at the end of the day saying you're not going to

20   raise prices, that's easy to make because the board made this

21   decision not on the assumption they were going to eliminate

22   TaxACT, which I heard about eight times towards the end of

23   counsel's presentation.  That was not the assumption as you'll

24   see at all in this case.  The assumption was that prices would

25   not go up.  They actually modeled it.  They actually model it

1    that no prices would go up at all.  And in fact, the company

2    believed that they would likely see prices go down.

3          That's what they actually believed, and that's what the

4    documents show.  No wonder there are no complaining customers in

5    here, no public interest groups, nobody saying, "Oh, we need to

6    come in here and complain because prices are going to go up."

7    What we have are numerous declarations from the plaintiff who

8    attained them from competitors.  I can see why they won't like

9    this deal.  It's not unusual for competitors to complain.  But

10   we still have many of them saying, "Gosh, I hope the Justice

11   Department is right because if the prices go up, we're going to

12   go in and steal those customers away."  That's what we think the

13   evidence will actually show, your Honor, and you'll see that.

14         Now, why is Block worried about the entire market?  Why

15   do they actually set their prices based on the entire market,

16   the diversion to tax stores from software and to pen and paper?

17   Why do they actually do that?  Well, it's because they're two

18   big elephants in the room that we don't want to talk about over

19   here on the government's side of the bench.

20         And that is Intuit, the largest provider of tax returns

21   of any kind in the country.  And their prices are a lot higher;

22   up in the hundred dollar range.  They are the ones in the

23   hundred dollar range up to $149.  They also have a lot of free

24   products trying to get people in the door so they can charge

25   them the higher price.  And that's what they do and they do that

1    very effectively.

2         They also threaten Block's tax store business.  That is

3    mostly where you see Intuit advertising and what they are doing

4    out in the real world to get more customers.  They know because

5    of high-retention rates and all these competitors know higher

6    retention rates, it's hard to take customers away from software

7    companies.  The big fish in the big pond that Mr. Bennett is

8    talking about is out there in the 63 percent of the market which

9    is tax stores and then you have a big chunk still left, about 11

10   million customers who are still doing it by hand.  That's where

11   the opportunity is, and that's where Intuit is going out there

12   and telling the world publicly that they are going to get

13   customers from there.

14        The other big elephant in the room is the IRS and the

15   Free File Alliance, which we thought we would hear from from the

16   government based on what they promised back the first day we

17   were here.  They're not here.

18        MR. WAYLAND:  I have to object, your Honor.  There is a

19   stipulation that's in evidence.  That's really inappropriate.

20        MR. ROBERTSON:  I meant the Free File Alliance, and

21   that's what I just said.  There's no stipulation on the Free

22   File Alliance.

23        MR. WAYLAND:  We have a stipulation, your Honor.

24        THE COURT:  Well, the IRS agents do talk about the Free

25   File Alliance so I think that's what Mr. Wayland is talking

1   about.  And I read the stipulation.  But I understand your

2   point.

3           MR. ROBERTSON:  Bad grammar.  The last person I was

4   referring to was Free File Alliance.  They're not here.

5           THE COURT:  I was here for the transfer motion.  I

6   appreciate your point.

7           MR. ROBERTSON:  Okay.  But the point is that it's the

8   IRS that has been pushing, pushing, pushing very hard now for

9   almost ten years and with the partners' page even before that,

10  for free products, free E-filing.  Why?  Because they don't want

11  to get stuff that's been handwritten mailed into them.  They

12  want to have this done electronically.

13          Just last year they stopped sending out the forms to

14  people in the mail.  They don't want people to fill out the

15  forms.  They want them to do it online or go into a store where

16  it's done in a computer and it's E-filed from the store as well.

17  They want to get it through the computer.  They don't want to

18  get handwritten forms anymore.  That is what's caused this

19  market to be moving and moving very differently now in the last

20  year and a half and two years than what you've seen back in 2006

21  or 2004 and 2003 when TaxACT offered its free for everyone on

22  the FFA.  That was when that happened.  That's when the maverick

23  behavior happened that Mr. Dunn was referring to.

24          Let me go through some of the documents that you're

25  going to see in this case.  I can't do all of them, obviously --

1    it would take us years -- but the ones that address what the

2    plaintiff just mentioned.  Well, this is 2008.  I didn't make

3    this up in the last couple months.  This is a pricing decision

4    by TaxACT.  And they decided back in 2008 not to raise prices on

5    the state product because they were afraid that customers would

6    complete them manually, pen and paper.

7           That's what they actually decided back then.  And

8    Mr. Dunn can testify about that.  Going to -- and this is what

9    counsel was referring to in terms of the chart showing the

10   difference in prices.  And this is from Dr. Meyer's expert

11   report, DX-17.  You can see that the prices, the green being

12   block, the red being TurboTax, and on the bottom are all these

13   ones in the value segment with TaxACT, TaxSlayer, Free Tax USA,

14   online taxes and these are federal plus state.  And you can see

15   how flat it is on the bottom.  TaxACT hasn't changed its 9.95

16   price for 11 years.

17          What you see on the top is not movement where Block and

18   TurboTax are moving identically every month to month to month to

19   month.  They move differently but for different reasons.  But

20   they don't move anywhere close to 7.95, 9.95 or a combined price

21   of 17.95, which is where TaxACT is.  That's for state plus

22   federal forms together.  That's what you actually see.  And

23   we'll show later whether there's any diversion back and forth

24   and how much it is between those products and the ones in the

25   bottom.

1         You wonder why the prices have gone up and then they
2   have leveled off over the last couple of years.  That happens to
3   be the same thing that's happened in the tax stores.  They
4   were -- both of those were going up because TurboTax is
5   attacking the tax stores and then over the last couple of years,
6   for whatever reason -- recession, whatever -- those prices have
7   leveled off from '10 all through 2010.  They go up and down
8   because of the tax season.  They tend to go up at the very end,
9   last eight days, in fact, so it's not really a straight line
10  from dot to dot.  It goes up in the last eight days of each
11  season.  Each season meaning right around April 15th.  The eight
12  days preceding that you'll see the price go up.
13        Now, pen and paper, this is one of the documents we
14  were fighting over, back in 1955, H&R Block's first
15  advertisement when it was called "United Business Co.," was
16  competing its manual.  Don't do-it-yourself, come into the
17  store.  We'll charge you $5.  I think with inflated adjusted
18  prices or present day value, Mr. Dunn over here is doing better
19  than that at 9.95.
20        But that's what they were afraid of then.  They are
21  still doing it today.  Mr. Dunn, over at TaxACT -- and there are
22  many different versions of this -- before there ever was a deal,
23  before there ever was a case, before there ever was an HSR, his
24  offering memorandum -- as counsel said, you want to be truthful
25  when you go to investors, you betcha.  This is what he said.

1          There are several pages in here where he talks about

2     what the market is.  It's a broader market.  Segment of a large

3     stable market.  He is explaining that they are attacking all

4     segments of that market.  And that's what he truly believes.

5     Both professional preparers, paper and pencil and do-it-yourself

6     computer compared.

7          Back in 2008, again, long before I got involved in

8     this, in an offering memorandum that Block did to get investors

9     to put money into the company, they described the market as a

10    broader market.  What's on the top here, that's what Block

11    actually wrote.  I didn't write that.  That's their words.

12         What about Intuit?  The same thing.  And you'll see

13    lots of Intuit documents.  A lot of them are going to be in

14    camera, but this is a public document, DX-6152, where they talk

15    about the entire market and what they are attacking, what is

16    their -- what is the market that they are addressing

17    professionally prepared tax stores, software and manual.

18         And after 2006, that counsel mentioned, a lot of things

19    happened.  Intuit actually got very good at it.  Very good at it

20    were they were attacking Block's tax stores, the retail tax

21    stores that I can walk into next to the 7-Eleven.  Very good at

22    it.  That is their strategy.  They have announced it.  They have

23    said it in earnings calls.

24         So what did Block do?  Did they just ignore it and say,

25    "No, no, no, we have a software market and a tax store market,

1  they're different"?  That isn't what they did.  In the real

2  world, they went and attacked Block back.  And they attacked

3  them back with TV commercials.  And the most famous one, the one

4  that did the best and has helped Block recover a lot of

5  customers, is Isis Martinez who was a TurboTax customer.  She

6  said she did her taxes two ways:  She did it on her own with

7  TurboTax and went into an H&R Block.  That's a tax store.

8          She walked in there and the tax professional told me my

9  refund was $2,000 more than I found on my own.  Surprise.

10  That's what Block is doing.  The retail stores understand that

11  the software that Intuit sells -- because they don't have tax

12  stores -- that that is their biggest threat.  They have to

13  attack back.  And Intuit attacks them.  That's part of the

14  market.

15          And here we have the one slide that we talked about the

16  other day, one of many, but one that we wanted to show your

17  Honor, which was on the Web site at Intuit.  Trying to convince

18  customers to switch from the leading tax store, which is H&R

19  Block, to TurboTax.  That's what they want them to do.  My

20  client sees this and knows we better do something back.

21          Well, what they are doing back is having TV commercials

22  and marketing and competing back against software from tax

23  stores to software.  Now, this has been going on for years.  We

24  didn't make it up in the last few months.  It's not possible.

25  I'm not that smart.  I didn't know these people back then.

1            Now, internal documents from Intuit, they have a beat

2    tax store execution plan in 2010.  And they are going after

3    retail tax stores, assisted preparation.  Here's another

4    document.  And these are DX-78 in page 2 and 3.  The beat tax

5    store objective.  Some of this is redacted.  They didn't want us

6    to show the other side here, my clients.

7            They want to increase acquisition of tax store

8    customers by driving confidence in TurboTax and neutralizing H&R

9    Block's attack.  Attack from the tax stores.  Now, the reason

10   why this is not redacted is that it's public.  They have been

11   saying this on earnings calls and saying this publicly and all

12   over the place.  That war is in the real world.  The government

13   wants us to ignore it.  We can't.  It's part of the market.

14           Now, what about the famous maverick document?  You

15   know, cases are made out of documents and it's fun now and then

16   to see you find a word called "maverick" in one document out of

17   all the millions of documents there.  And you know, I use that

18   same argument, maverick, in another case over at the FTC.  We

19   couldn't find a case that ever used it, but maybe counsel can

20   find us one.  He said it goes back many years.  I'm not aware of

21   one.  It's in the new merger guidelines, but it's not in the

22   court system.  You're going to be asked to decide this issue

23   fresh.

24           But here's the document.  Mr. Lance Dunn, sitting right

25   over here, back in January of 2006 -- again, a long time ago,

1    not yesterday, not the last few months -- the purpose of the

2    document was to say we were a maverick for what -- and what he

3    did back in 2003 and earlier in 1998 when they offered free

4    products, and the target audience -- and this is his own words

5    that he wrote that went into the press release -- was to go

6    after those who were preparing your taxes by hand.  By hand.

