<pre>
 1                      UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,      :  Civil Action
                                    :  No. 1:11-cv-00948
 4              Plaintiff,          :
                                    :  September 8, 2011
 5   v.                             :  Morning Session
                                    :
 6   H&R BLOCK, INC., et al.,       :  Washington, D.C.
                                    :
 7              Defendants.         :
     ............................:
 8

 9

10        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING - DAY 3
                   BEFORE THE HONORABLE BERYL A. HOWELL
11                 UNITED STATES DISTRICT COURT JUDGE

12

13   APPEARANCES:

14   For the Government:      Mr. Joseph Wayland
                              U.S. Department of Justice
15                            950 Pennsylvania Avenue, NW
                              Washington, D.C. 20530
16                            (202) 514-1157
                              joseph.wayland@usdoj.gov
17
                              Mr. Lawrence E. Buterman
18                            U.S. Department of Justice
                              450 Fifth Street, NW
19                            Washington, D.C. 20530
                              (202) 532-4575
20                            lawrence.buterman@usdoj.gov

21   For the Defendants:      Mr. J. Robert Robertson
                              Mr. Corey W. Roush
22                            Hogan Lovells
                              555 Thirteenth Street, NW
23                            Washington, D.C. 20004
                              (202) 637-5600
24                            robby.robertson@hoganlovells.com

25
</pre>

1    APPEARANCES (Continued):

2    Court Reporter:            Ms. Lisa Schwam, CSR, CRR, RMR
                                Official Court Reporter
3                               Room 4702-A, U.S. Courthouse
                                Washington, D.C. 20001
4                               (202) 354-3238
                                LisaSchwam@aol.com
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by machine shorthand, transcript
     produced by computer-aided transcription.

1                                I N D E X

2   WITNESS                  DIRECT      CROSS      REDIRECT      RECROSS

3

4   LANCE DUNN

5   By Mr. Wayland              5                     105

6   By Mr. Robertson                     27                        121

7

8                              E X H I B I T S

9       NUMBER                          MARKED FOR IDEN     ADMITTED

10  GOVERNMENT EXHIBITS:

11      Trial Exhibit 7                         17

12      Trial Exhibit 8                         25

13      Trial Exhibit 9                        105

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE DEPUTY CLERK:  This is Civil Action 11948, United

3    States of America v. H&R Block, et al.

4              THE COURT:  One of the things I was remiss about

5    yesterday, although I promised to talk about timekeeping in the

6    mornings, I didn't do that yesterday.  So do the parties want to

7    put on the record what their lapsed time is.

8              Have you all agreed upon that?

9              MR. WAYLAND:  I don't think we have it right at hand,

10   but we can do that at a break, your Honor.  We're keeping

11   track.

12             MR. ROBERTSON:  We've been watching it, your Honor, and

13   I think we're all fine.  I think by taking out a couple

14   witnesses in the middle, that that's helping with the time.  So

15   I think that we're fine.  In fact, it may be that if things roll

16   fast enough today, that we won't be taking all day tomorrow as

17   we mentioned.

18             THE COURT:  Right.  Okay.

19             MR. WAYLAND:  So today's schedule is we'll finish our

20   examination of Mr. Dunn.  Then the defendants will put him on.

21   And this afternoon we have Dr. Rick Warren-Boulton, who is our

22   expert, and then we'll rest, your Honor.

23             THE COURT:  Okay.  So you are not going to call the

24   other witnesses who are on your original list.

25             MR. WAYLAND:  The two IRS witnesses, they were the

```
 1    subject of a stipulation so that we didn't have to call them.
 2            THE COURT:  Great.  And you're not going to call
 3    Dr. Dhar?
 4            MR. WAYLAND:  Dr. Dhar is a rebuttal witness, your
 5    Honor, is as Dr. Z.  I don't want to mispronounce his name, but
 6    everyone calls him Dr. Z.  You may call him Dr. Z too, your
 7    Honor.
 8            THE COURT:  I'm glad to hear that.  All right.
 9    Excellent.
10            MR. WAYLAND:  May I call Mr. Dunn back to the stand?
11            THE COURT:  Yes.
12            MR. WAYLAND:  Mr. Dunn.
13            THE COURT:  Good morning, Mr. Dunn.  I remind you you
14    remain under oath.
15                    DIRECT EXAMINATION (Resumed)
16    BY MR. WAYLAND:
17    Q    Good morning, Mr. Dunn.
18    A    Good morning.
19    Q    Just a short examination this morning, Mr. Dunn, before I
20    turn you over to your counsel.
21        If you remember yesterday, we went through a series of
22    documents/memoranda that were prepared in connection with
23    companies accessing the capital markets that are looking for
24    investors?
25    A    Yes.
```

1    Q    And we started with 2004 and we went through 2009.  I want

2    to show you one more of those documents, sir, and that's at

3    Tab 20.  It's Government Exhibit 241.

4        All right.  Sir, at Tab 20, Government Exhibit 241, is a

5    Project Franklin information memorandum.  It's prepared for the

6    company by Jefferies, correct?

7    A    Yes.

8    Q    And what is Jefferies & Company?

9    A    Jefferies is an investment banking firm that represented

10   2nd Story Software and TA in the latest rounds of process

11   negotiations.

12   Q    And TA is the firm that has an ownership interest in the

13   company?

14   A    Correct.

15   Q    All right.  We're just going to look at two pages in this

16   document.  The first is at page 13.  I guess it's 12.  I'm

17   sorry.  Page 12.

18       And you'll see the top of the document from October 2010

19   says, "Competitive Landscape and 2SS Differentiation."

20       Do you see that?

21   A    Yes.

22   Q    And the first -- and then there are a number of bullet

23   points under this heading.  The second one says, "We know free."

24   And under that category, heading, you say, "2SS was the first

25   company to offer free tax preparation solutions and has done so

1    for over 12 years.  As a result, the company has deep, proven

2    expertise in developing, marketing and maximizing the value of

3    a free product."

4        And that deep, proven expertise was developed over the 12

5    years, correct?

6    A    Yes.

7    Q    All right.  And down at the bottom of the page is a heading

8    "Trusted Brand."  And the last sentence says, "With over

9    12 years of building reliable, robust software solutions, 2SS

10   has created a valuable brand within the online tax preparation

11   market."

12       Do you see that?

13   A    Yes.

14   Q    And that was correct when you put it in the offering memo of

15   October of 2010, right?

16   A    Yes.

17   Q    And the trusted brand was built over 12 years of hard work,

18   right?

19   A    Yes.

20   Q    Okay.  If you'd turn the page, sir, we're still under the

21   heading "Competitive Landscape and Differentiation" in October

22   of 2010.  You see under Exhibit 8, there is a chart.  It has

23   consumer tax preparation software, product comparison.  And

24   you've listed three companies:  2nd Story, which is TaxACT, H&R

25   Block and Intuit, correct?

1   A    Correct.

2   Q    And you haven't listed any of the other value competitors

3   that we see on the chart from yesterday, correct?

4   A    Correct.  And as I mentioned yesterday, information about

5   them is not available publicly for potential investors to

6   analyze.

7   Q    Could you even say, "Gee, we've got these two really

8   important value competitors out there.  Can't tell you very much

9   about them but they're out there, and they're really who we

10  really compete with, not these people"?

11  A    I'm sure that we talk about that during our management

12  presentation, yes.

13  Q    And concluded that it was more accurate to describe H&R

14  Block and Intuit as your competitors than Free Tax and

15  TaxSlayer?  Is that what you talked about?

16  A    As I mentioned yesterday, you know, with this document being

17  mailed out to in bulk to many private equity firms, yes, we need

18  to differentiate ourselves from the ones that they're going to

19  immediately compare us with.

20  Q    Even though you're not competing with those.

21       Why didn't you just say, "Don't worry about these two, we

22  don't compete with them, they're in a different market"?

23  A    That is one of the points of this whole document as well as

24  the management presentation that would follow.  We talk about,

25  you know, being the value leader, and we talk about our business

```
 1   model and how we utilize free and how that makes us different

 2   and word of mouth.

 3        You know, if you read the document as a whole, it does make

 4   the point that we are different and that's why we don't really

 5   compete with them, and that's why we continue to carve out the

 6   niche as the value leader.

 7   Q    Actually, this is about a different marketing strategy and

 8   that's how you compete with them, right?  You're saying you've

 9   got your prices listed right here.  Your price is lower than

10   their price.

11        Isn't that how you differentiate yourself?

12   A    That's a key element of the value model, yes.

13   Q    Exactly.  All right, sir.  And we can put that aside.

14        Now, as you said just now, that you -- comparing prices is a

15   way to differentiate yourself.  You do over -- been tracking and

16   worrying about the prices of Intuit and H&R Block, right, over

17   the years?

18   A    We track them, but we don't really worry about them unless

19   we're to see them drop down to our level.

20   Q    I'm sorry?

21   A    We don't look at their prices and establish our prices.

22   Q    Don't you market directly -- don't you have direct price

23   competition in your ads?

24   A    We -- you know, we're targeting 140 million taxpayers so,

25   yes, we do find that we need to differentiate our message
```

1    against certainly the message of Intuit.  As I mentioned

2    yesterday, the average taxpayer is going to see an Intuit or a

3    TurboTax ad 30 times to our one.  It's critically important that

4    we get our value message across in the one time that they see

5    our ad.

6    Q    So if you run an ad that has your price versus TurboTax,

7    isn't that price competition?

8    A    It's a price comparison.

9    Q    What's the difference between price comparison and price

10   competition?

11   A    We don't set our prices based on their price.

12   Q    But you're trying to sell a product to a consumer and you

13   have ad that has two different prices, and the only difference

14   in the price are your price and TurboTax's.

15        Isn't that price competition?

16   A    We're trying to make pricing transparent.  As I've said, you

17   know, a key component of the value proposition is to show a

18   consumer that price should be a key determinant in their

19   purchase decision, and they should be aware of what pricing is

20   as they're making that decision.

21        For example, for state prices, it's very difficult to know

22   what TurboTax or Block's state price is.  And so we feel that it

23   is important to differentiate and to separate the value model

24   from the premium model by pointing out, you know, make sure you

25   know what you're getting into.

1          THE COURT:  I have to say that I'm finding it a

2    little -- I'm puzzling over what the difference is between

3    price -- how price comparison isn't price competition.  And I'm

4    trying to listen carefully to your answer to figure out why

5    that -- why we're hearing a lot of words from you in response to

6    a fairly simple question:  Isn't price comparison price

7    competition?

8          Are you saying that it's not?  Is that what I'm

9    supposed to understand from your response?

10         THE WITNESS:  Yeah.  We do differentiate from other

11   products by price, yes.  It is a key --

12         THE COURT:  And you don't view that as price

13   competition?

14         THE WITNESS:  We don't set our prices based on someone

15   else's price.

16         THE COURT:  You only view it as price competition if

17   you look at the prices that Intuit or H&R Block are offering

18   their products at in order to set your prices?

19         THE WITNESS:  Yes.  We set our price on the proposition

20   that we feel our customers are going to respond to.  And having

21   a value conscious, price conscious customer base is the key

22   thing in how we set our prices.  We don't look at what Intuit

23   and Block are doing for their prices.  We need to monitor them.

24         THE COURT:  Okay.  But also, I mean, Intuit and H&R

25   Block clearly offer free products as well so, you know, that's

```
 1    the same price -- free -- that you offer a number of your

 2    products.

 3              THE WITNESS:  Yes.

 4              THE COURT:  But the fact that they offer free products

 5    is also not something that you would look to in terms of price

 6    comparison in order to determine how you're going to compete

 7    against them?

 8              THE WITNESS:  You know, we certainly try to

 9    differentiate our free product from their free product as well

10    so, yes, we do differentiate ours based on price.  So if you

11    believe that's price competition, then yes.

12              THE COURT:  Well, I think -- Mr. Wayland, sorry for the

13    interruption.

14              MR. WAYLAND:  That's fine, your Honor.  I'm having the

15    same set of questions.  I'm trying to understand.

16    BY MR. WAYLAND:

17    Q    If I'm a consumer, sir -- and you try to put yourself in the

18    position of consumers and figure out what it is that they're

19    going to respond to, correct?

20    A    Yes.

21    Q    If I'm a consumer and I see an ad from TaxACT and the ad has

22    a price point for TurboTax and then it says, "But look at our

23    price, it's lower," as a consumer, don't you want me to come to

24    you because you have a lower price?

25    A    Yes.  You want them to make an informed decision.
```

1    Q    And that's price competition, isn't it?

2    A    Yes.

3    Q    All right, sir.  Let's look at a couple of documents.

4         If you look at Tab 32.  This is Government Exhibit 28-14.

5    And it is an e-mail from Kristen Peterson at TaxACT.

6         What is her position?

7    A    Kris Peterson is vice president of marketing.

8    Q    And it's an e-mail to you and others.  Cammi is the person

9    you described yesterday.  She was in charge of marketing for a

10   while, correct?

11   A    She still is in charge of marketing.  She is the chief

12   marketing officer.

13   Q    She was one of the founders?

14   A    Yes.

15   Q    And this is an e-mail which they're transmitting to you some

16   information about TurboTax's pricing, correct?

17   A    Yes.

18   Q    This is the kind of information that would get transmitted

19   to you from time to time at the company?

20   A    Occasionally.

21   Q    Let's look at Exhibit 33 which follows.  It's Tab 33, sir.

22   It's Government Exhibit 28-15.

23        This is an e-mail from you to a number of people at TaxACT.

24   And it attaches an H&R Block notice about new product with no

25   price increase.

1       Do you see that?

2   A   Yes.

3   Q   And you thought that was important enough to distribute to

4   some of your fellow executives, correct?

5   A   I do generally forward everything that I get from TA to my

6   partners, yes.

7   Q   All right.  And this had been provided to you by

8   Mr. Crockett at TA.  And who is Mr. Crockett?

9   A   He is a managing partner at TA Associates and on my board of

10  directors.

11  Q   So he's on the board of directors, and he think it's

12  important enough to bring to your attention an ad from H&R Block

13  regarding pricing and product improvement, correct?

14  A   About marketing messaging, yes.

15  Q   All right, sir.  Let's turn back to Tab -- I'm sorry.  Hold

16  on.  Tab 34.

17      You know what, before we go there, there's one other place I

18  want to go first so we'll hold off on Tab 34 and we'll go to

19  Tab 8, sir.

20      Now, when the two companies were coming to the Department of

21  Justice to explain the transaction, you attended some of those

22  meetings -- one of those meetings?

23  A   Yes.

24  Q   You attended a meeting on November 10th, 2010?

25  A   Yes.

1    Q    And what we have in front of you is Government Exhibit 28-2.

2    And that's the presentation that was made on behalf of the

3    companies on November 10th, 2010, which was testified about by I

4    think Mr. Bennett as well.

5         If you would go the page 5.  At the top, the heading is

6    "H&R Block Seeks to Compete More Effectively Against TurboTax."

7    And then the second bullet point from the bottom says, "TaxACT

8    provides better value than TurboTax's value products."

9         Do you see that, sir?

10   A    Yes.

11   Q    And that was part of the presentation that was made to the

12   government in November 2010.

13        And how does that fit under the chart that you've created

14   for us, sir?

15   A    I did not agree with the value premium definition of this

16   document.

17   Q    And you were sitting at the meeting when it was presented to

18   the government, correct?

19   A    I was given this document an hour before that meeting

20   started, yes.

21   Q    All right.  And you were there when they went over the

22   information and the material, correct?

23   A    I was there.

24   Q    All right.  Now, let's go to page 14.

25        All right, sir.  And this is a chart that says, "H&R Block

1    and TurboTax offer higher priced products as compared to TaxACT

2    and other value providers."  And then there's a table:  Premium

3    versus value, tax preparation providers.

4        Not too much different than the chart we created yesterday

5    except that under value tax preparation providers, the

6    presentation that was made to the government in November of 2010

7    says H&R Block and TurboTax under value tax preparation

8    providers, correct?

9    A    It does say that, yes.

10   Q    And I guess you don't agree with that either, sir, right?

11   A    I do not.

12   Q    And did you agree November 2010?

13   A    I believe I made the point to my attorney.

14   Q    After the meeting?

15   A    No, before.

16   Q    All right.  But you didn't say anything at the meeting.  You

17   let the people go through it and say, "Hey, tell the government

18   what's in there.  I don't agree with it, but I'll keep my mouth

19   shut"?

20   A    Yes.  The meeting was already scheduled.

21   Q    It wasn't scheduled -- it wasn't supposed to be a lying

22   meeting, though, was it?  It was a meeting.  Nobody said you had

23   to allow people to say things that you didn't believe in,

24   correct?

25   A    Yes.

1    Q   All right, sir.  Let's look at a document we looked at

2    yesterday, and that is at Tab 34.  This is Government Exhibit

3    28-19.  It's 2009 Competitive Price Comparison.

4        I believe your testimony yesterday, sir, was that you'd

5    never seen this before, and it wasn't prepared during the

6    ordinary course of business, right?

7    A   Correct.

8    Q   I'm going to hand to you, sir, a document we've marked as

9    Government Trial Exhibit No. 7, with the Court's permission.

10   And I'll hand it up.  It's not in the book, your Honor.  May I

11   do so?

12          THE COURT:  That's fine.  You may approach the witness.

13       (WHEREUPON, a certain document was marked Trial Exhibit 7

14        for identification as of September 8, 2011.)

15   BY MR. WAYLAND:

16   Q   Now, Mr. Dunn, you have not seen Government Exhibit Trial 7

17   before.  What this is is the information that was provided by

18   your counsel to us that comes with all of the documents.  So

19   when we -- it will take me a moment to set this up for you just

20   so you understand what it is, sir.

