```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,     :  Civil Action
                                   :  No. 1:11-cv-00948
 4              Plaintiff,         :
                                   :  September 9, 2011
 5   v.                            :  Afternoon Session
                                   :
 6   H&R BLOCK, INC., et al.,      :  Washington, D.C.
                                   :
 7              Defendants.        :
     ...........................:
 8

 9

10        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING - DAY 4
                 BEFORE THE HONORABLE BERYL A. HOWELL
11                 UNITED STATES DISTRICT COURT JUDGE

12

13   APPEARANCES:

14   For the Government:      Mr. Joseph Wayland
                              U.S. Department of Justice
15                            950 Pennsylvania Avenue, NW
                              Washington, D.C. 20530
16                            (202) 514-1157
                              joseph.wayland@usdoj.gov
17
                              Mr. Lawrence E. Buterman
18                            U.S. Department of Justice
                              450 Fifth Street, NW
19                            Washington, D.C. 20530
                              (202) 532-4575
20                            lawrence.buterman@usdoj.gov

21   For the Defendants:      Mr. J. Robert Robertson
                              Mr. Corey W. Roush
22                            Hogan Lovells
                              555 Thirteenth Street, NW
23                            Washington, D.C. 20004
                              (202) 637-5600
24                            robby.robertson@hoganlovells.com

25
```

1    APPEARANCES (Continued):

2    Court Reporter:              Ms. Lisa Schwam, CSR, CRR, RMR
                                  Official Court Reporter
3                                 Room 4702-A, U.S. Courthouse
                                  Washington, D.C. 20001
4                                 (202) 354-3238
                                  LisaSchwam@aol.com
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by machine shorthand, transcript
     produced by computer-aided transcription.

1                             I N D E X

2   WITNESS                   DIRECT    CROSS    REDIRECT    RECROSS

3

4   DR. FREDERICK WARREN-BOULTON

5   By Mr. Wayland              4                  92

6   By Mr. Robertson                    19                    104

7

8                           E X H I B I T S

9       NUMBER                      MARKED FOR IDEN    ADMITTED

10  DEFENDANT EXHIBITS:

11      Trail Exhibit 1                  55

12      Trial Exhibit 2                  31

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2            MR. WAYLAND:  May we resume, your Honor?

3            THE COURT:  Yes, let's do that.

4            Dr. Warren-Boulton, please return to the stand.  And

5    please proceed.

6                   DIRECT EXAMINATION (Continued)

7    BY MR. WAYLAND:

8    Q   Dr. Warren-Boulton, we were talking about -- I started to

9    talk about efficiencies at the break.

10           And so just to reorient ourselves, you had considered the

11   efficiencies that Dr. Meyer claimed that the transaction

12   produced?

13   A   Yes.

14   Q   And why don't we just pick up your testimony there.

15   A   Well, if I can remember where I was, it was to say that I

16   understand that Dr. Z is looking to see as to whether or not the

17   efficiencies are verifiable and merger specific.

18           And my only -- I want to stick to my comparative

19   advantage and say as an economist in this, I would only add two

20   things.  The first is that I understand from Dr. Meyer's report

21   that she may be arguing that there are reductions in fixed costs

22   and that, in some sense, those should be taken into account in

23   the analysis.  Looking at the effects of a merger on consumers

24   and prices, cost improvements or efficiencies should only be

25   taken into account to the extent that they are variable costs

1  and not fixed costs.

2       And that's, I think, a generally very well agreed-upon

3  principle in my area.   If there is a change in fixed costs, it

4  may make the parties better off, but it doesn't change their

5  incentives as to what price to choose.

6       I think it's an important enough point so since I've

7  only done one diagram, if I could do a second.

8       THE COURT:   Please go ahead and use the board.   Let us

9  just get the microphone set up.   We had our technical expert

10  look at this lapel mike and hopefully it will work now.

11  BY THE WITNESS:

12  A    I'm not going to draw too many supply curves.   I'm just

13  going to draw a little hill.   And I want to imagine that you've

14  got a line here (indicating).   And these are the profits that

15  the firm is earning.   To an economist, that's what a firm tries

16  to maximize because that determines its share value and that

17  determines the value of the corporation.

18       And in deciding how much -- what maximizes profits, you

19  ask the question, you know, what's the optimal price, what's the

20  equivalent optimal quantity that I'm going to sell?   And if you

21  start off this firm, and imagine that you have a firm and it's

22  about to start production but it hasn't -- it's not producing

23  anything at all.   Then it has fixed costs that it has to incur.

24  And the definition of a "fixed cost" is a cost that you incur

25  even if you don't produce any output, okay.

1          So if I had a firm that for some reason decided not to

2     produce anything at all, it would make losses, and those losses

3     would be equal to its fixed costs.  So if we were to draw a line

4     here (indicating) that says what happens to profits as I

5     increase my output, so output is going up and price is going

6     down as I go along this line (indicating), okay, you know, I

7     start off way down here (indicating) with a real loss, if this

8     is zero.  And these are, if you like, my fixed costs.

9          Now, as the firm starts to produce, its price that it

10    gets is going to be higher than its marginal cost or incremental

11    cost, and as a result with each unit that it produces, it's

12    going to dig itself further and further out of its hole.  And so

13    what we get is, you know -- let's see if I can do this -- a

14    curve that looks something like this (indicating).

15         Now, as you continue to increase your output and drop

16    your price, you eventually get to a point where you're

17    maximizing your profits in the sense that if you kept increasing

18    your output or reducing your price after that point, your

19    profits would start to fall.  And that's basically that

20    balancing act we talked about before.

21         But the profit-maximizing firm sits on the top of this

22    hill (indicating).  He sits on the top of the hill because he

23    says, well, should I increase my output, you know, drop my

24    price?  No, my profits are going to go down.  Should I go in the

25    other direction?  No, profits are going to go down.  I want to

1    get to the top of the hill, okay.

2          Now, in this world, if there's a change in your fixed

3    costs, that's going to affect your profits.  Let's suppose, for

4    example, that the fixed costs drop; something happens and you

5    reduce your fixed costs.  So instead of your fixed costs being

6    way down there (indicating), they're now down here (indicating).

7    Now, this whole hill shifts, but it all goes up proportionately.

8    So I just want to see if I could draw this correctly.

9          So my whole hill goes up because I save -- my fixed

10   costs, my profits are going to go up.  But if I look at my

11   profit-maximizing load output, that hasn't changed.  In other

12   words, this -- my fixed cost is like winning the lottery or if

13   the government suddenly gave the firm a whacking great windfall

14   refund.  That wouldn't change the decision as to what price to

15   charge and which output to charge.

16         So it's in that sense when economists say if there are

17   changes savings in fixed costs due to a merger, they could be

18   real.  They are certainly real to the shareholders and certainly

19   real to the firms, but they're not going to change the pricing

20   behavior of the firm.  And that's why we say a change in fixed

21   costs are not going to be passed through to consumers because it

22   doesn't change the profit-maximizing decision.  The only costs

23   that an economist is going to argue is relevant to a merger case

24   where the concern is the effect on consumers is reductions in

25   variable costs.

1          And so those are the reductions that Dr. Meyer talks

2     about, the reductions in variable costs that are relevant in the

3     sense that they are reductions in variable costs.  My only first

4     point here is I think we have to be really careful, you know, to

5     distinguish between variable and fixed costs and to recognize

6     that fixed costs simply, except under very unusual

7     circumstances, are not likely to be passed through.  So the

8     focus is on the reductions in variable costs.

9          That's basically My first point to add to whatever

10    Dr. Z says.  Other than my second point is to say I then look --

11    I do run the exercise --

12    Q    You can sit down, Doctor.

13          THE COURT:  Are you still going to need the chart?

14          THE WITNESS:  No.

15          THE COURT:  Then we can remove the mike.

16    BY THE WITNESS:

17    A    I look at the variable costs that Dr. Meyer identifies for

18    each firm, and I do go through the exercise of saying suppose --

19    ignoring Dr. Z for a moment -- suppose that we were to accept

20    all of those variable cost reductions as merger specific and as

21    reductions in variable costs, merger specific and they are what

22    we would call "cognizable," then I input them into the

23    unilateral effects model.

24          Even if I accept all of those efficiencies, I still get

25    a very significant harm to consumers.  So I'm not offering an

1    opinion on the extent of the variable cost efficiencies.

2    That's, I think, something between Dr. Z and Mr. Meyer --

3    Dr. Meyer.  I'm just saying even if I put them all in, right,

4    I'd still get very large unilateral fixed losses to -- this is

5    before we talk about the coordinated effects problem.

6          So while I wanted to make it clear that I didn't put in

7    efficiencies, I do want to make it clear if I do put it in, I

8    come to the same conclusion.

9    Q    Let's talk about entry.  Why have you concluded that entry

10   will not deter the anticompetitive effects that you have found

11   likely?

12   A    Well, let's begin with what we know.  There's no shortage of

13   firms in this business.  There's about 20, maybe more, little

14   firms with about one-half of 1 percent of the market.  So we're

15   not talking about are there enough little firms down there.

16         When we're talking about entry here, the entry question is,

17   will the price increases that we're talking about here, is this

18   going to induce a supply response on the part of the other firms

19   in the industry which is large enough to make -- to deter that

20   original price increase so that the parties look at it and say,

21   boy, you know, we could raise prices by 8 or 10 percent, but we

22   would just get so much expansion here, not entry -- not simple

23   entry -- but expansion of existing firms such that we would lose

24   so much of a market share it would be unprofitable?

25         And I look at the economics in this business and at the

1   smaller firms, and my conclusion is clearly this is not going to

2   be, you know, a problem.  And I come to that because, first and

3   most important, you have to recognize that the problem in this

4   business, if you like, isn't making the stuff, it's selling it,

5   okay.  These are products with more gross margins on the order

6   of 80 or 90 percent.  The marginal incremental cost of selling

7   or producing another piece of software is -- people often say

8   it's zero.  It's not quite zero, but it's extremely low.

9       So the gross margin or the incremental margin on software is

10  very, very high.  If you can sell the stuff, it's very

11  profitable to do it.  So the problem that firms have in this

12  business isn't making it.  Any one of these firms can expand

13  their capacity.  It's the nature of software.  You're basically

14  either licensing or checking out more boxes.  The real problem

15  is selling it.

16      And the question is, if they already have something on the

17  order of an 80 percent margin, you know, if that margin gets a

18  little bit higher because of a price increase, the kind of price

19  increase that we're talking about here, how much of an incentive

20  is there to expand?  And the answer is not much.  They already

21  have every incentive to expand if they could sell the stuff.

22  The problem is selling it.  It's getting people to try your

23  product out, you know, and buy your product.  It's not a

24  manufacturing problem, okay.

25      And there are -- when you look at the problem of trying to

1   get people to buy your product, your marketing problem, it's not

2   a problem that's solved by just going out and buying, you know,

3   TV ads.  That's helpful, as we've seen.  You can buy search

4   words on Google.  You can spend a lot of money on marketing.

5   But the problem is, is that there's, in our terms, diminishing

6   returns to spending more and more money on marketing.  And the

7   reason is because this is a trust product, okay.  You can spend

8   money on marketing that will get people to be aware of your

9   product, but you've got to get people to try it out and people

10  adopt it.

11      And I think that what the documents show -- and I doubt

12  anybody's going to disagree with this -- is that this is a trust

13  world.  This is a world in which word of mouth is important.

14  It's, you know, if Joe tells me that TaxACT is really terrific

15  and I should give it a try because he's done it, that's what's

16  going to get me to try TaxACT.

17      And the result is that growth is slow.  You grow from the

18  base, okay.  You can't just sort of blitzkrieg the process.

19  So that's why, you know, our two points.  One, all these firms

20  already have an incentive to expand if they could.  And two, the

21  real problem is selling the stuff.  The little firms are just

22  simply not going to respond to this merger by saying, great, let

23  me get to the size of TaxACT in a short time period.

24  Q   Does the source of the customer base here at all play into

25  your entry analysis?

1    A    Yes.   Historically -- can I flip back without actually doing

2    anything dramatic?

3         Historically, the source of a lot of this customer base has

4    been this pen and pencil, which is coming up from below, okay.

5    And that's -- I may have said before, that's really shrinking.

6    The share pen and paper has been shrinking rapidly.   The share

7    of new people coming in from there has been falling.   And these

8    firms all kind of grew up during the period when there was that

9    pool down there that you could draw on, particularly for the

10   FFA.   And that pool is slipping.

11        So looking forward into the future, you know, these

12   opportunities for growing rapidly by trying to appeal to people

13   who haven't already chosen a particular type of software, that's

14   getting tougher and tougher.

15   Q    All right, sir.   Let's turn finally to coordinated effects.

16   In your opinion -- is it your opinion that the merger will lead

17   to a coordinated anticompetitive effect?

18   A    Yes.

19   Q    And explain how you came to that conclusion.

20   A    I came to that conclusion really from two things.   One is

21   the change in the structure.   The traditional way of looking at

22   coordinated effects is to look at the number of significant

23   firms and sort of say how many do I have to coordinate in order

24   to recognize our interdependence?   In this industry, what we

25   basically got is we've got the big three, okay.   The simplest

1   way to think of a coordination problem is it's easier to

2   coordinate with two than with three.   It's just like

3   coordinating your schedule or anything else.

4       And I'm not talking here necessarily about anything that's

5   illegal or a formal agreement.   We're talking here about a

6   recognition that if I do something, are you likely to follow

7   along with me or, you know, will you not play along?   And that's

8   always easier with a smaller number of main players.   And while

9   there's a large number of players in this game, we're really

10  talking about going from a big three to a big two.

