```
 1                      UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,      :  Civil Action
                                     :  No. 1:11-cv-00948
 4                Plaintiff,         :
                                     :  September 13, 2011
 5    v.                             :  Morning Session
                                     :
 6    H&R BLOCK, INC., et al.,       :  Washington, D.C.
                                     :
 7                Defendants.        :
      ............................:
 8

 9

10         TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING - DAY 6
                   BEFORE THE HONORABLE BERYL A. HOWELL
11                  UNITED STATES DISTRICT COURT JUDGE

12

13    APPEARANCES:

14    For the Government:      Mr. Joseph Wayland
                               U.S. Department of Justice
15                             950 Pennsylvania Avenue, NW
                               Washington, D.C. 20530
16                             (202) 514-1157
                               joseph.wayland@usdoj.gov
17
                               Mr. Lawrence E. Buterman
18                             U.S. Department of Justice
                               450 Fifth Street, NW
19                             Washington, D.C. 20530
                               (202) 532-4575
20                             lawrence.buterman@usdoj.gov

21    For the Defendants:      Mr. J. Robert Robertson
                               Mr. Corey W. Roush
22                             Hogan Lovells
                               555 Thirteenth Street, NW
23                             Washington, D.C. 20004
                               (202) 637-5600
24                             robby.robertson@hoganlovells.com

25
```

1   APPEARANCES (Continued):

2   Court Reporter:              Ms. Lisa Schwam, CSR, CRR, RMR
                                 Official Court Reporter
3                                Room 4702-A, U.S. Courthouse
                                 Washington, D.C. 20001
4                                (202) 354-3238
                                 LisaSchwam@aol.com
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by machine shorthand, transcript
     produced by computer-aided transcription.

1                          I N D E X

2   WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

3

4   DR. CHRISTINE SIEGWARTH MEYER

5   By Mr. Wayland                    4

6

7                       E X H I B I T S

8       NUMBER                  MARKED FOR IDEN    ADMITTED

9   GOVERNMENT EXHIBITS:

10       Trail Exhibit 14                     20

11       Trial Exhibit 15                     95

12       Trial Exhibit 16                     96

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              P R O C E E D I N G S

3              THE DEPUTY CLERK:   Civil Action 11-948, United States

4     of America v. H&R Block.

5              MR. WAYLAND:   Good morning, your Honor.   I do not

6     believe there are any administrative matters, but Mr. Robertson,

7     anything?

8              MR. ROBERTSON:   No, your Honor.   I think we're trying

9     to get this accomplished this morning.   And Dr. Meyer is in the

10    courtroom so I think we can commence and keep this moving.

11             THE COURT:   Good.   Dr. Meyer, please come up to the

12    bench.

13             Good morning.   And I remind you you remain under

14    oath.

15             THE WITNESS:   Thank you.

16                             CROSS-EXAMINATION

17    BY MR. WAYLAND:

18    Q   Good morning, Dr. Meyer.   I'm Joe Wayland, and I represent

19    the government in this matter.

20        Diversion.   It's a word I've written on the board over

21    there (indicating).   See it?

22    A   I see it.

23    Q   As I listened to your testimony yesterday, it seemed to be

24    at the heart of your opinion, right?

25    A   Diversion is an important concept in merger analysis, yes.

1   Q   Well, I take it it must be because you're relying on

2   diversion to support most of your opinion, correct?

3   A   I have a lot of different pieces of evidence that support my

4   opinion.  But diversion is very important.

5   Q   And you told us yesterday that diversion is critical to

6   understanding the main issue in this case, which is what happens

7   as a result if there's a price increase, correct?

8   A   That is certainly one of the elements that you have to take

9   into account when thinking about whether there's going to be a

10  price increase.  As I indicated, there are other elements as

11  well.

12  Q   All right.  And you said that the government's market

13  definition is wrong because we don't have the closest substitute

14  in our market, right?

15  A   Yes, I believe that's correct.

16  Q   And the basis for that, as I got it, the quantitative basis

17  for that is your calculation of diversion ratios, correct?

18  A   That's the quantitative basis.  There's also qualitative

19  evidence that corroborates that.

20  Q   You're an economist.  You're here to tell us about the

21  quantitative analysis that you've done, correct?

22  A   I am here to tell you about the quantitative analysis, but

23  qualitative analysis is also important.

24  Q   Well, we're going to talk this morning about the

25  quantitative analysis that you've done.

1       And the diversion quantitative analysis that you've done, as

2  I understand it, a big part of it is the simulator, correct?

3  A    The simulator is important, yes.

4  Q    In fact, the simulator is where you get the quantitative

5  evidence that supports your diversion analysis, correct?

6  A    Yes.

7  Q    All right.  Let's go to the simulator.

8       Now, the simulator was prepared on the basis of what you

9  called in your report a "discrete choice survey," correct?

10 A    Correct.

11 Q    That's at Paragraph 44 of your report, right?  It's on the

12 screen.

13          MR. WAYLAND:  Your Honor, I think we have some binders.

14 Do you have the binders that we -- Binders 1 and 2?  Let me hand

15 them up.

16 BY MR. WAYLAND:

17 Q    All right, Dr. Meyer.  Paragraph 44 of your report says,

18 "The simulator was prepared using a discrete choice survey of

19 6,119 respondents," correct?

20 A    Yes.

21 Q    Now, you've written about discrete choice surveys, right?

22 A    Yes.

23 Q    You wrote an article called "Designing and Using Surveys to

24 Define Relevant Markets," correct?

25 A    I believe that was the title, yes.

1    Q    Yes.  We've displayed it on the screen.  It's at Tab 28.

2         And that's an article you wrote, correct?

3    A    That's correct.

4    Q    Okay.  And where did the article appear?

5    A    The article appeared in a book.

6    Q    Do you remember the name of the book?

7    A    It had to do with antitrust.  I don't remember the name of

8    the book.

9    Q    And the article that we're looking at, "Designing and Using

10   Surveys to Define Relevant Markets," that reflects your views of

11   surveys and the proper use of surveys, correct?

12   A    Yes.

13   Q    All right.  Let's see what you said about discrete choice

14   surveys.  Let's go to page 105.

15        And you say in your article that "discrete choice surveys

16   refer to a form of stated preference survey in which respondents

17   are offered choices under hypothetical conditions," correct?

18   A    Correct.

19   Q    All right.  And that's your understanding of what a discrete

20   choice survey should do, right?

21   A    Correct.

22   Q    And then you say, "In a discrete choice survey, respondents

23   are presented with a set of alternative items with specified

24   characteristics at randomly selected prices," correct?

25   A    Correct.

1   Q    And so a properly formulated discrete choice survey would

2   satisfy this condition, correct, "presented with a set of

3   alternative items with specified characteristics at randomly

4   selected prices," correct?

5   A    Correct.

6   Q    All right.   Now, let's -- I think you've said some more

7   about it so let's keep going.

8        You give an example.   "The respondent may be shown four

9   product options."   It could be more, right, it doesn't have to

10  be four, correct?

11  A    That's correct.

12  Q    "Each option would be a product with a different combination

13  of attributes and prices," correct?

14  A    Correct.

15  Q    That's what a discrete choice survey would be; a bunch of

16  products, attributes, and prices, correct?

17  A    Correct.

18  Q    And makes sense.   If you're trying to figure out what people

19  would do in the real world, here's a list of products, here's

20  the prices; we're going to change something about it, we'll

21  change a price and see what happens, see how people react,

22  right?

23  A    That's correct.

24  Q    And then later on you say, "The range of prices of different

25  product options shown to the respondents might be randomly

1    selected from among a set of four or five hypothetical price

2    points," correct?

3    A    Correct.

4    Q    So -- and I think as we see when we get into the simulator,

5    that was supposed to happen, right?  You change the price points

6    and see how the respondents change their reaction, correct?

7    A    Correct.

8    Q    Okay.  And the whole point of this, as you say in your

9    article, is "an attempt to create a controlled market

10   environment," correct?

11   A    I think I say "a controlled market experiment."

12   Q    "Experiment," all right.  You're right.  "A controlled

13   market experiment."

14       Are you trying to get as close as you can to what consumers

15   would do in the real world, right?

16   A    You're trying to get information about how consumers respond

17   to prices within a survey environment, yes.

18   Q    Okay.  Because you're trying to create a controlled market

19   experiment, right; what happens in the market, you're trying to

20   duplicate that, correct?

21   A    Clearly, this is a survey so we have to recognize that.  But

22   you're trying to get as close as possible to understanding what

23   consumers would do in the event of a price increase, that's

24   correct.

25   Q    All right.  Let's go back to your report and see how you've

1    described what happened here.

2        Now, in your report you say, "The respondents were shown

3    five pricing scenarios, and the options included online

4    do-it-yourself options, software do-it-yourself options,

5    assisted tax preparation options, and other do-it-yourself

6    options, including pen and paper and friends and family."

7        Do you see that?

8    A    Yes.

9    Q    And that's, as far as you know, a correct explanation of

10   what happened in the simulator, correct?

11   A    Correct.

12   Q    And then you say, "The pricing of the various options

13   changed across scenarios."

14       And that, as far as you understand, is what happened as

15   well, right?

16   A    Correct.

17   Q    And that's your understanding.  Your understanding of the

18   simulator is what's set forth that we've highlighted, correct?

19   A    That's correct.

20   Q    All right.  Now, you looked at the results of the simulator,

21   and you interpret them to show, as you report in Paragraph 45 of

22   your report, that, "the largest diversion from HRB's TaxCut, in

23   the event of a price increase, is to CPAs and accountants,"

24   right?

25       That's the conclusion that you reported in your report that

1   you submitted in this case, correct?

2   A    Correct.

3   Q    And that's what your simulator told you, right?

4   A    That's correct.

5   Q    Okay.  But before we talk about that conclusion, I just want

6   to make sure I understand because, in my view, there's a little

7   bit of uncertainty just in the sentence so let's talk about

8   that.

9        First of all, CPAs and accountants, that's just a subset in

10  the assistant market, right?

11  A    That's correct.

12  Q    All right.  And by the way, when you say "HRB's TaxCut," you

13  don't specify a particular product.

14       Do you mean to say that the largest diversion from any

15  product of HRB in the digital market?  Is that what you mean to

16  say, or is there a specific TaxCut product you had in mind?

17  A    This is not a specific TaxCut product.  It's all of the

18  TaxCut products in aggregate.

19  Q    Okay.  So all the TaxCut products in aggregate, all right,

20  we've got that.  Then you say, "in the event of a price

21  increase."  You don't say how big of a price increase.

22       Did you have a range in mind?

23  A    This is a -- looks at what's known as the "cross-price" and

24  "own-price elasticities."  So these are deviations in the price

25  around the base price.  So it's --

1   Q   It doesn't say that there.

2       So let me see if I understand this.  Any HRB product, any

3   price increase, biggest diversion CPAs and accountants.  Is that

4   your testimony?

5   A   Well, what the pricing simulator is able to do, it looks --

6   Q   I don't want to know what the pricing simulator is now.  I

7   want to know your conclusion with respect to the impact of a

8   price increase on an HRB product.

9       And as I read this sentence, it says, any HRB product, any

10  price increase, the result is most diversion goes to CPAs and

11  accountants.

12      Is that your testimony?

13  A   Yes.  Well, it's not any price increase.  These are small

14  price increases around the starting point.  That's the way that

15  these calculations are done.

16  Q   Okay.  How small a price increase?

17  A   Again, this is based on an own-price and a cross-price

18  elasticity, which basically looks at, technically speaking, what

19  we call the "slope," right around the starting point.  So it's

20  looking at -- you know, you think about it as sort of the

21  smallest possible price increase, but it's looking at the

22  direction of the price increase right around -- and the

23  magnitude of the price increase right around the starting point.

24  This doesn't depend on a particular 5 percent or 10 percent

25  price increase.

 1   Q    What's the lowest priced HRB product?

 2   A    Pardon?

 3   Q    The lowest priced HRB product -- you could take the lowest

 4   price that was presented in the simulator.

 5        What was the lowest price?

 6   A    The lowest price that I recall was 14.95 for a basic price

 7   in the simulator.

 8   Q    14.95.  What's 5 percent of that?

 9   A    Somewhere around 70 cents.

10   Q    So 70 cents, HRB decides let's give them a buck.  Let's

11   raise the price of that product by a dollar.

12        What you're saying is that the reaction of the consumers to

13   that price, the most diversion you'd see to raise the price from

14   14.95 to 15.95, off we trot to the CPAs and the accountants.

15        Is that your testimony?

16   A    My testimony is that what the pricing simulator does is

17   obviously it did not include 15.95 as a price.  It has

18   particular prices embedded within it.  But you can look at that,

19   the prices that are within the simulator, and then you can take

20   some inferences about where consumers go.  You look at the

21   pricing that was presented to consumers and you say, well, you

22   know, on average -- again, this is a statistical analysis.  This

23   doesn't look at one particular respondent in the survey and say

24   let's raise his price by 70 cents or a dollar and see where he

25   goes.

1    What you do is you look at all of the data for all of the

2    price changes, and you get -- as I said, it's not point-to-point

3    changes.  The way that you do this statistically is you look at

4    what's known as "slopes," but that's the way you do that in this

5    industry.  That's how you analyze diversion generally; you look

6    at elasticities and cross-price elasticities.

7         THE COURT:  But could you answer the one question of

8    what was the starting point?  Was the starting point 14.95 or

9    was it higher?

10        THE WITNESS:  The starting point is at the base.

11        THE COURT:  So that was 14.95?

12        THE WITNESS:  The base is not in this simulator always

13   the lowest priced product.  I'd have to go back and check.

14        MR. WAYLAND:  We're going to look at that, your Honor.

15   I think it will become clear as we go forward.

16   BY MR. WAYLAND:

17   Q   Well, when you looked at the simulator and you got this

18   result, which you've reported which is the largest diversion

19   from HRB's TaxCut, any product, in the event of any price

20   increase, is to CPAs and accountants, did you stop and say,

21   "That's kind of a bit of a weird result?  You know, I'm an

22   economist.  I think about the real world.  And a conclusion that

23   suggests that somebody who is buying something at 14.95 sees a

24   price increase is going to rush off to a CPA or an accountant,"

25   did you stop to think, "Maybe I better try to figure out what's

1    going on?"

2         Did you try to do that?

3    A    That's why I looked at the documents in this case, yes.

4    Q    But in your conclusion, you don't have any explanation.   Did

5    you think people might want to understand, how do you explain

6    this?   What do you think is going on here that I come to a

7    conclusion, which most of my testimony is based on, that CPAs

8    and accountants are the closest substitute for any HRB product"?

9         Did it occur to you that that was kind of weird?

10   A    No, not really in light of all of the other evidence that

11   looks at how closely it appears that H&R Block and assisted tax

12   preparation compete.   They look at assisted tax preparation in a

13   lot of their -- for example, in the pricing simulator, they

14   chose to include assisted tax preparation.   When they looked at

15   market shares and looked at switching, they look at it to

16   include assisted tax preparation.   Mr. Smyth in his letter talks

17   about competing so -- between retail and the assisted tax

18   preparation.

19        So no, I mean, this didn't seem particularly odd to me.   The

20   datas say what the datas say.

21   Q    Your testimony is, "I read all the documents" -- and you

22   have 19 pages of cites of documents and other things that you

23   looked at.   "I read all this stuff.   I sort of got a sense of

24   what's going on so I looked at the simulator and, gee, that's

25   not a surprise.   The documents tell me -- I was ready for that

1    conclusion.   The documents prepared me to believe reasonably

2    that the highest level of diversion would be from a 14.95

3    product to people trotting off to the CPAs and accountants.

4    That's what the documents told me."

5         MR. ROBERTSON:   Objection; form.   Counsel is testifying

6    about 19 pages.   There's a heck of a lot more than just the

7    19 pages.   I think that that's misleading.

8         THE COURT:   The objection's sustained.   Could you ask a

9    question.

10        MR. WAYLAND:   Sure.

11   BY MR. WAYLAND:

12   Q    Attached to your report is a 19-page appendix which

13   describes the extent of the information you looked at,

14   correct?

15   A    I'd have to go back and check the page number.   I think

16   you're referring to my Appendix 2, which lists all the documents

17   considered.

18   Q    Yes.   I didn't mean to belittle it.   I meant to suggest that

19   you did a lot of work, correct?

20   A    Correct.

21   Q    And the amount of documents that you read and the amount of

22   data that you looked at and the amount of articles and others

23   things that you considered, took 19 pages just to list those all

24   out, correct?

25   A    Again, I'd have to go back and check the page count.

1   Q    We can look at it.  I'll tell you it's 19 pages of, you

2   know, sources for your opinion, correct?

3   A    That sounds about right.

4   Q    And your testimony today is having reviewed all that

5   material, "I didn't think it was odd when my simulator told me

6   that the greatest diversion was going to be to CPAs and

7   accountants," correct?

8   A    Yes.  As I said, I looked at all the documents and I

9   explained this yesterday.  There are documents that look at the

10  world in different ways.  That wasn't surprising to me.

11       And so this quantitative analysis was able to distinguish

12  between different views of the world and say which one is

13  relevant for my analysis, which is to look at diversion based on

14  price.

15  Q    All right.  Now, in your conclusion, I think CPAs and

16  accountants were the largest and then retail stores were the

17  fourth largest diversion, correct?

