UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA       :    Civil Action No. 11-948
                               :
                               :
v.                             :    September 8, 2011
                               :    AFTERNOON SESSION
                               :
H&R BLOCK, INC., et al.,       :
                               :    2:08 p.m.
            Defendants         :
. . . . . . . . . . . . . . :   . . . . . . . . . . . .

        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
                        DAY 3
                  AFTERNOON SESSION
          BEFORE THE HONORABLE BERYL A. HOWELL
               UNITED STATES DISTRICT JUDGE


 APPEARANCES:

 For the United States:     JOSEPH F. WAYLAND
                            LAWRENCE E. BUTERMAN
                            ANTHONY DAVID SCICCHITANO
                            U.S. DEPARTMENT OF JUSTICE
                            950 Pennsylvania Avenue, NW
                            Suite 3121
                            Washington, DC 20530
                            (202) 514-1157


 For the Defendants:        J. ROBERT ROBERTSON
                            COREY W. ROUSH
                            LOGAN M. BREED
                            HOGAN LOVELLS US LLP
                            555 13th Street, NW
                            Washington, DC 20004
                            (202) 637-5774


 Court Reporter:            REBECCA STONESTREET, RPR, CRR
                            Official Court Reporter
                            Room 6511, U.S. Courthouse
                            Washington, D.C.  20001
                            (202) 354-3249


 Proceedings reported by machine shorthand, transcript produced
 by computer-aided transcription.

2

# C O N T E N T S

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|----------|--------|-------|----------|---------|
| LANCE DUNN (unsealed) | | | | |
| By Mr. Wayland | -- | -- | 3 | -- |
| FREDERICK WARREN-BOULTON | | | | |
| By Mr. Wayland | 5 | -- | -- | -- |

# E X H I B I T S

| NUMBER: | ADMITTED |
|---------|----------|

(NO EXHIBITS ADMITTED INTO EVIDENCE)

1                    **P R O C E E D I N G S**

2              THE COURT:  Mr. Dunn, please resume the witness stand.

3    And I will just check with counsel to ensure that everybody is

4    in the -- everybody who is in the courtroom is appropriate to be

5    here.

6              MR. WAYLAND:  They're all Department of Justice.

7              THE COURT:  Okay.  Fine.

8              MR. ROBERTSON:  Your Honor, our side is clear.

9              THE COURT:  So for the record, the courtroom is sealed

10   and this portion of the transcript will be sealed.

11             Mr. Robertson, do you want to continue with your

12   examination of the confidential documents?

13             MR. ROBERTSON:  Yes, Your Honor.

14             (WHEREUPON, sealed proceedings were transcribed under

15   separate cover.)

16             (Proceedings resume unsealed:)

17   BY MR. WAYLAND:

18   Q.  All right.  With respect to Avanquest, Mr. Dunn, they were

19   at Staples.  Right?  You had a product at Staples.  Correct?

20   Avanquest put on a product at Staples?

21   A.  That's my understanding.

22   Q.  And it's your understanding they're now expanding that to

23   other big box retailers.  Correct?

24   A.  I have not seen that yet.

25   Q.  Do you have some idea that's what they're planning to do?

1    A.  When I discussed this with them, they wanted to talk to me

2    after the Block deal was announced, and they did indicate that

3    they wanted to make approaches to other retailers.

4    Q.  And did they tell you that they were using the government's

5    complaint in this case as a selling point to convince people

6    that you were a maverick?

7    A.  No.

8    Q.  Have you ever seen a presentation from Avanquest that

9    they've been circulating that said that -- that used excerpts

10   from the government's lawsuit to show that you were a maverick?

11   A.  No.

12   Q.  Would you be pleased to know that they were doing that?

13   A.  I guess it doesn't really matter to me.

14   Q.  All right, sir.  On to efficiencies, sir.

15          THE COURT:  Can I just stop for one second?

16          MR. WAYLAND:  Yes.

17          THE COURT:  Is there anything about what you just said

18   that has to be sealed?

19          MR. WAYLAND:  No, Your Honor.  The reason it had to

20   come up in the sealed session was I have a document from

21   Avanquest that is sealed.  I was trying to lay a foundation to

22   see whether he had seen the document, and since he hadn't, I

23   didn't show it to him.  But what I've just said, and the

24   answers, as far as I know, don't have to be sealed.

25          THE COURT:  Do you have any objection to unsealing that

1    portion of the transcript?

2          MR. ROBERTSON:  No, Your Honor.  We had discussed that

3    beforehand.  I didn't believe that we had seen the document, and

4    we have to protect the third party designations.

5          THE COURT:  I understand.  From the beginning of

6    Mr. Wayland's question until his next question, that portion of

7    the transcript shall be unsealed.

8          MR. ROBERTSON:  Fine with me, Your Honor.

9          (WHEREUPON, sealed proceedings were transcribed under

10   separate cover.)

11         (Proceedings resume unsealed:)

12         THE COURT:  Fine.  Mr. Dunn, you are excused.

13         THE WITNESS:  Thank you.

14         THE COURT:  And we are going to take a 10-minute break

15   before we return to take on our next witness.

16         (Recess taken at 3:44 p.m.)

17         THE COURT:  Mr. Wayland, are you prepared to call your

18   next witness?

19         MR. WAYLAND:  Your Honor, we're calling our final

20   witness on our direct case.  It's Dr. Rick Warren-Boulton.

21            (Oath administered by Courtroom Clerk.)

22         MR. WAYLAND:  Your Honor, we have a binder for

23   Dr. Warren-Boulton and yourself.

24         THE COURT:  Thank you.

25   **(FREDERICK WARREN-BOULTON, GOVERNMENT witness, having been duly**

1              **sworn, testified as follows:)**

2

3                      **DIRECT EXAMINATION**

4    BY MR. WAYLAND:

5    Q.  Good afternoon, Dr. Warren-Boulton.

6    A.  Good afternoon, sir.

7    Q.  Doctor, we've put your curriculum vitae in the front of the

8    set of binders.  Do you see it?

9    A.  Yes.

10   Q.  That was submitted to the Court with your expert report.

11           MR. WAYLAND:  Your Honor, if you want us to mark it as

12   a trial exhibit, we can do it, but it's in the binder that you

13   have.  We're not offering it as evidence.  It's before the Court

14   already attached to his report.

15           THE COURT:  If it's attached to his report, I think

16   it's going to be part of the record anyway, so I don't think we

17   need to clutter the record with more exhibits.

18   BY MR. WAYLAND:

19   Q.  Just so we have a record, the curriculum vitae that is in

20   front of the binder is yours?

21   A.  Yes.

22   Q.  All right.  And Dr. Warren-Boulton, could you tell us where

23   you currently work?

24   A.  I'm a principal at Microeconomic Consulting & Research

25   Associates.  It's a Washington based consulting and research

1  firm, as the name implies.

2  Q.  When was it founded?

3  A.  1991.

4  Q.  And who was it founded by?

5  A.  It's founded by four of us, all, I guess, who used to be in

6  the antitrust division, the economics section, the economics

7  analysis group of the antitrust division.  We are basically, I

8  guess, an antitrust division alumni organization for economists.

9  Q.  Where did you go to college, sir?

10 A.  I was an undergraduate at Yale.  I got my BA in economics

11 from Yale.

12 Q.  Why don't you take us through your graduate work?

13 A.  I went to Princeton, got a master's in public affairs from

14 the Woodrow Wilson school at Princeton; then got master's and

15 Ph.D. degrees in economics from Princeton.

16 Q.  What did you do after graduate school?

17 A.  Went to Washington University in St. Louis, taught economics

18 for about 11 years.

19 Q.  What were your areas of specialty at Washington University?

20 A.  Well, I'm a microeconomist.  That's why we called it

21 Microeconomic Consulting.  We don't do inflation or

22 macroeconomics, so it's not our fault what's going on out there.

23       Within microeconomics, my specialty is industrial

24 organization, which is the study of how firms interact within

25 markets, and within that I would say my specialty is antitrust

1   economics.

2   Q.  Can you explain what antitrust economics is?

3   A.  Yes, it's the application of economic theory and empirical

4   analysis to antitrust issues such as mergers, price fixing,

5   monopolization.

6   Q.  After your teaching at Washington University, what did you

7   do?

8   A.  Well, I came to Washington, which is what all academics do,

9   on a leave of absence, and I came to the antitrust division as

10   the -- to serve as chief economist in the antitrust division.

11   Q.  How long were you in that position?

12   A.  Nearly six years.

13   Q.  And how many economists were working for you when you were

14   at the antitrust division?

15   A.  Approximately about 50, I would say, or fairly close.

16   Q.  Can you tell us in a little bit more detail what the

17   economists were doing at the division while you were there?

18   A.  Well, the economists of the division conduct a very wide

19   range of activities involving antitrust and regulation.  Their

20   primary focus is in the antitrust area, which again would

21   involve analysis of mergers and price fixing and monopolization,

22   but they also -- particularly during the time I was there, we

23   had a very wide-ranging, what we would call competition advocacy

24   program, in which we would try to persuade other regulatory

25   agencies to behave more competitively, usually with mixed

1    results.

2    Q.  As chief economist, did you have any role with respect to

3    the review of mergers that came before the agency?

4    A.  Yes, as chief economist, at least in principle I was

5    supposed to review everything that was done by the economists

6    there.  Mergers are the single most important thing that

7    economists worked on.  It was our bread and butter, so to speak,

8    and so I spent a great deal of my time at the division working

9    on merger analysis.

10   Q.  And what did you do after you left the division?

11   A.  Well, I did what most people do when they leave the

12   government:  I went to a think tank and parked myself for a

13   while at the American Enterprise Institute.  I taught at

14   Princeton, and in 1991, as I said, we founded Micro.

15   Q.  Approximately how many merger reviews have you been involved

16   in?

17   A.  Well, if you count the mergers that I was involved in at the

18   antitrust division, it would have to be in the hundreds.

19   Q.  And are you familiar with what's known as the merger

20   guidelines that are published by the government?

21   A.  Oh, yes.

22   Q.  And what's your familiarity with the merger guidelines?

23   A.  Well, I was involved with a group of economists and

24   attorneys who worked on the 1984 revision of the merger

25   guidelines.

1   Q.  And have you stayed familiar generally with the developments

2   with respect to the guidelines?

3   A.  Yes.

4   Q.  Have you testified in other merger cases?

5   A.  Yes.  Actually, in this building I testified in *Staples*,

6   with Staples and Office Depot, with Judge Hogan, and before

7   that, actually, also for the antitrust division in Georgia, on

8   *Englehart*.

9   Q.  Have judges always agreed with you?

10  A.  Unfortunately, no.

11  Q.  Sometimes yes, sometimes no?

12  A.  Sometimes yes, sometimes no.

13  Q.  All right.

14        MR. WAYLAND:  Your Honor, at this point I tender

15  Dr. Warren-Boulton as an expert in merger analysis.

16        THE COURT:  Is there any objection?

17        MR. ROBERTSON:  I don't know what merger analysis is.

18  As an economist or as a microeconomist, I have no objection.

19  I've never heard of merger analysis as an economic field.

20        MR. WAYLAND:  He's going to give his opinion on this

21  merger, Your Honor, and I think he's qualified to do so, and I

22  tender him for that purpose.

23        MR. ROBERTSON:  For that, as an economist.  I don't

24  want him giving opinions on everything, but as an economist, I

25  have no objection.

1            THE COURT:  Dr. Warren-Boulton will be allowed to give

2    his opinion testimony as an expert economist.

3            THE WITNESS:  Thank you.

4    BY MR. WAYLAND:

5    Q.  Dr. Warren-Boulton, in the course of your testimony today,

6    would it be helpful for you to refer to particular exhibits and

7    other demonstratives that you've prepared?

8    A.  Yes.

9    Q.  And we've compiled those in the binder that's in front of

10   you with Tabs 1 through 9.  Correct?

11   A.  That's correct.

12   Q.  And during the course of your discussion today, you intend

13   to refer to some of those.  Right?

14   A.  Yes.

15   Q.  What's the objective of antitrust merger analysis?

16   A.  The objective is to determine if a merger is anticompetitive

17   in the sense that it's going to cause harm to consumers.  It's

18   specifically consumer oriented.

19   Q.  And what role, in your view, did the merger guidelines play

20   in that analysis?

21   A.  Well, the merger guidelines, in the course of numerous

22   revisions over the years, have tried with each revision to

23   incorporate whatever is the latest of economic analysis in terms

24   of theory, empirical work done in economics, and also what we've

25   learned from court cases and from litigation.

1            So at any one point, I think what the merger guidelines

2    reflect is if you like the consensus opinion, at least among

3    economists, as to the best way to analyze mergers, it's our

4    guide book to analyzing mergers.

5    Q.  How do you generally begin, yourself, when you set out to

6    analyze a merger?

7    A.  Well, I think you begin obviously by trying to understand

8    the facts of the case.  You begin by trying to understand what

9    are the products, what firms produce the products, you know,

10   what the brand looks like.  You try to understand the

11   interaction between the firms.  You basically try to understand

12   the competitive process in the market as a sort of general

13   background, and the history of what's happened in the market.

14   Q.  And then what analysis, what kinds of analysis do you then

15   do after you come to this general understanding?

16   A.  Well, there's basically two kinds of analysis that you go

17   through, and they're complementary.  One is what you might call

18   the traditional approach, sometimes called the structural

19   approach.  And the structural approach begins by asking what's

20   the relevant market; what's happened to the concentration of

21   that market; is the increasing concentration in that market

22   severe enough so that there's what's sometimes called a

23   structuralist presumption that this merger is problematic, so

24   that's looking at shares, looking at changes in shares, and

25   finding a market.

1          Then the second approach, which is very complementary,

2     is -- I would say over the last 10 years, at least, has become

3     more and more important as economic analysis has improved, and

4     that is to try to look specifically and often quantitatively at

5     the question of:  Can we actually predict the kinds of effects

6     that this particular merger is going to have.  And in

7     particular, can we look at what are called unilateral effects

8     and coordinated effects, where unilateral effects are the

9     incentive of the merging parties to change their behavior, if

10    you like, on their own, without assuming any kind of cooperative

11    behavior by somebody else.  And the second part of the effects

12    analysis is to ask:  In addition to that unilateral story, is

13    there a reason why this merger would make coordination easier?

14         And the total effects of the sum of those two - they're

15    not substitutes for each other, it's the combined effect of the

16    two - the difference is the first is more amenable to

17    econometric modeling and numbering, whereas the second is a more

18    qualitative -- you know, when you're looking at increasing

19    coordination, or the incentive to increase coordination, it's a

20    little bit more of a qualitative discussion as opposed to the

21    direct effects analysis.

22    Q.  And with respect to the structural approach, are there

23    two -- is it a two-step approach?

24    A.  Yes.  Under the merger guidelines, the structural approach

25    is a two-step.  It's sort of like a fox trot.  The first step is

1    you have to define what's called a relevant market.  And that

2    really is a term of art.  So you define the relevant market, and

3    then the second step is you look at the shares of firms within

4    that market and you ask the question:  What has happened to

5    concentration within that market?

