UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :     Civil Action No. 11-948
                                  :
                                  :
v.                                :     September 9, 2011
                                  :     MORNING SESSION
                                  :
H&R BLOCK, INC., et al.,          :
                                  :     11:00 a.m.
               Defendants         :
. . . . . . . . . . . . . . . .   :     . . . . . . . . . . .

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
DAY 4
MORNING SESSION
BEFORE THE HONORABLE BERYL A. HOWELL
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the United States:        JOSEPH F. WAYLAND
                              LAWRENCE E. BUTERMAN
                              ANTHONY DAVID SCICCHITANO
                              U.S. DEPARTMENT OF JUSTICE
                              950 Pennsylvania Avenue, NW
                              Suite 3121
                              Washington, DC 20530
                              (202) 514-1157


For the Defendants:           J. ROBERT ROBERTSON
                              COREY W. ROUSH
                              LOGAN M. BREED
                              HOGAN LOVELLS US LLP
                              555 13th Street, NW
                              Washington, DC 20004
                              (202) 637-5774


Court Reporter:               REBECCA STONESTREET, RPR, CRR
                              Official Court Reporter
                              Room 6511, U.S. Courthouse
                              Washington, D.C.  20001
                              (202) 354-3249


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FREDERICK WARREN-BOULTON | | | | |
| By Mr. Wayland | 4 | -- | -- | -- |
| By Mr. Robertson | -- | -- | -- | -- |

# E X H I B I T S

| NUMBER: | ADMITTED |
|---|---|

**(NO EXHIBITS ADMITTED INTO EVIDENCE)**

1                        **P R O C E E D I N G S**

2              MR. WAYLAND:  Good morning, Your Honor.

3              THE COURT:  Good morning, counsel.

4              COURTROOM CLERK:  Your Honor, we have civil action

5     11-948, United States of America versus H&R Block, Inc., et al.

6     I would ask that lead counsel on both sides please approach the

7     lectern and identify yourself and those on your respective

8     teams.

9              MR. WAYLAND:  Joseph Wayland for the United States.

10    And I have with me Lawrence Buterman.

11             MR. ROBERTSON:  Good morning, Your Honor.

12    Robby Robertson on behalf of defendants.  We have Logan Breed,

13    Corey Roush, Will Rawson, and Stephanie Seymour at our table.

14             THE COURT:  Good morning, everyone.  Are you ready to

15    proceed, Mr. Wayland?

16             MR. WAYLAND:  We are, Your Honor.  The only

17    housekeeping matter is, you had inquired yesterday as to the

18    hours.  We were at 12 and seven.  So 12 for us and seven for the

19    defendants.  I don't think we run any risk of even approaching

20    the total that we agreed to.

21             THE COURT:  And there's no disagreement about it?

22             MR. ROBERTSON:  No, Your Honor.  We'll try to catch up.

23             THE COURT:  Mr. Wayland, please call your witness.

24             MR. WAYLAND:  Dr. Rick Warren-Boulton, please return to

25    the stand.

1            THE COURT:  Good morning.  Dr. Warren-Boulton, you

2    remain under oath.

3        **(FREDERICK WARREN-BOULTON, GOVERNMENT witness, having been**

4            **previously duly sworn, testified as follows:)**

5                    **CONTINUED DIRECT EXAMINATION**

6    BY MR. WAYLAND:

7    Q.  Good morning, Doctor.

8    A.  Good morning, sir.

9    Q.  Yesterday we spoke very briefly about your background and

10   your work.  The one issue I wanted to make clear is, can you

11   just describe for us what percentage of your work has been with

12   the Department of Justice over the last decade or so?

13   A.  Actually, it's a very low percentage.  The one major case

14   that I've testified with the Department of Justice was the

15   Microsoft case in front of Judge Jackson.  I was in fact the

16   witness for the state.  It was a combined states and DOJ

17   witness, but we pooled the witnesses.  But I think even if you

18   include that in the pool, you're talking about five percent of

19   what I do.

20   Q.  All right.  Thank you, sir.

21           Yesterday we had ended our discussion, Doctor, with the

22   discussion of shares and concentration.  Do you recall that?

23   A.  Yes.

24   Q.  Let's move on and talk about competitive effects.  One area

25   that you identified yesterday of competitive effects is

1    unilateral effects.  Correct?

2    A.  Yes.

3    Q.  And what is your opinion of the merger's potential to have

4    unilateral effect?

5    A.  Well, we have estimated that simply looking at the

6    unilateral effects, along with just simply the incentive of the

7    parties to change their prices on their own without any

8    coordinated behavior, that at least, absent extraordinary

9    efficiencies, this merger is likely to lead to significant price

10   increases for both parties.

11   Q.  And how can a merger produce a unilateral effect?

12   A.  Well, if the Court will give me a minute to sort of walk

13   through, it's how it works.  And what I would like to start with

14   is, the position of a firm, a profit-maximizing firm in an

15   equilibrium, and how it decides what is the profit-maximizing

16   price to choose.  And essentially, as I think has probably been

17   said here before, it's a balancing act.  I look out there and I

18   ask the question:  What would happen to my profits if I raised

19   my price?  Now, if I raise my price, I make more money on the

20   units that I keep, but I lose the profits on the ones that I

21   lose.

22          And so I'm asking the question:  Do I raise my price?

23   And I'm going to stop -- if I look at a price increase and say:

24   No, I'm going to lose more money from the units that I lose than

25   I'm going to make on the units that I keep.

1          And I also work backwards, I look backwards and I ask

2     the question:  Maybe I should drop my price.  So I ask the

3     question, If I should drop my price, what happens?  And the

4     answer is:  I'll make some additional sales and I'll make

5     profits on those.  But the other hand, by dropping my price, I'm

6     reducing my margin, and I'm reducing my profits on all the ones

7     I have.

8          So what all firms do who want to make as much money as

9     possible, they try their best to find that right profit

10    maximizing price.  I'm not saying it's easy, you know, but

11    that's where you try to be.  And it's that equilibrium that, if

12    you like, gets disturbed when there's a merger.

13         And that's sort of the beginning of the competitive

14    effects story.  Because when you -- when our firm here was

15    looking to see, is it worth it to raise the price, they knew

16    they were going to lose sales, but they really don't care who

17    they lose it to.  A lost sale is a lost sale, and other firms

18    are going to gain as a result of this.  But those are other

19    firms.

20         Once we're talking about a merger, and so I'm now at

21    TaxACT, and I'm considering a price increase.  Now I care where

22    those sales go to.  Because if they're going to go to my

23    partner, if they're going to go to H&R Block, then suddenly

24    those sales aren't going to someone else I don't care about.

25    Those sales are going to me.  I'm going to, in a sense, recover

1     those sales.

2             So the easiest way to think of the unilateral effects

3     of the merger is that when you're trying to make that decision

4     as to whether or not to raise your price or not, now suddenly

5     you change your calculus.  You say to yourself:  What percentage

6     of those lost sales are going to go to my partner?  That's the

7     first question.  And the second question is:  How much money are

8     they going to make on those sales?  What's the margin they're

9     going to make?

10            So if I lose a sale and it goes over to my partner, and

11    my partner's gross margin on that sale is $20, then there's

12    going to be an increase in profits over there at my partner.

13    Okay?

14            Now, before, I didn't care about that, because we

15    weren't merged.  But now, if I maximize the profits of the

16    entire firm - which makes sense; that's what firms do, they

17    don't maximize the profits of subsidiaries separately - then

18    what it means is, I have to take that into account.

19            So suddenly a price increase, which wasn't profitable

20    because it would have led to a fall in profits, suddenly that

21    price increase -- Suddenly what would have been a reduction in

22    profits if I was acting alone, suddenly when I take that into

23    account, suddenly that price increase now becomes profitable.

24            The thing to remember is, it's also happening at the

25    other side.  Over, if you like, at the HRB side, what's going on

1    is, they're looking at a price increase.  And before, they

2    didn't care where those sales went to.  They didn't care whether

3    it went to Intuit, they didn't care whether it went to TaxACT.

4    But now, if some of those sales, some percentage, are now going

5    to TaxACT, now when they raise their price over an HRB product,

6    now there are these increased profits over at TaxACT.

7         So both sides of this process, if you think of it

8    acting unilaterally, and that's what we mean by unilaterally,

9    acting unilaterally find it in their interests to raise prices.

10   So it all depends on how much is diverted to your partner, and

11   what's the margin when it gets diverted to your partner?  That's

12   basically the intuition.  The rest of it is just arithmetic.

13   Q.  And I think yesterday you testified, Dr. Warren-Boulton,

14   that one of the ways you measure what you've been describing is

15   to use a merger simulation.  Is that correct?

16   A.  Yes.  And a merger simulation, when I say it's just

17   arithmetic, my apologies to the economists who've spent their

18   careers developing complex merger simulation problems.  But we

19   could do it without computers if we had to.  It's essentially

20   going through that process and figuring out just what is the

21   profit maximizing price at both products, given the diversion

22   ratios and given the margins on each side.

23   Q.  And is a merger simulation a standard tool of economic

24   analysis for mergers?

25   A.  Yes, it has been for quite some time now.

1    Q.  And did you -- what are the most important inputs for a

2    merger simulation?

3    A.  Well, again, the two most important are, how much is

4    diverted, the percentage that's diverted; and the profit margin

5    when you get there.  And remember, it's in both directions, so

6    I've got two diversion ratios and I've got two margins.

7    Q.  And did you do a merger simulation here?

8    A.  Yes.

9    Q.  And how did you estimate diversion ratios?

10   A.  Well, we estimated diversion ratios from two sources.  The

11   first is, we began with what is the structuralist story, by

12   defining the market, determining shares.  And then by looking at

13   the shares you can come to also an estimate of the diversion

14   ratios by using shares to estimate diversion ratios.  And I can

15   go through that.

16   Q.  So one way you estimated diversion ratios was to use market

17   shares?

18   A.  Market shares.  And the second is, we used switching data

19   from the Internal Revenue Service.  Those are the two that I

20   relied on.

21   Q.  And why did you use two sources rather than one?

22   A.  Well, nowadays no method is perfect.  And I think, as I may

23   have said, my preference is to try to look at the problem in as

24   many different ways as possible, to try to see if, using

25   different methodologies, we come up with approximately the same

1    result.  And to the extent that I do, it gives me more

2    confidence that I'm in the right direction.

3         So what you want is two.  I would like three

4    methodologies that would let me say:  If I look at this mountain

5    from north, south, east, and west, do I come up with similar

6    type of results?

7    Q.  You need to slow down slightly.  The reporter is looking at

8    me and asking you to slow down a bit.

9    A.  Actually, I think she's sighing.

10   Q.  Would you please explain how you estimated diversion ratios

11   for market shares for a digital do-it-yourself market?

12   A.  Sure.  You can estimate diversion ratios from shares through

13   a very simple process.  And what it basically does is, it says:

14   The proportion that I expect sales to go to is really

15   proportional to their market shares.

16        And let me give a very simple example.  Suppose I had

17   three firms in the market, and one had 50 percent and the other

18   two had 30 and 20 percent.  Now, let's suppose that the firm

19   with the 50 percent of the market raised its price and lost

20   100 sales, 100 customers left it.  Where would they go?

21        Well, the diversion ratio according to share analysis

22   assumes that they'll go roughly to where they went to begin

23   with.  In other words, I look at the rest of the market.  My

24   firm, with 50 percent of the market, has just raised its price.

25   So there's 50 percent of the market left.  One of those firms

1    has 30 percent, the other has 20 percent.  So I look at the firm

2    that has 30 percent share, and I say:  That's 60 percent of the

3    remaining market.

4         So the reasonable assumption, absent other information,

5    is probably, you know, if Firm A loses 100 people, 60 percent of

6    them will go to Firm B.  And then I've got this third firm over

7    here, and it has 20 percent of the market, but that's 40 percent

8    of the remaining market.  And so I ask, if it's 40 percent of

9    the remaining market, then probably a good first estimate for

10   where the guys from A are going to go is, 40 percent of them are

11   going to go to C.

12        So, if I've defined my market correctly, and that's why

13   defining the relevant market is really very, very important, if

14   I define my relevant market correctly, then I can use shares to

15   also provide at least a starting point or one way of estimating

16   my critical number here, or one of my critical numbers here,

17   which is the diversion ratio.