7            There's no whiting out.  You can see what he said.  The

8    red is his.  I didn't make it red.  He made it red way back in

9    2006.  The second one was that it's less expensive than using an

10   accountant.  The interesting thing is there is no mention in the

11   maverick document about TurboTax, H&R Block, any of that stuff.

12   It's not there.  He's going after the broad market back in 2006,

13   long before the last few months when counsel made it sound like

14   we just made it up because we got sued.  I want to tell the

15   Court what the documents actually say so the Court can decide

16   what really happened.  That's what we want to do here.  And

17   that's what the document actually says.

18           Now, we did do a survey, and there are lots of surveys

19   in this case.  The point is that although we are all in the

20   market, because the difference in prices and because the parties

21   deliberately, as counsel said, differentiate themselves in terms

22   of features and price, that the customers when they're asked, if

23   the price goes up, the most likely response is they'll go to pen

24   and paper from TaxACT.  That's where they're going to go.

25   Followed by TurboTax, Free Tax USA, TaxSlayer and Block is dead

1   even with accountants in a tax store.  That's what the document

2   actually says.

3        Other documents, other surveys that were done in the

4   normal course of business, say exactly the same thing.  There's

5   no difference.  You can't find any of the surveys that come up

6   with a different analysis to say that people aren't switching

7   more heavily to pen and paper or to assisted prep.  They are all

8   over the place.  Even the switching data, which is not

9   diversion, by the way, your Honor.  They only use switching

10  data.  We're the only side here that actually used diversion

11  data, meaning people who switch because prices change.

12        Their own expert said that the only three documents

13  he's seen that actually contain diversion analysis are our three

14  surveys.  The one that was done for the litigation and the two

15  that your Honor has heard about, the 2009 pricing simulator and

16  the later survey.  Those are the only three he's aware of.

17  Well, we're not aware of any they have either because they have

18  not done that analysis.  Instead, they just want to use

19  switching data, and then they adjust it to try to get the shares

20  up.

21        And then they use a model that everybody uses, he says,

22  and everybody knows that model will always create a price

23  increase no matter what numbers you put in there.  It's an easy

24  way to prove something by having a model that every time you put

25  numbers in there, it creates a pricing increase.  That's why

1    Judge Collyer in CCC threw it out, did not accept it.

2          And you'll see that.  Ask him if he changed the

3    diversion numbers, changed the margins, changed price.  Do

4    anything you want to do, you always get a price increase.  Heads

5    the government wins; tails the government wins.  It doesn't

6    really matter.  That's not proof, especially now when we have a

7    trial on the merits.

8          Switching rates, complexity.  Do people only go to

9    assisted preparation because of complexity?  Well, the

10   difference between 11.3 percent and 9.3 percent are those that

11   claim they do in the IRS data so the rest of them don't.  And we

12   don't really know why, and they don't either, why they all seem

13   to come back on net average because the numbers stay flat.

14         So as many people go in, as many people come out.  And

15   we don't know why.  We have ideas.  The companies can testify

16   about what they believe.  But nobody really knows.  The fact is

17   that they shift a lot.  And everybody has to be competing for

18   them.  If they fail to do so, they will fail to compete.

19         The actual diversion data from the model that was done

20   back in 2009 to set prices, your Honor knows about this one.

21   The pricing simulator.  And what does it show?  If you change

22   the price, where is the big diversion?  It is to non-H&R Block

23   accountants and CPAs followed by pen and paper, TurboTax and

24   then its own stores.  That's the highest number of switchers.

25   The reason why you can't ignore all that, and that's why the

1    pricing model actually includes pen and paper and tax stores in

2    the model, because you have to understand that if you raise the

3    price, people are going to leave and they may go to a tax store.

4        But it may be Jackson Hewitt.  And Block has to

5    consider that.  So that's what they're looking at in the model.

6    And the reason why they have to from the same model, we printed

7    out -- the model is an Excel, by the way, your Honor, and you

8    push a button and this shows where the software is on the left

9    side that the DOJ is talking about and everything else.

10        Everything else is over to the right.  And so you have

11    over 75 percent of the market that they want to leave out that

12    is actually in the model and has to be considered in order to

13    set a price.

14        In 2010, before the deal was done, there were reports

15    in the company where they actually analyzed their market share

16    by everything.  We put this in there because we knew they would

17    try to claim that I made it up.  Well, I didn't, it's there.

18    They report this to the company every week.

19        Back when Mr. Bennett first took over, he was given a

20    brief on what to know about the company and the market.  And

21    someone had told him that the net change between retail and the

22    software was a balance; about as many people left and about as

23    many people came back.  They said, yeah, but that doesn't mean

24    you shouldn't worry because look at this.  And this is GX-127,

25    page 7.  At that time, 23 million tax filers were switching back

1    and forth.  If you don't fish in that pond, you're going to lose

2    customers.

3         Now, counsel can talk about what happened back in

4    20066.  By 2009, the company was putting in its annual reports a

5    clear statement that retail stores were competing against

6    software.  That's what they were doing.  And here's an example

7    of one that Mr. Bennett actually signed in June of 2010 before

8    this deal was done, before it was negotiated.

9         Mr. Bennett went there in July of 2010 to start the

10   negotiation with Mr. Dunn.  And it says that our digital tax

11   solutions businesses also compete with in-office tax preparation

12   services and a number of online and software companies primarily

13   on the basis of price and functionality.  Telling the public --

14   again as counsel said, you're not supposed to lie when you tell

15   the public things like that.  You're supposed to tell them how

16   you view the world.  And they are viewing the world as including

17   retail tax stores and software.

18        There are documents, as counsel mentioned, where Block

19   will say we don't compete against our retail stores with

20   software.  It's because Block is not trying to compete against

21   itself.  They don't say we're not competing against the other

22   people like Intuit who were trying to go up against our tax

23   stores.  They clearly don't mean this, and they clearly don't do

24   that.  But internally, they don't like telling their fellows

25   down the hall we're competing against you.

1          That's just the nature of being in the same building,

2    the same corporation.  We want to compete against the other

3    people.  Well, of course you can find documents that say that.

4          Now, at the end of the day when you look at the entire

5    market -- and this is an overstatement -- the market shares,

6    HHI -- and this is from Dr. Meyer's report at DX-17 at page

7    28 -- the total HHI at the end of the day is 792 with a change

8    of 172.  Either one of those numbers are well below the

9    threshold.  792 is far below 1800.  172 is below 200.

10          The numbers, I said, are an overstatement for two

11    reasons:  One is that you have a square of one person firms.  In

12    reality, we need to take all the one-person firms there are out

13    there.  There are tons and tons and tons of them.  And the other

14    is Block has franchises.  43 percent of the units sold at Block

15    are sold by franchises.  They are independent.  Block does not

16    set their prices.  They set their prices independently.

17          And that is not only in the record, it is proven.  It's

18    in their annual reports that those prices are traditionally

19    lower than Block's because those people can do whatever they

20    want.  Block just gets a license fee.  They are independent

21    competitors out there.  If you take those numbers out, then

22    these numbers and the combined market share drops significantly.

23    In an antitrust, you're worried about who has market power to

24    raise prices.  They can't tell the franchises what to set their

25    prices at at all.

1            The same information we have on the chart here that you

2     just saw is just reflected in a pie chart.  It's the same exact

3     information.  Nothing unusual there.  But just to show when you

4     take the light green, which is the franchises out, that the

5     combined market share drops to 16 1/2 percent.  Even combined

6     with Intuit, it's 33 1/2 percent.  And that includes everything.

7     That includes tax stores, it includes everything that all the

8     companies do.  And that's because there are a lot of competitors

9     out there that companies have to deal with every day that are

10    trying to get these same customers.

11           Now, the plaintiff's story -- and I heard over and over

12    again about eliminating TaxACT and all that -- that story of

13    anticompetitive intent is not supported by the record at all.

14    And you'll see that as we have the witnesses come on here.  It's

15    why we wanted to have a trial.  They said that in their press

16    release.  They said that in their complaint.  That there were

17    company documents saying that they were going to eliminate

18    TaxACT.

19           In the motion to transfer venue, counsel actually put

20    in a declaration -- signed a declaration -- saying the

21    company -- the documents were H&R Block documents.  For the

22    first time I could see what he was citing to.  He was citing to

23    third-party consulting documents, not H&R Block documents.

24           But what was more interesting is what they said, and

25    we'll see that here in a minute.  There aren't any documents

1    where the company is deciding to eliminate TaxACT.   That's not

2    the purpose of this deal at all.

3           Now, in the past, Block has had a great difficulty with

4    the cost.   It's public.   People know about it.   You can read it

5    in analyst reports.   It's not something that is unknown.   Block

6    has problems with its costs.   They are too high for its software

7    product.   TaxACT doesn't have a problem with its cost.   They are

8    very, very low.   Why?   Because they are a software company.

9    They developed as a software company.   It would be like taking

10   McDonald's and saying, "McDonald's, we'd like to have you go in

11   the software business."   Even though they are a big company,

12   they wouldn't be very good at it.

13          But TaxACT is, and they want to have TaxACT run Block's

14   software business.   That's the plan.   And that's the plan.   And

15   they want to have TaxACT operate the same way they've been

16   operating in the past.   And what you'll see is that's exactly

17   what the documents actually say.

18          It was interesting during the depositions and all that

19   in this case that the government would never show any of our

20   witnesses the actual documents that were used by the board, the

21   actual documents that were used to analyze, doing it ourselves,

22   which found that it was unprofitable.   They couldn't see they

23   would make any profit for years in advance.   They wouldn't show

24   the actual decision documents.   What they want to do is show all

25   these documents from 2006 and 2004.   And that's what they're

1    going to do again -- they are going to try to anyway -- I'm

2    going to object -- with Mr. Bennett, because he wasn't even

3    there.

4         That's what we did in all the depositions is show

5    people documents that you've seen from earlier time periods and

6    get people to say explain this one.  And most people couldn't

7    because they weren't even there.  We want to show your Honor

8    what the actual decision documents say.  When people before

9    there was any antitrust issues, before we had this case, back

10   before they even made their deal, what were they thinking?  What

11   did they want to do?

12        And that tells us, we believe, the true story.  And

13   then when they told the public that, which as a public company

14   they must be honest, then you'll see what they actually said.

15   So let me give your Honor an example.

16        And before I put it up, I just want to mention that

17   there are a lot of these other documents that you just saw from

18   2009.  It may not be clearer from the briefing in this case.  In

19   2009, there was a short period of time when the company

20   considered buying TaxACT.  It decided not to do it.  It was a

21   different CEO, different regime.  They did not look at

22   efficiencies.  They didn't even consider them.  They didn't even

23   consider moving the operation to Cedar Rapids.  They didn't

24   think that was going to work.