21       When your attorneys produced documents to us, each document,

22   the way they were produced electronically, comes with some

23   information.  And this is the information that was given to us

24   by your attorneys.  And what this says, sir, is that at the top,

25   the custodian for the document that's in front of you -- that's

1   the Government Exhibit 28-19 -- came from -- you were the

2   custodian of that document, sir.  And as well, there were some

3   other custodians, a number of people, many of whom are the

4   senior executives of the firm.

5       And assuming that that's correct, as we believe it is, do

6   you have any explanation as to why this document was produced

7   from your files?

8           MR. ROBERTSON:  Counsel, objection; leading.  I'm

9   looking at it, and I see a different page number, a different

10  document.

11          MR. WAYLAND:  Actually, turn -- I can put a witness on

12  the stand, your Honor, if we need to to connect this up.

13          THE COURT:  Mr. Wayland, could you just alert each of

14  us as to where you're looking to connect this Government Trial

15  Exhibit 7 to Government Exhibit 28-19, which may enlighten both

16  Mr. Robertson and me.

17          MR. ROBERTSON:  Your Honor, all these documents have a

18  number at the bottom.

19          THE COURT:  I see TA00088.

20          MR. ROBERTSON:  TA is TA Associates.  That's not

21  2nd Story.

22          MR. WAYLAND:  The way this works, your Honor, the

23  actual -- because we had to do this quickly last night after he

24  said he hadn't see it before, we -- there were different

25  versions -- things are produced with different numbers, so we

1    went back and we found the actual sheet that matches the

2    document.  And if you look at the final -- the second-to-last

3    page of the document, you'll see that there's actually an

4    excerpt from the document, online price.  It has comparisons.

5        In any event, if we need to, your Honor, we will -- we can

6    put on a witness later and explain the providence of the

7    document.  But let me do it this way, your Honor, so we don't

8    take the Court's time at this point.

9            THE COURT:  Well, I mean, I have to say, Mr. Wayland, I

10   have to agree with Mr. Robertson that I don't see any document

11   identification number of TA00088 that associates it with Trial

12   Exhibit 7.  I do note that Trial Exhibit 7 appears to show that

13   a document with the file name "Competitiveanalysis2009.xlx" was

14   found on Lance Dunn's hard drive, but clearly it's unclear from

15   this document that that document with that file name is the same

16   document labeled TA00088.

17           I think that's your point, Mr. Robertson; am I correct?

18           MR. ROBERTSON:  Yes, your Honor.

19           MR. WAYLAND:  That's fine.  I understand.  We'd have to

20   put a witness on the stand to make the connection between this

21   document and that document, which we didn't think we'd have to

22   do since we had understood it came from his files.  But we're

23   going to pass on that.

24           MR. ROBERTSON:  That's why I interjected because he

25   said counsel said had produced the documents from his files and

1    plainly, I didn't do that.

2              THE COURT:  Am I recalling correctly from yesterday

3    that Mr. Dunn says that he doesn't see documents like this?

4              MR. WAYLAND:  That's my recollection.  I'll ask some

5    more questions, your Honor.

6              THE COURT:  Thank you.

7    BY MR. WAYLAND:

8    Q   So is it your testimony, sir, that you've never seen this

9    document, you don't get these kinds of documents, nobody in the

10   company gets these kinds of documents?

11   A   I testified that I did not see this document.

12   Q   And do you have any -- if it was produced from your files --

13   and we have to establish that somehow -- would you have any

14   explanation of how it got there?

15             THE COURT:  Mr. Wayland, could you just slow down for a

16   second.  You asked a compound series of questions.

17             MR. WAYLAND:  All right.

18             THE COURT:  And he answered to only one part of your

19   compound question.

20             MR. WAYLAND:  All right, your Honor.  I understand.

21             THE COURT:  Could you ask each of your individual

22   components because each of them is important.

23             MR. WAYLAND:  I understand, your Honor.

24   BY MR. WAYLAND:

25   Q   So just we'll take this step by step, Mr. Dunn.

1      Your testimony is the same today as it was yesterday, which

2   is that you don't have any recollection of having seen this

3   document before, correct?

4   A    That is correct.

5   Q    And you don't have any -- if it was produced from your

6   files, you don't have any knowledge as to how it got there,

7   correct?

8   A    No.

9   Q    And if it was produced from the files of other senior

10  executives, you don't know one way or the other why they would

11  have it, correct?

12  A    No.

13  Q    All right.  And your testimony today is this is not a

14  document that was produced in the ordinary course of business?

15  A    That's correct.

16  Q    If it were -- would you have any idea of why somebody at

17  TaxACT would have produced this document?

18  A    No.

19          MR. ROBERTSON:  Objection, your Honor.  I think we're

20  still unclear as to which document we're talking about.

21          MR. WAYLAND:  We're talking about 28-19.

22          THE COURT:  I understand we're talking about

23  Government Exhibit 28-19.

24          MR. ROBERTSON:  It is the one from TA Associates.

25          MR. WAYLAND:  He's the owner of TaxACT, your Honor.  We

1    understand that.  We're not talking about this document.  The

2    Judge asked me to go through a series of questions to establish

3    his knowledge about this document.  If there is any connection

4    here, I'm trying to do that.

5              THE COURT:  And Mr. Robertson, you make a very good

6    point.  Part of the reason he may not be familiar with this kind

7    of chart, he may not have seen this kind of chart, the reason

8    that he -- he's testifying that this is not the kind of chart

9    produced in the ordinary course of business at 2SS is because

10   this was the kind of chart produced by, as I understand, TA is

11   the equity investor in 2SS?

12             THE WITNESS:  Yes.

13             THE COURT:  And so perhaps that is -- and you can

14   clarify that on your cross-examination.

15             MR. ROBERTSON:  Yes, your Honor.  But my objection was

16   he just said that it was this 28-19, the TA document.  "How did

17   it end up in your files?"

18             MR. WAYLAND:  I didn't say that.  I said, "If it were

19   in your files."

20             THE COURT:  Let's just move on.

21             MR. WAYLAND:  Thank you, your Honor.

22   BY MR. WAYLAND:

23   Q    All right, sir.  So what's the role of TA Associates with

24   respect to 2nd Story Software?

25   A    They are a majority owner in 2nd Story Software.

1    Q    And do you know one way or the other whether anybody at TA

2    is in the practice of compiling competitive price comparison

3    charts?

4    A    No.

5    Q    Where would they get the information to compile the

6    competitive price comparison chart?

7    A    I would say a lot of this information -- all this

8    information -- is available on the Internet looking at the

9    products.

10   Q    Can you identify somebody at TA Associates who you think

11   would be tasked with preparing competitive price comparisons and

12   product comparisons?

13   A    No.

14   Q    Can you think of any reason why somebody there would be

15   doing that and not actually dealing with somebody at your

16   firm?

17   A    My guess would be somebody in an investment bank prepared

18   this.

19   Q    Somebody in an investment bank prepared this.  That's your

20   testimony now?

21   A    I don't -- I really don't know.  You asked me, you know, if

22   I knew of anybody or how it might come to exist.  That would be

23   my best guess.

24   Q    You see it's more than just a price comparison.  It goes on

25   to have a competitive positioning statement on the second page.

1        Do you see that?

2    A    Yes.

3    Q    Was somebody at TA tasked with understanding the competitive

4    position of TaxACT, H&R Block and TurboTax?

5    A    I don't know.

6    Q    And do you see at the next page is the data import

7    comparison.

8        That requires a fairly detailed knowledge of the product;

9    don't you think?

10   A    I believe this would all be available on the Internet,

11   yes.

12   Q    All right.  But you can't tell me why anybody at TA

13   Associates would be on the Internet making up charts of

14   competitive positioning or data import comparison, right?

15   A    No, I cannot.

16   Q    All right, sir.  Let's look at the last tab in the book at

17   Tab 51.  This is Government Exhibit 28-35.

18            MR. ROBERTSON:  Your Honor, if counsel can provide me

19   with Tab 51.  I don't have a Tab 51.

20            MR. WAYLAND:  I'm sorry.  It's not in the book yet.

21   It's Government Exhibit 28-35.

22            May I hand it to the witness and the bench, your Honor?

23            THE COURT:  Yes, please.

24   BY MR. WAYLAND:

25   Q    Now, Mr. Dunn, what's marked as Government Exhibit 28-35 is

1    you'll see a document entitled "2010 Comparative Price

2    Comparison."

3        Do you see that, sir?

4    A    Yes.

5    Q    Have you ever seen this document before?

6    A    No.

7    Q    It's still your position that the company doesn't produce

8    competitive price comparisons in the regular course of

9    business?

10   A    I don't know who prepared this.

11   Q    It looks pretty similar to the 2009, doesn't it?

12   A    It's a lot more abbreviated and includes TaxSlayer.

13   Q    And that includes Staples on the right side.  In 2010, you

14   started doing business at Staples, right?

15   A    Yes.

16   Q    All right.

17   A    Avanquest did.

18   Q    All right, sir.  The last thing I want to talk to you about

19   is a videotape so let's watch a video.  If you look right on

20   your screen, it will be right up on the video.  This is

21   Government Trial Exhibit No. 8.

22       (WHEREUPON, a certain document was marked Trial Exhibit 8

23        for identification as of September 8, 2011.)

24       (Videotape played.)

25           MR. WAYLAND:  Let's just run that again because it went

1   by very quickly.

2        (Videotape played.)

3   BY MR. WAYLAND:

4   Q    Mr. Dunn, have you seen this ad before?

5            MR. ROBERTSON:  We have not received this.  It's not on

6   the exhibit list.  I'd like to know if we have it.

7            Thank you.

8            MR. WAYLAND:  This is Government Trial Exhibit No. 8.

9   May I hand this to your Honor?

10           THE COURT:  You can give it to my courtroom deputy.

11  And is the only thing on this CD --

12           MR. WAYLAND:  Yes, your Honor.

13           THE COURT:  -- this single video?

14           MR. WAYLAND:  I'll make a record of it, your Honor.

15  What we've entered as Government Trial Exhibit No. 8 is a video

16  clip of a TurboTax/TaxACT comparison which we played for the

17  Court.

18           THE COURT:  And has this been previously disclosed to

19  the defendants as being --

20           MR. WAYLAND:  I'll lay some more foundation, your

21  Honor.

22           THE COURT:  Okay.

23  BY MR. WAYLAND:

24  Q    Have you seen this ad before?

25  A    Yes.

1    Q    Is it a TurboTax ad?  I mean, Turbo TaxACT ad?

2    A    It is a TaxACT ad, yes.

3    Q    All right, sir.  And let me show you what we've marked as

4    Government Exhibit 959.

5         Sir, what we've handed to you is Government Exhibit 959.

6    It's an e-mail from Kris Peterson to Lance Dunn and others.  And

7    it has an attachment which is an HTM site.

8         And then attached to that are a series of screenshots from

9    the ad we just saw, correct?

10   A    Correct.

11           MR. WAYLAND:  Your Honor, I have no more questions of

12   Mr. Dunn.

13           MR. ROBERTSON:  Your Honor, may I inquire?

14           THE COURT:  Yes, please.

15           MR. ROBERTSON:  You'd think having a smaller lectern

16   was supposed to keep us from having so many documents, but it

17   hasn't worked.

18                        CROSS-EXAMINATION

19   BY MR. ROBERTSON:

20   Q    Good morning, sir.

21   A    Good morning.

22   Q    And I just want to be clear.  Have we talked about your

23   testimony at all since you were on the stand yesterday?

24   A    No.

25   Q    Okay.  The apples-to-apples comparison, you still running

1    it?

2    A    No.  We ran it for a very limited run.  It was not

3    successful.

4    Q    And why do you think it wasn't successful?

5    A    Because we don't really appeal to the same customers as

6    TurboTax.

7    Q    Let's just go back to some basics here, sir.  You mentioned

8    a few things about your background.

9         And when you were at Parsons, were you just working on tax

10   software?

11   A    Initially, but by the end of my career at the end of the

12   seven years, I was working on all of the financial and

13   productivity titles.  I was vice president of software

14   development.

15   Q    And when you ramped up the tax software there at Parsons,

16   can you just give us a brief overview of how long it took you to

17   ramp that up.

18   A    At Parsons, it was very quick.  Parsons also had a software

19   infrastructure and already had a client base as well as a

20   reputation.  So we were able to hit the ground running.  We had

21   a very competitive product year one, and we were very

22   competitive in the market year one.

23        And Bob -- Mr. Parsons, obviously, had capital already for

24   advertising budgets.

25   Q    And when you started over at 2nd Story -- and it may seem

1   obvious -- but why did you call it "2nd Story"?

2   A   It was called "2nd Story" because it was a play on words.

3   That was our second time around in the tax software business, as

4   well as we were on the walk-up second floor of a low-rent office

5   condominium.

6   Q   And back when Parsons and the tax software went to Intuit,

7   do you know whether Intuit let anybody else use that software?

8   A   As part of that transaction, yes, we had to create a version

9   of TaxACT for Novell which had recently purchased Corel, I

10   believe, at that time.  And as part of that transaction, we had

11   to create another version of Personal Tax Edge for them to

12   distribute and give them source code, teach them how to use it,

13   et cetera.

14   Q   And when you went to 2nd Story -- and when did that begin?

15   What year?

16   A   2nd Story began in 1998.

17   Q   And what did you have in terms of assets in order to start

18   that business?

19   A   We started 2nd Story Software by contributing $5,000 each, a

20   desk, a chair and a computer.

21   Q   And in your view, how long did it take you to become a

22   significant player in the tax software end of the business?

23   A   Because we were 100 percent self-funded, it really took us

24   to our third product year.  It would have been tax year 2000

25   before we had a competitive, full-featured product.  We had all

1    the products, all the states, in all the platforms, and it was

2    from that point forward that the company's growth really started

3    to take off.

4    Q    And do you know if the FFA had any effect at all on your

5    ability to grow?

6    A    Absolutely.  The FFA was a very economical channel that we

7    were able to utilize to, you know, get no-cost marketing.

8    Q    And have you seen anybody else enter in the FFA in the last

9    few years?

10   A    Yes.  You know, over the last few years a lot of players

11   have come online in the FFA, including just in the last month

12   with 1040.com.

13   Q    And 1040.com?

14   A    Yes.

15   Q    And who are they, sir?

16   A    1040.com, I believe, is registered by Drake Software.  Not

17   exactly sure what the affiliation is, but Drake is an

18   established provider of tax -- professional tax preparation

19   software and had been in that business for a long time.

20   Q    And do you have any view of the market in which TaxACT

21   actually competes?

22   A    Yes.  Just like our marketing message says, we are free for

23   everyone.  We compete for everyone.  There is 140 million

24   taxpayers in a given year, and a lot of those people are

25   reconsidering each year how they prepared their return the year

1   before.   And we want to get our name, our product, our offer in

2   front of as many of those as possible.

3   Q    And does that include the people who are doing assisted

4   preparation?

5   A    Absolutely.   We look for people that are -- we try to get

6   our name in front of people that use assisted, did pen and

7   paper.   All preparation -- tax preparation solutions.

8   Q    Now, as we went through a number of documents yesterday --

9   and we'll go through them in more detail here -- but did you

10  ever tell anybody on the outside that you were looking at the

11  market as the entire tax preparation market?

12  A    Yes.   I believe that in pretty much every offering

13  memorandum and management presentation, it always starts with,

14  you know, we're looking at everyone.   There's 135, 140 million

15  taxpayers.   And our offer, our product, appeals and is capable

16  of handling anyone's return.

17  Q    And the documents yesterday, when you used the phrase

18  "entire industry," what are you referring to?

19  A    Tax preparation across the board.   Every possible

20  solution.

21  Q    Now, you gave a lot of description from counsel's questions

22  about this distinction that you have between value and

23  premium?

24  A    Yes.

25  Q    Can you just tell the Court briefly -- I know you're in

1   sales and you like to talk more than I do, but we need to kind

2   of keep things limited here, but give the Court an overview of

3   why it is you think there's that distinction.

4   A    That distinction exists because there are customers that are

5   value conscious and price conscious.   They are looking at their

6   preparation solution options from the year before and

7   reconsidering what they want to do.

8        And you know, in comparison to other DIY software solutions

9   we're the low-priced leader, but we're also the low priced

10  leader, the value leader, across the industry.   If you need to

11  prepare and E-file your federal return and state return, we're

12  one of the best, lowest priced, highest value solutions out

13  there.

14  Q    Why not just raise the price and go head to head against

15  Block or Intuit?

16  A    That would break our entire model.   As I mentioned

17  yesterday, you know, the word-of-mouth advertising is what

18  drives the success in the value model.   We have to provide

19  value -- not only the perception of value, but value in fact.

20  The customer has to believe that they got the best value in

21  order for them to make a recommendation to their friends,

22  neighbors and coworkers, which is where we get most of our new

23  customers.

24       And so to raise the price would break that trust, would

25  break that chain and the whole thing falls apart.   It's like a

1    double drowning.  You raise the price, you lose the customer you

2    already have, and you don't get the referral that they would

3    have given you or could have given you down the road.

4    Q    And how much have you raised the price on your federal

5    product?

6    A    We've never raised the price on our standard product.  It's

7    always been 9.95.

8    Q    And do you know where your competitors in that value end of

9    the market are pricing at?

10   A    Very similar.  You have a number of different pricing

11   models, specifically with TaxSlayer and Free Tax USA, but

12   they're in that same ballpark, especially when you look at the

13   fed state combination.