11      So you know, the history of economics and the structural

12  presumption is that it's easier to coordinate a dance with two

13  than with three.   So that's the first reason.   But in this

14  particular industry, there's a particular reason to be concerned

15  about coordinated effects.   And that is the TaxACT is truly

16  unique.   I mean, it's quite a marvelous firm in terms of what

17  it's done and what it's achieved in terms of the behavior that

18  it's exhibited.   I mean, it has been continuously, you know, a

19  tough competitor in this market.

20      And one of the things I've tried to do at the very beginning

21  going through that figure was to talk about how TaxACT has acted

22  as a maverick, you know, along the way.

23          THE COURT:   I'm glad you brought that up again.   I need

24  to interrupt you to ask you about that.

25          Is it important to your -- how important to your

1    analysis and to your conclusions is your characterization of

2    TaxACT as a maverick?  Is that critical?

3              THE WITNESS:  It is -- I think it is very important to

4    my analysis of the coordinated effects.  It doesn't have

5    anything to do with the numbers we talked about before, which

6    was the unilateral effects.  So first of all, it's only

7    important in the sense of it's the coordinated effects story.

8              Next, I have, you know, a problem of we're going from

9    three to two so that by itself creates a basis for feeling that

10   I have a coordinated effects problem here.  But then I go even

11   further, and I'm saying that it's not just going from any three

12   to any two.  The firm that we're being eliminated here or being

13   merged with, you know, is one which has exhibited particularly

14   procompetitive behavior.

15             And I would stress two things.  First of all, it stood

16   out in two senses which are closely correlated.  I look at its

17   behavior.  And as we went through in the past the history, you

18   know, it has two remarkable instances of where it, if you like,

19   broke loose of the pack, disagreed with everybody else, did

20   something which was very procompetitive and other people were

21   forced to follow.  And that's describing a maverick in terms of

22   its behavior.

23             But the other thing to realize is this is not

24   accidental.  It's not accidental that TaxACT is a maverick.  It

25   comes from the fundamental economics of the situation that

1    TaxACT finds itself in; and that is, to go back to our problem

2    here, TaxACT doesn't have a cannibalization problem.  If TaxACT

3    offers a better, quote, "free product," you know, it may lose,

4    may -- some of its customers may switch from paid, but two

5    things.  One is, it's a small share of the market so if people

6    switch from other paid product to it, that's great.  So it

7    doesn't have to worry that much about its own paid product.

8         But even more than that, the difference between a paid

9    product -- the revenue from a paid product -- and the revenue

10   from a, quote, "free product," is far less for TaxACT.  So if

11   TaxACT loses -- switches one of its own, cannibalizes itself, it

12   goes from a paid product to a quote, "free product," that

13   difference is really quite small.  It's only a few dollars.

14        But if the same thing happens at HRB or at Intuit,

15   there's a big difference between the average revenue on a paid

16   product, particularly a higher one, and the average revenue on a

17   free product.  So the problem that the other firms face is the

18   cost to them of that cannibalization is just very large.

19        So the reason why TaxACT has been a maverick in terms

20   of the constant slogan, it's free, free, free, free, is because

21   for TaxACT, free is cheap.  It doesn't cost them that much to

22   offer a free product because they don't lose that much in the

23   sense of the opportunity cost of a paid product.  But for the

24   big guys, offering free is expensive.

25        THE COURT:  But what difference would it make -- or

1    would it make a difference to your analysis and, if so, how, if

2    there were more than one maverick in this market?  I mean, there

3    are a number of different players in this market who evidence

4    maverick-like behavior if the definition of that is doing

5    something that's disruptive to the market in some way either

6    because of advertising, because of a pricing structure, because

7    of a feature bundle.  So what if a number of firms demonstrate

8    different kinds of maverick behavior in this tax preparation

9    market?  How does that affect your analysis if TaxACT isn't the

10   only maverick?

11          THE WITNESS:  Well, that's one of the questions, which

12   is, if we lose the maverick, are we replaced by another one?  I

13   don't think there's any doubt that you're going to see

14   individual firms innovating.  They are all trying to get more

15   customers.  They are all trying to do new and something which

16   will grab more customers.

17          I think the question to me becomes, is there something

18   particularly unique about the situation of TaxACT as a maverick?

19   Is there a reason why nobody else is going to step into those

20   shoes?  And you know, to begin with, I look back at the past

21   history, and if you look, for example, at that decision -- the

22   original decision -- way back we went back through, which was to

23   offer a free for all within the FFA, at the time, there were 15,

24   20 people in the FFA.  And the only ones who wanted to go free

25   for all were TaxACT, and I think one little person who I don't

1    know their name.

2            Basically, everybody else had the same kind of model,

3    if you like, that the others had which is, you know, we have

4    this paid product that we're trying to migrate people to the

5    paid product.  TaxACT -- even when you look at a time when there

6    was a whole bunch of other little firms, the other little firms

7    didn't act like mavericks, okay, in that sense.  So if we look

8    at the history, we don't see anybody doing this kind of behavior

9    that TaxACT did.

10           And the second reason is because -- it goes back to

11   this issue of how difficult it is to grow really rapidly?  I

12   mean, TaxACT was in a position where the kind of particular

13   actions that it took within the FFA and on the Web site, where

14   it was really able to exploit those openings.  And the reason

15   is, is because it already had a pretty significant share.

16           So you know, for a maverick to quote, "replace," TaxACT

17   as a maverick, it's not only got to want to be a maverick and

18   want to act like a maverick, it's got to be big enough so that

19   if it does act as a maverick, it's really going to have an

20   effect.  And these little firms are starting from very small

21   shares.

22           So we look into the future and say, if another

23   opportunity came along for real maverick behavior, like free for

24   all on the Web, who is in a position to take advantage of that?

25   And the answer is -- well, the next closest firms would be

1    TaxSlayer and TaxHawk.  And while in terms of numbers of

2    customers they may be about the same size as TaxACT was way back

3    when, in terms of share, they're not.  So it's important that

4    your maverick replacement be big enough to make a difference.

5              THE COURT:  Go ahead.  I appreciate your answer.

6              THE WITNESS:  I tend towards long answers.  I'm

7    sorry.

8    BY MR. WAYLAND:

9    Q   Dr. Warren-Boulton, have you thought about -- on the

10   coordinated effect side, have you thought about incentives that

11   might drive coordination, might lead to coordination between

12   Intuit and H&RB?

13       Have you thought about a situation or circumstances that

14   would lead them to kinds of activity you would expect to see in

15   coordination?

16   A   Well, in terms of coordination, what you'd probably expect

17   to see is a mutual recognition that free is really expensive,

18   and that maybe we don't want to all, you know, provide free at

19   that level.  So I think what you'd expect to see -- I don't want

20   to look at a crystal ball, even though that's what economists, I

21   guess, do, but those are macroeconomists.

22       I think what you're likely to see is a much less incentive

23   to offer a value proposition in free.  A recognition that if

24   there's just two of us and now if we both do it, that that's

25   something that is not in our mutual self-interest.  I think if

1    we're talking about things and investing in ways to sort poach

2    customers from each other like developing software that will let

3    you import the other guy's data, you can imagine a mutual truce

4    on this.  I won't put in that software, I won't poach your guys

5    if you don't poach mine.  So we can basically agree without a

6    formal agreement, but I don't do it and you don't do it.

7         So there are a lot of ways in which you can get a

8    recognition of interdependence that leads to higher prices or,

9    in particular, a lower value proposition down at the bottom end.

10   And that's the kind of coordinated effects that we'd expect to

11   see coming out of this.

12   Q   All right.  Thank you, Dr. Warren-Boulton.

13        MR. WAYLAND:  I have no further questions at this time,

14   your Honor.

15        MR. ROBERTSON:  Your Honor, may I inquire?

16        THE COURT:  Yes, please, Mr. Robertson.

17                         CROSS-EXAMINATION

18   BY MR. ROBERTSON:

19   Q   Good afternoon, sir.

20   A   Good afternoon, sir.

21   Q   Just one thing I wanted to clear up right off the bat.  You

22   said a couple of times that an expansion or a new entrant had to

23   be as big as TaxACT.

24        Did I get you right?

25   A   What I was saying is that to replace the role of TaxACT as a

1   maverick, we're talking not just about the kinds of behavior,

2   but the scope of that kind of behavior.  I'm not saying it has

3   to be as large as TaxACT.  I'm saying that you have to see

4   significant expansion or a concern or a threat of significant

5   expansion.

6   Q   You would agree with me that "entry by one or more firms

7   operating at a smaller scale may be sufficient if such firms are

8   not at a significant competitive disadvantage," as I've just

9   read from Paragraph 9.3 of the Horizontal Merger Guidelines?

10      Would you agree with me, yes or no, sir?

11  A   Do you want to restate it.

12  Q   "Entry by one or more firms operating at a smaller scale may

13  be sufficient if such firms are not at a significant competitive

14  disadvantage," end quote.  Paragraph 9.3, Horizontal Merger

15  Guidelines.

16      Do you agree with that statement, yes or no?

17  A   I agree with that statement in this context where the issue

18  is not, as I said, entry of a firm because there are a lot of

19  little firms.  We're really talking here about expansion.

20      Clarification.

21  Q   You would agree with me, sir, that you don't have to be of

22  the same size or scale of TaxACT, correct, sir?

23  A   I haven't asked the question how big would you have to be.

24  I don't think you would have to be as big as -- you would not

25  have to see one of the other firms suddenly becoming a TaxACT

1   overnight in order to deter a price increase.

2   Q   All right, sir.  In terms of defining the market, you did

3   look at documents and testimony, correct, sir?

4   A   That's correct.

5   Q   And you testified yesterday that part of your definition of

6   the market, you also checked it through your unilateral effects

7   model, correct, sir?

8   A   Yes.

9   Q   And the third way you did it was using a model called

10  "critical loss," correct, sir?

11  A   That's correct.

12  Q   And in critical loss, you included the example that's in

13  your report, correct, sir?

14  A   My report, yes.

15  Q   And the basic idea -- there's a formula.  I'm not sure how

16  well established it is, but I'll use the one in your report.

17      L equals X over X plus M.  Did I get that right?

18  A   That's correct.

19  Q   And before we get there, what you also did on the side was

20  estimate the aggregate diversion ratio for H&R Block TaxACT and

21  TurboTax in your candidate market, correct, sir?

22  A   Yes.

23  Q   And let me put those up on the screen.  And you calculated

24  those to be for Block 57 percent, TaxACT 53 percent, TurboTax

25  39 percent, correct, sir?

1   A    I don't have a screen.

2   Q    You don't?

3          MR. ROBERTSON:  My gosh.

4          May I approach the witness, your Honor?

5          THE COURT:  Yes.

6   BY MR. ROBERTSON:

7   Q    Sir, do you have your report there?

8   A    No.

9   Q    Let me just do this hypothetically.  Would you agree that

10  the numbers in your report are the ones you have as of today?

11  A    Why don't you just give me the numbers.

12  Q    H&R Block 53 percent, TaxACT -- I'm sorry.  H&R Block 57

13  percent, TaxACT 53 percent, TurboTax 39 percent.

14      And the loss in your critical loss analysis that you were

15  trying to go over in this example is 16.7 percent; is that

16  correct?

17  A    Yes, that's correct.

18  Q    And the fact that each of these numbers are above 16.7

19  percent, means that it satisfies your test, correct, sir?

20  A    That's correct.  That's the critical loss test.

21  Q    Now -- and we'll get into what that means here in a minute.

22  I just want to get the basic numbers down.

23      In order for you to calculate the hurdle that you're trying

24  to get over, the 16.7 percent, you used the example from

25  Mr. Shapiro's article, correct, sir?

 1  A    Yes.  Well, I used the analysis in Mr. Shapiro's, yes,

 2  article, correct.

 3  Q    And just to be fair, you are aware that there are a number

 4  of articles going back and forth between him and Joe Simones and

 5  a bunch of other people disagreeing with this approach,

 6  correct, sir?

 7  A    There have been a number of articles on critical loss.

 8  Critical loss began as -- I can go into the details.

 9  Q    I don't want the details.  I just want to know are there a

10  bunch of articles where people are still fighting over whether

11  one should do it Mr. Shapiro's way?

12  A    I don't know if they are still fighting over it, but they

13  certainly were fighting over it before Mr. Shapiro's article.  I

14  haven't seen anything since then.  Perhaps the other side has

15  simply given up.

16  Q    Have you read the last issue of the Antitrust Law Journal?

17  A    No, no.  I've been busy.

18  Q    When you get a minute -- I have too.  I had to edit it

19  unfortunately.

20      But when you get a chance, you ought to read that.

21          MR. WAYLAND:  Your Honor, stick to questions, please.

22  BY MR. ROBERTSON:

23  Q    Sir, let me ask you this:  What you did in your report is

24  you assumed a margin for the analysis we are going to do here of

25  50 percent, correct?

```
 1    A    A margin?

 2    Q    Yes, sir.

 3              MR. ROBERTSON:  Your Honor, may I approach the witness

 4    so I can refresh him?

 5              THE COURT:  Yes, please.

 6    BY THE WITNESS:

 7    A    Oh, I see, yes, yes.  To calculate the 16.7 percent, yes,

 8    it's a 50 percent margin, the formula, yes.

 9    Q    Now, to do this analysis correctly, you have to use the

10    actual pre-merger margins of the products in the candidate

11    market; isn't that correct, sir?

12    A    The traditional way that it's done is to use the pre-merger

13    margins because that's the data that we have.  Ideally, what

14    you'd really like to do is -- yes, yes.

15              THE COURT:  Mr. Robertson, I hate to interrupt you for

16    just one second.  I have my technical person here so we can get

17    this screen working.  If you would give me just a couple of

18    minutes.

19              MR. ROBERTSON:  Yes, your Honor.

20        (Brief pause.)

21              MR. ROBERTSON:  Your Honor, may I proceed?

22              THE COURT:  Yes.  And I apologize for the interruption,

23    but I do think this will be easier for you moving forward.  So

24    please proceed.

25              MR. ROBERTSON:  Absolutely.  Otherwise, we'd be using
```

1   sign language or something here.