18  A    That's my recollection.

19  Q    Yeah, okay.  And retail stores, they are part of the

20  assisted, but they're lower priced generally, right?

21  A    They are also another part of assisted, yes.

22  Q    Okay.  Let's look at some -- well, at Paragraph 33 of your

23  report, you make some observations about the price of assisted,

24  and you refer in a footnote to an HRB pricing survey in which

25  there are a variety of prices for various forms of tax

1    preparation, okay.

2        And we have the page of your report up, and then the

3    footnote is displayed, HRBDOJ00359542 at page 38.

4        Do you see that?

5    A    I see what you have highlighted, but the footnote doesn't

6    refer to the highlighted text so I'd have to go back.

7    Q    It's redacted.  If you want to look at your report to

8    confirm that the footnote appears, we can do that, or you can

9    just take my word that the footnote's in your report.

10   A    Well, if I can just take a quick look to make sure what the

11   footnote is referring to, I'd appreciate it.

12   Q    Sure.  It's at Paragraph 33.

13   A    Yes, I see.

14            MR. WAYLAND:  Okay.  The next couple of slides we're

15   going to look at, your Honor, one of them comes from the

16   footnote reference.  And then we have a summary that we

17   prepared.  And they have been marked confidential so we're going

18   to show them to the Court and the witness, but we're not going

19   to display them to the audience, if that's okay.

20   BY MR. WAYLAND:

21   Q    All right.  Let's look at the survey that you referred to.

22   It's Tab 16.  You see we've displayed the first page.  It's at

23   Tax Season '10, "Market Dynamics, Switching Pricing, Competitive

24   Profiles."

25       Do you see that?

1    A    I see that.

2    Q    We're going to go to page 38, which is what you referenced

3    in your report.

4         And again, as you answer my questions, please don't reveal

5    any of the information.  We're just going to describe it, and

6    then I'll ask you some general questions about it, okay?

7    A    Yes.

8    Q    All right.  So this is a chart that's entitled "Pricing

9    Overview by Method."  And that down the left margin in the

10   chart, there are different kinds of tax preparation methods,

11   accountants and tax prep firms, correct?

12   A    Correct.

13   Q    And then all the way on the right, there is a pricing range,

14   Tax Season '10, that would be 2010, price range, and it lists

15   the 25th to the 75th percentile pricing, correct?

16   A    Correct.

17   Q    And this page only lists assisted kinds of preparation,

18   correct?

19   A    With the exception that I had pointed out yesterday about

20   paid family and friend, that's a little bit of an unclear

21   category.  But other than that, those are clearly in the

22   assisted category.

23   Q    Okay.  This chart -- and this is the one you cited in your

24   report, correct, on page 38?

25   A    Yes.

1    Q    Okay.  This one has to do with the 25th to 75th percentile

2    pricing of assisted products plus paid family and friend.  Let's

3    go to page 40.  And you'll see this is a separate chart, and

4    this has "Pricing Overview by Digital Method."

5        Do you see that?

6    A    Yes, I do.

7    Q    And this has various digital competitors and also lists

8    their pricing for the 25th to 75th percentile, correct?

9    A    Yes.

10            MR. WAYLAND:  All right.  Now, we prepared a chart that

11   puts the numbers together from page 38 and page 40, and that is

12   Trial Exhibit 14.  We'll mark that as Trial Exhibit 14, your

13   Honor.  And it's displayed to you, Dr. Meyer, and to the Court,

14   but not publicly.

15       (WHEREUPON, a certain document was marked Government Trial

16        Exhibit 14 for identification as of September 13, 2011.)

17   BY MR. WAYLAND:

18   Q    And it reflects the 25th to 75th percentile that we see

19   reflected in the charts, including the 25th to 75 percentile

20   numbers that you refer to in your report, okay.

21       We can't reveal the numbers, but would you agree with me,

22   Dr. Meyer, that the CPAs are on the far left side, which is

23   meaning they have the highest price for the 25th to 75th

24   percentile, correct?

25   A    Well, that's one category within CPAs is all the way on the

```
 1   left.  There are two other categories that are also within CPAs.
 2   Q   Right.
 3   A   And those don't exhibit the same characteristic as having
 4   the highest prices within assisted.
 5   Q   All right.  And then -- but the blue, the digital, is to the
 6   right, correct, the digital is on the right substantially lower,
 7   correct?
 8   A   Blue is on the right.
 9   Q   Okay.  All right.  Now, you knew that, I mean, you knew
10   this -- you cited this chart so you knew about this difference
11   in percentile pricing between the 25th and the 75th percentile,
12   right?
13   A   I clearly didn't cite this chart, but I did cite the
14   underlying document.  And I understand this difference, yes.
15   Q   Okay.  And again, you didn't comment on it.  You just -- in
16   your report, you just said, "This is my result; largest
17   diversion goes to CPAs and accountants," correct?
18   A   No.  I think I did actually speak at length about it, at
19   least a page and a half, about the relevance of the price
20   differential.
21   Q   All right.  Well, here in your report at paragraph 44, you
22   said, "Here's what the simulator tells me," correct?
23   A   I'd have to look and see whether it's Paragraph 44 that I
24   talk about the simulator.  I do talk about the simulator in
25   paragraph 44, yes.
```

1    Q    Okay.  Let's go to the simulator itself and see if we can

2    find an explanation for your conclusion that any price increase

3    for any HRB product will lead to the largest diversion to CPAs

4    and accountants.  So if you would go to Defendants' Exhibit

5    9231.  That's Tab 47.

6    A    I'm sorry; which tab?

7    Q    Tab 47, yes.

8              MR. WAYLAND:  You can turn the screen back on.

9    BY MR. WAYLAND:

10   Q    Okay.  So this is a PowerPoint of the pricing simulator.

11   It's dated May 2009.

12        Do you see that?

13   A    I see.

14   Q    All right.  Now, let's go to page 2.  One more page.

15        It says, "The number of respondents in this survey was

16   6,119," correct?

17   A    Correct.

18   Q    That was your understanding; that's how many people were

19   surveyed.  And let's go page 3.

20        And as I understand it, Dr. Meyer, these 6,119 people were

21   divided into eight groups.  And each of those eight groups

22   viewed five different price scenarios, correct?

23   A    That was the first task, yes.

24   Q    And if you look at -- it says, "Respondents were randomly

25   assigned to one of eight cells.  Each cell viewed five different

1    price scenarios."  If you drop down to page 4 for a minute,

2    you'll see there's a list of the pricing scenarios that were

3    tested by product, correct?

4    A    Yes, that's correct.

5    Q    Okay.  Let's go back up on page 3.  And it says that, in,

6    the second bullet point, "Prices changed across the scenarios

7    for three brands of tax preparation products -- TaxCut, TurboTax

8    and TaxACT -- available in two forms, online and software.

9    There were four predetermined price points for each brand or

10   form."

11        Correct?

12   A    Correct.

13   Q    And that's your understanding of what happened in the

14   simulator, correct?

15   A    Well, I have to be a little -- clarify that a little bit.

16   This is one part of the simulator.  There was a second part as

17   well.  But this is what happened in this part of the

18   simulator.

19   Q    We'll look at the second part if we need to, but right now

20   we're talking about what happened in this simulation, correct?

21   A    In this task, yes.

22   Q    Yeah, okay.

23             THE COURT:  Which tab is this PowerPoint in?

24             MR. WAYLAND:  This is at Tab 47, your Honor.

25             THE COURT:  Thank you.

1    BY MR. WAYLAND:

2    Q    Okay.  And then what happened was for each scenario,

3    "respondents selected which tax preparation method we were most

4    likely to choose," correct?

5    A    Correct.

6    Q    And each task scenario that a respondent faced, included

7    34 different product choices, correct?

8    A    Yes.

9    Q    Okay.  34.  When each time you had to make a choice, your

10   respondent -- 34 choices, your job is to choose one of them,

11   right?

12   A    Correct.

13   Q    Okay.  Let's count up and find out where those 34 choices

14   came from, okay.  Let's go to page 4.

15        And you see, Dr. Meyer, that there are three columns; TaxCut

16   Online Scenarios, TurboTax Online Scenarios, and TaxACT Online

17   Scenarios across the top of the page, correct?

18   A    Correct.

19   Q    And underneath each column, there are separately numbered

20   boxes, correct, one, two, three, four?

21   A    Correct.

22   Q    Okay.  Remember we said there were going to be four

23   scenarios, correct?  We can go back and look at that.

24   A    There were four scenarios with regards to each of the

25   products, yes.

1    Q    Correct.   Okay.

2         And each scenario we're going to see 34 products, correct,

3    34 different choices?

4    A    Correct.

5    Q    Let's look at choice -- scenario one, so we're going to look

6    at the 1 boxes and start counting.

7         TaxCut Online Scenarios, choice one on the upper left hand

8    column.   Start one, two, three, four, five choices in box one,

9    correct?

10   A    Correct.

11   Q    And then in box one for TurboTax, so now we have five so

12   far.   And there's one, two, three, four, five.

13        Five more, right?

14   A    Correct.

15   Q    And then there are -- then in the TurboTax line, there are

16   three, correct?   TurboTax number one, there's three choices?

17   A    Are you referring to the TaxACT?

18   Q    Yeah, TaxACT.   I'm sorry.

19        TaxACT, three, correct?

20   A    There are three choices listed there, yes.

21   Q    And then you also have to count in the software choices

22   because you got online and software.   If you go down below,

23   you'll get TaxCut, there are four choices there.

24   A    I see four choices there.

25   Q    And then there are four choices in the TurboTax and there

1   are four choices in TaxACT in scenario number one software,

2   correct?

3   A    Yes.

4   Q    All right.   Now, if you add those all up, you get

5   25 products so -- you get 25 product choices so we still need to

6   find nine more, okay?   Let's see where we can find those, all

7   right, Dr. Meyer?

8        Are you still with me?

9   A    I'm with you.

10  Q    Okay.   Let's look to the bottom of the page.   And it says,

11  "Base Case Scenario" -- "Scenario" is shaded -- "Other

12  Non-Priced Choice Options."

13       Do you see that?

14  A    I see that.

15  Q    Let's count those up, and then we'll go back and look at

16  them.   Other online, other software, that's two.   H&R Block,

17  Jackson, Liberty, other retail office, that's six.   CPA or

18  accountant, friend or family, paper and pencil, that's nine.

19       That gives us our 34.   And that makes sense, right?   They

20  got these choices that they saw from the TaxACT, TurboTax and --

21  well, the Intuit, H&R Block, and TaxACT choices that we counted

22  on the top, correct?

23  A    Correct.

24  Q    And as the simulator said, you're also going to see some

25  other things, correct?

1    A    In this task, yes.

2    Q    Let's go back and look at what these options are.

3         Other online, there's no differentiation among the different

4    possible vendors.  Your choice was other online -- just other

5    online, correct?

6    A    Correct.

7    Q    And your choice was other software, right?

8    A    Correct.

9    Q    And then you could choose from H&R Block retail office, et

10   cetera, or you could choose CPA or accountant.

11        Do you see that on the right side?

12   A    Yes, I do.

13   Q    Okay.  Now, they are actually grouped with products that are

14   free or pretty cheap, right, friend or family or paper and

15   pencil, right?

16   A    I don't know whether friend or family would necessarily be

17   cheap.  Paper and pencil I would assume does not cost very much,

18   yes.

19   Q    And that's the thing that's wrong with the survey, isn't it,

20   Dr. Meyer?  It's a nonprice choice that the people had in front

21   of them for those scenarios, those nine scenarios, right?

22   A    I don't understand why you think that's wrong.  That's not

23   wrong.  What you're looking at is when the prices of -- I mean,

24   the question that's being asked here is when the price of TaxCut

25   changes, what happens to the shares of the other options?

1        What the survey can't tell us -- I agree with that -- is

2   what happens when the price of a CPA goes up because it doesn't

3   vary the price of a CPA.  But this was done in the ordinary

4   course of business for H&R Block's online and software products

5   to help them figure out how to price those products.

6        So this -- it's a setup that makes sense for the purpose

7   that it was intended, and it is also relevant to, you know, the

8   purpose that I'm looking at, which is what happens when the

9   price of H&R Block's online and software products goes up.

10           THE COURT:  Well, Dr. Meyer, you're clearly more of a

11  survey expert than I am, certainly, but if you're given a choice

12  with numbers next to a whole bunch of choices and then also

13  given choices without numbers next to them, does that have an

14  impact on how respondents might view that other option?

15           THE WITNESS:  I don't think so in this case,

16  particularly because CPA and accountant can mean different

17  things to different people.  I mean, it depends on, you know,

18  what kind of tax return you have, how expensive that's going to

19  be for you.

20           So it should be in the mind of each respondent the way

21  that they think about that option and whether or not that's an

22  option for them based on, you know, whatever their particular

23  tax, you know -- their tax situation is.

24           THE COURT:  Couldn't they also look at that and say,

25  "Wow, if I were a millionaire and price wasn't even an issue,

1    I'd like to go to my own personal financial advisor, CPA"?  So

2    wouldn't this sort of lead respondents, as opposed to being

3    practical and focusing on what the price might be, on what their

4    wishful thinking might be if they didn't have to think about the

5    price of those people if there was no price next to it?

6         THE WITNESS:  In a survey, there is always the issue

7    that people don't have to plunk down real money for any of these

8    choices so we realize that.  That is what a survey is.  That's

9    why I said yesterday in situations where --

10        THE COURT:  Excuse me.  But if you don't have a price

11   next to it, would it help encourage that kind of wishful

12   thinking?

13        THE WITNESS:  I don't think any more so than any of the

14   other products.  I mean, what we're relying on is for people to

15   be truthful in what they would do.  It's their best estimation

16   of what they would do given the choices.  And I think, you know,

17   putting down a particular price for a CPA or accountant when we

18   don't know what kind of CPA or accountant that person would go

19   to or what kind of, you know, tax return they have, you know, I

20   don't think that's a bad way of going.

21        And I can tell you -- say the following:  The firm that

22   does this research does a lot of research for H&R Block, and

23   they have thought very hard about how to do that.

24        THE COURT:  Dr. Meyer, if you were doing this survey

25   and you were designing this survey, would you want to have all

29

1    of the choices presented in basically a uniform manner?  So if

2    you're presenting choices with all the other choices, would it

3    be your preference, if you were designing this survey and doing

4    it, would you want to have some prices down to help avoid some

5    of the wishful thinking that you've already said is part of the

6    problem with surveys anyway?

7            THE WITNESS:  I would have to think about that.  I

8    don't know sitting here whether it would be better to put in a

9    price for the CPA and accountant and then perhaps have that be

10   an irrelevant price for the respondent, or rather let the

11   respondent have in their own mind what a CPA or accountant

12   choice means for them.  I don't know sitting here.  I'd have to

13   think about that some more.

14   BY MR. WAYLAND:

15   Q   But we know in the real world what CPAs and accountants cost

16   because you cited material in your page 38 of your -- page 38 of

17   that survey, right?  We know what those costs, right?  It's not

18   a mystery.

19   A   Well, but there's a range of prices.  I mean, a software

20   product or an online product has a list price and perhaps -- and

21   some discounting as well, but there's a specified price there.

22       My understanding of CPAs and accountants is that the price

23   can vary depending on what you need them to do.  How many

24   schedules you have to fill out, you know, what type of tax form

25   you have, and other factors like that.  So I don't think there's

1   one particular price that's associated with the CPA or an

2   accountant in the same way that you have, you know, a price

3   associated with a particular software package, let's say.

4   Q    Dr. Meyer, there are literally tens and tens of individual

5   prices you've listed for software products ranging from, just on

6   the first box on the top left, 14.95 to 19.95.

7        That's a pretty big range in percentage terms, isn't it?

8   A    That's a pretty big range in percentage terms.

9   Q    And you couldn't come up with some kind of price that

10  represents CPA numbers?  I mean, we looked at a footnote where

11  you had the information.

12  A    Well, look, I didn't do the survey.

13  Q    That's exactly right.  You didn't do the survey.  The only

14  piece of evidence that you're citing that you say is data that

15  supports your diversion analysis, you didn't do it, and you

16  can't explain why they didn't use pricing data for the number

17  one diversion choice, right?

18  A    Like I said, I did not do the survey.  I do know that

19  Directions that did the survey does a lot of work for H&R Block.

20  It's done in the ordinary course of business.  H&R Block thinks

21  that it's valuable enough to be used in making pricing

22  decisions.  So to me that's valuable information.

23  Q    And they're not here to testify, as far as -- right?  They

24  aren't here to explain what they did.

25       You're here to say that you don't know what they did or why

1   they did it, correct?

2   A    I wouldn't agree with that at all.  I know a lot of what

3   they did and why they did it.  That particular question of a

4   price on the CPA or accountant, I don't recall having a

5   discussion on that.

6   Q    Don't you think, just as a matter of practicality, that if

7   somebody was given a choice of a 19.95 product on the one box

8   and an accountant that cost them 150 bucks, you'd want -- it

9   would make a difference whether the accountant was free or

10  5 bucks?

11       You think it would make a difference in determining what the

12  diversion rate is to know how people would respond to the way

13  the CPA was priced?