6    Q.  Now, with respect to the competitive effects analysis, what

7    kinds of competitive effects are of concern in this merger?

8    A.  Well, in this case we have both.  We have a clear concern

9    here with unilateral.  There's a unilateral incentive that the

10   parties have to raise prices, even without any cooperative

11   behavior by rivals, but in addition to that we have a

12   coordinated effects problem which comes from the fact that

13   there's something sort of very special here, and that is the

14   particular role of TaxACT has been, over its history, as a

15   maverick.

16          So we have a particular concern in this merger that

17   this merger could really facilitate coordination in the sense

18   that it's removing not just any firm, it's removing a firm that

19   historically has acted as a maverick in this industry.  And that

20   makes it particularly important.

21   Q.  Now, the term "coordinated effects," does that, as

22   economists understand it, require an explicit agreement between

23   providers?

24   A.  No.  I mean, it could, but when I use the term here, I'm not

25   talking about leading to criminal price fixing, I'm talking

1    about a recognition of mutual interdependence.  I'm talking

2    about a situation in which as the number of firms in the market

3    get small enough, we recognize that my behavior is going to

4    affect your behavior.  And that's what economists call kind of

5    tacit coordination, and it's really just in our recognition

6    that, you know, it's in our mutual self-interest not to do

7    certain things.  We don't have to enter into an illegal

8    agreement for that to happen, it can just happen through mutual

9    understanding.

10   Q.  Now, the two different approaches you've described,

11   structural and effects, are they mutually exclusive?

12   A.  No.  I think of them as -- once again, as two ways of

13   looking at the same question.  If you were -- I don't know, if

14   you were looking at Mount Everest, and you wanted to look at it

15   from the north and you want to look at it from the south, there

16   are just different ways that you have of -- because what I like

17   to do, generally speaking, with a problem, is I like to have,

18   you know, if I can, three, but several ways of looking at

19   something so I can see if you look at it from different

20   directions, do you get pretty much the same result.

21        So the structuralist traditional approach and the

22   effects-based approach are really -- I think you want to look at

23   both of them.  One reinforces the other, assuming that they both

24   come up with the same answer.

25   Q.  One concept we should probably talk about before we get into

1    the details of your opinion, Doctor, is the SSNIP test.  Would

2    you just explain to the Court what the SSNIP test is and how it

3    plays into merger analysis?

4    A.   Sure.  The structuralist approach, as I said before, is a

5    two-step approach, and the first step is to define the relevant

6    market, and, as I say, the second is to look at the changing

7    concentration.

8            When you define the relevant market under the merger

9    guidelines, what you do is you conduct what's called the

10   hypothetical monopolist test.  It's a little jargony, but the

11   question that you ask is:  Suppose that I was to try to put

12   together a collection of products, and what I'm going to do is

13   I'm going to ask how many products do I have to put together

14   into this collection, so that a hypothetical monopolist - that

15   is to say, if one firm was the only supplier of that set of

16   products - that that firm would find it profitable to pose

17   what's called a Small But Significant and Nontransitory Increase

18   in Price, which to save us all a lot of time is called the SSNIP

19   test.

20           And the important thing about the SSNIP test is that

21   you want to define a relevant market so it's just large enough.

22   It's very dangerous if you define this market too large.  So the

23   principle that you have here is something called the smallest

24   market principle, which is when you're defining the relevant

25   market and conducting your SSNIP test, you want to define the

1    market so that it's just big enough so that that hypothetical

2    monopolist would impose this small but significant and

3    nontransitory increase in price.  Traditionally we've used five

4    or 10 percent, but if there's a natural break in the market

5    somewhere else, it can be larger than five or 10 percent.

6           But the point is to create a market, which is a group

7    of products that in a sense is worth monopolizing, and which if

8    there was somebody that did control all those products, there

9    would be real harm to consumers.  And that's the hypothetical

10   monopolist test, and the SSNIP test is the percentage of harm

11   from that hypothetical monopolist.

12   Q.  Now, in merger analysis, after you've gone through your

13   structural and effects approach, what else is left to be done as

14   you complete your analysis?

15   A.  Well, if you do this two-step analysis, and suppose you

16   define a relevant market and then you looked at the changing

17   concentration within that market, you know, then you say, well,

18   if there's a big change, a significant change in concentration

19   within that relevant market, then there's what you would call a

20   structuralist presumption; there's a presumption that this

21   merger is likely to lead to harm to consumers.  So if I have a

22   big enough increase in concentration in my relevant market, it's

23   a starting point to say I have a concern here.

24          Now, that's a rebuttable concern.  So, for example,

25   even if you go through that exercise and then you find, for

1    example, that entry is really very easy, that firms -- that this

2    hypothetical monopolist couldn't raise prices because entry is

3    so easy, that it would deter any price increase, so that's one

4    question you have to ask.

5           And the other question that you need to ask is, is what

6    are the efficiencies from this merger?  Are the efficiencies

7    from this merger so large that in fact even though you could

8    raise the price, you wouldn't want to because your costs have

9    fallen so that it's now not profitable to raise your price as

10   much as you would?

11          So the structuralist presumption is the beginning.  You

12   then have to check entry and you have to check efficiencies.

13   Q.  Is the question of entry just simply whether you can enter

14   the market, or how well you succeed once you've entered the

15   market?

16   A.  Well, the entry question really is:  Is the response of

17   other firms going to be large enough so that it will defeat the

18   price increase?  So it's not will entry occur; the question is,

19   is entry so easy, is entry so quick that the merging parties

20   would be considering a price increase, but say, oh, no, that

21   would be stupid because it would just lead to such a large loss

22   of share that just -- and then would leave us with this entrant

23   that we would then have to deal with.  So it wouldn't actually

24   be profitable to raise prices because it would induce this

25   response which would make us less profitable in the long run.

1    Q.   Now, you've described the effects approach and the

2    structural approach.   What approaches have you followed in the

3    analysis of the transaction at issue here?

4    A.   Both.

5    Q.   And have you reached conclusions on the structural approach?

6    A.   Yes.

7    Q.   We're going to go into that in detail, but just give us a

8    quick summary.

9    A.   My conclusion is that the relevant market in this case is

10   digital do-it-yourself, or DIY, and that the increase in

11   concentration in this market is sufficient so that there is, if

12   you like, a structuralist presumption.   We're beginning with a

13   structuralist presumption that we have a merger here of serious

14   concern, which absent some other finding with respect to entry

15   or efficiencies means that this merger is likely to lead to

16   significant harm to consumers.

17   Q.   Do you have any conclusions with respect to competitive

18   effects?

19   A.   Yes, both with respect to unilateral and coordinated.   With

20   respect to unilateral, where we are able to actually construct a

21   precise mathematical model, to solve for the price increase that

22   we would expect from this merger, we come to the conclusion that

23   at least absent extraordinary efficiencies, the unilateral

24   effects alone from this merger are likely to result in

25   significant harm to consumers.

1          In addition to that, we have also a concern, or I have

2     a concern, with coordinated because of the unique

3     characteristics of TaxACT, its unique history as a maverick, and

4     the removal of that firm from this market, and what that is

5     likely to do in the future to the ability of the remaining firms

6     in the industry to coordinate their behavior.

7          So I have both a unilateral concern and a coordinated

8     effects concern.

9     Q.  And do you have any views with respect to entry or expansion

10    and efficiencies?  You can take them one at a time, sir, if you

11    like.

12    A.   Okay.  With respect to entry, my conclusion is that entry

13    sufficient to deter price increases would not occur, that the

14    kind of entry that we're talking about here is really not

15    somebody first getting into the business.  That's not really the

16    entry we're talking about, because we have no shortage of firms

17    in this business.  There are like 20 little firms.

18         The real issue in terms of entry is, can the reigning

19    firms of the industry, either individually or collectively, can

20    they both grow to the level where they replace TaxACT as a

21    disciplining force in the market, and also do they have the

22    incentive to act as a maverick?  And my conclusion is no, that

23    ease of entry does not absolve this merger.

24         In terms of efficiencies, my answer is that, as I said

25    before, it would take extraordinary efficiencies for this merger

1    not to result in a price increase just from the unilateral

2    effects.  I understand that Dr. Z will be speaking on the

3    subject of efficiencies, but just to preempt a little bit, what

4    I've done is I've taken all of what I understand to be

5    Dr. Meyer's proposed efficiencies, I have put them into our

6    model, and even if one were to accept all of those

7    efficiencies - which I gather Dr. Z is going to argue should not

8    be done - we would still get a significant price increase just

9    from the unilateral effects alone, not even worrying about the

10   maverick problem.

11   Q.  Doctor, have you studied some of the history of competition

12   in this market?

13   A.  Yes.

14   Q.  As an economist, what if anything have you learned from

15   reviewing that history?

16   A.  Well, I don't know about a history of the tax preparation

17   business, but what I would like to do is just walk through what

18   I think is a pretty good overall guide to what interests me

19   about the efficiencies, and that's essentially taken from

20   Figure 9 of my original report, and looks like it's reproduced

21   here.

22   Q.  That's at Tab 1 of Government Exhibit 1000?

23   A.  Yes.

24   Q.  All right, sir.

25   A.  So basically I would like to tell a story here.  It starts

1  in 2002.  Generally speaking, I refer to the tax year, if that's

2  okay, so if I say 2002, it's tax year 2002, and going through

3  2009.

4       You know, our story really begins in tax year 2002 with

5  the Free File Alliance.  And if you look at the figure here,

6  what you'll see is in tax year '02 -- unfortunately we have too

7  many greens.  The green stretch at the bottom is the FFA

8  on-line, the free alliance; the blue is paid on-line; and the

9  top sort of icky green is software.  And back in tax year '02

10  was the first year of the alliance, and what you can see is we

11  had about 18 percent of the market in terms of units were in the

12  FFA.

13       The first event that I'm interested in occurs in tax

14  year '03, and that's where TaxACT really begins to first act as

15  a maverick in my story, which is it introduced free for all

16  within the FFA, and that, within the FFA, was a real break from

17  the consensus.  TaxACT was the one who wanted to go free for

18  all, and it was seriously disruptive behavior within the FFA.

19       And what you can see is that in tax year '03, what you

20  see is the beginning of a little bump-up in the share in free

21  for all, and that's basically because of TaxACT.  But where you

22  start really to see the effects of maverick behavior isn't so

23  much in the results of the firm itself as it is in the responses

24  of the competitors.  And what you see in tax year '04 is the

25  response of the major firms - which once TaxACT went free for

1    all, everybody goes free for all - and what you'll see here is

2    in tax year '04 is a big bump-up in the share of FFA after

3    everyone else followed TaxACT's lead.

4          Now, that wasn't the only reaction in tax year '04.

5    The other thing that happened in tax year '04 is because Intuit

6    lost so much share because of what was going on here, and

7    TaxACT's share went way up, Intuit responded by pretty

8    dramatically cutting its prices as well.

9          So consumers in tax year '04 did pretty well for two

10   reasons.  One is a larger share of tax preparation was done for

11   free through the FFA alliance, and also prices began to fall

12   even for paid product.  And you can see that in the graph just

13   below there, the blue line.  What that tracks is the average

14   adjusted for inflation.  It's the average digital DIY price, and

15   as you can see, there's a real drop in 2005.  And again, it's

16   reflecting both the increase in the share through the FFA and

17   the reduction in prices in response.

18         Tax year 2005 comes along and two things happen.  One

19   is that almost all of the firms in the industry, with the

20   exception of TaxACT and I think one other, basically got

21   together and persuaded the Internal Revenue Service to limit the

22   scope of the FFA.  My understanding is that that's perfectly

23   legal under *Noerr-Pennington*, but from the consumer's point of

24   view, the result is that it really restricted the benefits of

25   the FFA to consumers.  It was done through the Internal Revenue

1    Service, and the result is, as you can see, that the amount of

2    the FFA share falls pretty well back to where it does before.

3    Okay?

4            So what has happened in this little story is that

5    TaxACT has acted as a maverick; it's offered free for all, and

6    then in turn has induced this reaction on the part of its

7    competitors to restrict that effect.

8            But the second thing that happened in that year, as you

9    can see, is suddenly your little orange block has become much

10   bigger.  Because TaxACT, basically frustrated from being able to

11   expand output through the FFA, broke loose from the pack once

12   again and decided to offer free on-line.  And that's the second

13   major disruptive or maverick action that we've been able to

14   observe from TaxACT, and that was even more important than the

15   first.  Because what you can see is that you get a real jump in

16   the amount of free federal that's on-line.  And that box, that

17   orange box in 2006, is TaxACT.  That's the increase in share

18   that TaxACT got because it went free on the on-line.

19           The next year, in 2006, what you can see is that orange

20   block is growing a little bit, and it's really once again

21   because its rivals are responding.  Which is really the critical

22   role here.  In 2006 Intuit took a look at what was going on and

23   said, we have to do something about this, and Intuit started

24   testing free on-line as well.  Okay?  And so you get an increase

25   in the share of free there.

1        In 2007, tax year 2007, what happens is Intuit decides

2   to go free completely, no longer testing, and HRB, which was

3   somewhat of a lagger in here, this is the year that HRB starts

4   testing.  So we're getting a lag of one to two years in terms of

5   the response here, but as the other firms, Intuit and HRB, begin

6   to respond to TaxACT, what you see is a pretty dramatic growth

7   in the share of free on-line.  And mirroring that, if you look

8   down below, as that share grows, so does the average price that

9   people pay for tax preparation services.

10        So what I'm drawing from this is a history of maverick

11   behavior, if you like, particularly by TaxACT, in which TaxACT

12   breaks loose from the pack, it does something that none or very

13   few of its competitors want to do.  It increases its market

14   share; as a result it becomes more profitable, but the reactive

15   response, of course, from its competitors is that they're forced

16   to reduce prices and provide a better deal to consumers.

17        So what we really have here is a story of competition

18   in this industry largely instigated or favored by TaxACT's

19   actions.  So that's sort of what I draw out of the history.

20   Q.  Now, Doctor, are you aware that the defendants have argued

21   that Intuit and H&R Block are premium brands that don't compete

22   with TaxACT?

23   A.  Yes.

24   Q.  And how can TaxACT provide competitive benefits to consumers

25   if it has a lower price, or even free, versus a high price for a

 1    different group of competitors?

 2    A.  Can I draw a picture?

 3         MR. WAYLAND:  With the Court's permission.

 4    A.  Because I understand that this is a major issue in this

 5    case, is the issue of how is it --

 6         MR. WAYLAND:  I think they want to see if they can get

 7    your microphone to work.

 8    A.  As I understand it, this is really becoming a major focus in

 9    this case, is just exactly how does --

10         THE COURT:  Excuse me just one second.  We have to make

11    sure the court reporter can hear.

12         (OFF THE RECORD.)

13    A.  So the issue is how does TaxACT's pricing and behavior

14    constrain HRB and Intuit in terms of their pricing?  And in

15    particular, how is it that somebody who is a customer of Intuit

16    or HRB, who is paying $80 or something like this for a very high

17    end product, how is it somehow that he benefits from the

18    competition from TaxACT?