18        And this is the classic way we've always thought of the

19   process of the structuralist presumption.

20   Q.  So when you say, "classic way," do you mean that the market

21   share analysis is an accepted method of a diversion ratio

22   analysis?

23   A.  Well, there's a famous play by Moliere, *The Bourgeois*

24   *Gentilhomme* in which the bourgeois gentilhomme wants to do

25   poetry, but he's such a bad poet, so finally somebody convinces

1    him that perhaps he should speak prose.  So he's delighted to

2    discover that he's been speaking prose all his life.

3            The diversion ratio according to shares is basically

4    what underlies the idea that if I merge together two firms with

5    large shares in a relevant market, I'm likely to get a price

6    increase.  It's precisely because they would divert to each

7    other.

8            And so the diversion ratio based on shares is a sort of

9    a more specific or mathematical or arithmetical statement of a

10   classic way that we've always looked at merger analysis.

11   Q.  Did you make any adjustment here for diversion out of the

12   market as you've defined it?

13   A.  Yes.  When you define a relevant market, if you define it

14   correctly, there's always going to be diversion outside of the

15   relevant market.  Because remember, you're looking for the

16   smallest relevant market.  If you define the market as all tax

17   preparation, then probably, as I said, other than death and

18   Canada, there probably is very little or no diversion.

19           But if you've done it correctly, for example by saying

20   it's a digital DIY market, we're going to get diversions outside

21   of the market.  So you have to plug into the model some estimate

22   of the diversion outside the market, and that's part of the

23   arithmetical calculation.  So we don't assume that you just

24   divert within the market.

25   Q.  Did you do that here?

1    A.  Yes.

2    Q.  Do you recall what your diversion assumption was?

3    A.  Yes.  We assumed that there's a HRB study called the

4    Hoover Study, and it assumed approximately a 20 percent

5    diversion outside of the market.  I've used that.  And we've

6    also looked at other estimates of diversion outside the market,

7    and 20 percent is probably a reasonable number.

8    Q.  All right, Doctor, you've just explained how you use market

9    shares to calculate diversion.  Can you explain how you use the

10   IRS switching data?

11   A.  Well, the IRS provided us with data for 2007-2008, from

12   which we were able to answer the question, who left and went

13   where?  And then I see what the IRS data, of course it tracks

14   everybody.  So what he we are able to do is, we're able to say:

15   For those people who used TaxACT in 2007 and stopped using

16   TaxACT in 2008, where did they go?

17          So we know who they switched to.  And similarly for

18   HRB, if somebody used a Block product in 2007 and didn't in

19   2008, we can track through the Social Security number exactly

20   where they went.

21          So we know, with great accuracy, migration flows.

22   Q.  And did you think it was reasonable to use switching data to

23   estimate diversion?

24   A.  Yes.  Again, nothing is perfect.  Using migration doesn't

25   really answer, or it doesn't answer the precise question of the

1    merger guidelines, which of course is, where would you go if

2    there was a small but significant price increase?  It basically

3    asks the question, where did you go?

4            And you could go for a lot of reasons.  You could go

5    because the price has changed, you could go because the quality

6    changes, you could go because you changed.  Complexity changes.

7    And there's a lot of evidence in the record that people switch

8    because of changes in their own complexity.

9            But using migration percentages, or using those gives

10   you, I think, a reasonable second estimate of diversion ratios,

11   because it's really asking the question, you know, if you went

12   to some -- if for some reason you decided to go from HRB to

13   TaxACT, for all those reasons, is that roughly about the same

14   percentages if you went due to a price increase?

15           So once again it provides us with a reasonable estimate

16   of diversion ratios.

17   Q.  All right, Doctor, is there any particular advantage for

18   using the IRS data for switching purposes?

19   A.  Well, there are several.  The first is that the data is very

20   accurate.  You don't have to worry about errors in the data set.

21   Second is I think the most important reason, and that is that

22   the IRS data is data on what actually happened.  It says:  Where

23   did people actually go to?  So it's real in that sense.

24           And the contrast is what I would call hypothetical

25   surveys of what people could do.  It's not that they are not

1    useful, but I think that one has to recognize that people -- the

2    choices that people actually make are often not the choices

3    that, if simply asked off the top of their head, "What would you

4    do," they would actually make.

5            For trivial choices, I think that's probably true.  But

6    for choices that require thought, perhaps learning, and maybe

7    also actually being in a situation where you have to make the

8    decision, there can be a real difference between what you would

9    answer in a survey and what you would actually do.

10           And in this case we're talking about a decision:  Who

11   do I switch to?  Now, if somebody asked me before this trial

12   started, suppose that TurboTax raised its prices; where would

13   you go?  I have to tell you, I wouldn't have said TaxACT.  With

14   all due respect, I had never heard of TaxACT.  So, if asked to

15   check the TaxACT box, I wouldn't have checked the TaxACT box.

16           But the third real advantage of the IRS data is the

17   size of it.  We have 140 million observations.  Two years,

18   that's 280 million observations.  So we're not talking about a

19   survey of a few thousand.

20   Q.  Right.  And you actually calculated diversion ratios using

21   the two methods that you've described?

22   A.  Yes.

23   Q.  And do you recall what your diversion ratios -- the results?

24   A.  Yes.  If you use the share methods, using market shares, the

25   diversion ratio from HRB to TaxACT is about 12 percent;

1    diversion ratio from TaxACT to HRB is about 14 percent.

2    Q.   And if you use the switching rates?

3    A.   If we use the switching rates, the best estimate is probably

4    about 12 percent in each direction.

5    Q.   Now, are those numbers significant in your view?

6    A.   Well, you have to remember that there's two numbers here

7    that are really important:  There's the diversion ratio, and the

8    margin.  And you're going to multiply, really, one by the other.

9    So how high a diversion ratio you need in order to get a big

10   price increase depends on the margin.

11       And we're talking here about a software industry, and

12   one of the characteristics of software industries is that they

13   have very, very high gross margins.  When that customer is

14   diverted to you and lands on your doorstep, basically you don't

15   have to do much to provide them with a product.  It's

16   80 percent, often 90 percent gross margins.

17       So it's a combination of, how big is the diversion

18   ratio, and how big is the value when they get there?  So given

19   that we've got very large margins in this industry, you can get

20   significant price increases on quite low diversion ratios.

21   These aren't low, but I'm just saying you don't need the

22   diversion ratios to be particularly high as long as your margins

23   are high as well.

24   Q.   And are these diversion ratios one element in your merger

25   simulation model?

1    A.  Yes.

2    Q.  And what other evidence have you seen related to the

3    potential for diversion?

4    A.  Well, there's a lot of documents that refer to -- back and

5    forth, and that's a general history in the documents.  No

6    particular expertise as an economist in interpreting those

7    documents; I just simply review them for consistency.  So that's

8    one source.

9    Q.  Have you seen any other empirical analysis to show that

10   these two firms compete with each other?

11   A.  Yes.  I think one thing that I can contribute to this

12   discussion beyond the documents and what's in the documents is

13   to talk a little bit about what happened when TaxACT performed

14   what economists think of as a natural experiment.  Actually, it

15   was an experiment.  TaxACT wanted to find out what would happen

16   if it increased its advertising expenditures, so it ran an

17   experiment.  It chose some DMA's and decided:  I'm not going to

18   advertise in those.  And then it chose another set of DMA's -

19   that's marketing areas, designated marketing areas - and saying:

20   I'm going to advertise in that.  So in that sense it's like a

21   controlled experiment.  It's not quite six white rats and six

22   white rats, but it's the closest we're going to come here.

23          So the thing they wanted to know was:  Is it profitable

24   to advertise?  In order to find that out, they wanted to know:

25   How big of a bang do I get for advertising?  So they performed

1    that analysis for various kinds of advertising, radio and

2    particularly for TV.  And we have --

3    Q.  I think at Tab 4, Doctor.  Tab 4 is what's been marked as

4    Government Exhibit 1002.

5    A.  Now, what Tab 4 shows on the top in the blue is, these are

6    the DMA's, and they're down there below.

7    Q.  Would you say what DMA's are?

8    A.  Designated marketing areas.  They're basically an

9    advertising group, where you want to advertise.  And it's

10   typically, down below, for example, there's Albany, New York.

11   And over on the right is Tulsa, Oklahoma.

12           So these are the DMA's which TaxACT chose for its

13   experiment in which to advertise.  And the blue bars up above

14   tell you what happened to their unit sales in those.  And as you

15   can see, they got a pretty big bang.  Okay?  It varies across

16   DMA's, always does, but if you kind of drew a line through the

17   middle of there, you would get about 16 percent.

18           Now, the thing to remember here is that this is growth

19   in areas where the DMA's compared to areas where there are no

20   DMA's.  They're growing in both.  But the blue line that I've

21   plotted here is the difference:  How much more do you grow when

22   you advertise, as opposed to where you don't grow?  So the

23   advertising itself would result in about a 16 percent increase

24   in sales at TaxACT.

25           Now, that was their purpose in doing that.  That's what

1    TaxACT wanted to find out.  We had a different question, which

2    is:  Where do they come from?  And so what we were able to do

3    is, we were able to get data from the parties, obviously this

4    isn't open and available to TaxACT.  But what we were able to do

5    is get data from both the parties and look at what happened to

6    HRB's sales.

7            THE COURT:  Can I stop you for a second?  When you use

8    your 16 percent number, you're taking an average of all the blue

9    lines on this chart?

10           THE WITNESS:  Yes.  In fact, in addition to this we

11   also did an econometric analysis to say:  What are the price

12   numbers?  It comes out to 16 percent.

13   A.  So we're looking at what happens to H&R Block, and we're

14   doing the same calculation that TaxACT did for TaxACT.  We look

15   at the DMA's where TaxACT advertised, we look at H&R Block

16   sales, and we look at H&R Block sales where TaxACT didn't

17   advertise.  And lo and behold, what you find is that there is a

18   significant reduction in the growth of sales in HRB in those

19   DMA's where TaxACT advertised, as compared to those DMA's where

20   TaxACT didn't advertise.

21           So one way to think of this is, where did all those

22   customers come from that went to TaxACT?  And again, if you kind

23   of draw a little line across there, you probably come up with

24   something pretty close to about eight percent.  So what we have

25   is, in DMA's where TaxACT advertises, sales go up by about

1    16 percent for TaxACT, and they go down by about eight percent

2    compared to what they would have been from H&R Block.

3            My interpretation of this is that a significant share

4    of the customers who are going to TaxACT when they try to market

5    are going to come from H&R Block.  I'm not saying that you can

6    look at this and say:  Here's a 50 percent diversion ratio.

7    Because we're not talking about the price experiment, we're

8    talking about marketing.  But I think it's highly indicative of

9    the fact that when TaxACT competes more vigorously in this

10   particular forum, where does it get those customers?  Where are

11   those customers switching from?  And a large portion of them are

12   switching from H&R Block.

13           THE COURT:  And is there a date associated with this

14   chart at DX 1002?  Or is this targeted advertising by TaxACT

15   over a lengthy period of time?

16           THE WITNESS:  I believe it's over two years, and it's

17   TV advertising.

18           MR. WAYLAND:  It's in his report, Your Honor.  It's

19   2005-2007.

20   BY MR. WAYLAND:

21   Q.  Now, I think you used the word "natural experiment," Doctor,

22   to describe this.  Does that mean these are real world events

23   versus a simulation?

24   A.  Yes.  Once again, we're not asking people, where did they

25   go?  We're looking at where people actually went to.

1    Q.  Now, Doctor, did you look at any Intuit document that helped

2    you on the same issue?

3    A.  Yes.

4         MR. WAYLAND:  I'm sorry, Your Honor, this one does not

5    go up on the screen.  Intuit asked for it to be, not privileged,

6    but protected.

7         THE COURT:  Confidential.

8         MR. WAYLAND:  Confidential.  Thank you, Your Honor.

9    It's in the book in front of you.  The witness has it, opposing

10   counsel has it, and you have it.  We just won't display it.

11   I'll ask Dr. Warren-Boulton not to reveal it.  It's Tab 5.  I'll

12   ask Dr. Warren-Boulton not to reveal the actual numbers, but

13   just to describe generally what it shows.