25        They were talking about buying TaxACT and running it

1   independently and just letting it do its thing.  That never went

2   anywhere because they couldn't make a deal happened, and the

3   deal died in the fall of 2009.  So there are a lot of documents

4   when people scurrying about in October -- late September October

5   2009 trying to get on board and help out and the deal died right

6   after that.

7        Well, it's a little misplaced, to put it kindly, to

8   take documents from that week -- in that couple weeks -- from

9   people who had not been working on the project, who didn't know

10  anything about it, who didn't know any of the reasons why the

11  deal was going to be done, and to say, "Oh, Mr. Newkirk, for

12  example, is a senior executive at H&R Block and he was telling

13  us the reasons for the deal."  That's their first exhibit in

14  their opening statement.

15       He had no idea what the purpose of the deal was on that

16  day and I don't even know if he knows now.  We'll have to ask

17  him.  He's not an executive at H&R Block at all.  He is a fellow

18  who is very good at what he does.  He writes reports for people.

19  If I want a report -- and I have in this case -- asked him to

20  give me all the data for this, he'll give me a data run.  He'll

21  give me a very nice report.  He does an excellent job of that.

22       He is not a decisionmaker.  Has never set prices.  Has

23  never made a decision about anything.  Not just in this case.

24  He doesn't have decision-making authority.  None of what he was

25  talking about did he send over to the people that actually were

1    the decisionmakers in this case.  That's why we want to show

2    your Honor with witnesses what those documents and what those

3    people actually said and decided why to spend $287 million.  Why

4    would he do that if you're going to eliminate that company and,

5    according to them, make an extra about a million dollars because

6    the harm to consumers, you don't get all that because you lose a

7    lot of customers if you raise prices.

8         And when you work out his formula, Dr. Warren-Boulton,

9    you lose about 700,000 customers so that's on year one.  Who

10   knows about year two or three because he didn't analyze that.

11   And they are going to spend $287 million in order to take that

12   risk?  That's what this case is supposedly about, but it doesn't

13   make any sense and nobody at that company believed it did.

14        They actually did the analysis.  They did a pro forma.

15   They looked at whether we did it ourselves.  They found that to

16   be unacceptable.  They looked at doing it with TaxACT.  They

17   understood the prices may go down or were likely to go down and

18   not up.  And they thought that was a great thing.  Why?  Because

19   they could bring their cost structure way down.  They can

20   compete harder.  They liked the way Mr. Dunn does business, and

21   they want him to take their software and run it for them.

22   That's what they want him to do.

23        So for example, in the spring of 2010 when the company

24   first started talking about, well, let's go see if we can buy

25   TaxACT, this is the deal we're talking about, not the one in

1    2009.  And the management recommended that they buy TaxACT at

2    the right price because it's the quickest, most proven way to

3    secure a share profitably.  But it says it's a risk that

4    competitive market factors could drive the online tax prep price

5    lower.

6         They knew that when they bought them, that that would

7    still not stop prices from going down.  They are going to go

8    down anyway.  But what they wanted to do was to get a fighter

9    brand.  That's what they started calling it, a "fighter brand."

10   A little confusion in the record because Mr. Newkirk was doing

11   an analysis on a fighter brand that was internal.  These people

12   were talking about buying TaxACT as a fighter brand.

13        And you'll see that.  Hopefully, it will become more

14   clear as we get the witnesses up here.  And it's in the

15   documents.  You'll see it.

16        Same document.  What's the future of free?  They said,

17   "Well, we're trying to get free to go away."  Kinda hard to do

18   because everything is free out there.  Everybody has free.  I

19   don't know if your Honor knows, but Intuit is the biggest

20   provider of free.  They think it's great.  And you'll read what

21   they said in their deposition testimony.  But also their public

22   documents.  That's what they say.

23        And they believe it's a great way to make money.  Their

24   expert doesn't believe it is, but none of the people in the

25   business actually agree with him.  They are not on his plan.

1    They are on a real business plan where they think free is great.

2    Intuit has free for all its other products.  You can start free

3    for Quicken, you can get Mint for free, which counsel mentioned,

4    which is a home financial software.  You can go to a lot of

5    products and get a free product from not just Intuit but all

6    across the board.

7         And that's what H&R Block knew when it was recommending

8    the deal.  It said it seems logical given the rise in 99-cent

9    Apps and the continued entry of new players like

10   OnePriceTaxes.com, that was in 2005.  There was just one that

11   entered the market again.  Entry is so hard that we had one just

12   enter just this last month, your Honor, by the way, a new entry

13   in the software business.  But the price will continue to dip

14   further over time.

15        Further, freemium is a known market dynamic that has

16   arisen in multiple product categories and will continue to grow.

17   That's what the company thought when it was recommending to buy

18   TaxACT, not let's buy TaxACT to eliminate free.  You can't get

19   rid of it.  What they were trying to do is be more competitive.

20   And Mr. Bowen, who will testify in our case, thought that

21   setting up the digital business out in Cedar Rapids away from

22   Block, away from the franchise business, would make it be more

23   nimble to respond to market and competitive demands.

24        Why?  Because they got a fight with Intuit and a fight

25   with everybody else.  Last thing they are going to do is by

1   TaxACT and say, "Let's raise prices.  What the heck.  Let's see

2   what happens."  They know what will happen.  They'll lose many,

3   many customers.  And we know what happened last time they lost

4   many, many customers.  The CEO who lost that many customers back

5   in 2007 was asked to leave.  He is one of their witnesses.  He

6   went to work for the IRA after that.

7          Now, back in October 2010 when the board was

8   considering this, we have Mr. Houseworth, the head of digital at

9   Block saying he thinks free is great and says we have to have a

10  fighter brand to freely market free.  They are not trying to get

11  TaxACT to stop doing what they're doing.  They want them to

12  continue doing what they are doing well at because they make

13  good money doing it.  It's a good business plan.  They don't

14  want to break it up.

15         Do they talk about raising prices?  No.  At the same

16  time, in June of 2010 -- and it carries all the way over into

17  the board -- Mr. Houseworth says, "No, this is what we believe

18  is the pricing that will happen post-acquisition."

19         Now, you see they have Block and TurboTax at

20  approximately the same prices over on the right.  TaxACT is

21  still down at free 9.95, 17.95, 14.95 for estate E-file.  It's

22  higher than that today, but this is when he thinks is going to

23  happen.

24         So that is what he is thinking.  He is not saying, oh,

25  let's raise prices.  They then went and had a pro forma done,

1    which assumed these assumptions that prices would not go up.

2    They use these numbers.  And in fact, in one case the price

3    actually goes down.  And that's what they gave to the board.

4          Back earlier when Mr. Houseworth was thinking should we

5    go back and talk to TaxACT, he said, "You gotta keep -- for the

6    benefits of a merger, keep TaxACT as premiere free brand."  It's

7    got to be free.  It's got to be the best of free.  That's what

8    they want them to be because they have been very successful at

9    it.

10          What did Mr. Bennett, their first witness here, former

11   CEO of Block, is he going to say we wanted to buy TaxACT and get

12   rid of free?  No.  When he actually negotiated the deal, when he

13   went out there for the first time in July of 2010, he liked the

14   approach of having two brands, having TaxACT at the low price,

15   having Block as a premium product, but he also said -- and this

16   is his handwriting -- "I like this approach.  I like two brands.

17   Keep TaxACT as the price leader.  Free federal."

18          He wants them to be down there competing hard because

19   they do well at it.  And that's what he told his shareholders,

20   by the way.  And I'll show your Honor that.

21          He also knew that he couldn't do the deal unless they

22   got substantial efficiencies, and that's listed here on DX-1005.

23   I don't have the amounts on here because we're going to do those

24   in closed session.

25          In October when the board is being -- discussing this,

1    management wanted to know why they were doing it, and

2    Mr. Houseworth actually talked with them.  He gave a

3    presentation.  Before that he wrote it out in an e-mail what he

4    was going to say.  And he said that TaxACT had to have a low

5    price.  Free, free, free.  He has it in all capital letters.  I

6    didn't emphasize that, he did, back before I even met the

7    gentleman.

8            Separate brands allow TaxACT to be nimble, efficient

9    and focused on free.  Again, Mr. Tony Bowen.  When he was

10   actually talking with management, he is saying, "We have to keep

11   nimble, efficient and stay focused on TaxACT's core customer

12   which resides in the free space."  He wants to compete harder,

13   not less.  Why?  Because it's a great way to make money.  If

14   they don't compete hard for free and hard in the value space,

15   they won't get the customers who will then stay.

16           What TaxACT's model is, the model that Mr. Bennett

17   loves -- and he told his people that he loved the TaxACT

18   model -- was they bring people in with the free product.  And

19   there's very little difference between their free product and

20   their paid product.  They want people to stay.  And they don't

21   have a lot of advertisement.

22           Most of the way they get people in is through word of

23   mouth.  People are happy with the product.  They like the

24   product.  It's simple.  It's more like, you know, a Volkswagen.

25   I joke because he drives a Volkswagen, but it's more like a

1   Volkswagen than it is a Cadillac.  But a lot of people like it,

2   and they like the free product.

3        And he doesn't care if they stay for free, for two,

4   three years, it's fine, because they'll tell other people it's a

5   great product.  And then people are willing to pull that button

6   and pay 9.95 for the added feature of, for example, getting the

7   stuff from last year moved into year; saves you some typing.

8   It's a good feature.

9        But the free model is what allowed them to do what he

10  did.  You take it away, all those people are going to flee.

11  There's no chance he would change that model.  He is being hired

12  to run it his way.  Why would he change his model when what he

13  has works and what the government proposes doesn't work?  He

14  will lose tons of customers and the company will not be as

15  profitable and they just wasted $287 million.  Nobody believed

16  that.  And these documents show that.  And their testimony will

17  as well.

18       The deal strategy in July of 2010.  They put forth what

19  was the plan going forward?  To have two brands.  Not eliminate

20  TaxACT.  Two brands.  There's no eliminate TaxACT in these

21  documents, the real documents that were used to decide this

22  case -- decide this deal.  For TaxACT, low price.  For H&R

23  Block, online support and live tax advice.

24       These differentiators of premium versus value have been

25  in the documents for a long time because the companies believe

1    it.   The customers believe it.   If they didn't believe it, why,

2    your Honor, would they be paying 9.95 for a TaxACT product and

3    49.95 for a block product if there wasn't some difference in the

4    way customers look at these products?   Why would I pay more for

5    a Volvo than a Volkswagen?   There are differences in the way

6    customers view these products.