14       In this model, you make a lot of your revenue off the state

15   sale, and it is the combination of federal and state return that

16   is the driving revenue factor.  And we're all clumped in there

17   at around $17 to get your federal and state -- that is, the

18   value players are lumped in there at $17.  That's the price you

19   need to be to be successful in value.

20           THE COURT:  Mr. Dunn, you used the term "model."  And I

21   think you're using -- your describing the value proposition as a

22   business model; am I correct?

23           THE WITNESS:  Yes.

24           THE COURT:  But isn't it, in essence, just a marketing

25   strategy that rather than spending the amount of money that

1    Intuit and H&R Block supposedly spend on marketing, you don't

2    spend that amount on marketing, but instead rely on word of

3    mouth?

4          So when you use the term "business model," aren't you

5    just talking about a different marketing strategy?

6          THE WITNESS:  The word of mouth is a key element to it.

7    And so to do that, you have to provide a high-quality, usable

8    federal program.  You have to overdeliver.  When you advertise

9    free and then you disappoint someone, they're not going to give

10   you the word of mouth.  If you advertise free and they come to

11   your Web site and, in fact, they can't use a free product

12   because your free is not as free as it's claimed, you know, a

13   bate-and-switch-type offer, you've created disappointment.

14         We have to provide -- we have to overdeliver.  We have

15   to overcome that stigma of a free product.

16         THE COURT:  Which means -- and correct me if I'm

17   wrong -- that you're offering in your free product more features

18   than the other players offer in their free products, but then

19   they instead rely on larger marketing budgets to attract

20   consumers to be educated about those features and to buy those

21   features.

22         So it really still just boils down -- how does it not

23   just boil down to not a different business model, but a business

24   model that is, in essence, a different marketing strategy?

25         THE WITNESS:  Yes.  It is a different marketing

1    strategy.

2            THE COURT:  Okay.

3            THE WITNESS:  To drive word of mouth.

4    BY MR. ROBERTSON:

5    Q   And sir, in fact, the Court just mentioned it, the

6    difference in features.

7    A   Yes.

8    Q   Yesterday on the transcript at page 74 in the afternoon,

9    counsel was showing you TX 6 and was asking you what

10   distinguishing things there were.  And you mentioned features

11   and quality.

12       Did you notice that he didn't write the word "features" on

13   his chart?

14   A   Yes.

15   Q   And what did you mean by features as a distinction?

16   A   The premium players do include some features that we do not.

17   The breadth of their import capabilities, you know, in terms of

18   W-2, 1099 imports.  They also tend to provide more sophisticated

19   tax advice, help, certainly in the case of Block and more

20   sophisticated back-end support in terms of audit support.

21       And probably most importantly, because they have the strong

22   brands, they have the credibility that the customer believes

23   that those back-end support and the continued support is going

24   to be there.  So those are the types of features that separate

25   premium from value.

1    Q    Now, we've seen some documents already in the case where you

2    or your staff will mention H&R Block online as a product.

3         You've seen some of those here yesterday, sir?

4    A    Yes.

5    Q    And how close do you regard H&R Block's online product as a

6    substitute to your product?

7    A    We don't.  I mean, we service completely different types of

8    customers.  And you know, I believe our surveys back up that

9    conclusion.

10             MR. ROBERTSON:  May I have a moment, your Honor?

11             THE COURT:  Yes.

12        (Brief pause.)

13             MR. ROBERTSON:  Your Honor, may I approach the witness?

14             THE COURT:  Yes.

15             MR. ROUSH:  May I approach the Court with copies?

16             THE COURT:  Yes.  Thank you, Mr. Roush.

17             MR. ROBERTSON:  All right.  Your Honor, if I could

18   continue.

19             THE COURT:  Yes, please proceed.

20   BY MR. ROBERTSON:

21   Q    Sir, turn to your Tab No. 1.  And there should be DX 378 in

22   there.

23        Do you see that, sir?

24   A    Yes.

25   Q    And what is this, sir?

1   A    This is a summary results for an exit survey that is offered

2   to all TaxACT customers that actually complete the filing of

3   their return.

4   Q    And do you know whether 2nd Story conducts a survey in the

5   ordinary course of business?

6   A    Yes.  This has been offered -- the exit survey has been in

7   the online product for a number of years.

8   Q    And for example, we can with start any year, but just pick

9   page 4, please, 2008.  We could do any year you'd like.

10       But in 2004, can you tell us what these numbers told you, if

11  anything?

12  A    Yes.  This basically shows of the customers that finished

13  their return and opted to complete the survey, that, you know,

14  9.7 percent of them said that they used TurboTax the year

15  before.  Only 2 1/2 percent said they used TaxCut, which at that

16  time was the name of the Block product the year before.

17  12 1/2 percent had used a tax professional the year before.  And

18  4.8 or 5 percent had prepared their return manually.

19  Q    And if we can go to page 6, which is the 2009 online

20  feedback.  And you called this an exit survey.

21       Is that people who were leaving?

22  A    Yes.  This is people that have completed their returns.

23  Q    Complete the returns?

24  A    Yeah.

25  Q    And what, if anything, do these numbers tell you, sir?

1    A   Looks like we changed the survey.  It is a little bit more

2    detailed breakdown.  5.7 percent prepared themselves.  3.6 used

3    an accountant.  9.1 used a tax preparation service.  2.8 used a

4    spouse, friend or relative.  Fairly significant number there

5    that used, in essence, assisted preparation.  TurboTax was 8.7.

6        And again TaxCut, which at that time was the name of Block

7    At Home, was 2.2 percent.  And 1.8, this was their first time.

8    Q   And except for the "none" or "none, this is my first time,"

9    is there any other category of method of doing their taxes that

10   is as low as TaxCut?

11   A   No.  It has the -- you know, "none" and "my first time" are

12   the only two that are lower than TaxCut.

13   Q   Now, when you saw these numbers each year -- let me ask you

14   this:  Did you see these numbers each year?

15   A   Yes.  This is a report that we actually see on a weekly

16   basis.

17   Q   And when you saw these numbers, were you surprised at all at

18   the low numbers that were switching from H&R Block At Home?

19   A   No.

20   Q   Why not?

21   A   Again, it's our belief that we don't compete closely with

22   Block or TurboTax, the other premium products.  That we get more

23   customers from other sources than other DIY software.

24   Q   And does that affect at all your way that you market the

25   product?

1    A    Yes.  I mean, we cast as broad a net as possible, as I've

2    said numerous times.  You know, we really look at 140 million

3    taxpayers as our potential customer base.  We don't know where

4    the value customer is or what they used last year, but we want

5    to get our name, our product and our offer in front of as many

6    people as possible so that for those customers, for those

7    taxpayers looking at considering their alternatives, that they

8    consider ours.

9    Q    And turn to Tab No. 2, sir, DX 2200.

10   A    Yes.

11   Q    And if you can tell the Court, please, what this is, sir.

12   A    This is a survey of taxpayers that completed a free online

13   return in 2006, but then did not come back and utilize our

14   services in 2007.

15   Q    And for example, if you'd turn --

16        MR. WAYLAND:  Your Honor, before this inquiry, could I

17   ask that Mr. Robertson lay a foundation about this witness'

18   knowledge.

19        MR. ROBERTSON:  I'm doing that.  That's a fair

20   objection.

21        THE COURT:  I look forward to it.

22        MR. ROBERTSON:  Thank goodness I had it on my outline.

23   BY MR. ROBERTSON:

24   Q    Sir, you've identified what this survey is.  Do you know

25   whether it was prepared in the ordinary course of 2nd Story's

1   business?

2   A    Yes.

3   Q    And do you get to see these documents each year, sir?

4   A    Yes.

5   Q    And do you rely on them, if at all?

6   A    They confirm what we already believe to be true about the

7   market.

8   Q    And if you could then take us to Page No. 7.  And just tell

9   the Court what this particular component of the survey is, sir.

10  A    Page No. 7 is people that completed an online Deluxe return

11  in 2005, but did not return to complete their 2006 return.

12  Q    And what is your Deluxe product?

13  A    The Deluxe is our paid federal program.

14  Q    Except for the free product, is there anything lower priced

15  than Deluxe?

16  A    No.

17  Q    And except for the Deluxe product, is there any Super Deluxe

18  for consumers?

19  A    Not at TaxACT, no.  This is our only paid product.

20  Q    This is the paid product?

21  A    This is our paid federal program, yes.

22  Q    All right.  And looking at the results on here, do you know

23  what the largest number of people were that -- where people went

24  to as an alternative?

25  A    They went to some version of assisted preparation.  The

1    combination of personal, accountant or CPA, and walk-in tax

2    office represents 43 percent.

3    Q   And as you saw these numbers each year, does that surprise

4    you at all?

5    A   No, it does not.  When taxpayers lose confidence in doing

6    the return themselves, they may step out of the do-it-yourself

7    solution, go to assisted prep, but it's my belief that at some

8    point -- a year or two down the road -- they'll come back.

9    Q   And do you try to get them back?

10   A   Absolutely.

11         We have reactivation campaigns as well as, you know,

12   general broadcast advertising.

13   Q   And you have prepared by hand.  What is that, sir?

14   A   That is the number of people that left our federal solution

15   and then the next year prepared their tax return by hand doing

16   it manually, paper and pencil.

17   Q   And I see you have TaxCut software up there.  Do you know

18   what that one is?

19   A   Yes.  The Block and Intuit products here are split out

20   between their desktop and their online version so TaxCut

21   software would be someone that's switched to a PC-based

22   application and used the Block software.

23   Q   And then we have TaxCut Online.

24         What's that, sir?

25   A   That would be the online version of the Block program.

1   Q    And compared to either prepared by hand or by going into a

2   tax store -- I think you gave this a number 43 percent people go

3   to, 8 percent prepared by hand -- where does TaxCut's software

4   or online digital product fit in that mix?

5   A    Very few.  Very few people leave us to go to the Block

6   products.  I think you have 3 -- 5 percent.

7   Q    Do you have any explanation why you're not getting as many

8   people from H&R Block's product to either come to TaxACT or go

9   there when they leave you?

10  A    Yeah, I don't believe that our customers -- the value

11  customers -- believe that, you know, Block is a substitute, a

12  competitor.  They are looking at other solutions.  Our value

13  customers don't associate with that brand.

14        THE COURT:  Could I just interrupt you for a second.

15  You had mentioned earlier this morning about the importing of

16  data being one of the features that tax filers may look for

17  going from one year to another.

18        THE WITNESS:  Yes.

19        THE COURT:  Does the TaxACT product -- free product --

20  allow for the import of data from one year to another so a tax

21  filer can avoid manual input of the data each year?

22        THE WITNESS:  No.  To import your TaxACT data from year

23  one to year two, you would have to use our paid Deluxe

24  program.

25        THE COURT:  Okay.

1  BY MR. ROBERTSON:

2  Q    And if you'd turn to Tab 3, sir.

3  A    Yes.

4  Q    And DX 364.

5         MR. WAYLAND:   Your Honor, I'd like to voir dire the

6  witness on this document before he asks any questions.   I'd like

7  to voir dire the witness on this document before any questions

8  are asked.

9         THE COURT:   Okay.   Let me just see what this

10  document is.

11        MR. ROBERTSON:   This is a spring 2011 survey, your

12  Honor.

13        THE COURT:   The 2011 survey.

14        MR. ROBERTSON:   I think we've seen this one before.

15        THE COURT:   Yes.   Don't you want to wait until you see

16  whether the foundation established by Mr. Robertson is

17  sufficient?

18        MR. ROBERTSON:   Kind of depends on what I'm using it

19  for.

20        THE COURT:   Right.   So please proceed, Mr. Robertson.

21  BY MR. ROBERTSON:

22  Q    Now, sir, I'm going to tell you what I'm not asking you

23  about.   I'm not asking you about whether you were involved in

24  doing this survey.

25  A    Yeah, I was not involved in doing this survey.

1     Q    Okay.  Have you seen the survey?

2     A    Yes.

3     Q    And my only question is whether the results of the survey

4     comport with what you've seen in your experience in your surveys

5     over the past eight years?

6          MR. WAYLAND:  Objection, your Honor.  Two bases:

7     Foundation and seeks an opinion which he has not been qualified

8     to do.

9          THE COURT:  Overruled.

10    BY THE WITNESS:

11    A    Yes.  The results of this survey were generally consistent

12    with the surveys that we've had in the past.

13    Q    You mentioned yesterday, sir, and I think again this

14    morning, that there's some kind of management presentation that

15    goes along with this -- the banking or offering memoranda?

16    A    Yes.  The normal sequence of events in this type of process

17    is you mail out these offering memorandums in bulk.  You get

18    some letter of interest or inquiry from the private equity

19    firms.

20         And those that are deemed worthy by our investors and the

21    investment bank are then invited to a person-to-person,

22    face-to-face meeting where they get to ask questions and

23    management makes a presentation.

24    Q    And how many of these presentations, approximately, have you

25    personally made?

1   A   I would say over the last seven years, probably 50.

2   Q   And if we could turn, please, sir, to DX 558 in Tab 4.  This

3   was a document that counsel showed you a couple pages out of --

4   I think one page -- yesterday.  I'm using our version DX 5058

5   because I don't have counsel's version that I can put on the

6   screen.

7       Could you please tell the Court what this is, sir.

8   A   This would have been the PowerPoint presentation that

9   accompanied the management presentation for the last process

10  that was completed in -- that we conducted in 2010.

11  Q   And in terms of the overall organization of this, how does

12  this compare to the other 49 or so that you've done?

13  A   Very consistent.

14  Q   And turn to page DX 5058 at page 7, please.  And can you

15  tell us please, sir, what's depicted here, if you know.

16  A   Again, it shows the total market and how it's split with --

17  at this time and how we have product offerings that appeal to

18  all of that.

19  Q   And if you'd turn to page 9 of the slides, which is actually

20  DX 5058-10.  You begin a section called "The Market

21  Opportunity"?

22  A   Yes.

23  Q   And when you gave these presentations, did you tell people

24  about the market opportunity?

25  A   Yes, absolutely.  And again, we present the market as

1    140 million taxpayers and how our product appeals to the value

2    segment that's in those 140 million, but that we have to put our

3    message in front of all of them.  And that regardless of what

4    they used in the past, they are a potential candidate to use us

5    in the future.

6    Q    And if you'd look at DX 5058-11, which is the following

7    page, what is this slide, sir?  Is this still within the section

8    called "The Market Opportunity"?

9    A    Yes.  This shows the growth of the number of U.S. individual

10   income tax returns filed over time.  It shows the percentage

11   growth as well as the growth in absolute numbers.  Also shows,

12   again, the current breakdown, but it, you know, talks about the

13   transition from paper and pencil and professional into DIY.

14   Q    And I notice there are footnotes at the bottom where it has

15   a bunch of IRS this and IRS that.

16        Do you know what that is, sir?

17   A    It's citing the source for the information, and this is all

18   based off of information that's released by the IRS.

19   Q    And what does this graph on the left-hand side say, if

20   anything?

21   A    That, you know, the market is growing and consistently

22   growing in terms of absolute numbers.

23   Q    And to reach all these people in this entire market, what do

24   you do in the way of marketing to try to reach those people, if

25   anything?

1    A    We advertise in the broadest vehicles available:  On TV,

2    banners on the Internet, home pages of sites like Yahoo, MSN,

3    and try and get our name in front of as many people as

4    possible.

5    Q    After hearing the questioning from counsel yesterday, did

6    you think to yourself, "Golly, gee, we should be ignoring all

7    the assisted prep and pen-and-paper customers"?

8    A    No.  You know, there's certainly -- as the Internet has

9    become the consumers' tool of choice for convenience, it has led

10   a lot of people to reconsider their tax preparation solutions

11   and, you know, the transition that is happening in the tax prep

12   market is not too dissimilar from that that has happened in

13   other markets like cars, insurance, airline tickets, travel

14   agencies, et cetera.

15       As people become more comfortable and more familiar with

16   utilizing the Internet to conduct business, they like the

17   convenience and they are making that transition in tax prep as

18   well.

19   Q    You mentioned to counsel yesterday that some people will

20   switch to assisted because of a life change?

21   A    A loss of confidence.  And this is a problem that's, you

22   know, I guess plagued the DIY software business really going

23   back to Parsons.  Something happens that causes the taxpayer to

24   lose confidence.  It may be a life event.  It may be that they

25   inherited money, for example, and are unsure about how that

 1    might impact their tax return.  In fact, it doesn't, but that

 2    doesn't mean that they feel comfortable about making that

 3    determination.

 4        Likewise, it could be something as routine as getting one of

 5    the millions of IRS computer-generated letters.  You know, if

 6    you close a bank account and move and forget to tell the bank

 7    where you moved to, you don't get the 1099.  The IRS gets the

 8    1099, and 18 months later you get a letter that says, "Gee, you

 9    forgot to report $150 in interest.  We'd like $65 in penalty and

10    interest, please."

11        That rattles a lot of people and could cause them to

12    reconsider their decision to DIY and might go to assisted again.

13    Q   And you said earlier that you see those people often come

14    back?

15    A   Yes.

16    Q   Any explanation for that?

17    A   You know, they, A, regain their confidence; B, they get

18    tired of paying someone to sit on the other side of a computer

19    that's asking them the same questions that they could answer at

20    home.

21    Q   And we just saw a percentage of people that shift from your

22    product back to pen and paper.  Any explanation for that?

23    A   Yes.  Again, with our customer base, the value conscious,

24    cost-conscious customer, they are looking at the next lowest

25    priced solution, which is pen and paper.  And again, throughout

1  my 20 years in DIY software, pen and paper, especially for state

2  returns, is our biggest threat.