2   BY MR. ROBERTSON:

3   Q   Sir, what you just said, that you need to use the pre-merger

4   margins or the products in the candidate market in order to

5   calculate the critical loss, that's actually what you see

6   contained in the Horizontal Merger Guidelines?

7   A   And that's correct, yes.

8   Q   And you agree with that?

9   A   Yes.

10  Q   Now, you have actually said several times today that the

11  actual margins that you have seen out there are in this industry

12  are between 80 and 90 percent; is that correct, yes or no?

13  A   For software products, incremental gross margins on the

14  order of 80, 90 percent are probably about average, yes.

15  Q   So let's just calculate -- one moment here.  I think I can

16  make this a little easier.

17        MR. ROBERTSON:  I want to give Dr. Warren-Boulton a

18  copy of this (indicating).

19        May I approach the witness, your Honor?

20        THE COURT:  Yes, you may.

21        MR. ROBERTSON:  Your Honor, may I use the board over

22  here (indicating)?

23        THE COURT:  Yes, you may.

24        MR. ROBERTSON:  Mr. Wayland graciously offered to give

25  me a couple of pieces of paper.

1   BY MR. ROBERTSON:

2   Q    Now, sir, the way that one figures out this hurdle that

3   we're trying to get over in the critical loss analysis is

4   through a very simple formula that you have in your report,

5   right, sir?

6   A    Yes.

7   Q    And the L, that's the loss, right, sir?  That's the number

8   we're trying to get over, right, sir?

9   A    That's right.  It's called the critical loss.

10  Q    And then you have X over X plus M; is that correct, sir?

11  A    That's correct.

12  Q    And X is the price increase percent that we're trying to

13  analyze here.  For example, yesterday you testified that for a

14  SSNIP, we want to see if a hypothetical monopolist can raise

15  prices by 5 or 10 percent.

16       That's what the X is; it's either 5 or some number above 5

17  percent, correct, sir?

18  A    Would you like me to be precise?

19  Q    No, sir.  Can you agree with that or not?

20  A    Probably not.  I'd like to make the following distinction:

21  In the critical loss test, the critical loss test asked the

22  question what price increase would just be profitable?  It

23  doesn't actually ask the question what would be the most

24  profitable price increase.  It basically asks for a break-even

25  price increase.

1       So just to answer the question --

2    Q    That's fair.  Let's just continue on with this, all right,

3    sir?

4    A    Yes.

5    Q    And M, that's the margin, right, sir?

6    A    M is the incremental margin, correct.

7    Q    And incremental, that's what you explained to the Judge is

8    the 80, 90 percent margin that you just described, right?

9            MR. WAYLAND:  Objection.  That's not what he said

10   actually.

11   BY MR. ROBERTSON:

12   Q    In this case, 80 to 90 percent?

13   A    No.

14           MR. WAYLAND:  Margin, not incremental.

15   BY THE WITNESS:

16   A    The margin that I'm using -- I guess this was in something

17   that we couldn't -- the margin that I'm assuming for the parties

18   in this case, okay, is the number which was on the screen that

19   you can't actually see; that only the Judge can see.

20       I said that in software markets -- in most software

21   markets -- incremental margins on the order of 80, 90 percent

22   are normal.  This particular case, we're assuming margins which

23   are well below that for both TaxACT and HRB because there are

24   marketing expenses which arguably are incremental in this

25   software market that generally aren't incremental in other

 1   software markets.

 2       So I want to be clear that we're talking about a lot of

 3   different margin concepts here.

 4           THE COURT:  Okay.  And if you can just respond to the

 5   specific questions you're asked.

 6           THE WITNESS:  All right.

 7           THE COURT:  And Doctor, I know you've testified before.

 8   If there's something else that you need to say, on redirect

 9   you'll be given the opportunity to explain that.

10           THE WITNESS:  All right.

11   BY MR. ROBERTSON:

12   Q   Sir, let's assume a price increase of X is 5 percent on this

13   math problem we're going to do.

14       Will you please assume that for me?

15   A   Yes.

16   Q   Say yes.

17   A   Yes.

18   Q   .05.  We got that right?

19   A   Okay.

20   Q   Okay.  And then it's the same number down here at the

21   bottom, .05 plus whatever the margin is we're going to use in

22   this formula, right, sir?

23   A   Yes.  Can I point out that .05 is not the SSNIP test?

24   Q   No.

25   A   Okay.

1    Q    Now, the margin that we're going to use just for fun because

2    you've now said it's not 80 to 90 percent in this industry, is

3    that what you're now saying?

4    A    No.   What I've said is in the software industry, it's 80, 90

5    percent.   We've estimated margins in this industry, incremental

6    margins, which are somewhat lower than that.

7    Q    Okay.   Let's try just for this hypothetical 70 percent.

8    A    Okay.

9    Q    Okay.   Now -- and you can calculate what that is, I think,

10   for a .05 for 5 percent.   Then what we end up with is a loss of

11   6.67 percent, right?

12        Does that look right?

13   A    As far as I can tell, but I assume your math is correct.

14   Q    You can do the math.   I can give you a calculator if you

15   want to check my math.

16        Do you need to check it, sir?

17   A    That's fine.

18   Q    Now, if the price increase were 10 percent rather than

19   5 percent, then this loss number would be 12.5 percent.

20        Does that look right or do you want to check my math, sir?

21   A    It should be about double.

22   Q    Well, that's about double.

23   A    About double.

24   Q    Even I can do that.

25   A    Good.

1    Q   All right, sir.  And the lower the margin that you put in

2  this number, then does this loss number for 5 percent go up or

3  go down?

4  A   It's going to go down if you have a higher margin.

5  Q   For example -- sir, if you had a 50 percent margin, as you

6  calculated for 10 percent price increase, you got 16.7.  It

7  actually went up.

8  A   Well, you're changing both the 5 and the 7.

9  Q   Okay.

10  A   Okay.  My example is, asking if a 10 percent price

11  increase --

12  Q   Sir.

13  A   Sorry.  You asked about that.

14  Q   Okay.  Well, let's do 5 percent.  Apples to apples.  Apples

15  to apples for 50 percent, it would be a 9.1, higher than 6.67.

16    Do you want to do the math?

17  A   What are you changing?

18  Q   Let's go .05 over .05 plus .5, 50 percent.

19  A   Okay.

20  Q   That gives us 9.1 percent.

21  A   Okay.

22  Q   Right, sir?

23  A   Correct.

24  Q   If you lower the margin in your formula, it causes the loss

25  number as a percent to go up; isn't that correct?

1   A    That's correct.

2   Q    And the fact that you used a 50 percent margin, if

3   hypothetically that is below the actual margins in this case,

4   you have overestimated what that last number is; isn't that

5   correct?

6   A    If 50 percent is below the incremental margin, then you

7   should use the correct margin.

8   Q    Fair.  Now, for our hypothetical, we're going to use the .7

9   or 70 percent instead of 50 percent, all right, sir?

10  A    Correct.

11  Q    Can you follow me on that?

12  A    I'm with you so far.

13  Q    All right.

14          MR. ROBERTSON:  And I'll mark this, your Honor, as

15  Defense Trial Exhibit No. 2.  I already have another one that's

16  marked 1, your Honor, that I haven't used yet so I don't get the

17  labels mixed up.

18      (WHEREUPON, a certain document was marked Defense Trial

19      Exhibit 2 for identification as of September 9, 2011.)

20  BY MR. ROBERTSON:

21  Q    Now, sir, what you did -- when you did the math, and we

22  already saw how that worked out, let's try to do -- see if we

23  can get past this hurdle rate of loss equals 6.67 if it's

24  5 percent, or 12.5 if a 10 percent price increase.  Let's just

25  see if we can do that in a few examples.

1      We know your example works, right, sir, because the

2    aggregate diversion ratios, those numbers are higher than either

3    of these numbers; isn't that correct?

4    A    That's correct.

5    Q    Okay.  Now, in your book, sir, you have different tabs.  And

6    I want you to turn to Tab No. 22 first.  And what we have on

7    Tab 22 are examples of doing this math we've already done.

8        Do you see that, sir?

9    A    Yes.

10   Q    And then turn to Tab 23.  And what we have here, sir -- do

11   you see tab 23?

12   A    Yes.

13   Q    And look at the first page.  Now, do you understand how to

14   calculate the aggregate diversion ratio for H&R Block and

15   TurboTax in a market that is a candidate market that's only H&R

16   Block and TurboTax using your data?

17   A    I believe so.

18   Q    Okay.  Have we done it correctly or do you need a

19   calculator?

20   A    Well, what you would do is rather than add up all the

21   diversion within, just look at the diversion outside.  That

22   would be 11 percent plus 1.9 percent.  It's 11.9 percent.

23       Now, 70 percent is within HRB so you'd take 11.9 percent and

24   you would divide it by .70.  Do you want to do it?

25   Q    Go ahead.  I'll give you a calculator if that will help you.

1    A    No, I think I probably have one.

2    Q    It's my old iPhone.

3    A    I use Polish notation so it may not be the same as everybody

4    else.

5         I take the share that's diverted outside, the 11.9, okay,

6    which is assisted and pen and paper, and I'm going to ask the

7    question if I look at what is lost to H&R Block, so I'm taking

8    out the 70 percent that stays within, so of the remaining

9    30 percent that's left, what share is diverted out of the

10   market?  And the answer is I'm getting about 17 percent is

11   diverted outside the market.  So about 83 percent is diverted

12   within.

13   Q    All right, sir.  And what is the aggregate diversion

14   ratio?

15   A    That's basically what I'm looking at to sort of see how much

16   gets diverted within, you know --

17   Q    I want a number, please.

18        For H&R Block, what's the number in this candidate market?

19   A    If H&R Block raises its prices, then all but the 11 and

20   1.9 percent are diverted to, if you like, you know, within.

21   Q    Give me a number of what the aggregate diversion ratio is.

22        Let me ask you this --

23   A    It's been calculated for H&R Block.  I assume that's the

24   57 percent that's in the report.

25   Q    And it's way above 6.67 or 12.5, right?

1    A    Yes.

2    Q    And in the same candidate market where the only other

3    competitor is TurboTax, what is the aggregate diversion ratio

4    for TurboTax?

5    A    It gets 39 percent.

6    Q    Well, that passes the test, right, sir?

7    A    Yes.

8    Q    Now, turning to DX 9802-2.  And what number are you on,

9    sir?

10   A    1.

11   Q    9802-2, so that's the second page.  Are you there, sir?

12   A    Yes.

13   Q    And if we had a candidate market which were those in what

14   some people have called the value part of the business --

15   TaxACT, TaxHawk, TaxSlayer, TaxWise, Easytaxreturn.com and, do

16   you see that, sir?  That's the first grouping here.  Alternative

17   market calculations, players in candidate market, value, DIY.

18        Do you see the aggregate diversion ratio of 9.7 percent?

19   A    Yes.

20   Q    Can you verify for me that that is correct?

21   A    I'll take your word for it.

22   Q    And for TaxHawk and TaxSlayer, we do see that each of those

23   is above either 6.7 or 12.5.

24   A    Correct.

25   Q    Either way.

1    If there's a candidate premium do-it-yourself market with

2  Block, TurboTax and CCH, do you see the aggregate diversion

3  ratios that are calculated there, sir, for Block and TurboTax?

4  A    Sure.

5  Q    And you need to check to see if that's in the ballpark?

6  A    I'm assuming your arithmetic is correct.

7  Q    And you could see there above your loss numbers percent of

8  6.67 for a 5 percent price increase, or a 12.5 for the 10

9  percent; isn't that correct?  Is that correct or not?

10  A    That's correct.  Go ahead.

11         THE COURT:  Mr. Robertson, before you go ahead, I think

12  you should just let you know, this is the first time I'm seeing

13  this data and you and the witness may be having a very fruitful

14  conversation over there, but I personally have no idea what

15  you're talking about.

16         MR. ROBERTSON:  Okay.  Let me slow down.

17         THE COURT:  Just to let you know.  When you're talking

18  about an aggregate diversion ratio of 38.8 percent, I have no

19  idea what that figure is supposed to represent.  What are you

20  talking about?

21         MR. ROBERTSON:  Let me back up so we can --

22         THE COURT:  Is this a diversion between TaxACT, HRB?

23  What is that supposed to mean to me?

24         MR. ROBERTSON:  I probably shouldn't tell you.  I'll

25  probably have it go through the witness here.

1        THE COURT:  Who prepared this document, this summary of

2   switching --

3        MR. ROBERTSON:  The switching data is from the IRS.

4   I'm having him calculate it.  But let me let the witness

5   explain it.

6        THE COURT:  Is this from a report that I've missed?

7        MR. WAYLAND:  That's my question too, your Honor.  As

8   we understand it -- we haven't seen this before, we were

9   supposed to get things in advance -- we understand this is

10  something they created on their own to use apparently.  They

11  have done some calculations.  They are trying to get the witness

12  apparently to do the math that they have done.  That's what I

13  understand.  We haven't seen it before.

14       THE COURT:  I was looking at this.  I've read a lot of

15  reports with a lot of different attachments.  And this I don't

16  think I've seen.

17       MR. WAYLAND:  No, you haven't.

18       THE COURT:  I haven't missed something.

19       MR. WAYLAND:  They created it for today.

20       MR. ROBERTSON:  Let me back up, and I think you'll see

21  what I'm doing.

22       THE COURT:  It sounds like what you're doing might be

23  very important, but I have no idea what you're doing.