14  A    Yes, but again, the point is that for each individual

15  respondent, they'll have a different perception in their head,

16  and as well they should, about what a CPA or accountant would

17  cost for them.  So in other words, if there is a respondent who

18  has a very simple tax form and who -- perhaps, you know, the

19  value of their time is very high such that really at the end of

20  the day, a CPA or accountant is not all that much more expensive

21  for them, then they should have a certain thought in their mind

22  as they're answering the survey about what the price of CPA or

23  accountant is.

24       The same thing with someone who has a very complex tax

25  return.  They'll have a different perception.  They, I would

1   think, would be less likely to choose a CPA or accountant

2   perhaps because it's more expensive.  On the other hand, of

3   course, it would take them longer to do the tax form themselves.

4       And that's why -- you know, all of those things are going on

5   within a respondent's head, and that's fine, because we want to

6   know, you know, for respondents what they're likely to do.  We

7   want them to have in their mind what their choices are.

8   Q   Dr. Meyer, when you reached your conclusions about the

9   diversion rate that you see in this pricing simulator, did you

10  know that there was no price choice associated with the boxes on

11  the bottom?

12  A   Yes, I did.

13  Q   All right.  You did know that, okay.  You knew it at the

14  time, correct?

15  A   Correct.

16  Q   Let's go to your report and see what you said.

17          MR. WAYLAND:  Can we blow up the sentence ahead of it.

18  BY MR. WAYLAND:

19  Q    "The respondents were shown" --

20          MR. WAYLAND:  Yeah, that's great.

21  BY MR. WAYLAND:

22  Q   So this is what you said, "The respondents were shown five

23  pricing scenarios, and the options included DIY options,

24  software DIY options, assisted preparation options and other DIY

25  options, including pen and paper and friends and family."  Then

1    you said, "The pricing of the various options changed across

2    scenarios."

3        Do you think that accurately describes the understanding of

4    the survey that you've just given now?

5    A   What that sentence was meant to convey was that the pricing

6    of different options changed.  Clearly, reading of that is --

7    you know, it's clear to understand that the pricing, for

8    example, of pen and paper doesn't change so perhaps, you know, I

9    could have worded the sentence a little bit more -- in a

10   different way, but it still conveys the general sense that the

11   pricing of options changed.  I was just explaining how the

12   survey works.

13   Q   All right.  You didn't think it was necessary to give the

14   kind of explanation you've given to the Court today about why it

15   doesn't matter that CPA pricing wasn't listed when you described

16   your conclusions that diversion to CPA was the largest

17   diversion?

18   A   Obviously, I included in my report what I included.  This

19   was sufficient to come to my conclusion.  I had a broader

20   understanding of the survey.  I wasn't going to write down

21   every, you know, last understanding of the survey.  That would

22   have taken pages and pages.

23       And I didn't think -- I don't think that's in any sense a

24   fatal flaw of the survey such to render it not useful for my

25   analysis.

1    Q    And in your paper that you wrote that we looked at, your

2    paper acknowledges the need for prices for all the products.

3    That's what you said in your paper.   We looked at it.

4         Otherwise, it makes no sense, right, Doctor?

5    A    No.   I mean, look, here it says, you know, "Each option is

6    a product with different combinations of attributes and prices."

7    If I have something like a pen and paper, which is a product

8    whose price doesn't change, then it wouldn't make sense within

9    the survey to change its price.

10   Q    Okay.   But accountants, they do have prices and they do

11   change, right?

12   A    Their price can change, but the price of every product

13   doesn't have to change within the survey.   It depends on what

14   the purpose of the survey is.

15   Q    Doesn't say that in your paper.

16   A    I'm not sure whether it says that somewhere else in the

17   paper or not, but that's -- it's true.   I mean, each survey is

18   designed based on what you're looking for.   So if you're really

19   focusing on a change in the price of the HRB product, then you

20   don't have to have every other price changing in order to get

21   some insights as to the change in that price.

22        One thing to keep in mind with surveys as well is that there

23   is a tradeoff between adding more information to the survey and

24   getting, you know, results, first of all, that respondents can

25   understand and also that can be analyzed.   You know, there are

 1   time constraints and other sorts of constraints.

 2       So there's a tradeoff.  And you obviously look to change the

 3   prices of the things that matter in your inquiry.  And the way

 4   in which H&R Block used the survey was to think about what price

 5   it should be charging for its products.  And so --

 6   Q   But the way you're using it is to tell us what's going to

 7   happen as a result of a price change, right, that's what you're

 8   using it for?

 9   A   But I'm only using it with regards to a price change on the

10   HRB products.

11   Q   As your article says, the purpose of the discrete choice

12   survey is to do a market experiment, right, simulator market

13   experiment?  We can look at the words.  I think market

14   experiment, right?

15   A   I think this is a controlled market experiment, yes.

16   Q   And in a real market, people know the different prices of

17   the products that they're choosing among, right?

18   A   Generally speaking, yes.

19   Q   All right.  If I want to buy one product at 5 bucks, a guy

20   raises it the next day to 6 bucks, I reach my hand in blindly

21   and say, "I'll take this one, whatever the price is," that

22   doesn't happen in the real world, does it?

23   A   No.  But that wasn't happening in the survey either.  The

24   respondents have an idea in their mind of what it means to go to

25   a CPA.

1          THE COURT:  Dr. Meyer, you don't know what was really

2     in the respondents mind.  And for all you know, they might have

3     been saying, "I know a CPA is really expensive so I'm going to

4     calculate that in my mind."  But they just have easily might

5     have been saying, "Wow, so in this survey, I have a choice of --

6     I didn't have to think about the price of a CPA or accountant

7     because there's no price there.  Would I like to go to that?

8     Would I like the benefit of going to a personal person?"

9          As you sit here today, you don't know what was in the

10    mind of the respondents; isn't that right?

11         THE WITNESS:  I don't know what's in the mind of the

12    respondent.  That certainly is the case.

13    BY MR. WAYLAND:

14    Q   All right, Dr. Meyer.  Now, Tab 1 of your report -- at Tab 1

15    of your book is your report and, as I said, there are 19 pages

16    of citations.  And you can look through them.

17        But as I understand it, you looked at a lot of documents,

18    correct?

19    A   I looked at a lot of documents, yes.

20    Q   You looked at a lot of data, correct?

21    A   I did.

22    Q   You spoke to a number of people?

23    A   I did.

24    Q   You looked at depositions?

25    A   That's correct.

1  Q   And I think you did other things.  You listened to testimony

2  here, correct?

3  A   I listened to testimony here, yes.

4  Q   Now, in all of that, all of that wide range of evidence,

5  only the pricing simulator in your mind provides a

6  quantification of diversion, correct?

7  A   That's the best direct test of a quantification of

8  diversion.  I think that the TaxACT survey sheds some light on

9  diversion as well and the documents that I believe corroborate

10  that quantitative evidence.

11  Q   Okay.  You said, "It's the pricing simulator that provides a

12  quantification, and I haven't seen another document that

13  provides the specific quantification of diversion."

14     You haven't changed your view about that, have you?

15  A   No.

16  Q   And if calculation of diversion based on a survey in which

17  respondents didn't even know the price of the choices they had

18  is flawed, then you don't have any quantification of diversion,

19  do you?

20  A   Well, your hypothetical is not what I think is true in this

21  case.  I think, first of all, the pricing simulator is not

22  flawed, and I also think there are other pieces of evidence that

23  shed some light on diversion, while not perhaps being a precise

24  quantification of diversion, they shed some light on

25  diversion.

1    Q    When were you hired for this case?

2    A    I was hired in June of this year.

3    Q    Do you remember the date?

4    A    I don't remember the date.

5    Q    All right.  When was your report -- when did you file your

6    report?

7    A    It was in July.  I can look at the date.

8         Oh, I'm sorry.  It was in August.  August 12th.

9    Q    August 12th.  So you had just a couple months to come to

10   your conclusions, right?

11   A    That's correct.

12   Q    Now, you haven't previously been qualified as an expert

13   economist to testify in a relevant antitrust product market,

14   correct?

15   A    Correct.

16   Q    And you have not previously been qualified as an expert

17   economist on the competitive effects of a merger or acquisition,

18   correct?

19   A    Correct.

20   Q    And you haven't been previously qualified as an expert

21   economist on entry or expansion on relevant market, correct?

22   A    Correct.

23   Q    And you haven't been -- you've never submitted an expert

24   report under your name regarding the competitive effects of a

25   merger or acquisition except for the one in this case; is that

1   right?

2   A    Correct.

3   Q    And your doctoral dissertation was related to labor

4   economics and not IO, correct?

5   A    Correct.

6   Q    And you've never written any peer-reviewed articles on any

7   antitrust issue, correct?

8   A    Correct.

9   Q    Did you have tenure, Dr. Meyer?

10  A    No.

11  Q    In the DOJ matter that you mentioned, you weren't the lead

12  economist.  You were working for somebody else under his

13  direction, correct?

14  A    Correct.

15  Q    Do you know who Dr. Dennis Carlton is?

16  A    I've heard the name.

17  Q    Do you know anything about his reputation in the business?

18  A    Yes.

19  Q    What is it?

20  A    He has a good reputation in the business.

21  Q    As what?  As a leading economist?

22  A    He's a well-known antitrust economist.

23  Q    All right.  You know whether Dr. Carlton has written in a

24  number of peer-reviewed articles about antitrust matters?

25  A    I don't know Dr. Carlton's CV.

1   Q    Do you follow the economic literature -- the antitrust

2   literature at all?

3   A    I certainly do.

4   Q    Ever come across Dr. Carlton's name?

5   A    I have come across his name.

6   Q    All right.  Did you know that Dr. Carlton was hired as an

7   expert for the defendants before you were?

8   A    No.

9   Q    Did you ask when you got hired in June, with only a couple

10  months before trial, whether any other experts have been

11  hired?

12  A    No.

13  Q    You didn't?  You didn't ask?

14  A    Whether there was another expert?

15  Q    Whether anybody else had preceded you.

16  A    Oh, I understand that someone else -- another firm assisted

17  counsel in their analysis in front of the agencies.

18  Q    Okay.  Did you ever ask to speak to them?

19  A    No.  Let me clarify.  My staff did speak with someone

20  regarding some of the data that they sent -- some of the IRS

21  data -- and so we clarified, you know, what the files were.  But

22  that's the extent of our conversations.

23  Q    And you don't know why, one way or the other, you were asked

24  to be the testifying expert in this case in June, correct?

25  A    I don't have an understanding of that, no.

1    Q    All right.  Let's go back to the simulator for a few

2    minutes.

3         You understand that Dr. Rick Warren-Boulton looked at the

4    simulator, and one of the problems that he identified was the

5    fact that when you increased price in one scenario, it actually

6    predicted an increase in share and revenue.  That's the anomaly

7    that you described we talked about yesterday?

8    A    Could you repeat your question.  I just want to make sure

9    that I heard right what you said.

10   Q    That one of the problems that Dr. Rick Warren-Boulton

11   identified was that when you looked at the scenarios -- you

12   looked particularly at the 19.95 scenario -- it had a funny

13   result because it seemed to suggest that there would be an

14   increase in share and revenue as the price increased to 19.95.

15        Do you remember that, that's what he said?

16   A    Yes.

17   Q    Okay.  And you don't have any reason to dispute that that

18   version of the simulator actually shows that result, right?

19   A    Well, because -- I had previously been using the term

20   "simulator" in a slightly more expansive way so let me just, in

21   light of the clarification that I gave yesterday, that anomaly

22   is not in the simulator -- what I would call the simulator --

23   which is the drop-down menu simulator.  It's an Excel

24   spreadsheet that was used to make the PowerPoint slides.

25   Q    Okay.  But wherever it is, you understood that there was a

1   problem.  You acknowledged -- it showed some kind of problem,

2   right?

3   A   It showed some sort of anomaly, yes.

4   Q   So Dr. Rick Warren-Boulton had correctly pointed out some

5   kind of an anomaly, wherever it resided, correct?

6   A   Correct.

7   Q   All right.  In response to that, you decided you needed to

8   do a little bit more work, correct?

9   A   Correct.

10  Q   And one of the things that you did was to run a regression,

11  correct?

12  A   Correct.

13  Q   And the regression is based on the same underlying data,

14  right?

15  A   Two of the regressions are based on that same underlying

16  Excel spreadsheet.  And as I explained yesterday, one regression

17  was based on the drop-down menu simulator.

18  Q   Okay.  But the regression is based on the same responses to

19  the same survey that we've been talking about, right?

20  A   The regression is based on the simulator that was created by

21  Directions Research that comes out of that survey.

22  Q   Okay.  But there's a lot of steps to get there, but we start

23  with the survey, right?

24  A   Yes.  There are a lot of steps.

25  Q   And your regression didn't change the questions in the

1    survey, right?

2    A    Correct.

3    Q    And it didn't change the respondents' answers looking at the

4    choices, correct?

5    A    Correct.

6    Q    You just took the answers from that survey that didn't have

7    price points for a number of options, and you ran a regression

8    against it, right?

9    A    Correct.

10   Q    All right.  Let's do one more thing with the simulator

11   before we leave.

12        You said yesterday that you can get very different diversion

13   rates depending on which scenario you look at, correct?

14   A    I think I was talking about which slide you looked at.

15   Q    Okay.  Which slide.  Depending on which slide.

16        The slides represent runs of the simulator, correct?

17   A    No.  The slides don't represent runs of the simulator.  The

18   slides represent subsets of that Excel spreadsheet which is the

19   intermediate step, if you will, between the simulator and the

20   PowerPoint presentation.

21   Q    All right.  Let's look at page 18 of DX 9231.

22   A    Can you refresh my recollection on which tab.

23   Q    47.  Are you with, Doctor?

24   A    I'm just finding the page.  It's easier for me to see it on

25   the hard copy than on the screen.

1      Yes.

2   Q   Okay.  So this is titled "Case D:  Who is Affected Most by

3   Maximizing TaxCut Share."

4      Do you see that?

5   A   Yes.

6   Q   And you're familiar with this case, right?

7   A   Yes.

8   Q   This is the case that you used to calculate your diversion

9   ratio, right?

10  A   This was the case that was used to get my diversion ratio

11  that was reported in my report.  This doesn't reflect the

12  subsequent work on the regressions that you mentioned previously

13  and I testified to yesterday.

14  Q   I understand that, Doctor.  I'm just starting at the

15  beginning of where you started with your work, okay?

16  A   Yes.

17  Q   So just so we have a clear record, Case D is your initial

18  calculation of the diversion ratio, correct?

19  A   Correct.

20  Q   All right.  And tell us what you did.  How did you do

21  that?

22  A   Well, that comes from the changes in share that come from

23  the bottom.

24  Q   Maybe we can blow that up.  Just down at the very bottom,

25  the last line.

1   A    Yes.   The last two -- I think you'll need a little bit more.

2   Right.

3        So you can see, for example, the change in share of TaxCut

4   was 1.86.  And the share -- the change in the share of the CPA

5   accountant was negative 1.06.  So if you take the -- so what

6   that basically says is TaxCut's share went up by 1.86 percentage

7   points, and CPA's share went down by 1.06 percentage points.

8        And so the diversion ratio from TaxCut to CPA is 1.06

9   divided by 1.86.

10  Q    All right.  Now, let's go up to page 17.  And that's a

11  different case.

12       "What Prices Minimize TurboTax Share, Individual Pricing,"

13  correct?

14  A    Correct.

15  Q    And at the bottom of the page, we don't have the same totals

16  that you used, but we can do the same calculation because the

17  information is set forth on the page, correct?

18  A    Correct.

19  Q    Let's see what happens when we do that.  The average share

20  percent for the top ten lines of data is 5.0, right, Doctor?

21  We're not going to go through all the calculations, but we

22  assume that we're correct.  And if we check it later and it

23  turns out we're wrong, we'll correct the record.

24       But for our purposes today, let's assume that we've done the

25  calculations correctly, okay?

1    A    I'll assume that you did the calculations correctly for the

2    purpose of this question, yes.

3    Q    Then the average share percent of TaxCut for the bottom ten

4    lines of data is 5.06.

5         See that calculation, Doctor?

6    A    I don't see a calculation.

7    Q    You see the results?

8    A    Likewise, I'll assume for the purpose of the question that

9    it's true.

10   Q    All right.  Then we need also to get the average share

11   percent correct in order to do a diversion calculation?

12   A    Yes.

13   Q    All right.  Let's do that.  The top ten lines for TaxACT,

14   2.92.

15        Assume with me, Doctor, okay?

16   A    Yes.

17   Q    And the average percent -- the average share percent of

18   TaxACT for the bottom ten lines is 3.06, correct, or assume with

19   me?

20   A    I'll assume with you.

21   Q    All right.  To calculate the diversion of TaxCut to TaxACT

22   the way you did for slide 18, we need to first calculate the

23   difference of the average percent share for the top ten rows

24   versus the average percent share for the bottom ten rows, right?

25        That's what you did on page 18, right?

1  A   Correct.

2  Q   Okay.  And the average difference is .44 because we've taken

3  5.5, subtracted 5.06 to get .44, right?

4  A   Correct.

5  Q   For TaxACT, that would mean taking 2.92 and subtracting 3.06

6  to get .14.

7      Does that look right to you, the calculation?

8  A   The calculation looks right to me, yes.

9  Q   Okay.  Then a diversion ratio is simply .14 divided by .44,

10  right?