19         And what I would like to do is just draw this up to

20    understand that there's really two forms of linkages, or two

21    forms of competition here that are going on, and I think for me

22    it's been very helpful to keep these two separate.  Okay?  So

23    I'm going to split them into two parts, and to do this I'm going

24    to draw a little picture which is sort of a pictorial of the

25    range of prices or the range of products that are being offered

1    by our three firms in this case.

2         So I'm going to start with Intuit, which has basically

3    the very highest range.  This is our friend Intuit.  Then we

4    have H&R Block, which also has a similar very high range, and

5    then we have TaxACT, which as we all know has a much smaller

6    range of prices for is products.  In fact, if you -- and then

7    not only is the range much narrower, but the average price is,

8    also.  Can I say this?  I'm not sure if I can say numbers or

9    not.

10        MR. WAYLAND:  I think you can say the average numbers.

11   A.  All right.  The average price for Intuit --

12   BY MR. WAYLAND:

13   Q.  Just to make sure, just do it graphically generally.  I

14   think you can make the point.

15   A.  There's a big difference in the average price.  So it goes

16   one, two, four to price each other.  So there's a big difference

17   in average prices we're talking about here.  Okay?

18        All right.  What we have is, at the bottom of the

19   highest value proposition, of the least expensive, is the

20   product that each of them will call free.  As we all know, free

21   isn't really free; free just means that usually just the filling

22   out and sometimes e-mailing of the federal product is free, but

23   the customer, except under unusual circumstances - I think it's

24   Florida and someplace else - has to fill out a state return, so

25   he buys a bundle of products.  So when we talk about the free

1    product, we're talking about a customer who's buying a bundle,

2    where the average revenue that the firm gets from that bundle is

3    pretty significant.  Okay?  So when we say free, it's kind of

4    like free in quotation marks.

5         And then up here we have some kind of premium product.

6    In the case of TaxACT, of course, it's called deluxe product

7    instead of premium, but it's a range.  And when we talk about

8    the kinds of competition that's going on for customers, the one

9    that we all immediately think of is:  I have a customer who is

10   sitting here and he sees an advertisement at HRB, and he's

11   paying 25 or 30 dollars, and he sees an advertisement from

12   TaxACT that says, "Use TaxACT and it's only going to cost you

13   $10."  So he says, "Well, maybe I can switch."

14        There's a direct competition there.  He sees the ad,

15   looks at the functionality, maybe somebody recommends it, and so

16   what we get is we get switching behavior.

17        So what happens is, here at HRB there's a constraint on

18   the pricing here because of the threat that your customer could

19   leave you and go to TaxACT.  That occurs across the line here.

20   So we can think of all these firms as competing with each other

21   horizontally for customers who switch from Intuit to HRB or from

22   HRB to TaxACT, and that's the traditional form.

23        But what's really in a sense almost unique about this

24   case is, there's a second way that these firms interact.

25   Because if you just look at this, you know, the intuition is to

1    say:  Wait a minute, I've got this guy way up here, he's an

2    Intuit customer.  He happens to be an Intuit customer.  Okay?

3    He cares an awful lot about his income tax.  He's paying 80 or

4    90 dollars because he's very worried about his refund.  What's

5    the chances that he's going to say, "gosh, I think I'll try

6    TaxACT."  So you could have customers up here who may be very

7    reluctant to switch, so this kind of switching behavior could be

8    really quite limited.

9          So how does this person up here gain from the existence

10   of TaxACT?  And the answer is:  It's because of the nature of

11   free and the nature of competition to be free.  There's this

12   pool historically of -- sort of this big pool, growing smaller

13   all the time, of the pen and paper customers who are being drawn

14   into the digital DIY market, and all of these firms are

15   competing with this pool of customers to come in.  Customers, as

16   we sort of know from the record, they come into DDIY from pen

17   and pencil; they tend not to go back unless they've got a real

18   fall in complexity.

19         And traditionally, when this thing started off, there

20   was this big pool.  As we also know, and I think as the previous

21   witnesses have testified, it's much easier to pull somebody out

22   of that pool than it is to get somebody to switch, largely

23   because this guy up here, he has all his data -- I have -- all

24   my data is already in my tax program; it carries over from

25   previous years, so it's extraordinarily difficult for me to

1  switch over to somebody else because I can't carry my data with

2  me.

3          But what's happening is, TaxACT comes out with a super

4  free product, and it's really a very strong value proposition.

5  And what this does is it forces its competitors also to come up

6  with a very strong value proposition at the free end.

7          Now, it's not as strong a value proposition.  If you

8  kind of look at these free products, what you'll see is that

9  TaxACT's free product is less expensive, and also that it's not

10  as restrictive.  For example, the free products here, you

11  couldn't use CD.  I couldn't use either of these free products

12  myself because I have to fill out a Schedule C because of my

13  $120 every year in royalty earnings from my famous book.

14          So what's happening is, partly in order to get this

15  competition into here, they're forcing themselves into this free

16  competition.  What that creates is, there's a very strong

17  competition right in here.  Partly it's because they're all

18  pulling out of this same pool - you know, that's the fish in the

19  ocean, I guess, analogy that people are using - and partly it's

20  because I think it's generally recognized that once people get

21  something for free and you tell them it's not for free, guess

22  what, they look for something else that's free.

23          For example, we have a nice survey response which asks

24  a question:  What would you do if you were buying a free product

25  from HRB or TaxACT or Intuit and they started charging you for

1    it?  What would you do?  About 30 percent said:  I would stick

2    with Intuit or I would stick with HRB and I would buy the paid

3    product.  But 88 percent of the people who wouldn't stick with

4    the product said:  I would go with another free product.  That's

5    just common sense.  If you've got a free product here and

6    somehow this price goes up, where are you likely to go?  You're

7    likely to go here.

8           So there's an intense competition here.  So how does

9    our friend up here gain from this competition?  Well, the better

10   the value proposition that TaxACT provides down there, the

11   better the value proposition we get across here.  So this is

12   forcing a value proposition across here.

13          The next step that happens is, as Intuit and H&R Block

14   are forced to improve the value proposition of their free

15   product, it creates a real tension.  Because I've got customers

16   up here who look down and say:  Wait a minute, I'm a premium

17   customer or I'm a deluxe customer or I'm a paid customer, and

18   suddenly my company is offering a free product which looks

19   pretty good.  Okay.  So what's going to happen is I'm going to

20   start saying:  Wait a minute, why don't I switch down to that

21   product?

22          Now, that's what in our terms and in terms of the

23   documents and everything else, that's what's called the

24   cannibalization problem.  So I don't know if I can spell this

25   right.  So there's a cannibalization issue that comes down here.

1   So the way this works is, this forces these companies to provide

2   a better value proposition, and then in order to avoid

3   cannibalization, what has to happen is you have to improve the

4   value proposition up here.  So you get this linkage all the way

5   up to the top because you're linked through free, and then up

6   here, where you have to improve value.

7           And that's why the customer over here who wouldn't

8   directly switch at all, all these customers gain from this

9   competition, because we have two forms of competition, direct

10  switching and through the higher value free, and then the kind

11  of behavior that you have to have in order to prevent too much

12  loss from your high paid.  And it's been useful for me, at any

13  rate, to keep those two separately -- when people talk about

14  what's going on, to keep separately the direct competition end

15  and the kind of limits on it, that this kind of thing is going

16  to happen once people get locked into this system, and that's

17  going to limit the amount of direct competition over time,

18  particularly as these people start to disappear.  But this

19  competition is the competition that's going to survive, because

20  there's no way that they can permit this sort of merger.  So I

21  find this is a useful way to think of the nature of competition.

22  Q.  You've put some average price figures up there.  Does that

23  play into your analysis at all?

24  A.  Well, what's going to happen is, as you improve the value

25  proposition here and here, you're going to force down these --

1   over time you're going to force down these average revenues.

2   And that's basically what you see in the picture up here.  And

3   the concern essentially is that if you have a merger and you

4   eliminate this -- if you want to think of it, this anchors all

5   three firms on free.  They can't lift off from it.  Their feet

6   are stuck in it like cement, okay, and they have to maintain

7   this value proposition.

8          If you get rid of TaxACT here, it kind of -- you're not

9   going to get rid of free, people aren't going to stop offering a

10  free product, but they have an economic incentive now to offer a

11  less good free product or a less of a value proposition.  And

12  the reason they have an incentive to do that is because if they

13  can raise the cost of free or reduce the quality of free, what

14  it means is they can maintain prices up here.  And this is, as

15  somebody once said, where the money is.

16         So that's the connection that's really important here.

17  Q.  All right, sir.  All right, Dr. Warren-Boulton, you

18  testified earlier that your analysis begins with market

19  definition, and having given the background of your view of the

20  industry, why don't we start there.  I think you testified that

21  the test for market definition is the hypothetical monopolist

22  test?

23  A.  Yes.

24  Q.  All right.  Could you explain it and tell us whether you

25  applied it here?  That's the SSNIP test you discussed.  Right?

1    A.   The SSNIP test.   What we need to do is we need to come up

2    with our collection of products that will just satisfy the

3    hypothetical monopolist test; not too much, not too little,

4    Goldilocks.   We want a collection of products where the

5    hypothetical monopolist would raise prices by our small but

6    significant amount, but not enormously.   We want it to be

7    something realistic.   We want a market that's of concern.

8    Because remember, what we're going to do is we're going to look

9    at the change in structure within that market.   We're going to

10   ask the question:   How close does this merger take us to the

11   hypothetical monopolist?

12            So a hypothetical monopolist, the price increase that

13   the hypothetical monopolist is going to charge provides us with

14   a guideline.   If going from here to here is going to raise

15   prices by 20 percent, then the merger takes us from here to

16   here.   So it's really important that when you define the

17   hypothetical monopolist, you define it in such a way that you

18   don't get an indefinitely large price increase.   It's the metric

19   that you're going to compare your changes in shares with.

20   Q.   And do you know whether Dr. Meyer applied the hypothetical

21   monopolist test in this case?

22   A.   To the best of my understanding, the answer to that is no.

23   To the best of my understanding, Dr. Meyer appears to be arguing

24   that the relevant market in this case is all forms of tax

25   preparation.   I mean, she has her own chance to testify, so I

1    don't want to put words in her mouth, but assuming that I

2    understood this correctly - and I think that's what I read in

3    her report - the problem with this is immediate and almost

4    unique to this situation.

5           If you are the only supplier of all forms of tax

6    preparation, you're in fat city.  As far as I can see, the only

7    alternatives to preparing and filing taxes in the United States

8    are either I flee to Canada - which I guess I then have to pay

9    Canadian taxes, so it's not going to do much good - I could

10   decide not to earn any income, which is very expensive, or I

11   could go to jail.

12          In other words, if you're talking about the market for

13   all tax preparation, you're talking about a market where, in

14   economist terms, demand is completely elastic.  There are no

15   alternatives.  It's like talking about the market for water.

16   Okay?  I guess that's in a sense, because, what is it, the

17   alternatives are taxes or death.  So in that sense it's like the

18   market for water.

19          And this negates the entire purpose of defining a

20   relevant market in an antitrust case.  You want to define a

21   relevant market in an antitrust case so then shares and the

22   change in shares makes sense.  I don't want to go to infinity, I

23   want to look at my change in shares and say:  Does this give me

24   some indication of how bad the merger is, because I've gone this

25   distance towards someplace that's a problem.  I don't want to go

1    this distance towards death, I want to define a relevant market

2    under what's called the smallest market principle, which is I

3    want to define the relevant market so that if a hypothetical

4    monopolist, if somebody did manage to control all of those

5    products, they would impose a significant price increase, large

6    enough to be of concern but not so large as to make the whole

7    exercise pointless.

8           And that's essentially what would happen if one were to

9    define the relevant market as all forms of tax preparation.  It

10   just negates the whole procedure of the structuralist analysis.

11   I'm not sure that's...

12   Q.  No, that's fine.  Just sp I'm clear, what you're saying is

13   under Dr. Meyer's analysis, that monopolists would be -- anybody

14   in the U.S. that wanted to pay their taxes would have to go to

15   this monopolist?

16   A.  Yes.  Essentially you're in pretty much the same situation

17   as the IRS.

18   Q.  Now, you said earlier your conclusion was that the digital

19   do-it-yourself tax preparation products are a relevant market.

20   How did you come to that conclusion using the hypothetical

21   monopolist test?

22   A.  Well, you begin and look at what are basically products that

23   you think are the closest substitutes.  In this case I think

24   both the documents and common sense says one digital DIY product

25   looks and quacks a lot like another digital DIY product, and is

1    really quite different from assisted and pen and paper.

2          So you would begin with the digital DIY product.  The

3    question really becomes:  How many digital DIY products do you

4    include?  Do you include all of them or a subset?

5          And what I have done is I've said:  Look, let's err on

6    the side of over-exclusiveness.  Let's have a relevant market

7    that includes all digital DIY products.  And my tester, or the

8    way I do the hypothetical monopolist test, is I'm going to ask

9    the question:  If somebody were lucky enough to have a monopoly

10   over all digital DIY products, if we merge TaxACT and HRB and

11   all the little guys all together, how much could they raise

12   their prices?  And as long as that number is significantly

13   greater than five or 10 or 15 or 20 percent, I've satisfied my

14   test for a relevant market.  I don't need to go any further, and

15   I don't need to go any further even though in my estimation

16   significant numbers of people, if that hypothetical monopolist

17   raised the prices of digital DIY product, a significant number

18   of people would go elsewhere, either to assisted or to pen and

19   paper, probably about an 85 to 15 percent split.

20         So there is diversion from outside the market, but the

21   relevant question for a hypothetical monopolist test is:  Is

22   there so much diversion outside the market that if the

23   hypothetical monopolist tried to raise the price by five or

24   10 percent, he would lose so many sales that that price increase

25   wouldn't be profitable?

1          And that clearly is not true for digital DIY.  There's

2    no question that a hypothetical monopolist of a digital DIY --

3    of all digital DIY products could raise prices significantly

4    above, a small but significantly nontransitory price increase.

5    So I've satisfied my hypothetical monopolist test.

6    Q.  And did you do anything else?  Did you do a critical loss

7    analysis?

8    A.  Well, I did two things.  The first is, I referred back

9    earlier to the effects analysis and the fact that one of the

10   real advances over the last 10 years in the economic analysis of

11   mergers has been to construct merger simulation models which are

12   very explicit.  They're mathematical models, and what they try

13   to do is they try to explicitly model exactly what the

14   determination of prices are and explicitly model how a merger is

15   going to result in increased prices.  And this is the unilateral

16   effects analysis.

17          Now, I think we're going to talk a little bit about

18   that later, but for the moment let's just point out that I can

19   use that same analysis for two things.  I can use it for what

20   I'm going to, I think, talk about later, which is I'm just going

21   to look at the merger of the two firms; but I can also use that

22   same model to ask a second question, which is the hypothetical

23   monopolist question.  Instead of asking in my merger simulation

24   model what happens if I merge TaxACT and HRB, I can ask the

25   question:  What happens if I merge all the firms in the digital

1   DIY market.  So I can ask my mathematical model, my merger

2   simulation model, exactly what is the price increase that I

3   would get from my hypothetical monopolist in my relevant market.