14         THE WITNESS:  Which page are we on?

15   BY MR. WAYLAND:

16   Q.  Tab 5.

17   A.  Tab 5, page?

18   Q.  It's Exhibit 234, Government Exhibit 234.

19   A.  Okay.  Got it.

20   Q.  Dr. Warren-Boulton, would you describe in very general terms

21   what GX 234 is and how you used it?  And the judge has it in

22   front of her, so you don't need to be very specific.  Just

23   explain what it is and what significance you drew from it.

24   A.  Okay.  When TaxACT undertook this experiment, particularly

25   of TV advertising in these DMA's, what Intuit was able to do was

1    to, since it knew it could calculate, as you can see, how much

2    TaxACT TV advertising was going on.  It could do the same thing

3    for Intuit that we did for HRB, which is, what happened to our

4    sales at Intuit in those DMA's where TaxACT was advertising on

5    TV, versus where TaxACT wasn't?

6         And as you can see, they looked at that analysis and

7    came to the conclusion that --

8    Q.  Very generally.  Very generally.

9    A.  -- very generally, TurboTax's growth rate was significantly

10   depressed in TaxACT-tested DMA's, as opposed to the TaxACT

11   didn't test DMA's.

12        So again, to get a feeling for the kinds of the numbers

13   we were talking about before, we were talking about a 16 percent

14   increase in TaxACT sales.  HRB, looked like it was about eight

15   percent from HRB.  And then there's the numbers that are here.

16   Q.  Thank you.

17        All right, Dr. Warren-Boulton, let's turn more

18   specifically to margins.  Could you tell us what the

19   significance of margins are for your model?

20   A.  Again, margins and diversion ratios are the two critical

21   elements that we have here.  One says how much gets diverted;

22   and the second is, how much is that diversion worth?

23   Q.  How did you determine the margins in this case?

24   A.  In both cases what we did is, we used the accounting data

25   from the parties.  And we looked at the gross margins, which in

1   software are usually on the 80 to 90 percent.  And we added a

2   significant amount of marketing expenditures, for reasons which

3   are particular to this industry, to try to estimate what the

4   incremental margin was going to be to the diverted party.  And

5   it includes not only the production costs, but also any

6   additional costs they would have to incur, for example, payments

7   to Google and search and things like that.

8          So we're really trying to answer the question, when

9   this guy lands on Mr. B's doorstep, how much is it worth?  So

10  we've calculated those margins from the accounting data from the

11  parties.

12  Q.  Dr. Warren-Boulton, we're going to display Government

13  Exhibit 1003.

14         MR. WAYLAND:  Your Honor, we're going to display to the

15  public a redacted version of this.  At the bottom your version

16  will have the actual margin numbers, but those need to be

17  confidential.  So you have them, Dr. Warren-Boulton has them,

18  the attorneys on the other side have them; the public will not

19  see the margin numbers at the bottom.  This is Government

20  Exhibit 1003.

21  BY MR. WAYLAND:

22  Q.  And Dr. Warren-Boulton, as you discuss the exhibit, please

23  do not disclose the actual margin numbers that are at the bottom

24  of your page.

25  A.  Okay.

1    Q.  You can proceed with explaining exhibit -- can you explain

2    what exhibit -- Government Exhibit 1003 shows?

3    A.  Sure.  Can I make a comment about the margins?

4    Q.  Generally.  Just don't give the specific margins.

5    A.  The margins that are shown at the bottom are the percentage

6    margins, but also the dollar margins.  And I think the important

7    walkaway here is that if we look at TaxACT's dollar margin, that

8    is to say, what does it make when it sells a unit that we assume

9    here, and if we look at HRB's margins, as you can see, HRB's

10   margins are much higher.

11        That's going to be important, because when I divert a

12   sale from TaxACT to HRB, I'm losing a sale over here that has a

13   low margin, and I'm making a sale over here that has a high

14   margin.  So I wanted to draw your attention to the difference in

15   the size of the margins.

16        All right.  So what that is, is it's the results of the

17   merger simulation model.  Okay?  What it does is, it has inputs.

18   The critical inputs are the margins that are shown at the

19   bottom, and diversion ratios.  There are some other assumptions

20   that need to be made, but those are the critical ones.

21        And then what I'm presenting here is the results for my

22   two ways of estimating diversion ratios.  The one at the top

23   looks at the Internal Revenue Service data and says:  Suppose

24   that I estimate diversion ratios using IRS switching data.  And

25   again, that's about 12 percent in each direction.

1          The one at the bottom says:  Okay, now let's suppose

2     that I use the more structuralist approach.  I'm going to

3     estimate diversion ratios by market shares in my relevant

4     market, having adjusted for diversion outside the market.

5          And I look at what kind of price increase would be

6     simply profitable for the firms under to take (sic), under the

7     assumption that there's no accommodating behavior whatsoever by

8     any other firm in this market.  If every firm in this market

9     acts in its own individual self-interest, so there's no

10    coordination, there's just a classic concern about merger

11    analysis.  There's no effect from an increased stability or

12    incentive of firms to be able to coordinate their behavior.

13    This is strictly unilateral.

14         As you can see, for example, just using the diversion

15    according to share method, we get about a 13 percent increase

16    forecast in the price of TaxACT, somewhat lower if you use the

17    IRS numbers.  A much smaller percentage increase at HRB.  It's

18    only about three percent, two and a half to three percent.

19         And also, I should say that there's also a price

20    increase from Intuit because there's kind of a second step in

21    which HRB and TaxACT raises its price.  And then within the

22    model you can ask, is it now profitable for Intuit to raise its

23    price a little bit?  This is kind of like a second-order effect,

24    so you also get Intuit raising its price a little bit.

25         So what happens is, you get the biggest price increase

1    for TaxACT, and you get a significant price increase for HRB,

2    but you also get a little follow-on from Intuit.

3           Now, given those price increases, we can look at the

4    quantity of sales that are involved and ask the question:  What

5    does this impose on customers, the consumers?  What's the cost

6    this is going to impose on consumers if all this happens?  And

7    the answer is, using the IRS diversion, we estimate about 16,

8    17 million dollars a year in increased cost to consumers.  You

9    know, if you use the diversion to share, it's about 24 percent.

10   Okay?

11   Q.  I think you meant 24 million?

12   A.  I'm sorry, 24 million.  My apologies.  So, you know, the

13   higher the diversion ratio, the greater the price increase, the

14   greater the loss to consumers.

15          One of the things to stress about this is, we've run

16   this model without efficiencies.  And so when I talk about these

17   estimates, they are always before making an allowance for

18   efficiencies.  And I understand that's a major issue here.  So

19   we're running a simulation in this example without having input

20   the efficiencies into the model.  So that's the big caveat to

21   keep in mind.  Okay?

22   Q.  And this is only a calculation of what you've described as

23   unilateral effects.  Correct?

24   A.  That's correct.

25   Q.  And it doesn't take into account, for example, product

1    degradation?

2    A.  Well, in a sense it does, but the price increases we're

3    talking about here could come about in different forms.  They

4    come out through product degradation, they come out from an

5    increase in nominal price.  It's the value proposition, I think,

6    is really the best way of think of it.

7    Q.  And it doesn't include any calculation of the effect of

8    coordinated effects.  Correct?

9    A.  No, that's the next additional issue.

10   Q.  Just to go back, Dr. Warren-Boulton, to your discussion of

11   the TaxACT marketing experiment that you've discussed.

12   A.  Yes.

13   Q.  And if you look back at the chart that you described, does

14   that tell you anything about the horizontal competition?

15   A.  Yes.  When we were dividing this up into the two forms, we

16   were talking first about the horizontal competition, and that

17   can take the form of people switching --

18        MR. ROBERTSON:  Your Honor --

19        THE COURT:  Could you hold on, Dr. Warren-Boulton, and

20   use the microphone, please.

21   A.  The horizontal competition that we've been talking about is

22   across, and it takes the form of people switching across here,

23   people who are already users.  Then, as we pointed out before,

24   people switching across here, where we have really good data to

25   show that people are particularly likely to switch across here

1    as well.

2          And then also there's another horizontal form of

3    competition, which is drawing out this pen and paper.  So when

4    TaxACT decides to advertise and it draws customers, it can draw

5    customers straight from H&R Block, from its paid units; it can

6    draw customers from free units; in a sense it can also draw

7    customers that would have gone here, but because of advertising

8    decided instead to go to TaxACT.

9          So those are all the horizontal diversion forms of

10   competition.  And my point earlier is, that's really quite

11   separate from this problem, which is, by providing free and

12   forcing a value proposition down there, that to prevent too much

13   cannibalization, that forces Intuit and H&R Block to provide a

14   better proposition up here, to prevent this second flow.

15         But what you're talking about is, what we see in the

16   results of the advertising study is this horizontal form of

17   competition switching.

18         THE COURT:  Dr. Warren-Boulton, perhaps we can talk

19   about this now.  You may be getting to it.  But you have

20   familiarity with dealing with software markets?

21         THE WITNESS:  Yes.

22         THE COURT:  And we have talked in this hearing a little

23   bit about the stickiness factor that's associated with software

24   markets.  And you've talked in your expert report a little bit

25   about the import data and the difficulty of -- you know, one of

1   the features and one of the things that keeps some consumers

2   sticking with one software tax preparation product is the

3   stickiness of the software.  They've got to download it, they

4   don't want to have the problem of manual input, and so on.

5            How should that figure in to an analysis of how

6   sensitive this market is to price changes, if at all?

7            THE WITNESS:  Well, that's a good question.  I gather

8   it's been up in front of you a lot.  One way to think of it

9   is --

10           THE COURT:  In terms of this horizontal switching that

11  you're talking about, that, you know, small changes in price,

12  given the stickiness of the software and the disincentive that

13  filers have to manually re-input their data into a new program

14  may have an effect.  And I'm just curious whether that is

15  something that is appropriate for me to consider; and if so, how

16  should I consider that?

17           THE WITNESS:  Well, I think it's an important element.

18  I think that the marketing strategy here is very much one, when

19  we talk about free, is very much one of getting people to first

20  try the product for free.  And then -- and then the really

21  critical second step is, once you viewed, say, H&R Block free

22  product the first year, you come back the second year, and you'd

23  really love to be able to import your data, but you really can't

24  do that unless you actually upgrade to paid.  And all of them do

25  this.

1        And so, trying to take advantage of the fact that once

2    you use the software, that it's easier for the customer to use

3    that same software again.  You could think of that as either

4    brand loyalty, or just simply that they've done it.

5        Now, as a technical question, I think all of the firms

6    would like to be able to, and I think they're all trying.

7    Intuit would like to be able to say:  Oh, look, if you use

8    TaxACT software, don't worry about it, we've figured out a way

9    that you can switch to us.  Now, I understand there are

10    technical difficulties with doing that.  I understand TaxACT,

11    for example, has been trying to come up with a way to ease that

12    process.  And for somebody like myself, yes, that's a problem.

13    But first of all, it's only a problem for some.  If you have a

14    tax carryover or something like that, that's a problem.

15        But the thing that we notice is that, while that

16    stickiness is there, and while firms try to encourage that

17    stickiness, because that's where the money is, it's the

18    difference between the paid guys and the free guys.  That what

19    we do know is that there's still an awful lot of switching here,

20    or of switching back and forth of people, that's going on

21    continuously.  We see that from the Internal Revenue Service

22    data, we see that in the other data.  So for whatever reason,

23    people are switching back and forth.  And the problem of having

24    to reimport the data isn't deterring a lot of people.

25        Over time, that may change, particularly, I think, as

1   this pool here begins to get exhausted.  And I think there's

2   evidence in the record that says that that pool has been

3   shrinking.  I think Mr. Houseworth said, for example, that, you

4   know, he expects that pool to be exhausted in about three years.

5         So over time, what we're going to see is much more of a

6   lock-in, I think, over time.  But at the moment, where we are

7   right now, there's still a lot of switching back and forth.  And

8   the firms are competing with each other to get those customers.

9         Sorry.

10  BY MR. WAYLAND:

11  Q.  No, you answered the judge's question, which is what you're

12  here to do.

13        All right, sir.  You at your deposition were asked

14  whether you had seen any other documents that actually discuss a

15  switch from one product to the other because of a change in

16  relative prices.  And I think you identified two documents.  One

17  was a simulator, a 2011 survey.  Do you remember that?

18  A.  Yes.

19  Q.  Let's focus first on the 2011 survey.  Did you, or have you

20  used the 2011 survey in any way as informative on diversion

21  ratios?