7            Now, they also had synergies which were key to this

8    deal.   And I should mention because if your Honor hasn't done

9    one of these cases before, economists like to talk about

10   efficiencies and marginal cost.   And we're fighting over a lot

11   of that marginal cost stuff and what the marginal stuff really

12   is and the cost efficiencies that are gained that are variable.

13           Well, in the software business, that's a fairly small

14   number because it doesn't cost a whole lot more to add another

15   customer except for marketing expenses and a few other expenses.

16   And economists, especially Warren-Boulton, says you have to

17   forget about all the fixed cost.   That doesn't have any bearing

18   on anything.

19           We don't believe that.   None of the business people

20   believe that because the fixed costs they are talking about have

21   to be recovered each year.   Fixed costs include all the people

22   that you hire for that year, the call-center people, those are

23   fixed costs in a lot of cases.   The people -- some of those are

24   variable, but some of them are not.   You have to pay for the

25   research and development for a new piece of software every year

1    because it's a new tax return, new tax season.

2          They don't want to include any of that.  But if H&R

3    Block doesn't make that money back at the end of the year, they

4    are unprofitable.  So they want to be in a position where they

5    reduce all the costs so they can be more profitable and, hence,

6    reduce their prices.  They will reduce their prices more if all

7    the costs come down than if some little smidgeon cost that

8    Dr. Warren-Boulton can identify came down, because they are

9    graded on how much profit they make at the end of the year, not

10   some profit that an economist says is just a smidgeon of

11   variable cost.

12         Now, move on here.  In the final board approval, actual

13   document, they didn't like to use this document.  TaxACT, low

14   price.  Continue to offer the free product in the H&R Block

15   brand to drive client acquisition.  Well, that's a shocker.  I

16   thought we were going to get rid of free.  They want to use free

17   not only for TaxACT but for Block.  They think it's good.  They

18   like it.  It works.  They didn't believe it four years ago, five

19   years ago or 2006, 2003, in that time period.  Everybody

20   believes it now because it's everywhere.

21         The final board approval has strategic rationale for

22   the transaction.  And it talked about meaningful synergies and

23   secure strong digital leadership that is proven how to attract

24   and retain clients using the free model.  TaxACT is an

25   established brand name in the free space.  This is what was

1   voted on.  They didn't vote on the story that the government

2   puts forward.  That is not the real world here at all.

3           Mr. Bennett got up on a phone call, explained how much

4   he liked the free product when he was asked whether he would

5   change that and he said, "No, we like it.  It's a very, very low

6   cost model.  It's a very low price."  And this is on DX-6124.

7   He was asked, "Are you going to change the Block prices?"  He

8   would say, "I'd say not."  He is telling the public this.

9           I don't think that the facts in this case will show at

10  all that Block can make more money by eliminating TaxACT.

11  There's no evidence you'll see of that at all.  What the

12  evidence will show is doing what you just saw will cause Block

13  to not only make more money, but to offer more features to

14  customers and, as Mr. Cobb will testify, compete at a lower

15  price.  Because if your costs are that high and you can reduce

16  them as much as we're talking about, in the tens of millions of

17  dollars, it may not sound like a lot, but they are only making

18  tens in the millions of dollars of software in Block.  So it is

19  a huge number for them.  If they bring that down that, allows

20  them to compete a lot harder against Intuit.

21          In terms of coordinated effects, haven't quite figured

22  this one out.  They say that because Block is up there at 40,

23  $60 and Intuit is maybe even higher, that because they buy a

24  company that sells a $9.95 product, that that's going to help

25  coordinate with Intuit when Intuit's whole goal is to go and

1   attack the tax stores.  Intuit's not in on this plan.  Intuit

2   wants to compete hard against Block, and it has and has shown

3   that in the past.  That's what the data actually shows.

4        The only time -- and counsel showed one document.  The

5   only time you see any movement together where they are both

6   doing it about the same thing, a lot of other people are, too,

7   in the last eight days of the season, trying to get their people

8   to do their tax returns early.  And they are not trying to get

9   them to pay more.  They want them to do it early so not

10  everybody is doing it on April 15th.  It's a real load on the

11  computer system.  It's a real load on the whole company to have

12  their entire business operate on the one day.  I didn't realized

13  until I got involved in this case so I am going to try to be

14  better in doing mine sooner.

15       In terms of the maverick, there was one document

16  mentioned so I mentioned that, based on what they did in 1998

17  and 2003.  They haven't changed their prices at all since 2006,

18  which was when they put free on the Web site.  The prices

19  actually haven't changed at all in over 11 years in the federal

20  product.  They went up a couple of times for the state product,

21  but actually that was as a result of the product going free for

22  federal, and the overall price that people paid was actually

23  less at TaxACT.  Well, they haven't done anything maverick since

24  then and everybody else was doing it.

25       The plaintiff's case, as I mentioned, I just don't

1    think that the evidence will show that it's real, it's not in

2    the real world.  Free just can't go away.  You'll see lots of

3    documents where everybody thinks free is great.  I think that

4    this whole business of eliminate TaxACT that was in their

5    original complaint, the complaint hasn't been amended.  It's in

6    their papers they filed with this Court, which we were not happy

7    with, but we wanted to wait until trial to come on in here and

8    show your Honor the real evidence.

9        This business of eliminating TaxACT was in a document

10   written by an outside consultant.  And the outside consultant in

11   the same document, counsel said the documents he was citing were

12   too voluminous to give your Honor back then.  It's 30 pages

13   long.  And in the same document, this is what it says:

14   "Eliminating TaxACT is an unsustainable long-term strategy

15   giving way for other players to enter and capture the low-cost

16   segment."

17       Well, that's our case.  They're right.  They're right.

18   In fact, we're going to have testimony, and there's already

19   testimony in the record that will show that's exactly what

20   happened.  If you tried to eliminate TaxACT, it's an

21   unsustainable strategy because other competitors would take away

22   the customers.

23       And what happened when that company met with H&R Block

24   the next time?  Was this even an option?  No.  It was in the

25   strategic graveyard.  That option wasn't there.  This did not go

1    to the board, did not go to upper management.  No one ever

2    considered let's eliminate TaxACT.  It's not there.

3         What they recommended, which was rather odd at the

4    time, was that they go to Intuit and TaxACT and see if they

5    could give referrals to our tax stores at Block.  Well, fat

6    chance of that happening.  So it never went anywhere.  The deal

7    never went anywhere in 2009.  But that's what the government has

8    been using.  This is the only document they cited in their press

9    release saying it was an H&R Block document.  And it showed that

10   one of the primary reasons for the deal was to eliminate TaxACT.

11        We think that's not only unfair, we think it's

12   misleading.  Our CEO at Block was not very happy when they said

13   that, especially when we went in and told them we're not raising

14   prices and there's nothing like that in any of the actual

15   documents in the real world when the deal was done.

16        Your Honor knows, essentially, who the witnesses are, I

17   assume.  We've given the witness list here.  And we do have our

18   expert, Dr. Christine Meyer, who will be here as well to counter

19   a lot of the things that counsel said.  And she also did do the

20   merger simulation, too, contrary to what he said, to show how it

21   works and to show that Dr. Warren-Boulton's little model, which

22   is kind of an off, backhand model, actually gives you a price

23   increase no matter what you do.  He did not include efficiencies

24   or repositioning or expansion or any of these other things in

25   his model at all.

1           The real evidence in this case will show this deal will

2     have the likely effect of enhancing competition -- that's what

3     we believe it will show -- and extending low prices and other

4     features to customers like the bank and the credit card and

5     products that Mr. Dunn can use from the Block bank.  That's an

6     example of that.

7           And we don't have the burden of proof on these issues,

8     as your Honor knows, especially now that we're in a merits

9     trial.  But even under the PI, we didn't have it either.  But

10    we're going to show these issues and show you in the documents

11    that are already on the record, many of which you may have seen,

12    many of which you may not have seen, but also the live testimony

13    here, and at the end of the day we may do findings or something

14    that will give you what all this evidence actually is.

15          And we believe that the evidence at the end of the day

16    will show that this deal is being done to help Block be more

17    competitive and to offer more features for consumers.  They will

18    do better in their business if they do that with the changing

19    world that we're seeing out there with software becoming much

20    more prevalent, not only at home, but actually in the tax

21    stores.  That's what they're using.

22          We ask this Court to find at the end of the day, that

23    the government has not shouldered its burden.  If anybody has

24    changed things in the last few months, is they have been citing

25    documents and little snippets, and we'll get into during the

```
1   case these ones they just put on the board where they took out
2   ellipses of things.  They are pretty important.  Like Mr. Cobb
3   saying that he thought that they would do better in the market.
4   Little ellipses that there is actually as the Justice Department
5   claimed.  They took that out to make it sound like he was saying
6   that he believed that was the market.
7        The little ellipses they take out are very important.
8   Pages they ignore are pretty important.  That's why we have live
9   witnesses, so when they try to do that here, we can have the
10  witness say, "Wait a minute, you're ignoring what's on the first
11  couple of documents talking about a broader market, for example.
12       At the end of the day, we don't think the government
13  will shoulder its burden, and the Court should not slap such an
14  extraordinary remedy of an injunction to stop a deal like this.
15       Thank you, your Honor.  We are prepared to proceed
16  unless your Honor has any questions.
17       THE COURT:  No.  I don't have any questions right now.
18  Why don't we take a break before we call the first witness.
19       MR. ROBERTSON:  Thank you, your Honor.
20    (Recess was taken.)
21       THE COURT:  Mr. Wayland, are you ready to call your
22  first witness?
23       MR. WAYLAND:  Yes, your Honor.  I think the way we'd
24  like to proceed with the witness, in terms of giving him copies
25  of the evidence, is if it would be okay if I have an associate
```

1   bring up copies as we use them?

2          THE COURT:  That's fine.

3          MR. WAYLAND:  I mean, I can do it myself, your Honor,

4   but it might speed things up if the person just walks up and

5   hands it.

6          THE COURT:  That's fine.

7          MR. WAYLAND:  Thank you, your Honor.  We call Mr. Alan

8   Bennett to the stand.

9          (WHEREUPON, the witness was sworn.)

10                          ALAN BENNETT,

11  called as witness herein, having been previously duly sworn, was

12  examined and testifies as follow:

13                      DIRECT EXAMINATION

14  BY MR. WAYLAND:

15  Q   Good morning, Mr. Bennett.

16  A   Good morning.

17  Q   We're going to get your background in a few minutes, but

18  while we have in our mind freshly some of the documents that

19  your counsel put on the screen, I just want to talk about those

20  for a minute before we forget about them.

21      As I understand it, Mr. Bennett, your understanding of the

22  competition that H&R Block was having with TurboTax is that you

23  were generally pricing just a little bit underneath TurboTax?