3       And if you look -- you know, of our federal E-filers, we can

4  only get about half of them to finish their state return using

5  our product.  The other half, if they've used us for their

6  federal return, half of them use us for their state return.  The

7  other half are going out and filling that return in either by --

8  filling it by hand and either mailing a paper return in or using

9  one of the online fill-in forms options that a lot of the states

10  provide.

11            THE COURT:  And to use you for the state, they have to

12  pay for the Deluxe version?

13            THE WITNESS:  No.  They have to pay us for the state.

14  You can use our free federal addition for free, and then you

15  would have to pay us 14.95 to file the state.

16            THE COURT:  Okay.  It means I wasn't paying as close

17  attention to the ads I've seen here.

18            THE WITNESS:  The ultimate bundle would be 17.95 just

19  if you want to do both, Deluxe and state.  We only charge $3

20  more over what the state price alone would be.  So consequently,

21  a lot of people that buy our state would go ahead and buy the

22  ultimate bundle.

23  BY MR. ROBERTSON:

24  Q    Sir, do you observe in the marketplace Intuit out there

25  competing in marketing?

1    A    Absolutely.  They're out there everywhere.

2    Q    And in your observation, do you see them just marketing

3    towards people who want to use online software?

4    A    No.  They are out there advertising for everyone and, in

5    fact, you know, in this last tax season, they were aggressively

6    going after assisted prep.

7    Q    Now, you mentioned to counsel that you looked at TaxSlayer

8    and Free Tax USA, one of the products by TaxHawk, as other value

9    players.

10        Do you see them out there in the marketplace marketing?

11    A    Yes, absolutely.  TaxSlayer especially is very creative in

12    their marketing campaigns.  I believe that they have -- I know

13    that they have sponsored NASCAR numerous times.  I think they

14    still do.  I believe that they're sponsoring a football ball

15    game this year.

16        And we also bump up against them and Free Tax USA in search.

17    You know, search is an open-bid system.  And the most, best

18    producing terms are the generic ones:  "Free tax return," "free

19    E-filing," "E-filed return."  And it's an open bid.  It's just

20    like eBay:  You bid, your name gets put up so it's something you

21    have to monitor constantly.

22        And so, yes, we do get outbid by Free Tax USA, TaxSlayer.

23    All of these companies are out there aggressively competing for

24    those high-producing search terms.

25    Q    And do any of your documents, including those counsel showed

1   you yesterday, make this value premium distinction we were

2   talking about?

3   A   We probably didn't make the premium distinction, but we

4   certainly talk about being the value leader a lot, both in

5   marketing materials as well as management presentation and in

6   offering memorandum.  The value premium construct is probably

7   something unique to hear, but we did talk about we're value,

8   they're not.

9   Q   And when you call yourself No. 1, what do you mean by

10  that?

11  A   That we are the leader in value.  That, you know, obviously,

12  you know, Intuit's the biggest DIY software provider by far, but

13  we are the leader in value.

14  Q   Let me just turn to Tab 5 and looking at DX 12.  Hopefully

15  it will appear.

16      At the very top of the screen, do you know what DX 12 is,

17  sir?

18  A   Yes.  This would be a press release.

19  Q   And do you have any role in deciding to call yourself

20  "America's #1 value leader in tax preparation software

21  products"?

22  A   Yes.  I know that we would have discussed this amongst the

23  four of us.

24  Q   And if you were referring to just an online software market,

25  would it be accurate to describe you as No. 1?

1   A    Yes.  We are the No. 1 provider of value software.

2   Q    Are you the No. 1 in an online software market that counsel

3   was describing yesterday?

4   A    No.

5   Q    Who would that be, if you know?

6   A    Intuit.

7   Q    And how big is Intuit, to your knowledge, compared to you?

8   A    In terms of units, I believe they are probably seven to

9   eight times larger than we are.  But in terms of revenue, as I

10  mentioned yesterday, they made $1.3 billion on consumer tax last

11  year.  We made 70 million.  That makes them like 20 times larger

12  than we are.

13  Q    And this same document, sir, do you see where it says, "It's

14  thrilling to know that it is customer input and loyalty that has

15  helped position TaxACT's brand name so that it is, in every

16  aspect, synonymous with value"?

17  A    Yes.

18  Q    We're going to get it up here on the screen.  And what did

19  you mean by that, sir?

20  A    That we, from the onset, you know, wanted to build a brand

21  that would be equated with value.  And so we have done

22  everything across time to support that proposition.  And, yes,

23  we want to be the value leader in software.

24  Q    Now, this says this is something from you.  Did you

25  authorize this statement to be put out there in the public?

1    A    Yes.

2    Q    And do you feel the same way today?

3    A    Yes, I do.  We still want to be the value leader of the

4    American taxpayers.

5    Q    And you also at the time had different ways you could enter

6    the information in the TaxACT product.

7         Do you remember that, sir?

8    A    Yes, and we still do.  You can enter your information via a

9    question-and-answer format, but you can also enter your

10   information directly on a tax form for those taxpayers

11   especially that have prepared manually in the past and are more

12   comfortable and more familiar with the tax forms.  They want to

13   utilize that format.  And we still provide that format today.

14   Q    Do people use that?

15   A    Yes, absolutely.

16   Q    And how is that different than the IRS fillable forms?

17   A    The primary difference between the fillable forms is that

18   ours calculates more information than the fillable forms.  The

19   fillable forms that the IRS provides today will add up on that

20   form, but it won't transfer information between forms.

21        So if you have itemized deductions on Schedule A, Schedule A

22   will add up the itemized deductions.  You have to read that

23   number, then go to the 1040 and enter your total itemized

24   deductions.

25   Q    Now, let's turn to Tab No. 6, please.  And this was

1   Government Exhibit No. 28-26 that you were shown yesterday.

2   A    Yes.

3   Q    Counsel was pointing you to --

4   A    I don't think they showed it to me, but they did ask me if I

5   had ever referred to the company as being a maverick, which this

6   was the document that I referred to us as a maverick.

7   Q    All right, sir.  And when you say that word, you say, "This

8   is possible because a tax industry maverick" -- what did you

9   mean by "tax industry"?

10  A    That, you know, our offer was unique across the whole tax

11  preparation industry.  And our, you know, offer was being

12  presented to everyone regardless of their preparation solutions

13  in the past.

14  Q    And just curious why you didn't put TurboTax and H&R Block

15  At Home anywhere on this press release?

16  A    It wasn't, you know, important to us.  You know, we wanted

17  to get the word out that we were a maverick across all

18  preparation solutions.  Our offer was unique.  This was the only

19  free offer at that time in any preparation solution.

20  Q    And this was back -- just to firm up the date, can you tell

21  us when this was?

22  A    This was for tax season 2005.  So it was in February 2006.

23  Q    And you list under "A Number of Good Reasons Exists for

24  Filing Your Taxes Online," and you list a bunch of reasons down

25  here.  And you say -- let me make it clear.

1          Did you have a role in writing this?

2     A     Yes, I did.

3     Q     And No. 1 where you say, "It's faster," faster than what?

4     A     It's faster than manual preparation.  So yes, easy to

5     understand, Q&A, plain English.

6     Q     And what do you say in the first sentence of paragraph 2?

7     A     That it's easier than preparing your taxes by hand.

8     Q     Is that what we've been calling paper and pencil or pen and

9     paper?

10    A     Yes.

11    Q     Why are you marketing to people who are preparing their

12    taxes by hand?

13    A     Because that is, you know, one of the sources for customers

14    to come to TaxACT.  And again, we're looking for taxpayers that

15    are value conscious, cost conscious, so we understand that those

16    are the most likely still to be using paper and pencil.

17    Q     And No. 3, you say, "You'll make fewer mistakes."

18          Fewer mistakes than what?

19    A     Than paper and pencil, than computing them by hand, yes.

20    Q     And No. 4, you say, "It's less costly."  And can you read

21    the next sentence.

22    A     "Filing returns online is less expensive than using an

23    accountant."

24    Q     Why were you marketing to people who were thinking about

25    using a tax store?

1    A    Again, of the 140 million taxpayers that are out there, at

2    any one point in time there is a large chunk of those

3    reconsidering their preparation solutions.  And we want them to

4    go about our option.

5    Q    And then the next one, "Faster refunds."  Talking about

6    mailing the return in.

7         What kind of customer, if any, were you trying to target

8    there?

9    A    All.  Anyone that, you know, would want to E-file their

10   return.

11   Q    Let's turn to Tab No. 7, sir, and DX No. 13.  And if you can

12   tell us, please, what DX No. 13 is.

13   A    It is the minutes of a meeting called "The Strategy Meeting"

14   on September 9th, 2008.

15   Q    And it has listed on the top the people who were there.

16        Do you know who these folks are?

17   A    Yes.  In addition to myself, those are the middle

18   management/senior management staff at 2nd Story.

19   Q    And what was the issue that you were talking about in here

20   under the second bullet point under "Marketing"?

21   A    They were discussing and considering, you know, whether now

22   is an opportune time for a state price increase.  You know, one

23   of the purposes of this meeting is to get our middle management

24   staff to think more about the company and less about their

25   individual departments.  So we frequently challenge them with

1   assignments like this.

2   Q    And under the state pricing, you're raising the price a

3   dollar.  Can you just read us, please, what the con for that is.

4   A    The con would be that it may drive customers to complete

5   manually.  As I mentioned earlier, we already have a difficult

6   time convincing our customers to utilize our DIY software at

7   14.95 to prepare their state return.  A lot of them already do

8   it manually.

9        And to increase the price even a dollar is going to drive

10  even more of them to do that.  And in our belief, the loss in

11  revenue and word-of-mouth advertising, would more than offset,

12  you know, what we would gain from the price increase.

13  Q    And do you know what decision was made at that time in

14  September 2008?

15  A    There was no price increase.

16  Q    Turn to Tab 8, please, sir.  We're looking at DX 2002.

17       And please tell us, sir, if you know, what DX 2002 is.

18  A    These are -- it's an agenda for a board of directors meeting

19  on August 13th, 2008.

20  Q    And who was on the board of directors at that time, sir?

21  A    The board of directors is myself, Todd Crockett from TA and

22  Kurt Jaggers from TA.

23  Q    And under Point No. 2, there's "Tax Year 2008 Plans."  And

24  can you read Point A on there.

25  A    "Hold off on price increases due to competitive pressure on

1    free."

2    Q    And do you know what was meant by that, sir?

3    A    Yes.  That, I believe, the board had asked us if in a

4    previous phone call -- that is TA had asked us, you know -- if

5    we had considered a price increase.  And so the discussion here

6    was why we would not want to do that.  And especially with our

7    federal program, there is a lot of competition with free not

8    only between other free alternatives, such as TaxSlayer and Free

9    Tax USA, but also with our own free.

10       You know, to increase the price from 9.95 to 10.95 or 11.95,

11   we're going to get that many fewer people to upgrade.  And we

12   did not feel that it would be a good decision at all, which is

13   why we've never raised it.

14   Q    So is it fair to say at that time you didn't raise the

15   price?

16   A    No.

17   Q    And of the board members who were there, do you know who it

18   was who was advocating not raising the price because of these

19   pressures from free?

20   A    Me.

21   Q    Do you still believe that today, sir?

22   A    Yes, absolutely.  There's even more free today than there

23   was then.  Like, assisted preparers are now going free.

24   Q    After this transaction goes through, do you know who is

25   going to run the TaxACT software products?

1    A    Me.

2    Q    And do you have any plans to raise prices?

3    A    No, we don't.

4    Q    As you sit here today, do you think it would be a great idea

5    to raise prices?

6    A    No.  The reasons to or not to raise prices after this

7    transaction are exactly the same as they are today:  The value

8    model doesn't allow for a significant price increase, even a

9    dollar.  We will break the chain reaction that drives the TaxACT

10   engine.  It simply does not make sense, does not work and it

11   would be a bad idea.

12   Q    Now, we're going to just switch binders for a few moments,

13   sir, to the big, heavy binder that was, I think, next to your

14   chair.

15   A    I set it on the floor.

16          THE COURT:  Are you referring to the government's Lance

17   Dunn documents binder?

18          MR. ROBERTSON:  Yes, your Honor.  I'm just going

19   through some of the documents that counsel used yesterday and

20   this morning.

21   BY MR. ROBERTSON:

22   Q    If anything, sir, I think we've helped the binder business

23   in this case.

24       Now, if you'd turn to Tab No. 3.  And this is of GX 28-10.

25   And just turning to what is Page No. 18 on the document, which

1   is seven pages in, where it says "TaxACT" -- pardon me.  Nine

2   pages in where it says "Final ACT."  I think counsel was

3   pointing you to the "Note from the President."  One more page,

4   please.

5        "Note from the President," that was you?

6   A    Yes.

7   Q    And counsel asked you about this note that you made.  And

8   you said, "Since that time" -- do you see the second sentence

9   from the "Note from the President"?  Can you just read that

10  sentence beginning "Since."

11  A    Yes.  "Since that time, TaxACT has been a catalyst for

12  change in the tax preparation industry."

13  Q    And what were you talking about, this tax preparation

14  industry?  What is that?

15  A    That is all preparation of income taxes regardless of

16  method.  It's also in the last sentence of that note.

17  Q    What is that, sir?

18  A    "We know that you'll see what we see, the best bargain in

19  the tax preparation industry."

20  Q    And do you think that's true?

21  A    Yes, I do.

22  Q    And counsel mentioned to you a presentation by the Willkie

23  Farr firm, which is in their Tab 8.

24       Do you see that, sir?

25  A    Yes.

1    Q    And the fourth page of that document, which is GX 28-2,

2    where it has, "The Competitive Landscape."

3    A    Yes.

4    Q    Do you remember seeing this flashed up on the board when we

5    were there at the Department of Justice?

6    A    Yes.

7    Q    And that has -- what types of things are on there, sir?

8    A    It has the all taxpayers broken down into three categories:

9    Assisted, do-it-yourself and friends and family.

10   Q    And do you see what the source is?

11   A    Yes.  H&R Block:  TS10 Market Dynamics, Switching Pricing

12   Competitive Profiles.

13   Q    You mentioned to counsel that there were some things in here

14   you disagreed with.  At the time, did you ask the Department of

15   Justice to get a chance to come in and give your story?

16   A    Yes, I believe we did.

17   Q    And did you ever get a chance to do that?

18   A    Yes, we did.  I spent several hours there describing how I

19   saw the value premium business model and distinction.

20   Q    And do you know what the time early on when the Willkie Farr

21   people were doing this, whether we had -- or they had the data

22   from all the other players in the industry at that time?

23   A    No, I don't know.

24   Q    And do you have access to that data like how many sales

25   TaxSlayer is making?

1    A    No, I do not.

2    Q    Do you know how much money they're making?

3    A    No, I do not.

4    Q    What about TaxHawk?

5    A    No, I do not have any information about them.

6    Q    And when counsel was asking you, well, why don't you just

7    figure out their market shares in the value segment, do you have

8    the data to actually do that?

9    A    No, I do not.

10   Q    Besides the public companies that we know about, do you have

11   access to the sales information and profitability and things

12   like that of these other companies that are not public

13   companies?

14   A    No, I do not, which is why we generally -- which is why when

15   we compute market share, we compete it based on electronic

16   filing divided -- our electronic filing, divided by total DIY

17   and total electronic filing in total.  Those are two numbers

18   that the IRS puts out on a regular basis in press releases.

19   Q    And in the information you get from the IRS, can you tell

20   about how many of those folks did it by hand, pen and paper?

21   A    They release that information about a year after the fact,

22   but not on a monthly basis.

23       THE COURT:  Is this a good time for a break?  Mr. Robertson,

24   is this a good time for a break?

25            MR. ROBERTSON:  Yes, ma'am.

1          THE COURT:  Okay.  We will take a ten-minute break.

2      (Recess was taken.)

3          THE COURT:  Mr. Robertson, whenever you're ready.

4          MR. ROBERTSON:  Yes, your Honor.  Thank you.

5   BY MR. ROBERTSON:

6   Q   Sir, we were about ready to turn to Tab No. 3.  And this is

7   Government Exhibit No. 28-17.  Counsel asked you about this.

8   A   Okay.

9   Q   And you mentioned when counsel was talking to you asking you

10  questions, about differentiating yourself from what you called

11  the "premium online products"?

12  A   Yes.

13  Q   And he was asking you where that was.  And I just wanted to

14  point you to a paragraph and see if you recognize it.

15      Do you remember this particular meeting, this document,

16  28-17?

17  A   Yes.

18  Q   And you look down where it has "Thoughts brought up" during

19  this strategy meeting in January of 2008.

20  A   Yes.

21  Q   And the paragraph says, "Look at the product.  Redefine what

22  is free.  We need to better differentiate our free offer from

23  TurboTax."  And we read the rest of the sentence yesterday, but

24  feel free to read it.

25      Why were you talking about differentiating yourself from

1    TurboTax?

2    A    Because of their free advertising.   There was confusion

3    about who was value, who was premium.

4    Q    Why not just offer the same product they have for free?

5    A    Again, that would break our value model and our customers

6    would not, you know, give us that word-of-mouth referral that's

7    critical to our business.   I don't like, you know, what TurboTax

8    does with free, which is, in essence, say, a

9    bate-and-switch-type offer.

10            THE COURT:   Could you explain that.

11            THE WITNESS:   In their advertising, they make very

12   general claims:   Free is better and, you know, free, free, free,

13   free.   It's not -- sorry.   There's a very small footnote at the

14   bottom of their -- for example, their television commercial that

15   says, "Simple returns only."