24  BY MR. ROBERTSON:

25  Q   Sir, when you did your calculations for the aggregate

1   diversion ratios that we started out with just about ten minutes

2   ago, the ones that are in your report, you did that using the

3   information that we have on the top of the sheet on DX 9802-1,

4   correct, sir?

5   A   That's all IRS data, yes.

6   Q   This was the data on the top of the sheet on 9802-1 that you

7   used in your report to calculate the aggregate diversion ratio.

8   So let's just make that clear.

9   A   Yes.  It's the same data.

10  Q   All right.  So we started there.

11         THE COURT:  We got that.

12  BY MR. ROBERTSON:

13  Q   Okay.  Now, when you calculate that, let's go back to the

14  example of H&R Block and TurboTax only being in the market all

15  by themselves, what the aggregate diversion ratio is for

16  Block --

17  A   Wait a minute.  Where are you?

18  Q   On 9802-1, first page.

19  A   Okay.  We're back here (indicating).

20  Q   Yes, sir.  I'm going back a couple steps just so we can

21  frame this a little better.

22         MR. ROBERTSON:  And I apologize, your Honor.

23  BY MR. ROBERTSON:

24  Q   Now, you start out with all the data that the IRS has for

25  H&R Block as to where people went or if they stayed at H&R

1    Block?

2        Did I get that right?

3    A    Yes.

4    Q    And so -- this is for 2008 --

5            MR. WAYLAND:   Your Honor, may I interpose an objection

6    here.   Let me tell you what my objection is.

7            This is really Mr. Robertson giving his own expert

8    testimony.   They have created a sheet that's based on their own

9    assumptions of what the market should be.   They should sponsor

10   that in with an expert who can explain exactly it is.

11   Otherwise, we're going to have Mr. Robertson explaining why it

12   is that his example, which is really what an expert should be

13   testifying to, trying to get my witness to adopt it.

14           And I think that's improper.   If he wants to put his

15   own witness on and say we've done it this way and this is what

16   we get, then they're perfectly fine to do that.   But this is --

17   as your Honor sees, none of us can follow what's going on.   They

18   have a title "Alternative Market Calculation."   Who is going to

19   come up and sponsor what that is?   That's what their expert

20   should be doing.

21           MR. ROBERTSON:   Your Honor, we could have a short

22   objection here.   I'd be happy to explain your Honor what I'm

23   doing.

24           MR. WAYLAND:   That's not the point.   It's not

25   explaining anything.   It's sponsoring a witness to do it, not

1    his testimony.

2         MR. ROBERTSON:  This witness has already testified to

3    this Court that he used a critical loss analysis, which is in

4    his report, to identify what the market is, the smallest market.

5    We've heard all that.

6         This is one of the ways how he did it.  And what I am

7    showing, and we've just went through it -- I need to go back and

8    make sure your Honor sees what I've done -- is you can use his

9    same numbers and find a market of any grouping of these people,

10   which doesn't make his model very valid.  That's the point.

11        And I think on cross-examination I should be entitled,

12   I believe, to challenge his model.  That's what he used to come

13   up with his identification of the market.

14        THE COURT:  So what you're trying to demonstrate is

15   that if you use different numbers and include assisted or pen

16   and paper or some of these other numbers, you're going to get a

17   different relevant market definition?

18        MR. ROBERTSON:  Under exactly his same formula.

19        MR. WAYLAND:  Yes.

20        THE COURT:  I mean, I have to say this is a little bit

21   of an unusual demonstrative and way of doing this.  I mean, I

22   do -- I mean, I think that you can either do this through your

23   own expert.  I don't think it's totally out of line.  We don't

24   have a jury here for me to see Mr. Robertson go through this.

25        So I'm going to overrule the objection and just ask you

```
 1    since it's new -- I haven't seen this document, it's a lot of

 2    numbers, if you could just go through this in a very clear way

 3    so we don't waste time with a lot of what sounds to me like

 4    gobbledygook, because I don't understand the context or what

 5    you're doing.

 6              MR. ROBERTSON:  I understand, your Honor.

 7    BY MR. ROBERTSON:

 8    Q   Sir, what we just did, if, using the same formula in your

 9    report except we have a margin of 70 percent instead of

10    50 percent, what we just went through shows us in this first

11    question that H&R Block and TurboTax would meet or exceed the

12    loss that would be calculated from your formula in your report;

13    isn't that correct?

14    A   I haven't done the calculation.

15    Q   We just did it.

16    A   I would expect it to be true, yes.

17    Q   Okay.  Referring to DX 9802.

18        Clearly, if we were talking about a 5 percent price increase

19    with a loss of 6.67 percent, that the aggregate diversion ratios

20    for the candidate do-it-yourself market that we have outlined on

21    DX 9802, page 2, would meet that test, correct, sir?

22    A   I don't mean to use a legal term, but I have a continuing

23    objection to the use of the term "a 5 percent price increase"

24    for reasons which we may not get into.  Assuming your arithmetic

25    is correct and you ask the question would you break even with a
```

1    5 percent price increase -- not that that's what you would

2    actually do -- but if you would break even with a 5 percent

3    price increase, you know, do these numbers look reasonable

4    without having a chance to look at them?  I can't tell you.

5         Do I sort of think that where you're going, do I understand

6    where you're going?  I think.  Frankly, because you actually

7    explained it to me.  But, yes, I think these numbers look

8    reasonable.

9    Q    Now, just a simple question.  A market with TurboTax and

10   H&R Block online digital -- digital products in it and nobody

11   else?

12   A    Yes.

13   Q    Is that a smaller market than the one you identified?  Yes

14   or no?

15   A    Smaller market?  It's a smaller irrelevant market.

16   Q    Is it a smaller market?  Yes or no?

17   A    Yes, it is a smaller but irrelevant market, yes.

18   Q    And yesterday you testified that one should start at the

19   smallest market, right, sir?

20   A    The general principle is you try to come up with the

21   smallest market that is useful in terms of figuring out what the

22   change in the shares are going to do.  So I want to have a

23   market that's large enough so I get a big price increase concern

24   and not so large that it becomes indefinitely large.

25        So I need a large enough price increase in my candidate

1    market.

2    Q   All right, sir.  And the do-it-yourself value market we just

3    looked at, that is smaller than the one that you considered,

4    correct, sir?

5    A   That's correct.

6    Q   And the premium market we just looked at, that is smaller

7    than the one you just looked at?

8    A   There are a lot of markets that you could define out there

9    which could be smaller.  Indeed, simply the big three combined

10   as -- I think that's probably one of these here.  Is it, by the

11   way?

12   Q   Sir, is it smaller or not?  It's pretty simple.

13   A   The big three by themselves is smaller than the market that

14   I defined.  A merger amongst just the big three is large enough,

15   as I say in my report, to generate a substantial price increase,

16   even without including all the other firms in the DDIY market.

17      So you could have defined "irrelevant market" as simply H&R

18   Block, TaxACT and Intuit, that is correct.

19   Q   And you could, as we just went over, you could define the

20   market just as H&R Block and TurboTax using the critical loss

21   and nothing else; is that correct, sir?

22   A   You would do that if you are interested in a merger between

23   TurboTax and Intuit.  And I would fully agree that if you were

24   looking at a merger between TurboTax -- I'm sorry; between

25   TurboTax and HRB, that a candidate market consisting just of

1    those two would be a relevant market in the sense that simply

2    the merger of those two into a hypothetical monopolist would

3    result in a price increase significantly above the SSNIP test.

4    Q    You started with all 17 players that are digital in your

5    smallest market, correct, sir?

6    A    No.   What I did is I looked at the relevant market in terms

7    of what are the close substitutes, digital, and I asked the

8    question, how far do I need to expand that market to get to a

9    market that's large enough so that if somebody were a

10   hypothetical monopolist, if all those firms merged, I would get

11   at least a small but significant price increase.

12        I could have stopped with just the big three.   Because the

13   products are so similar is a natural breaking point which is all

14   DDIY.   And so I defined the relevant market as all digital DIY

15   product, even though a merger amongst a subgroup of those could

16   lead to a small but significant price increase.

17        I'm not here to say that H&R Block should be allowed to

18   merge with Intuit.   That's not, I don't think, the relevant

19   question that we're facing.

20   Q    I didn't ask you that, sir, so it's very nice that you gave

21   me that commentary.

22   A    Next time.

23   Q    My question is, when you started your analysis that we see

24   in your report, you started with all 17 players in digital,

25   correct, sir?

1   A    No.   I started with looking at the nature of the products

2   and asking on the basis of the documents and the evidence, which

3   products compete with each other?   Which products are similar?

4   And the answer is digital DIY products are similar to each

5   other.

6   Q    And after you did that, when you did the actual math that we

7   have in your report, what you started with was all 17 players in

8   digital, correct, sir?

9   A    But I checked to make sure that even if it was just only the

10   three that merged, I still would get a very large price

11   increase.   So my market is large enough so --

12   Q    Sir, I just asked when you did your math, if you started

13   with all 17 players or not.

14       Did you?

15   A    When I started?

16   Q    Yes, sir.

17   A    I looked at all digital DIY products, yes.

18   Q    Okay.   Thank you.

19       The Department of Justice has filed its complaint back in

20   May; is that right, sir?   Do you remember?

21   A    I'd have to -- I wasn't in it at the time.

22   Q    That's right.   You were retained in late June; is that

23   right?   June 21st, to be exact.

24   A    That sounds about right.

25   Q    And when you started, you did read the complaint, correct,

1    sir?

2    A    Yes.

3    Q    Now, when the 17 digital people we were talking about, to be

4    clear, you were not including in your market anything in

5    assisted preparation, correct, sir?

6    A    My relevant market does not include assisted, correct.

7    Q    Okay.  It is also correct, isn't it, that your market that

8    you defined does not include pen and paper; isn't that

9    correct?

10   A    That's correct.

11   Q    Isn't it true that your relevant market that you have

12   defined does not include friends or family; isn't that

13   correct?

14   A    That's correct.

15   Q    And one of the things that you did before you did the math

16   and when you were -- you were just explaining how you were

17   identifying these customers, these competitors -- is that you

18   looked at documents to see if there was competition between the

19   products; isn't that correct, sir?

20   A    Yes.

21   Q    Did you look at documents showing that the merging firms

22   view each other as significant competitors for their digital DIY

23   products?

24   A    Yes.

25   Q    And because you saw that these firms viewed themselves as

1   competitors, you believed that with strong evidence, they should

2   be placed in the same relevant market, correct?

3   A   That's the purpose of using market definition to predict the

4   effects of a merger, yes.

5   Q   And that's because documents showing who the parties view as

6   competitors is strong evidence that those products are in the

7   same market; isn't that correct?

8   A   Yes.

9   Q   Now, in your book, sir, if you'd please turn to Tab 5.  And

10  Tab 5 is a document you cited in your report at page 12, which

11  is HRBDOJ00104507?

12      Do you see that, sir?

13  A   Yes.

14  Q   Now, in this particular document, on page 1, this is a

15  letter, as you see from the back.  Page 2 in your binder.

16      Do you know who Russ is, sir?

17  A   Smyth, I believe.

18  Q   And he was the former CEO of H&R Block, right, sir?

19  A   That's correct.

20  Q   He was the CEO when he wrote this letter, to your

21  knowledge?

22  A   I would assume so.

23  Q   That's what you cited it for.

24  A   Okay.

25  Q   Now, do you see on the first page of this letter that in the

1    second paragraph towards the bottom where Mr. Smyth --

2              MR. ROBERTSON:   Blow it up here so we can see it on the

3    screen.   Bottom half of the paragraph.   The whole paragraph is

4    fine.

5    BY MR. ROBERTSON:

6    Q    Says, "We have many competitors -- Intuit, TaxACT, Jackson

7    Hewitt, Liberty and 100,000 independent tax preparers in the

8    retail space -- and need to perform better against all of them."

9         Do you see that, sir?

10   A    Yes.

11   Q    And you considered this in rejecting the tax stores as part

12   of your market, right, sir?

13   A    I read this document, yes.

14   Q    And turn to page 2, please, sir.   Very top of the page, top

15   paragraph.

16   A    Yes.

17   Q    Mr. Smyth states, "I expect our retail business to

18   aggressively market the value of their services against all

19   retail and digital competitors, just as I expect our digital

20   business to aggressively market their products and services

21   against all retail and digital competitors."

22        Is this a letter you read, cited in your report, and decided

23   to reject the tax stores as being part of your relevant market,

24   correct, sir?

25   A    What's correct is I've read this, and my relevant market

1    does not include assisted, that is correct.

2    Q    Now, let's turn to Tab 6, another document you cited in your

3    report.   This is GX 128.

4         MR. ROBERTSON:   It's been used here in court before,

5    your Honor.

6    BY MR. ROBERTSON:

7    Q    You've seen this document, sir?

8    A    Yes.

9    Q    And if you'd turn, please, to page 8.  And just for the

10   record, sir, I believe you cited this in your reply at Notes 5,

11   6 and 15, three different times.

12        Do you see where the company under market share has "Tax

13   Prep Method Market Share"?  Do you see that, sir?

14   A    Yes.

15   Q    And do you see that it has every way of doing taxes listed

16   on here, sir?

17   A    Yes.

18   Q    And this particular document shows switching across the

19   entire tax preparation market; isn't that correct, sir?

20   A    It shows switching across all different kinds of tax

21   preparation.

22   Q    Let's turn to page 13, please, sir, where it has "Switching

23   by Method."

24        Do you see this, sir?

25   A    Yes.

1   Q   And do you see in the top paragraph, the bottom sentence

2   where it says, "This does allow for direct comparison of all

3   competitors."

4       Do you see that, sir?

5   A   Hold on.  What page are you on?

6   Q   Page 13.  It's also on the screen.

7   A   Oh, okay.

8   Q   Do you see that, sir?

9       THE COURT:  I'm sorry.  I have a different page in

10  mine.