11  A   That's what comes out of the slide, yes.

12  Q   All right.  And so using Case C, we get a very, very

13  different diversion ratio than using Case D, correct?

14  A   I agree.

15  Q   All right.  1.6 in the case that you used and 32 percent,

16  correct?

17  A   Correct.

18  Q   All right.  And so you would agree -- and I'm sure there are

19  explanations -- but you would agree that you can get very

20  different diversion ratios depending on what case you use in

21  this simulator, right?

22  A   I agree.  And that's why I did further work, that's

23  correct.

24  Q   All right.  Now, when you did your first set of work, my

25  understanding is that you wound up at Case D because that's what

1   the research company told you you should look at, right?

2   A   Not because they told me that's what I should look at.

3   That's because that was the case in which they chose to report

4   diversion to HRB for the purpose of HRB thinking about prices to

5   charge.

6       So I didn't ask Directions which case I should use.   I

7   looked at, in the ordinary course of business, which case they

8   chose to report.   I didn't have at that point in time the Excel

9   spreadsheet that had all the data for all of the cases so I had

10  to make a determination of which one to choose.   And the one

11  that made the most sense was the one that the firm who was

12  reporting these results thought was relevant to HRB, who was

13  thinking about pricing.

14  Q   So in the first instance, you, the expert, didn't exercise

15  your independent judgment to review all of the cases and make

16  your own determination as to which case you should use,

17  correct?

18  A   No.   I did make a judgment about which case I should use.

19  And I just described that judgment.

20  Q   As you described it, it's a judgment you relied on

21  Diversion -- is that the name?   What's the name of the firm?

22  A   Directions Research.

23  Q   Directions Research had made a choice, and you relied on

24  their choice.   You thought it was reasonable, but you relied on

25  their choice, right, for your first run?

1   A   It's reasonable to rely on choices that business people make
2   in the ordinary course of business.  You know, they were
3   advising H&R Block on their pricing.  And that's the scenario
4   that they thought was most relevant in terms of reporting
5   diversion to report to H&R Block.
6       Once I received the fuller set of data, I analyzed the
7   fuller set of data.
8   Q   I like the phrase "ordinary course of business" because
9   we're going to turn to the 2011 survey right now.  And you know
10  what the 2011 TaxACT survey is, right?
11  A   Yes.
12  Q   That's another piece of paper or evidence that you rely on
13  at least a little bit for diversion, right?
14  A   Correct.
15  Q   And that wasn't prepared in the ordinary course of business,
16  was it?
17  A   No.
18  Q   It was prepared in the course of preparing for litigation,
19  right?
20  A   My understanding, it was prepared before litigation and as
21  part of the discussions with the Department of Justice and its
22  merger analysis.
23  Q   Now, you just told us one of the reasons you relied on the
24  survey firm for telling you what you should do with respect to
25  the division ratio in the simulator was because they are doing

1    it in the ordinary course of business, right?

2    A    Yes.

3    Q    And now you're relying on a 2011 survey that wasn't prepared

4    in the ordinary course of business, right?

5    A    Correct.

6    Q    All right.  Let's talk about the details of that survey a

7    little bit and see what it actually asks.

8         Now, yesterday the Judge asked you whether the survey was

9    about price changes, and you said yes.  And let's see exactly

10   what the survey did.

11        Before we get there, let me ask you:  Here's the -- page 68

12   of the transcript.  The Judge asked you, "And it's because the

13   TaxACT survey specifically asked about price change.  That's why

14   you viewed that as more pertinent to your analysis?"  And your

15   answer to the Judge was, "Well said, yes," correct?

16   A    Correct.

17   Q    All right.  Let's see whether it's really about price

18   change.  But before we get there, let's ask a couple of

19   questions.

20        Your view is that simply looking at switching data between

21   various tax preparation methods doesn't measure the degree of

22   commission between firms, right?

23   A    Correct.

24   Q    So if we just know that people switched, but we don't know

25   that it was in respect to a price change, you don't think that

1    tells us very much, right?

2    A    It gives us information, but it doesn't give us information

3    regarding diversion.

4    Q    And you've been particularly critical of Dr. Warren-Boulton

5    because you say he too much on switching data, which doesn't

6    tell us very much about price changes, right?

7    A    Yes.  I believe that is an important reason why his analysis

8    is incorrect, yes.

9    Q    For example, if a customer switched to a different tax

10   preparation method because of a change in his or her tax

11   complexity, that wouldn't be because of a change in price,

12   right?

13   A    Correct.

14   Q    Or if they changed because something happened in their life

15   besides complexity, that wouldn't be because of price, right?

16   A    Correct.

17   Q    And if you are going to look at switching data, whatever it

18   tells us, it's better to look at the IRS data than to look at a

19   subset of some sample of people, isn't it?

20   A    Yes.

21   Q    Okay.  Now, the survey didn't ask about a price change,

22   did it?

23   A    It did not specifically ask about a price change, no.

24   Q    So when you said yes to the Judge yesterday, you weren't a

25   hundred percent accurate, were you?

1    A    That's correct.

2    Q    Litigation survey.  Let's look at the litigation survey.

3    It's Tab 43.  That's Defendants' Exhibit 9015, Tab 43, page 1.

4    A    I'm sorry.  Which tab?

5    Q    43.  Okay.  The questions are laid out for us, I think, so

6    let's look at them.

7         "If you became" --

8              MR. WAYLAND:  Can we pull up the question.

9    BY MR. WAYLAND:

10   Q    This is Exhibit 9015, the 2011 TaxACT survey.  The question

11   that was asked, "If you became dissatisfied with TaxACT's price,

12   functionality or quality, which of these products or services

13   would you have considered using to prepare your federal taxes?

14   Please select all that apply."

15        That's the question -- the fundamental question -- that was

16   asked that you rely on, correct?

17   A    Correct.

18   Q    But you'd agree that a change in complexity could lead

19   someone to be dissatisfied with their tax preparation method,

20   correct?

21   A    A change in complexity certainly could lead someone to look

22   for a new tax preparation method.  I don't see how that would be

23   related to dissatisfaction regarding price, functionality, or

24   quality.  There particular is a modifier to the dissatisfaction

25   that I think is important.

1  Q   All right.  That's your view of what the survey means,

2  right?

3  A   I think the survey means what the survey means.  You know,

4  you can see what the questions are.

5  Q   Well, you would agree that the survey did not specifically

6  ask the survey takers what tax preparation product they would

7  choose in the event of a change in the price of a TaxACT

8  product, correct?  Didn't ask that question?

9  A   Correct.  That's not the way the question was worded.

10 Q   In fact, there's no specific price change indicated anywhere

11 in the survey, is there?

12 A   There's not a specific price change indicated.

13 Q   There is not a specific amount, correct?

14 A   There's not a specific amount, no.

15 Q   There's not a range, correct?

16 A   There's not a range.

17 Q   There's not even a percentage increase listed, right?

18 A   Correct.

19 Q   It doesn't even allow the respondents to distinguish in

20 their response between dissatisfaction among price, quality, or

21 functionality, correct?

22 A   Correct.

23 Q   Now, to answer your question that you think is at the heart

24 of this case, wouldn't it have been better to ask, "If the price

25 of a TaxACT product went up by this amount, what would you do"?

1    Isn't that a better way to get at what you're trying to get

2    at?

3    A    You know, we can -- that may have been a better way.  I'd

4    have to think about it some more.  But the question is, does

5    this survey shed any light on the question at issue?

6    You know, I wasn't involved with this survey.  I saw it when

7    I reviewed the evidence in the case.  And the question to me was

8    not is this survey prepared perfectly or could I have prepared

9    the survey better.  It was, you know, does this shed any light

10   on the questions that I'm being asked to analyze?  And I thought

11   it shed some light on it.

12   Q    Not much, though, right?

13   A    I wouldn't say not much.  You know, in connection with, for

14   example, the TaxACT document that's looked at when TaxACT

15   changed its -- was considering changing its state price, you

16   know, what was it concerned about?  It was concerned about pen

17   and paper.  And the fact that TaxACT's price hadn't changed very

18   much so, you know, looking at historical evidence on price

19   changes, wasn't going to yield much in terms of diversion from

20   TaxACT.  This survey certainly sheds some light on the questions

21   at issue.

22   Q    You never talked to the survey firm about this survey, did

23   you?

24   A    I did not.

25   Q    Now, the article that we looked at earlier, "Designing and

1    Using Surveys to Define Relevant Markets," you have a section

2    entitled "Distinguishing Good Surveys from Bad Surveys,"

3    right?

4    A    I don't recall the sections.

5         MR. WAYLAND:   Tab 28.   That's Government Exhibit 622,

6    Your Honor.

7    BY MR. WAYLAND:

8    Q    You have a section called "Distinguishing Good Surveys from

9    Bad Surveys."

10        Do you see that?

11   A    I see that.

12   Q    And one of the problems that you identify in the bullet

13   points is, "The survey should address nonresponse bias."

14        Do you see that?

15   A    Yes.

16   Q    Now, could you tell us what "nonresponse bias" is, just

17   generally.

18   A    Generally, nonresponse bias is when there is -- there are

19   some respondents -- there are people to whom the survey is sent

20   who respond, and there are people who don't respond to the

21   survey.   And if there's reason to believe that those groups are

22   different, then you have to take that into account when you're

23   analyzing the survey.

24   Q    How many people responded to the survey?

25   A    I don't recall the response rate.

1  Q   Okay.  Did you do anything to -- did you think it was a few

2  hundred people that responded, a few thousand, 20,000?

3  A   I know it's actually on that -- I think it was on the

4  document that you just showed me before.  I can refresh my

5  recollection.  I don't recall offhand.

6      I would say a relatively large number of respondents.

7  Q   Like 1 -- less than 2 percent, right?

8  A   Oh, before I thought you were talking about numbers of

9  people versus percent.  Yes, I think it was.

10 Q   All right.  Did you do anything to attempt to address any

11 particular nonresponse bias with regard to the survey?

12 A   No.

13 Q   All right.  Let's look at another survey, Dr. Meyer.  Let's

14 look at Tab 34, Government Exhibit 1351.

15     First page is displayed on your screen.  It's entitled "H&R

16 Block Market Research, Outline of Free File Alliance, Free

17 Filing Brand Loyalty Study, Final Report."  It's dated

18 April 11th, 2008.

19     Do you see that?

20 A   Yes.

21 Q   Do you have any recollection of reviewing this among the

22 many thousands of documents that you reviewed in the case?

23 A   This looks familiar.

24 Q   All right.  Let's go to page 38.  The title of the page is

25 "Action If Brand Charged A Fee" and among those planning to file

 1   online next year.  And it says, "What would online filers do if

 2   their current brand charged a fee next year?"

 3        Do you see that question?

 4   A    Yes.

 5   Q    The question is, if you get it free this year and we charge

 6   a fee next year, what would happen, right?

 7   A    Correct.

 8   Q    And then the results are listed below.  And the first one is

 9   TurboTax free.  What would you do?  Switch to a free online

10   program, pay to keep paying your current brand.

11        Total of that is -- they call it 70, 97 minus 2 -- it's

12   95 percent of people would stick in the online world, right, in

13   response --

14   A    I'm not sure which line you're referring to.

15   Q    Oh, I'm sorry.  Right now we're just looking at the first

16   line.  Under the subheading, "What would you do if current brand

17   were not free to you next year?"  Meaning, this year it's free,

18   next year you have to pay money.

19        So there's a price increase, right?

20   A    Correct.

21   Q    And they surveyed TurboTax, TaxCut, and TaxACT users and the

22   answers are on -- and then they gave the answers.  And the first

23   line has the answers for people who are using TurboTax, and

24   95 percent of the people would either keep their brand or stick

25   in another -- stick to another online digital product.

1        That's what the survey seems to suggest, right?

2  A   No, I understand what you're trying -- I just didn't

3  understand which line you were referring to when you talked

4  about a number just a moment ago.

5  Q   Oh, I'm sorry.  The first line I'm adding 68 and 97.

6  A   I see.

7  Q   Okay.  Right?

8  A   68 plus 97.

9  Q   68 plus 27.

10 A   Yes.

11 Q   It's 95 I think.  For TurboTax it's 89.  For TaxCut -- I'm

12 sorry; keep a clear record.

13      For TurboTax free it's 89.  For TaxCut it's 92.  And for

14 TaxACT free it's 92.  Would either switch to another free or

15 keep their brand -- keep their current brand.

16      Do you see that?

17 A   Yes.

18 Q   Okay.  And that -- a little bit different than the kind of

19 survey results that you were testifying about, right?

20 A   The results are from a different survey, they're different,

21 yes.

22 Q   And this survey you read and decided it's not the survey you

23 wanted to rely on.  You wanted to rely on the 2011 survey that

24 was prepared in connection with the investigation, right?

25 A   Well, this survey didn't give enough information to analyze

1    what would happen to customers, for example, of the TaxACT paid

2    products.

3    Q    I'm not saying that it did.   I'm just saying it's a question

4    that's pretty straight forward that says if you charged money,

5    if you raise the price from zero to something, what's the

6    reaction?   It was a pretty straightforward question.   Here's a

7    price change, here's the effect, right?

8    A    That's true.   But this -- the way that this type of question

9    is asked is something that I think I talked about yesterday in

10   the type of way that you wouldn't want to ask a question in a

11   survey like this.

12       You know, if you ask a respondent, so what would you do?

13   You know, I know that you, for example, bought -- you know, like

14   to drink Diet Coke, and the survey says, well, what would you do

15   if the price of Diet Coke went up, you know, you think that what

16   the company is doing is thinking about a price increase on Diet

17   Coke and you certainly don't want that.   So what respondents are

18   likely to do is answer more than they actually would, that they

19   would leave the product.

20       So you know, this is not the kind of question that I think

21   is really the best way to ask a question related to pricing.   I

22   think I mentioned that yesterday as well.

23              MR. WAYLAND:   All right.   Your Honor, I'm about to

24   change topics.   It's 11 o'clock.   Would this be an appropriate

25   time for a morning break?

1          THE COURT:  Yes.

2          MR. WAYLAND:  Thank you, your Honor.

3          THE COURT:  We'll break for ten minutes.

4      (Recess was taken.)

5          THE COURT:  Mr. Wayland.

6          MR. WAYLAND:  May I proceed?

7          THE COURT:  Yes, please.

8          MR. WAYLAND:  Thank you.

9  BY MR. WAYLAND:

10  Q    Doctor, we're going to put away simulators and surveys for a

11  little bit and talk about market definition.

12      As I understand your market definition, it's all forms of

13  tax preparation, correct?

14  A    Correct.

15  Q    And you get there because your diversion data tells you that

16  all those things are close substitutes for each other in some

17  way or another, right?

18  A    I wouldn't characterize it exactly in that way, but it's

19  true that there are substitutes for each other.  And the closest

20  substitutes, assisted on the H&RB side, and pen and paper on the

21  TaxACT side, that that comes from the survey, yes.

22  Q    Okay.  All right.  So if your survey is wrong, maybe your

23  market definition is wrong?

24  A    I think I indicated this before.  The survey of both the

25  pricing simulator and the TaxACT survey are certainly the

1   pricing simulator, the best evidence, direct evidence, of

2   diversion in response to a price increase.  And I think the

3   TaxACT survey sheds some light on it as well.  But there are

4   documents as well that deal with the general issue of

5   substitutes and closeness of substitution.

6   Q    I think you acknowledged yesterday, Dr. Meyer, that there

7   are a number of documents in which the parties identify a

8   separate market for digital and identify the big three as direct

9   competitors, right?

10  A    There are documents in which they talk about the big three.

11  I don't think they ever define a relevant antitrust market for

12  digital DIY and, of course, that's the question at hand.

13          THE COURT:  Can I interrupt you just for a question

14  because I want to go back to one question to make sure I

15  understand the answer about it.

16          MR. WAYLAND:  Okay, your Honor.

17          THE COURT:  Dr. Meyer, in answer to the question about

18  if the survey is wrong, then the market definition is wrong, if

19  you took out the simulator -- the 2009 simulator -- would that

20  change your definition of the market at all or would your

21  reliance on the documents and the TaxACT survey, in your view,

22  be sufficient for you to continue to have your view of the

23  market?

24          THE WITNESS:  It would still be sufficient.

25          THE COURT:  Okay.  That's what I wanted to be clear

1   about.   Okay.

2   BY MR. WAYLAND:

3   Q   And I think yesterday you said it was important to look at

4   the context of the documents in order to understand why they

5   might have identified a separate digital market, correct?

6   A   Correct.

7   Q   We're not going to look at many of those documents today,

8   Dr. Meyer, but I did want to look at one.   And that's

9   Defendants' Exhibit 493 -- I mean, Government Exhibit 493,

10  Tab 65.

11        MR. WAYLAND:   This is sealed so it's off.

12  BY MR. WAYLAND:

13  Q   Exhibit 493, "Project Island Overview."   And you understood

14  that Project Island is HRB's acquisition of TaxACT, right?

15  A   Correct.

16  Q   And this was a presentation -- there's been other testimony

17  about it -- "Senior Level Executive Presentation."   And they are

18  discussing the transaction.   And you can look at the first page.