4          And that I've done, and that generates a very large

5   price increase.  Even if I just take the three firms, even if I

6   just combine Intuit, HRB, and TaxACT, I'll still get a price

7   increase which is significantly above and passes the SSNIP test.

8   Okay?

9          So I'm confident just by looking at my unilateral

10  effects model that my relevant market satisfies the criteria for

11  being a relevant market.

12         But in addition to that, there's a second test which

13  you could do which is called the critical loss test.  It's a

14  little different.  It doesn't ask the question how big a price

15  increase would I get with my hypothetical monopolist; it asks a

16  more qualitative question, sort of a yes or no.  It asks the

17  question:  Would it be profitable to have at least a five or

18  10 percent price increase.  Okay?  And not surprisingly, since

19  actually a hypothetical monopolist here would result in a much

20  larger price increase, that test gets passed with flying colors

21  as well.

22         So I have two empirical tests of my market definition,

23  and they both pass, as I say, with plenty of room to spare.

24  Q.  Doctor, with that market definition, have you calculated

25  shares within the digital market?

```
 1    A.  Yes.  This is our second step.  We have our problem, and now

 2    we're going to ask how much of a change do we get within that

 3    market.  And that should be somewhere.

 4    Q.  If you look at Tab 3.

 5    A.  Okay.

 6    Q.  This is Government Exhibit 1001.

 7    A.  Tab 3 shows shares.  We have calculated this from IRS data,

 8    Internal Revenue Service data.  They are for tax year 2009, and

 9    they're for IRS's digital e-file shares, so we know they're

10    pretty accurate.  And it's the entire universe.  This isn't a

11    survey or anything like that, this is everybody who has e-filed.

12            And as you can see up above, if you use the IRS, you

13    get a share from TurboTax of 62 percent; HRB rounded to

14    16 percent; TaxACT rounded to about 13 percent.  Okay?  So those

15    are the shares of our three firms in the market.  And my guess

16    is -- I don't know if you've seen these before, but we then have

17    two little guys, TaxHawk and TaxSlayer, and then we just have

18    this break in this market, as you can sort of see.  You suddenly

19    go from what are basically the big three to this little two and

20    then the tiny 20, because down here there's just an awful lot of

21    them, and they all have less than one-half percent market share.

22    So there's a lot of firms that provide tax preparation service,

23    but there's only three what in the documents you've probably

24    seen or we've all seen is what we refer to as the big three.

25            What I'm looking at is a change in concentration here,
```

1    and basically I'm going to go --

2    Q.  Let me stop you for a moment, Doctor, because you have the

3    Herfindahl-Hirschmann index on the right.  Can you just explain

4    to the Court what that is?

5    A.  The Herfindahl-Hirschmann index is named for two famous

6    economists.  I can't resist this.  One of them died while trying

7    to climb Mount Everest.  That's one of the many things he's

8    famous for.

9            In any event, the Herfindahl-Hirschmann index, once

10   referred to in a legal document I read as a complex mathematical

11   formula, what it does is it takes the market shares of each firm

12   and squares it and then looks at the total.  It ranges from zero

13   to 10,000.  So if you had sort of a perfectly atomistic

14   industry, where every firm had a minute little share and you

15   squared them all, you would get a number close to zero.

16           So if you looked at wheat farming in the United States

17   in calculating a Herfindahl, you would get two.  The other

18   extreme is if you have a monopoly and somebody has a 100 percent

19   share, so we square 100 and what we get is 10,000.

20           So our Herfindahl runs from zero to 10,000, where zero

21   is a perfectly competitive world and 10,000 is a monopoly, and

22   in between is what economists refer to as oligopoly.  That's the

23   business I'm in, which is industrial organization, large firms

24   operating in markets.  Okay.

25           Now, in this particular case, what happens is that we

1   get a Herfindahl after this acquisition, which is, as you can

2   see, 4691.  But more critically what we have is a change in the

3   Herfindahl of about 400.  And to put this in a little bit of

4   perspective, if I can, what the merger guidelines do is they say

5   these are the ranges of Herfindahls which we consider to be

6   unconcentrated, or of concern, or seriously concentrated, and

7   these are the changes in the Herfindahls that we consider to

8   create a problem.

9         And what the guidelines approach says is:  If we have a

10  change of a Herfindahl which is at least, say, 200 points, where

11  after the merger the Herfindahl is going to reach 2500, that

12  that creates a presumption, a structural presumption, that this

13  merger is likely to cause harm to consumers.  So when you're

14  looking at this, what we've got is a change of 400, to a

15  Herfindahl of nearly 4700, and compare that with the guidelines,

16  which says it's of serious concern once you get a change of 200

17  to at least 2500.

18        So these Herfindahls and change in Herfindahls, even in

19  my market, are considerably above the level that creates, if you

20  like, the structuralist presumption that this merger is likely

21  to cause anticompetitive problems.

22        Now, that presumption can be defeated, if you like, by

23  evidence of ease of entry or extraordinary efficiencies.  But it

24  basically sets the stage for this analysis.  And that's what the

25  structuralist analysis does.  It's the traditional way we've

1  always analyzed mergers.  Before merger simulation models and

2  economists came along, we looked at the change in structure.

3  That's where we wind up with this merger.

4          MR. WAYLAND:  Your Honor, it's 5:00 o'clock, and we're

5  at the end of a particular part of Dr. Warren-Boulton's

6  testimony.  It would be a good time to break, if that's all

7  right with the Court.

8          THE COURT:  Yes, I think this would be a good time to

9  break, and we will resume at 10:30 tomorrow morning since I have

10 other matters on my calendar in the morning.

11         MR. WAYLAND:  Thank you, Your Honor.

12         (Recess taken at 5:00 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3              I, Rebecca Stonestreet, certify that the foregoing is a

4        correct transcript from the record of proceedings in the

5        above-entitled matter.

6

7

8

9        _____           _____

10       SIGNATURE OF COURT REPORTER                 DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 28:13
**$120** [1] - 30:13
**$80** [1] - 26:16

## '

**'02** [2] - 22:6, 22:9
**'03** [2] - 22:14, 22:19
**'04** [5] - 22:24, 23:2, 23:4, 23:5, 23:9

## 1

**1** [2] - 11:10, 21:22
**10** [7] - 13:2, 17:4, 17:5, 37:13, 37:24, 38:10, 39:18
**10,000** [4] - 41:13, 41:19, 41:20, 41:21
**10-minute** [1] - 5:14
**100** [2] - 41:18, 41:19
**1000** [1] - 21:22
**1001** [1] - 40:6
**10:30** [1] - 43:9
**11** [1] - 7:18
**11-948** [1] - 1:3
**13** [1] - 40:14
**13th** [1] - 1:19
**15** [2] - 37:13, 37:19
**16** [1] - 40:14
**18** [1] - 22:11
**1984** [1] - 9:24
**1991** [2] - 7:3, 9:14

## 2

**20** [4] - 20:17, 34:15, 37:13, 40:20
**200** [2] - 42:10, 42:16
**20001** [1] - 1:23
**20004** [1] - 1:20
**2002** [4] - 22:1, 22:2, 22:4
**2005** [2] - 23:15, 23:18
**2006** [3] - 24:17, 24:19, 24:22
**2007** [2] - 25:1
**2009** [2] - 22:3, 40:8
**2011** [1] - 1:5
**202** [3] - 1:16, 1:20, 1:23
**20530** [1] - 1:16
**25** [1] - 28:11
**2500** [2] - 42:11, 42:17
**2:08** [1] - 1:7

## 3

**3** [3] - 1:9, 40:4, 40:7
**30** [2] - 28:11, 31:1
**3121** [1] - 1:15
**35** [1] - 2:4
**354-3249** [1] - 1:23
**3:44** [1] - 5:16

## 4

**400** [2] - 42:3, 42:14
**4691** [1] - 42:2
**4700** [1] - 42:15

## 5

**50** [1] - 8:15
**514-1157** [1] - 1:16
**555** [1] - 1:19
**5:00** [2] - 43:4, 43:12

## 6

**6** [1] - 2:4
**62** [1] - 40:13
**637-5774** [1] - 1:20
**6511** [1] - 1:22

## 7

**75** [1] - 2:4

## 8

**8** [1] - 1:5
**80** [1] - 29:3
**81** [1] - 2:4
**83** [1] - 2:6
**85** [1] - 37:19
**88** [1] - 31:3

## 9

**9** [2] - 11:10, 21:20
**90** [1] - 29:4
**950** [1] - 1:15

## A

**ability** [1] - 20:5
**able** [3] - 19:20, 24:10, 24:13
**above-entitled** [1] - 44:5
**absence** [1] - 8:9
**absent** [2] - 19:14, 19:23
**absolve** [1] - 20:23
**academics** [1] - 8:8
**accept** [1] - 21:6
**accurate** [1] - 40:10
**acquisition** [1] - 42:1
**act** [2] - 20:22, 22:14
**acted** [2] - 14:19, 24:5
**Action** [1] - 1:3
**action** [1] - 24:13
**actions** [1] - 25:19
**activities** [1] - 8:19
**ad** [1] - 28:14
**addition** [4] - 13:12, 14:11, 20:1, 39:12
**adjusted** [1] - 23:14
**administered** [1] - 5:21
**ADMITTED** [2] - 2:10, 2:12
**advances** [1] - 38:10
**advertisement** [2] - 28:10, 28:11
**advocacy** [1] - 8:23
**affairs** [1] - 7:13
**affect** [1] - 15:4
**afternoon** [2] - 6:5, 6:6
**AFTERNOON** [2] - 1:5, 1:10
**agencies** [1] - 8:25
**agency** [1] - 9:3
**agreed** [1] - 10:9
**agreement** [2] - 14:22, 15:8
**aided** [1] - 1:25
**al** [1] - 1:6
**Alliance** [1] - 22:5
**alliance** [3] - 22:8, 22:10, 23:11
**allowed** [1] - 11:1
**almost** [3] - 23:19, 28:23, 35:3
**alone** [2] - 19:24, 21:9
**alternatives** [3] - 35:7, 35:15, 35:17
**alumni** [1] - 7:8
**amenable** [1] - 13:16
**AMERICA** [1] - 1:3
**American** [1] - 9:13
**amount** [4] - 24:1, 24:16, 32:17, 34:6
**analogy** [1] - 30:19
**analysis** [33] - 7:7, 8:4, 8:21, 9:9, 10:15, 10:17, 10:19, 11:15, 11:20, 11:23, 12:14, 12:16, 13:3, 13:12, 13:21, 14:6, 16:3, 17:12, 17:14, 17:15, 19:3, 32:23, 33:18, 36:10, 36:13, 38:7, 38:9, 38:10, 38:16, 38:19, 42:24, 42:25
**analyze** [2] - 12:3, 12:6
**analyzed** [1] - 43:1

**analyzing** [1] - 12:4
**anchors** [1] - 33:4
**announced** [1] - 4:2
**answer** [4] - 15:24, 20:24, 29:10, 34:22
**answers** [1] - 4:24
**ANTHONY** [1] - 1:14
**anticompetitive** [2] - 11:16, 42:21
**antitrust** [17] - 7:6, 7:7, 7:8, 7:25, 8:2, 8:4, 8:9, 8:10, 8:14, 8:19, 8:20, 9:18, 10:7, 11:15, 35:20, 35:21
**anyway** [1] - 6:16
**APPEARANCES** [1] - 1:12
**application** [1] - 8:3
**applied** [2] - 33:25, 34:20
**approach** [16] - 12:18, 12:19, 13:1, 13:22, 13:23, 13:24, 15:21, 15:22, 16:4, 16:5, 17:13, 19:1, 19:2, 19:5, 42:9
**approaches** [3] - 4:3, 15:10, 19:2
**appropriate** [1] - 3:4
**area** [1] - 8:20
**areas** [1] - 7:19
**argue** [1] - 21:7
**argued** [1] - 25:20
**arguing** [1] - 34:23
**art** [1] - 14:2
**assisted** [2] - 37:1, 37:18
**Associates** [1] - 6:25
**assuming** [3] - 13:10, 15:23, 35:1
**atomistic** [1] - 41:13
**attached** [2] - 6:14, 6:15
**attorneys** [1] - 9:24
**Avanquest** [4] - 3:18, 3:20, 4:8, 4:21
**Avenue** [1] - 1:15
**average** [11] - 23:13, 23:14, 25:8, 27:7, 27:10, 27:11, 27:15, 27:17, 28:2, 32:22, 33:1
**avoid** [1] - 32:2
**aware** [1] - 25:20
**awful** [2] - 29:3, 40:20

## B

**BA** [1] - 7:10
**background** [2] - 12:13, 33:19
**bad** [1] - 35:24
**based** [2] - 6:25, 15:22
**become** [2] - 13:2, 24:9
**becomes** [2] - 25:14, 37:3
**becoming** [1] - 26:8

**BEFORE** [1] - 1:10
**beforehand** [1] - 5:3
**began** [1] - 23:11
**begin** [6] - 12:5, 12:7, 12:8, 25:5, 36:22, 37:2
**beginning** [4] - 5:5, 18:11, 19:12, 22:20
**begins** [4] - 12:19, 22:4, 22:14, 33:18
**behave** [1] - 8:25
**behavior** [13] - 13:9, 13:11, 14:11, 15:3, 15:4, 20:6, 22:18, 22:22, 25:11, 26:13, 28:16, 29:7, 32:11
**below** [2] - 23:13, 25:8
**benefits** [3] - 23:24, 25:24, 26:17
**BERYL** [1] - 1:10
**best** [3] - 12:3, 34:22, 34:23
**better** [4] - 25:16, 31:9, 31:11, 32:2
**between** [3] - 12:11, 14:22, 41:22
**big** [12] - 3:23, 17:1, 17:18, 17:22, 23:2, 27:15, 27:16, 29:12, 29:20, 39:14, 40:19, 40:24
**bigger** [1] - 24:10
**binder** [4] - 5:22, 6:12, 6:20, 11:9
**binders** [1] - 6:8
**bit** [6] - 8:16, 13:20, 21:3, 24:20, 38:17, 42:3
**Block** [4] - 4:2, 25:21, 27:4, 31:13
**block** [2] - 24:9, 24:20
**BLOCK** [1] - 1:6
**blue** [2] - 22:8, 23:13
**book** [2] - 12:4, 30:13
**bottom** [2] - 22:7, 27:18
**BOULTON** [2] - 2:5, 5:25
**Boulton** [8] - 5:20, 5:23, 6:5, 6:22, 10:15, 11:1, 11:5, 33:17
**Boulton's** [1] - 43:5
**box** [3] - 3:23, 24:16, 24:17
**brand** [1] - 12:10
**brands** [1] - 25:21
**bread** [1] - 9:7
**break** [6] - 5:14, 17:4, 22:16, 40:18, 43:6, 43:9
**breaks** [1] - 25:12
**BREED** [1] - 1:18
**broke** [1] - 24:11
**building** [1] - 10:5
**bump** [2] - 22:20, 23:2
**bump-up** [2] - 22:20, 23:2
**bundle** [3] - 27:25, 28:1, 28:2
**business** [4] - 20:15, 20:17,
21:17, 41:23
**BUTERMAN** [1] - 1:13
**butter** [1] - 9:7
**buy** [1] - 31:2
**buying** [2] - 28:1, 30:24
**buys** [1] - 27:25
**BY** [5] - 3:17, 6:4, 6:18, 11:4, 27:12