22  A.  No.

23  Q.  And do you have any understanding of what the 2000 (sic)

24  survey asked?

25  A.  2011 survey?

1    Q.   I'm sorry.

2    A.   First time I actually managed to correct you on something.

3         I haven't used the 2011 survey, I think for two

4    reasons.  One is, it is, without saying anything to imply

5    anything, it's a survey done in the course of litigation.  The

6    second is that I'm not an expert on surveys.  And I understand

7    the government has an expert on surveys, which is Dr. Dhar from

8    Yale, who is going to speak extensively on the survey.  And I

9    defer to him on the quality of those questions.

10        My point is simply that once again, you know, it is

11   very hard, when a decision is important, to get people to

12   decide, to pick a choice, which is the same choice that they

13   would actually make if they were actually in that situation:  To

14   go on to Google and search, and look and see, and ask their

15   friends, and talk to other people, that you can get very

16   different answers.

17        I like to work, generally speaking, with real data on

18   what people did.  And I have two very good sources for diversion

19   ratios.  I don't really need to go to sources which are highly

20   questionable.

21   Q.   Now, you also listed the pricing simulator as a document

22   that discusses a change in relative prices.  Did you rely on a

23   pricing simulator in any way --

24   A.   No.

25   Q.   -- in your work?

1          And what's your understanding of what the pricing

2     simulator -- well, let me ask you this:  You did cite it at

3     page 41 of your initial report.  Correct?

4     A.   That's correct.

5     Q.   And why did you cite it if you didn't use it in your

6     diversion ratio analysis?

7     A.   I think it's two questions.  One is, why did I cite it?  I

8     cited it because I was citing examples of where HRB was looking

9     at other providers of digital DIY.  And the pricing simulator is

10    an example where they look at all forms of tax preparation.  But

11    if you look at who they looked at within digital DIY, the answer

12    is, it's just the big three and, quote, "Other."

13         So it's cited for the proposition that what we're

14    really talking about here within the digital DIY mark is three

15    guys who are worried about each other.

16    Q.   And is that the reason you cited it in your report?

17    A.   That's the reason I cited it in the report, yes.

18    Q.   And you did not rely on the pricing simulator for any of

19    your own analysis.  Right?

20    A.   No.

21         MR. WAYLAND:  Your Honor, at this point we'll need to

22    close the courtroom.  We're going to talk about the pricing

23    simulator, and the defense have asked us to do that in a sealed

24    courtroom.

25         THE COURT:  And how long do you think will take for

1    both your direct and cross-examination?  And after this, will

2    you be completed with your examination?

3              MR. WAYLAND:  Yes, Your Honor.

4              MR. ROBERTSON:  And Your Honor, my only issue is that I

5    have a lot of other material that is going to cause the

6    courtroom to be closed.  And it would have a shorter time if I

7    did mine at the end.  And the reason is that in order to explain

8    what I'm talking about, because we have a lot of math and a lot

9    of details here, I have to go into a lot of nonpublic stuff to

10   set the stage, which is easier to do in a nonpublic setting.

11             THE COURT:  So what about if we save the pricing

12   simulator direct examination, and go to cross-examination now?

13             MR. ROBERTSON:  He can do the pricing simulator, and I

14   can just stop and do that, and get that off the table.  Then I

15   can go into my public session after that, if that will work with

16   counsel.

17             MR. WAYLAND:  That's fine with me, Your Honor.

18             THE COURT:  Fine.

19             MR. WAYLAND:  So I don't know how long he'll take on

20   the pricing simulator, but we have maybe 15 minutes or so,

21   20 minutes or so at the most, I think.  At the end there's one

22   or two topics.  They may not need to be sealed, but they're

23   close enough that it's probably just as easy to close the

24   courtroom.

25             THE COURT:  Okay.  Let's close the courtroom now.

1          (WHEREUPON, sealed proceedings were transcribed under

2     separate cover.)

3          (Proceedings resume unsealed:)

4                    **REDIRECT EXAMINATION**

5     BY MR. WAYLAND:

6     Q.  Dr. Warren-Boulton, in doing the work that you've done in

7     this case and that you've reported on and that's reflected in

8     your report, did you have assistance?

9     A.  Oh, yes.

10    Q.  And what kind of assistance did you have?  Just generally

11    describe how you operated.

12    A.  Excellent assistance.  We had economists, I'm not even

13    counting the lawyers, economists at the Justice Department in

14    the economic analysis group, the group that I used to be part

15    of, and also economists at Micro.  We had six economists at EIG,

16    all of whom worked very hard.  And about six economists at MCRA.

17    So we had a staff at one point of about 12 economists working on

18    this project.

19    Q.  Were they working under your direction, sir?

20    A.  Yes.

21    Q.  Is that typically how you work when you do merger analysis,

22    with a staff of assistants to help you analyze data?

23    A.  Yes.

24         MR. WAYLAND:  No further questions, Your Honor.

25         MR. ROBERTSON:  I think that can go public.  We can

1     deal with that in the public session.

2          MR. WAYLAND:  It seemed to be the appropriate time,

3     Your Honor.

4          MR. ROBERTSON:  I don't think it's a secret that he

5     worked with the Department of Justice.

6          THE COURT:  I'll instruct the court reporter to unseal

7     the redirect by Mr. Wayland in that last series of questions.

8          We will now break for lunch until 1:35.

9          MR. ROBERTSON:  Thank you, Your Honor.

10          (Lunch recess taken at 12:36 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3          **I, Rebecca Stonestreet, certify that the foregoing is a**

4    **correct transcript from the record of proceedings in the**

5    **above-entitled matter.**

6

7

8

9    _____          _____

10   **SIGNATURE OF COURT REPORTER**                    **DATE**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$20** [1] - 7:11

## 1

**100** [3] - 10:20, 11:5
**1002** [2] - 18:4, 20:14
**1003** [3] - 23:13, 23:20, 24:2
**11-948** [2] - 1:3, 3:5
**11:00** [1] - 1:7
**12** [6] - 3:18, 15:25, 16:4, 24:25, 35:17
**12:36** [1] - 36:10
**13** [1] - 25:15
**13th** [1] - 1:19
**14** [1] - 16:1
**140** [1] - 15:17
**15** [1] - 34:20
**16** [7] - 18:17, 18:23, 19:8, 19:12, 20:1, 22:13, 26:7
**17** [1] - 26:8
**1:35** [1] - 36:8

## 2

**20** [6] - 10:18, 11:1, 11:7, 13:4, 13:7, 34:21
**2000** [1] - 31:23
**20001** [1] - 1:23
**20004** [1] - 1:20
**2005-2007** [1] - 20:19
**2007** [2] - 13:15, 13:18
**2007-2008** [1] - 13:11
**2008** [2] - 13:16, 13:19
**2011** [6] - 1:5, 31:17, 31:19, 31:20, 31:25, 32:3
**202** [3] - 1:16, 1:20, 1:23
**20530** [1] - 1:16
**234** [3] - 21:18, 21:21
**24** [2] - 26:9, 26:11, 26:12
**280** [1] - 15:18

## 3

**30** [3] - 10:18, 11:1, 11:2
**3121** [1] - 1:15
**354-3249** [1] - 1:23

## 4

**4** [5] - 1:9, 2:4, 18:3, 18:5
**40** [3] - 11:7, 11:8, 11:10
**41** [1] - 33:3

## 5

**5** [3] - 21:11, 21:16, 21:17
**50** [5] - 10:17, 10:19, 10:24, 10:25, 20:6
**514-1157** [1] - 1:16
**555** [1] - 1:19

## 6

**60** [2] - 11:2, 11:5
**637-5774** [1] - 1:20
**6511** [1] - 1:22

## 8

**80** [2] - 16:16, 23:1

## 9

**9** [1] - 1:5
**90** [2] - 16:16, 23:1
**950** [1] - 1:15

## A

**a.m** [1] - 1:7
**able** [11] - 13:12, 13:14, 19:2, 19:3, 19:4, 21:25, 25:12, 29:23, 30:6, 30:7
**above-entitled** [1] - 37:5
**absent** [2] - 5:8, 11:4
**accepted** [1] - 11:21
**accommodating** [1] - 25:7
**according** [3] - 10:21, 12:3, 25:15
**account** [3] - 7:18, 7:23, 26:25
**accounting** [2] - 22:24, 23:10
**accuracy** [1] - 13:21
**accurate** [1] - 14:20
**act** [1] - 5:17
**acting** [3] - 7:22, 8:8, 8:9
**Action** [1] - 1:3
**action** [1] - 3:4
**acts** [1] - 25:9
**actual** [3] - 21:12, 23:16, 23:23
**added** [1] - 23:1
**addition** [1] - 19:10
**additional** [3] - 6:4, 23:6, 27:9
**adjusted** [1] - 25:4
**adjustment** [1] - 12:11
**ADMITTED** [2] - 2:9, 2:11

**advantage** [3] - 14:17, 15:16, 30:1
**advertise** [9] - 17:18, 17:20, 17:24, 18:9, 18:13, 18:22, 19:17, 19:20, 28:4
**advertised** [2] - 19:15, 19:19
**advertises** [1] - 19:25
**advertising** [12] - 17:16, 17:25, 18:1, 18:9, 18:23, 20:14, 20:17, 21:25, 22:2, 22:4, 28:7, 28:16
**agreed** [1] - 3:20
**aided** [1] - 1:25
**al** [2] - 1:6, 3:5
**Albany** [1] - 18:10
**allowance** [1] - 26:17
**alone** [1] - 7:22
**AMERICA** [1] - 1:3
**America** [1] - 3:5
**amount** [1] - 23:2
**analysis** [15] - 8:24, 10:21, 11:21, 11:22, 12:10, 17:9, 18:1, 19:11, 22:6, 25:11, 29:5, 33:6, 33:19, 35:14, 35:21
**analyze** [1] - 35:22
**answer** [8] - 6:4, 13:12, 13:25, 15:9, 23:8, 26:7, 33:11
**answered** [1] - 31:11
**answers** [1] - 32:16
**ANTHONY** [1] - 1:14
**apologies** [2] - 8:17, 26:12
**APPEARANCES** [1] - 1:12
**approach** [2] - 3:6, 25:2
**approaching** [1] - 3:19
**appropriate** [2] - 29:15, 36:2
**area** [1] - 4:24
**areas** [5] - 17:19, 18:8, 18:19
**arithmetic** [2] - 8:12, 8:17
**arithmetical** [2] - 12:9, 12:23
**assistance** [2] - 35:8, 35:10, 35:12
**assistants** [1] - 35:22
**associated** [2] - 20:13, 28:23
**assume** [2] - 12:23, 24:8
**assumed** [2] - 13:3, 13:4
**assumes** [1] - 10:22
**assumption** [3] - 11:4, 13:2, 25:7
**assumptions** [1] - 24:19
**attention** [1] - 24:14
**attorneys** [1] - 23:18
**available** [1] - 19:4
**Avenue** [1] - 1:15
**average** [1] - 19:8
**awful** [1] - 30:19

## B

**B's** [1] - 23:9
**background** [1] - 4:9
**backwards** [2] - 6:1
**bad** [1] - 11:25
**balancing** [1] - 5:17
**bang** [2] - 17:25, 18:15
**bars** [1] - 18:13
**based** [1] - 12:8
**becomes** [1] - 7:23
**BEFORE** [1] - 1:10
**began** [1] - 9:11
**begin** [1] - 10:22
**beginning** [1] - 6:13
**begins** [1] - 31:1
**behalf** [1] - 3:12
**behavior** [3] - 5:8, 25:7, 25:12
**behold** [1] - 19:17
**below** [2] - 18:6, 18:10
**BERYL** [1] - 1:10
**best** [3] - 6:9, 16:3, 27:6
**better** [1] - 28:14
**between** [2] - 15:8, 30:18
**beyond** [1] - 17:12
**big** [7] - 16:9, 16:17, 16:18, 17:25, 18:15, 26:20, 33:12
**biggest** [1] - 25:25
**bit** [6] - 10:8, 17:13, 25:23, 25:24, 28:23, 28:24
**Block** [12] - 3:5, 6:23, 13:18, 19:13, 19:15, 19:16, 20:2, 20:5, 20:12, 28:5, 28:13, 29:21
**BLOCK** [1] - 1:6
**blue** [4] - 18:5, 18:13, 18:20, 19:8
**book** [1] - 21:9
**bottom** [6] - 23:15, 23:19, 23:23, 24:5, 24:19, 25:1
**BOULTON** [2] - 2:3, 4:3
**Boulton** [14] - 3:24, 4:1, 8:13, 21:11, 21:12, 21:20, 22:17, 23:12, 23:17, 23:22, 27:10, 27:19, 28:18, 35:6
**Bourgeois** [1] - 11:23
**bourgeois** [1] - 11:24
**box** [2] - 15:15
**brand** [1] - 30:4
**break** [1] - 36:8
**Breed** [1] - 3:12
**BREED** [1] - 1:18
**briefly** [1] - 4:9
**BUTERMAN** [1] - 1:13
**Buterman** [1] - 3:10
**BY** [6] - 4:6, 20:20, 21:15, 23:21, 31:10, 35:5