24  A   Yes.

25  Q   About how much?

1    A    I think one of the things you'll find throughout this and

2    again --

3    Q    If you could just answer my question, sir.

4    A    I think it varies quite a bit from year to year.

5    Q    But generally, under price?

6    A    Yes.

7    Q    Okay.  I think you told Mr. Buterman at one point that you

8    were under pricing at about 5 percent generally, sometimes more,

9    sometimes less; is that right?

10   A    I think it varied quite a bit, but 5 percent would have been

11   a reference point at one point in time.

12           THE COURT:  I'm not sure what the time frame we're

13   talking about is.

14           MR. WAYLAND:  Your Honor, that's fair enough.

15   BY MR. WAYLAND:

16   Q    Let me do a little background, sir.  Maybe it will help

17   explain.

18           THE COURT:  It's very helpful to the Court.

19           MR. WAYLAND:  Yes, your Honor.  I'm sorry.

20           THE COURT:  Start with background.

21   BY MR. WAYLAND:

22   Q    Why don't we start with your background then.  Let's put up

23   the chart.

24       Mr. Bennett, we've prepared a little demonstrative that I

25   think accurately reflects your time at the company; is that

1    right?

2    A    That is correct.

3            MR. WAYLAND:   Let's start at the beginning, your Honor,

4    for your benefit.

5    BY MR. WAYLAND:

6    Q    Let's talk about H&R Block, okay, and what it is and what

7    business it's in.

8    A    Again, we've got a time frame here from '07 to '12.   Do you

9    want me to talk about the continuum from that time frame or

10   today?

11   Q    Let's just talk about the business of H&R Block.   What's the

12   business of H&R Block?

13   A    Today?

14   Q    Yes.

15   A    As of today, it's a tax business.   It has a bank.   It owns

16   an accounting firm called "McGladrey."   Those are the primary

17   businesses its own.

18   Q    What's been your connection with the company?

19   A    Well, I came in November of '07 as interim CEO on the

20   premise that they would recruit a full-time CEO soon after I got

21   there.   A private equity firm had taken a position in Block, was

22   going to make management changes.

23       And that was at the height of some of the issues they had

24   was subprime mortgages which is why I asked the question before.

25   They were heavily into subprime mortgages.   They also owned a

1    brokerage company, both of which were doing very poorly.

2         So I went out there really to focus on selling those

3    businesses, disposing of those businesses and to help in the CEO

4    recruitment process.

5    Q    So you were the interim CEO from November of 2007 to July of

6    2008, correct?

7    A    Correct, yes.

8    Q    And then you assumed a position as an independent board

9    member?

10   A    Yes.

11   Q    And that was from August 2008 to June 2010?

12   A    Correct.

13   Q    And during that time, did you pay attention to the company's

14   business?

15   A    Yes.

16   Q    Generally kept yourself familiar with what was going on at

17   the company?

18   A    Yes.

19   Q    All right.  And then in July of 2010, you came back as the

20   CEO, correct?

21   A    In July, correct.

22   Q    Why don't you describe for the Court the circumstance of

23   your return.

24   A    My predecessor, who had been the CEO for two tax seasons --

25   Q    What was his name, sir?

1   A    Russ Smyth.  We had had two very bad tax seasons, but there

2   was also a number of management openings.  We didn't have a

3   full-time CFO.  We didn't have a president of tax.  We didn't

4   have a full-time person as general counsel.  And then Russ

5   resigned very abruptly.

6        So the board looked to me, since I had some background with

7   Block, to come back as CEO.

8   Q    So then you spent just under a year as the CEO, correct?

9   A    Correct.

10  Q    And you weren't the interim.  You had the actual title of

11  CEO?

12  A    I was.

13  Q    And you continued as the CEO to remain familiar with the

14  business of the company, obviously?

15  A    Yes.

16  Q    All right.  And then in May of 2011 you left?

17  A    May of 2011 we were just about to put together a plan for

18  the next year and so we thought that would be a good time to

19  transition to the next CEO so that person could be part of the

20  planning process.

21  Q    Do you have any continuing role with the company now?

22  A    I have been added as a consultant for a year.  So far they

23  haven't called me.

24  Q    What's your -- are you compensated as a consultant?

25  A    I am.

1   Q    All right.  Would you mind telling us what it is.

2   A    It's 15,000 a month.

3   Q    Do you have any other financial connection to the company?

4   A    No.

5   Q    You own any stock?

6   A    I own some stock I bought personally.

7   Q    You left in May of 2011 as chief executive.  Did you have a

8   role in the TaxACT acquisition?

9   A    Yes.

10  Q    Just describe it generally.  We'll get into details later.

11  A    I came again in July.  In July, the deal was pretty much

12  dead.  I knew that there had been discussions.  I wasn't aware

13  of all the discussions.  So from that point on I called -- I

14  made a phone call to see where the deal was.  The other side

15  said, "If you are involved personally in this and you go

16  quickly, we'll go back to the table.  Otherwise, you guys have

17  been, you know, too long in looking at this and we'll do other

18  things."

19       So I said, "I promise that I'll get personally involved and

20  we'll do it quickly."  So we started July something, 20th or

21  so.

22  Q    And what stage was the acquisition at when you left as chief

23  executive?

24  A    We had announced it publicly, and we were waiting for

25  approval.

1    Q    So you had filed for approval with the government?

2    A    Correct.

3    Q    And you were the chief executive officer when the company

4    filed a number of white papers, as you know, with the

5    government, correct?

6    A    I'm not sure what the time frame of those are.

7    Q    All right.  We'll look at some of those later.

8         All right, Mr. Bennett.  During the time that you served as

9    interim chief executive officer and an independent board member

10   and chief executive officer, were you generally familiar with

11   H&R Block's pricing strategy in the digital market?

12   A    Broadly.  Again, within the context of the size of that

13   business within all of our businesses.

14   Q    Okay.  And it's your understanding, isn't it, that H&R

15   Block's general strategy was to price below TurboTax?

16   A    Correct.

17   Q    Okay.  And so let me just make sure we -- all right.  We're

18   going to make a little chart here, Mr. Bennett, pre-transaction

19   and post-transaction.  And I think you're telling me that

20   pre-transaction, TurboTax prices are X --

21              MR. ROBERTSON:  Your Honor, if we use these

22   demonstratives, can we get them marked each time?

23              MR. WAYLAND:  Sure.  I'm happy to mark it, your

24   Honor.

25              THE COURT:  Why don't we mark this demonstrative as --

1    do you have a particular --

2            MR. WAYLAND:  We can call it Trial Exhibit 1, your

3    Honor, if you want.

4            THE COURT:  Fine.

5            MR. WAYLAND:  The way the exhibits are marked, your

6    Honor, they are already premarked so rather than confusing that

7    number, we'll just use new things.

8            THE COURT:  I know.  That's why I asked.

9            MR. WAYLAND:  We'll mark this as Trial Exhibit 2, your

10   Honor.

11      (WHEREUPON, a certain document was marked Trial Exhibit 2

12       for identification as of September 6, 2011.)

13   BY MR. WAYLAND:

14   Q   All right.  Pre-transaction, TurboTax price X.  And in

15   general, your testimony is that H&R Block's price would be X

16   minus something, correct?

17   A   Something.

18   Q   All right.  So X minus 5 percent, for example?

19   A   I'm not sure that's the right number.

20   Q   But it's a number -- whatever TurboTax number, it's below

21   it?

22   A   Likely below.  I think the only exception would be a product

23   which we came out which tried to combine software and service

24   within our tax retail locations, which was something that was

25   unique to us.  But generally, this is true.

1   Q    Okay.  Now, Mr. Robertson showed you a document -- or showed

2   the Court a document.  You were in the audience, weren't you,

3   Mr. Bennett?

4   A    Yes.

5   Q    And this purports to be all about what TaxACT is going to do

6   and H&R Block are going to do after the transaction?

7   A    Yes.

8   Q    And the line that Mr. Robertson pointed out is circled.  It

9   says, "Position TaxACT as price leader, HRB as premium product

10  with pricing equal to or above Turbo."

11       And any reason to believe that isn't the plan?

12  A    No.  I believe the above Turbo was the product I was just

13  talking about.

14  Q    It just doesn't say that there.  It just says "above Turbo,"

15  right?

16  A    That's what it says.

17  Q    So post-transaction, we've got TurboTax at X, and we've got

18  H&R Block at X -- at least X -- and possibly, or X plus.

19  A    Yes.

20  Q    That's what the document says, right, Mr. Bennett?

21  A    I think what I said before the transaction, I said we had

22  one product that was priced above them because it was a unique

23  product that we could offer.  And that is exactly the way it

24  would be posed.  There was no pricing on any of the modeling,

25  any of the discussions to have a change in H&R Block's pricing

1    position vis-a-vis Turbo after this deal.

2    Q    All right.  Well, Mr. Robertson put this on in front of the

3    Court and said this is what's going to happen.  It doesn't make

4    any distinction between a special product, a unique product.  It

5    says, "After the transaction, we're going to raise H&RB's

6    premium product with pricing equal to or above Turbo."

7         Isn't that what it says?

8    A    Yes.

9    Q    Okay.  So the effect of the transaction will be to raise the

10   prices by H&R Block.  That's what this document says, correct?

11   We just read it.

12   A    It's not our plan to raise prices.

13   Q    That's what the document says, isn't it?

14   A    I read that, yes.

15   Q    Okay.  Now, another document that Mr. Robertson displayed

16   for the Court was a document that's -- we haven't marked.  We'll

17   get the exhibit number.  But this is the excerpt from it.  We're

18   going to look at the document in full a little bit later.  It

19   has to do -- it actually was prepared in connection with the

20   transaction, Mr. Bennett, and we'll show it to you in a little

21   bit.

22        But the thing that Mr. Robertson highlighted was, "We

23   recommend acquiring TaxACT at the right price because it's the

24   quickest, most proven way to acquire share profitably."

25        Do you see that?

1    A    Yes.

2    Q    That was what Mr. Robertson wanted the Court to focus on.

3         You actually can acquire share otherwise, right?  You can

4    compete for share?

5    A    Yes, we can.

6    Q    All right.  You can lower your costs on your own, right?

7    A    Yes.

8    Q    And you can improve your marketing, correct?

9    A    Right.

10   Q    And you can improve your product, correct?

11   A    Yes.

12   Q    Okay.  So you can compete for share without having to buy

13   TaxACT, right?

14   A    Correct.

15        THE COURT:  For the record, the document number that

16   you were just showing the witness is DX-0344-014.

17        MR. WAYLAND:  Thank you, your Honor.

18   BY MR. WAYLAND:

19   Q    All right.  Let's, Mr. Bennett, talk a little more detail

20   about H&R Block's businesses.

21        Now, within that tax preparation business, you distinguish

22   between assisted tax preparation and digital, correct?