16            So then when you come to their Web site and start a

17   free return, if you have business income, if you sold investment

18   property such as stocks, bonds, mutual funds, if you have rental

19   property, if you have a partnership/S corp or any investment

20   property or ownership, you can't use their free product.   If you

21   pay estimates for the next year, you can't use their free

22   product to do that.   And so it's -- they're holding free out

23   there, but then they're only delivering it for about half the

24   taxpayers.

25            THE COURT:   But even your product doesn't perform all

1    functions for all taxpayers.

2              THE WITNESS:  Yes.  Our free program --

3              THE COURT:  Do you more expressly detail what you don't

4    provide in your free product than Intuit does?

5              THE WITNESS:  Yes.  Our free program does include every

6    form that you can E-file.  Every IRS form that -- there is not a

7    single taxpayer's return that could be E-filed that we don't

8    provide support for.

9              Anyone and everyone can utilize the TaxACT free

10   product.  And we hope they do.  We don't distinguish based on

11   characteristics or income types.  Everyone can use the TaxACT

12   free product.

13   BY MR. ROBERTSON:

14   Q    When you say "free for everyone," that's what you meant?

15   A    Yes.

16   Q    And you've been doing that all the way back now for a number

17   of years.

18        And when you're looking at these premium products, have you

19   ever thought there was any belief that TurboTax was just going

20   to become a free for everyone just like you?

21   A    We contemplated that they might do that back in 2005,

22   but no.

23   Q    Have you seen it happen any time?

24   A    No, they have not.  They have not matched that

25   free-for-everyone offer.  They have not matched that capability.

1    Other than Free Tax USA, no one else in the industry has.

2    Q    In terms of offering all the forms?

3    A    Correct.

4    Q    Now, how does TaxSlayer do it?  Do you know?

5    A    TaxSlayer today uses a slightly different free model.  They

6    have a more selective free.  I believe it's for 1040EZ and

7    active duty military.  But they also have a very low-paid

8    federal and a low-paid state product so that they're still in

9    there at that $16 combination price.

10   Q    And does anybody offer free state on the online products?

11   A    You can get some through the FFA, yes.  There is a state

12   Free-File-Alliance-type movement.  So if you prepare your

13   federal return with select vendors' free file offer, there is

14   also a corresponding state offer.

15   Q    Is that something you're doing?

16   A    It is not.

17   Q    Turn to Tab 20 of the government exhibit book, please, sir,

18   Government Exhibit 241.  And I want to turn to -- it's page 6 of

19   the document, which I assume is going to be page 7 of the

20   slides.  This is Government Exhibit 241.

21       Do you see that page, sir?

22   A    Yes.

23   Q    And when this document is describing the market opportunity,

24   is it just limited in the way that counsel was suggesting just

25   to online?

1    A    It's talking about E-file growth in general.

2    Q    All right, sir.

3    A    And it's talking about the growth in online financial

4    management.

5    Q    And growth from where?

6    A    From brick-and-mortar-type institutions.

7    Q    And if you'd turn to Tab No. 26, which is GX 28-8.  This is

8    the Greene Holcomb, H-o-l-c-o-m-b, document.

9         Do you see that, sir?

10   A    Yes.

11   Q    And turn to page 11 on the screen, which is page 9.

12        And do you recognize this part, sir?

13   A    Yes.

14   Q    And the industry that's being described, can you tell us

15   what the industry is that we're describing?

16   A    Tax preparation.  That represents 132 million taxpayers.

17   Q    And towards the bottom where it talks about people who

18   decide to self-prepare, do you see that, sir?

19   A    Yes.

20   Q    And counsel was asking you about whether you included pen

21   and paper in this.  Did you tell people that pen and paper is a

22   substitute for online do-it-yourself tax preparation?

23   A    Yes.  It is absolutely an option.

24   Q    And if that were -- when it says here that you can go to

25   libraries, local IRS offices to complete returns with pen and

1    paper, were you talking about there, sir?

2    A    Yes.   The first sentence in the last paragraph, "Individuals

3    who choose to self-prepare have several alternatives," and forms

4    and instructions is definitely the first one listed.

5    Q    And on the next page continuing, the "Industry Overview."

6    A    Yes.

7    Q    Did you miss telling the investors for this Green & Holcomb

8    report about the other methods of doing taxes besides just doing

9    it on an online product?

10   A    No.   Shows the mix of all individual tax filings, you know,

11   for a couple of different years projected as well as historic.

12   Q    And same document turning to page 14 of the document, which

13   is likely to be 16 on the slide, there's a section that we

14   skipped over yesterday entitled "Competition."

15        Do you see that, sir?

16   A    Yes.

17   Q    And can you read the first sentence for the Court so we see

18   what we're talking about here.

19   A    Reading underneath "Competition"?

20   Q    Yes.   Under "Competition," your first sentence.

21   A    "The income tax preparation software and electronic filing

22   industry is a highly competitive market."

23   Q    And who are the competitors that are listed here on the

24   second sentence?

25   A    "The company has numerous competitors that include other

1   income tax software providers, companies providing pure E-file

2   service, professional tax practitioners who provide these

3   services directly to individual consumers."

4   Q   Had you just skipped over in this document as was suggested

5   yesterday, assisted preparation as competition?

6   A   No.

7   Q   In Tab No. 27, which is Government Exhibit 134, which is

8   "Project Sprout," S-p-r-o-u-t, of June 2007.  And this was the

9   Deutsche Bank Securities one that was put together, right,

10  sir?

11  A   Yes.

12  Q   In the page which is No. 1 of the document, which is likely

13  to be page 3 on the slides, counsel pointed you to a part they

14  had highlighted under the "Executive Summary."  I want to ask

15  you about the second sentence under the second paragraph after

16  you mention when you were founded, "2nd Story's unique approach

17  combines a low-cost pricing model coupled with direct marketing

18  strategy."

19      Do you see that, sir?

20  A   Yes.

21  Q   And what is this unique approach that 2nd Story has?

22  A   You know, we were the first to prepare -- or to provide free

23  tax preparation options.

24  Q   And why were you trying to tell people that you were

25  unique?

1    A    You know, in this case, to build potential buyer interest

2    and to show how we are different from the rest of the industry.

3    Q    And in the bottom of the page, the part that wasn't blown up

4    yesterday, there's a paragraph there.

5         Do you see that, sir?

6    A    Yes.

7    Q    And do you see where it says, "In the U.S., tax preparation

8    represents a $19 billion annual market which can be broadly

9    divided into the self-preparation segment which includes tax

10   returns prepared using both paper and software-based solutions,

11   and the paid professional preparation segment"?

12        Do you see that, sir?

13   A    Yes.

14   Q    Do you know whether you were neglecting to tell people that

15   you were competing against pen and paper?

16   A    No.   Clearly, we were listing all of our preparation options

17   which we compete against.

18   Q    Same document turning to page 5 under "Market opportunity."

19   Underneath "Market opportunity," do you see what kind of market

20   is being described?

21   A    Yes.   This would be the U.S. market for all federal income

22   tax returns.

23   Q    Is that what you mean by "tax preparation market"?

24   A    Yes.

25   Q    And we've got various pie charts here.   Do you know what the

1  pie charts -- are they limited just to online software?

2  A    No.  It shows all preparation methods and gives the

3  breakdown by units and dollars.

4  Q    Turning to Tab No. 32, counsel asked you about an e-mail,

5  Government Exhibit 28-14, and it had a price on here.

6      Do you see 22.45?

7  A    Yes.

8  Q    When it says in the sentence right before that, "another

9  test," do you know what "test" means?

10  A    Pricing tests are a fairly common thing that happen

11  throughout the online business world as a whole.  You're looking

12  at if I lowered my price, what would happen?  If I raise my

13  price, what would happen?

14      And in this case, Intuit was doing some price testing.  It

15  didn't stay that way for very long, apparently.

16  Q    And their deluxe on this price test, does that include a

17  state product too?

18  A    I don't believe their deluxe product includes a state, no.

19  Q    And after the test, do you know whether they just stayed

20  down there at that price?

21  A    No.  I'm sure they did not.  Intuit's general pricing

22  strategy is to continue to increase prices throughout tax

23  season.  So you paid the highest price at the end.

24  Q    Counsel pointed you to Tab No. 50, Government Exhibit 105.

25  And on page 4, which is likely to be slide 5, I think you were

1    asked about the word "pioneer."

2        But do you see the phrase right below "pioneer"?  Page 4 of

3    the slide, which is -- we have it on the screen.

4    A    We're the nation's value leader.  2nd Story Software is the

5    nation's value leader, yes.

6    Q    But were you telling people that you were a leader in the

7    value segment of the market?

8    A    Yes.

9    Q    Now, just to be clear, sir, your view of the way you market

10   and who you're marketing against this value-versus-premium

11   thing, just to be clear, how long have you believed that?

12   A    Since the very first day in 1998, that was the mission of

13   the company from the onset was to be the value leader.  And as

14   one of these press releases said, to build the TaxACT brand to

15   be synonymous with the word "value."

16   Q    Did you get a chance to tell that to the Justice

17   Department?

18   A    Absolutely.

19   Q    Now, going back -- and fortunately we'll be getting out of

20   the big binder for a while, sir.

21       Going back to this whole history of free and where that came

22   from, and let's go back to the beginning of your experience with

23   free.

24   A    Okay.  The first free tax software that I'm familiar with

25   was in about 1993 when Computer Associates started offering a

1   free product.  At that time, it was only distributed via CD.

2   The Internet wasn't quite as prevalent as it was today and so

3   they offered a free CD.  You just had to pay for the shipping

4   and handling.

5       Parsons followed suit, and we created a product called "Tax

6   Mate" and Tax Mate was also free to -- you didn't have to pay

7   for the CD, but you had to pay 4.95 shipping and handling but

8   you could download that one for free if you had CompuServe, AOL,

9   et cetera.

10  Q   About when are we talking about?

11  A   That was about 1993, I believe.  And the Tax Mate program

12  was even after Computer Associates got out of the tax business,

13  Parsons continued the Tax Mate program until it was -- until the

14  tax -- Personal Tax Edge product line was discontinued.  So we

15  continued free throughout the next three years at Parsons.

16  Q   And after you stopped working there at Parsons and were out

17  thinking about the 2nd Story --

18  A   Yes.

19  Q   -- then did you observe anybody else out there in the

20  marketplace offering free?

21  A   Yes.  Intuit at that time was offering free products on the

22  IRS partners' page.  It was really kind of a predecessor to the

23  Free File Alliance.  The IRS had a page on their Web site to

24  encourage electronic filing and they called it the "E-file

25  partners' page."

1      Even in '98, Intuit had a free offer really for free

2   E-filing that emulated the criteria for the earned income tax

3   credit.  So it was targeted at low income.  At that time, it was

4   probably $25,000 in AGI.

5   Q   I think that level's gone up quite a bit since.

6   A   Yes.  The EIC goal has.  But from there, then 2nd Story

7   introduced free in 1998 with our product.  It was free to

8   prepare and free to print.  That was free to download.  We also

9   sold it on CD with a nominal shipping and handling charge.

10      But that was unique in that we implemented what was becoming

11   a standard on the Internet of a "try before you buy" model.  The

12   prevalent model at that time was obviously CD-based sales.  So

13   at that time, Intuit and Block were selling most of their

14   products at retail.  So the only time you could actually use

15   a -- or see a tax software program, you had to pay for it first.

16      With TaxACT, we used the "try before you buy" model with our

17   online distribution so you could download and install that

18   application without giving us a dime.  You could use it to

19   prepare and print your return without paying us a cent, and then

20   you only had to pay us something at that time if you chose to

21   E-file or attach a state.

22      So we were a pioneer in the "try before you buy," and we

23   were a pioneer in the free to prepare, free to print.  We were

24   making a very broad-based offer at that time with free.

25   Q   Now, you said at the time you weren't offering free E-file.

1    Where did that come from?

2    A    We didn't offer free E-filing until our product appeared on

3    the Free File Alliance.  You know, we really didn't provide that

4    until the government basically forced us to.

5    Q    And the Free File Alliance, what was your first offer on the

6    Free File Alliance?

7    A    Our very first offer for tax season 2002 was free if you

8    made more than $100,000 or if you qualified to file a form

9    1040EZ.

10   Q    And where, generally, were the other folks?

11   A    At that time, on day one, when the Free File Alliance

12   launched, most of them were in the $30,000, $32,000 and less.  A

13   lot of them were grouped around that income tax threshold.

14   Q    And at some point did you change your offer?

15   A    Yes.  After the first processing peak -- I talked about the

16   dual volume or capacity peaks that tax seasons have.  After the

17   first one, we felt that we had excess capacity and we might as

18   well expand our offer, and so we expanded it to be 50K and

19   above, as well as maintained the 1040EZ.

20   Q    And what year are we in about then?

21   A    That still would have been tax year 2002.

22           THE COURT:  Mr. Robertson, can I just interrupt for a

23   second.

24           When you say that your first offer was free if you made

25   more than $100,000 or if you qualified to file a form 1040EZ, do

1    you mean that people who earned -- who only earned more than

2    $100,000 could take advantage of the free form?  Is that what

3    you're saying?  Or do you mean unless you made more than

4    $100,000?

5            THE WITNESS:  Yes.  Our first offer was for people that

6    made more than 100,000.

7            THE COURT:  So people who were -- who made less than

8    100,000 still had to pay for it?

9            THE WITNESS:  They didn't qualify for our offer on the

10   Free File Alliance page.  On the Free File Alliance page, there

11   was at that time probably 15 different offers.  And as Robby was

12   pointing out, the bulk of them were down at the lower end of the

13   income spectrum, so there was 15 offers all clumped together

14   providing free services to people that made less than $30,000.

15           Our first initial offer that year was for people that

16   made more than 100,000.  We actually had two offers.  If you

17   made more than $100,000 or the second offer was if you qualified

18   to file Form 1040EZ.

19           THE COURT:  You weren't targeting the low-income filer

20   at all?

21           THE WITNESS:  No, we weren't.

22           THE COURT:  I thought I misheard something so thank you

23   for that clarification.

24   BY MR. ROBERTSON:

25   Q    Why were you targeting the upper income when the other folks

1    were targeting the lower income?

2    A    We just wanted to differentiate our offer.   There was a lot

3    of companies there.   And as I said, it was kind of the Walmart

4    of tax offers.   And this was the first time ever in the industry

5    that every tax software product had an offer, had a listing on

6    the same page.

7        So it was very much a head-to-head competition.   And we felt

8    that, you know, once a customer went there, we've obviously

9    already lost them and, therefore, we needed to stand out because

10   there was some very strong brands on that page.   And if we had

11   the same offer as everybody else, would they pick a Block

12   product or would they pick TaxACT?

13       And so we felt that we needed to differentiate and stand

14   out, and so that's why we decided to make an offer.   And going

15   into that tax season, I had presumed that most companies would

16   follow the offer that they made on the IRS partners' page the

17   year before.   Intuit and others had made that earned income tax

18   credit offer there, and I presumed that they would just extend

19   that to the Free File Alliance since that was kind of a

20   successor strategy at the IRS.

21   Q    And had your product been on the partners' page?

22   A    We had been on the partners' page, but we did not offer free

23   E-filing.   We offered free software.

24   Q    And did there come a time when you offered what we've now

25   heard as free for everyone on the FFA?

1    A    Yes.  So then in the next year, tax year 2003 -- and you

2    have the option of changing your offer a set number of times on

3    the Free File Alliance.  So we started the 2003 tax season with

4    the same offer that we ended in 2002.  So $50,000 and above was

5    who we were providing free services to on the Free File

6    Alliance.

7        The others were all over the board.  Some companies

8    followed.  Some other -- other companies had the same offer we

9    had the year before, 100k and above, 75 and above.  Offers were

10   all over the board.  And when you looked at the offers in

11   aggregate, there was only $10,000 that wasn't covered, between

12   40 and 50.

13       And so we didn't understand, you know, why it wasn't being

14   covered.  And so we decided that we would change our offer to

15   cover that $40,000, but in doing so, felt why not go for an

16   offer that's much simpler to understand.  When you come into the

17   IRS Web site, do you really know if your adjusted gross income

18   is going to be $50,000 and above?

19       And so we just decided to say, well, we're going to expand

20   our offer by 10,000.  It's going to provide a hundred percent

21   coverage.  Looking at the aggregate offers, a hundred percent

22   coverage would be provided, so why not just make the offer

23   that's simpler to understand, free for everyone.

24           THE COURT:  Well, I guess what I'm -- maybe you can

25   help me reconcile an offer early on on the FFA Web site of free

1    only if you make more than a hundred thousand dollars with your

2    marketing strategy to go after the value conscious customers.

3         Not that people who make more than a hundred thousand

4    dollars aren't value conscious, but certainly everybody who

5    makes less than $100,000 would also be looking for good value

6    too, particularly at free.

7         So how do you reconcile that marketing strategy in 2003

8    and 2004 with only making an offer on the FFA of free federal

9    tax preparation if you make more than 100,000?

10        THE WITNESS:  You're right in that you cannot identify

11   a value customer by demographics or, you know, what they drive,

12   what they eat.  They are across the spectrum.  And if you look

13   at who files free tax returns using our program, it's everybody.

14   We have high-income people, we have low-income people.  We have

15   complex returns that include multiple partnerships, S corps,

16   rental properties and we have people that earn just wages.