11      MR. ROBERTSON:  GX 126, Tab 6.  This is at page 13.

12  BY THE WITNESS:

13  A   Do I see page 13?  Yes.

14  Q   Yes, sir.

15      Do you see where it says, "This allows for direct comparison

16  of all competitors," at the top of the page?  It's also ON THE

17  screen if you can't read it there, sir.

18  A   Yes.

19  Q   Now, you cited this document three times in your report --

20  in your reply report -- and yet over 40 percent of this document

21  are talking about the entire tax preparation market.

22      MR. WAYLAND:  Objection, your Honor.

23      THE COURT:  Excuse me, Mr. Robertson.

24      MR. WAYLAND:  The first part was testimony.  If he

25  wants to show him 40 pages, that's fine.  If he wants to point

1   to a specific page and say that, that's testimony and not

2   appropriate.

3          THE COURT:   Overruled.   Please proceed,

4   Mr. Robertson.

5          MR. ROBERTSON:   Thank you, your Honor.

6   BY MR. ROBERTSON:

7   Q   Sir.

8   A   Yes.

9   Q   You cited this document, and yet you rejected all the other

10   tax preparation methods except for do-it-yourself digital and

11   your market; isn't that correct?

12   A   I cited this document, that is correct.

13   Q   That's all I asked.

14   A   We know that.

15   Q   Okay.   And we know you've rejected all other methods except

16   for do-it-yourself digital, correct, sir?

17   A   I have defined a relevant market which excludes digital and

18   DIY as more than sufficient in order to generate at least a

19   small but significant price increase.   As I've testified

20   repeatedly, you don't need to include every possible substitute

21   in a relevant market in order to get a price increase from that

22   market.

23   Q   Sir, I think we've got your testimony.

24       You also concede that you can combine any variation of these

25   competitors and still get a price increase under your model,

1    right, sir?

2    A    You can combine a number of them.   If we were talking about

3    a merger between Intuit and HRB, we would define a different

4    relevant market if we were talking about then here.

5        You define a relevant market for the purpose --

6    Q    Sir, just listen to my question and answer my question.

7    Please don't continue on.

8    A    Okay.

9    Q    Give you an example.   Any merger of any competitors in your

10   defined market.   Any merger between two of any competitors in

11   your defined market with positive diversion ratios and positive

12   margins under your model will generate a price increase absent

13   efficiencies, entry or expansion; isn't that correct?

14   A    That is correct as a matter of economic theory.

15   Q    Thank you.   Thank you, sir.

16   A    Yes.

17   Q    Now, in Tab No. 7, another document you cite in your report,

18   page 28 at Note 76.   And you cite this document for the

19   proposition that H&R Block digital doesn't compete with

20   assisted.

21       Do you remember this document, sir?

22   A    Well, do you want to point me to the particular point.

23   Q    Okay.   Let's turn to page 2.   Look at the bottom under

24   "Digital Advertising/Marketing."   The bottom paragraph where it

25   says, "This specific example shows that our tax season '09

```
 1    online banner ads with a digital message drove nearly 100,000
 2    retail appointments."
 3         Do you see that, sir?
 4    A    Yes.
 5    Q    Let's go to Tab 8, another document you cite in your report.
 6    Page 23, Note 63.
 7    A    I'm on Tab 8.  What page would you like?
 8    Q    All the way to page No. 12 of the slide.
 9    A    Yes.
10    Q    You there?
11    A    Yes.
12    Q    And it says, "Continued free online causing price
13    compression across all tax prep."
14         Do you see that, sir?
15    A    Yes.
16    Q    And see the "all" is both italicized and bold.
17    A    Yes.
18    Q    It doesn't say just digital do-it-yourself tax prep, does
19    it, sir?
20    A    No.  It's referring to price compression both within --
21    Q    That's all I want to know.
22         Did it say digital tax preparation or not?
23    A    It says what it says.
24    Q    Right.  Now, you are aware that Mr. Ernst, former CEO of
25    H&R Block, testified that H&R Block digital competes with tax
```

1   stores for customers, right, sir?

2            MR. WAYLAND:  Objection, your Honor.

3            THE COURT:  He can ask the question.  He may or may not

4   be able to answer.

5   BY THE WITNESS:

6   A    Could you ask me the question again.

7   Q    Yes, sir.

8        Are you aware that Mr. Ernst said that H&R Block digital

9   competes with tax stores for customers?

10  A    I've read his declaration and his deposition.  I'm trying to

11  think of the context in which you're saying it.

12       Does H&R Block, as it runs office stores, does it compete

13  with other off the stores?  Yes.  Does -- is digital a

14  substitute for office?  To some extent, yes.  I have no

15  disagreement with what he said.

16  Q    Let me turn you to Tab No. 9.  And we have Mr. Ernst's

17  deposition there that you said you just read.  And turn to

18  page 28 of the deposition, line No. 14.

19       Are you there, sir?

20  A    Yes.

21  Q    "Question:  Did you know that your own online business was

22  taking away customers from tax stores, from Jackson Hewitt and

23  other companies?

24       "Answer:  Yes, that was part of the strategy."

25  A    That was part of the strategy, that's correct.

1    Q    All right.  You were aware of that when you did your report,

2    right, sir?

3    A    Well, certainly my team was, yes.

4    Q    You were aware -- when you say your "team," you didn't

5    actually read all this stuff when you did in your report, right,

6    sir?

7    A    No.  I read his deposition, but in terms of the amount that

8    I've read, it's a small share of the record in this case.

9    That's inevitable.  But I've read this one.

10   Q    You are aware that Intuit is targeting tax stores, correct,

11   sir?

12   A    I think part of Intuit's strategy, since it doesn't have tax

13   stores, is to target HRB stores, and I think that's what I

14   believe Mr. Ernst said as well -- or somebody said it.

15        MR. ROBERTSON:  Your Honor, I'd like to tender an

16   exhibit which is Trial Exhibit No. 1 from the defense and I'd

17   like to play it, please.

18        MR. WAYLAND:  Can I ask what it is?

19        MR. ROBERTSON:  Yes.  I'll identify it.  It's a

20   commercial from H&R Block.

21        MR. WAYLAND:  Did this witness rely on it in his

22   report?

23        MR. ROBERTSON:  I'm cross-examining the witness, your

24   Honor.

25        MR. WAYLAND:  He can't just show a piece of evidence

 1   without sponsoring a witness unless he lays a foundation for

 2   it.

 3           MR. ROBERTSON:  He said it the other day.

 4           MR. WAYLAND:  No.  I had a witness who said it was his

 5   ad.

 6           MR. ROBERTSON:  After he played it.

 7           MR. WAYLAND:  You didn't object.  Your Honor, he has to

 8   lay a foundation for this witness.  It's not in his report, and

 9   there's no witness that says what this is.

10           THE COURT:  I will allow the playing of this.

11       (WHEREUPON, a certain document was marked Defense Trial

12         Exhibit 1 for identification as of September 9, 2011.)

13       (Videotape played.)

14           MR. ROBERTSON:  Your Honor, did you hear the first

15   part?

16           THE COURT:  I did.  And we have heard testimony about

17   this advertisement.

18           MR. ROBERTSON:  I have a hard time hearing anything.

19   BY MR. ROBERTSON:

20   Q   Sir, I know you and I both have hearing aids.  But did you

21   hear the first part?

22   A   No, actually, I didn't.

23           THE COURT:  We can replay it.

24           MR. ROBERTSON:  Let's just replay it.  We're both

25   getting older.

1          THE WITNESS:  My batteries aren't what they used to be.

2      (Videotape played.)

3  BY MR. ROBERTSON:

4  Q   Now could you hear it, sir?

5  A   Yes.

6  Q   And you could see that H&R Block in this particular ad,

7  their retail stores are going after TurboTax, which is a

8  software product?

9  A   Yes.  They are going after people like me who filled out

10  their taxes on TurboTax.

11  Q   I hope they get you.

12  A   You know, somehow I don't think I'm going to be going to

13  H&R Block next year.

14  Q   Now, the fact is -- oh, come on, sir.

15          THE COURT:  Excuse me.  It's 3 o'clock.  I'd like to

16  move this along.

17          MR. ROBERTSON:  Yes, your Honor.

18  BY MR. ROBERTSON:

19  Q   Sir, the fact is, you didn't consider any marketing activity

20  by the retail stores of anybody against software in your report,

21  correct, sir?

22  A   No.

23  Q   Is that correct?

24  A   That's not correct.

25  Q   Did you look at any marketing material from H&R Block

1  against software, yes or no?

2  A    Did I look at marketing material?  I or my staff may have

3  seen some of it.  I think it's perfectly reasonable that it's

4  out there.  Did we consider substitution towards assisted?

5  Continuously.  There's major movement back and forth between

6  assisted and DDIY.  We take that fully into account.

7  Q   Sir, my question is, have you looked at any H&R Block retail

8  store advertising at all?

9  A    I've looked at their Web site.

10  Q   When you had your deposition, sir -- and turn to page 54 of

11  your deposition, beginning at -- actually, the question starts

12  at the very bottom of page 53, line 22.

13         MR. WAYLAND:  Counsel, I don't think he has a copy of

14  his deposition, your Honor.

15         THE COURT:  Is there a tab in this book?

16         MR. ROBERTSON:  I'll put it on the screen.

17         THE COURT:  Is there a tab?

18         MR. WAYLAND:  Tab 4.

19         THE COURT:  Did you hear that, Dr. Warren-Boulton?

20  It's Tab 4.

21         THE WITNESS:  I've got it.  Okay.  I'm looking at your

22  hand actually.

23  BY MR. ROBERTSON:

24  Q   Sir, it's real simple, and maybe this will refresh your

25  recollection if you just don't know.  But look at the question

```
 1   at line 22.  You were asked this question and you gave this

 2   answer:  "Do you know that H&R Block retail tax stores advertise

 3   specifically against Intuit's software products?"

 4       Answer, "I haven't looked at H&R Block's retail store

 5   advertising so I have no opinion on that."

 6   A   That's the correct answer.

 7   Q   Have you looked at their advertising since then?

 8   A   I've just looked at an example, your ad, yes.

 9   Q   Okay.  Let's move on then, please, sir.

10           THE COURT:  Have you seen that ad before?

11           THE WITNESS:  No.

12   BY MR. ROBERTSON:

13   Q   You talked a little bit about the maverick document with the

14   Court.  Do you remember that, sir?

15   A   The maverick document?  I talked about mavericks, yes.

16   Q   Yes, sir.  And you cited a document in your report that

17   actually used the term "maverick."

18       Do you remember that, sir, from TaxACT?

19   A   Yes.

20   Q   And turning in your binder at Tab 10.

21       Did you look at any document at TaxACT that actually had the

22   word "maverick" on it?

23   A   Yes.  The document here, as we discussed in the deposition,

24   as I recall, is a press release.

25   Q   All right, sir.  Let me show you the press release.  Let's
```

1   use the one we have here.

2           MR. ROBERTSON:  I think we've already gone through this

3   with the witness.

4   BY MR. ROBERTSON:

5   Q   Let me just ask you this:  Were you aware that TaxACT was

6   targeting pen and paper and assisted preparation with its press

7   release that you just mentioned?

8   A   I should expect that it would be reasonable for them to do

9   that.

10  Q   Did you know that?

11  A   I'd have to -- let me see.

12  Q   When you look at --

13  A   Do I recall when I read this document, do I recall

14  specifically that it was pen and paper?  It's targeting an

15  accountant.

16  Q   Yes, sir.

17  A   It should.  If it's a sensible effort, it should address pen

18  and paper and other people as well.

19  Q   And when it talks about easier than preparing your taxes by

20  hand, that's pen and paper?

21  A   Yes.  That's the first one.

22          THE COURT:  Mr. Robertson, would this be a good time

23  for a short break?

24          MR. ROBERTSON:  Yes, your Honor.

25          THE COURT:  We'll take a ten-minute break.

1          (Recess was taken.)

2              MR. ROBERTSON:  May I proceed, your Honor?

3              THE COURT:  Yes, please proceed.

4    BY MR. ROBERTSON:

5    Q    Sir, let's turn to a different topic.  Complexity.

6    A    Yes.

7    Q    And I'm not talking about all the math we did earlier.

8         One of the things that you stated, sir, is that assisted

9    should not be in the market because people often switch to

10   assisted due to a change in their tax complexity, correct, sir?

11   It's one of the reasons?

12   A    One of the reasons why using the IRS data gives you an

13   overestimate of diversion is because a significant amount of the

14   switching from -- between DDIY and assisted is because of a

15   change in complexity.  I think that's probably what I was

16   saying.

17   Q    Okay.  And in that model, you excluded 50 percent of those

18   that were not in DIY tax preparations online or DIY digital, you

19   excluded 50 percent of all of those that were outside that

20   market; is that correct?

21   A    I'm not sure.

22   Q    Okay.

23   A    I think I know what you're saying.  And if I understand what

24   you're saying, is in one of the simulation models, we assumed

25   that 50 percent of what was migrating was due to a change in

1    complexity.

2    Q   On the two that you showed the Court when you said

3    discounted, isn't that what you mean?

4    A   That's correct.  We took --

5    Q   That's it.  That's what you mean?

6    A   Yes.

7    Q   Okay.  And what you did is you excluded 50 percent of those

8    that diverted outside of your defined market when you did the

9    calculation for diversion ratios for those numbers, correct?

10   A   I haven't excluded everybody.  What I've said is that if you

11   look at the migration, that 50 percent of that is due to

12   complexity; and, therefore, when you go from the migration rates

13   to diversion rates, one way to handle that is to cut the IRS

14   migration rate in half to get to the diversion rate.