19  There is an executive summary of the reasons.

20      And let's go to the market share chart.   And this page has

21  market share for the digital market, correct?

22  A   This looks like it is actually online.   Let me just -- it

23  looks like the pie chart has to do with online --

24  Q   And the --

25  A   -- which is a subset of digital.

1    Q    Right.  Subset of digital.  And this is the only market

2    share -- you can look through it.  This is the market share data

3    that's displayed for an analysis of the transaction, right?

4    A    Within this document.  I didn't see any additional market

5    share information.

6    Q    All right.  So as I said, we could look at many, but at

7    least when they are talking about the transaction, what its

8    effect might be, they are looking at market share and digital,

9    right?

10   A    Well, I don't see this document as talking about what the

11   antitrust and anticompetitive effect of the market

12   transaction is.

13   Q    All right.  You can put that aside, Dr. Meyer.  Let's go

14   back to your market definition.

15        Let's start with pen and paper.  It's literally not pens and

16   reams of paper, correct?

17   A    There are some individuals that fill it out with a pen or,

18   obviously, could be a pencil.  I'm not sure how specific we need

19   to get.  And specific pieces of paper, forms -- paper forms.

20   They are also are included in that what I call fillable forms.

21   Q    Okay.  But manufacturers of pens and paper are not

22   competitors that you are counting in this market, correct?

23   A    No.  It's the method of tax preparation, not the sale of

24   the pen.

25   Q    Right.  You're talking about an act that you've put into

1  your product market, correct, the act of filling out a form,

2  right?

3  A   It's a method of filling out a form.

4  Q   And that, in your mind, is a product?

5  A   It's a method of filling out the form that consumers can

6  turn to.  Again, the purpose of relevant market definition --

7  market definition -- is to think about the alternatives that

8  consumers can turn to.

9      And sometimes those alternatives include, you know, doing it

10 completely yourself without having a particular, you know, piece

11 of software, for example, as in this case.

12 Q   If I have a cold and I can go to a doctor to get some

13 assistance or I can go to the drug store and buy some cold

14 remedies produced by a bunch of manufacturers of drugs or I can

15 sit at home and drink chicken soup, is my sitting at home and

16 drinking chicken soup part of the market for cold remedies?

17 A   Look, in that situation -- you know, I'll start off by

18 saying I haven't studied that market -- just because in some

19 markets the possibility of, you know, sort of completely doing

20 it yourself may or may not be an alternative.  In other markets,

21 it may be, and that's the question that we're really asking.

22     The question is if the price of cold medicines went up

23 sufficiently, would people turn to chicken soup?  I'm not saying

24 that they would -- logically, they probably wouldn't -- but in

25 some markets that is an important constraint, and in some it's

1    not.  And so that's the question that we're asking here:  Is

2    this a market in which the choice of really doing it yourself --

3    and here I'm distinguishing that from DIY software, I mean, just

4    sort of really pen and paper, is it a constraint?  That's the

5    question.  It's not either a constraint automatically or it's

6    out of the market automatically.  You have to ask the

7    question.

8    Q    Are there any competitors in the pen-and-paper segment of

9    the market as you've described it?

10   A    Those forms are provided by the Internal Revenue Service

11   freely.

12   Q    So is the Internal Revenue Service a competitor that we're

13   adding in?

14   A    No.

15   Q    So there are no competitors in this segment of the market

16   that you're including, the pen-and-paper segment, right?

17   A    These are consumers who are choosing to do the work

18   themselves.  And it's an alternative that consumers have.

19   Q    So all consumers, all people who on earth do dwell, are they

20   part of the market?

21   A    No.  We're obviously talking about individuals who are

22   filing their taxes.

23   Q    So all individuals who are filing their taxes are

24   competitors in the tax preparation market?

25   A    That's not what I said at all.  What I said is that the

1    option of going and using pen and paper is an option to which

2    consumers -- it's an alternative or a substitute that consumers

3    can turn to in the event of a price increase on the products at

4    issue.

5        And that's exactly the question that we're asking.  I mean,

6    to -- that's at the heart of the question of market definition.

7    That's what it's all about.

8    Q   Section 4.1 of the Merger Guidelines say, "When a product

9    sold by one merging form competes against one or more products

10   sold by the other merging firm, the agencies define a relevant

11   product market around Product A to evaluate the importance of

12   that competition.  Such a relevant product market consists of a

13   group of substitute products including a Product A.  Multiple

14   relevant product markets may thus be identified."

15       Pen and paper is not a product.

16   A   It's not a product in the sense of a firm is putting out a

17   software product, but it is relevant and it still fits into that

18   same concept by saying it's a way of filling out your taxes.  In

19   the same way that digital software is a way of filling out your

20   taxes and assisted tax preparation is a way of filling out your

21   taxes.

22       It's a piece of paper -- it's several pieces of paper --

23   provided by the IRS, and it's an alternative that consumers can

24   turn to and it's a constrain on pricing.

25   Q   And 4.1 talks about product markets.  Now, markets are where

1   there is an exchange of economic activity, right, good for

2   money, right, that's what a market is?

3   A    That's one definition of the word "market."

4   Q    And that's not what's happening with pen and paper.

5   Nobody's exchanging money.  It's just somebody's choosing to do

6   a task and not spending money, right?

7   A    Well, the same is true for the free products that are sold

8   by -- that are not sold, but that are provided by H&R Block or

9   TaxACT or some of the other firms in this industry.  I mean, not

10  every element of this product market involves an exchange of

11  money.  For example, the free products -- the ones -- and I

12  certainly have an understanding that some of the free products

13  lead to monetization, but there are certainly consumers that --

14  tax filers who use free products and never pay for anything.

15      Those are -- likewise, there's no exchange there, but that

16  doesn't mean that they are not in the relevant market.  Indeed,

17  I think they are even in Dr. Warren-Boulton's relevant product

18  market.

19  Q    All right.  We'll get back to the free in a little bit, but

20  let's keep focusing on pen and paper.

21      You said you read depositions of various parties, right, as

22  part of this?

23  A    Correct.

24  Q    And you see the answers where the executives said we don't

25  think pen and paper, we don't compete with pen and paper?  Did

1    you take that into account?

2    A    I did take that into account.

3    Q    Let's look at a couple of those.  We'll put up Tab 55,

4    Government Exhibit 293.  This, again, can't be shown to the

5    audience because it's an Intuit executive.

6    A    What page?

7    Q    Tab 55, Government Exhibit 293.  Page 37, lines 20 to

8    page 38, line 2.  And we can't read it out loud, but you'll see

9    that the Intuit executive was asked, "Did you compete with free

10   fillable forms in seeking to attract tax preparation?"  And

11   you'll see his answer there.

12       Do you see that?

13   A    I do.  If I can just find it on my page to make sure that I

14   see the context.

15   Q    Okay.  Let's look at Tab 56, Government Exhibit 296.  This

16   is Mr. Houseworth's testimony.  He is an executive at H&R Block

17   whose testimony you've cited in your report and declaration, I

18   think, correct?

19   A    I'd have to go back and check what I cited, but I certainly

20   have reviewed his deposition.

21   Q    Okay.  And you agree that he's actually -- is he in charge

22   of the digital business right now at H&R Block?

23   A    Yes, that's my understanding.

24   Q    All right.  If you would look at his deposition.  We're at

25   page 89, line 2, to 90, line 1.

1          MR. WAYLAND:  This isn't sealed, is it?  I'm not sure

2     it should be.  Mr. Robertson, could you just --

3          MR. ROBERTSON:  We can display it.

4     BY MR. WAYLAND:

5     Q   So this is testimony of Mr. Houseworth on August 4th,

6     page 89, line 2, to 91, 1.

7          "Question:  Do you believe that pen and paper is a

8     constraint on H&R Block's digital business?"

9          "What do you mean by 'constraint'?  How could it be a

10    constraint?"

11         "That's what I'm trying to understand."  And then there's

12    some colloquy.

13         Line 14, "Do you view -- do you believe that pen and paper

14    is a constraint on H&R Block's digital business?"

15         "The Witness:  Constraining how?

16         "Question:  Does it constrain H&R Block in terms of the

17    prices it can charge?"

18         Answer from the head of the digital business, "I don't think

19    so."

20         That was part of the deposition record that you considered,

21    right?

22    A   Yes.

23    Q   You think that Mr. Houseworth knows more about his business

24    than you do?

25    A   Yes.

1    Q    So if he testified that pen and paper doesn't constrain his

2    business, don't you think we should listen to him?

3    A    I think we should certainly take account of what he says but

4    put it into its context of he is a business person who is

5    thinking about constraints in a certain way.  And I'm an

6    economist who is thinking about things perhaps in a slightly

7    different way than he is because I'm thinking about it in terms

8    of an antitrust context.

9        As a starting point, we're talking about TurboTax, Intuit --

10   I can say that much, right -- and H&R Block in these particular

11   deposition excerpts.  And indeed, in terms of the quantification

12   of diversion or at least the closest thing that we have to a

13   quantification of diverse, the place where the constraint seems

14   to be most prevalent for pen and paper is with regards to

15   TaxACT.  And that's not surprising, because that's -- TaxACT'S

16   products are at a lower price point.  So it's reasonable to

17   think that the constraint would be more so at that part of the

18   marketplace.

19       But even so, I mean, when business people think about the

20   primary constraints on their business, you know, they are

21   usually thinking -- you know, a lot of times business people say

22   what keeps you up at night?  It's the primary things that are on

23   their minds.  But what I have to do is step back and look at,

24   you know, all of the evidence and in terms of where customers

25   would go.

1    So the analysis is a little bit different.  I do believe

2    that he knows his business, at least I have no reason to believe

3    he doesn't, but it's a different question that he is sometimes

4    thinking -- that a business person is sometimes thinking about

5    than what an antitrust economist is thinking about.

6    Q   And aren't you thinking about whether one product constrains

7    the price of another?  Isn't that your fundamental -- that's why

8    you're here, right?

9    A   Correct.

10   Q   And Mr. Houseworth, the head of the business, is answering

11   that question.

12   A   Again, as I indicated, this is H&R Block, and I wouldn't

13   expect that the effect of pen and paper is most prevalent on H&R

14   Block.  Indeed, I think it's more prevalent for TaxACT, as I

15   stated before.

16   Q   All right.  You agree that the standard methodology for

17   defining a relevant market is known as the hypothetical

18   monopolist test, correct?

19   A   The hypothetical monopolist test is an element in defining a

20   relevant market, yes.  There are some other principles, as I

21   mentioned in my direct testimony, that are also important in

22   defining relevant market.

23   Q   Actually, Dr. Meyer, I was quoting your report at

24   Paragraph 152 where you said, "The standard methodology for

25   defining a relevant market is known as the hypothetical

1   monopolist test."

2       You haven't changed your view, have you, since you wrote

3   your report?

4   A   No.  I was just clarifying that it's the standard

5   methodology but in light of other factors as well.  That's all

6   I was clarifying.

7   Q   And you did not yourself perform a hypothetical monopolist

8   test on the digital do-it-yourself market that the government's

9   alleged, correct?

10  A   No.  Because I don't think it's a proper relevant antitrust

11  market.

12  Q   So you just said, "Okay, I'm not going to run a test on that

13  market," right?

14  A   Well, it doesn't conform to the other principles of a

15  relevant market so there was no point, in some sense, of running

16  a SSNIP test on something that starts out fundamentally as not

17  being a proper relevant antitrust market because it omits the

18  important alternatives.

19  Q   And you didn't perform any kind of calculation SSNIP test of

20  your own market, right?

21  A   As I said, there's not a particular calculation, but I

22  explained in my direct testimony that it's clear that my market

23  passes a SSNIP test.

24  Q   I think at your deposition, you said the SSNIP test was

25  "inherent" in what I did, right?

1    A    I don't recall the exact language that I used.

2    Q    All right.  Let's look at your deposition to refresh your

3    recollection as to what you said.  And we're at page 38 of your

4    deposition on August 22nd, 2011.

5        And at line 12, you were asked, "Which product set did you

6    apply the hypothetical monopolist test in?"  And your answer

7    was, "Inherent in the opinions expressed in my report are

8    hypothetical monopolist tests to the relevant market that I've

9    determined all tax preparation methods," correct?

10   A    Correct.

11   Q    Does that refresh your recollection that you've described

12   your test as being inherent in what you did?

13   A    Yes.

14   Q    All right.

15        THE COURT:  What is the tab for Dr. Meyer's deposition?

16   Is this in the notebook?

17        MR. WAYLAND:  It's not in the book, your Honor.  We can

18   provide you with a copy.

19        THE COURT:  It's okay.

20        MR. WAYLAND:  It's Government Exhibit GX 666, your

21   Honor.

22        THE COURT:  Thank you.

23   BY MR. WAYLAND:

24   Q    Now, let's talk about the SSNIP test a little bit.  It's a

25   small but significant nontransitory increase in price, right?

74

 1    A    That's what "SSNIP" stands for.

 2    Q    And we're generally talking about 5 or 10 percent.  That's

 3    what economists, the government, that's how we talk when we're

 4    doing merger analysis generally, right?

 5    A    I believe that's in the Merger Guidelines, yes.

 6    Q    Now, in Section 4.11 of the Guidelines says that "groups of

 7    products" -- and we're going to display this, "may satisfy the

 8    hypothetical monopolist test without including the full range of

 9    substitutes from which consumers choose," correct?

10    A    I actually see something that talks about not excluding a

11    product that's a closer substitute for the first product than is

12    the second product --

13    Q    This is yours.

14    A    -- which is the point that I've been making.

15    Q    That's what you said, right.  I'm sorry.  Let's back up.

16         MR. WAYLAND:  Let's display that again.

17    BY THE WITNESS:

18    A    I'm glad this is coming up so many times because this is

19    really important.

20    Q    All right.  This is the section of the Merger Guidelines

21    that you quoted from yesterday, correct?

22    A    Correct.

23    Q    All right.  Let's look at Section 4.1, see some more of it.

24         It says, "Groups of products may satisfy the hypothetical

25    monopolist test without including a full range of substitutes

1    from which consumers choose," correct?  That's a quote.  Any

2    disagreement?

3    A    I don't know what the -- it doesn't look like the Horizontal

4    Merger Guidelines to me so I don't know what that was.

5    Q    This doesn't look like the Horizontal Merger Guidelines to

6    you?

7    A    This document --

8    Q    It's not.  If you want me to get the actual copy, we can do

9    that, or you can accept that we've typed it out correctly.

10        Do you have any reason to believe that that doesn't --

11   A    No.  I thought that you were --

12   Q    It's my script.  We should have a copy for you.  For some

13   reason it's not here.  So I'm just --

14   A    I understand.  I'm sorry.  I was just confused.  I thought

15   that --

16   Q    I understand.  It's out fault for the confusion.  We should

17   have the text.  It's not here for some reason.  But in any

18   event, we've typed it out.

19        And you don't disagree.  You've read them, right?

20             MR. ROBERTSON:  Objection.  If we can just ask a

21   question rather than have counsel show the witness his own

22   outline.

23             MR. WAYLAND:  We'll just put it aside.

24             THE COURT:  Read from the Horizontal Guidelines as

25   opposed to showing us all your work product, as much as we enjoy

1  looking at it.

2       MR. WAYLAND:  I don't usually follow a script either.

3  BY MR. WAYLAND:

4  Q   All right.  We're going to put the Horizontal Merger

5  Guidelines aside because they say what they say.  Let's talk

6  about applying a test here.

7       In your market, a market you've defined, the hypothetical

8  monopolist monopolizes all forms of tax preparation, correct?

9  A   Correct.

10 Q   So I -- in order to do your taxes, you have to come to me.

11 That's your hypothetical monopolist, right?

12 A   Correct.

13 Q   So the SSNIP test is sort of silly in that case because he

14 can charge -- or she can charge -- an infinite price because

15 everybody has to do their taxes, right?

16 A   I don't know whether he could charge an infinite price

17 because at some point in time, people don't have the income to

18 pay that price.  But, I mean, that's -- just to follow out your

19 logic to its conclusion.  But I agree, a hypothetical monopolist

20 of that market could certainly increase the price and people can

21 continue to pay their taxes, yes.

22 Q   Right.  And so that's why it didn't really make sense for

23 you to do a SSNIP test because you're not going to get any

24 result that tells you anything because the hypothetical

25 monopolist can charge to infinity, essentially.

1   A    It's true.  That's why it passes the SSNIP test.

2   Q    But the SSNIP test, you're supposed to be getting a yes or

3   no.  Either I raise the prices 5 or 10 percent and see a change,

4   or maybe it's not enough and I have to try another test, right?

5   You're trying to get a yes or no out of the SSNIP test.

6        Is it a relevant market or not, right?

7   A    The SSNIP test is a yes-or-no type test, yes.  In my market,

8   it passes.  I would say, yes, it is a relevant market.  It

9   passes the SSNIP test.

10  Q    Because there can never be a no in your market because

11  everyone has to pay and everyone has to pay whatever the

12  monopolist demands.

13  A    As I said yesterday, I mean, there are certainly times in

14  which the proper relevant market is all of the alternatives to

15  which people would practically turn.  There's nothing wrong with

16  that, and that happens to be the case in this matter.

17  Q    But in the government's market, the one we've defined, you

18  could reasonably say at some point some price that the digital

19  monopolist monopolizes all digital prices is too high, people

20  will go back to pen and paper, or they'll switch to assisted.