---

# C

**calculated** [2] - 39:24, 40:7
**calculating** [1] - 41:17
**calendar** [1] - 43:10
**Canada** [1] - 35:8
**Canadian** [1] - 35:9
**cannibalization** [3] - 31:24, 31:25, 32:3
**cares** [1] - 29:3
**carries** [1] - 29:24
**carry** [1] - 30:1
**case** [16] - 4:5, 5:20, 12:8, 14:8, 19:9, 26:5, 26:9, 27:1, 28:6, 28:24, 34:21, 34:24, 35:20, 35:21, 36:23, 41:25
**cases** [2] - 10:4, 11:25
**CD** [1] - 30:11
**cement** [1] - 33:6
**certain** [1] - 15:7
**CERTIFICATE** [1] - 44:1
**certify** [1] - 44:3
**chance** [1] - 34:25
**chances** [1] - 29:5
**change** [14] - 13:9, 17:18, 34:9, 35:22, 35:23, 40:2, 40:25, 42:2, 42:10, 42:14, 42:16, 42:18, 43:2
**changes** [3] - 12:24, 34:19, 42:7
**changing** [2] - 16:6, 17:16
**characteristics** [1] - 20:3
**charge** [1] - 34:13
**charging** [1] - 30:25
**check** [3] - 3:3, 18:12
**chief** [3] - 8:10, 9:2, 9:4
**circulating** [1] - 4:9
**circumstances** [1] - 27:23
**city** [1] - 35:6
**Civil** [1] - 1:3
**clear** [3] - 3:8, 14:8, 36:12
**clearly** [1] - 38:1
**Clerk** [1] - 5:21
**climb** [1] - 41:7
**close** [3] - 8:15, 34:10, 41:15
**closest** [1] - 36:23
**clutter** [1] - 6:17
**collection** [4] - 16:12, 16:14, 34:2, 34:4

---

**collectively** [1] - 20:19
**college** [1] - 7:9
**colors** [1] - 39:20
**COLUMBIA** [1] - 1:2
**combine** [1] - 39:6
**combined** [1] - 13:15
**common** [2] - 31:5, 36:24
**companies** [1] - 32:1
**company** [1] - 31:18
**compare** [2] - 34:19, 42:15
**compete** [1] - 25:21
**competing** [2] - 28:20, 29:15
**competition** [20] - 8:23, 21:11, 25:17, 26:18, 26:21, 28:8, 28:14, 29:11, 30:15, 30:16, 30:17, 31:8, 31:9, 32:9, 32:14, 32:17, 32:19, 32:21
**competitive** [6] - 12:12, 14:6, 14:7, 19:17, 25:24, 41:21
**competitively** [1] - 8:25
**competitors** [6] - 22:24, 24:7, 25:13, 25:15, 26:1, 30:5
**compiled** [1] - 11:9
**complaint** [1] - 4:5
**complementary** [2] - 12:17, 13:1
**complete** [1] - 17:14
**completely** [2] - 25:2, 35:14
**complex** [1] - 41:10
**complexity** [1] - 29:18
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concentrated** [1] - 42:6
**concentration** [9] - 12:20, 12:21, 14:5, 16:7, 17:17, 17:18, 17:22, 19:11, 40:25
**concept** [1] - 15:25
**concern** [15] - 14:7, 14:8, 14:16, 17:23, 17:24, 19:14, 20:1, 20:2, 20:7, 20:8, 33:3, 34:7, 36:6, 42:6, 42:16
**conclusion** [6] - 19:9, 19:22, 20:12, 20:22, 36:18, 36:20
**conclusions** [2] - 19:5, 19:17
**conduct** [2] - 8:18, 16:9
**conducting** [1] - 16:25
**confident** [1] - 39:9
**confidential** [1] - 3:12
**connection** [1] - 33:16
**consensus** [2] - 12:2, 22:17
**consider** [2] - 42:5, 42:7
**considerably** [1] - 42:19
**considering** [1] - 18:20
**constrain** [1] - 26:14
**constraint** [1] - 28:17
**construct** [2] - 19:20, 38:11

---

**Consulting** [2] - 6:24, 7:21
**consulting** [1] - 6:25
**consumer** [1] - 11:18
**consumer's** [1] - 23:23
**consumers** [10] - 11:17, 17:9, 17:21, 19:16, 19:25, 23:9, 23:25, 25:16, 25:24, 42:13
**continue** [1] - 3:11
**control** [2] - 17:8, 36:4
**convince** [1] - 4:5
**cooperative** [2] - 13:10, 14:10
**coordinate** [1] - 20:6
**coordinated** [6] - 13:8, 14:12, 14:21, 19:19, 20:2, 20:7
**coordination** [5] - 13:13, 13:19, 14:17, 15:5
**COREY** [1] - 1:18
**correct** [5] - 3:19, 3:23, 11:10, 11:11, 44:4
**correctly** [1] - 35:2
**cost** [2] - 28:12, 33:13
**costs** [1] - 18:8
**counsel** [1] - 3:3
**count** [1] - 9:17
**course** [5] - 11:5, 11:12, 11:21, 21:15, 28:6
**COURT** [19] - 1:1, 3:2, 3:7, 3:9, 4:15, 4:17, 4:25, 5:5, 5:12, 5:14, 5:17, 5:24, 6:15, 10:16, 11:1, 26:10, 43:8, 44:1, 44:10
**court** [2] - 11:25, 26:11
**Court** [7] - 1:21, 1:22, 6:10, 6:13, 16:2, 41:4, 43:7
**Court's** [1] - 26:3
**Courthouse** [1] - 1:22
**courtroom** [2] - 3:4, 3:9
**Courtroom** [1] - 5:21
**cover** [2] - 3:15, 5:10
**create** [1] - 17:6, 42:8
**creates** [4] - 30:16, 31:15, 42:12, 42:19
**criminal** [1] - 14:25
**criteria** [1] - 39:10
**critical** [3] - 24:21, 38:6, 39:13
**critically** [1] - 42:2
**CROSS** [1] - 2:2
**CRR** [1] - 1:21
**curriculum** [2] - 6:7, 6:19
**customer** [11] - 26:15, 27:23, 28:1, 28:9, 28:18, 29:2, 31:17, 32:7
**customers** [8] - 28:8, 28:21, 29:6, 29:13, 29:15, 31:15, 32:8
**cutting** [1] - 23:8

## D

**D.C** [1] - 1:23
**dangerous** [1] - 16:22
**data** [5] - 29:23, 29:24, 30:1, 40:7, 40:8
**DATE** [1] - 44:10
**DAVID** [1] - 1:14
**DAY** [1] - 1:9
**DC** [2] - 1:16, 1:20
**DDIY** [1] - 29:16
**deal** [4] - 4:2, 9:8, 18:23, 25:16
**death** [2] - 35:17, 36:1
**decide** [1] - 35:10
**decided** [1] - 24:12
**decides** [1] - 25:1
**defeat** [1] - 18:17
**defeated** [1] - 42:22
**Defendants** [2] - 1:7, 1:17
**defendants** [1] - 25:20
**define** [14] - 14:1, 14:2, 16:5, 16:8, 16:21, 16:22, 16:25, 17:16, 34:16, 34:17, 35:20, 36:1, 36:3, 36:9
**defining** [2] - 16:24, 35:19
**definition** [4] - 33:19, 33:21, 39:22, 39:24
**degrees** [1] - 7:15
**deluxe** [2] - 28:6, 31:17
**demand** [1] - 35:14
**demonstratives** [1] - 11:7
**Department** [1] - 3:6
**DEPARTMENT** [1] - 1:14
**Depot** [1] - 10:6
**described** [2] - 15:10, 19:1
**designations** [1] - 5:4
**detail** [2] - 8:16, 19:7
**details** [1] - 16:1
**deter** [2] - 18:3, 20:13
**determination** [1] - 38:14
**determine** [1] - 11:16
**developments** [1] - 10:1
**died** [1] - 41:6
**difference** [3] - 13:16, 27:15, 27:16
**different** [6] - 15:10, 15:16, 15:19, 26:1, 37:1, 39:14
**difficult** [1] - 29:25
**digital** [17] - 19:10, 23:14, 29:14, 36:18, 36:24, 36:25, 37:2, 37:3, 37:7, 37:10, 37:17, 38:1, 38:2, 38:3, 38:25, 39:25, 40:9
**DIRECT** [2] - 2:2, 6:3
**direct** [6] - 5:20, 13:21, 28:14, 32:9, 32:14, 32:17
**directions** [1] - 15:20
**directly** [1] - 32:8

**disappear** [1] - 32:18
**disciplining** [1] - 20:21
**discussed** [3] - 4:1, 5:2, 33:25
**discussion** [2] - 11:12, 13:20
**disruptive** [2] - 22:18, 24:13
**distance** [2] - 35:25, 36:1
**DISTRICT** [3] - 1:1, 1:2, 1:11
**diversion** [2] - 37:20, 37:22
**division** [12] - 7:6, 7:7, 7:8, 8:9, 8:10, 8:14, 8:17, 8:18, 9:8, 9:10, 9:18, 10:7
**DIY** [14] - 19:10, 23:14, 29:14, 36:24, 36:25, 37:2, 37:3, 37:7, 37:10, 37:17, 38:1, 38:2, 38:3, 39:1
**do-it-yourself** [2] - 19:10, 36:19
**doctor** [3] - 6:7, 21:11, 39:24
**Doctor** [3] - 16:1, 25:20, 41:2
**document** [4] - 4:20, 4:22, 5:3, 41:10
**documents** [4] - 3:12, 31:23, 36:24, 40:23
**dollars** [2] - 28:11, 29:4
**done** [9] - 9:5, 11:24, 17:13, 21:4, 21:8, 23:10, 23:25, 37:5, 39:4
**down** [8] - 25:8, 31:10, 31:16, 31:20, 31:25, 32:25, 33:1, 40:20
**Dr** [15] - 5:20, 5:23, 6:5, 6:22, 10:15, 11:1, 11:5, 21:2, 21:5, 21:7, 33:17, 34:20, 34:23, 36:13, 43:5
**dramatic** [1] - 25:6
**dramatically** [1] - 23:8
**draw** [4] - 25:19, 26:2, 26:19, 26:24
**drawing** [1] - 25:10
**drawn** [1] - 29:13
**drop** [1] - 23:15
**duly** [1] - 5:25
**Dunn** [3] - 3:2, 3:18, 5:12
**DUNNE** [1] - 2:3
**during** [2] - 8:22, 11:12

## E

**e-file** [1] - 40:9
**e-filed** [1] - 40:11
**e-mailing** [1] - 27:22
**earn** [1] - 35:10
**earnings** [1] - 30:13
**ease** [2] - 20:23, 42:23
**easier** [2] - 13:13, 29:21
**easy** [3] - 18:1, 18:3, 18:19
**econometric** [1] - 13:17
**economic** [6] - 8:3, 10:19,

11:23, 13:3, 33:10, 38:10
**economics** [8] - 7:6, 7:10, 7:15, 7:17, 8:1, 8:2, 11:24
**economist** [9] - 8:10, 9:2, 9:4, 10:18, 10:23, 10:24, 11:2, 21:14, 35:14
**economists** [13] - 7:8, 8:13, 8:17, 8:18, 9:5, 9:7, 9:23, 12:3, 14:22, 15:4, 41:6, 41:22, 43:2
**effect** [2] - 13:15, 24:7
**effects** [24] - 13:5, 13:7, 13:8, 13:11, 13:14, 13:21, 14:6, 14:7, 14:12, 14:21, 15:11, 15:22, 17:13, 19:1, 19:18, 19:24, 20:8, 21:2, 21:9, 22:22, 38:9, 38:16, 39:10
**effects-based** [1] - 15:22
**efficiencies** [14] - 4:14, 18:6, 18:12, 19:15, 19:23, 20:10, 20:24, 20:25, 21:3, 21:5, 21:7, 21:19, 42:23
**either** [4] - 20:19, 30:11, 35:8, 37:18
**elastic** [1] - 35:14
**eliminate** [1] - 33:4
**elsewhere** [1] - 37:18
**empirical** [3] - 8:3, 11:24, 39:22
**end** [4] - 26:17, 30:6, 32:14, 43:5
**Englehart** [1] - 10:8
**enormously** [1] - 34:6
**ensure** [1] - 3:3
**enter** [2] - 15:7, 18:13
**entered** [1] - 18:14
**Enterprise** [1] - 9:13
**entire** [2] - 35:19, 40:10
**entitled** [1] - 44:5
**entrant** [1] - 18:22
**entry** [17] - 18:1, 18:2, 18:12, 18:13, 18:16, 18:18, 18:19, 19:14, 20:9, 20:12, 20:14, 20:16, 20:18, 20:23, 42:23
**err** [1] - 37:5
**essentially** [4] - 21:19, 33:3, 36:8, 36:16
**estimation** [1] - 37:15
**et** [1] - 1:6
**event** [2] - 22:13, 41:9
**Everest** [2] - 15:14, 41:7
**EVIDENCE** [1] - 2:12
**evidence** [2] - 6:13, 42:23
**exactly** [3] - 26:9, 38:13, 39:2
**EXAMINATION** [1] - 6:3
**examination** [1] - 3:12
**example** [4] - 17:24, 18:1, 30:10, 30:23
**except** [1] - 27:23
**exception** [1] - 23:20

**excerpts** [1] - 4:9
**exclusive** [1] - 15:11
**exclusiveness** [1] - 37:6
**excuse** [1] - 26:10
**excused** [1] - 5:12
**exercise** [2] - 17:25, 36:7
**Exhibit** [2] - 21:22, 40:6
**exhibit** [1] - 6:12
**exhibits** [2] - 6:17, 11:6
**EXHIBITS** [1] - 2:12
**existence** [1] - 29:9
**expand** [1] - 24:11
**expanding** [1] - 3:22
**expansion** [1] - 20:9
**expect** [1] - 19:22
**expensive** [3] - 27:19, 30:9, 35:10
**expert** [3] - 6:10, 10:15, 11:2
**explain** [4] - 8:2, 16:2, 33:24, 41:3
**explicit** [2] - 14:22, 38:12
**explicitly** [2] - 38:13, 38:14
**extraordinarily** [1] - 29:25
**extraordinary** [3] - 19:23, 20:25, 42:23
**extreme** [1] - 41:18