## C

calculate [2] - 13:9, 22:1
calculated [2] - 15:20, 23:10
calculation [4] - 12:23, 19:14, 26:22, 27:7
calculus [1] - 7:5
Canada [1] - 12:18
cannibalization [1] - 28:13
care [7] - 6:16, 6:21, 6:24, 7:14, 8:2, 8:3
careers [1] - 8:18
carryover [1] - 30:14
case [5] - 4:13, 4:15, 15:10, 22:23, 35:7
cases [1] - 22:24
catch [1] - 3:22
caveat [1] - 26:20
CERTIFICATE [1] - 37:1
certify [1] - 37:3
change [5] - 5:7, 7:5, 30:25, 31:15, 32:22
changed [2] - 14:5, 14:6
changes [5] - 14:6, 14:8, 29:6, 29:11
characteristics [1] - 16:12
chart [3] - 19:9, 20:14, 27:13
check [1] - 15:15
checked [1] - 15:15
choice [2] - 32:12
choices [4] - 15:2, 15:5, 15:6
choose [1] - 5:16
chose [3] - 17:17, 17:18, 18:12
cite [3] - 33:2, 33:5, 33:7
cited [4] - 33:8, 33:13, 33:16, 33:17
citing [1] - 33:8
Civil [1] - 1:3
civil [1] - 3:4
classic [4] - 11:18, 11:20, 12:10, 25:10
clear [1] - 4:10
CLERK [1] - 3:4
close [5] - 19:24, 33:22, 34:23, 34:25
closed [1] - 34:6
closest [1] - 17:22
COLUMBIA [1] - 1:2
combination [1] - 16:17
combined [1] - 4:16
comment [1] - 24:3
compared [3] - 18:19, 19:19, 20:2
compete [1] - 17:10
competes [1] - 20:9
competing [1] - 31:8
competition [6] - 27:14,

27:16, 27:21, 28:3, 28:10, 28:17
competitive [3] - 4:24, 4:25, 6:13
completed [1] - 34:2
complex [1] - 8:18
complexity [2] - 14:6, 14:8
computer [1] - 1:25
computer-aided [1] - 1:25
computers [1] - 8:19
concentration [1] - 4:22
concern [1] - 25:10
conclusion [1] - 22:7
confidence [1] - 10:2
confidential [3] - 21:7, 21:8, 23:17
consider [2] - 29:15, 29:16
considering [1] - 6:21
consistency [1] - 17:7
consumers [1] - 26:5, 26:6, 26:8, 26:14, 29:1
CONTINUED [1] - 4:5
continuously [1] - 30:21
contrast [1] - 14:24
contribute [1] - 17:11
controlled [1] - 17:21
convinces [1] - 11:25
coordinate [1] - 25:12
coordinated [2] - 5:8, 27:8
coordination [1] - 25:10
Corey [1] - 3:13
COREY [1] - 1:18
correct [9] - 5:1, 8:15, 26:23, 26:24, 27:8, 32:2, 33:3, 33:4, 37:4
correctly [4] - 11:12, 11:14, 12:14, 12:19
cost [2] - 26:5, 26:8
costs [2] - 23:5, 23:6
counsel [4] - 3:3, 3:6, 21:10, 34:16
counting [1] - 35:13
course [3] - 13:13, 14:1, 32:5
Court [3] - 1:21, 1:22, 5:12
court [1] - 36:6
COURT [20] - 1:1, 3:3, 3:14, 3:21, 3:23, 4:1, 19:7, 20:13, 21:7, 27:19, 28:18, 28:22, 29:10, 33:25, 34:11, 34:18, 34:25, 36:6, 37:1, 37:10
Courthouse [1] - 1:22
courtroom [5] - 33:22, 33:24, 34:6, 34:24, 34:25
COURTROOM [1] - 3:4
cover [1] - 35:2
critical [6] - 11:16, 22:20, 24:18, 24:20, 29:21
cross [2] - 34:1, 34:12

CROSS [1] - 2:2
cross-examination [2] - 34:1, 34:12
CRR [1] - 1:21
curious [1] - 29:14
customer [2] - 16:13, 30:2
customers [11] - 10:20, 19:22, 20:4, 20:10, 20:11, 26:5, 28:4, 28:5, 28:6, 28:7, 31:8

## D

D.C [1] - 1:23
data [26] - 9:18, 13:10, 13:11, 13:13, 13:22, 14:18, 14:19, 14:20, 14:22, 15:16, 19:3, 19:5, 22:24, 23:10, 24:23, 24:24, 27:24, 28:25, 29:13, 29:23, 30:22, 30:24, 32:17, 35:22
DATE [1] - 37:10
date [1] - 20:13
DAVID [1] - 1:14
DAY [1] - 1:9
DC [2] - 1:16, 1:20
deal [1] - 36:1
dealing [1] - 28:20
death [1] - 12:17
decade [1] - 4:12
decide [1] - 32:12
decided [3] - 14:12, 17:17, 28:8
decides [2] - 5:15, 28:4
decision [4] - 7:3, 15:8, 15:10, 32:11
defendants [2] - 3:12, 3:19
Defendants [2] - 1:7, 1:17
defense [1] - 33:23
defer [1] - 32:9
define [4] - 11:14, 12:13, 12:16
defined [2] - 11:12, 12:12
defining [2] - 9:12, 11:13
degradation [2] - 27:1, 27:4
delighted [1] - 12:1
DEPARTMENT [1] - 1:14
Department [4] - 4:12, 4:14, 35:13, 36:5
deposition [1] - 31:13
depressed [1] - 22:10
describe [4] - 4:11, 20:22, 21:13, 21:20, 35:11
described [3] - 15:21, 26:22, 27:13
describing [1] - 8:14
designated [2] - 17:19, 18:8
details [1] - 34:9
determine [1] - 22:23

determining [1] - 9:12
deterring [1] - 30:24
developing [1] - 8:18
Dhar [1] - 32:7
difference [4] - 15:8, 18:21, 24:14, 30:18
different [5] - 9:24, 9:25, 19:1, 27:3, 32:16
difficulties [1] - 30:10
difficulty [1] - 28:25
digital [5] - 10:11, 12:20, 33:9, 33:11, 33:14
DIRECT [2] - 2:2, 4:5
direct [2] - 34:1, 34:12
direction [4] - 10:2, 16:4, 24:25, 35:19
directions [1] - 9:5
disagreement [1] - 3:21
disclose [1] - 23:23
discover [1] - 12:2
discuss [2] - 23:22, 31:14
discussed [1] - 27:11
discusses [1] - 32:22
discussion [4] - 4:21, 4:22, 17:12, 27:10
disincentive [1] - 29:12
display [3] - 21:10, 23:12, 23:14
DISTRICT [3] - 1:1, 1:2, 1:11
disturbed [1] - 6:12
diversion [52] - 8:21, 9:6, 9:9, 9:10, 9:13, 9:14, 9:16, 10:10, 10:12, 10:21, 11:17, 11:21, 12:3, 12:8, 12:11, 12:14, 12:18, 12:22, 13:2, 13:5, 13:6, 13:9, 13:23, 14:10, 14:16, 15:20, 15:23, 15:25, 16:1, 16:7, 16:9, 16:17, 16:20, 16:22, 16:24, 17:3, 20:6, 22:20, 22:22, 24:19, 24:22, 24:24, 25:3, 25:4, 25:14, 26:7, 26:9, 26:13, 28:9, 31:20, 32:18, 33:6
diversions [1] - 12:20
divert [3] - 12:6, 12:24, 24:11
diverted [7] - 8:10, 8:11, 9:4, 16:14, 22:21, 23:4
dividing [1] - 27:15
DIY [4] - 12:20, 33:9, 33:11, 33:14
DMA's [16] - 17:17, 17:18, 18:6, 18:7, 18:12, 18:16, 18:19, 18:20, 19:15, 19:19, 19:25, 21:25, 22:4, 22:10, 22:11
do-it-yourself [1] - 10:11
Doctor [7] - 4:7, 4:21, 13:8, 14:17, 18:3, 20:21, 21:1
document [2] - 21:1, 32:21

documents [7] - 17:4, 17:5, 17:7, 17:12, 31:14, 31:16
DOJ [1] - 4:16
dollar [2] - 24:6, 24:7
dollars [1] - 26:8
done [4] - 12:19, 30:4, 32:5, 35:6
doorstep [2] - 16:14, 23:9
down [6] - 10:7, 10:8, 18:6, 18:10, 20:1, 28:12
download [1] - 29:3
Dr [15] - 3:24, 4:1, 8:13, 21:11, 21:12, 21:20, 22:17, 23:12, 23:17, 23:22, 27:10, 27:19, 28:18, 32:7, 35:6
draw [5] - 19:23, 24:14, 28:4, 28:6
drawing [1] - 28:3
draws [1] - 28:4
drew [2] - 18:16, 21:23
drop [2] - 6:2, 6:3
dropping [1] - 6:5
due [2] - 14:14, 15:14
duly [1] - 4:4
DX [1] - 20:14

E

ease [1] - 30:11
easier [2] - 30:2, 34:10
easiest [1] - 7:2
east [1] - 10:5
easy [2] - 6:10, 34:23
econometric [1] - 19:11
economic [2] - 8:23, 35:14
economist [1] - 17:6
economists [8] - 8:17, 17:14, 35:12, 35:13, 35:15, 35:16, 35:17
effect [6] - 5:4, 5:11, 25:11, 25:23, 27:7, 29:14
effects [8] - 4:24, 4:25, 5:1, 5:6, 6:14, 7:2, 26:23, 27:8
efficiencies [4] - 5:9, 26:16, 26:18, 26:20
EIG [1] - 35:15
eight [3] - 19:24, 20:1, 22:14
either [1] - 30:3
element [2] - 16:24, 29:17
elements [1] - 22:21
empirical [1] - 17:9
encourage [1] - 30:16
end [2] - 34:7, 34:21
ended [1] - 4:21
entire [1] - 7:16
entitled [1] - 37:5
equilibrium [2] - 5:15, 6:11
errors [1] - 14:20
essentially [2] - 5:16, 8:19

estimate [14] - 9:9, 9:13, 9:14, 10:12, 11:9, 12:21, 13:23, 14:10, 14:15, 16:3, 23:3, 24:24, 25:3, 26:7
estimated [4] - 5:5, 9:10, 9:16, 10:10
estimates [2] - 13:6, 26:17
estimating [2] - 11:15, 24:22
et [2] - 1:6, 3:5
events [1] - 20:22
evidence [3] - 14:7, 17:2, 31:2
EVIDENCE [1] - 2:11
exactly [1] - 13:19
EXAMINATION [2] - 4:5, 35:4
examination [4] - 34:1, 34:2, 34:12
example [10] - 10:16, 12:19, 18:10, 23:6, 25:14, 26:19, 26:25, 30:11, 31:3, 33:10
examples [1] - 33:8
excellent [1] - 35:12
exhausted [2] - 31:1, 31:4
Exhibit [6] - 18:4, 21:18, 23:13, 23:20, 24:2
exhibit [3] - 23:22, 24:1, 24:2
EXHIBITS [1] - 2:11
expect [1] - 10:14
expects [1] - 31:4
expenditures [2] - 17:16, 23:2
experiment [9] - 17:14, 17:15, 17:17, 17:21, 18:13, 20:7, 20:21, 21:24, 27:11
expert [3] - 28:24, 32:6, 32:7
expertise [1] - 17:6
explain [5] - 10:10, 13:9, 21:23, 24:1, 34:7
explained [1] - 13:8
explaining [1] - 24:1
extensively [1] - 32:8
extent [1] - 10:1
extraordinary [1] - 5:8