23   A    Correct.

24   Q    And the products you offer in the do-it-yourself business

25   are digital generally?

1    A    Digital and software.

2    Q    Yeah.  And generally, you use the term "digital" as a

3    shorthand in the business to include the software product as

4    well?

5    A    Right.

6    Q    And when you arrived at H&R Block, the business was called

7    Digital Tax Solutions, correct?

8    A    I think it was, yes.

9    Q    Who do you consider -- what's assisted tax preparation?

10   What is that business?

11   A    It's where you're face to face in front of someone.

12   Q    And what happens?

13   A    You go to a tax pro.  It's a very fragmented market.

14   There's hundreds and hundreds of thousands of people that do

15   this.  A hundred thousand are our tax pros.

16   Q    What actually happens when you go to see one of your tax

17   pros?

18   A    They look at your information.  You summarize your

19   information, and you together prepare the returns.

20   Q    Who do you consider your principal competitors in the

21   assisted business?

22   A    When you say "competitors," people that look like that or

23   people that we get business from or lose business to?

24   Q    What I mean by that, sir, is when I look at your documents

25   and you identify the competitors in the assisted business, who

1   do you list?

2   A    We list people that go to assisted would look like Jackson,

3   Liberty and then a multitude of accountant CPAs.

4   Q    Just so we have a clear record, Mr. Bennett, Jackson Hewitt

5   is a company?

6   A    It is.

7   Q    Then there is a separate one called "Liberty Tax"?

8   A    Correct.

9   Q    Okay.  What is your digital business, sir?

10  A    Digital business is software and the Free File Alliance.

11  Are products through that and our own products online.

12  Q    You sell products online, correct?

13  A    Correct.

14  Q    And you sell software in stores, correct?

15  A    Correct.  And we send disks out.

16  Q    That are downloadable?

17  A    Correct.

18  Q    Okay.  And your principal competitors in that business are

19  TurboTax and TaxACT, correct?

20  A    People that participate in the market are those two and

21  others.

22  Q    If I look at your documents, sir, and you're discussing who

23  your principal competitors are, won't I see TaxACT and Intuit?

24  A    Correct.

25  Q    Okay.  Let's talk about the difference between the assisted

1   business and the digital business.

2       Now, it's important to you as an executive, as I understand

3   it, Mr. Bennett, that your different businesses run as separate

4   business units?

5   A   I like all of my businesses to run as separate business.

6   Q   Right.  That's, in fact, one of your important management

7   principles, correct?

8   A   Correct.

9   Q   And you even like to have the businesses that are doing

10  different things physically separated, correct?

11  A   Yes.

12  Q   And these are principles that you've tried to follow at H&R

13  Block, right?

14  A   Right.

15  Q   And the H&R Block digital business is run separately from

16  the assisted business?

17  A   Correct.

18  Q   You have different leaders?

19  A   I do.

20  Q   They have their own responsibility for marketing?

21  A   They do.

22  Q   They have their own way of marketing?

23  A   Yes.

24  Q   And that's different from each other, right?

25  A   Yeah.

1   Q   Okay.  And assisted has a stronger brand image, correct?

2   A   Assisted has more brand awareness, yes.

3   Q   So when you're marketing for assisted, you tend to focus on

4   the actual product rather than convincing people that H&R Block

5   is a good company, right?

6   A   Our main strategy in all of them is to serve customers where

7   they want to go.  It's very different than our other digital

8   competitors because it's not our strategy to pull people away

9   from our retail to make them online or vice versa.  We want to

10  serve them where they are.

11      So we're very careful, for example, to be responsive, not to

12  send disks out to retail clients, for example.  Whereas, Turbo

13  sends disks to our retail clients as a target.  So I think the

14  way we approach the market, trying to serve both and trying to

15  protect our client base where they want to be served, is a

16  little bit different than the way other people would look at the

17  market.

18  Q   And sir, you don't view your assisted business to be in

19  competition with your digital business, correct?

20  A   Net-net, the numbers generally wash out over the last two or

21  three years.  We lose about 7 percent or so of our digital

22  customers to our retail base, and we lose about 2 to some-odd

23  percent of the retail to digital.  So there's 3- or 400,000

24  clients moving back and forth, but generally with a hundred

25  thousand, 50,000 net.  So the answer would be on a net basis,

1    they seem to wash out, but there's movement back and forth.

2    Q    Let me ask you straight forward, Mr. Bennett.  It's your

3    view, isn't it, that you don't believe the retail store business

4    is competition for the digital business, right?

5    A    Our retail versus digital --

6    Q    Yes.  Your retail store business versus your digital

7    business.  It's not competition, right?

8    A    Our numbers would say --

9    Q    Not your numbers.  I want your view.

10   A    Well, there's two points to make.  My view is that we don't

11   market against our retail so, therefore, we don't drive people

12   to digital like others would be.  So internally, as I look at

13   our retail business versus our digital business, net-net, I

14   would agree with those numbers over the last three years.  They

15   do not steal customers back and forth net, but there are 3 or

16   400,000 people who move back and forth.

17   Q    I just want an answer to a simple business.  It's a

18   yes-or-no answer.

19        Is it your view today that, quote, "I don't view our retail

20   stores as competition"?  Is that your view today?

21   A    Net-net, yes.

22   Q    Answer yes, right?

23   A    Yes.

24   Q    And you don't believe that the digital business has impacted

25   your assisted business so far, correct?

1   A    Net-net, no.

2   Q    To date, no, right?

3   A    So far.  I mean, the last three years' data would say that

4   there's been a slight migration of our customers to digital from

5   retail.  But net-net a very small percentage of our total

6   business.

7   Q    And so your view today is that its digital business -- H&R

8   Block does not view its digital business as impacting it's

9   assisted business, correct?

10  A    I think I've answered that.

11  Q    Well, I'm not sure you have, sir.  I want you to say yes or

12  no.  And I'll ask it again so it's clear we have a record.

13       It's your view today, isn't it, that H&R Block does not view

14  its digital business as impacting it's assisted business?

15  A    You know, there's an important nuance.

16  Q    You could answer that yes or no at the deposition, Mr.

17  Bennett.  Answer it today.  Yes or no?

18  A    Net-net I would agree with that statement.

19  Q    When you announced your offer for TaxACT, you made sure in

20  public comments to reassure investors that you didn't expect the

21  transaction to have any negative effect on your assisted

22  business, correct?

23  A    Correct.

24  Q    That was even though you think the transaction will help

25  grow your digital business, correct?

1    A    Our digital business?

2    Q    Yeah.  The whole point of this is to help grow your digital

3    business, isn't it?

4    A    The point of the acquisition.  It was to make our Block

5    brand more competitive by lowering our cost and using their

6    platform which would help grow the digital business.

7    Q    Now, you understand, don't you, Mr. Bennett, that the reason

8    that migration generally takes place between the assisted

9    business and the digital business is because of life changes?

10   A    That's one reason.

11   Q    And by "life changes," you mean some change that -- in

12   someone's tax situation, right?

13   A    Yes.

14   Q    Changes in income or the nature of the income?

15   A    Could be marriage, could be buy a house.  Could be lots of

16   different things.

17   Q    I think, as you've described it, it's basically when an

18   individual's taxes get more or less complex?

19   A    I think that's a driver.

20   Q    Now, your digital business has grown substantially over the

21   last decade, correct?

22   A    I would say modestly.  We've lost share.

23   Q    But you've grown in terms of overall, right?

24   A    Yes.

25   Q    And that growth in digital has not come at the expense of

1    assisted, correct?

2    A    Again, within the categories, the amount of people in

3    do-it-yourself as a percentage of the total market and the

4    percentage of assisted, has stayed relatively the same for ten

5    straight years.  There's been lots of migration but, again,

6    net-net, the numbers would say that they are relatively stable

7    with lots of migration back and forth.

8              THE COURT:  You keep using this term "net-net."  When

9    you're saying "net-net," what are you talking about?

10             THE WITNESS:  The question is do you think your digital

11   business has affected your retail business?  So I look at the

12   numbers in both.  And I can see that our customers that were

13   digital one year, you know, 7 percent of them switch.  It's a

14   pretty big number.  It's 150,000 customers switch from digital

15   to our retail.  It's a big number.

16             But 2 or 3 percent of our bigger retail number switch

17   back to digital.  So the pies at the end net, although it

18   changes back and forth, would say that we really haven't

19   impacted it in total.  But there's been a lot of change in

20   between.  So I think both facts are important.

21   BY MR. WAYLAND:

22   Q    Now, Mr. Bennett, to follow up on the Judge's question, when

23   did you come up with this concept of net-net?

24   A    It's always something we track as migration.  We don't want

25   to steal from our retail stores.  We have lots of franchises

1    that get angry if we're taking a lot of business from our retail

2    stores into the digital.

3        So we always track it.  We've tracked it for a long time.

4    And I think if we saw lots of migration do to our marketing

5    actions, we might take -- we may make changes.  One example I

6    gave you was the not mailing disks.

7    Q   On April 29th, 2011, you had in your mind this concept of

8    net-net?

9    A   We tracked that for many years, at least the last years that

10   I've seen.

11   Q   When you were asked questions about the topics we're

12   covering today about how your business has been affected,

13   digital versus assisted, and you want to answer truthfully and

14   net-net met something, you would have included that in your

15   answer, right?

16   A   I think the question was specifically -- there was a lot

17   dialogue around that, but the question was do I see an impact on

18   our retail business from digital, and the answer is no.

19   Q   All right.  Well, let me ask you this, Mr. Bennett:  Is the

20   growth of digital coming at the expense of assisted?

21   A   The numbers for the last ten years would say that the

22   percentage of the total market in assisted and do-it-yourself

23   are relatively stable within a percentage point.

24       Now, when we do the market, all of our analysis and the

25   numbers that we enter, analysts to and others to talk about

1    because they are all watching for a see change from assisted to

2    digital, we're seeing the market is relatively stable.  But

3    within that do-it-yourself, we include pen and paper, and we've

4    always included pen and paper.  So that's why the market is

5    relatively stable.  It's 60-something percent versus

6    30-something percent.

7    Q   All right.  So would you agree, sir, that the growth of

8    digital at the expense of assisted hasn't happened over the last

9    ten years?

10   A   Well, the way we define the market in all of our documents

11   are consistent for many years on this is that if you look at the

12   total market for assisted and the total market for

13   do-it-yourself under any method, and you compare those over ten

14   years, I think the difference is only 1 percentage point

15   difference over ten years.  So the answer is no.

16   Q   All right.  Mr. Bennett, would you look at your deposition

17   transcript that's in front of you.  Look at page 97, line 9

18   through 16.  Page 97, Mr. Bennett.  I guess we can show it.