17   Everybody uses the free product.

18        Knowing that, because we've been offering free products

19   for a number of years before this, the primary thing that we

20   wanted to do was to distinguish our free offer in that space

21   where we knew we would have to compete head to head with 15

22   other companies.  Prior to that, you couldn't go to one space

23   and see every offer and see every company that's in the

24   industry.  You had to do a search.  And you would find the ones

25   that were advertising for that search term.

1          Here was going to be a head-to-head competition, and so

2     we felt that we needed to differentiate ourselves.  And it was a

3     shot in the dark.  We had no idea what people's offers were

4     going to be.  We also had no idea what the demand was going to

5     be.  The IRS had never done this before.  We had no idea if ten

6     people were going to respond or if a million people would

7     respond.  So as we came out -- as we planned what our offer

8     would be, we hesitantly said $100,000 and above because we did

9     not want to make an offer that would overwhelm our capacity.

10         Does that make sense?  We intentionally limited it

11    because we had no idea what the response was going to be.  This

12    was the first time ever that the IRS had put a promotion for DIY

13    software on their home page.  And their home page gets a lot of

14    traffic.  So we really had no idea what the response would be.

15    So when we made that offer, we were a little bit tentative

16    because we did not know what the response was going to be.

17    After the first peak and we understood what the traffic was

18    going to be and how many people were going to click on that

19    offer and we understood that by expanding our offer what the

20    impact would be on the people -- the worst thing you want to do

21    is make an offer and not be able to fulfill it.

22         We don't want to make an offer and have the capacity,

23    you know, to process, you know, 20,000 simultaneous customers

24    and have 40,000 people try and hit your Web page.

25         THE COURT:  So if I'm understanding the last part of

1    your answer correctly, you were limiting it to filers with over

2    $100,000 because you were somewhat concerned about your ability

3    to service everybody under $100,000 if they also went to that

4    Web site?

5            THE WITNESS:  We did not know what the response was

6    going to be, how many people were going to visit the IRS.gov.

7    It was completely new.

8            THE COURT:  So you were concerned about capacity?

9            THE WITNESS:  We were concerned about our capacity.

10           THE COURT:  I understand.

11           THE WITNESS:  So that's why we made a somewhat

12   restrictive offer and then why we opened it up to 50k and above.

13   Again, to provide differentiation from the other offers that

14   were there.  As I said, our assumption was as soon as a customer

15   went to the Free File Alliance page, they're going to pick one

16   of those -- 16 companies.

17           THE COURT:  I understand.  I'm sorry for the

18   interruption, Mr. Robertson.  Thank you.

19   BY MR. ROBERTSON:

20   Q   Sir, at the same time, were you selling the product on a

21   different Web page?

22   A   Yes.  We continued to promote our free to prepare, free to

23   print offers for both desktop and online at TaxACT.com.  But the

24   free E-filing was only available on the FFA.

25   Q   And how did the $10,000 and above free E-filing on the FFA

1    work for you?

2    A   100,000 and above.  But it worked fairly well.  It brought

3    us some good volume, but not anything outstanding.  It wasn't

4    until we changed the offer to 50k and above that we started to

5    get some very good Web traffic from the Free File Alliance.

6    Q   And how are you doing on your normal Web site in terms of

7    volume based on what you were doing on the FFA at that time in

8    2003?

9    A   Yes.  Actually, that was 2002 that we changed to 50,000.

10   Q   Okay.

11   A   We were doing good, but the FFA was a primary driver of our

12   growth that year.

13   Q   And then when you finally decided to go ahead and bridge the

14   gap of, I think you said, 40,000 to $50,000 AGI.

15   A   Yes.

16   Q   What percent in terms of total volume, if you know, were you

17   trying to bridge, that was either available on the FFA and you

18   were trying to add?

19   A   We were just trying to span that last 10,000 of AGI.  So it

20   was a very small percentage of the total population.

21   Q   Now, when you refer to yourself as a pioneer in offering

22   free E-filing, which of these events, if any, are you talking

23   about?

24   A   We speak primarily about 1998 as being the biggest thing

25   that we did as a pioneer.  But we did also reference what we did

1  in 2003 as being the first to provide free E-filing for

2  everyone.

3  Q   Now, in your view of the world, do you look at free as a

4  separate market segment?

5  A   No.  Free is an integral part of our brand.  It's an

6  integral part of our marketing strategy.  It is part of our

7  customers.

8  Q   And do you see others using free as a marketing strategy?

9  A   Yes.

10  Q   And you mentioned "try before you buy."  Do you see that

11  elsewhere in the marketplace?

12  A   Yes.  It certainly existed in other places outside of tax

13  software when we did it, and now it's relatively prevalent

14  across the Internet and mobile devices now.  You know, it is

15  pretty much the standard for distributing Apps on iPhones and

16  Androids and iPads and everything.

17  Q   And not to make you sound like Vice President Gore, but did

18  you invent this free model on the Internet?

19  A   The "try before you buy"?

20  Q   Yes, sir.

21  A   No.  Others were doing it at the time in different

22  categories.  And in fact, you know, at Parsons, even in tax, you

23  know, the Tax Mate, was also utilizing that "try before you buy"

24  model.

25  Q   And let me ask you this:  Do you know what Mint is?

1   A    Yes.  Mint is an anonymous financial planning tool.

2   Q    And what is it for?

3   A    It is for people to provide all of their financial

4   information and to get advice about what they could do

5   differently, but you can do it anonymously so you don't have to

6   give them your name, you don't have to give them your address.

7   But you do have to give them your account numbers.

8   Q    And do you know what kind of model they have in terms of

9   marketing?

10   A    It's free, yes.  It's all free.

11   Q    And has 2nd Story ever dabbled with Mint?

12   A    Yes.  We were in discussions with Mint to work together.  We

13   would have incorporated some tax content into Mint, but it never

14   came to fruition because they were acquired by Intuit before

15   anything ever happened.

16   Q    And after they were acquired by Intuit, do you still see

17   them out there with the free model?

18   A    Absolutely.

19   Q    Have you seen any other products that Intuit has where it

20   has this "try before you buy" type model?

21   A    Yes.  Intuit has applied free and "try before you buy" to

22   pretty much their entire product line:  Quicken, QuickBooks.  I

23   don't think they've done it with Quicken Payroll.  They may have

24   actually done, you know, try for 30 days on Quicken Payroll.

25   Q    And what, if anything, do you see as the current role of

1   free in the tax preparation market?

2   A    You know, free is at this point I would say the industry

3   standard.  The Free File Alliance has created the demand and

4   created the purpose for free services.  And in order to compete

5   in either value or premium, you have to have free products

6   because otherwise, people would simply go to the Free File

7   Alliance.

8   Q    And have you seen the assisted prep folks at tax stores just

9   skip over the model?

10  A    No.  As I said before, you know, free is affecting the whole

11  tax preparation industry and so, yes, you now see assisted prep;

12  H&R Block being the most prevalent announcing that they provided

13  or would prepare returns for free in their brick-and-mortar

14  stores.

15  Q    Would you ever contemplate now just moving away from the

16  free model and doing something else?

17  A    No.  That would be impossible.

18  Q    Why?

19  A    Well, certainly with TaxACT, that would break the chain

20  reaction, word-of-mouth advertising chain, but you have to have

21  a free product that's better than what you have on the Free File

22  Alliance.  Every player does.  You can't have your best offer on

23  someone else's Web site.  It needs to be on yours.  The

24  customers need to come to you so that you can build that

25  relationship.

1      Once they start going to the Free File Alliance, they could

2   pick anybody's product.  So you need to have a free offer on

3   your page that is better than what you offer on the Free File

4   Alliance.  And that's pretty much what everyone does now.

5   Q   What about Block?  Have you seen what they've done?

6   A   Yes.  They're aggressively promoting free in software and in

7   brick-and-mortar assisted prep.

8   Q   Now, after this acquisition goes through, what is your

9   expectation of what your role, if any, will be?

10  A   I will be leading the Block digital group.  That would

11  include the Block products, as well as the TaxACT product

12  lines.

13  Q   And what about the Web site?  Do you know where that's going

14  to go?

15  A   HRBlock.com.  Yes, we will be managing that.  I believe

16  that's probably in year two, but we will be taking over

17  providing that service.

18  Q   And in hosting that Web site, do you know today whether it

19  only has the online products on the H&R Block dot-com Web

20  site?

21  A   No.  It would be the complete corporate Web site for

22  investor relations, find a preparer, locate an office.  All the

23  information that is on their corporate Web site today plus more

24  would be hosted and supported, and our marketing group would do

25  the creative and content creation for that site as well.

1   Q   And what's your plan in terms of -- without getting into

2   prices -- I don't want to do that right now, we'll do that

3   later -- but just generally in terms of your plans, if any, of

4   marketing TaxACT and H&R Block At Home?

5   A   We would build off of what we're currently -- what each is

6   currently doing today.  So in terms of TaxACT, the free and

7   Deluxe and state programs would remain at their current prices

8   and current functionality.  As I said before, the rationale to

9   either increase or decrease prices post-close are the same as

10  they are today.

11      From the Block standpoint, from a strategy, would be, again,

12  to continue to position that product as a premium product and to

13  continue to aggressively use free to attract premium customers

14  to that brand.

15  Q   Now, sir, if we can get some sort of a timeline here.

16      Do you recall there being discussions with Block on a

17  possible acquisition back in 2009?

18  A   Yes, I do.

19  Q   And we heard some testimony that at some point that died.

20      Do you know why?

21  A   I don't know what their specific reasons were.  I know what

22  they told us and our investment bankers was that they stopped

23  that process because they didn't feel that the four founders

24  were sufficiently interested and motivated in the transaction.

25  Q   And as we sit here today, are the four founders interested

1   and motivated to do the transaction?

2   A    Absolutely.  And we were then too.  However, they provided

3   us absolutely no information about what we were going to do, how

4   we were going to do it, where we were going to report.  The 2009

5   process was very much a black box for us.  They just wanted us

6   to blindly sign on without knowing what we were going to do or

7   who we were going to report to.

8        So, yes, we were very skeptical about what we were getting

9   into and I guess that showed.

10  Q    And at some point later did a new process begin?

11  A    You know, it was really about three processes in the time

12  frame of about a little over a year.  You know, I talked with

13  Russ Smyth and his senior management team throughout the 2009

14  process, which they abandoned in about the October/November time

15  frame.

16       And then by, I think, mid-February of 2010, again, Russ

17  Smyth contacted me and said, "Hey, let's start talking again."

18  And that mini process continued from February until about May or

19  June.  And then he again abruptly said, "No, we can't finish

20  this.  I have issues here I need to deal with."  And so it

21  stopped.  It then comes to light a few weeks later that he's

22  leaving the company, and it starts again a third time with Alan

23  Bennett on July 19th and 20th.

24  Q    And how did that meeting arise?  Give us a history of that.

25  A    I don't remember exactly the date that Russ Smyth resigned,

1  but the day that it became publicly announced at about 4 o'clock

2  in the afternoon on that day, Russ Smyth called me and said,

3  "Hey, Lance, you probably saw the news.  I've resigned.  But

4  Alan Bennett is going to be taking over.  He is a great guy.  He

5  is here in the office with me.  I'd like to introduce you guys,

6  and we'd like to come to Cedar Rapids to talk to you about, you

7  know, restarting this process."

8  Q   And did he do that?

9  A   Yes.  Russ and Alan Bennett and several senior management

10 people from H&R Block came to Cedar Rapids on July 19th and 20th

11 for what I half jokingly refer to as a job interview for the

12 four founders.

13 Q   And why did you call it a job interview?

14 A   It was initially presented to us as it was going to be an

15 opportunity for us to learn more about the job.  That there was

16 going to be as much sharing.  So it was going to be a

17 traditional job interview.  You learn as much about the job that

18 you're going to get as explaining why you're qualified for.

19     And then the night before -- the meeting was to be on Monday

20 and Tuesday.  On Friday night at about 4:30, we got an e-mail

21 from Block with an agenda that had a whole lot more on it than

22 just, you know, let's get together and meet and talk.

23 Q   And did you do any preparation for this meeting?

24     MR. WAYLAND:  Your Honor, relevancy objection.  I don't

25 know where we're going here.  We haven't put it at issue the

1   back and forth during the discussions.  I don't really see why

2   we're wasting anybody's time on this, your Honor.

3          THE COURT:  Where are we going with all this?

4          MR. ROBERTSON:  I'm going to a document that counsel

5   used yesterday.  Just trying to provide context for it.

6          THE COURT:  Okay.  Let's proceed.

7          MR. ROBERTSON:  That's my next stop.

8          THE COURT:  Okay.  Good.

9   BY MR. ROBERTSON:

10  Q   Sir, please turn in your small binder to Tab No. 6.  Pardon

11  me.  Tab No. 9.  And tell us what GX 28-43 here is, sir.

12  A   This is a document that I created in preparation for the

13  meeting on July 19th and 20th.  And the expressed purpose of

14  this was to get my board of directors and my investment banker

15  off of my back because we got the agenda on Friday night.  It

16  included a lot of things that -- beyond just the typical

17  discussion.

18     One of the things that Block had on the agenda was they

19  wanted to have a discussion of product strategy and branding.

20  And because the previous process had ended with the four

21  founders being blamed for not being committed to the process, my

22  board and investment bank was immediately all over trying to

23  help us wanting to assist us in preparation.  And numerous phone

24  calls, numerous e-mails.  It got terribly annoying.  The four of

25  us, the four founders, had already been discussing what we would

1    do to discuss branding and strategy.

2        In the previous two processes with Block when I had

3    discussed this with Russ Smyth, we had had similar conversations

4    but it had been around utilizing two brands.  It had been about

5    utilizing TaxACT as the value leader.  At that time, Block was

6    not promoting free, they were not doing anything with free, and,

7    seemed to be scared of free.  And so free -- taxACT was going to

8    be the free vehicle for H&R Block because they weren't doing

9    anything with free at that time.

10       And now we're going to do this branding strategy again with

11   a new CEO.  And so as part of that preparation for the job

12   interview, we prepared for a discussion.  And to have a

13   discussion, we presume they wanted to go, again, with the

14   dual-brand approach because that was the approach that made the

15   most sense to us too, but in order to have a discussion, we had

16   to have something to compare and contrast it to.

17       So over the course of Friday, Saturday, there was a lot of

18   back and forths between the four founders preparing for that

19   discussion.  And this document was a summary of two options that

20   we intended to present at that July 19th meeting as a basis, as

21   a starting point, for discussing product positioning and

22   branding strategy.  So it was really just a tool for a job

23   interview.

24   Q    Did you actually give the document to the Block people?

25   A    No.  I only sent this to my board and to Jefferies to get

1    them off my back.

2    Q   All right, sir.  And there were two plans in here, a Plan B

3    and a Plan T?

4    A   Yes.

5    Q   Was there an equal discussion about both?

6    A   No.  You know, I laid out the very basics of Plan B, you

7    know, saying we could do one brand.  We could mix the current

8    products under that one brand.  Use the TaxACT free as it

9    existed at that point as a Block-branded product and promote the

10   Block -- promote free inside the Block brand.  And that's about

11   where the discussion ended.

12       Then they said, "Well, what's your other ideas?"  And so

13   then we started talking about the dual-brand approach.  And most

14   of the discussion -- we probably talked two or three minutes

15   about Plan B and a half hour, 45 minutes about a dual-brand

16   strategy.

17   Q   And the dual-brand strategy was Plan T?

18   A   Yes.  I mean, the discussion was all over the board, but it

19   more closely represented Plan T than Plan B.

20   Q   And who actually drafted this document, sir?

21   A   I did.

22   Q   And on the last bullet point on "Marketing," it says, "Keep

23   HRB free for use in search and limited home page exposure. Do

24   not promote to the outside"?

25   A   Yes.

1    Q    Where did this discussion go, if any, on that issue, sir?

2    A    That is exactly what we were doing at that time frame.   And

3    they didn't have any problem with continuing to do that,

4    although the discussion at that time was -- Russ Smyth was more

5    vocal as the out going CEO about the flack that he was getting

6    from franchisees and that he was very hesitant that we would

7    promote Block free, you know, on their home page.

8         As long as it was hidden, as long as you could only get to

9    it through search, free tax software, et cetera, he thought that

10   was appropriate.

11   Q    And that's what they were already doing at the time.   Did

12   that change at all after that, sir?

13   A    Yes.   Yeah, it changed for the next, which was last tax

14   season where Block aggressively promoted free with the Block

15   brand across all their preparation.

16   Q    At the time, were you aware of any product Block had on the

17   high end of their product group?

18   A    Yes.   It was their Best of Both product, which we discussed,

19   you know, in detail as part of this dual-brand strategy.   You

20   know, I said that the important part -- my view was that to

21   continue to promote the Block premium brand, we needed to

22   differentiate it specifically against Intuit and that we needed

23   to focus on permanent differentiators.   We couldn't get tied

24   into a feature war with Intuit.   We had a feature.   They had a

25   feature.   We had it the next year.   It's like a cold war race.

1    Instead, we needed to focus on those things that were unique

2   to those -- those assets that were unique to Block, which is

3   their thousands of experienced tax preparers, that reputation

4   and built-in tax expertise and knowledge.  And we needed to

5   incorporate that into the brand and specifically we needed to

6   continue a product like the Best of Both.  Perhaps not

7   specifically that, but it had to be built upon the Block

8   expertise and tie in to the assisted preparation model so that

9   there was someone to help you, someone to back you up in your

10   town.

11    It really addresses that lack of confidence that is a

12   problem that has plagued DIY software.  What happens to

13   customers when they have something that causes them to lose

14   confidence?  They go to assisted.  Eventually they come back.