15       I'm just trying to be accurate.

16   Q   Sure.  And the percent that you used when you did that

17   calculation was 50 percent, correct?

18   A   That's correct.

19   Q   All right.  And the approximate percent of those that were

20   outside of your relevant market in the IRS data is about

21   60 percent, correct?

22   A   It's -- yes.

23   Q   Okay.  Now, you analyzed switching rates for customers that

24   had no change in complexity, correct, sir?

25   A   Yes.

1   Q   And you found that among people with no complexity change,

2   the switching from TaxACT to H&R Block was about 10.5 percent,

3   correct, sir?

4   A   I'm speaking from memory.  I calculated three groups; one

5   with no complexity, one average, and one with complexity.  And

6   that sounds about correct.

7   Q   Just go to your deposition and make this go a lot faster so

8   you can remember the numbers that you gave me.

9      Look at page No. 160 of your deposition, please, sir.

10   A   Is this on the screen?

11   Q   I'm sorry, sir.  It is in your Tab 4, page 160.  I'll put it

12   up on the screen if that would help you, sir.  Page 160 of the

13   deposition.

14      Are you there, sir?

15   A   I'm getting there.  160.

16   Q   Okay.  Now, let me get the numbers right here.

17      What did you find that the switching from TaxACT to H&R

18   Block was for those people without a complexity change?

19   A   From TaxACT to HRB without a complexity change as measured

20   by the IRS is 8.5 percent.

21   Q   Okay.  Now, if you look down at line 18 and 19 and you

22   explain this, that whole paragraph, if you take out those that

23   switch because of complexity among people with no complexity

24   change, switching from TaxACT to Block, is that about

25   10.5 percent?

1    A    That's correct.

2    Q    And the switching from H&R Block to TaxACT was about

3    10.1 percent, correct, sir?

4    A    Yes.

5    Q    And your analysis also found that people with no complexity

6    switched from digital do-it-yourself to assisted at the rate of

7    about 29 percent?

8    A    Yes.

9    Q    So for math, that's pretty close.  Almost three times as

10   many people with no complexity change switched to assisted than

11   between H&R Block and TaxACT?

12   A    That's correct.

13   Q    And you believe that most switching occurs because of what

14   you'd call a "life event"; is that correct, sir?

15   A    No.  I'm saying switching occurs for a large number of

16   reasons.  Some of which people switch because they look at

17   different prices.  People may switch because quality changes.

18   People may switch because their situation changes such as

19   complexity.

20   Q    Isn't it true that switching from do-it-yourself digital tax

21   products is highest for those who are switching because of price

22   than for any other reason to assisted?  Or do you know?

23   A    I think what we're discussing is an HRB survey.

24   Q    Yes, sir.

25   A    I've looked at what happened when the price -- the

 1   respondents were asked what would you do if the price of your

 2   free product went up?  And I cite that for the proposition that

 3   something like 88 percent of them would -- if I can recall

 4   correctly, would switch to -- it's gone.  But that's the study

 5   that I cited for the proposition that people switch rapidly

 6   between -- or easily between free products.

 7       And if your price goes up for a free product, you're

 8   particularly likely to switch to another free product.  That's

 9   correct.

10   Q   All right.

11   A   And that is an HRB study.

12   Q   That's correct.  We can just stop there, and I'll move to

13   the next one.

14       Do you know, sir, that in the same survey that you used for

15   your report, that only 25 percent of people have life event

16   changes or complexity changes in a given year?

17   A   I wouldn't be surprised.

18   Q   And sir, isn't it true that people switch to other -- from

19   one do-it-yourself digital product to another do-it-yourself

20   digital product because of complexity?

21   A   Yes.

22   Q   It's fairly common, right, sir?

23   A   I don't know how common it is but, yes, it happens.

24   Q   And you didn't exclude those in your unilateral effects

25   model, did you, sir?

```
 1   A    If you go back --

 2   Q    Did you exclude them, yes or no?

 3   A    They're included.  The issue is --

 4   Q    That's what I need to know.

 5   A    Yes.  Okay.

 6   Q    Included is kind of the opposite of excluded.

 7   A    I hope so.

 8   Q    Now, turning to your model, sir, for unilateral effects.

 9        Now, do you remember when I handed you a component of your

10   model at your deposition?

11   A    Which component?

12   Q    What program is your model in?

13   A    I don't know.  You'd have to ask.

14   Q    Is the gentleman you're pointing to at the Department of

15   Justice?

16   A    Oh, one of the gentleman from one of the economists at the

17   Department of Justice, Marc Remer, I believe, ran the model so

18   he did all the programming.

19   Q    Is that Mr. Remer?

20   A    Yes.

21   Q    Okay.  Marc Remer.  He's here today, right?

22   A    Yes.

23   Q    And he was the one that put together the model, right,

24   sir?

25   A    He is the one who did the programming, as far as I know, on
```

1    the competitive effects model.

2    Q    And you yourself have not actually looked at the program,

3    right, sir?

4    A    No.

5    Q    Is that correct?

6    A    That's correct.

7    Q    And is it true that the actual diversion ratios that are

8    calculated through the IRS switching data that are used in the

9    model are lower than those that you use to calculate the harm?

10   A    Can you provide me some explanation for that.

11   Q    Okay, sir.  We can switch sides, and we can do that a lot

12   easier.

13   A    What do you mean by "the harm"?

14   Q    The numbers you put up on the board earlier today.

15   A    Were you talking about the dollar harm number or were you

16   talking about percentages?

17   Q    We're talking about either one.  Diversion ratios that were

18   used in the model are higher in either model for either number

19   than they are actually from the IRS switching data.

20   A    Oh, yes.

21   Q    And that's because you discount half of the 63 percent of

22   the total market, correct, sir?

23   A    That's what the exhibit shows.

24   Q    Now, you agree that the documents in this case provide, in

25   your view, the strongest documentary evidence on the point of

1   diversion is -- are two documents; the pricing simulator and the

2   2011 TaxACT survey, correct, sir?

3   A   No, I don't believe so.

4   Q   Have you actually seen a document that discusses a switch

5   from one product to the other because of the change in relative

6   prices?  Yes or no?

7   A   Yes.

8   Q   And the documents which probably come closest to doing that

9   specifically are, you would say, the simulator and the 2011

10  survey, correct, sir?

11          MR. WAYLAND:  Your Honor, the question is "discuss."  I

12  just want to make that clear.

13  BY THE WITNESS:

14  A   You know, in deposition --

15          THE COURT:  The objection is overruled.  Go ahead and

16  answer if you feel comfortable answering that question.

17          THE WITNESS:  Sure.

18  BY THE WITNESS:

19  A   The documents that actually ask the question what would

20  happen if there were a price increase, is the two surveys; an

21  HRB survey, which we've just been talking about, which is what

22  happens if the price of free went up, okay, where would you

23  switch to?  We talked about a finding that a very high share

24  would switch to another free product.

25     The only other survey that asks the question what would you

1   do if the price of your product went up is the 2011 survey.  And

2   I understand that Professor Dhar is going to comment on that.

3   Q   And aside from those documents, you can't name any others

4   that answer the question about switching from one product to the

5   other because of a change in relatively price; isn't that

6   correct?

7   A   Those are the only two that ask that question

8   specifically.

9   Q   Now, you mentioned earlier today that you rely on IRS

10  switching data to determine the diversion ratios; is that

11  correct, sir?

12  A   Correct.

13  Q   And you mentioned in terms of the way you did it by market

14  shares, the exclusion from the total market there, you got that

15  20 percent number from the Hoover Model.

16      Did I get that right?

17  A   That's correct.  That's for online.

18  Q   Now, you say that you did some work to put efficiencies back

19  in your model to see how it worked?

20  A   Well --

21  Q   Did you run it or not with efficiencies?

22  A   Yes.  I ran it specifically with the variable cost

23  efficiencies identified by Dr. Meyer.

24  Q   And where is that?

25  A   In my head.

1   Q   That's the problem.  You didn't print out a piece of paper

2   or anything?

3   A   Yes.  I think at one point I've seen a piece of paper.

4   Q   Did you ever produce that to us, sir?

5   A   I have no idea.

6   Q   Just not either in your original report or in your reply

7   report, correct, sir?

8   A   No.

9   Q   That's all I wanted to know.

10  A   As far as I know, the --

11  Q   Sir --

12  A   -- the numbers are not in the reply report, correct.

13  Q   Or in the original report, correct, sir?

14  A   That's right.  They were only done for the reply report.

15  Q   Now, over lunch, did you have an opportunity to talk to your

16  counsel about your testimony?

17  A   I mean, I talked to my counsel, but very briefly.

18  Q   Did you talk to anybody at the DOJ about your testimony

19  during the break we had?

20  A   No.  I understand I'm not supposed to talk to my other

21  economists.

22  Q   Now, when you did put efficiencies in your model and it's

23  in your head, can you remember whether that brought the price

24  increase for the first number that you gave the Court, the

25  $6.7 million?  What percent did that bring it down to, sir; do

1   you know?

2   A    What I presented to the Court was not a $6.7 million.   What

3   I presented to the Court was the price increases for two runs of

4   the simulator.   I'm sorry; two runs of the market model.

5   Q    Did you run the efficiencies for both runs?

6   A    Yes, I think so.

7   Q    For the first one?

8   A    Uh-huh.

9   Q    What did it bring it down to in terms of a percent price

10  increase?

11  A    My recollection is that if we take her efficiencies, we

12  allocate them --

13  Q    I just want the percent, sir.

14  A    Oh, the percentages.   Okay.

15       I think what happens is that the percentage increase at HRB

16  falls to zero or close to zero.   And the percentage increase at

17  TaxACT is still substantial.

18  Q    What's the number?

19  A    Probably AT least half of what otherwise would be there.

20  Probably about 5, 6 percent.   I'm speaking purely from memory

21  here, but my recollection is somewhere around 6, 7 percent.

22  Q    I'm trying to pull it out of the head.   That's all I can do.

23  A    That's right.   What I testified to is that there is

24  substantial price increases at TaxACT.

25  Q    I need numbers, not your view of whether it's substantial.

```
 1            THE COURT:  Dr. Warren-Boulton, rather than just
 2   guessing at this, I mean, is there someplace where you've
 3   documented the specific numbers so if your recollection fails
 4   you, you can provide the accurate numbers?
 5            THE WITNESS:  Yes.  I could probably find out pretty
 6   quickly.
 7   BY MR. ROBERTSON:
 8   Q   Going back to the first number, the first increase, what was
 9   the total number of millions of dollars that you projected for
10   the first one?  You have two numbers.
11   A   Well, there's Exhibit --
12            MR. ROBERTSON:  Your Honor, a moment?
13            THE COURT:  Yes.
14        (Brief pause.)
15            THE WITNESS:  Exhibit 6.
16   BY MR. ROBERTSON:
17   Q   What tab are you in?
18   A   I'm in Tab 6.
19   Q   And on Tab 6.
20            THE COURT:  For the record, this is Government
21   Exhibit 1003.
22            MR. ROBERTSON:  1003.  It has a 6 on there.
23   BY MR. ROBERTSON:
24   Q   And you have harm in millions of 16.7?  Do you see that,
25   sir?
```

1   A    Yes.

2   Q    And in your report, you had another run that was a lower

3   number; is that right?

4   A    That's right.  That's if you don't discount the IRS at

5   all.

6   Q    All right, sir.  And what is the -- that's the total

7   additional charge to customers as a result of that particular

8   analysis; is that correct?

9   A    That is the increase in cost to consumers from the

10  unilateral effects alone assuming no efficiencies, that's

11  correct.

12  Q    And under this model -- this particular model -- the gain in

13  terms of revenue to the combined H&R Block and TaxACT is under

14  $2 million; isn't that correct, sir?

15  A    I haven't done that calculation.  Are you telling me

16  that --

17  Q    Does that make sense?

18  A    Well, running the model in my head, I would probably -- I

19  would say that of that 16.7 million, how much of it is

20  translated into profits to the merging firms, something on the

21  order of 2 to 3 million doesn't sound unreasonable.

22  Q    Okay.  Generally, 2 to 3 million.

23       And the loss of total customers as a result of this price

24  increase is over a million for that model, right, sir?

25  A    I wouldn't be surprised.  I can't give you the exact number,

1    but a million or over sounds about the right number.

2          THE COURT:  Mr. Robertson, where are you getting those

3    numbers of the customers?

4          MR. ROBERTSON:  I can ask him.

5    BY MR. ROBERTSON:

6    Q   What happens, sir, the way it works -- and this is just

7    classic economics and you've taught it more than I have -- that

8    the way the model works is that when you increase price, then

9    output goes down, right, sir?

10   A   Except in the simulator model, yes.

11   Q   That's how it works.  So when one raises prices, one loses

12   customers?

13   A   That's correct.

14   Q   And where they go, who knows, we're not even trying to

15   estimate that at this point?  They have to go somewhere because

16   you say you have to die or go to jail or you have to do a tax

17   return?

18   A   That's right.  But the central question is where do they go

19   in the merger analysis, correct.

20   Q   But in the simulator, we're not trying to figure that out?

21   A   The merger model or the simulator?

22   Q   The merger model to make your simulator, not H&R Block's.

23   A   In this merger model, we do care where they go.

24   Q   But you haven't calculated in the merger model itself where

25   they go?

1  A    The merger model can calculate loss customers and with

2  diversion ratios, where they went.

3  Q    Doesn't your merger model just have data in there for Block,

4  TaxACT and TurboTax, and everybody else is an "other"?

5  A    That's correct.  It's not interested in where you go other

6  than TurboTax and H&R Block.

7  Q    All right, sir.  And we know that in the example where they

8  raise prices and the company -- the combined company -- gains

9  2- to $3 million, the million customers that are lost, they

10  could go to Intuit or they could do to any of the others that

11  are out there?