21       As an economist you'd say, yeah, that makes sense.  At some

22  point, somebody would switch to pen and paper or somebody would

23  switch to assisted, right, and you could test that?

24  A    You could test that.

25  Q    All right.  So that's a market you can actually apply the

1    SSNIP test to.  Whether you agree that it's the right market, if

2    it is, you can apply the SSNIP test and get a reasonable answer.

3        Some price people will switch out or switch up to assisted,

4    right?

5    A    Yeah, but that's not the SSNIP -- you can do the test that

6    you outlined, but that's not the SSNIP test.  The SSNIP test is

7    not would it be a relevant market at a 5 percent price increase,

8    but would it not be a relevant market if I applied a higher

9    price increase.  That's not the SSNIP test.

10   Q    We talked about the pen-and-paper part of the market.  Let's

11   go to the other side of it which you include, and that's the

12   assisted side.  Let me show you Tab 29, Government Exhibit 629.

13   This is a white paper that was submitted to the government on

14   May 2nd, 2011.  I think it was before you were retained as an

15   economist.  But submitted by counsel on behalf of both

16   defendants.  Let's look at page 92.

17       By the way, did you see this document among the things that

18   you read in coming to your conclusion about the market?

19   A    I have seen this document.  This was not a document prepared

20   in the ordinary course of business and so I didn't base my

21   opinions on anything within this document.  But I certainly have

22   seen this document.

23   Q    Well, it was prepared in the course of providing the

24   government with the parties' positions.  And I assume -- you've

25   worked on white papers that go to the government, right?

1  A    I have.

2  Q    And when you prepared white papers that went to the

3  government, you made your best effort to faithfully represent

4  the truth to the government, right?

5  A    That's correct.

6  Q    All right.  So that's the course in which it was prepared,

7  right?

8  A    That's my understanding.

9  Q    All right.  And on page 92, the paper says, "After several

10  painful years of confusion, indecision, apprehension, and false

11  starts, H&R Block has finally arrived at a coherent business

12  strategy on which to base its efforts to compete with Intuit.

13  It has recognized that the digital tax preparation business

14  serves do-it-yourself customers and does not adversely affect

15  its much larger tax preparation business."

16      You read the paper.  You took that into account when you

17  came to your opinion that assisted and digital were in the same

18  market, right?

19  A    I saw this, and I took this into account, yes.

20  Q    Okay.  Were you here for Mr. Bennett's testimony?

21  A    I was not.

22  Q    Did anybody tell you what Mr. Bennett said about assisted

23  and digital?

24  A    I read Mr. Bennett's testimony.

25  Q    Okay.  Do you recall that Mr. Bennett agreed that the

1   digital tax preparation business serves do-it-yourself customers

2   and does not adversely affect its much larger assisted tax

3   preparation business?

4   A   I don't recall specifically what he said.

5   Q   I think you also read the Intuit declaration that was

6   submitted, right?

7   A   Yes.

8           MR. WAYLAND:  All right.  Let's look at that and that

9   cannot be displayed.

10          MR. ROBERTSON:  Your Honor, I'll explain that documents

11  were flashing on the screen that were under seal, and I wanted

12  to make sure that he was aware of that.

13          MR. WAYLAND:  We have the screen turned off.

14  BY MR. WAYLAND:

15  Q   We're looking at Paragraph 25.  This is Intuit's pricing.

16  "Similarly, when setting prices, Intuit" --

17  A   Which tab is this?

18  Q   This is Tab 29.  It's Government Exhibit -- it's Tab 8,

19  Government Exhibit 29.

20      And in that -- do you have it, Dr. Meyer?

21  A   Yes, I do.

22  Q   All right.  So in Government Exhibit 29, Paragraph 25,

23  Intuit executive writes, "Similarly, when setting prices, Intuit

24  relies primarily on its own consumer behavior studies and looks

25  to the pricing of TaxACT and H&R Block."

1        Do you see that?

2   A    Yes.

3   Q    All right.  Were you here for the trial testimony of

4   Mr. Ernst?

5   A    No, I was not in the courtroom when Mr. Ernst testified;

6   however, I did review his testimony.

7   Q    All right.  And you understood that Mr. Ernst is a former

8   CEO of H&R Block?

9   A    Yes, I understand that.

10  Q    And he was asked at line 33 --

11          MR. WAYLAND:  Do we have that?

12  BY MR. WAYLAND:

13  Q    The trial testimony of Mr. Ernst on September 7th, line

14  33 -- at page 33, line 23.

15      "Did H&R Block view the digital market -- the digital method

16  and the assisted method of tax preparation as competing with one

17  another?"

18      "Not to any large degree, no."

19      And you read that, right?

20  A    Yes.

21  Q    Now, it's your view that if the prices of H&R Block's

22  digital products went up, customers would switch in greater

23  numbers to assisted tax preparation than they would switch to

24  anywhere else, right?

25  A    Correct.

1    Q    And it's your view that, for example, if the price of basic

2    went from 30- to $35, people would -- biggest switch would be to

3    assisted, right?

4    A    This is looking at the prices generally of H&R Block

5    products.  I didn't do a specific analysis of one product or

6    another product.

7    Q    Well, can you shed any light as to what would happen if the

8    price of the $30 product went up to $35?

9    A    Again, what I looked at in terms of the statistical

10   analysis -- I just want to be clear as to what I did -- was

11   looking at the prices across the board of H&R Block products.

12   Q    Okay.  No matter what you did, I'm asking if it allows you

13   to tell the Court anything at all about what would happen if the

14   price of H&R Block's basic product went from 30- to $35?

15   A    That would increase the overall pricing of HRB's pricing

16   portfolio, and that would -- the statistical analysis tells me

17   that that would tend to lead to a diversion to assisted.

18   Q    So how many people -- what percentage of people who bought

19   the $30 product would leave to go to assisted if the price went

20   up to $35?

21   A    Again, this was -- I just want to be clear as to what the

22   statistical analysis can tell us and what it can't tell us.

23        It can tell us that in general when HRB's prices go up, that

24   the first place -- and this is in general across the board --

25   that they go to assisted.  It doesn't identify one particular

1   price from one particular product.  That's not what the

2   statistical analysis does.  It's looking at across all of the

3   prices in the portfolio.

4   Q   Now, you are saying that it would just -- whatever happens,

5   it's going to go from H&R Block to assisted, right?  You defined

6   assisted, right?

7   A   Yes.

8   Q   Okay.  And you haven't -- you can't tell us where in the

9   assisted group of various segments it would go, right?

10  A   That's incorrect.  The pricing simulator does break out

11  different types of assisted tax preparation, and the most -- the

12  highest diversion would go to CPA and accountants within even

13  the assisted group.

14  Q   Okay.  And apart from what you learned from the simulator,

15  is there any other basis to tell us where a customer who is

16  buying the $30 Block product is going to go when the price goes

17  to $35?

18  A   There's not a specific pricing test that identified -- let

19  me put it this way:  There's not a particular analysis that

20  looks just at the price of that one product and where people

21  would go.  I make -- I look at the data that's available on

22  generally what happens when pricing goes up.

23  Q   Okay.  So if we put aside all the work that you've done with

24  the simulator -- put that aside, pretend you didn't do it -- do

25  you have any other basis to tell us what would happen if the

1    price of H&R Block's basic product went from 30- to $35?

2    A    I don't have a specific quantification.  However, I have

3    seen a lot of documents in which H&R Block talks about competing

4    with assisted tax preparation which Mr. Smyth, for example,

5    talks about the importance of digital competing with assisted

6    and assisted competing with digital.

7         So there's a lot of qualitative evidence that indicates that

8    they're competing.  What you're asking about in terms of a

9    specific quantification that, in the case of H&R Block, comes

10   from the pricing simulator.

11   Q    And your answer would be the same if I went through various

12   price changes in, for example, the TaxACT products?  If I asked

13   you what would happen in response to a change in price from 9.95

14   to 10.95, would you have a different answer?

15   A    Generally speaking, as well, you know, there are a lot of

16   documents that speak generally to the competition that TaxACT

17   faces.  There is certainly a document that contemplates a

18   specific price increase on the TaxACT side of a state increase

19   by a dollar and the thinking of management as to why they

20   couldn't do that.  And they are concerned that people would turn

21   to pen and paper.  That's perhaps a bit closer to asking the

22   specific question of what would happen if the price went up by a

23   particular amount of money.

24   Q    I think we've had a lot of testimony about the 9.95 price at

25   TaxACT has been constant for a long time.  If it goes up 10

1    percent to 10.95, your testimony is that the result of that

2    would be largest diversion would be people stopped doing

3    their -- stopped using digital products?

4    A    Well, I think it's important to realize that when we're

5    talking about diversion, we're talking about the difference

6    between what would happen at one price, the higher price versus

7    the lower price.  So you know, generally speaking, we know that

8    there are each year, even on net, consumers coming from pen and

9    paper and beginning to do their taxes digitally.

10        And so it could be that in response to a price increase,

11   what would happen would be that a former TaxACT customer would

12   switch back to pen and paper.  That's one possibility.  And

13   that's what is specifically contemplated in the TaxACT survey.

14   But its diversion would also refer to in a year -- if we compare

15   how many new customers TaxACT got at the 10.95 price coming from

16   pen and paper, that they would get fewer customers from pen and

17   paper at the 10.95 price as they would from the 9.95 price.  So

18   in other words, that it slows down their growth of customers

19   coming from pen and paper.

20        So I just want to be clear that diversion could be either

21   one of those because it's comparing, you know, what would my

22   world look like in a 10.95 price scenario versus a 9.95 price

23   scenario?  How many customers are using pen and paper and how

24   many are using my product?  It's a subtle distinction, but it is

25   important in this case where TaxACT and, indeed, all of the

1    firms, are looking to get tax preparation customers from across

2    the spectrum.

3        And so in order to keep that pipeline going of new

4    customers, that's an important component of how they compete and

5    what they care about.  So I just hope that was -- didn't add

6    more confusion, but I just wanted to be clear there.

7    Q    All right.  Just a couple more questions on this, Dr. Meyer.

8    You testified in response to the Court's question that if the

9    simulator were disregarded, there is sufficient basis for your

10   relevant market opinion, right?

11   A    Correct.

12   Q    The TaxACT survey, that doesn't quantify diversion from

13   H&R Block, right?

14   A    Correct.

15   Q    Okay.  And it just addresses switching, right?

16   A    Well, it is -- it's switching, but within a mind towards

17   dissatisfaction with regards to price, features, or quality.  So

18   it's certainly closer to diversion than is pure switching

19   data.

20   Q    But in any event, it doesn't quantify diversion, right?

21   A    It is not a specific direct test of diversion, but it sheds

22   light on the question.

23        THE COURT:  Can I just follow up on that one question

24   because I know you asked about this, and I wasn't sure I

25   followed it then so thank you for giving me another opportunity

1    to clarify this in my own mind.

2        MR. WAYLAND:  Yes.

3        THE COURT:  So the 2011 survey asks about price

4    features and quality satisfaction.  It doesn't ask about

5    complexity.  So you say that that's better than switching data

6    for purposes of your analysis of the diversion ratio and

7    diversion generally.  And so as I see the only difference

8    between the switching data and this survey is that the survey

9    doesn't ask about complexity, but it does ask about three other

10   different characteristics associated with the software.

11        Why is it that you don't think -- why is it

12   specifically that you think that the switching data isn't better

13   than that survey?  I still don't understand.  Since the only

14   thing it seems to be not asking about -- let me put it to you

15   this way:  If that survey had said tell me about your -- if

16   there was a difference in satisfaction in pricing, features,

17   quality, and there was a change in the complexity of your tax

18   situation, would it then, in your mind, be analogous to

19   switching data?

20        THE WITNESS:  No.  You want a clarification.

21        THE COURT:  Yes.

22        THE WITNESS:  Because why are people switching in the

23   switch data?  Part of it could be because of price, features, or

24   quality dissatisfaction.  Part of it could be changes in

25   complexity.  But there are lots of other reasons why they could

1    be changing as well.

2           For example, we've heard about advertising.  It could

3    be that they saw some advertising, and that's why they switched.

4    It could be that their friend told them about the product and

5    they switched.  It could be that they just wanted to try

6    something different.  They wanted to see if they got a higher

7    return from a different product or method.

8           THE COURT:  So the reason you prefer the survey is

9    because unlike switching data where there's this whole panoply

10   of reasons, at least it just refines the answers to those

11   respondents who participated in the survey to those three

12   different aspects that were asked about in the survey?

13          THE WITNESS:  Correct.

14          THE COURT:  Okay.

15   BY MR. WAYLAND:

16   Q   Okay.  Just finish up on this line, Dr. Meyer.

17       So if you disregard the pricing simulator, there's no

18   quantitative basis to support your view that assisted is a

19   closer substitute to H&R Block than other digital products,

20   right?

21   A   At that point, I would have to look to the qualitative data,

22   yes.

23   Q   Okay.  Let's take a look at the slide again with the numbers

24   on assisted and competing from digital that you used yesterday.

25   This is your demonstrative.

1          MR. WAYLAND:   Do you know what tab it was in her book?

2    BY MR. WAYLAND:

3    Q   It's tab 52 in our book.   I'm not sure what it was in your

4    book.

5        If you recall, Dr. Meyer, after you testified about how the

6    simulator provided your basis for diversion conclusions, you

7    said, "Okay, well, I'll look at some other data too to see what

8    it says."   And here's what you presented to support your view

9    that HRB's closest competitor is assisted.   And you have the

10   simulator data.   And then you correct it after Dr. Rick

11   Warren-Boulton pointed out the problem with the 19.95 and so you

12   ran some other numbers, right?

13   A   Correct.

14   Q   Then you also lined up the IRS switching data.   And you

15   presented your results, right?

16   A   I lined up the IRS switching data, yes.   I don't think that

17   that is diversion data.

18   Q   I know.   You think it's switching data, but you were just

19   using it to show even with the switching data, I can support my

20   position, right?

21   A   Well, the switching data would have to include both this

22   switching data and then the data with regards to TaxACT.

23   Q   Okay.   This is your chart.   You presented it yesterday.

24       I'm not -- you had a purpose, right?

25   A   Correct.

1    Q    Okay.  And do you know in statistics the basic problem of

2    improper aggregation?  Do you know anything about that?

3    A    I have not heard of that particular term.

4    Q    Well, do you understand just as a matter of logic that if

5    you're comparing a group of something to individuals,

6    individuals in another set, that that doesn't really work?

7         Do you understand that's a basic concept in statistical

8    analysis?

9    A    I'm not familiar with that concept.

10   Q    Okay.  Well, let's just look at what you did.

11        In getting your numbers, you have assisted listed as a

12   single group, as if it's a thing, a one thing, right?

13   A    Correct.

14   Q    And then you've broken out TurboTax, TaxACT, other digital,

15   right?  They are separate.

16        You didn't group them together as digital, right?

17   A    Correct.

18   Q    Okay.  And did you do that to see if you compared one

19   segment to another segment if the numbers came out

20   differently?

21   A    No.  As I said, I mean, you can also break out assisted

22   into, for example, the CPA.  And that still has the highest

23   diversion from the pricing simulator.

24   Q    What if you broke out assisted into Jackson Hewitt, CPA

25   firm, Liberty Tax?  What if you broke it out that way just as

1    you've broken out digital in some respects?  Would it look

2    different?

3    A    Well, the CPA group still has the highest diversion.

4    Q    We took your numbers and we did group to group, and we're

5    going to show you what that is.  So we've added together all the

6    digital switching or diversion in your sense, switching on the

7    IRS numbers, and we've added them together.

8         And if you compare group to group, again, just using your

9    way of looking at it, it turns out that the closest competitor

10   by group is digital, right?

11   A    If you add up the numbers of digital, but the question here

12   is a comparison between -- you know, the merger here is between

13   HRB and TaxACT.  And those are distinct entities, you know,

14   within the digital space.  And they are looked at separately by

15   HRB.

16        On the other hand, assisted is looked at as a group by HRB.

17   So I'm not sure what this shows.  But I see the math that you're

18   looking at.

19   Q    It shows if you compare apples to apples you get a different

20   result than if you sort of mix things up a bit, doesn't it?

21   A    No, I don't think so.

22   Q    All right.

23        THE COURT:  I'm sorry.  I don't understand why you

24   don't think so.

25        THE WITNESS:  Because when H&R Block looks at its

1    competition, when it talks about where its customers go, it

2    considers TurboTax separately because, you know, that has a

3    particular set of product features and has particular products.

4    It looks at TaxACT separately and, of course, we have to look at

5    them separately because that's the other party merging.

6         But then for assisted, it doesn't know where those

7    customers are going to assisted.  And when you see the way that

8    it breaks things down in its ordinary-course-of-business

9    documents, it looks at either assisted as a group or it looks at

10   CPAs as a group versus tax stores at a group.

11        THE COURT:  But that's not really right, isn't it,

12   because in the simulator that you looked at yourself, I mean,

13   they took assisted and they broke it down to a different

14   groups -- friends and family, CPAs and accountants, retail

15   stores -- and then you took all those and you put them together

16   into assisted.