## F

**facilitate** [1] - 14:17
**fact** [4] - 14:12, 18:7, 27:6, 38:9
**facts** [1] - 12:8
**fairly** [1] - 8:15
**fall** [2] - 23:11, 29:18
**fallen** [1] - 18:9
**falls** [1] - 24:2
**familiar** [2] - 9:19, 10:1
**familiarity** [1] - 9:22
**famous** [3] - 30:13, 41:5, 41:8
**far** [2] - 4:24, 35:6
**farming** [1] - 41:16
**fat** [1] - 35:6
**fault** [1] - 7:22
**favored** [1] - 25:18
**federal** [2] - 24:16, 27:22
**feet** [1] - 33:5
**few** [1] - 25:13
**FFA** [12] - 22:7, 22:12, 22:16, 22:18, 23:2, 23:11, 23:16, 23:22, 23:25, 24:2, 24:11
**field** [1] - 10:19
**Figure** [1] - 21:20
**figure** [1] - 22:5
**figures** [1] - 32:22
**file** [1] - 40:9
**File** [1] - 22:5
**filed** [1] - 40:11

filing [1] - 35:7
fill [2] - 27:24, 30:12
filling [1] - 27:21
final [1] - 5:19
fine [4] - 3:7, 5:8, 5:12, 36:12
firm [10] - 7:1, 14:18, 16:15, 16:16, 20:4, 22:23, 28:2, 41:11, 41:14
firms [25] - 7:24, 12:9, 12:11, 14:3, 15:2, 18:1, 18:17, 20:5, 20:16, 20:17, 20:19, 22:25, 23:19, 25:5, 27:1, 28:20, 28:24, 29:14, 33:5, 38:21, 38:25, 39:5, 40:15, 40:22, 41:23
first [9] - 13:16, 13:25, 16:5, 20:15, 22:10, 22:13, 22:14, 24:15, 38:8
fish [1] - 30:18
five [5] - 17:3, 17:5, 37:13, 37:23, 39:17
fixing [3] - 8:4, 8:21, 14:25
flee [1] - 35:8
Florida [1] - 27:24
flying [1] - 39:20
focus [2] - 8:20, 26:8
followed [2] - 19:2, 23:3
follows [1] - 6:1
FOR [1] - 1:2
force [3] - 20:21, 32:25, 33:1
forced [2] - 25:15, 31:14
forces [2] - 30:5, 32:1
forcing [2] - 30:15, 31:12
foregoing [1] - 44:3
form [1] - 28:22
forms [6] - 26:20, 26:21, 32:9, 34:24, 35:5, 36:9
formula [1] - 41:11
foundation [1] - 4:21
founded [4] - 7:2, 7:4, 7:5, 9:14
four [2] - 7:5, 27:16
fox [1] - 13:25
FREDERICK [2] - 2:5, 5:25
Free [1] - 22:5
free [49] - 22:8, 22:15, 22:17, 22:20, 22:25, 23:1, 23:11, 24:5, 24:12, 24:16, 24:18, 24:24, 24:25, 25:2, 25:7, 25:25, 27:20, 27:21, 27:22, 27:25, 28:3, 28:4, 29:11, 30:4, 30:6, 30:8, 30:9, 30:10, 30:11, 30:15, 30:21, 30:22, 30:24, 31:4, 31:5, 31:14, 31:18, 32:5, 32:10, 33:5, 33:9, 33:10, 33:11, 33:13
friend [2] - 27:3, 31:9
front [3] - 6:7, 6:20, 11:9
frustrated [1] - 24:10

functionality [1] - 28:15
future [1] - 20:5

## G

gain [3] - 29:9, 31:9, 32:8
gather [1] - 21:7
general [2] - 12:12, 12:15
generally [6] - 10:1, 12:5, 15:17, 22:1, 27:13, 30:20
generates [1] - 39:4
Georgia [1] - 10:7
given [1] - 33:19
Goldilocks [1] - 34:4
gosh [1] - 29:5
government [2] - 9:12, 9:20
Government [2] - 21:22, 40:6
GOVERNMENT [1] - 5:25
government's [2] - 4:4, 4:10
graduate [2] - 7:12, 7:16
graph [1] - 23:12
graphically [1] - 27:13
great [1] - 9:8
greater [1] - 37:13
green [2] - 22:7, 22:9
greens [1] - 22:7
group [4] - 7:7, 9:23, 17:6, 26:1
grow [1] - 20:20
growing [2] - 24:20, 29:12
grows [1] - 25:8
growth [1] - 25:6
guess [8] - 4:13, 7:5, 7:8, 30:19, 30:21, 35:8, 35:16, 40:15
guide [2] - 12:4, 21:18
guideline [1] - 34:14
guidelines [12] - 9:20, 9:22, 9:25, 10:2, 11:19, 11:21, 12:1, 13:24, 16:9, 42:4, 42:9, 42:15
guy [2] - 29:1, 29:23
guys [2] - 37:11, 40:17

## H

H&R [4] - 1:6, 25:21, 27:4, 31:13
half [1] - 40:21
harm [7] - 11:17, 17:9, 17:10, 17:21, 19:16, 19:25, 42:13
hear [1] - 26:11
heard [1] - 10:19
HEARING [1] - 1:9
helpful [2] - 11:6, 26:22
Herfindahl [7] - 41:3, 41:5, 41:9, 41:17, 41:20, 42:1,

42:3, 42:10, 42:11, 42:15
Herfindahl-Hirschmann [3] - 41:3, 41:5, 41:9
Herfindahls [4] - 42:5, 42:7, 42:18
high [4] - 25:25, 26:16, 27:4, 32:12
higher [1] - 32:10
highest [2] - 27:3, 27:19
Hirschmann [3] - 41:3, 41:5, 41:9
historically [2] - 14:19, 29:12
history [8] - 12:13, 14:14, 20:3, 21:11, 21:15, 21:16, 25:10, 25:19
Hogan [1] - 10:6
HOGAN [1] - 1:19
Honor [12] - 3:8, 3:13, 4:19, 5:2, 5:8, 5:19, 5:22, 6:11, 10:14, 10:21, 43:4, 43:11
HONORABLE [1] - 1:10
horizontally [1] - 28:21
HOWELL [1] - 1:10
HRB [15] - 25:2, 25:3, 25:5, 26:14, 26:16, 28:10, 28:17, 28:21, 28:22, 30:25, 31:2, 37:10, 38:24, 39:6, 40:13
hundreds [1] - 9:18
hypothetical [26] - 16:10, 16:14, 17:1, 17:9, 17:11, 18:2, 33:21, 34:3, 34:5, 34:11, 34:12, 34:13, 34:17, 34:20, 36:3, 36:20, 37:8, 37:16, 37:21, 37:23, 38:2, 38:5, 38:22, 39:3, 39:15, 39:19

## I

icky [1] - 22:9
idea [1] - 3:25
illegal [1] - 15:7
immediate [1] - 35:3
immediately [1] - 28:9
implies [1] - 7:1
important [7] - 9:6, 13:3, 14:20, 16:20, 24:14, 33:16, 34:16
impose [2] - 17:2, 36:5
improve [4] - 31:14, 32:3, 32:6, 32:24
improved [1] - 13:3
INC [1] - 1:6
incentive [6] - 13:9, 13:19, 14:9, 20:22, 33:10, 33:12
include [1] - 37:4
includes [1] - 37:7
income [2] - 29:3, 35:10
incorporate [1] - 11:23

Increase [1] - 16:17
increase [24] - 13:19, 17:3, 17:22, 18:3, 18:18, 18:20, 19:10, 19:21, 21:1, 21:8, 23:16, 24:17, 24:24, 34:12, 34:18, 36:5, 37:24, 38:4, 39:2, 39:5, 39:7, 39:15, 39:18, 39:20
increased [1] - 38:15
increases [2] - 20:13, 25:13
increasing [2] - 12:21, 13:18
indefinitely [1] - 34:18
index [3] - 41:3, 41:5, 41:9
indicate [1] - 4:2
indication [1] - 35:24
individually [1] - 20:19
induce [1] - 18:24
induced [1] - 24:6
industrial [2] - 7:23, 41:23
industry [7] - 14:19, 20:6, 20:19, 23:19, 25:18, 33:20, 41:14
infinity [1] - 35:22
inflation [2] - 7:21, 23:14
INJUNCTION [1] - 1:9
instead [2] - 28:7, 38:23
instigated [1] - 25:18
Institute [1] - 9:13
intend [1] - 11:12
intense [1] - 31:8
interact [2] - 7:24, 28:24
interaction [1] - 12:11
interdependence [1] - 15:1
interest [1] - 15:6
interested [1] - 22:13
interests [1] - 21:18
Internal [3] - 23:21, 23:25, 40:8
INTO [1] - 2:12
introduced [1] - 22:15
Intuit [19] - 23:5, 23:7, 24:22, 24:23, 25:1, 25:5, 25:21, 26:14, 26:15, 27:2, 27:3, 27:11, 28:21, 29:2, 30:25, 31:2, 31:13, 39:6
intuition [1] - 28:25
involve [1] - 8:21
involved [3] - 9:15, 9:17, 9:23
involving [1] - 8:19
IRS [3] - 36:17, 40:7, 40:12
IRS's [1] - 40:9
issue [6] - 19:3, 20:18, 26:4, 26:5, 26:13, 31:25
issues [1] - 8:4
itself [1] - 22:23

## J

jail [1] - 35:11
jargony [1] - 16:10
JOSEPH [1] - 1:13
Judge [1] - 10:6
JUDGE [1] - 1:11
judges [1] - 10:9
jump [1] - 24:15
Justice [1] - 3:6
JUSTICE [1] - 1:14

## K

keep [3] - 26:22, 32:13, 32:14
kind [11] - 13:10, 15:4, 20:14, 28:3, 28:5, 29:7, 30:8, 32:10, 32:15, 33:8
kinds [5] - 12:14, 12:16, 13:5, 14:7, 28:8
known [1] - 9:19

## L

lag [1] - 25:4
lagger [1] - 25:3
LANCE [1] - 2:3
large [10] - 16:21, 16:22, 18:7, 18:17, 18:21, 34:18, 36:5, 36:6, 39:4, 41:23
largely [2] - 25:18, 29:22
larger [3] - 17:5, 23:10, 39:20
last [2] - 13:2, 38:10
latest [1] - 11:23
LAWRENCE [1] - 1:13
lawsuit [1] - 4:10
lay [1] - 4:21
lead [4] - 17:21, 18:21, 19:15, 23:3
leading [1] - 14:25
learned [2] - 11:25, 21:14
least [8] - 9:4, 12:2, 13:2, 19:23, 27:19, 39:17, 42:10, 42:17
leave [4] - 8:9, 9:11, 18:22, 28:19
left [2] - 9:10, 17:13
legal [2] - 23:23, 41:10
less [5] - 18:25, 30:9, 33:11, 40:21
level [2] - 20:20, 42:19
lift [1] - 33:5
likely [8] - 17:21, 19:15, 19:24, 20:5, 31:6, 31:7, 42:13, 42:20
limit [2] - 23:21, 32:17

limited [1] - 29:8
limits [1] - 32:15
line [9] - 22:8, 23:13, 24:12, 24:16, 24:18, 24:24, 25:7, 28:19
linkage [1] - 32:4
linkages [1] - 26:20
linked [1] - 32:5
litigation [1] - 11:25
LLP [1] - 1:19
locked [1] - 32:16
LOGAN [1] - 1:18
look [21] - 13:4, 13:7, 14:3, 15:14, 15:15, 15:19, 15:22, 16:6, 22:5, 24:22, 25:7, 28:25, 30:8, 30:22, 31:16, 34:8, 35:23, 36:22, 37:5, 38:21, 40:4
looked [2] - 17:16, 41:16, 43:2
looking [9] - 12:24, 13:18, 15:13, 15:14, 15:18, 39:9, 40:25, 42:14
looks [6] - 12:10, 21:20, 28:15, 31:18, 36:25, 41:12
loose [2] - 24:11, 25:12
lose [1] - 37:24
loss [4] - 18:21, 32:12, 38:6, 39:13
lost [1] - 23:6
Louis [1] - 7:17
LOVELLS [1] - 1:19
lower [1] - 25:25
lucky [1] - 37:9

## M

machine [1] - 1:25
macroeconomics [1] - 7:22
mailing [1] - 27:22
maintain [2] - 33:6, 33:14
major [4] - 22:25, 24:13, 26:4, 26:8
manage [1] - 36:4
mark [1] - 6:11
market [67] - 12:12, 12:13, 12:20, 12:21, 12:25, 14:1, 14:2, 14:4, 14:5, 15:2, 16:6, 16:8, 16:21, 16:22, 16:24, 16:25, 17:1, 17:4, 17:6, 17:16, 17:17, 17:19, 17:22, 18:14, 18:15, 19:9, 19:11, 20:4, 20:21, 21:12, 22:11, 25:13, 29:14, 33:18, 33:21, 34:7, 34:9, 34:24, 35:12, 35:13, 35:15, 35:18, 35:20, 35:21, 36:1, 36:2, 36:3, 36:9, 36:19, 37:6, 37:14, 37:20, 37:22, 39:1,

39:3, 39:10, 39:11, 39:22, 39:24, 39:25, 40:3, 40:15, 40:18, 40:21, 41:11, 42:19
markets [2] - 7:25, 41:24
marks [1] - 28:4
master's [2] - 7:13, 7:14
mathematical [4] - 19:21, 38:12, 39:1, 41:10
matter [2] - 4:13, 44:5
matters [1] - 43:10
maverick [12] - 4:6, 4:10, 14:15, 14:19, 20:3, 20:22, 21:10, 22:15, 22:22, 24:5, 24:13, 25:10
mean [2] - 14:24, 34:25
means [3] - 19:15, 27:21, 33:14
merge [3] - 37:10, 38:24, 38:25
merger [51] - 9:9, 9:15, 9:19, 9:22, 9:24, 10:4, 10:15, 10:17, 10:19, 10:21, 11:15, 11:16, 11:19, 11:21, 12:1, 12:6, 12:23, 13:6, 13:13, 13:24, 14:7, 14:16, 14:17, 16:3, 16:8, 17:12, 17:21, 18:6, 18:7, 19:13, 19:15, 19:22, 19:24, 20:23, 20:25, 32:20, 33:3, 34:10, 34:15, 35:24, 38:11, 38:14, 38:21, 38:23, 39:1, 42:4, 42:11, 42:13, 42:20, 43:1, 43:3
mergers [9] - 8:4, 8:21, 9:3, 9:6, 9:17, 12:3, 12:4, 38:11, 43:1
merging [2] - 13:9, 18:19
metric [1] - 34:18
Meyer [2] - 34:20, 34:23
Meyer's [2] - 21:5, 36:13
Micro [1] - 9:14
Microeconomic [2] - 6:24, 7:21
microeconomics [1] - 7:23
microeconomist [2] - 7:20, 10:18
microphone [1] - 26:7
might [1] - 12:17
minute [4] - 29:1, 31:16, 31:20, 41:14
mirroring [1] - 25:7
mixed [1] - 8:25
model [9] - 19:21, 21:6, 38:13, 38:14, 38:22, 38:24, 39:1, 39:2, 39:10
modeling [1] - 13:17
models [3] - 38:11, 38:12, 43:1
moment [2] - 38:18, 41:2
money [1] - 33:15
monopolist [27] - 16:10,