F

fact [4] - 4:15, 19:10, 20:9, 30:1
factor [1] - 28:23
fall [1] - 7:20
familiarity [1] - 28:20
famous [1] - 11:23
features [1] - 29:1
few [1] - 15:19
figure [1] - 29:5
figured [1] - 30:8
figuring [1] - 8:20
filers [1] - 29:13
finally [1] - 11:25

fine [2] - 34:17, 34:18
Firm [2] - 11:5, 11:6
firm [10] - 5:14, 6:14, 7:16, 10:18, 10:24, 11:1, 11:6, 25:8
firms [13] - 6:8, 6:17, 6:19, 7:16, 10:17, 10:25, 12:4, 17:10, 25:6, 25:12, 30:5, 30:16, 31:8
first [10] - 7:7, 9:11, 11:9, 14:19, 27:16, 29:19, 29:22, 30:13, 31:19, 32:2
five [1] - 4:18
flow [1] - 28:14
flows [1] - 13:21
focus [1] - 31:19
follow [1] - 26:2
follow-on [1] - 26:2
follows [1] - 4:4
FOR [1] - 1:2
forces [1] - 28:13
forcing [1] - 28:12
forecast [1] - 25:16
foregoing [1] - 37:3
form [4] - 27:17, 27:22, 28:2, 28:16
forms [4] - 27:3, 27:15, 28:9, 33:10
forth [4] - 17:5, 30:20, 30:23, 31:7
forum [1] - 20:10
FREDERICK [2] - 2:3, 4:3
free [6] - 28:6, 28:11, 29:19, 29:20, 29:21, 30:18
friends [1] - 32:15
front [4] - 4:15, 21:9, 21:22, 29:8

G

gain [1] - 6:18
gather [1] - 29:7
general [2] - 17:5, 21:20
generally [7] - 21:13, 22:8, 22:9, 24:4, 32:17, 35:10
Gentilhomme [1] - 11:24
gentilhomme [1] - 11:24
given [5] - 8:21, 8:22, 16:18, 26:3, 29:12
Google [2] - 23:7, 32:14
government [1] - 32:7
GOVERNMENT [1] - 4:3
Government [5] - 18:4, 21:18, 23:12, 23:19, 24:2
great [1] - 13:21
greater [2] - 26:13, 26:14
gross [4] - 7:11, 16:13, 16:16, 22:25
group [3] - 18:9, 35:14

grow [2] - 18:21, 18:22
growing [1] - 18:20
growth [3] - 18:18, 19:18, 22:9
guidelines [1] - 14:1
guy [1] - 23:9
guys [4] - 11:10, 30:18, 33:15
GX [1] - 21:21

H

H&R [12] - 1:6, 3:5, 6:23, 19:13, 19:15, 19:16, 20:2, 20:5, 20:12, 28:5, 28:13, 29:21
half [1] - 25:18
hand [1] - 6:5
hard [2] - 32:11, 35:16
head [1] - 15:3
heard [1] - 15:14
hearing [1] - 28:22
HEARING [1] - 1:9
help [1] - 35:22
helped [1] - 21:1
high [5] - 16:9, 16:13, 16:22, 16:23, 24:13
higher [2] - 24:10, 26:13
highly [2] - 20:8, 32:19
history [1] - 17:5
HOGAN [1] - 1:19
hold [1] - 27:19
Honor [17] - 3:2, 3:4, 3:11, 3:16, 3:22, 20:18, 21:4, 21:8, 23:14, 27:18, 33:21, 34:3, 34:4, 34:17, 35:24, 36:3, 36:9
HONORABLE [1] - 1:10
Hoover [1] - 13:4
horizontal [7] - 27:14, 27:16, 27:21, 28:2, 28:9, 28:16, 29:10
hours [1] - 3:18
housekeeping [1] - 3:17
Houseworth [1] - 31:3
HOWELL [1] - 1:10
HRB [16] - 7:25, 8:5, 13:3, 13:18, 14:12, 15:25, 16:1, 19:18, 22:3, 22:14, 22:15, 24:12, 25:17, 25:21, 26:1, 33:8
HRB's [3] - 19:6, 24:9
hypothetical [1] - 14:24

I

idea [1] - 12:4
identified [2] - 4:25, 31:16

**identify** [1] - 3:7
**imply** [1] - 32:4
**import** [2] - 28:25, 29:23
**important** [9] - 9:1, 9:3, 11:13, 14:21, 16:7, 24:6, 24:11, 29:17, 32:11
**impose** [2] - 26:5, 26:6
**Inc** [1] - 3:5
**INC** [1] - 1:6
**incentive** [2] - 5:6, 25:12
**include** [2] - 4:18, 27:7
**includes** [1] - 23:5
**increase** [21] - 5:23, 6:21, 7:12, 7:19, 7:21, 7:23, 8:1, 12:6, 14:2, 14:14, 16:10, 18:23, 22:14, 25:5, 25:15, 25:17, 25:20, 25:25, 26:1, 26:13, 27:5
**increased** [4] - 8:6, 17:16, 25:11, 26:8
**increases** [4] - 5:10, 16:20, 26:3, 27:2
**incremental** [1] - 23:4
**incur** [1] - 23:6
**indicative** [1] - 20:8
**individual** [1] - 25:9
**industries** [1] - 16:12
**industry** [3] - 16:11, 16:19, 23:3
**information** [1] - 11:4
**informative** [1] - 31:20
**initial** [1] - 33:3
**INJUNCTION** [1] - 1:9
**input** [3] - 26:19, 29:4, 29:13
**inputs** [3] - 9:1, 24:17, 24:18
**inquired** [1] - 3:17
**instead** [1] - 28:8
**instruct** [1] - 36:6
**interest** [1] - 25:9
**interests** [1] - 8:9
**Internal** [3] - 9:19, 24:23, 30:21
**interpretation** [1] - 20:3
**interpreting** [1] - 17:6
**INTO** [1] - 2:11
**Intuit** [12] - 8:3, 21:1, 21:5, 21:25, 22:3, 22:4, 25:20, 25:22, 25:24, 26:2, 28:13, 30:7
**intuition** [1] - 8:12
**involved** [1] - 26:4
**IRS** [9] - 13:10, 13:11, 13:13, 14:18, 14:22, 15:16, 24:24, 25:17, 26:7
**issue** [5] - 4:10, 21:2, 26:18, 27:9, 34:4
**itself** [1] - 18:23

## J

**Jackson** [1] - 4:15
**JOSEPH** [1] - 1:13
**Joseph** [1] - 3:9
**judge** [1] - 21:21
**Judge** [1] - 4:15
**JUDGE** [1] - 1:11
**judge's** [1] - 31:11
**JUSTICE** [1] - 1:14
**Justice** [4] - 4:12, 4:14, 35:13, 36:5

## K

**keep** [3] - 5:20, 5:25, 26:21
**keeps** [1] - 29:1
**kind** [6] - 18:16, 19:22, 25:5, 25:20, 25:23, 35:10
**kinds** [2] - 18:1, 22:12

## L

**lands** [2] - 16:14, 23:9
**large** [3] - 12:5, 16:19, 20:11
**last** [2] - 4:12, 36:7
**Lawrence** [1] - 3:10
**LAWRENCE** [1] - 1:13
**lawyers** [1] - 35:13
**lead** [2] - 3:6, 5:9
**learning** [1] - 15:6
**least** [2] - 5:8, 11:15
**lectern** [1] - 3:7
**led** [1] - 7:20
**left** [3] - 10:20, 10:25, 13:12
**lengthy** [1] - 20:15
**life** [1] - 12:2
**likely** [3] - 5:9, 12:5, 27:25
**line** [3] - 18:16, 18:20, 19:23
**lines** [1] - 19:9
**listed** [1] - 32:21
**litigation** [1] - 32:5
**LLP** [1] - 1:19
**lo** [1] - 19:17
**lock** [1] - 31:6
**lock-in** [1] - 31:6
**Logan** [1] - 3:12
**LOGAN** [1] - 1:18
**look** [22] - 5:17, 5:23, 6:1, 9:23, 10:4, 10:23, 11:1, 19:5, 19:14, 19:15, 19:16, 20:6, 21:1, 24:7, 24:9, 25:5, 26:3, 27:13, 30:7, 32:14, 33:10, 33:11
**looked** [6] - 12:10, 13:6, 22:6, 22:14, 22:25, 33:11
**looking** [9] - 5:5, 6:15, 8:1,

9:12, 10:7, 12:15, 19:13, 20:25, 33:8
**looks** [1] - 24:23
**lose** [7] - 5:20, 5:21, 5:24, 6:16, 6:17, 7:10
**loses** [1] - 11:5
**losing** [1] - 24:12
**loss** [1] - 26:14
**lost** [4] - 6:17, 7:6, 10:19
**love** [1] - 29:23
**LOVELLS** [1] - 1:19
**low** [4] - 4:13, 16:20, 16:21, 24:13
**lower** [1] - 25:16
**loyalty** [1] - 30:4
**lunch** [1] - 36:8
**Lunch** [1] - 36:10

## M

**machine** [1] - 1:25
**major** [2] - 4:13, 26:18
**managed** [1] - 32:2
**manual** [1] - 29:4
**manually** [1] - 29:13
**margin** [14] - 6:6, 7:8, 7:11, 8:11, 9:4, 16:8, 16:10, 23:4, 23:16, 23:19, 23:23, 24:7, 24:13, 24:14
**margins** [21] - 8:22, 9:6, 16:13, 16:16, 16:19, 16:22, 22:18, 22:19, 22:20, 22:23, 22:25, 23:10, 24:3, 24:4, 24:5, 24:6, 24:9, 24:10, 24:15, 24:18
**mark** [1] - 33:14
**marked** [1] - 18:3
**market** [40] - 9:12, 9:16, 9:18, 10:11, 10:15, 10:17, 10:19, 10:23, 10:24, 10:25, 11:3, 11:7, 11:8, 11:9, 11:12, 11:13, 11:14, 11:20, 12:5, 12:12, 12:13, 12:15, 12:16, 12:20, 12:21, 12:22, 12:24, 13:5, 13:6, 13:8, 15:24, 20:4, 25:3, 25:4, 25:8, 29:6
**marketing** [7] - 17:19, 18:8, 20:8, 23:2, 27:11, 29:18
**markets** [2] - 28:20, 28:24
**material** [1] - 34:5
**math** [1] - 34:8
**mathematical** [1] - 12:9
**matter** [2] - 3:17, 37:5
**maximize** [2] - 7:15, 7:17
**maximizing** [4] - 5:14, 5:15, 6:10, 8:21
**MCRA** [1] - 35:16
**mean** [3] - 8:8, 11:20, 20:22

**means** [1] - 7:18
**meant** [1] - 26:11
**measure** [1] - 8:14
**merge** [1] - 12:4
**merged** [1] - 7:15
**merger** [17] - 5:9, 5:11, 6:12, 6:20, 7:3, 8:15, 8:16, 8:18, 8:23, 9:2, 9:7, 12:10, 14:1, 16:24, 24:17, 25:10, 35:21
**merger's** [1] - 5:3
**mergers** [1] - 8:24
**method** [3] - 9:22, 11:21, 25:15
**methodologies** [2] - 9:25, 10:4
**methods** [2] - 15:21, 15:24
**Micro** [1] - 35:15
**microphone** [1] - 27:20
**Microsoft** [1] - 4:15
**middle** [1] - 18:17
**migration** [3] - 13:21, 13:24, 14:9
**million** [5] - 15:17, 15:18, 26:8, 26:11, 26:12
**mind** [1] - 26:21
**mine** [1] - 34:7
**minute** [1] - 5:12
**minutes** [2] - 34:20, 34:21
**model** [7] - 12:21, 16:25, 22:19, 24:17, 25:22, 26:16, 26:20
**Moliere** [1] - 11:23
**moment** [1] - 31:6
**money** [5] - 5:19, 5:24, 6:8, 7:7, 30:17
**MORNING** [2] - 1:5, 1:10
**morning** [7] - 3:2, 3:3, 3:11, 3:14, 4:1, 4:7, 4:8
**most** [4] - 9:1, 9:3, 14:21, 34:21
**mountain** [1] - 10:4
**move** [1] - 4:24
**MR** [28] - 3:2, 3:9, 3:11, 3:16, 3:22, 3:24, 4:6, 20:18, 20:20, 21:4, 21:8, 21:15, 23:14, 23:21, 27:18, 31:10, 33:21, 34:3, 34:4, 34:13, 34:17, 34:19, 35:5, 35:24, 35:25, 36:2, 36:4, 36:9
**multiply** [1] - 16:8