19        Now, when you were at your deposition, Mr. Bennett, you

20   promised to be truthful just like you are being truthful here,

21   correct?

22   A   Yes.

23   Q   All right.  I'm sorry.  I think I may have the wrong page.

24   I'm sorry.  Page 98.

25   A   I think 97 is helpful too.

```
 1   Q    I'm sure your counsel -- we can look at it all, Mr. Bennett.

 2   I'm focused right now on page 98, line 9.

 3        The question was asked, "Is the growth of digital coming at

 4   the expense of assisted?"  And you had a pretty quick answer.

 5   "It hasn't over the last ten years, not significantly."

 6        Is that still your testimony today, sir?

 7   A    That's what I just said.  The 61 percent, 39 over ten years.

 8   The total categories have not changed.

 9   Q    All right.  I just want to make sure I have a clear record

10   of your answer before you qualify it.

11        Now, what day in May did you leave the company, sir?

12   A    Not sure what the exact date was.

13   Q    After May 2nd?

14   A    I don't recall.

15   Q    Well --

16   A    I just don't remember.

17   Q    All right.  When your company filed statements with the

18   Department of Justice in connection with this transaction, you

19   expected those statements would be true, correct?

20   A    Yes.

21   Q    You have no reason to doubt that what was submitted was

22   accurate, correct?

23   A    No.

24   Q    And so you would agree, sir, that digital tax preparation

25   serves do-it-yourself customers and does not adversely affect
```

1    its much larger assisted tax preparation business?

2              MR. ROBERTSON:  Objection; foundation.

3              MR. WAYLAND:  I'm just asking him a question.  Does he

4    agree?

5              MR. ROBERTSON:  He's never even seen the document.

6              MR. WAYLAND:  I've asked him whether he agrees with the

7    statement, your Honor.  I don't need to show him the document.

8              THE COURT:  What are you reading from?

9              MR. WAYLAND:  I'm reading from their submission, which

10   I'm happy to show him.  I am reading from May -- "Joint

11   Submission on Behalf of H&R Block and 2nd Story Software in

12   Support of the Proposed Acquisition of 2nd Second Story

13   Holdings, Inc., by H&R Block."  Submitted on May 2nd, 2011.

14   Signed by Willkie Farr & Gallagher and Hogan Lovells.  I'm happy

15   to put the document in front if it helps.  Why don't I just

16   display it here.

17             THE COURT:  But the date of the document is before the

18   witness left H&R Block?

19             MR. WAYLAND:  We haven't quite established it, but I

20   think we're close.

21             THE WITNESS:  I think it's probably a public document

22   when Bill took over, but I can't remember the exact date.

23   BY MR. WAYLAND:

24   Q    In any event, let me put the document in front of you, sir.

25             THE COURT:  I'm going to overrule the foundation

1    objection.

2           MR. WAYLAND:  Government 629, your Honor.  I'm

3    directing you to page 92.  I'm pointing to the third bullet

4    point from the bottom.  And that bullet point says, "H&R Block

5    has recognized that the digital tax preparation business serves

6    do-it-yourself customers and does not adversely affect its much

7    larger assisted tax preparation business," correct?

8           Did I read it correctly, sir?

9    A    Let me just --

10   Q    Sure.

11   A    What I would say to that --

12   Q    I'm not asking you to say anything about it.  I'm asking

13   whether you disagree.  Yes or no?

14   A    I agree with that.

15   Q    Would you also agree that the choice of digital versus

16   retail as a tax preparation alternative is not an economic

17   one?

18   A    I think economic plays a part in it.

19   Q    All right.  Do you know what a pricing simulator is?

20   A    Yes.

21   Q    What is it?

22   A    It's an elasticity model that shows the relativity of prices

23   and affects on volume and profitability.

24   Q    When was the last time you saw a pricing simulator before

25   the case started?

```
 1   A    I saw it in -- at one of the board meetings.

 2   Q    And did you report to the board any conclusions that you

 3   were drawing from the price simulator?

 4   A    I was actually a board member at the time.

 5   Q    Did anybody report to you conclusions?

 6   A    The conclusion was there was a lot of elasticity, lots of

 7   competition.

 8   Q    You're familiar with the term "pen and paper," sir, right?

 9   A    I am.

10   Q    What is it?

11   A    It's people that actually fill their returns out.  Get the

12   forms, get a paper and pencil and fill it out themselves and

13   send it in.

14   Q    Task, pen and paper, fill out your tax returns?

15   A    Right.

16   Q    No one sells pen and paper, right?

17   A    We don't sell pen and paper.

18   Q    It's just the task if you don't buy a product, right?

19   A    It's people who do it themselves.

20   Q    Yeah.  Like instead, if you want to walk from here to there,

21   you can either buy a horse or a car, right?

22   A    I'm not sure if the analogies are helpful.

23   Q    Fine.  You look at taxpayers who are using pen and paper as

24   a source of business, right?

25   A    We do.
```

1    Q    All right.  And there's been a pretty rapid decline in the

2    number of people using pen and paper, correct?

3    A    Yes.

4    Q    You're worried about that?

5    A    I think the -- not worried about it.  It's been a source of

6    new business for lots of new people.  So the fact that that's

7    drying up is an issue.

8    Q    And it's been pretty much a one-way street, right?  I mean,

9    the decline of pen and paper is pretty dramatic and the growth

10   of digital is pretty dramatic, right?

11   A    I would say again people move back and forth.  Some people

12   actually come back to pen and paper but, again, the numbers have

13   been declining net over time.  But there's movement back and

14   forth.

15   Q    Do you have an idea of what your average price of a product

16   is?  Do you keep that in mind?

17   A    I do at retail so I have an idea for that.  Digital I have a

18   little less of a kind of reference point.

19   Q    Like 20s, 30s, 40s?  Do you have any sense?

20   A    Assisted?

21   Q    No.  Digital.

22   A    I would be guessing.  Do you want me to guess?

23   Q    If it's educated, sure?

24   A    40.

25   Q    $40 range?

1   A    Yes.

2   Q    What's 5 percent of 40?

3   A    8.

4   Q    8 bucks.  So somebody is buying a sophisticated $40 product.

5   Goes up or down 8 bucks.  Are they going to switch back and down

6   to pen and paper?

7   A    I don't know where the elasticity is it, but people do go

8   back.  Especially in the 2007-'08 period where we had the

9   financial crisis and people lost jobs.  People found cheaper

10  solutions for tax returns.

11  Q    10 percent of 40 is 4 bucks so 5 percent has got to be 2

12  bucks, right?

13  A    Okay.

14  Q    Okay.  So same answer, though?  2 bucks, $40 product goes up

15  or down 5 percent, and they are going to run back to pen and

16  paper?

17  A    You could use that analogy of $2 on any of the channels in

18  any of the players.  I think there's lots of reasons why people

19  switch.  There's money.  There's convenience.  There's time on

20  their hands.  There's lots of reasons for that, not just

21  elasticity of prices.

22  Q    You don't have any basis to say that a 5 percent increase in

23  your average price product is going to drive people to pen and

24  paper, do you?

25  A    No.  I think it's more of an issue for the value players

1  than it is for us.

2  Q   And we'll talk about this a little bit later, but let's get

3  this straight now.

4      Your view is you're not a value player, H&R Block?

5  A   I think there's clearly pricing tiers in the marketplace,

6  and we do not play at the low end of the marketplace.  We play

7  at the branded, in the premium sector.

8  Q   Now, we've discussed the differences between pen and paper

9  and assisted.  Let's focus on the digital market.

10     Brand names that you've used, they were using TaxCut at the

11 beginning when you were -- was it before you joined or after?

12 A   Actually, in '07 we used TaxCut so I was there when that was

13 used.

14 Q   Then you switched to what, sir?

15 A   When I left, they changed it to a Block-branded product.

16 Block At Home or something like that.

17 Q   And any reason for including the Block name in the product

18 at that point?

19 A   There's pros and cons.  One is to have a Block brand on it

20 might have been more conflictive to our franchises.  But the

21 flip side of that is the Block brand is much, much stronger than

22 TaxACT or TaxCut.

23 Q   All right.  Now the largest competitor in the digital market

24 is TurboTax?

25 A   Correct.

1   Q    And the next largest are H&R Block and TaxACT?

2   A    Yes.

3   Q    And between H&R Block and TaxACT, depending on how you

4   calculate it, it's pretty close?

5   A    Yes.

6   Q    Mr. Bennett, we're going to hand to you Government

7   Exhibit 493.  And I'm going to direct your attention to page 5.

8   But take a moment.  We'll look at what it is.  The first page,

9   as you see, is an H&R Block document entitled "Project Island

10  Overview."  June 17th, 2010, correct?  And Project Island was

11  the TaxACT acquisition?

12  A    Are your pages numbered?

13  Q    Well, let's start with the first page, and I'll get you to

14  where we need to be.

15  A    Okay.

16  Q    So again, sir, I think I want you to just look at the title

17  page.

18  A    I'm sorry.

19  Q    The title page says "H&R Block Project Island Overview, June

20  17th, 2010," correct?

21  A    Yes.

22  Q    Project Island was the name of the TaxACT project?

23  A    Yes.

24  Q    Then if you would flip to page 5, do you see a chart

25  entitled "Market Share"?

1    A    I do.

2    Q    Just so we set the stage here, this is a document that was

3    prepared for the company's executives to discuss, summarize the

4    TaxACT transaction, correct?

5    A    Again, I was not CEO at this time.  This was done before

6    mine, and I'm not sure if this got to the board or not.

7    Q    But you were on the board at the time?

8    A    I was, yes.  So we would have gotten pieces of this for

9    sure.

10   Q    You don't have any reason to believe that it wasn't prepared

11   by senior executives of the company, correct?

12   A    Yes.

13   Q    Let's look at the market share.

14          MR. ROBERTSON:  It sounds like we have an objection to

15   foundation.  Which haven't established that the witness has seen

16   the document.

17          MR. WAYLAND:  Your Honor, we're beyond that.  We've had

18   objections -- they had an opportunity to object on foundation to

19   any document that was in our lists.  There are no objections.

20          So there's absolutely no basis.  We've been through

21   this.  If there is a problem here, we'll have to bring in a

22   whole bunch of witnesses to lay the foundation.  There's no

23   question this isn't a company document.  There's no question

24   it's an admission of the company so I don't understand what's

25   going on.

1          MR. ROBERTSON:  May I respond, your Honor?

2          THE COURT:  Yes.

3          MR. ROBERTSON:  This witness needs to be able to

4    testify about a document and have personal knowledge about this

5    document.  There are other witnesses that they have deposed who

6    will be here in the courtroom who can testify about this

7    document and they know it.  And I was waiting to see if he was

8    going to establish foundation, and I heard that he was not doing

9    that and I objected to foundation.