15   The important part is keeping those customers in the Block

16   brand, providing them with the combination of tools that they

17   can choose from that meet their needs at any one point in time,

18   but that they can continue to choose and make that switch back

19   and forth between assisted, DIY, DIY premium, DIY value,

20   whatever meets their needs at that time.

21    Block needs -- and this was a discussion.  Block needs to

22   embrace that circular movement that's happening in the industry.

23   They need to embrace it, and that's how they're going to

24   separate and differentiate from Intuit.  They are uniquely

25   positioned to provide that service.  Best of Both is what

1    they're currently doing.

2         THE COURT:  And how will the dual-brand plan that I

3    understand from the briefing in this case is the plan

4    post-merger with TaxACT being a brand and H&R Block being a

5    brand, help accomplish what you just talked about?

6         THE WITNESS:  There are clearly customers in the tax

7    market that are value conscious.  Today, the Block brand does

8    not service them.  So we will continue to have -- in the

9    combined organization, you'll have the DIY premium, you'll have

10   the DIY value and you'll have the assisted.  There will be the

11   opportunity to tie in between assisted and TaxACT in the DIY

12   value.  It won't be just between Block assisted and Block DIY.

13        Regardless of what product meets your needs today, you

14   need to have the option to pick the product that meets your

15   needs in the future.  So if you use TaxACT today and you lose

16   confidence and you need help with assisted, you can go to a

17   Block store and the Block store will be able to access your

18   previous TaxACT return.  And the reverse will be true.  So when

19   you regain confidence and you've prepared a return -- had a

20   return prepared at a Block store, when you go to decide to go

21   back to DIY, you'll have your choice of doing DIY premium or DIY

22   value, and you'll have the opportunity to bring that data

23   forward to your return.

24        It's going to be the -- you know, provide the optimal

25   product mix to let the customer pick and choose what meets their

1    needs.

2    BY MR. ROBERTSON:

3    Q    I think not to put words in the Court's mouth, I think we

4    were trying to get out is this some plan to eliminate TaxACT?

5    A    No.

6    Q    Okay.

7    A    No.  Quite the opposite.

8    Q    I think that's what I was hearing.

9         Sir, has the plan changed since then, since July of 2010?

10   A    Yes.  I mean, Block is aggressively promoting free both in

11   their assisted and their DIY.  So we would have -- we will

12   incorporate that, and we will utilize that in the plan going

13   forward.

14   Q    And based on what's happened since then, do you think that's

15   a good or bad idea?

16   A    I think it's a good idea, yes.  Free is here to stay.  And

17   whether you're assisted, whether you're premium, whether you're

18   value, you know, free has universal appeal.

19        And like I said, we have to embrace that there's movement

20   amongst all these preparation options and free is the -- that

21   hook that applies to everyone.

22   Q    Now, in your experience having gone from scratch as you've

23   described and gone into the market with a tax preparation

24   software product on two different occasions, from your

25   experience, did the FFA help at all your company in expanding

1    and getting presence in the marketplace?

2    A    Absolutely.   It was a great springboard for us, and it is a

3    fantastic low-cost, free marketing channel today.   And every new

4    entrant into the market starts with the Free File Alliance, and

5    that's where they obviously can start building that reputation

6    and track record.

7    Q    In your experience, does the IRS check out the product

8    before it goes on there or can just anybody put a product on

9    there?

10   A    There is a minimal check that the IRS does.   It does not

11   check the accuracy of the return, but it does make sure that you

12   provide the services that you say you're going to provide and

13   that your product does function.

14   Q    Does it help at all in your experience for customers too

15   find you on an IRS.gov Web site?

16   A    Absolutely.   You know, certainly for startups and for

17   companies that don't have an established reputation, it is

18   absolutely a seal of approval, as is the IRS E-file logo which

19   everyone prominently displays on their Web sites.

20   Q    You mentioned a number of smaller competitors out there,

21   sir.   Do those competitors have any effect on the way you do

22   business, these smaller competitors in the value market?

23   A    Absolutely.   TaxSlayer and Free Tax USA are two that

24   influence us the most in the value segment.   Free Tax USA has an

25   offer and a model that is almost exactly like ours.   And in

1    fact, it's lower priced than ours today.  And that is of

2    concern.

3        Likewise, TaxSlayer has been very creative.  They're still

4    in the value segment.  They don't compete with the same offer,

5    but their offers are very creative and they are very creative in

6    their marketing such as sponsoring NASCAR, college football

7    games, and they're very creative and very efficient in how they

8    use their online marketing spend.  They're out there quite a

9    bit.

10   Q   Have you seen any activity in this business, this tax

11   preparation business, on social media?

12   A   Yes.  Social media is, you know, I would say a component of

13   virtually everybody's -- not just in tax software, in tax

14   preparation, you have to be in social media, especially in

15   places like Facebook.  If people are saying things about your

16   product, you need to respond.  But it's also a great way.  As an

17   emerging channel, it hasn't quite been figured out.  And there's

18   a lot of opportunity there to exploit social media, especially

19   for startups, whether it's Facebook, Twitter, et cetera.

20   Q   And have you seen any activity on mobile-type Apps?

21   A   Yes.  Intuit is leading the way there with a mobile App

22   called "SnapTax."  A lot of companies have Apps that you can

23   download that would allow you to do things like check the status

24   of your return once you've E-filed it to check the status of

25   your refund.  Intuit's, I would say, far out in front of

1    everyone else with their SnapTax product.

2       I haven't actually tried it myself, but you can use your

3    cell phone camera to take a picture of your W-2, and then it

4    imports the data into your tax prep right on your phone.  It is

5    limited to pretty simple returns, but they're clearly way out in

6    front of everybody else.

7    Q   And speaking of social media again, if you'd turn to

8    Tab No. 10, DX 5064.  And just identify this for the record, if

9    you can, sir.

10   A   Yes.  This is the social media plan that I believe that

11   our -- Greg Hollingsworth, who was in charge of our social media

12   group, put together.

13   Q   I think that's enough of this document, sir.  I think we all

14   know what social media is.  My children do.  I don't think I can

15   say very much about it.

16      Turning to shrink-wrap software.  You mentioned to counsel

17   that you had tried that once before.  When was that?

18   A   Well, we've never tried it directly, but we have at various

19   times in our history, I think we were there probably in 2000,

20   2001, 2003.  I think there was three different vendors that took

21   our product to retail.  And each time they did it once or twice

22   and then decided not to do it again.  It was not a successful

23   venture for them.  And each one tried a slightly different

24   tactic.

25   Q   Why haven't you tried it yourself?

1    A    It's very expensive and not something that I felt that there

2    was a return on investment on.  Especially with the TaxACT

3    pricing, as the value leader, our product is very affordably

4    priced and to start sharing that with third parties, nobody

5    makes any money.  There's just not enough to share.

6    Q    And without getting into the actual contract documents,

7    which we'll do in a closed session, can you tell us how it came

8    about that you actually offered a shrink-wrap product just last

9    year through a distributor.

10   A    Yes.  Avanquest, a distributor, approached us and asked if,

11   you know, they could get, in essence, a licensing-type deal to

12   take our product to retail.

13   Q    And without getting into specifics, did you tell them what

14   to do?

15   A    No.  We really have no expertise at retail and our

16   experience has all been bad.  The only thing we did -- if there

17   was anything -- if there was any discourse at that time, it was

18   are you sure you want to do this?  You understand you're

19   probably going to lose money.  Why are you doing this?  We

20   wanted to make sure they were serious and not just, you know.

21   Q    And without getting into the nitty-gritty details, was it a

22   success last year?

23   A    You know, I don't know how much money they made.  I didn't

24   really deem it a success.  No, at 20,000 units, it's not a big

25   event.  It is a nonevent, which is consistent with our past

1  retail experience.

2  Q   Now, what I'd like to do is before we go into the

3  nitty-gritty details of things, just talk generally about the

4  efficiencies, the synergies of the merger, all right, sir?

5  A   Okay.

6  Q   And I think you're aware of what you don't want to disclose

7  to the public and what you do, so just make sure I keep the fine

8  line here.

9  A   Okay.

10  Q   How far back had you had discussions, if any, with Block

11  about the synergies of this deal?

12  A   It was brought up in -- very loosely during the 2009 process

13  but we learned nothing.  I would guess that -- I would say that

14  the only thing that we really learned in 2009 was that they did

15  have three development teams that created their tax software and

16  that the core synergy was going to be in consolidating that.

17      So Block has an entire development staff that creates their

18  desktop product.  They have an entirely different and separate

19  staff that creates their online product.  They have a completely

20  different and separate staff that creates the software that they

21  use in their assisted preparation business.

22      And we have one staff that, in essence, creates all three of

23  those products.  Our one staff is smaller in numbers than any

24  one of their three.  So at a high level, there was immediately

25  an understanding that there was going to be a tremendous amount

1  of synergies from moving their development in operational

2  infrastructure to utilize the TaxACT infrastructure.

3  Q   Did you ever get any details back in 2009 as to what Block

4  wanted to do?

5  A   No.

6  Q   Later in 2010, did you?

7  A   Yes.  We, again, starting with that meeting where Alan

8  Bennett and Russ Smyth came to Cedar Rapids on July 19th and

9  20th, we got, again, confirmation of what we had learned in 2009

10 about how grossly inefficient they were in the software area

11 and, you know, general discussion on other efficiencies that

12 could be obtained but no specifics.

13     And we had come to that meeting -- again, the previous

14 process had been -- the failure of the previous process had been

15 blamed on us, and we had even at that time asked, "Well, what is

16 the job we're going to do?  What is it you're expecting of us?"

17 So we had come to that meeting on July 19th and 20th, 2010, with

18 a fairly comprehensive list of questions about what is it they

19 do there and how they do it so that we can understand what it

20 was we were going to be taking over.

21     But we didn't get any answers at that detailed level simply

22 because the people that were there, Russ and Alan, weren't in a

23 position to answer our questions.

24 Q   Did there come a time when you were able to get the answers

25 to those questions?

1   A    Yes.  We sent them a couple of documents.  We sent them a

2   list of questions about marketing and operations, and then we

3   sent them a separate document about product development and IT.

4   And I believe we sent both of those on July 27th of 2010.  We

5   got immediate feedback that the marketing list was way too

6   detailed, and they weren't going to be able to provide all of

7   those answers and that we needed to prioritize what we wanted

8   answers to.  So we had to reduce that list, and we sent them a

9   reduced list then on the 28th.

10       But we didn't get any answers until I had another

11  face-to-face meeting with Alan Bennett -- just Alan and I -- on

12  August 3rd.  And at that meeting, Alan came to Cedar Rapids, and

13  I think he came to Cedar Rapids to address the issue about

14  founders commitment and interest in this transaction.  The

15  reason that the previous transaction, we were told that it had

16  failed.  And -- excuse me; my throat's getting dry.

17       So he came to that meeting and explained to me a lot more

18  about the role that he saw for myself and the four founders of

19  2nd Story Software within --

20  Q    What did he want you to do?

21  A    He wanted us to take over the Block digital product.  And it

22  was obvious that he was very impressed with the unique asset

23  that the four founders represented.  We had a 20-year history of

24  working together and not only working together, but being

25  successful in working together; in essence, building two

1   products from scratch.

2        And he was very -- he admired the corporate culture of

3   entrepreneurialism that we had built at 2nd Story.  It wasn't

4   just the four founders; it was everybody in the company that had

5   the desire and the interest in controlling costs and providing

6   the best customer experience possible.  And he wanted to make

7   sure that the four founders were going to stay in Cedar Rapids,

8   and that TaxACT was going to remain in Cedar Rapids, and that

9   the digital business would be moved to Cedar Rapids to

10  perpetuate that entrepreneurial culture.

11        MR. ROBERTSON:  Your Honor, I'll be going into more

12  detail later.  If your Honor wishes to, it would be a good point

13  for a break.  I do anticipate going into confidential

14  material.

15        THE COURT:  Okay.  Well, what -- let me just see.

16  Mr. Wayland, because what I was thinking about doing is doing

17  all of the closed session all in one shot and then not going

18  back into a public session with Mr. Dunn.  So if that would work

19  with the questioning of Mr. Wayland and with you, perhaps we

20  can -- I don't know -- how long do you think that your redirect

21  will be?

22        MR. WAYLAND:  15, half an hour maybe.  I don't know.

23  We can stop right now and be more efficient.  It's a closed

24  session.

25        THE COURT:  Then we would have to go back to the public

```
 1    session with Mr. Dunn.  I think what I'd like to do -- just one
 2    second.  If we can go off the record for a second.
 3         (Discussion off the record.)
 4              THE COURT:  So Mr. Wayland, proceed.
 5              MR. WAYLAND:  Your Honor, may I approach the witness?
 6              THE COURT:  Yes, you may.
 7              MR. WAYLAND:  I'm going to hand to you what we've
 8    marked as Government Exhibit 9.  I'm going to hand one to the
 9    witness, your Honor.
10         (WHEREUPON, a certain document was marked Trial Exhibit 9
11         for identification as of September 8, 2011.)
12                        REDIRECT EXAMINATION
13    BY MR. WAYLAND:
14    Q   Mr. Dunn, I hate to revisit ground we've plowed before, but
15    just so we leave no mistake about where these documents are
16    coming from, we've put before you what we've marked as
17    Government Exhibit 9.  Again, this is -- if you look at the
18    third page of the document, it's the 2009 Competitive Price
19    Comparison.
20         Do you see that?
21    A   Yes.
22    Q   All right.  And if you go back to the first page, again,
23    this is information that comes from your counsel describing the
24    nature of the document.  If you go down, you'll see there's a
25    number that says "2SSDunnLE003185."
```

1        Do you see that?

2    A    Yes.

3    Q    Do you see that that matches the number on the first page of

4    the attached document 003185.

5        Do you see that, sir?

6    A    Yes.

7    Q    If you go down to the bottom of the page, it says, "File

8    Path."  This is the bottom of the first page of Trial Exhibit 9.

9    It says, "File Path:  Dunn, Lance hard

10   drive/documentsandsettings/Lance/mydocuments/competitive

11   analysis."

12       Do you see that, sir?

13   A    Yes.

14   Q    Does seeing this path give you any better recollection of

15   where this document -- how this document wound up in your

16   files?

17   A    No.  I mean, clearly it came from my hard drive, but no, I

18   don't recall this document specifically.

19   Q    And you see that it was -- "dup custodians" are listed at

20   the top.  That means that it resided in other people's files

21   too.

22       So Kris Peterson, who is Kris Peterson?

23   A    Vice president of marketing.

24   Q    And who is Joanne Kintzel?

25   A    She is the CFO.

1    Q    And who is Cammi Greif again?

2    A    Chief marketing officer.

3    Q    All right.  You can put that aside.

4         Now, sir, let me see if I can understand a few things about

5    incentive.  Today, where you sit as CEO of TaxACT -- we're on

6    the right side of the column as you've described it, and we're

7    looking at the chart where you described TaxACT on the value

8    side, right?

9    A    Yes.

10   Q    And today, you'd want customers on the left side, anybody,

11   if you can get them to come over to the right side, you'd take

12   them, wouldn't you?

13   A    I'll take customers from any source, yes.

14   Q    And that's one of the reasons you have an ad out that

15   compares the $25 price of an Intuit product with the 13.95 price

16   of a TaxACT product, right?

17   A    We tried to show the pricing transparency issue in 2008.

18   Was not successful for us, but we tried it.

19   Q    All right.  You tried it because you thought if you could

20   convince people that you had a value at 13.95 versus the 25

21   Intuit, they should come over to your side of the world,

22   right?

23   A    No.  We were more concerned with people that were evaluating

24   their options coming into the market.  That they needed to make

25   sure that as they were looking at their options and comparing

1    our solutions with that of TurboTax, that they understood what

2    the pricing was going to be.  We really weren't concerned

3    about -- the people that had already used TurboTax, they already

4    knew what the state price was.  I didn't need to tell them.  The

5    only people that I needed to tell the state price to were people

6    that hadn't used TurboTax before.

7         So I was more concerned about people that were coming into

8    the market.

9    Q    So you didn't think anybody was using TurboTax and saw that

10   you were -- had just as good a product, a lot cheaper.  You

11   didn't think anybody was going to come over to your side of the

12   world, right?

13   A    It's a money-losing proposition to try and move people from

14   one digital solution to another.

15   Q    Well, don't you have an incentive to get people who are

16   paying 25 bucks now to come over and pay 13.95 for your

17   product?

18   A    I have an incentive to move anybody regardless of their

19   preparation solution last year to move to my product.

20   Q    Right.  So if people are at Block and they are paying $25

21   right now and you've got a product that's 13.95 and you think

22   it's just as good, your motivation is to get those people to

23   come over to your side, right?

24   A    Yes.  But only those people that are value conscious.

25        Only those people that are value conscious and price

```
 1   conscious are going to make that switch.  And they chose Block

 2   for a reason to begin with.

 3   Q   But there are some people you think you could get to come

 4   over who are paying $25.  If you can convince them to come over

 5   for 13.95, you'll take them, right?

 6   A   I would take them, but I'm not convinced that it's worth --

 7   you can't advertise to do that.  That's why we don't run, you

 8   know, competitor-specific ads.

 9   Q   All right, sir.  And today, two companies are separate.

10   Block doesn't want anybody to go over to the 9.95 side.  If

11   you're that president of Block, you don't want the person who is

12   paying you $25 to head over and pay 9.95, right?

13   A   In the environment that you're describing, it's more

14   important to keep them in the brand.  If someone is going to

15   leave the brand because they're not happy with the value that

16   you're providing, it would be more important to provide them

17   with the solution that they're looking for but keep them in the

18   brand.

19   Q   This is a pretty simple question.  If you're the head of

20   Block and you've got a product for $25, you'd rather keep that

21   person buying your product than going over to you and buying

22   your product for 9.95.  That's pretty simple.

23       Yes or no?

24   A   Yes.

25   Q   And today, your motivation is to keep the guy who is paying
```

1   9.95 not to go over to the other side and pay $25 to Block,

2   right?