12  A    That's correct.

13  Q    And some of them could go outside the market somewhere

14  else?

15  A    They could go to assisted, yes.  It's unlikely they're going

16  to go to Canada.

17        THE COURT:  Dr. Warren-Boulton, are the numbers of the

18  gain to the merging firms and the loss of customers to the

19  merging firms under the merger model that you talk about in your

20  expert reports, is that anywhere in your expert reports?

21        THE WITNESS:  Yes.  Oh, I'm sorry.  These numbers are

22  all in my expert report.

23        THE COURT:  The gain to the merging firms of 2- to

24  $3 million and the loss of customers to the merging firms?

25        THE WITNESS:  No, that's not.  I'm just saying that if

1    I run the model in my head and you asked me to do that, I can --

2    I know enough about the model so that I can calculate the

3    expected loss of customers.

4              THE COURT:  Okay.  That was part of my question.

5              THE WITNESS:  I'm comfortable with the numbers because

6    I can do it roughly in my head.

7              THE COURT:  I wanted to make sure I hadn't mixed

8    anything from the reading of the voluminous reports.  That was

9    really my question.

10             MR. ROBERTSON:  That's what we were trying to do is

11   fill in the gaps of what wasn't on the paper.  We went through

12   this exercise in the deposition, and I can confirm that

13   Dr. Warren-Boulton was able to do it in his head a lot better

14   than I could.

15   BY MR. ROBERTSON:

16   Q    Now, what's the total -- sir, approximate total -- revenue

17   in the entire market that you defined for all players; do you

18   know?

19   A    In the total DDIY market?

20   Q    Yes, sir.

21   A    I couldn't give you an exact number, but I'm prepared to go

22   with whatever you're ready with.

23   Q    Do you know if it's billions?  Not millions, is it?

24   A    It's a lot of money.  I mean, I think somewhere in my report

25   it's probably in there, but I don't -- I can't tell you what

1    that number is offhand.

2    Q    Just quickly on the DMA study.  I don't want to spend much

3    time on it.  You and Dr. Meyer have been going back and forth on

4    that.  I'll let you all do that.

5         Did you look to see when you looked at your DMA study,

6    whether there were other cities where Block's share actually

7    decreased as well without any advertising from TaxACT?

8    A    Everybody's share is increasing.  We look to see where you

9    were increasing in DMAs where you advertised relative to DMAs

10   where you didn't.  And there's a lot of variations so we're

11   looking at the mean, the average difference between these two

12   groups.

13        But as you can see from the plot, there's a lot of

14   variation.

15   Q    Do you know how much money was spent on that advertising

16   campaign?

17   A    I probably did at some point, but right now, no.

18   Q    And do you know if it was more than a million and a half

19   dollars?

20   A    No.

21   Q    In the TurboTax document that you referred to -- and I don't

22   want to get into the details of that in the public session --

23   but do you know whether after the test, whether TaxACT then

24   continued with that advertising campaign?

25   A    That's my recollection, that they looked at it and said it

1  was profitable.

2  Q    You believe they actually continued it?

3  A    My recollection is they continued advertising, but that's

4  just a recollection.

5  Q    You cited as maverick behavior to the Court what TaxACT had

6  done in 2003 and 2005, right, sir, tax seasons?

7  A    Yes.  Well, tax years, right.

8  Q    Right.  And you had a nice chart with all the things that

9  TaxACT had done.

10      Had you checked to see when Intuit first offered free?

11  A    Well, depends on what you define as "free."

12  Q    Anything free.

13  A    Anything free, 1998.

14  Q    And that was free E-filing for people below a certain AGI,

15  right, sir?

16  A    That's right.

17  Q    Is that correct?

18  A    Yes.

19  Q    Now, in 2003, that offer that TaxACT made was on the FFA,

20  correct, sir?

21  A    Yes.

22  Q    And then everybody on the FFA followed that; is that

23  right?

24  A    That's my recollection, yes.  We had people who went to

25  basically free for all.

1    Q    And after the change in 2005, nobody is offering that offer

2    on the FFA anymore, right, sir?  Is that correct?

3    A    Free for all, that's correct.

4    Q    Thank you.

5    A    You mean, after the IRS limited the amount that you could

6    offer?  Yes.  After the IRS shut it down, it shut down.  Nobody,

7    as far as I know, is violating the IRS' rule.

8    Q    Just talking about advertising, sir.  You've seen the fact

9    that TaxSlayer is sponsoring the Gator Bowl?

10   A    I haven't seen the effect of it, but I do understand that

11   TaxSlayer is sponsoring the Gator Bowl.

12   Q    They seem to have money for marketing on TV, right, sir?

13   A    That's correct.

14   Q    And you also know that point-and-click advertising is highly

15   effective, right, sir, on the Web?

16   A    That's a pretty broad statement.  It's effective, yes.

17   Q    And is it true that it requires no up-front investment?

18   A    I don't know the answer to that question.  I'd have to look

19   at it.  But I wouldn't be surprised.

20        MR. ROBERTSON:  Your Honor, I believe I can now go to

21   the closed session.

22        MR. WAYLAND:  Fine with us.

23        THE COURT:  Fine.  We will close the courtroom.

24        MR. WAYLAND:  Your Honor, can we understand how much

25   longer we have?  Are we going to hit the next witness today?

1          THE COURT:  I would say after this closed session and

2     then you doing redirect -- how long do you think you're going to

3     be on the closed session?

4          MR. ROBERTSON:  Give me 20 minutes, your Honor.

5          THE COURT:  20 minutes.  And then probably redirect on

6     the -- we're likely not going to get to the next witness

7     today.

8          MR. WAYLAND:  Thank you, your Honor.

9          THE COURT:  So we're going to close the courtroom now,

10    go into closed session, and then return to see how far we can

11    go, if we go until about 4:30 today with the remainder of the

12    public session.

13         MR. WAYLAND:  Thank you, your Honor.

14         THE COURT:  So I have to excuse everybody from the

15    spectators.

16         MR. ROUSH:  We can release the witness we have?

17         THE COURT:  Yes, you may.

18         I would just like to put on the record that the

19    courtroom is appropriately cleared.  I see a couple more people

20    in the back.

21         MR. ROUSH:  They are with us, your Honor.

22         THE COURT:  And from the government?

23         MR. WAYLAND:  Also, your Honor.

24         MR. ROBERTSON:  Your Honor, I just had one thing which

25    is a transcription error because I'm sure I mumble and the

 1   witness speaks better than I do, but I think one thing got

 2   missed.  I can clarify it by asking the witness, and we can do

 3   it on or off the record.  I think it's a simple issue.  I can do

 4   it on the record.

 5          THE COURT:  Why don't you do it on the record and then

 6   there will be no issue with it.

 7          Does this have to be part of the sealed part of the

 8   record?

 9          MR. ROBERTSON:  No, it's not.  We just found it by

10   looking on the record.

11          THE COURT:  When we go back into a public record, you

12   can do that.  This part of the record will be sealed.

13   BY MR. ROBERTSON:

14   Q   Sir, if you remember back about, oh, 35, 40 minutes ago,

15   apparently, this is at -- 15:25, in fact -- it was 25 minutes

16   after 3:00 where I asked you whether you knew that 29 percent of

17   people who have life changes, if that was the right number for

18   people who had shifted from do-it-yourself to assisted.  And I

19   believe you said, "I would not be surprised."

20       And we saw on the record it was, "I would be surprised," and

21   I wanted to make sure we got down exactly what your answer was.

22   A   Why don't you reask me the question, and I'll try to figure

23   out what I think the answer is.

24   Q   I thought you said, "I would not be surprised."

25       Is it true that you would not be surprised that 29 percent

1   of people leave do-it-yourself digital to assisted for the

2   reason of a life change?

3   A   I don't know about a life change.  I've looked at changes in

4   complexity, if that's what you mean by "a life change."

5   Q   Yes, sir.

6   A   I can't vouch for that number, but I certainly can't say

7   it's wrong.

8   Q   But you wouldn't be surprised?

9   A   That's why I can't say it's wrong.

10  Q   Okay.  Thank you.

11          THE COURT:  Okay.  This part of the record does not

12  have to be sealed so please unseal that.

13          I think we are now turning to the sealed part of the

14  record; is that correct, Mr. Robertson?

15          MR. ROBERTSON:  Yes, your Honor.

16          THE COURT:  Okay.

17      (The following portions, pages 82-91, were designated as

18       confidental/attorneys' eyes only and sealed under a

19       separate transcript per order of the Court.)

20

21

22

23

24

25

```
 1            THE COURT:  Mr. Wayland, any time you're ready, start

 2   with redirect.

 3                      REDIRECT EXAMINATION

 4   BY MR. WAYLAND:

 5   Q    I just have a few questions, Dr. Warren-Boulton.

 6        First, there was a lot of discussion at the beginning about

 7   your use of the 50 percent margin in the critical loss

 8   analysis?

 9   A    Yes.

10   Q    And just to explain the factors that -- you said you took

11   into account some factors about this particular industry that

12   were different than general software.

13        Could you just review those and tell us the basis for the

14   50 percent.

15   A    Sure.  In most software, if a customer arrives on your

16   doorstep because somebody else has increased their price and you

17   ask the question how much money do I get out of that customer,

18   all I have to do is deliver them the software.  So if you like,

19   pull it off the shelf or license them or give it to him.

20        The cost of making the software, reproducing the software,

21   is very, very small.  So that's usually what's referred to as

22   the "gross margin."  It's about 80, 90 percent, I think, for --

23   we have data for HRB.  I think it's 92 percent, okay.  It's

24   nearly all profit, okay.

25        In this industry, there's something odd that happens, and
```

1   that is, when going through our natural experiment, when one of

2   the parties raises his prices and those people start to divert,

3   they start saying wait a minimum, prices have come up, I'm going

4   to look elsewhere.  They don't just search themselves and land

5   in various places all by themselves.  If they did that, then all

6   we'd be looking at is a gross margin of 90 percent.

7       In this industry, when they start to search, they start to

8   search nowadays by going on Google or some kind of search engine

9   and they put in keywords.  And this triggers an ad on the part

10  of Intuit, TaxACT or whomever.  When that happens, those

11  companies get charged.  So normally, a customer that's diverted

12  through a price increase arrives for free.  This particular

13  industry, what happens is he doesn't arrive completely for free.

14  He arrives with a little baggage, a little cost that's attached

15  to him, okay.

16      So we can't say that if you're considering raising your

17  price and looking at the extra profits to your partners, it

18  isn't just the production cost that your partner incurs.  It's

19  that this search triggers these payments to Google.  And that's

20  complicated.  But that's what I've tried to take into account by

21  estimating the incremental marketing costs, that that, in a

22  sense, has to be taken into account when you make that decision

23  to raise prices that you're going to get this customer over

24  there and your partner, you're not going to have -- it's not

25  going to cost you much to provide him with the product, but it

1    is going to trigger this search activity.

2        And I've made estimates of what that looks like, and that's

3    incorporated in the margin because what I'm trying to find out

4    is what happens to the profits of your partner when you raise

5    prices and lose some customers?  That's the incremental margin

6    that we're talking about in these merger simulation studies.

7    And that's why we're using a much lower margin than we normally

8    would.  And the result is to make the result very conservative

9    in terms of the price increase because, as you can see, the

10   greater the margin over at the partner, the greater the

11   incentive to raise prices.  And so instead of using an 80 or

12   90 percent margin, I've used a 50 or 70 percent margin.

13   Q    So actually using a lower margin is more conservative than

14   using a 70 percent margin that Mr. Robertson put on the board

15   and did calculations, correct?

16   A    Yes.

17   Q    Now, another set of numbers we talked about were the IRS --

18   the diversion numbers and the use of IRS switching data?

19   A    Yes.

20   Q    And you said that you had applied a discount to that?

21   A    Yes.

22   Q    Just explain the reason for doing that, sir.

23   A    Two reasons really.  One is that we're able to look at,

24   fundamentally, what the -- we could take the people who

25   switched, and we can break them up into those who said they had

1   a change in complexity and those who didn't have a change in

2   complexity.  And this is actually Dr. Meyer's suggestion for

3   which I must thank her.

4       And when we do that, what we find is that when we remove the

5   people who are changing because of complexity, both, by the way,

6   between DIY, which I think was counsel's point, and in and out

7   of DDIY, when we remove all the changes in complexity, you know,

8   what we get is a significant reduction in diversion to outside

9   the market and a correspondingly significant increase in

10  diversion between the parties within the market.

11      So I have done the best I can to take complexity out of the

12  equation.  For all the reasons that people switch, I've tried to

13  remove as best I can complexity.  And the results that I get

14  really support the kinds of diversion numbers that we've

15  inputted into the model.

16          THE COURT:  And you've tried to remove complexity in

17  order to get closer to answering the question of what would be

18  the diversion ratio if it was based solely on a price change?

19          THE WITNESS:  Exactly, exactly.

20          THE COURT:  Without asking that specific question?

21          THE WITNESS:  I would love to be able to ask that

22  specific question.  I can't.  But I can get rid of the elephant

23  in the room.

24  BY MR. WAYLAND:

25  Q    And in fact, you actually ran the undiscounted numbers and

1   showed them in Table 10 of your appendix to your report,

2   correct?

3   A    That's correct.  You still get very large price increases.

4   Q    And completely consistent with your discounting as well,

5   right?

6   A    Yes.

7   Q    We could spend a fair amount of time at this,

8   Dr. Warren-Boulton, going through the documents that

9   Mr. Robertson showed.  I'm just going to take one because that's

10  all I think we need to do.