17        So just like you did that, why isn't a group of DDIY,

18   why doesn't that include all the DDIY ways of performing your

19   tax preparation in the way that this shows?  You're saying it's

20   not apples to apples, and I'm really having difficulty

21   understanding why comparing assisted as a group, and all the

22   different methods combined into assisted, why isn't that one

23   group and all of DDIY digital tax preparation methods, why isn't

24   that another group and why isn't that a better way of grouping

25   these numbers?

1          THE WITNESS:  Well, I would say the question is really,

2     the way that I would think about it, is it correct to break down

3     assisted into its individual components?  Because if you do that

4     and say, well, I'm going to start with all digital DIY and just

5     put them together as a group, then you've done, in essence,

6     exactly what Dr. Warren-Boulton has done, which is you assume

7     your conclusion.  You just say I assume that they're all

8     together, I assume that they all compete, you know, with H&R

9     Block, and then I'll just test to see whether they do.  And as

10    we can see, the diversion to TaxACT, for example, is relatively

11    low.

12         On the other hand, the question of assisted, can you

13    break it up?  Yes, you can break it up.  And sometimes the firms

14    look at groups like CPAs and separately tax stores.  And when

15    you look at that, there's still very high diversion to CPAs.  So

16    even if I did it that way, there would still be very high

17    diversion to CPAs.

18         So I don't think doing more aggregation is the answer.

19    I think the question is, could there be less aggregation on the

20    assisted side, and you can but the conclusions are still the

21    same.

22         THE COURT:  Well, I think the discussion about

23    aggregation is -- not to get granular on exactly where people

24    are being diverted -- but if you're going to put up a number for

25    assisted of 41.8 percent or 38 percent, what is the comparable

1  number?  And I think that that's the purpose.

2          So anyway, I'm sorry, Mr. Wayland; please continue.

3          MR. WAYLAND:  That's fine, your Honor.

4          Just as a clear record, are we marking this?  Do we

5  have a separate exhibit number for this?

6          This will be Government Exhibit 15, your Honor, which

7  just for the record --

8          THE COURT:  This is a trial exhibit?

9          MR. WAYLAND:  Yes, I'm sorry.  Government Trial

10  Exhibit 15 which is the calculation we've just displayed that

11  aggregates the do-it-yourself market, your Honor.

12          THE COURT:  Is that a tab in the notebooks?

13          MR. WAYLAND:  It is, your Honor.  Tab 52, your Honor.

14     (WHEREUPON, a certain document was marked Government Trial

15     Exhibit 15 for identification as of September 13, 2011.)

16  BY MR. WAYLAND:

17  Q   All right.  We have another slide which deals with the same

18  issue.  This is another one of the slides that you presented

19  yesterday.  This is TaxACT's closest competitor is pen and

20  paper.

21      And you have the assisted batch -- before I go any further,

22  now, as I understand it, Doctor, the IRS switching data, you can

23  look individually at every single -- you can get the data on

24  every single preparer, right?  You know that, right?

25  A   I'm sorry.  Say that again.

1  Q    You can get switching data by individual preparer,

2  correct?

3  A    Sort of.  You have to do a little bit of work.  It doesn't

4  actually tell you the preparer but the way in which it was

5  prepared.  But you can match up the way in which -- so in other

6  words, it says that it was Jackson Hewitt software that was used

7  and so you can bring that back and say, well, that was Jackson

8  Hewitt that prepared the return.

9  Q    All right.  So you could have looked at the data and said

10  preparer by preparer, where are people going to on the switching

11  analysis, right?

12  A    For the switching data, yes?

13  Q    Okay.  Let's just stick with the aggregation issue.  And

14  we've prepared another slide that does the same thing, adding up

15  the digital shares.

16      And you'll see that if you calculate digital shares, it's

17  actually higher than assisted or pen and paper by a substantial

18  amount, right?

19  A    I see the numbers that you're talking about, yes.

20          MR. WAYLAND:  All right, your Honor.  This will be

21  Government Exhibit -- Trial Exhibit 16, Tab 51.  And this again,

22  for the record, is the aggregation of digital in the chart

23  "TaxACT's Closest Competitor is Pen And Paper."

24      (WHEREUPON, a certain document was marked Government Trial

25        Exhibit 16 for identification as of September 13, 2011.)

1    BY MR. WAYLAND:

2    Q    Now, when you were thinking about whether assisted would be

3    in the market, did you think about what Mr. Houseworth thought

4    about that, the head of the digital business at H&R Block?

5    A    Yes.

6    Q    And what did he think about it?

7    A    H&R Block, actually not all that different from TaxSlayer I

8    believe that I -- Mr. Rhodes who was here -- has both a digital

9    DIY product and an assisted product.  And for both of those

10   firms, there's obviously a consideration within the firm that

11   they had these two products and a question of how hard that they

12   want one product to compete against the other, you know, within

13   that firm and taking sales.

14        And that's always been, I think, its attention and a

15   constraining factor on firms that are set up in that way.  They

16   have to take into account all of the products in their

17   portfolio.  So -- you know, the retail business is a large part

18   of H&R Block's business, and so there's certainly a hesitancy on

19   the part of the management in certain documents to promote a

20   whole lot of competition within the firm.  They'd rather, you

21   know, compete outside the firm.

22        But, you know, even Mr. Smyth, who was the CEO I believe in

23   2010, has recognized that that's just not a feasible way to

24   proceed.  That digital does compete with the retail business,

25   and retail does compete with their digital business, whether

 1   that's something that they like to admit or not.

 2   Q    We talked about documents.   I'm talking about sworn

 3   testimony which you said you read, right?

 4   A    Yes.

 5   Q    And when Mr. Houseworth said, "No, I don't view H&R Block's

 6   assisted business as competing with its digital business," did

 7   you have any reason to doubt that he knew what he was talking

 8   about?

 9   A    No.

10        MR. WAYLAND:   All right.   Your Honor, could I just

11   inquire as to the schedule?   I know that you're stopping early.

12   Are we having lunch?   Are we working through?

13        THE COURT:   I'd like to go through to 1 o'clock if we

14   can.

15        MR. WAYLAND:   Okay.   Thanks.

16   BY MR. WAYLAND:

17   Q    Now, yesterday I think, Dr. Meyer, you testified that for

18   diversion purposes, what you want to look at is increases in

19   prices and see what happens, right?

20   A    It's the responsiveness to a change in price, that's

21   correct.

22   Q    Okay.   Now, in your report at page 29, you included a

23   figure, Figure 1.   And that's a chart that purports to show that

24   the prices of certain products increased over a number of years,

25   correct?

1   A    If I can just look at my report so I can see it in color

2   because it's --

3   Q    I'm sorry, Doctor.  Your report is at Tab 1, page 29.  This

4   is Government Exhibit 854.

5   A    Oh, okay.  I was hoping for a version in color.  Let me just

6   see if it's here.

7        Here's a version in color.

8   Q    Okay.  And for this chart, you picked a few products, and

9   you laid out the price increase -- or the price change or lack

10  of change over a period of time, right?

11  A    Yes.

12  Q    And this shows, would you agree, that -- and I think it was

13  the point you put in your report for, that over the last four or

14  five years or so, the prices of H&R Block's and TurboTax's

15  products has increased, right?

16  A    I think I was trying to show something slightly different

17  with this chart.

18  Q    Well, does the chart show that the prices of H&R Block and

19  Intuit have increased over the last five years or so?

20  A    It certainly shows that the price of the particular H&R

21  Block product that I'm showing here has increased over time.

22  Q    And during that period of time, there hasn't been much of a

23  switch from H&R Block to assisted, right, or from Intuit

24  either?

25  A    I haven't looked at that specific question.  Obviously,

1    controlling for all other factors.

2    Q    Well, in one of the charts that you presented yesterday, the

3    circle chart -- let me see if I can find it.  Your binder,

4    Tab -- I don't know what the tab number is, but it's in your

5    binder, Doctor.

6        And net switching from assisted to digital DIY was

7    1.3 million.  So the testimony you presented yesterday was

8    there's a movement from assisted to do-it-yourself, right?

9    A    No.  That's -- what I was showing here is that the net

10   switching masked -- if you only looked at net switching, that

11   masked a lot of switching in both directions between DIY and

12   assisted.  That was the purpose of this particular chart.

13       And as I realized as I was thinking about this yesterday, I

14   may have mentioned that I thought this came from a HRB document.

15   I thought about it, and I believe this comes from switching

16   data, just to be clear.

17   Q    You created it?

18   A    Yes.

19   Q    Let's go back to your chart, Figure 1, and see if we can

20   learn anything about increases of prices and switching to

21   digital.

22       Did you -- you presented some information showing that there

23   was an increase in price for certain digital products,

24   correct?

25   A    Correct.

1   Q   Did you do any investigation to see what the consequence of

2   what that was, whether there was any switching to assisted as a

3   result of these price increases?

4   A   I did not do that particular analysis, no.

5   Q   And that's what you're here to testify about, increased

6   prices and switching, right?

7   A   Diversion, yes.

8   Q   All right.  And here was some information you at least had

9   part of the equation, and, you didn't try to solve the other

10  side of the equation which was to see whether it resulted in any

11  diversion, right?

12  A   Well, the question is can you use this type of data to

13  make -- to get information about diversion?  I certainly asked

14  myself that question because, as you said, it would be -- one

15  might think that you could use this kind of data to get

16  information about diversion.  I certainly considered that as a

17  possibility.

18      The problem is that, as you can see, that the prices only

19  change, you know, once or maybe twice, maybe three times a year.

20  That's not a whole lot of price variation, and so this is not

21  the kind of data that you can use to get information about

22  diversion.  And the reason is this:  You can't just look at what

23  happens with one price, for example, HRB's price, and assisted

24  tax preparation and say, "I just compared those two things.  I

25  look at what happened to HRB's price, I look at what happened to

1    the share of assisted, and I stop there," because you have to

2    control for all the other factors.   There are changes in

3    TurboTax pricing.   There are changes in pricing perhaps of other

4    products.   There's advertising that's happening.   There may be

5    new products that are introduced.

6       So it may appear at first glance -- and I certainly

7    considered this possibility -- that you can use this type of

8    data to come to diversion numbers and to come to an analysis of

9    diversion rates, but when I looked at it more closely, I

10   realized that you really can't because there's just not enough

11   variation in these data.   I mean, the typical type of data where

12   you actually do use actual changes in prices and use them to

13   estimate diversion data, I do that a lot in my work, but that is

14   where prices change, for example, on a weekly basis.

15      I was describing for you earlier the supermarket scanner

16   data.   Prices there change on a weekly basis so you have a lot

17   of observations about prices at different levels, and you can

18   see -- and you can control for the prices of other products at

19   different levels.   You can control for advertising in all of the

20   factors.   So you can actually make a quantitative and

21   statistical -- or show the relationship between a product's

22   pricing and share controlling for other factors.

23      But just, you know, this data just doesn't have enough

24   variation in it within to do it.   And any comparison of one set

25   of particular data points on here with a share of assisted --

1   and I pointed this out in my report because Dr. Warren-Boulton

2   did that kind of analysis -- that just doesn't -- it just

3   doesn't shed any light on the issue.

4   Q   Well, let me see if I can understand why you used this

5   chart.

6       If you look at the text, it says, "Figure 1 provides a clear

7   picture of HRB's murky middle period.  Before 2010, HRB's online

8   premium product had been priced between TurboTax's online

9   premiere and the value products.  However, realizing that the

10  old strategy was not successful, HRB has been focusing on

11  positioning itself more clearly as a premium product.  See since

12  2010 as discussed above."

13      You're using this data to show that HRB has increased its

14  prices which is enough for you, right?  This tells you that HRB

15  increased its prices?

16  A   This shows that it increased its prices on the HRB premium

17  product.  This was really -- I mean, the chart was meant for a

18  particular purpose which was to, as I said, describe what I had

19  seen in the documents.  It was a lot of discussion about this

20  concept of the murky middle.

21      And so I was using this graph to try and come up for myself

22  with a way of thinking about whether or not H&R Block had been

23  in a murky middle, how to think about that concept that I had

24  heard people talk about, and then think about the concept that

25  H&RB saying that it was trying to get out of that murky middle.

1   So I asked myself what kind of data can I use to show or to

2   indicate that trend.  That's really all that this was doing.

3   Q   And you understand that there are a lot of other products

4   that HRB has -- had at the time, and some of those prices didn't

5   go up, they actually came down, right?

6   A   I think there may have been a product or two whose prices

7   came down.  I'd have to look at the data again to remember.

8   Q   So looking at these individual provides points, I think what

9   you're telling us is it's a little tricky, it doesn't really

10  tell you a lot about what's happening in the market?

11  A   Again, it's like data and statistics generally.  You have to

12  think about what you're using the data and statistics to show.

13  This doesn't show that HRB's pricing on all products went up.

14      No, I'm not saying that it does.  I use this for a

15  particular purpose, and that's the purpose -- that's the reason

16  why it was in my report.

17  Q   You actually chose their highest priced product, right, HRB

18  premium plus state?

19  A   Yes.

20  Q   Okay.  Now, you didn't use average price, right?

21  A   No.  And I did that exactly because what I was showing was

22  obviously if this is the highest priced products, all of the

23  other products are below the highest priced product.  And so

24  what this shows is that, you know, in the middle part of this

25  middle, the murky middle period, the products had a range, but

1    even the top end of the range was not at the level of TurboTax's

2    price.   By the end, the top end of the range approached -- or

3    was at TurboTax's prices.

4        That's what I was showing.   That's what the graph shows.

5    Q    Now, you -- do you know whether the companies in this

6    business track average price?

7    A    I have seen mention and data about average price, yes.

8    Q    And you were critical of Dr. Warren-Boulton for using

9    average price as a way of measuring anything about this

10   transaction, right?

11   A    I wouldn't say you can't use average price for anything.   I

12   think, again, statistics are -- you have to understand what

13   question you're asking and what pieces of data and what

14   statistics are informative as to that question.

15   Q    This is a business where a large percentage of the product

16   is distributed for free, correct?

17   A    There is a sizeable percentage distributed for free, yes.

18   Q    And in fact, that percentage has been increasing in recent

19   years, right?

20   A    I'd have to look specifically -- I just don't recall the

21   percentage for each company, whether it's been increasing or

22   decreasing, but it's a sizeable percentage.

23   Q    And for H&R Block it's been increasing, right?   Isn't that

24   part of them coming out of the murky middle and deciding to

25   launch free in a more aggressive way?

1    A    Again, I'd have to look at the data.  I really can't

2    remember every single data point.

3    Q    And free has value to a company, right, free product?  They

4    are not giving it away because they are a charitable

5    organization?  They think there's a business purpose for giving

6    away free, right?

7    A    Certainly.

8    Q    So a company would put value on free, right?

9    A    Free is important to these firms, yes.

10   Q    Okay.  And customers are clearly getting some value by

11   taking the product for free.  They are satisfying their need,

12   not paying any money, but there's clearly some economic value to

13   them, right?

14   A    Yes.

15   Q    So when you're thinking about the company's business and

16   you're trying to understand what's going on in the business,

17   you'd want to put into your calculation what's happening with

18   free, wouldn't you?

19   A    Well, it depends what purpose, you know, what question

20   you're asking.  If you're asking a question about what happened

21   to average pricing, then you look at free and you include free.

22   But if you're asking a question did the firm change pricing, did

23   the firms increase pricing, then looking at average pricing

24   isn't correct because you're mixing -- there are two things that

25   can change an average in this case.  It could be changes of

```
 1   individual prices or it could be that there's a change in the
 2   mix of prices.
 3        And so, you know, again, it depends on what question you're
 4   asking.  But if you're asking the question are firms behaving in
 5   such a way as to increase pricing, then looking at an average is
 6   not the right way to go.  So it all depends on what question
 7   you're asking.
 8   Q    All right.  And you agree, though, that H&RB, for example,
 9   keeps track of average pricing as part of its basic statistical
10   analysis of its business, right?
11   A    I have seen average pricing on HRB spreadsheets, yes.
12   Q    Okay.  And you've seen it on their documents that are
13   described as the "Single Point of Truth" for understanding the
14   company's financial position?
15   A    I can't recall whether it was specifically on the "Single
16   Point of Truth" document, but that was a spreadsheet that talked
17   about financials.  It may well have been on there.
18   Q    All right.  Let's look at Tab 24, Government Exhibit 296-7.
19   And we have to turn off the screen for this.  This is a document
20   entitled "Digital Tax Solutions."
21        And you understood that Digital Tax Solutions, Dr. Meyer, is
22   a separate business unit within H&R Block, right?
23   A    Yes.
24   Q    Their assisted and their digital are run by separate people
25   and separate, right?
```

1    A    That's my understanding, yes.

2    Q    Okay.  This is called "Fiscal Year 11, Actual Deep Dive."

3    And it consists of a number of pages of information.  And if you

4    look at the "Single Point of Truth" page, which is the very

5    first page, you see it says, "Single Point of Truth" at the top.

6         Do you see that?

7    A    Yes.

8    Q    All right.  Then it has various categories of information.

9    And underneath HRB four or five down, it says, "HRB Average

10   Sales Price."

11        Do you see that?

12   A    Can you point it out in the monitor.

13   Q    On the monitor, we're just pointing it out to you.

14   A    Thank you.  Yes, I see that.

15   Q    Okay.  So on the "Single Point of Truth," HRB is tracking

16   the average sales price, right?