16:14, 17:2, 17:10, 17:11, 18:2, 33:21, 34:3, 34:5, 34:11, 34:12, 34:13, 34:17, 34:21, 36:4, 36:15, 36:21, 37:8, 37:16, 37:21, 37:23, 38:2, 38:5, 38:23, 39:3, 39:15, 39:19
monopolists [1] - 36:13
monopolization [2] - 8:5, 8:21
monopolizing [1] - 17:7
monopoly [3] - 37:9, 41:18, 41:21
morning [2] - 43:9, 43:10
most [2] - 9:6, 9:11
Mount [2] - 15:14, 41:7
mouth [1] - 35:1
MR [24] - 3:6, 3:8, 3:13, 3:17, 4:16, 4:19, 5:2, 5:8, 5:19, 5:22, 6:4, 6:11, 6:18, 10:14, 10:17, 10:20, 10:23, 11:4, 26:3, 26:6, 27:10, 27:12, 43:4, 43:11
mutual [3] - 15:1, 15:6, 15:8
mutually [1] - 15:11

## N

name [1] - 7:1
named [1] - 41:5
narrower [1] - 27:7
natural [1] - 17:4
nature [3] - 29:10, 29:11, 32:21
nearly [2] - 8:12, 42:15
need [6] - 6:17, 18:5, 34:1, 37:14, 37:15
negates [2] - 35:19, 36:10
never [1] - 10:19
next [5] - 5:6, 5:15, 5:18, 24:19, 31:13
nice [1] - 30:23
Noerr [1] - 23:23
Noerr-Pennington [1] - 23:23
none [1] - 25:12
Nontransitory [1] - 16:17
nontransitory [2] - 17:3, 38:4
north [1] - 15:15
number [4] - 15:2, 37:12, 37:17, 41:15
NUMBER [1] - 2:10
numbering [1] - 37:18
numbers [3] - 27:8, 27:10, 37:16
numerous [1] - 11:21
NW [2] - 1:15, 1:19

# O

**o'clock** [1] - 43:4
**Oath** [1] - 5:21
**objection** [4] - 4:25, 10:16, 10:18, 10:25
**objective** [2] - 11:15, 11:16
**observe** [1] - 24:14
**obviously** [1] - 12:7
**occur** [2] - 18:18, 20:13
**occurs** [2] - 22:13, 28:19
**ocean** [1] - 30:19
**OF** [6] - 1:2, 1:3, 1:9, 1:14, 44:1, 44:10
**OFF** [1] - 26:12
**offer** [2] - 24:12, 33:10
**offered** [2] - 24:5, 26:25
**offering** [3] - 6:13, 31:18, 33:9
**Office** [1] - 10:6
**Official** [1] - 1:22
**OFFICIAL** [1] - 44:1
**often** [1] - 13:4
**oligopoly** [1] - 41:22
**on-line** [7] - 22:8, 24:12, 24:16, 24:18, 24:24, 25:7
**once** [10] - 15:12, 18:14, 22:25, 24:11, 24:20, 30:20, 32:16, 33:15, 41:9, 42:16
**one** [23] - 4:15, 12:1, 12:17, 15:23, 15:25, 16:15, 18:3, 20:10, 21:6, 22:17, 23:10, 23:18, 23:20, 25:4, 26:10, 27:16, 28:8, 36:8, 36:24, 38:9, 40:21, 41:6, 41:7
**one-half** [1] - 40:21
**operating** [1] - 41:24
**opinion** [4] - 10:20, 11:2, 12:2, 16:1
**opinions** [1] - 10:24
**opposed** [1] - 13:20
**orange** [3] - 24:9, 24:17, 24:19
**order** [3] - 30:14, 32:2, 32:11
**organization** [3] - 7:8, 7:24, 41:23
**oriented** [1] - 11:18
**original** [1] - 21:20
**output** [1] - 24:11
**outside** [2] - 37:20, 37:22
**over-exclusiveness** [1] - 37:6
**overall** [1] - 21:18
**own** [2] - 13:10, 34:25

# P

**p.m** [3] - 1:7, 5:16, 43:12

**pack** [2] - 24:11, 25:12
**paid** [5] - 22:8, 23:12, 31:2, 31:17, 32:12
**paper** [3] - 29:13, 37:1, 37:19
**parked** [1] - 9:12
**part** [6] - 6:16, 13:11, 24:6, 43:5
**particular** [8] - 11:6, 13:6, 13:7, 14:14, 14:16, 26:15, 41:25, 43:5
**particularly** [4] - 8:22, 14:20, 25:11, 32:18
**parties** [3] - 13:9, 14:10, 18:19
**partly** [3] - 30:14, 30:17, 30:19
**parts** [1] - 26:23
**party** [1] - 5:4
**pass** [1] - 39:23
**passed** [1] - 39:20
**passes** [1] - 39:7
**pay** [4] - 25:9, 35:8, 36:14
**paying** [3] - 26:16, 28:11, 29:3
**pen** [4] - 29:13, 29:16, 37:1, 37:18
**pencil** [1] - 29:17
**Pennington** [1] - 23:23
**Pennsylvania** [1] - 1:15
**people** [12] - 4:5, 9:11, 25:9, 30:19, 30:20, 31:3, 32:13, 32:16, 32:18, 33:9, 37:16, 37:18
**percent** [15] - 17:4, 17:5, 22:11, 31:1, 31:3, 34:15, 37:13, 37:19, 38:9, 40:13, 40:14, 40:21, 41:18
**percentage** [1] - 17:10
**perfectly** [3] - 23:22, 41:13, 41:21
**permission** [1] - 26:3
**permit** [1] - 32:20
**person** [1] - 29:9
**perspective** [1] - 42:4
**persuade** [1] - 8:24
**persuaded** [1] - 23:21
**Ph.D** [1] - 7:15
**pictorial** [1] - 26:24
**picture** [3] - 26:2, 26:24, 33:2
**planning** [1] - 3:25
**play** [2] - 11:19, 32:23
**plays** [1] - 16:3
**pleased** [1] - 4:12
**plenty** [1] - 39:23
**point** [8] - 4:5, 10:14, 12:1, 17:6, 17:23, 23:23, 27:14, 38:18
**pointless** [1] - 36:7
**points** [1] - 42:10

**pool** [6] - 29:12, 29:15, 29:20, 29:22, 30:18
**portion** [3] - 3:10, 5:1, 5:6
**pose** [1] - 16:16
**position** [1] - 8:11
**precise** [1] - 19:21
**predict** [1] - 13:5
**preempt** [1] - 21:3
**PRELIMINARY** [1] - 1:9
**premium** [4] - 25:21, 28:5, 28:7, 31:16
**preparation** [9] - 21:16, 23:10, 25:9, 34:25, 35:6, 35:13, 36:9, 36:19, 40:22
**prepared** [2] - 5:17, 11:7
**preparing** [1] - 35:7
**presentation** [1] - 4:8
**presumption** [10] - 12:23, 17:20, 18:11, 19:12, 19:13, 42:12, 42:20, 42:22
**pretty** [10] - 15:20, 21:18, 23:7, 23:9, 24:2, 25:6, 28:3, 31:19, 36:16, 40:10
**prevent** [1] - 32:11
**previous** [2] - 19:20, 29:25
**Price** [1] - 16:18
**price** [35] - 8:4, 8:21, 14:25, 17:3, 18:3, 18:8, 18:9, 18:18, 18:20, 19:21, 20:13, 21:1, 21:8, 23:14, 25:8, 25:25, 27:7, 27:11, 27:15, 27:16, 31:6, 32:22, 34:12, 34:18, 36:5, 37:23, 37:24, 38:4, 39:2, 39:5, 39:6, 39:14, 39:18, 39:20
**prices** [14] - 14:10, 18:2, 18:24, 23:8, 23:11, 23:17, 25:16, 26:25, 27:6, 27:17, 33:14, 34:5, 34:15, 37:12, 37:17, 38:3, 38:14, 38:15
**pricing** [3] - 26:13, 26:14, 28:18
**primary** [1] - 8:20
**Princeton** [4] - 7:13, 7:14, 7:15, 9:14
**principal** [1] - 6:24
**principle** [4] - 9:4, 16:23, 16:24, 36:2
**problem** [8] - 14:12, 15:17, 21:10, 31:24, 35:3, 35:25, 40:1, 42:8
**problematic** [1] - 12:23
**problems** [1] - 42:21
**procedure** [1] - 36:10
**Proceedings** [3] - 1:25, 3:16, 5:11
**proceedings** [3] - 3:14, 5:9, 44:4
**process** [1] - 12:12
**produce** [1] - 12:9

**produced** [1] - 1:25
**product** [25] - 3:19, 3:20, 23:12, 26:17, 27:20, 27:22, 28:1, 28:5, 28:6, 30:4, 30:9, 30:24, 31:3, 31:4, 31:5, 31:15, 31:18, 33:21, 33:10, 33:11, 36:24, 36:25, 37:2, 37:17
**products** [22] - 12:9, 16:12, 16:13, 16:16, 17:7, 17:8, 26:25, 27:6, 27:25, 30:8, 30:10, 30:11, 34:2, 34:4, 36:5, 36:19, 36:22, 37:3, 37:7, 37:10, 38:3
**profitable** [7] - 16:16, 18:9, 18:24, 18:25, 25:14, 37:25, 39:17
**program** [2] - 8:24, 29:24
**proposed** [1] - 21:5
**proposition** [13] - 27:19, 30:4, 30:6, 30:7, 31:10, 31:11, 31:12, 31:14, 32:2, 32:4, 32:25, 33:7, 33:11
**protect** [1] - 5:4
**provide** [4] - 25:16, 25:24, 32:1, 40:22
**providers** [1] - 14:23
**provides** [2] - 31:10, 34:13
**public** [1] - 7:13
**published** [1] - 9:20
**pull** [1] - 29:21
**pulling** [1] - 30:18
**purpose** [2] - 10:22, 35:19
**put** [8] - 3:20, 6:7, 16:11, 16:13, 21:5, 32:22, 35:1, 42:3

# Q

**quacks** [1] - 36:25
**qualified** [1] - 10:21
**qualitative** [3] - 13:18, 13:20, 39:16
**quality** [1] - 33:13
**quantitatively** [1] - 13:4
**quick** [2] - 18:19, 19:8
**quite** [2] - 29:8, 37:1
**quotation** [1] - 28:4

# R

**raise** [11] - 14:10, 18:2, 18:8, 18:9, 18:24, 33:13, 34:5, 34:14, 37:11, 37:23, 38:3
**raised** [1] - 37:17
**range** [8] - 8:19, 26:25, 27:3, 27:4, 27:6, 27:7, 28:7
**ranges** [2] - 41:12, 42:5

**ranging** [1] - 8:23
**rate** [1] - 32:13
**reach** [1] - 42:11
**reached** [1] - 19:5
**reaction** [2] - 23:4, 24:6
**reactive** [1] - 25:14
**read** [2] - 35:2, 41:10
**real** [8] - 17:9, 20:18, 22:16, 23:15, 24:15, 29:17, 31:15, 38:10
**realistic** [1] - 34:7
**really** [26] - 4:13, 14:2, 14:17, 15:5, 15:22, 18:1, 18:16, 20:14, 20:15, 22:4, 22:14, 22:22, 23:24, 24:20, 24:21, 25:17, 26:8, 26:20, 27:21, 28:23, 29:8, 30:4, 33:16, 34:16, 37:1, 37:3
**reason** [3] - 4:19, 13:13, 33:12
**reasons** [1] - 23:10
**Rebecca** [1] - 44:3
**REBECCA** [1] - 1:21
**rebuttable** [1] - 17:24
**Recess** [2] - 5:16, 43:12
**recognition** [2] - 15:1, 15:5
**recognize** [1] - 15:3
**recognized** [1] - 30:20
**recommends** [1] - 28:15
**record** [6] - 3:9, 6:16, 6:17, 6:19, 29:16, 44:4
**RECORD** [1] - 26:12
**RECROSS** [1] - 2:2
**REDIRECT** [1] - 2:2
**reduce** [2] - 25:16, 33:13
**reduction** [1] - 23:17
**refer** [5] - 11:6, 11:13, 22:1, 40:24, 41:22
**referred** [2] - 38:8, 41:10
**reflect** [1] - 12:2
**reflecting** [1] - 23:16
**refund** [1] - 29:4
**regulation** [1] - 8:19
**regulatory** [1] - 8:24
**reigning** [1] - 20:18
**reinforces** [1] - 15:23
**relevant** [24] - 12:20, 14:1, 14:2, 16:5, 16:8, 16:21, 16:24, 17:16, 17:19, 17:22, 19:9, 34:24, 35:20, 35:21, 36:1, 36:3, 36:9, 36:19, 37:6, 37:14, 37:21, 39:3, 39:10, 39:11
**reluctant** [1] - 29:7
**remaining** [1] - 20:5
**remember** [1] - 34:8
**removal** [1] - 20:4
**removing** [2] - 14:18
**replace** [1] - 20:20

**report** [5] - 6:10, 6:14, 6:15, 21:20, 35:3
**reported** [1] - 1:25
**reporter** [1] - 26:11
**Reporter** [2] - 1:21, 1:22
**REPORTER** [2] - 44:1, 44:10
**reproduced** [1] - 21:20
**require** [1] - 14:22
**Research** [1] - 6:24
**research** [1] - 6:25
**resist** [1] - 41:6
**respect** [11] - 3:18, 9:2, 10:2, 13:22, 14:6, 19:14, 19:17, 19:19, 19:20, 20:9, 20:12
**respond** [1] - 25:6
**responded** [1] - 23:7
**responding** [1] - 24:21
**response** [7] - 18:16, 18:25, 22:25, 23:17, 25:5, 25:15, 30:23
**responses** [1] - 22:23
**restrict** [1] - 24:7
**restricted** [1] - 23:24
**restrictive** [1] - 30:10
**result** [8] - 15:20, 19:24, 21:1, 23:24, 24:1, 25:14, 38:15, 39:19
**results** [2] - 9:1, 22:23
**resume** [4] - 3:2, 3:16, 5:11, 43:9
**retailers** [1] - 3:23, 4:3
**return** [2] - 5:15, 27:24
**Revenue** [3] - 23:21, 23:25, 40:8
**revenue** [1] - 28:2
**revenues** [1] - 33:1
**review** [2] - 9:3, 9:5
**reviewing** [1] - 21:15
**reviews** [1] - 9:15
**revision** [2] - 9:24, 11:22
**revisions** [1] - 11:22
**Rick** [1] - 5:20
**rid** [2] - 33:8, 33:9
**rivals** [2] - 14:11, 24:21
**ROBERT** [1] - 1:17
**Robertson** [2] - 2:4, 3:11
**ROBERTSON** [7] - 1:17, 3:8, 3:13, 5:2, 5:8, 10:17, 10:23
**role** [4] - 9:2, 11:19, 14:14, 24:22
**Room** [1] - 1:22
**room** [1] - 39:23
**rounded** [2] - 40:13, 40:14
**ROUSH** [1] - 1:18
**royalty** [1] - 30:13
**RPR** [1] - 1:21
**run** [1] - 18:25
**runs** [1] - 41:20