## N

**natural** [2] - 17:14, 20:21
**need** [9] - 10:7, 16:9, 16:21, 21:22, 23:16, 24:20, 32:19, 33:21, 34:22
**never** [1] - 15:14
**New** [1] - 18:10

**new** [1] - 29:13
**next** [1] - 27:9
**nominal** [1] - 27:5
**nonpublic** [2] - 34:9, 34:10
**north** [1] - 10:5
**nothing** [1] - 13:24
**notice** [1] - 30:15
**nowadays** [1] - 9:22
**NUMBER** [1] - 2:9
**number** [4] - 11:16, 13:7, 13:19, 19:8
**numbers** [11] - 11:16, 16:5, 16:6, 19:12, 21:12, 22:12, 22:15, 23:16, 23:19, 23:23, 25:17
**NW** [2] - 1:15, 1:19

## O

**oath** [1] - 4:2
**observations** [2] - 15:17, 15:18
**obviously** [1] - 19:3
**OF** [6] - 1:2, 1:3, 1:9, 1:14, 37:1, 37:10
**OFFICIAL** [1] - 37:1
**Official** [1] - 1:22
**often** [2] - 15:2, 16:16
**Oklahoma** [1] - 18:11
**once** [6] - 6:20, 14:15, 20:24, 29:21, 30:1, 32:10
**one** [34] - 4:10, 4:13, 4:24, 8:14, 9:16, 9:21, 10:17, 10:25, 11:15, 11:16, 15:1, 16:8, 16:12, 16:24, 17:8, 17:11, 19:21, 21:4, 22:21, 24:22, 25:1, 26:15, 28:25, 29:1, 29:2, 29:8, 29:18, 29:19, 31:15, 31:16, 32:4, 33:7, 34:21, 35:17
**ones** [3] - 5:20, 6:6, 24:20
**open** [1] - 19:4
**operated** [1] - 35:11
**opinion** [1] - 5:3
**opposed** [2] - 18:22, 22:10
**opposing** [1] - 21:9
**order** [4] - 16:9, 17:24, 25:23, 34:7
**outside** [6] - 12:14, 12:20, 12:22, 13:5, 13:6, 25:4
**own** [4] - 5:7, 14:8, 25:9, 33:19

## P

**p.m** [1] - 36:10
**page** [4] - 21:14, 21:17, 23:24, 33:3

**paid** [3] - 28:5, 29:24, 30:18
**paper** [1] - 28:3
**part** [2] - 12:22, 35:14
**particular** [4] - 14:17, 17:6, 20:10, 23:3
**particularly** [5] - 16:22, 18:2, 21:24, 27:25, 30:25
**parties** [6] - 5:7, 5:10, 19:3, 19:5, 22:25, 23:11
**partner** [6] - 6:23, 7:6, 7:10, 7:12, 8:10, 8:11
**partner's** [1] - 7:11
**party** [1] - 23:4
**payments** [1] - 23:6
**pen** [1] - 28:3
**Pennsylvania** [1] - 1:15
**people** [21] - 11:5, 13:15, 14:7, 14:23, 14:25, 15:1, 15:2, 20:24, 20:25, 27:17, 27:22, 27:23, 27:24, 27:25, 29:19, 30:20, 30:23, 30:24, 32:11, 32:15, 32:18
**percent** [38] - 4:18, 10:17, 10:18, 10:19, 10:24, 10:25, 11:1, 11:2, 11:5, 11:7, 11:8, 11:10, 13:4, 13:7, 15:25, 16:1, 16:4, 16:16, 18:17, 18:23, 19:8, 19:12, 19:24, 20:1, 20:6, 22:13, 22:15, 23:1, 24:25, 25:15, 25:18, 26:9
**percentage** [7] - 4:11, 4:13, 7:5, 8:4, 9:4, 24:5, 25:17
**percentages** [2] - 14:9, 14:14
**perfect** [2] - 9:22, 13:24
**performed** [2] - 17:13, 17:25
**perhaps** [3] - 12:1, 15:6, 28:18
**period** [1] - 20:15
**pick** [1] - 32:12
**play** [1] - 11:23
**plotted** [1] - 18:21
**plug** [1] - 12:21
**poet** [1] - 11:25
**poetry** [1] - 11:25
**point** [5] - 11:15, 28:10, 32:10, 33:21, 35:17
**pointed** [1] - 27:23
**pool** [4] - 4:18, 31:1, 31:2, 31:4
**pooled** [1] - 4:17
**portion** [1] - 20:11
**position** [1] - 5:14
**possible** [2] - 6:9, 9:24
**potential** [2] - 5:3, 17:3
**precise** [1] - 13:25
**precisely** [1] - 12:6
**preference** [1] - 9:23
**PRELIMINARY** [1] - 1:9

**preparation** [3] - 12:17, 29:2, 33:10
**presenting** [1] - 24:21
**presumption** [1] - 11:19
**pretty** [2] - 18:15, 19:24
**prevent** [2] - 28:12, 28:14
**previously** [1] - 4:4
**price** [43] - 5:9, 5:16, 5:19, 5:22, 5:23, 6:2, 6:3, 6:5, 6:10, 6:15, 6:21, 7:4, 7:19, 7:21, 7:23, 8:1, 8:5, 8:21, 10:19, 10:24, 12:5, 14:2, 14:5, 14:14, 16:10, 16:20, 19:11, 20:7, 25:5, 25:16, 25:19, 25:21, 25:23, 25:24, 25:25, 26:1, 26:3, 26:13, 27:2, 27:5, 29:6, 29:11
**prices** [5] - 5:7, 8:9, 15:12, 31:16, 32:22
**pricing** [9] - 32:21, 32:23, 33:1, 33:9, 33:18, 33:22, 34:11, 34:13, 34:20
**privileged** [1] - 21:5
**problem** [7] - 9:23, 28:11, 29:4, 30:12, 30:13, 30:14, 30:23
**problems** [1] - 8:18
**proceed** [2] - 3:15, 24:1
**Proceedings** [1] - 1:25, 35:3
**proceedings** [2] - 35:1, 37:4
**process** [5] - 8:7, 8:20, 10:13, 11:19, 30:12
**produce** [1] - 5:11
**produced** [1] - 1:25
**product** [9] - 8:5, 13:18, 16:15, 26:25, 27:4, 29:2, 29:20, 29:22, 31:15
**production** [1] - 23:5
**products** [1] - 8:21
**profit** [5] - 5:14, 5:15, 6:9, 8:21, 9:4
**profit-maximizing** [2] - 5:14, 5:15
**profitable** [5] - 7:19, 7:23, 17:23, 25:6, 25:22
**profits** [10] - 5:18, 5:20, 6:5, 6:6, 7:12, 7:15, 7:17, 7:20, 7:22, 8:6
**program** [1] - 29:13
**project** [1] - 35:18
**proportion** [1] - 10:14
**proportional** [1] - 10:15
**proposition** [4] - 27:5, 28:12, 28:14, 33:13
**prose** [2] - 12:1, 12:2
**protected** [1] - 21:6
**provide** [3] - 11:15, 16:15, 28:13
**provided** [1] - 13:11
**providers** [1] - 33:9

**provides** [1] - 14:15
**providing** [1] - 28:11
**public** [5] - 23:15, 23:18, 34:15, 35:25, 36:1
**purpose** [1] - 18:25
**purposes** [1] - 14:18

## Q

**quality** [2] - 14:5, 32:9
**quantity** [1] - 26:4
**questionable** [1] - 32:20
**questions** [4] - 32:9, 33:7, 35:24, 36:7
**quite** [4] - 8:25, 16:20, 17:21, 28:10
**quote** [1] - 33:12

## R

**radio** [1] - 18:1
**raise** [7] - 5:19, 5:22, 6:15, 7:4, 8:5, 8:9, 25:22
**raised** [4] - 5:18, 10:19, 10:24, 15:12
**raises** [1] - 25:21
**raising** [1] - 25:24
**ran** [1] - 17:16
**rate** [1] - 22:9
**rates** [2] - 16:2, 16:3
**rather** [1] - 9:21
**ratio** [13] - 10:21, 11:17, 11:21, 12:3, 12:8, 15:25, 16:1, 16:7, 16:9, 16:18, 20:6, 26:13, 33:6
**ratios** [23] - 8:22, 9:6, 9:9, 9:10, 9:14, 9:16, 10:10, 10:12, 14:10, 14:16, 15:20, 15:23, 16:20, 16:22, 16:24, 22:20, 24:19, 24:22, 24:24, 25:3, 31:21, 32:19
**rats** [2] - 17:21, 17:22
**Rawson** [1] - 3:13
**re** [1] - 29:13
**re-input** [1] - 29:13
**ready** [1] - 3:14
**real** [5] - 14:23, 15:8, 15:16, 20:22, 32:17
**really** [16] - 6:16, 10:14, 11:13, 13:25, 14:11, 16:7, 16:8, 23:8, 27:6, 27:24, 28:10, 29:20, 29:23, 32:19, 33:14
**reason** [6] - 14:12, 14:21, 30:22, 33:16, 33:17, 34:7
**reasonable** [5] - 11:4, 13:7, 13:22, 14:10, 14:15
**reasons** [4] - 14:4, 14:13,

23:2, 32:4
**Rebecca** [1] - 37:3
**REBECCA** [1] - 1:21
**recess** [1] - 36:10
**recognize** [1] - 15:1
**record** [3] - 14:7, 31:2, 37:4
**recover** [1] - 6:25
**RECROSS** [1] - 2:2
**redacted** [1] - 23:15
**redirect** [1] - 36:7
**REDIRECT** [2] - 2:2, 35:4
**reducing** [1] - 6:6
**reduction** [2] - 7:21, 19:18
**refer** [1] - 17:4
**reflected** [1] - 35:7
**reimport** [1] - 30:24
**related** [1] - 17:2
**relative** [2] - 31:16, 32:22
**relevant** [7] - 11:13, 11:14,
12:5, 12:13, 12:15, 12:16,
25:3
**relied** [1] - 9:20
**rely** [2] - 32:22, 33:18
**remain** [1] - 4:2
**remaining** [3] - 11:3, 11:8,
11:9
**remember** [6] - 7:24, 9:5,
12:15, 16:6, 18:18, 31:17
**report** [6] - 20:18, 28:24,
33:3, 33:16, 33:17, 35:8
**reported** [2] - 1:25, 35:7
**reporter** [2] - 10:7, 36:6
**Reporter** [2] - 1:21, 1:22
**REPORTER** [2] - 37:1, 37:10
**require** [1] - 15:6
**respect** [1] - 15:14
**respective** [1] - 3:7
**rest** [2] - 8:12, 10:23
**result** [3] - 6:18, 10:1, 18:23
**results** [5] - 10:6, 15:23,
24:16, 24:21, 28:16
**resume** [1] - 35:3
**return** [1] - 3:24
**reveal** [2] - 21:11, 21:12
**Revenue** [3] - 9:19, 24:23,
30:21
**review** [1] - 17:7
**Rick** [1] - 3:24
**risk** [1] - 3:19
**Robby** [1] - 3:12
**ROBERT** [1] - 1:17
**Robertson** [2] - 2:4, 3:12
**ROBERTSON** [9] - 1:17,
3:11, 3:22, 27:18, 34:4,
34:13, 35:25, 36:4, 36:9
**Room** [1] - 1:22
**roughly** [2] - 10:22, 14:13
**Roush** [1] - 3:13
**ROUSH** [1] - 1:18