10          And he needs to establish with the particular witness

11   that this witness is competent to testify about this document.

12   Has he seen it before?  Simple question, I believe.

13          MR. WAYLAND:  No, your Honor.  Actually, foundation

14   goes to admissibility, not whether somebody can testify about

15   something.  And that's why foundation isn't a proper objection

16   when there has been no -- when they have admitted the document

17   into evidence.  I can ask him whatever questions I want.  If he

18   wants to rehabilitate him and say, "Actually, you don't know

19   anything about this."

20          That's what we're talking about, your Honor.

21          THE COURT:  The objection is overruled.  But the

22   usefulness of this witness in answering any questions about this

23   document I have yet to see because it seems like he's a little

24   confused by this exhibit.  But let's see where this goes.

25   BY MR. WAYLAND:

```
 1   Q    Let's look at the market share data, Mr. Bennett.
 2        You don't have any reason to believe that that market share
 3   data is not accurate, right?
 4   A    No.
 5   Q    You don't have any reason to believe that the people at
 6   H&R Block who are responsible for the transaction -- and you
 7   knew who they were, right?
 8   A    I do.  A lot of the people weren't there when I got back,
 9   but some of them were.
10   Q    No reason to believe that they didn't properly calculate the
11   market shares in the digital market, correct?
12   A    No.
13   Q    All right, sir.  And you don't have any reason to disagree
14   that, as it says at the top, that TaxACT is No. 3 in the overall
15   digital market and No. 2 in the high-growth online segment?
16   A    No.
17   Q    Okay.  And we see from this market share chart there's no
18   breakdown of -- for example, assisted's not on here, correct?
19   A    Correct.
20   Q    And pen and paper is not on here?
21   A    Correct.
22   Q    And there's no breakdown of state versus federal?
23   A    Correct.
24   Q    Okay.
25            THE COURT:  Is this the first time you've seen this
```

1    particular document?

2          THE WITNESS:  I'm just not sure.  It was before my time

3    so the question is whether this was presented to the board or

4    not.

5          THE COURT:  And you don't know what the purpose of this

6    particular document is?

7          THE WITNESS:  It was probably an assessment of where

8    they were with respect to analyzing this deal before, but I can

9    tell you when I came back, it was pretty cold.  So we didn't act

10   on this, but the data could very well be accurate.

11   BY MR. WAYLAND:

12   Q    You were on the board in 2010, correct?

13   A    I was.

14   Q    All right.  And Project Island was the name of the project,

15   right?

16   A    Right.

17   Q    TaxACT?

18   A    Yeah.

19   Q    Okay.  And as you said, you don't have any reason to

20   disagree with any of the market share information here,

21   correct?

22   A    I don't.

23   Q    Now, there are a number of other companies in the digital

24   business, correct?

25   A    Yes.

1    Q    They're much smaller than Intuit and TaxACT?

2    A    They are smaller.

3    Q    And H&R Block competes with all the companies that provide

4    digital products?

5    A    Yes, we do.

6    Q    You compete with everybody that's online, right?

7    A    We compete with everybody in the marketplace.

8    Q    And you think of all these companies as competitors because

9    they were all trying to get a piece of the pie, right?

10   A    Yes.

11   Q    TaxACT is a competitor?

12   A    They are.

13   Q    And it's a very serious competitor in the online space,

14   correct?

15   A    They are.

16   Q    It's actually passed you in that space from time to time?

17   A    Yes.

18   Q    And as a competitor, you want to know about their marketing

19   plans, what they are doing with pricing and product development,

20   correct?

21   A    Yes.

22   Q    Now, in thinking about competition among various sellers of

23   digital product, you have likened that to fishing, correct?

24   A    I have.

25   Q    You're a fisherman?

1    A    A little bit, yes.

2    Q    You talked about casting your net into a pond?  And you do

3    that to attract customers into your net, right?

4    A    Correct.

5    Q    And one of the ways you attract customers into the net is by

6    offering a free product?

7    A    Yes.

8    Q    And when you're casting your net, you're competing with all

9    the other sellers of digital products who are casting their net

10   into the same pond, correct?

11   A    Yes.

12   Q    Once you attract somebody into your net by offering free

13   product, you want to monetize them, correct?

14   A    You do.

15   Q    So either when they come in, they see they need a paid

16   product to meet their needs or maybe they start out free and you

17   try to get them to move up in future years, right?

18   A    Yes.

19   Q    That's your business model?

20   A    Yes.

21   Q    That's the business model of everybody in this segment,

22   right?

23   A    Not necessarily.  I think the values players, the

24   differential in the market price is significant.  And the sell

25   up is not as important because their cost structure is so low.

```
 1   Q    Anybody in the business that you know of a charity?

 2   A    I don't understand the question.

 3   Q    Does anybody give this stuff away for free as a matter of

 4   public good?

 5   A    No.

 6   Q    Everybody has a plan where they give out something for free,

 7   but they can't stay in business unless they make some money,

 8   right?

 9   A    Absolutely.

10   Q    Now, initially, H&R Block didn't want to compete in a free

11   market, right?

12   A    Again, I can read the papers, but it's before my time.

13   Q    Well, your deposition you seemed to have knowledge about

14   what was going on.  You didn't tell us you weren't informed

15   about the business; is that right?

16   A    I know the business for three years.

17   Q    All right.  When you became president the first time, Mr.

18   Bennett, did you undertake to understand what was going on in

19   the business?

20   A    I spent almost no time at all in digital.

21   Q    That's not my question.  The question was, did you do

22   anything to try and understand what was going on in the

23   business?

24   A    Yes.

25   Q    Okay.  Did you have some briefings from people?
```

```
1   A    Absolutely.

2   Q    And I think Mr. Robertson even showed a document.  He said

3   this was given to Mr. Bennett to help him understand the

4   business.

5   A    It was.

6   Q    You're the CEO.  You have to understand each of your

7   business segments, right?

8   A    Uh-huh.

9   Q    So when you're answering questions at the deposition about

10  what happened in the business and what the competitive framework

11  was when you got there, you did it on an informed basis,

12  right?

13  A    Yes.

14  Q    So you knew, as president, that H&R Block didn't really want

15  to compete in the free business, right?  You learned that?

16           MR. ROBERTSON:  Objection as to form.

17           MR. WAYLAND:  I don't understand the objection.

18           THE COURT:  Are you objecting to the form of the

19  question?

20           MR. ROBERTSON:  President.

21           MR. WAYLAND:  CEO.

22           THE WITNESS:  I'm having trouble with tense.

23  BY MR. WAYLAND:

24  Q    You formed an opinion -- let me see if --

25  A    Talking about 2007, '08 or now?
```

1   Q    I'm talking about generally as to your knowledge about the

2   business and your basis to be able to answer questions about

3   what H&R Block's business is and was, okay.  That's what we're

4   trying to do.

5   A    Is and was is two different things.

6   Q    I understand that.  On the was side of it, we're trying to

7   find out, and I think you've told us so far, that when you

8   became president, you were briefed on the business?

9        You need to answer.

10  A    Yes.  I thought I answered that one.

11  Q    When you nod your head, she can't get the answer.  That's

12  the problem.

13       You were briefed on the business.  You learned some things

14  about the business, correct?

15  A    Yes.

16  Q    You saw briefing books about the business?

17  A    Yes.

18  Q    Okay.  And the heads of the various businesses came to talk

19  to you?

20  A    Yes.

21  Q    And then when you went to your deposition, you were able to

22  answer questions about the business, correct, based on your

23  knowledge of having been educated along the way?

24  A    Yes.

25  Q    Okay.  That's all we're at.  That's where we are.

1    And based on that knowledge and your general knowledge of

2    the business, you understood that H&R Block didn't want to

3    compete into the free market initially, right?

4    A    Initially, yes.

5    Q    It didn't make business sense, right?

6    A    To people there at the time, they felt it did not.

7    Q    Do you have an understanding of why that was?

8    A    You know, I think -- I could speculate, but I really don't

9    know.

10         THE COURT:  When you say "initially," what do you mean?

11         THE WITNESS:  It's hard to put in context because I was

12    CEO over two very different periods of time.  And I was a board

13    member, which is a very different role in between.  This year,

14    for example, we not only went free online heavily, we went

15    online in retail.

16         So to say -- so I'm having trouble with the context.

17    When I got there, was there some reluctance to be more free than

18    we are today?  Certainly.  We changed our marketing strategy

19    significantly.  We had four CEOs in four years.  So it's very

20    logical.  So time sequence is important.

21         THE COURT:  But in terms of Mr. Wayland's question,

22    which was initially, was H&R Block not interested in free or

23    just like free -- I can't remember exactly the phraseology --

24    are we talking 2003, 2001 or are we talking when you initially

25    became a CEO?  Could you please clarify your question.

| | |
|---|---|
| 1 | MR. WAYLAND:  I'll do it a different way, your Honor. |
| 2 | I think we'll have a clearer record. |
| 3 | BY MR. WAYLAND: |
| 4 | Q   When you arrived, Mr. Bennett, did you have a view as to |
| 5 | whether the company should be engaged in free? |
| 6 | A   In 2007 or 2010? |
| 7 | Q   2007. |
| 8 | A   I had no point of view at all on it. |
| 9 | Q   And what was the company doing in 2007 with respect to |
| 10 | free? |
| 11 | A   I don't even recall what we were doing back then.  I spent |
| 12 | very little time on digital then. |
| 13 | Q   So do you know when H&R Block decided to go into the free |
| 14 | business? |
| 15 | A   I think -- and this is a guess.  I know we did it relatively |
| 16 | heavy in '10 -- tax season '10.  And then we went even more so |
| 17 | in '11. |
| 18 | But again, we could have done it in '09.  I don't know.  We |
| 19 | certainly participated in the Free File Alliance so we had free |
| 20 | product.  But I don't know how much we had on our own Web site |
| 21 | that complemented that. |
| 22 | Q   Now, it's your view, isn't it -- well, you understood that |
| 23 | Intuit and TaxACT had been -- went into the free market before |
| 24 | you, correct? |
| 25 | A   Correct. |

1    Q    And it was your view, wasn't it, that because you were late,

2    you lost share?

3    A    Yes.

4    Q    And the fact that TaxACT was offering free affected your

5    share, right?

6    A    Correct.

7              MR. WAYLAND:   Your Honor, do you want to stop now?

8              THE COURT:   If this is a good stopping point for you,

9    this is an appropriate time to stop for a one-hour lunch.

10             MR. WAYLAND:   Thank you, your Honor.

11             THE COURT:   Thank you.

12        (Proceedings adjourned at 12:44 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, Lisa S. Schwam, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _             _ _ _ _ _ _ _ _

10   SIGNATURE OF COURT REPORTER                  DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```