3   A   Yes.  We try to keep all of our customers happy.

4   Q   All right.  And after the transaction merges, you won't have

5   that separate motivation anymore and Block won't have that

6   separate motivation anymore because you're sort of mixed up now,

7   aren't you?

8   A   We will be combined.

9   Q   And if you're losing those $25 customers, they bring a lot

10  more to the bottom line.  That's not such a great thing, is

11  it?

12  A   If we're going to lose them, we're probably going to lose

13  them anyway.

14  Q   All right, sir.  Now, Block and 2nd Story are both market

15  free, as you've said, right?

16  A   Yes.

17  Q   And you have different ways of marketing free?

18  A   Yes.  We are marketing free to attract premium customers

19  with Block and marketing free to attract value customers with

20  TaxACT.  That's a determination that that customer sees once he

21  responds to the free ad.

22  Q   And you have a big motivation to use your free to get those

23  premium people to come over to your side, right, if you can get

24  them over?

25  A   Today, then, when?

1    Q    Now.

2    A    Now?

3    Q    Yeah.

4    A    Now?

5    Q    Yes.

6    A    Yes, we're trying to get everybody to try to come to

7    TaxACT.

8    Q    And you're differentiating your product right now --

9    remember we did that little fishing story with two of you with

10   your nets out in the water?

11   A    Yes.

12   Q    You need to differentiate your free product from H&R Block's

13   to get people to come into your net, right?

14   A    Yes.  But the biggest differentiation is when you get to the

15   TaxACT site.

16   Q    All right, sir.

17          THE COURT:  While you're moving on to another point,

18   you made an interesting statement, Mr. Dunn, when you said that

19   it was a money-losing proposition to try and move people from

20   one digital solution to another.

21          Would you explain what you mean by that.

22          THE WITNESS:  That, you know, to try and convince

23   someone to leave the digital solution that they have already

24   picked to come to yours, it's not worth it.  You can't -- the

25   cost of the advertising versus the returns that you're going to

```
 1    get isn't worth the investment.  So for example, we have done

 2    some bidding on competitive search terms, for example.

 3              THE COURT:  By that, do you mean that it just

 4    doesn't -- you know, if a customer's already with TaxSlayer, is

 5    already with H&R Block or with TurboTax, you've written off this

 6    consumer?  It's a money-losing proposition to try and get them

 7    to use TaxACT?

 8              THE WITNESS:  To specifically target them, yes.  To

 9    have a broadcast message out there and to cast a broad net and

10    to catch any of those that are looking, you know, to move,

11    regardless of their preparation method, works.  But to

12    specifically target and say, "Hey, TaxSlayer customers, you're

13    paying 9.95 today, we'll give you 7.95," no, it won't work.

14              THE COURT:  Is that because do-it-yourself software is

15    software and once people have downloaded software, imported all

16    their data to that software, it's very hard to get them to move

17    to another software solution?

18              THE WITNESS:  Yes.  There is a stickiness.  There is a

19    familiarity.  You're picking a tool that you feel comfortable

20    with.  That could be the interface, it could be the method that

21    they gather the data.  But you are comfortable and familiar with

22    that after you've used it.  To make a change and to suddenly do

23    something differently is unfamiliar and uncomfortable.  And the

24    data is a big tie-in, yes.

25              THE COURT:  Because I have seen -- not to bring us too
```

1    far off course, but in your document in the big notebook 13

2    which is your -- you don't have to look at it.  I'll just read

3    it to you.  This Government Exhibit 28-17 which has been talked

4    about by both parties, there's one section of it that hasn't

5    been talked about, and it refers to a bullet point for future

6    planning.  And it says, "Discussed if there is a way to import

7    TurboTax online tax data as a potential plan."

8         So was -- have you thought about ways to remove -- to

9    unglue, shall we say, to use your stickiness metaphor, to unglue

10   some customers from their digital do-it-yourself solution to try

11   out TaxACT?

12        THE WITNESS:  Yes.  It's impossible to import all of

13   their data because that data resides on a server at Intuit and

14   we're not going to be able to get access to it unless that -- we

15   can't get there.  But we do, this last year, provide a PDF

16   import so if you used any product, whether it's brick-and-mortar

17   assisted or another digital solution, there's a very good chance

18   that they gave you a copy of your return from last year as a

19   PDF, an electronic version of it.

20        And so we do now have an option to retrieve data from

21   that, in essence, paper copy of your return.  And we're trying

22   it, but the results at this point are that, A, we're not getting

23   a lot of people doing it; and B, they're not very happy with it.

24   Because the amount of data that you can pull off of that paper

25   return is pretty much name, address, Social Security numbers and

1    children's names and children's Social Security numbers.

2           When comparing that import option with what you would

3    get if you import, you know, the data in the native format, then

4    you can get carry forwards.  You know, if you have your itemized

5    deductions limited or passive activity loss limitations, you can

6    carry that information forward.  The details don't exist on the

7    paper return.  Pretty much all we can get -- and the other

8    information that is repetitive-like W-2 providers, banks, 1099

9    providers, that's also not available on the paper return.

10          So in comparing what you would get importing from year

11   to year within a product versus what we can offer on PDF, people

12   are not very happy with it.  I'm not sure we're going to

13   continue it.

14          THE COURT:  Okay.

15          MR. WAYLAND:  Thank you, your Honor.

16   BY MR. WAYLAND:

17   Q   Mr. Dunn, let's talk about the concept of value again.

18   Value is your basic business proposition, right?  We offer more

19   value than anybody else out there?

20   A   That is a component of it, yes.

21   Q   All right.  So if you come to us and buy our product, you

22   get better value than if you go to Intuit or Block, right?

23   A   Value is in the eye of the beholder, yes.

24   Q   But that's what you're -- we've seen document after

25   document.  That's what you say.  We have high value, low cost,

1   right?

2   A    Right.  And that appeals to a customer that is value or cost

3   conscious.

4   Q    Okay.  I'm sorry.

5   A    It is, you know, whatever makes you comfortable to sign that

6   line at the bottom that says, "I believe this return is true,

7   correct and complete."  If TaxACT provides that solution, that's

8   great.  But if you feel you need a safety in numbers from Intuit

9   or if you feel you need the backup of H&R Block, that may be

10  what that customer needs.

11  Q    Yeah.  Value, the way you're using it, is a quality, right?

12  This is our quality.  We have value.  That's a quality about

13  yourself that you're selling to people, right?

14  A    Yes.  We appeal to customers who are looking for a

15  high-quality product at a low cost.  And that's value.

16  Q    That's your value proposition, right?

17  A    Yes.

18  Q    And each company on these charts has a value proposition of

19  some kind.  Come to us, we've got brand, that's our value,

20  right?

21  A    Yes.

22  Q    Okay.  Sir, if you would turn to Tab 2 of the binder that

23  Mr. Robertson gave you.  It's Exhibit DX 2200.  This is the

24  survey that Mr. Robertson had you look at.

25  A    Yes.

1   Q    First of all, do you have any particular training in the use

2   or evaluation of survey data?

3   A    No.

4   Q    All right.  And this survey was prepared by a company called

5   "Zoomerang"?

6   A    That's the tool that was used to execute the survey.  It is

7   an e-mail survey tool.

8   Q    Who did the survey?

9   A    Our marketing department would have used it -- would have

10  prepared the survey using Zoomerang.

11  Q    All right.  If you'd turn to the second page down at the

12  bottom, it says, "Copyright Market Tools, Inc., all rights

13  reserved."

14       Do you see that?

15  A    Yes.

16  Q    Is this your document or is this a document prepared by some

17  company for you?

18  A    Zoomerang is a piece of software that allows you to send out

19  surveys.  They get the responses.  They tabulate the results.

20  So yes, this particular report comes out of their software

21  product so, yes, it is copyrighted.  You buy a license to it,

22  and you can access this information online for a set period of

23  time.

24  Q    And you weren't -- I'm sorry.

25  A    You have to re-up if you want to continue to access your old

1    surveys.

2    Q    You weren't the person who actually conducted the survey,

3    right?

4    A    No.

5    Q    How many people responded to the survey; do you know?

6    A    Looks like 983.

7    Q    983.  What's your customer base right now?

8    A    For consumer tax software?

9    Q    Tell me any of your -- however you want to measure it, sir.

10   A    Yes.  About 5 million.

11   Q    So you got 900 responses, got 5 million people.  You're

12   quite happy to tell us about these results have meaning?

13   A    No. 1, you're taking a pretty small slice here of the

14   taxpayers.  You're looking for people that were new in one year

15   and didn't come back and online.

16       But, you know, for our purposes, yes, this confirms what we

17   believed we already knew.  This was confirmation.

18   Q    Do you know anything about nonresponse bias in survey

19   results?

20   A    No.

21   Q    If you look at Question No. 2, which is on the first page of

22   the survey, it says, "If you didn't file your 2006 federal

23   income tax return with TaxACT online, how did you file?"  And

24   then I guess it has a series of responses.

25       Were these responses provided for the survey respondents or

1    did somebody tabulate written responses?  Do you know one way or

2    the other, sir?

3    A    I do not know.

4    Q    All right.  The list, as far as I can see, sir, has

5    companies that are on the left side of the chart that you made

6    yesterday, the premium side?

7    A    Yes.

8    Q    So I don't see anybody on the value side that's listed; is

9    that right?

10   A    Yes.

11   Q    Okay.  And I see that TurboTax is the -- "If you didn't file

12   your 2006 federal income tax, how did you file it?"  And the

13   biggest number is TurboTax.

14       Does this mean people who went -- that's the largest

15   destination of people who left TaxACT went to TurboTax?

16   A    Prepared by hand is larger at 22 percent, and the

17   combination of accountant and walk-in offices is larger at

18   19 percent for assisted.

19   Q    Yeah.  I should have been clear.

20       With respect to digital competitors, right?

21   A    With respect to digital, yes, it's the largest.  But I think

22   we've been talking about Intuit being 20 times bigger than

23   TaxACT.

24   Q    All right.  Well, it's your survey.  You offered it in.  I'm

25   just going through it with you.

1    Go to page 3, sir.  It says -- second question, "If you

2  didn't file your 2006 federal income tax return with TaxACT

3  online, how did you file?"

4    And then if we look at the largest respondent in terms of

5  where they went, it says "TurboTax Online"; is that right?

6  A   Yes.  I was looking at who the survey went to, but yes.

7  Q   And again, that set of answers doesn't appear to have been

8  an option for finding out if anybody went to a value player if

9  they left tax online, right?

10  A   I don't know what the options were for the people that

11  completed the survey.

12  Q   At least the options that are listed here, it doesn't list

13  the value provider, does it?

14  A   It's not completed -- it's not included in this summary, no.

15  I don't know what's in "Other, please specify."

16  Q   A question of the vibrancy of your value competitors.  I

17  think you talked about TaxSlayer and TaxHawk.  And one of them I

18  think you said, sir, has sponsoring NASCAR ads, I think you

19  said, right?

20  A   Yes.

21  Q   And I think you said they were, quote, "very creative in

22  what they did"?

23  A   Yes.

24  Q   And they have been around for a while, sir?

25  A   Yes.  TaxSlayer has been around for quite a while.

1   Q    And TaxSlayer and TaxHawk have been actively competing

2   against you, and you're paying close attention to them.

3        You're worried about them, right?

4   A    Yes.

5   Q    Okay.  In all the documents we've seen either shown by your

6   counsel or by me listing these competitive charts, I didn't see

7   them listed.

8   A    I believe TaxSlayer was on one of those charts.

9   Q    Would you agree, sir, that for the most part, when you're

10  comparing your competitors, you've been limited to Intuit and

11  H&R Block?

12  A    Depends on the context.

13  Q    All right.  But the documents we've been looking at, right?

14  We can look at them again, but I think you'll agree that the

15  ones, for example, in the offering memoranda when you actually

16  listed your competitors, instead of just talking about the

17  market generally, it was Intuit and H&R Block and TaxACT,

18  right?

19  A    Yes.  And I believe I covered why they were there.

20  Q    Now, sir, you have a financial interest in this merger,

21  don't you?

22  A    Yes.  I am a shareholder in 2nd Story Software.

23  Q    And what's the value of those shares, your payout as a

24  result of this transaction?

25  A    Depends on how much this costs.

1    Q    Can you answer my question, sir?

2    A    Yes.

3    Q    How much?

4    A    Roughly 20 million.

5          MR. WAYLAND:  All right.  I have no more questions,

6    your Honor.

7          MR. ROBERTSON:  Your Honor, may I inquire?

8          THE COURT:  Yes, please.

9          MR. ROBERTSON:  I promise I will keep it short.

10                        RECROSS-EXAMINATION

11   BY MR. ROBERTSON:

12   Q    Just so we don't have any misunderstanding, sir, on Tab 2 of

13   your small binder survey that your marketing department

14   conducted, counsel said there were only 983 people who

15   responded.

16          MR. WAYLAND:  No.  Actually, your Honor, the witness

17   said that, not me.  I asked the witness.

18   BY MR. ROBERTSON:

19   Q    Well, then, let's turn to page 3.  Do you see on page 3,

20   1106 responded on that one?

21   A    Yes.

22   Q    Are these the same people that were on the first page?

23   A    No.  This is a different audience.

24   Q    And when you answered counsel's question and said this was a

25   particular slice, I think your word was, what did you mean by

1    that?

2    A    It's a very specific audience that each survey was sent to.

3    So in the example of page 1, that was to new -- customers who

4    were new to TaxACT online standard and completed their returns

5    in 2006 and then did not come back for 2007.

6    Q    And going to page 5, do you see where there's a total of

7    2,656?

8    A    Yes.

9    Q    Are these the same people we've already started to count up

10   on the different pages?

11   A    No.  These would be unique again.

12   Q    And turning then to page 7, 2,239?

13   A    Yes.  That would be unique.  They're not the same as

14   previous.

15   Q    If I want to know what the total at least for the document

16   that responded that counsel was asking you about, do I look at

17   one of these numbers or do I add them together?

18   A    I would add them together.

19   Q    And counsel asked about your compensation or your interest

20   in this deal.  As you go forward, do you have any incentive in

21   terms of what you get out of this deal as to what happens after

22   you start running the entire software division of Block and

23   TaxACT?

24   A    Yes.  I have a base salary and an incentive compensation

25   plan and stock options.

1  Q    And all those incentives that you get, can you just not push

2  the TaxACT product as hard as you've been pushing it and get

3  that?

4  A    No.

5  Q    How does it work?  What's your understanding of it?

6  A    We haven't worked out specifics because we're not sure when

7  the deal will close so it's difficult to establish specific

8  goals until we know when it starts, but some portion of it will

9  be tied to achieving the synergies, the efficiencies that we

10 talked about, and some percentage of it will be tied to the

11 overall performance of the division.

12 Q    And do you think if you took a strategy where you'd lose

13 700,000 to a million customers, would that be good for your

14 compensation?

15 A    No.

16       MR. ROBERTSON:  All right.  That's all I have, your

17 Honor.

18       THE COURT:  All right.  Let me just see if there's any

19 re-redirect.  Is there any re-redirect?

20       MR. WAYLAND:  Just one question, your Honor.

21                    FURTHER REDIRECT EXAMINATION

22 BY MR. WAYLAND:

23 Q    Be good for compensation if you could get people to pay more

24 for their product, right?  More money in, compensation goes

25 up?

1   A    Like I said, we haven't worked out specifics.

2   Q    It would be based on how much money you bring in, right?

3   A    I presume that, yes, revenue and profits will both be a

4   determining factor for the division.

5   Q    So if you get more people to pay more money for a product,

6   looks like it works out pretty well for you after the deal is

7   done, right?

8   A    Provided that you make the bottom line, but it's not just a

9   one-year deal, it's multiple years, so I want to make sure I hit

10  the next goal and the next goal after that too.

11              MR. WAYLAND:  All right.  Thank you.

12              THE COURT:  Anything else?

13                      FURTHER RECROSS-EXAMINATION

14  BY MR. ROBERTSON:

15  Q    Simple question, sir.  Can you raise prices on TaxACT and

16  make more revenue?

17  A    No.  I mean, you might make it year one, but the whole model

18  falls apart and you're going to lose customers wholesale and the

19  whole thing falls apart.

20              MR. ROBERTSON:  That's all I have, your Honor.

21              THE COURT:  Mr. Wayland, I presume --

22              MR. WAYLAND:  No, your Honor.

23              THE COURT:  Okay.  Good.  All right.  Then we are going

24  to break for lunch until 5 after 2:00 when we will then go to

25  our closed session.

1          For purposes of the spectators, can I get an estimate

2   from counsel of how long you think the closed session will be so

3   that they will know how long their lunch break can be.

4          MR. ROBERTSON:  I'm guessing it's going to be about an

5   hour for both of us, but I don't know how many questions he has.

6   Could be an hour and a half.

7          THE COURT:  Okay.  Good.  Thank you.  I'll see you back

8   at 5 after 2:00.

9        (Lunch recess taken at 1:03 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, Lisa S. Schwam, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8

9   _ _ _ _ _ _ _ _ _ _ _ _ _ _ __ _          _ _ _ _ _ _ _ _

10  SIGNATURE OF COURT REPORTER                    DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```