11          THE COURT:  It's not because you're tired and it's

12  Friday afternoon?

13          MR. WAYLAND:  No, your Honor.  It's because we've seen

14  these for the whole week.  I do have to catch a plane back to

15  New York.

16  BY MR. WAYLAND:

17  Q    If you would look, sir, at Tab 6 of the binder that

18  Mr. Robertson gave you.

19  A    Yeah.

20  Q    And I'll use the ELMO to put these up because they are

21  Mr. Robertson's documents.  We're at Tab 6 of the defendant's

22  binder.  And that's listed at HRB0359542 is the first page of

23  the document.

24      I want to show you page 9 of the document to start, sir.

25  A    Yes.

1  Q   Well, first of all, this is on the left side.  You

2  understand that there's -- they have set out the market shares

3  by two different markets in assisted and an online market.

4      Do you see that?

5  A   Yes.

6  Q   And on the right-hand side, it says in the highlighted

7  part -- well, let's read the whole thing for context.

8      "Although online has been growing, this has not been coming

9  at the expense of assisted.  Instead, the growth has been at the

10  expense of software and pen and paper."

11      Do you see that?

12  A   That's correct.

13  Q   Then drop down to the one that we've highlighted.

14      "This suggests that online is not pulling incrementally from

15  assisted.  Rather than creating a shift in do-it-yourself versus

16  assisted, online is stealing from other do-it-yourself options."

17      Do you see that, sir?

18  A   That's correct, yes.

19  Q   And this is a document that Mr. Robertson put in front of

20  you and, as he noted, you had cited it in your report,

21  correct?

22  A   Correct.

23  Q   And is this description of what's actually happening in the

24  market consistent with your opinion and if so, tell us why?

25  A   I think the history that we're seeing here is the percentage

1   of assisted has remained pretty well flat.  The shift in the

2   market is that there's pen and paper and then within DDIY

3   there's software and online and then there's assisted.  And the

4   shift that you've seen over time has been, first of all, people

5   coming out of pen and paper into DDIY.  And then within DDIY,

6   there has been a pretty steady shift away from software, which

7   means you go into Staples and buy the box to doing it online.

8        So there's been a rapid growth in online which is where our

9   friend TaxACT sort of specializes.  And that growth has come at

10  the expense or, if you like, due to migration.  Migration from a

11  pen and paper and it's due to migration from boxes, from buying

12  software.  But it has not come from, in terms of the aggregate

13  share, it's not come from assisted.  That's remained remarkably

14  steady throughout this time period.  It sits up there at about

15  60 percent, as I recall.

16       THE COURT:  But are you seeing, Dr. Warren-Boulton,

17  some -- this seems like a very dynamic marketplace in part

18  because all the players, big and small, are trying to catch

19  those eyeballs --

20       THE WITNESS:  Yes.

21       THE COURT:  -- of tax paying filers?

22       THE WITNESS:  Yes.

23       THE COURT:  And I mean, in this kind of dynamic

24  marketplace which seems to have evolved just over the last

25  decade quite dramatically and seems, just based on evidence at

 1   this hearing, that it continues to be evolving into this

 2   hybrid -- you know, with these hybrid offerings, that the

 3   demarcation, if -- I think there's some dispute about how much

 4   of a demarcation there is, but if you accept that there was some

 5   demarcation in markets between assisted and digital

 6   do-it-yourself, that there is -- the market is evolving with

 7   these hybrid offerings and Intuit paying closer attention to

 8   resale stores, that this market is evolving so that the -- that

 9   there's less of a clear demarcation and in the future, in the

10   next couple of years even, there's going to be even less of a

11   clear demarcation between assisted and digital do-it-yourself?

12           THE WITNESS:  Well, I'm not really in the forecast

13   business, but let me try.  First of all, I look at the

14   history.

15           THE COURT:  Unfortunately, that's part of what we're

16   doing.

17           THE WITNESS:  I agree.  So to the extent that I can do

18   anything, I think the first thing to say is that --

19           THE COURT:  I'm relying on you to help define what the

20   relevant market is.  And the relevant market, as it was even in

21   tax season '10, may be changing in tax season '11 and '12, not

22   even in the far future, the near future.

23           THE WITNESS:  I understand that HRB, in particular, is

24   trying to offer hybrid so let's have a bit of both.  It's also

25   my understanding that that's not been, shall we say, a

1    spectacular success.  I think that there's a separate market for

2    assisted and DDIY is separate because the products are so

3    fundamentally different while people move back and forth.

4         You can get your taxes done either way.  You can get

5    your taxes done by buying the software, doing it yourself, or by

6    doing it through assisted, but they're sufficiently different so

7    that the -- you know, looking off into the future, that the

8    chance that assisted is going to disappear because DDIY is going

9    to become so easy to do it yourself, getting somebody to help

10   you with it is really quite different than do-it-yourself.

11        Analogies are perhaps bad, but if I want a steak

12   dinner, I can go to a grocery store.  And I can buy the steak,

13   and I can cook it at home.  And that's sort of like DDIY.  Or I

14   can go to a restaurant.

15        Now, are these substitutes?  Do people switch back and

16   forth?  When I go home and I say I want a steak, does my wife

17   say, "Well, why don't we go out to a restaurant"?  Yes.  But

18   it's a fundamentally different process.  When I do assisted, I'm

19   buying a lot more; I'm buying a lot of help that goes with it.

20        And for me, I think what in a sense is frustrating

21   about this process is, it's not the question I'm really asking.

22   The question that I'm really asking is, is it worth it to have a

23   monopoly just of DDIY, or would somebody who had that monopoly

24   who just had DDIY and tried to raise the prices of DDIY, would

25   he lose so many customers to assisted that it wouldn't be

1   profitable to have a 5 or 10 or 15 percent increase?

2          And there's simply no support for that whatsoever.

3   These are substitutes.  It's clear that they're substitutes.

4   People do switch back and forth.  Even, to some extent, they

5   switch back into paper sometimes if their world becomes less

6   complicated.  But in defining a market and looking at this

7   process, we don't include all the substitutes in the world, you

8   know.

9          If I was looking at a merger between Pepsi and Coke, I

10  wouldn't say let me define the market as all liquids, even

11  though, boy, if I can get a market of all liquids, would I make

12  a lot of money.  And if I define the market as all liquids, if I

13  included all this other stuff, and then I looked at Coke's and

14  Pepsi's share, they'd be minuscule and I'd say how could this

15  merger with a problem, look at how small the shares are.  That's

16  the problem with defining a margin that's too large.

17         I don't know if I've lost the question.

18         MR. WAYLAND:  I think I can follow up with some other

19  questions that go to this point, your Honor.

20  BY MR. WAYLAND:

21  Q   You understand, Dr. Warren-Boulton, that over the last

22  decade, for example, the percentage breakdown between assisted

23  and digital has remained constant, correct?

24  A   Very stable.

25  Q   How does that figure help you answer the Judge's question?

1   A   Oh, okay.   There's been a lot of innovations in digital.

2   Digital has become much, much better.   It's the nature of

3   software; things get much better.

4       So it's been improving pretty dramatically over time.   And

5   that rate of technical change, you know, as Moore's law, digital

6   is getting better, better and better.   And yet what we're seeing

7   despite that, we're seeing that the shared assisted is holding

8   constant at 60 percent.   People want to go to assisted.

9       It's not just people who are terribly complicated.   I have

10  friends or people I know who are Spanish who say, "I have

11  problems with the government, I don't know how to run a

12  computer, you know, I need assisted," who are willing to pay a

13  lot more money to go assisted.   I could say to her, "Why don't

14  you do, you know, a software?"   And her answer is, one, "I

15  wouldn't know how to do it," and B, more important, "I really

16  have to trust -- I don't want to get audited for a number of

17  reasons."

18      So assisted seems to be a product that, you know, has a

19  strong life of its own.   And H&R Block assisted and all the

20  other assisted tax firms, as far as I can see, they're going to

21  be out there in business and profitable for the indefinite

22  future.

23      And that's really what I'm trying to say.   Both of these

24  products are going to be out there and succeeding in the future.

25  They're both important.

1   Q   And I think just to follow up on that point, let's look at

2   page 10, which we haven't looked at.   This shows a destination

3   of HRB's lost clients.

4       "Online is not pulling a higher portion of HRB's lost

5   clients to assisted.   The rate that is going to DIY has not

6   increased and, in fact, has decreased as other retail

7   competitors emerged.   Most of our defecting clients do select

8   online, but this is instead of software or pen and paper,"

9   correct?

10  A   Yes.   And that's consistent with the testimony that I've

11  seen from Mr. Houseworth, for example, who I think makes this

12  point rather explicitly.

13  Q   So your view looking at the last decade in the steady shares

14  and considering what Judge Howell brought up of movement in the

15  market, does that change your view at all?   You've identified

16  the right market?

17  A   I think we've identified the right market.   You've seen

18  other markets in which software has simply swamped the market.

19  This is not one which has shown that.   What we've seen is a

20  dramatic improvement in the quality and a reduction.   Shall we

21  say, an increase in the value proposition of using software

22  considerably.

23      But what we have not seen as a result is the death of

24  assisted.   And you know, if assisted hasn't died given the

25  dramatic improvements in DDIY, it's hard to see why it's going

1    to be any more sensitive to that in the future.  People still

2    want to get help with their taxes.

3    Q    In terms of antitrust analysis and effect, what's the window

4    that you're typically looking at is, what, two to three years?

5    A    Or even shorter.  The old guidelines used to say two years.

6    In the end, we're looking at harm to consumers, and you have to

7    look at it and say, you know, we're talking about millions of

8    dollars in harm to consumers over the indefinite future.

9        One of the things about mergers is mergers are forever,

10   okay, or I guess not necessarily forever.  But it's a permanent

11   change in structure, yeah.

12            MR. WAYLAND:  That's all I have, your Honor.

13            THE COURT:  Mr. Robertson.

14            MR. ROBERTSON:  I'll be very fast.  Thank you, your

15   Honor.

16                        RECROSS-EXAMINATION

17   BY MR. ROBERTSON:

18   Q    Sir, I'm back.

19   A    That's right.

20   Q    I just want to make sure you're not walking away from your

21   testimony that the actual margins in this case are 80 to 90

22   percent.

23       Are you walking away from that?

24            MR. WAYLAND:  Your Honor, there is a piece of evidence

25   that's sealed.

1          MR. ROBERTSON:  He said it three times in the direct

2    testimony that it was 80 to 90 percent.  We kept writing it

3    down.

4          THE COURT:  Software market generally is my

5    recollection.

6          The objection is overruled.  I'm going to let this

7    witness handle this question.

8          MR. WAYLAND:  Okay.  Sorry.

9    BY MR. ROBERTSON:

10   Q   I just want to know if you're walking away from that

11   testimony?

12   A   I'm not walking away from my testimony.  Should I say what

13   I've said?  I've said software margins are generally in the 80

14   to 90 percent range.  That the financial reports for HRB show a

15   gross margin of about 92 percent, okay.  And that the margins

16   that I have calculated which referred to what's the margin if

17   sales are diverted, are 50 to 70 percent.  So I've tried to be

18   very conservative.

19   Q   And the reason why you used 50 percent was just to be

20   conservative, right?

21   A   No.  Because what I did is I looked at -- I made a

22   conservative estimate of the increase in marketing costs.

23   Q   I need to move fast here.  Let me just refresh your

24   recollection by showing you your testimony.

25          MR. ROBERTSON:  May I do that so I can get over

1    counsel's objections?  May I approach the witness, your Honor?

2              THE COURT:  Yes, you may.

3    BY MR. ROBERTSON:

4    Q    Turning to page 89 at line 5.  And sir, I do not want you to

5    read it aloud.  I just want you to read it to refresh your

6    recollection from line 5 to line 15.

7         After you've read it, just let me know, please, sir.

8    A    I've read it.

9    Q    Do you stand by your testimony, sir, that you gave on page

10   89 at line 5 to line 15, yes or no?

11   A    Yes.

12   Q    Thank you.

13        Now, in terms of hybrid, its true that Jackson Hewitt and

14   Liberty also have hybrid products, correct, sir?

15   A    I think that's correct, too.

16   Q    The shares between TaxACT and Block in the last three years

17   have remained stable too, correct, sir, between them?

18   A    That's approximately correct, yes.

19   Q    And the shares between TaxACT and TaxSlayer actually have

20   changed?

21   A    TaxSlayer has grown, yes.

22   Q    It's gone up?

23   A    Yes.

24   Q    And if you're Spanish, can you use a Spanish version?

25   A    Excuse me?

1  Q    You mentioned Spanish people may have to go to a Block

2  store.   Is there a Spanish online version?

3  A    I'm sure there is.

4  Q    Assisted preparation doesn't have to disappear to be a

5  competitor, does it, sir?

6  A    I don't understand that question.

7  Q    You kept saying they're not going to away, they're not going

8  to go away.   If they stay, they're still competing against

9  online digital software, aren't they, sir?

10  A    I'm saying that assisted is still going to be there, and it

11  will be a substitute.

12  Q    And it still will compete against online software, right,

13  sir?

14  A    It is an alternative, yes.

15           MR. ROBERTSON:   Thank you.   Thank you, your Honor.

16           THE COURT:   Is there anything else, Mr. Wayland?

17           MR. WAYLAND:   No, your Honor.

18           THE COURT:   Dr. Warren-Boulton, have a good weekend.

19  You are excused.

20           THE WITNESS:   Thank you very much.

21           THE COURT:   Everybody's excused.   I will see you Monday

22  morning at 9:30.   Everybody please have a good, relaxing

23  weekend.

24      (Proceedings adjourned at 4:37 p.m.)

25

CERTIFICATE OF OFFICIAL COURT REPORTER

        I, Lisa S. Schwam, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_ _ _ _ _ _ _ _ _ _ _ _ _ _ — _               _ _ _ _ _ _ _

SIGNATURE OF COURT REPORTER                    DATE