17   A    Yes.

18   Q    And this is confidential so we're not going to reveal what

19   it says, but you can see the trend on there, right, Doctor?

20   A    Is there a particular line that you're referring to?  There

21   are trends in several of the lines.

22   Q    Pick H&R Block online.  And again, I don't want you to

23   describe the trend.  We just want to draw your attention to it,

24   okay?

25   A    Yes.

1    Q    All right.  Let's look at Government Exhibit 492.

2    A    Is there a particular tab that you would like me to look at?

3    Q    64.  And do you have Defendants' Exhibit -- Government

4    Exhibit 492 in front of you, Doctor?

5    A    Yes, I do.

6    Q    And as you said yesterday, context matters when you look at

7    documents.  And so let's look at the front page, and we'll see

8    that this is an HRB board presentation from June of 2010,

9    correct?

10   A    Correct.

11   Q    And I think this is one of the documents you reviewed in the

12   course of your work?

13   A    This looks familiar, yes.

14   Q    All right.  So this is a board.  This is information being

15   presented to the board of H&R Block.  Let's go to page 11.

16        And the information that was thought important to share with

17   the board was the average sales price of H&R Block digital

18   versus TaxACT and TurboTax.

19        Do you see that?

20   A    I see that.

21   Q    All right.  And let's go to page 8 of the document.  This

22   doesn't deal directly with the average price issue, Doctor, but

23   I just wanted to bring to your attention the fact that in this

24   board presentation, the information is segmented -- market share

25   information is segmented by assisted and digital, correct, two

1    separate market shares?

2    A    Yes, I see that.

3    Q    Okay.  All right.  Let's go to page 10.

4    A    Of the same document?

5    Q    Yes.  And again, this the board presentation, and people are

6    deciding what the board should know about competition.   So

7    they've listed out the assisted competitor analysis.

8        Do you see that?

9    A    Yes.

10   Q    All right.  And then if you go to page 12, you'll see

11   there's a separate breakout for the digital competitor analysis,

12   correct?

13   A    I see the title, yes.

14   Q    Okay.  And this is the way that the information was

15   presented to the board, which you would expect as you were

16   talking about context, that's a pretty important context; don't

17   you think?

18   A    This was one of many, many documents that I reviewed in the

19   case.

20   Q    We're not talking about that, Doctor.  We're talking about

21   context because you said that was important yesterday.

22       So we're now looking at a board document in which people are

23   describing the competitive environment that HRB faces, and they

24   have distinguished between assisted and digital markets,

25   correct?

1    A    I don't know if they distinguish between what they would

2    call markets, and certainly they didn't distinguish between

3    antitrust markets, but they looked at digital and assisted

4    separately, yes.

5    Q    All right.  So your view as an economist, you -- well --

6         All right.  Now, you ran -- let me start over.

7         You didn't run a merger simulation on your own, correct?

8    A    I ran a merger simulation, yes.

9    Q    You ran Dr. Warren-Boulton's merger simulation, right?

10   A    I ran -- I used the same approach to merger simulation, the

11   same formulas that he used.  I ran it myself.

12   Q    Right.  What happened is you got -- you didn't start when

13   you got hired in June to run a merger simulation.  You got

14   Dr. Warren-Boulton's report, and you looked at his -- he had a

15   merger simulation and you said, "Oh, okay, I'll take that and

16   I'll put -- I'll do my own work with the same simulation,"

17   right, same merger?  I'm sorry; same merger model, right?

18   A    Yes.

19   Q    Okay.  And you presented your results in one of your tabs

20   yesterday, "Merger Simulation Predicts an Increase in Consumer

21   Welfare."  And I'm sorry; I don't have the plaintiff's exhibit

22   number.  It's our Tab 63 of your binder, and it's Defendants'

23   Exhibit 9808.

24        And this is your result, right?

25   A    Correct.

1    Q    And the top one is running essentially Dr. Warren-Boulton's

2    model, but you changed some inputs, right?

3    A    I just included efficiencies.

4    Q    Right.  You changed an input.  You added efficiencies,

5    right?

6    A    Yes, I accounted for efficiencies.

7    Q    And the bottom one is using your diversion data, which was

8    based on the simulator, right?

9    A    Correct.

10   Q    Okay.  And using Dr. Warren-Boulton's model, even with your

11   assumptions, shows consumer harm, right?

12   A    Again, as I said, the model shows consumer harm, but of

13   course that's not the end of the story with regards to

14   unilateral effects.  And I described that in detail yesterday.

15   Q    I understand that, but just running Dr. Warren-Boulton's

16   model with your numbers, your assumptions, you get consumer

17   harm, right?

18   A    No, that's not true at all.

19   Q    What do you mean?

20   A    Running Dr. Warren-Boulton's model with my numbers is the

21   second set which actually shows an increase in consumer

22   welfare.

23   Q    All right.  Running his models, but you're right.  Running

24   his model, but including efficiencies because that was one of

25   your criticisms of his model; you show consumer harm, right?

1    A    That was one -- of course, one of only several criticisms,

2    but just looking at that -- just including efficiencies reduces

3    the consumer harm substantially.  But it does still come up with

4    a negative number.

5    Q    And a negative number means consumer harm?

6    A    Correct.

7    Q    And then underneath, you've got your numbers.  You're using

8    the same model, right, you didn't switch models?  You took

9    Dr. Warren-Boulton's model?

10   A    Correct.

11   Q    And then you put in this data that you got from the

12   simulator.  That's how you showed how it actually helped

13   consumers, right?

14   A    Yes, because of efficiencies.  Efficiencies have a downward

15   pressure on price, and that is beneficial for consumers.  You

16   know, that's why we think that a lot of mergers are beneficial

17   because they lead to efficiencies which leads firms to be able

18   to compete more effectively and indeed lower prices according to

19   the model.

20           THE COURT:  While you're thinking, Mr. Wayland, can I

21   just ask -- if you're about to move on to a different area.

22           MR. WAYLAND:  I'm moving to a new topic.  It would be

23   perfectly timed for you to ask follow-up on this one.

24           THE COURT:  Okay.  Do you feel that it's important to

25   look at historical experiences that H&R Block has had with other

1    purchases of tax preparation software in your evaluation of

2    efficiencies?

3              THE WITNESS:  You know, I think it's important to look

4    at everything that has happened in an industry.  I wouldn't by

5    itself, you know, throw away a piece of information one way or

6    the other.

7              But again, the question is, does that shed light on

8    what's going to happen here?  I think that's really the

9    question.  And if a firm -- in this case, my understanding is

10   that H&R Block had some difficulties achieving efficiencies

11   perhaps in some of its previous acquisitions, but, you know,

12   firms learn from their mistakes.  That's what they do all the

13   time.

14             And so, you know, whether -- the probative value that

15   that has, I think here, as far as I can tell what my -- in

16   discussing the efficiencies with the business people, is that

17   they took that information from their previous acquisitions,

18   learned from it, and they believe that their efficiencies

19   estimates in this matter are conservative.

20             THE COURT:  Did you look at specific documents related

21   to H&R Block's purchase of TaxNet or RedGear?

22             THE WITNESS:  I don't recall.  There may have been some

23   documents related to that.  I don't recall a particular

24   document.  Nothing comes to mind.

25             THE COURT:  Thank you, Mr. Wayland.

```
 1              MR. WAYLAND:  Thank you, your Honor.
 2    BY MR. WAYLAND:
 3    Q   Dr. Meyer, you testified yesterday about a number of
 4    different products that you see as coming into the market and
 5    that H&R Block has been doing, its hybrid products and different
 6    kind of products you described.
 7         You remember that yesterday?
 8    A   Yes.
 9    Q   All right.  I mean, in general, none of these products have
10    worked so far, right?
11    A   My understanding is that they are selling a "Best of Both"
12    product right now.  The sales -- I can't recall the exact
13    amount -- were perhaps in the order of a hundred thousand units.
14         When I spoke with Mr. Ciaramitaro at H&R Block, what he said
15    was, you know, they think that it's an important concept, this
16    idea of hybrid, the fact that consumers are looking for some
17    elements of the assisted experience, if you will, and some
18    elements of the DIY experience, but that they're still working
19    to come up with a product that does that, you know, as optimally
20    as they can.  And they think that some of the new technology
21    will really assist them in that.
22    Q   Well, you testified yesterday with a lot of certainty, as I
23    heard it, that there are all these products out there and they
24    are going to change the world, and it turns out that they're not
25    because they haven't been successful yet, right?
```

1    A    I didn't say anything about changing the world.   What I

2    said -- I don't remember the exact words, but my -- the context

3    that I put them in is that when we look out into the future,

4    when we look at -- merger analysis is a phrase in the

5    industry -- is a merger analysis is inherently a forward-looking

6    emphasis, and so the question is, is leaving out -- you know,

7    one of the questions is, is leaving out assisted from a relevant

8    market appropriate considering the fact that merger analysis is

9    a forward-looking exercise?

10        I don't think it is even based on the historical data.   But

11   I think looking forward, there's even more reason to believe

12   that the competition between digital and assisted is going to

13   intensify.   It's not just the hybrid products.   Indeed, it's --

14   you know, for example, Thomson Reuters -- oh, this probably is

15   sealed.

16        When firms are thinking in the future about what's

17   competing, there are a number of different pieces of evidence

18   that indicate that increasingly digital and assisted tax

19   preparation is competing.   I think in open court that's what I

20   can say.

21   Q    But when you have evidence as opposed to conjecture of what

22   actually happened to a particular product, don't you think that

23   should factor into the calculation of whether there's really

24   going to be much change?

25   A    I think I should take all factors into account, and I did.

1   Q    Okay.  And with respect to "Best of Both," how long has that

2   product been out?

3   A    I can't recall exactly when it was --

4   Q    It's been out for a while?

5   A    It's been out for a couple of years.

6   Q    And the conclusion of H&R Block is, essentially, that it

7   doesn't work, right?

8   A    I don't recall H&R Block saying that in particular.   I

9   believe that there's no plan to discontinue the product, at

10  least as far as I am aware.  And as I said, when I spoke with

11  Mr. Ciaramitaro of H&R Block, what he indicated to me was that

12  they are involved in an ongoing process to figure out the best

13  way to provide consumers with options that combined some

14  elements of the assisted experience and some elements of the

15  digital DIY experience, and that they're continuing to

16  experiment with exactly which format and which approach is

17  best.

18  Q    If you would look at Tab 60 of your binder, Government

19  Exhibit 2112.

20  A    Which exhibit?

21  Q    It's Tab 60, Government Exhibit 2112.  These are H&R Block's

22  second request interrogatory response.  And we're just looking

23  at it to establish a date.

24  A    Okay.  Is there a particular page that you wanted me to

25  turn to?

1    Q    Page 13.  It says -- do you see the year?  I don't think

2    this is confidential.  That's not being shown, right?

3              MR. WAYLAND:  I won't say this in court if you think

4    it's confidential, Mr. Robertson.  It's on the screen.  It has a

5    date of when "Best of Both" introduced its product.

6              MR. ROBERTSON:  Counsel, that's one block.  I can't

7    read the whole page.

8              MR. WAYLAND:  The only thing I'm going to read into the

9    record is that block that I pulled out.

10             MR. ROBERTSON:  Counsel can read that particular line

11   in.

12             MR. WAYLAND:  Why don't we just take it down.

13   BY MR. WAYLAND:

14   Q    It says, "In 2001, H&R Block introduced its integrated

15   product now known as 'Best of Both.'"

16        Do you see that?

17   A    Yes.

18   Q    So it's been out for about ten years, right?

19   A    Yes.

20   Q    All right.  You testified earlier as to the number of users,

21   but actually I think that might be confidential as well so I'm

22   not going to repeat it, but I think you've established what it

23   is.  It's in the record.

24        That's a hybrid product, right, as far as you understand?

25   A    Yes.  Hybrid being some elements of assisted and some

1    elements of DIY, yes.

2    Q    For ten years Block's been trying to sell it without much of

3    a success, right?

4    A    Well, I know that they're continuing the product.  I haven't

5    seen any evidence at least that I know of that they are planning

6    to discontinue the product.  And they are looking for ways of

7    using technology and other changes to continue to appeal to that

8    and to address that perceived consumer demand for products that

9    integrate both.

10   Q    I apologize for making noise in the middle of your answer,

11   Doctor.  Just trying to get us moving along.

12        If you'd look at Tab 29, Government Exhibit 629.

13        MR. WAYLAND:  And this may be -- this is sealed so we

14   need to turn off -- it's off.

15   BY MR. WAYLAND:

16   Q    If you would look at page 36.

17   A    I'm sorry; which tab was it?

18   Q    This is Tab 29.  It's Government Exhibit 629.  And I'd

19   direct your attention to page 36.  This is another submission

20   made.  This is the submission we looked at earlier submitted to

21   the government in May 2011.

22        And looking at the last full paragraph, it says, "The view

23   that prevailed for several years" -- and I'll skip ahead -- "was

24   that H&RB needed to deploy advanced, state-of-the-art,

25   best-in-class technology to support its digital products and

1    accomplish integration of HRB's digital and assisted tax

2    preparation business to facilitate hybrid digital/assisted

3    products and to promote customer migration from digital to

4    retail.  That view led to several expensive, failed efforts to

5    develop new technology, including a failed product called

6    'TANGO.'"

7        I think that was a product you mentioned yesterday, right?

8    A    No.  I don't recall mentioning that.

9    Q    Oh, if you didn't, I'm sorry.

10       "And an abandoned effort to implement a technology called

11   'Silver Light' into the existing online product," correct?

12           MR. ROBERTSON:  May we have the document that's

13   confidential.  Just because we don't have it on the screen,

14   doesn't mean that he can read it into the record.

15           MR. WAYLAND:  He may be right.

16           THE COURT:  Thank you, Mr. Robertson, for raising that.

17   I thought he was reading a portion that has been cleared as

18   releasable.

19           MR. WAYLAND:  And I apologize.  I shouldn't have read

20   that.  I should have just brought her attention to it.  I don't

21   think there's any mystery.

22           MR. ROBERTSON:  It's a little late now.

23           MR. WAYLAND:  Actually, I'm told by my side that this

24   page was actually cleared in advance so we're okay.

25           THE COURT:  Mr. Robertson, is that consistent with your

1  view?

2          MR. ROUSH:   It's not consistent.

3          THE COURT:   Okay.   So there seems to be a dispute about

4  whether it was cleared or not so we're not displaying it on the

5  screen.   You will stop reading from it.

6          MR. ROBERTSON:   Thank you, your Honor.

7          MR. WAYLAND:   Thank you, your Honor.

8  BY MR. WAYLAND:

9  Q   Now, with respect to the "Best of Both," do you recall

10  Mr. Bennett's -- did you look at Mr. Bennett's testimony from

11  September 6th in the trial?

12  A   I did.

13  Q   And do you recall that he testified with respect to "Best of

14  Both," that it had very high costs, even higher costs and had

15  poor financial results?

16      Do you remember that?

17  A   I don't recall that specific testimony.

18  Q   All right.   Another product I think you talked about

19  yesterday was something called "Second Look"?

20  A   Yes.

21  Q   And this is a product that's aimed at attracting customers

22  by promising to find errors made by other preparers, right?

23  A   I'm not sure if it promises to find errors, and it's not

24  limited to other preparers.   I'm not sure if that's -- where

25  that phrase comes from.

1    Q    All right.   And your understanding of -- that you think it

2    was targeted at digital customers?

3    A    I said it was targeted at all tax preparation customers

4    because a tax filer -- a taxpayer -- could take either a

5    pen-and-paper tax return into the HRB store, they could take a

6    tax return done by another digital DIY software program in, they

7    could take a tax return that was done by another preparer in and

8    any of those could be -- you know, could go through the

9    second-look process, if you will.

10   Q    All right.   Let's look at Tab 59.   This is Government

11   Exhibit 1357.

12   A    Just to clarify, Tab 59?

13   Q    Tab 59, yes.

14   A    Okay.

15   Q    And this begins, Dr. Meyer, with an e-mail, and then it has

16   an attachment.   And this is the ad for 2nd Story.

17       "We found errors in 2 out of 3 Jackson Hewitt tax returns."

18   That seems to be -- what's Jackson Hewitt; do you know?

19   A    Jackson Hewitt is a provider of assisted tax preparation

20   services.

21   Q    All right.

22   A    They may also have a digital product.   I can't recall at the

23   moment.

24           MR. WAYLAND:   Your Honor, I am about to move into a new

25   area.   It involves efficiencies, and then the next area would be

1    the entry and expansion which deals with confidential

2    information from third parties.  It's probably half hour or so,

3    maybe a little bit longer, maybe 40 minutes at most, but it is

4    new.

5            If we're going to stop at 1:00, we should probably

6    finish up when we next meet and then we can do their redirect.

7            THE COURT:  All right.  So we are going to stop for the

8    day and resume Thursday morning at 9:30.

9            MR. WAYLAND:  Thank you very much, your Honor.

10           THE COURT:  Thank you.

11       (Proceedings adjourned at 12:53 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Lisa S. Schwam, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9    _ _ _ _ _ _ _ _ _ _ _ _ _ __ _          _ _ _ _ _ _ _

10   SIGNATURE OF COURT REPORTER                     DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25