**S**

**sales** [1] - 37:24
**satisfied** [2] - 37:13, 38:5
**satisfies** [1] - 39:10
**satisfy** [1] - 34:2
**save** [1] - 16:18
**Schedule** [1] - 30:12
**school** [2] - 7:14, 7:16
**SCICCHITANO** [1] - 1:14
**scope** [1] - 23:22
**sealed** [8] - 3:9, 3:10, 3:14, 4:18, 4:20, 4:21, 4:24, 5:9
**second** [13] - 4:15, 13:1, 13:11, 13:17, 14:3, 16:6, 24:8, 24:12, 26:10, 28:24, 38:22, 39:12, 40:1
**section** [1] - 7:6
**see** [24] - 4:22, 6:8, 15:19, 22:6, 22:10, 22:19, 22:20, 22:22, 22:24, 23:1, 23:12, 23:15, 24:1, 24:9, 24:15, 24:19, 25:6, 26:6, 30:8, 33:2, 35:6, 40:12, 40:18, 42:2
**sees** [3] - 28:10, 28:11, 28:14
**self** [1] - 15:6
**self-interest** [1] - 15:6
**selling** [1] - 4:5
**sense** [9] - 11:17, 14:17, 17:7, 28:23, 31:5, 35:16, 35:17, 35:22, 36:24
**separate** [3] - 3:15, 5:10, 26:22
**separately** [2] - 32:13, 32:14
**September** [1] - 1:5
**serious** [2] - 19:13, 42:16
**seriously** [2] - 22:18, 42:6
**serve** [1] - 8:10
**service** [1] - 40:22
**Service** [3] - 23:21, 24:1, 40:8
**services** [1] - 25:9
**session** [1] - 4:20
**SESSION** [2] - 1:5, 1:10
**set** [3] - 6:8, 12:5, 16:15
**sets** [1] - 42:24
**several** [1] - 15:18
**severe** [1] - 12:22
**shall** [1] - 5:7
**share** [17] - 18:22, 22:20, 23:2, 23:6, 23:7, 23:10, 23:16, 24:2, 24:17, 24:25, 25:7, 25:8, 25:14, 40:13, 40:21, 41:14, 41:19
**shares** [12] - 12:24, 14:3, 34:19, 35:21, 35:22, 35:23, 39:25, 40:7, 40:9, 40:15, 41:11

**shortage** [1] - 20:16
**shorthand** [1] - 1:25
**show** [2] - 4:10, 4:23
**shows** [1] - 40:7
**side** [2] - 3:8, 37:6
**sIGNATURE** [1] - 44:10
**Significant** [1] - 16:17
**significant** [10] - 17:2, 17:18, 19:16, 19:25, 21:8, 28:3, 34:6, 36:5, 37:16, 37:17
**significantly** [4] - 37:12, 38:3, 38:4, 39:7
**similar** [1] - 27:4
**simply** [1] - 18:13
**simulation** [4] - 38:11, 38:23, 39:2, 43:1
**single** [1] - 9:6
**sitting** [1] - 28:10
**situation** [3] - 15:2, 35:4, 36:16
**six** [1] - 8:12
**small** [4] - 15:3, 17:2, 34:5, 38:4
**Small** [1] - 16:17
**smaller** [2] - 27:5, 29:12
**smallest** [2] - 16:23, 36:2
**software** [1] - 22:9
**solve** [1] - 19:21
**someplace** [2] - 27:24, 35:25
**sometimes** [7] - 10:11, 10:12, 12:18, 12:22, 27:22
**somewhat** [1] - 25:3
**somewhere** [2] - 17:5, 40:3
**sort** [12] - 12:12, 13:25, 14:13, 22:9, 25:19, 26:24, 29:12, 29:16, 32:20, 39:16, 40:18, 41:13
**south** [1] - 15:15
**sp** [1] - 36:12
**spare** [1] - 39:23
**speaking** [3] - 15:17, 21:2, 22:1
**special** [1] - 14:13
**specialty** [3] - 7:19, 7:23, 7:25
**specifically** [2] - 11:18, 13:4
**spell** [1] - 31:24
**spent** [1] - 9:8
**split** [2] - 26:23, 37:19
**square** [1] - 41:19
**squared** [1] - 41:15
**squares** [1] - 41:12
**SSNIP** [9] - 16:1, 16:2, 16:18, 16:20, 16:25, 17:10, 33:25, 34:1, 39:7
**St** [1] - 7:17
**stage** [1] - 42:24
**stand** [1] - 3:2
**Staples** [5] - 3:19, 3:20, 10:5,

10:6
**start** [5] - 22:22, 27:2, 31:20, 32:18, 33:20
**started** [3] - 24:23, 29:19, 30:25
**starting** [1] - 17:23
**starts** [2] - 21:25, 25:3
**state** [1] - 27:24
**STATES** [3] - 1:1, 1:3, 1:11
**States** [3] - 1:13, 35:7, 41:16
**stayed** [1] - 10:1
**step** [9] - 13:23, 13:25, 14:3, 16:5, 17:15, 31:13, 40:1
**stick** [3] - 31:1, 31:2, 31:3
**still** [2] - 21:8, 39:6
**Stonestreet** [1] - 44:3
**STONESTREET** [1] - 1:21
**stop** [3] - 4:15, 33:9, 41:2
**story** [6] - 13:12, 21:25, 22:4, 22:15, 24:4, 25:17
**Street** [1] - 1:19
**stretch** [1] - 22:7
**strong** [4] - 30:4, 30:6, 30:7, 30:16
**structural** [9] - 12:18, 12:19, 13:22, 13:24, 15:11, 17:13, 19:2, 19:5, 42:12
**structuralist** [10] - 12:23, 15:21, 16:4, 17:20, 18:11, 19:12, 19:13, 36:10, 42:20, 42:25
**structure** [2] - 34:9, 43:2
**stuck** [1] - 33:6
**studied** [1] - 21:11
**study** [1] - 7:24
**stupid** [1] - 18:21
**subject** [1] - 21:3
**submitted** [1] - 6:10
**subset** [1] - 37:4
**substitutes** [2] - 13:15, 36:23
**succeed** [1] - 18:14
**suddenly** [3] - 24:9, 31:18, 40:18
**sufficient** [2] - 19:11, 20:13
**Suite** [1] - 1:15
**sum** [1] - 13:14
**summary** [1] - 19:8
**super** [1] - 30:3
**supplier** [2] - 16:15, 35:5
**suppose** [2] - 16:11, 17:15
**supposed** [1] - 9:5
**surprisingly** [1] - 39:18
**survey** [2] - 30:23, 40:11
**survive** [1] - 32:19
**switch** [7] - 28:13, 28:21, 29:7, 29:22, 30:1, 31:20, 32:8
**switching** [3] - 28:16, 29:7,

32:10
**sworn** [1] - 6:1
**system** [1] - 32:16

## T

**Tab** [3] - 21:22, 40:4, 40:7
**Tabs** [1] - 11:10
**tacit** [1] - 15:5
**tank** [1] - 9:12
**taught** [2] - 7:17, 9:13
**tax** [26] - 21:16, 22:1, 22:2, 22:4, 22:6, 22:9, 22:13, 22:19, 22:24, 23:2, 23:4, 23:5, 23:9, 23:10, 23:18, 25:1, 25:9, 29:3, 29:24, 34:24, 35:5, 35:13, 36:9, 36:19, 40:8, 40:22
**TaxACT** [35] - 14:14, 20:3, 20:20, 22:14, 22:17, 22:21, 22:25, 23:20, 24:5, 24:10, 24:14, 24:17, 24:18, 25:6, 25:11, 25:22, 25:24, 26:18, 27:5, 28:6, 28:12, 28:19, 28:22, 29:6, 29:10, 30:3, 30:25, 31:10, 33:8, 37:10, 38:24, 39:6, 40:14
**TaxACT's** [5] - 23:3, 23:7, 25:18, 26:13, 30:9
**taxes** [4] - 35:7, 35:9, 35:17, 36:14
**TaxHawk** [1] - 40:17
**TaxSlayer** [1] - 40:17
**teaching** [1] - 8:6
**tend** [1] - 29:17
**tender** [2] - 10:14, 10:22
**tension** [1] - 31:15
**term** [3] - 14:2, 14:21, 14:24
**terms** [9] - 11:23, 20:18, 20:24, 22:11, 25:4, 26:14, 31:22, 35:14
**test** [23] - 16:1, 16:2, 16:10, 16:19, 16:20, 16:25, 17:10, 33:21, 33:22, 33:25, 34:1, 34:3, 34:21, 36:21, 37:8, 37:14, 37:21, 38:5, 39:7, 39:12, 39:13, 39:20
**tester** [1] - 37:7
**testified** [6] - 6:1, 10:4, 10:5, 29:21, 33:18, 33:20
**testify** [1] - 34:25
**testimony** [3] - 11:2, 11:5, 43:6
**testing** [3] - 24:24, 25:2, 25:4
**tests** [1] - 39:22
**that's..** [1] - 36:11
**THE** [21] - 1:2, 1:10, 3:2, 3:7, 3:9, 4:15, 4:17, 4:25, 5:5, 5:12, 5:13, 5:14, 5:17,

5:24, 6:15, 10:16, 11:1, 11:3, 26:10, 26:12, 43:8
**themselves** [1] - 30:15
**theory** [2] - 8:3, 11:24
**they've** [2] - 4:9, 29:17
**third** [1] - 5:4
**threat** [1] - 28:18
**three** [8] - 15:18, 27:1, 33:5, 39:5, 40:15, 40:19, 40:23, 40:24
**tiny** [1] - 40:20
**today** [2] - 11:5, 11:12
**together** [4] - 16:12, 16:13, 33:21, 37:11
**tomorrow** [1] - 43:9
**took** [1] - 24:22
**top** [2] - 22:9, 32:5
**total** [2] - 13:14, 41:12
**towards** [2] - 35:25, 36:1
**tracks** [1] - 23:13
**traditional** [4] - 12:18, 15:21, 28:22, 42:25
**traditionally** [2] - 17:3, 29:19
**transaction** [1] - 19:3
**transcribed** [2] - 3:14, 5:9
**transcript** [5] - 1:25, 3:10, 5:1, 5:7, 44:4
**TRANSCRIPT** [1] - 1:9
**transcription** [1] - 1:25
**trial** [1] - 6:12
**tried** [2] - 11:22, 37:23
**trot** [1] - 13:25
**true** [1] - 38:1
**try** [8] - 8:24, 12:10, 12:11, 13:4, 16:11, 29:5, 38:12, 38:13
**trying** [4] - 4:21, 12:7, 12:8, 41:6
**TurboTax** [1] - 40:13
**turn** [1] - 24:6
**two** [28] - 12:16, 13:14, 13:16, 13:23, 13:25, 15:10, 15:12, 16:5, 17:15, 23:9, 23:18, 25:4, 26:20, 26:22, 26:23, 27:16, 32:9, 32:13, 38:8, 38:19, 38:21, 39:22, 40:17, 40:19, 41:5, 41:17
**two-step** [4] - 13:23, 13:25, 16:5, 17:15

## U

**U.S** [3] - 1:14, 1:22, 36:14
**unconcentrated** [1] - 42:6
**under** [8] - 3:14, 5:9, 13:24, 16:8, 23:23, 27:23, 36:2, 36:13
**undergraduate** [1] - 7:10
**understood** [1] - 35:2

**unfortunately** [2] - 10:10, 22:6
**unilateral** [13] - 13:7, 13:8, 13:12, 14:9, 19:19, 19:20, 19:23, 20:7, 21:1, 21:9, 38:15, 39:9
**unique** [4] - 20:2, 20:3, 28:23, 35:4
**UNITED** [3] - 1:1, 1:3, 1:11
**United** [3] - 1:13, 35:7, 41:16
**units** [1] - 22:11
**universe** [1] - 40:10
**University** [3] - 7:17, 7:19, 8:6
**unless** [1] - 29:17
**unsealed** [3] - 3:16, 5:7, 5:11
**unsealing** [1] - 4:25
**unusual** [1] - 27:23
**up** [24] - 4:20, 15:24, 22:20, 23:2, 23:7, 26:19, 28:5, 29:1, 29:6, 29:9, 29:23, 30:5, 31:6, 31:9, 31:16, 32:4, 32:5, 32:22, 33:2, 33:14, 34:1, 40:12, 43:3
**US** [1] - 1:19
**useful** [2] - 32:12, 32:21

## V

**value** [15] - 27:19, 30:4, 30:6, 30:7, 31:10, 31:11, 31:12, 31:14, 32:2, 32:4, 32:6, 32:10, 32:24, 33:7, 33:11
**versus** [1] - 25:25
**view** [3] - 11:19, 23:24, 33:19
**views** [1] - 20:9
**vitae** [2] - 6:7, 6:19

## W

**wait** [3] - 29:1, 31:16, 31:20
**walk** [1] - 21:17
**WARREN** [2] - 2:5, 5:25
**Warren** [9] - 5:20, 5:23, 6:5, 6:22, 10:15, 11:1, 11:5, 33:17, 43:5
**WARREN-BOULTON** [2] - 2:5, 5:25
**Warren-Boulton** [8] - 5:20, 5:23, 6:5, 6:22, 10:15, 11:1, 11:5, 33:17
**Warren-Boulton's** [1] - 43:5
**Washington** [8] - 1:16, 1:20, 1:23, 6:25, 7:17, 7:19, 8:6, 8:8
**water** [2] - 35:15, 35:18
**WAYLAND** [19] - 1:13, 3:6, 3:17, 4:16, 4:19, 5:19,

5:22, 6:4, 6:11, 6:18,
10:14, 10:20, 11:4, 26:3,
26:6, 27:10, 27:12, 43:4,
43:11

**Wayland** [3] - 2:4, 2:6, 5:17

**Wayland's** [1] - 5:6

**ways** [3] - 15:12, 15:16,
15:18

**wheat** [1] - 41:16

**whereas** [1] - 13:17

**WHEREUPON** [2] - 3:14, 5:9

**whole** [2] - 36:6, 36:10

**wide** [2] - 8:18, 8:23

**wide-ranging** [1] - 8:23

**Wilson** [1] - 7:14

**wind** [1] - 43:3

**WITNESS** [3] - 2:2, 5:13,
11:3

**witness** [5] - 3:2, 5:15, 5:18,
5:20, 5:25

**witnesses** [1] - 29:21

**Woodrow** [1] - 7:14

**words** [2] - 35:1, 35:12

**works** [1] - 32:1

**world** [1] - 41:21

**worried** [1] - 29:4

**worrying** [1] - 21:9

**worth** [1] - 17:7

## Y

**Yale** [2] - 7:10, 7:11

**year** [20] - 22:1, 22:2, 22:4,
22:6, 22:9, 22:10, 22:14,
22:19, 22:24, 23:2, 23:4,
23:5, 23:9, 23:18, 24:8,
24:19, 25:1, 25:3, 30:13,
40:8

**years** [7] - 7:18, 8:12, 11:22,
13:2, 25:4, 29:25, 38:10

**yourself** [4] - 5:23, 12:5,
19:10, 36:19

## Z

**zero** [4] - 41:12, 41:15, 41:20