**RPR** [1] - 1:21
**run** [2] - 3:19, 26:15
**running** [1] - 26:19

## S

**sale** [7] - 6:17, 7:10, 7:11,
24:12, 24:13
**sales** [22] - 6:4, 6:16, 6:22,
6:24, 6:25, 7:1, 7:6, 7:8,
8:2, 8:4, 10:14, 10:20,
18:14, 18:24, 19:6, 19:16,
19:18, 19:25, 22:4, 22:14,
26:4
**save** [1] - 34:11
**SCICCHITANO** [1] - 1:14
**screen** [1] - 21:5
**sealed** [3] - 33:23, 34:22,
35:1
**search** [2] - 23:7, 32:14
**second** [12] - 7:7, 9:18,
14:10, 14:21, 19:7, 22:22,
25:20, 25:23, 28:14, 29:21,
29:22, 32:6
**second-order** [1] - 25:23
**secret** [1] - 36:4
**Security** [1] - 13:19
**see** [14] - 6:15, 9:24, 13:13,
18:15, 22:1, 22:6, 23:19,
24:9, 25:14, 28:15, 30:21,
30:22, 31:5, 32:14
**self** [1] - 25:9
**self-interest** [1] - 25:9
**sells** [1] - 24:8
**sense** [6] - 6:25, 7:16, 14:23,
17:20, 27:2, 28:6
**sensitive** [1] - 29:6
**separate** [2] - 28:11, 35:2
**separately** [1] - 7:17
**September** [1] - 1:5
**series** [1] - 36:7
**Service** [3] - 9:19, 24:23,
30:21
**SESSION** [2] - 1:5, 1:10
**session** [2] - 34:15, 36:1
**set** [3] - 14:20, 17:18, 34:10
**setting** [1] - 34:10
**seven** [2] - 3:18
**several** [1] - 14:19
**Seymour** [1] - 3:13
**share** [7] - 10:21, 11:2,
11:21, 15:24, 20:3, 25:15,
26:9
**shares** [16] - 4:22, 9:12, 9:13,
9:14, 9:17, 9:18, 10:11,
10:12, 10:15, 11:14, 12:3,
12:5, 12:8, 13:9, 15:24,
25:3
**shorter** [1] - 34:6

**shorthand** [1] - 1:25
**show** [2] - 17:9, 27:25
**shown** [2] - 24:5, 24:18
**shows** [3] - 18:5, 21:13, 24:2
**shrinking** [1] - 31:3
**sic** [2] - 25:6, 31:23
**side** [4] - 7:25, 8:22, 23:18
**sides** [2] - 3:6, 8:7
**sighing** [1] - 10:9
**sIGNATURE** [1] - 37:10
**significance** [2] - 21:23,
22:19
**significant** [8] - 5:9, 14:2,
16:5, 16:20, 19:18, 20:3,
23:2, 26:1
**significantly** [1] - 22:9
**similar** [1] - 10:5
**similarly** [1] - 13:17
**simple** [2] - 10:13, 10:16
**simply** [7] - 5:5, 5:6, 15:3,
17:7, 25:6, 30:4, 32:10
**simulation** [8] - 8:15, 8:16,
8:18, 8:23, 9:2, 9:7, 16:25,
20:23, 24:17, 26:19
**simulator** [10] - 31:17, 32:21,
32:23, 33:2, 33:9, 33:18,
33:23, 34:12, 34:13, 34:20
**situation** [2] - 15:7, 32:13
**six** [4] - 17:21, 35:15, 35:16
**size** [2] - 15:17, 24:15
**slightly** [1] - 10:7
**slow** [2] - 10:7, 10:8
**small** [2] - 14:2, 29:11
**smaller** [1] - 25:17
**smallest** [1] - 12:16
**Social** [1] - 13:19
**software** [11] - 16:11, 16:12,
23:1, 28:20, 28:23, 29:2,
29:3, 29:12, 30:2, 30:3,
30:8
**someone** [1] - 6:24
**somewhat** [1] - 25:16
**sorry** [4] - 21:4, 26:12, 31:9,
32:1
**sort** [3] - 5:12, 6:13, 12:8
**source** [1] - 17:8
**sources** [4] - 9:10, 9:21,
32:18, 32:19
**south** [1] - 10:5
**speaking** [2] - 12:2, 32:17
**specific** [3] - 12:9, 21:22,
24:4
**specifically** [1] - 22:18
**spent** [1] - 8:17
**stability** [1] - 25:11
**staff** [2] - 35:17, 35:22
**stage** [1] - 34:10
**stand** [1] - 3:25
**standard** [1] - 8:23

**start** [1] - 5:13
**started** [1] - 15:12
**starting** [1] - 11:15
**state** [1] - 4:16
**statement** [1] - 12:9
**STATES** [3] - 1:1, 1:3, 1:11
**states** [1] - 4:16
**States** [3] - 1:13, 3:5, 3:9
**step** [2] - 25:20, 29:21
**Stephanie** [1] - 3:13
**stickiness** [5] - 28:23, 29:3,
29:12, 30:16, 30:17
**sticking** [1] - 29:2
**still** [2] - 30:19, 31:7
**Stonestreet** [1] - 37:3
**STONESTREET** [1] - 1:21
**stop** [3] - 5:23, 19:7, 34:14
**stopped** [1] - 13:15
**story** [2] - 6:14, 9:11
**straight** [1] - 28:5
**strategy** [1] - 29:18
**Street** [1] - 1:19
**stress** [1] - 26:15
**strictly** [1] - 25:13
**structuralist** [3] - 9:11,
11:19, 25:2
**study** [2] - 13:3, 28:16
**Study** [1] - 13:4
**stuff** [1] - 34:9
**subsidiaries** [1] - 7:17
**suddenly** [6] - 6:23, 7:4,
7:19, 7:20, 7:22, 7:23
**Suddenly** [1] - 7:21
**Suite** [1] - 1:15
**suppose** [5] - 10:16, 10:18,
15:12, 24:23, 25:1
**survey** [10] - 15:9, 15:19,
31:17, 31:19, 31:20, 31:24,
31:25, 32:3, 32:5, 32:8
**surveys** [3] - 14:25, 32:6,
32:7
**switch** [5] - 14:7, 15:11,
27:25, 30:9, 31:15
**switched** [1] - 13:17
**switching** [18] - 9:18, 13:10,
13:22, 14:18, 16:2, 16:3,
20:11, 20:12, 24:24, 27:17,
27:22, 27:24, 28:17, 29:10,
30:19, 30:20, 30:23, 31:7
**sworn** [1] - 4:4

## T

**Tab** [6] - 18:3, 18:5, 21:11,
21:16, 21:17
**table** [2] - 3:13, 34:14
**targeted** [1] - 20:14
**tax** [4] - 12:16, 29:2, 30:14,
33:10

**TaxACT** [47] - 6:21, 8:3, 8:5, 8:6, 13:15, 13:16, 14:13, 15:13, 15:14, 15:15, 15:25, 16:1, 17:13, 17:15, 18:12, 18:24, 19:1, 19:4, 19:14, 19:15, 19:16, 19:19, 19:20, 19:22, 19:25, 20:1, 20:4, 20:9, 20:14, 21:24, 22:2, 22:4, 22:5, 22:10, 22:14, 24:12, 25:16, 25:21, 26:1, 27:11, 28:4, 28:8, 30:8, 30:10

**TaxACT's** [1] - 24:7

**TaxACT-tested** [1] - 22:10

**teams** [1] - 3:8

**technical** [2] - 30:5, 30:10

**terms** [2] - 21:20, 29:10

**test** [1] - 22:11

**tested** [1] - 22:10

**testified** [3] - 4:4, 4:14, 8:13

**THE** [25] - 1:2, 1:10, 3:3, 3:14, 3:21, 3:23, 4:1, 19:7, 19:10, 20:13, 20:16, 21:7, 21:14, 27:19, 28:18, 28:21, 28:22, 29:7, 29:10, 29:17, 33:25, 34:11, 34:18, 34:25, 36:6

**they've** [2] - 29:3, 30:4

**third** [2] - 11:6, 15:16

**thousand** [1] - 15:19

**three** [7] - 10:3, 10:17, 25:18, 31:4, 33:12, 33:14

**together** [1] - 12:4

**tool** [1] - 8:23

**top** [3] - 15:3, 18:5, 24:22

**topics** [1] - 34:22

**total** [1] - 3:20

**track** [1] - 13:19

**tracks** [1] - 13:13

**transcribed** [1] - 35:1

**transcript** [2] - 1:25, 37:4

**TRANSCRIPT** [1] - 1:9

**transcription** [1] - 1:25

**trial** [1] - 15:11

**trivial** [1] - 15:5

**true** [1] - 15:5

**try** [9] - 3:22, 6:9, 6:11, 9:23, 9:24, 20:4, 23:3, 29:20, 30:16

**trying** [5] - 7:3, 23:8, 30:1, 30:6, 30:11

**Tulsa** [1] - 18:11

**TurboTax** [1] - 15:12

**TurboTax's** [1] - 22:9

**turn** [1] - 22:17

**TV** [5] - 18:2, 20:17, 21:25, 22:2, 22:5

**two** [23] - 9:3, 9:6, 9:10, 9:19, 9:21, 10:3, 10:18, 12:4, 15:17, 15:21, 16:6, 17:10, 20:16, 22:20, 24:22, 25:18, 27:15, 31:16, 32:3, 32:18, 33:7, 34:22

**type** [1] - 10:6

**typically** [2] - 18:10, 35:21

**U**

**U.S** [2] - 1:14, 1:22

**under** [5] - 4:2, 25:6, 35:1, 35:19

**underlies** [1] - 12:4

**undertook** [1] - 21:24

**unilateral** [7] - 5:1, 5:4, 5:6, 5:11, 7:2, 25:13, 26:23

**unilaterally** [3] - 8:8, 8:9

**unit** [2] - 18:14, 24:8

**UNITED** [3] - 1:1, 1:3, 1:11

**United** [3] - 1:13, 3:5, 3:9

**units** [5] - 5:20, 5:24, 5:25, 28:5, 28:6

**unless** [1] - 29:24

**unseal** [1] - 36:6

**unsealed** [1] - 35:3

**up** [11] - 3:22, 9:25, 10:5, 18:13, 19:23, 19:25, 21:5, 27:15, 28:14, 29:8, 30:11

**upgrade** [1] - 29:24

**US** [1] - 1:19

**useful** [1] - 15:1

**users** [1] - 27:23

**V**

**value** [3] - 16:18, 27:5, 28:12

**varies** [1] - 18:15

**various** [1] - 18:1

**version** [2] - 23:15

**versus** [3] - 3:5, 20:23, 22:5

**view** [1] - 16:5

**viewed** [1] - 29:21

**vigorously** [1] - 20:9

**W**

**walk** [1] - 5:12

**walkaway** [1] - 24:7

**wants** [1] - 11:24

**WARREN** [2] - 2:3, 4:3

**Warren** [14] - 3:24, 4:1, 8:13, 21:11, 21:12, 21:20, 22:17, 23:12, 23:17, 23:22, 27:10, 27:19, 28:18, 35:6

**WARREN-BOULTON** [2] - 2:3, 4:3

**Warren-Boulton** [14] - 3:24, 4:1, 8:13, 21:11, 21:12, 21:20, 22:17, 23:12, 23:17,

23:22, 27:10, 27:19, 28:18, 35:6

**Washington** [3] - 1:16, 1:20, 1:23

**Wayland** [5] - 2:4, 3:9, 3:15, 3:23, 36:7

**WAYLAND** [21] - 1:13, 3:2, 3:9, 3:16, 3:24, 4:6, 20:18, 20:20, 21:4, 21:8, 21:15, 23:14, 23:21, 31:10, 33:21, 34:3, 34:17, 34:19, 35:5, 35:24, 36:2

**ways** [3] - 8:14, 9:24, 24:22

**west** [1] - 10:5

**whatsoever** [1] - 25:7

**WHEREUPON** [1] - 35:1

**white** [2] - 17:21, 17:22

**who've** [1] - 8:17

**witness** [5] - 3:23, 4:3, 4:16, 4:17, 21:9

**WITNESS** [7] - 2:2, 19:10, 20:16, 21:14, 28:21, 29:7, 29:17

**witnesses** [1] - 4:17

**word** [1] - 20:21

**words** [1] - 10:23

**works** [1] - 5:13

**world** [1] - 20:22

**worried** [1] - 33:15

**worry** [2] - 14:20, 30:8

**worth** [3] - 6:15, 22:22, 23:9

**Y**

**Yale** [1] - 32:8

**year** [3] - 26:8, 29:22

**years** [3] - 15:17, 20:16, 31:4

**yesterday** [5] - 3:17, 4:9, 4:21, 4:25, 8:13

**York** [1] - 18:10

**yourself** [3] - 3:7, 7:5, 10:11