UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA       :    Civil Action No. 11-948
                            :
                            :
v.                            :    September 12, 2011
                            :    AFTERNOON SESSION
                            :
H&R BLOCK, INC., et al.,    :
                            :    1:25 p.m.
            Defendants    :
. . . . . . . . . . . . . . :  . . . . . . . . . . . .

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
DAY 5
AFTERNOON SESSION
BEFORE THE HONORABLE BERYL A. HOWELL
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the United States:    JOSEPH F. WAYLAND
                         LAWRENCE E. BUTERMAN
                         ANTHONY DAVID SCICCHITANO
                         U.S. DEPARTMENT OF JUSTICE
                         950 Pennsylvania Avenue, NW
                         Suite 3121
                         Washington, DC 20530
                         (202) 514-1157

For the Defendants:     J. ROBERT ROBERTSON
                         COREY W. ROUSH
                         LOGAN M. BREED
                         HOGAN LOVELLS US LLP
                         555 13th Street, NW
                         Washington, DC 20004
                         (202) 637-5774

Court Reporter:         REBECCA STONESTREET, RPR, CRR
                         Official Court Reporter
                         Room 6511, U.S. Courthouse
                         Washington, D.C.  20001
                         (202) 354-3249

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHRISTINE MEYER | | | | |
| By Mr. Robertson | 3 | -- | 75 | -- |
|     Voir Dire | | | | |
| By Mr. Wayland | 54 | -- | -- | -- |
|     Continued | | | | |
| By Mr. Robertson | 54 | -- | -- | -- |


# E X H I B I T S

| NUMBER: | ADMITTED |
|---|---|

### (NO EXHIBITS ADMITTED INTO EVIDENCE)

1                        **P R O C E E D I N G S**

2              THE COURT:  Mr. Robertson, are you ready to call your

3     next witness?

4              MR. ROBERTSON:  Thank you, Your Honor.  Your Honor, the

5     defendants call Dr. Christine Siegwarth Meyer to the stand.

6                    (Oath administered by Courtroom Clerk.)

7              THE COURT:  Good afternoon, Dr. Meyer.

8              THE WITNESS:  Good afternoon.

9      **(CHRISTINE MEYER, DEFENDANT witness, having been duly sworn,**

10                          **testified as follows:)**

11                          **DIRECT EXAMINATION**

12    BY MR. ROBERTSON:

13    Q.  And Dr. Meyer --

14              MR. ROBERTSON:  Your Honor, may I proceed?

15              THE COURT:  Yes, please.

16    BY MR. ROBERTSON:

17    Q.  Dr. Meyer, just state for the record your full name.

18    A.  Christine Siegwarth Meyer.

19    Q.  And where do you work?

20    A.  I work at NERA.  That stands for National Economic Research

21    Associates.

22    Q.  And what does NERA do, just briefly?

23    A.  NERA is a firm of consulting microeconomists.  We have about

24    300 economists worldwide, and we do a variety of consulting

25    projects; some of them are litigation related, some of them are

1    not litigation related, but they all fall under the general

2    rubric of microeconomics.

3    Q.  Do you have a title there at NERA?

4    A.  Yes, I'm a vice president.

5    Q.  And what do you do at NERA?

6    A.  My work is in the area of industrial organization, and in

7    particular I work in the areas of antitrust and intellectual

8    property.  That encompasses a wide range of types of projects,

9    but a lot of them are merger related, just like this case here,

10   or other cases in which we work, for example, with firms that

11   are going into the agencies for an antitrust review.

12   Q.  Can you give the Court the kinds of analyses, just at a high

13   level of what that means, to be working in industrial

14   organization?

15   A.  Yes.  Industrial organization involves looking at supply and

16   demand as it relates to firms in markets.  So on the demand

17   side, we're looking at consumers and consumers who demand

18   products; how that demand might change if prices change, if

19   features change; how consumers, for example, view substitutes in

20   a market.

21        And on the supply side we look at the firms' decisions,

22   so how much of a particular product does a firm want to supply;

23   at what price does it want to supply; how do those decisions

24   change when, for example, costs change or when competitors in an

25   industry change.

```
 1                  So it's supply and demand conditions as related to
 2       firms specifically.
 3       Q.  And how does that relate to the term you used a moment ago,
 4       microeconomics?
 5       A.  That's a subsection of microeconomics.  Microeconomics
 6       generally just means looking at supply and demand at a more
 7       micro level; hence the term "microeconomics."  It's
 8       distinguished from macroeconomics.  Macroeconomists are the
 9       folks who look at things like inflation, unemployment, they're
10       trying to fix our economy and so on.  That's not what I do.  I
11       look at things on a micro, smaller level.
12       Q.  And how long have you been working in the area of
13       microeconomics?
14       A.  I've been working in the area of microeconomics ever since
15       I've been doing economics.  My first internship way back in
16       college - I guess that was in '87 - dealt with microeconomics.
17       It's over 20 years.
18       Q.  And where was that, ma'am?
19       A.  My internship was at the Office of Management and Budget.
20       Q.  And to your education.  Where did you go to college?  You
21       just mentioned you went to college somewhere.  Where was that?
22       A.  I went to college somewhere.  I went to the United States
23       Military Academy At West Point.
24       Q.  And what was your area of concentration there?
25       A.  We didn't call them majors there.  At the time they were
```

1    called areas of concentration, and I concentrated in economics.

2    Q.  And then after you graduated, what did you do then?

3    A.  Well, after I graduated I had to serve in the military, so I

4    chose my branch as military police.  I had to do some branch

5    specific training for that; following that training, I went to

6    my first duty assignment, which was at Ft. Campbell, Kentucky,

7    being an MP in the 101st MP company.

8           We were deployed to Saudi Arabia and then to Iraq as

9    part of what was called Operation Desert Shield and

10   Desert Storm.  Those names may ring a bell.  Today we call that

11   the first Gulf War, generally.  And I served there with an

12   infantry brigade.

13   Q.  And then I assume you must have left the Army at some point?

14   A.  I did leave the Army at some point.  After I returned from

15   the first Gulf War, I left the Army in 1992 to begin my graduate

16   studies at MIT.  I received my Ph.D. in economics in 1995 from

17   MIT.

18   Q.  And what did you do your dissertation in?

19   A.  My dissertation was in an area of microeconomics called

20   labor economics.  I did some work that looked at income

21   inequality and how that related to the changing divorce rate in

22   this country.

23   Q.  And after that, after you finished your Ph.D., what did you

24   do?

25   A.  After I finished my Ph.D., I went to teach.  I taught

1    economics and statistics first at Bentley College in

2    Massachusetts, and then at Colgate University in upstate

3    New York.

4    Q.  And what kinds of things did you teach?

5    A.  I taught economics, introductory economics, both at the

6    graduate and undergraduate level.  I taught statistics.  I

7    taught some microeconomics courses; for example, one was an

8    economics of race and gender based on some of my previous work.

9    Q.  And while you were teaching, did you get any opportunity to

10   do any consulting?

11   A.  Yes, I did.  I consulted for the U.S. Department of Commerce

12   for a publication that they call the *U.S. Industry and Trade*

13   *Outlook.*  There I was doing more industrial organization type of

14   microeconomics, in which I was studying industries, and I wrote

15   some pieces for them for that publication looking at basically

16   what we just talked about, supply and demand conditions in

17   industries.  I think it was electrical, equipment, and

18   production machinery and wholesaling were the industries.

19   Q.  And when did you start working for NERA?

20   A.  I started working for NERA in the year 2000.

21   Q.  And if we can just focus for a moment on the merger end of

22   the business, can you just describe your experience in the

23   merger area?

24   A.  In the merger area, that's -- the primary focus of my

25   antitrust work, as I said before, is in the area of mergers.

1    I've worked on many, many mergers.  I don't have an exact count,

2    but I looked at the total number of antitrust projects that I

3    had worked on, which was over 125, and the mergers are the

4    majority of that.  So I would say probably at least 70, maybe 80

5    mergers that I've had some involvement with during that time.

6         My work with mergers is generally the same types of

7    analysis that we see here.  Every merger is different, so each

8    merger may focus a little bit more on one type of analysis or

9    another.  But it all involves relevant market determination,

10   looking at closeness of competition, looking at unilateral

11   effect, coordinated effects, efficiencies analysis, entry

12   analysis.  All of those things are common and usually to one

13   degree or another present in most mergers.

14   Q.  And can you give us some examples of the types of industries

15   you've analyzed?

16   A.  I've analyzed competition in many, many industries.  I don't

17   specialize in one in particular.  I've done a lot of work in

18   computer hardware and software industries, movie theatres; I've

19   done work in a lot of industrial types of industries, like

20   industrial chemicals, other kinds of intermediate goods that

21   large steel companies, for example, use; I've done a lot of work

22   with supermarket type products, things like yogurt, beer, things

23   like that.

24   Q.  And have you ever had an occasion to work on anything

25   involving software?

1    A.  I have.  I've worked on quite a number of projects involving

2    software.  In fact, one of the first mergers that I worked on

3    involved hardware and software on what was the predecessor to

4    some of the IPhones and some of the portable devices that we use

5    today.

6    Q.  And without going into any details, have you ever had an

7    opportunity to work for the Department of Justice?

8    A.  I have.

9    Q.  And any of that recent?

10   A.  Yes, I worked for the Department of Justice in the earlier

11   part of this year.

12   Q.  And just without giving any details at all, just about what

13   percentage of your time have you spent working for them?

14   A.  I would say this year it was a pretty substantial project;

15   probably 25 percent of my billable time this year, this calendar

16   year, has been working for the Department of Justice.

17   Q.  And in these mergers that you've described generally, have

18   you had the opportunity over the years to analyze relevant

19   markets?

20   A.  Yes, I have.  Almost every merger there's some aspect of

21   relevant market involved.

22   Q.  And you mentioned unilateral and coordinated effects.  What

23   about efficiencies and entry?

24   A.  Yes, I've analyzed all of four of them, unilateral,

25   coordinated effects, efficiencies, and entry.

1    Q.  Have you ever been involved in surveys in relation to your

2    merger analysis work?

3    A.  Yes, I have.  You know, surveys can serve a very useful

4    purpose in merger analysis, particularly when other data are not

5    available.  I mentioned some mergers before in, for example,

6    products that are sold in supermarkets; there's a lot of data

7    that come out of those industries, because every time you scan a

8    product across a scanner, it gets recorded.  And so when we

9    analyze mergers in those industries, we can get a ton of data

10    and really do a lot of empirical work.  But in other industries

11    there isn't so much data, so when we're looking at measuring

12    things like diversion, elasticities, and cross price

13    elasticities, we looked at surveys as a good alternative.

14          Recently -- I have an example.  Recently I was working

15    on a case - this was just a pre-merger analysis for a firm - and

16    the product was actually sold in supermarkets.  It was not an

17    edible product, it was a sort of a health and beauty aid

18    product, but the firm thought that there was substantial sales

19    that went through beauty supply stores, Sally's Beauty Supply

20    and a lot of mom and pop type stores.

21          And the firm was concerned that what you saw in the

22    data coming out of the supermarkets might not be indicative of

23    competition elsewhere, so they asked us to do a survey to look

24    at what the survey would tell us about competition in the

25    supermarkets versus competition in the beauty supply stores.  Of

1    course then we were also able to take that information and

2    compare it back again to what we saw in the supermarket data,

3    because we actually had those data.

4         So we found that the survey did a very good job of

5    showing us what would have happened in supermarkets, because we

6    could compare it to real data, or historical data.  And then it

7    was also able to show us that what was happening in the beauty

8    supply stores, their competition was a little bit different.

9    And the firm found that very useful in understanding competition

10   for their products, and they had no other way of getting that

11   information.

12   Q.  And have you -- just generally, have you written in the area

13   of microeconomics?

14   A.  Yes, I have.

15   Q.  Just give us an overview of what you've done.

16   A.  I've written a number of papers generally in the area of

17   microeconomics, some of them have been in peer reviewed

18   journals.  Specifically in the area of antitrust, I've written

19   about the horizontal merger guidelines, I've written about

20   competitive effects, I've written about surveys and the use of

21   surveys in merger analysis.

22   Q.  And have you ever been qualified in court as an expert?

23   A.  Yes, I have.

24   Q.  And did you get an opportunity to testify?

25   A.  Yes, I did.

1    Q.  And did any of these things that you've mentioned, for

2    example, supply and demand, pricing, responsiveness to change in

3    pricing, things like that, come up in your testimony?

4    A.  Yes, they did.

5    Q.  And how did that relate to what you were doing?

6    A.  I was testifying about economic damages.  In particular, one

7    of the cases was, for example, a patent case, and so the

8    question is, if a particular product - namely the infringing

9    product, allegedly infringing product - wasn't on the market,

10   how would that change the sales of the patentholder's product.

11   That was the question that I had to deal with.  And so that

12   looks essentially at the question of substitutability between

13   the infringing product, the allegedly infringing product, and

14   the patentholder's product.  So although it's a different area

15   in terms of the law, in terms of the economics we use the same

16   tools, we look at the questions really with the same framework,

17   supply and demand, substitutes, elasticities.

18   Q.  Have you been engaged to work in other litigation that

19   relates to this same kind of microeconomics?

20   A.  Yes, I have.

21   Q.  And have you ever testified in depositions?

22   A.  Yes, I have.

23   Q.  And have you ever been asked by an antitrust agency to

24   testify in a hearing?

25   A.  Yes, I have.

1    Q.  Can you describe what that was?

2    A.  Certainly.  The FTC -- because of my work on both antitrust

3    and intellectual property matters, and some of my writings in

4    those areas, the Federal Trade Commission asked me to testify in

5    some hearings, I think in 2009, related to some changes in the

6    area of patent law, and the impact of those changes on

7    competition.

8    Q.  Thank you.

9         MR. ROBERTSON:  Your Honor, at this time I would like

10   to proffer Dr. Meyer as an expert in microeconomics and

11   industrial organization.

12        MR. WAYLAND:  No objection, Your Honor.

13        THE COURT:  Dr. Meyer will be accepted to opine and

14   give her expert opinions in that area.

15        MR. ROBERTSON:   Thank you, Your Honor.

16   BY MR. ROBERTSON:

17   Q.  Dr. Meyer, just before we go into a lot of details here,

18   could you just summarize your opinions, if any, that you've

19   reached in this case?

20   A.  Certainly.  It is my opinion that the appropriate relevant

21   market to analyze this merger is all tax preparation methods.

22   It is my opinion that within that market for all tax preparation

23   methods, that market is unconcentrated today, and will remain

24   unconcentrated after the merger.  The shares of TaxACT and HRB

25   are relatively small, meaning together they have in this case

1    approximately 20 percent of that market.  When I see an

2    unconcentrated market, that tells me that the likelihood of

3    anticompetitive effects is very low, and that means both the

4    likelihood of unilateral effects and the likelihood of

5    coordinated effects.

6         Furthermore, however, I went and delved deeper into the

7    question of unilateral and coordinated effects.  In the area of

8    unilateral effects, I believe it's unlikely that this merger

9    would lead to any anticompetitive unilateral effects because of

10   several factors.  One of which is there is very little what we

11   call diversion between the merging parties' products; the not,

12   as we would call them, particularly close substitutes in the

13   marketplace.  That means that there's very little incentive for

14   the merged entity to raise prices post merger.  But even on top

15   of that, there are a lot of other competitors to which consumers

16   could turn and would likely turn in the event of a price

17   increase.

18        This market is also dynamic.  I've heard testimony and

19   certainly seen evidence about the fact that a lot of the way in

20   which firms compete is by offering free products which don't

21   necessarily provide them with any revenue or profit in the first

22   year in which they're offered.  Sometimes it takes a tax filer a

23   year or two years to convert to being -- to going from a free

24   status to actually paying.  So that's an additional constraint

25   on the firms, because if they increase the price or decrease the

1    quality of their free products in one year, they have to also

2    consider the fact that in subsequent years that taxpayer isn't

3    going to be monetized, as they call it.

4         In addition, there are substantial efficiencies that

5    the firms have consolidated that would arise out of this merger.

6    Efficiencies have a downward -- tend to have a downward effect

7    on pricing, and so would undo any potential incentive to raise

8    prices because of the coming together of these to firms.

9         Finally in that area there's the strong possibility

10   that if there were any anticompetitive action by the firm, that

11   there would be expansion by competitors such as TaxSlayer and

12   TaxHawk, whose testimony I heard this morning; could even be

13   entry.  But certainly those two companies appear poised and

14   ready to take advantage of any profit opportunity that an

15   anticompetitive price increase would give them.

16        Having said that, entry of that sort is likely to

17   thwart that anticompetitive price increase in the first place,

18   because the merging parties know that if they were to undertake

19   such an anticompetitive price increase, that expansion will take

20   away any profits that they hope to make.

21   Q.  And you mentioned earlier, ma'am, the term "diversion."  And

22   we've also heard in this case the term "switching."  Are they

23   the same?

24   A.  No, they're not the same.

25   Q.  Can you explain to the Court, please, what we're talking

1    about here?

2    A.  Certainly.

3    Q.  I think I was being pretty confusing myself the other day

4    about it.

5    A.  Happy to do it.  Diversion means if the price of a

6    particular product goes up, the customers that leave that

7    product, where do those customers go?  So to put it into some

8    concrete terms, if we're talking about diversion from HRB, we're

9    saying if HRB raises the price of its products, a certain number

10   of people will stay, and they're not really considered in this

11   area of diversion.

12        We look at the people who are going to leave HRB in

13   response to the price increase, and we say:  What percentage of

14   them would go to, for example, TurboTax.  That would be the

15   diversion ratio.  What percentage of the people who leave HRB

16   will go to TaxACT?  What percentage of the people who leave HRB

17   would go to assisted?  So that's diversion.  It has to be in

18   response to a change in price, typically; could be in response

19   to a change in quality or features as well, but generally

20   speaking, we think about it as responsiveness to changes in

21   price.

22        Switching is what we just see happening without regard

23   to what the reason for the switch is.  You know, every year

24   there are consumers that for whatever reason, maybe their

25   situation changed, maybe their situation didn't change; maybe

1    they just heard about a new product and they wanted to try it;

2    maybe they saw an advertisement and wanted to try a new product;

3    maybe they saw that a product has a low price, and maybe price

4    was a factor in some of those switches.  But, of course, we

5    can't tell, it's just switching that happens historically.  So

6    those are not the same concepts.

7    Q.  And just generally, can you tell us what kinds of materials

8    you were able to review before you reached an opinion in this

9    case?

10   A.  I reviewed a lot of materials.  They included documents

11   produced in the course of this litigation, they included

12   testimony, both declarations and deposition testimony from a

13   number of different employees of the firms, and also employees

14   of other firms.  I also spoke with some employees of H&R Block,

15   some employees of TaxACT, I spoke with some employees from

16   Directions Research, which was a firm that did some of the

17   surveys that are at issue in this litigation.  I also spoke with

18   the two gentlemen that testified this morning, Mr. Kimber and

19   Mr. Rhodes from TaxHawk and TaxSlayer.  Those are the things

20   that come to mind.

21        Of course, I also relied on my background as a

22   microeconomist.  I looked at economic literature on some

23   relevant topics.  Those are the things that come to mind.

24   Q.  And did you see that Dr. Warren-Boulton had not had an

25   opportunity to look at his own model, the merger simulator?

1    A.  I'm sorry?

2    Q.  Did you see that Dr. Warren-Boulton did not even have an

3    opportunity to look at his own model, the merger simulator?

4            MR. WAYLAND:  Objection, Your Honor.

5            THE COURT:  Are you objecting to the form of the

6    question?

7            MR. WAYLAND:  To the form, yes.  Form of the question,

8    argumentative, there's no foundation.  If we can get her

9    opinion, not his argument.

10           THE COURT:  Overruled.

11           If you can answer the question.

12   A.  I do understand that in testimony he had indicated that he

13   wasn't familiar with his merger simulation model.

14   BY MR. ROBERTSON:

15   Q.  Do you have any reaction to that at all?

16   A.  I certainly have -- you know, would look at any model that I

17   or my staff have run, but I don't have a particular reaction.

18   Q.  Did you have a chance to look at his model yourself?

19   A.  Yes, I looked at his model.

20   Q.  Now let's go to the first point you mentioned, which is the

21   market definition.  Could you explain to the Court what the

22   point is?  Why are we doing this?

23   A.  Certainly.  The point of market definition is really to

24   provide us with a starting point to understand the alternatives

25   that consumers face in this marketplace, what they consider to

1    be their substitutes.  It's a way of thinking about what are the

2    confines of this market in order to do things like calculate

3    market shares and calculate HHI's, which are the measure of

4    concentration that I'm sure that Dr. Warren-Boulton testified

5    to, and that we typically use in merger review.

6            So the point really is all about the alternatives that

7    consumers would turn to in the case of a price increase.  It's

8    very similar to what we just talked about with diversion.  It's

9    about substitutability of products.

10   Q.  And why, if it is important, should one identify what those

11   alternatives are that consumers can select as a substitute?

12   A.  Well, again, because that's what constrains the actions of

13   the firms in this market.  If there are a lot of other

14   substitutes to which consumers can turn, and would turn, in the

15   case of a price increase, then if a firm attempts a price

16   increase, then those customers will leave to those other sources

17   and then that price increase will not be profitable.

18           If instead all of the substitution within this

19   marketplace is between the two merging parties, then we have the

20   type of situation that you might be concerned about.  Of course

21   there might be other factors that you would look at, but that

22   would be a case in which the merger leads to a great deal of

23   internalization of competition.

24           But if there's a lot of substitution from the parties'

25   products to products that are not going to be under the control

1       of the merging parties, then there's a lot of competition left

2       after the merger, there's not going to be the incentive to raise

3       price, and there are a lot of places that consumers can go.

4       There are a lot of substitutes, a lot of alternatives that they

5       can turn to.

6       Q.  Can you walk us through the basics of what one does to build

7       what the relevant market should be, in your experience?

8       A.  Certainly.  The starting point is obviously the products of

9       the merging parties.  It's called a relevant market because it

10      has to be relevant to what we're doing.  So we start with the

11      products of the merging parties, and then the first step is to

12      say:  Well, what are the closest substitutes?  What are the next

13      best alternatives to the products offered by the merging

14      parties?  And then we include those in the marketplace.

15      Q.  And why is it important to look to the next best closest

16      substitute?

17      A.  Because what you want to understand is what's constraining

18      the firms in the marketplace.  So if you leave out the closest

19      substitutes in your relevant market, then you've missed the

20      whole point of market definition, which is to understand what's

21      constraining these firms, what's acting in terms of competition

22      in this market that's leading to the actions that we see in the

23      marketplace.  The firms are setting their prices, they're taking

24      their decisions in response to the competition that they're

25      facing.

1          And so if you leave the most important competition out

2     of your marketplace, then you've really missed the point of

3     market definition.  I have an analogy, if I can.

4     Q.  Sure.  Go ahead.

5     A.  I know that the analogy of Coke and Pepsi gets thrown

6     around, I think gets thrown around a lot because we can all

7     relate to it.  But if you imagine a merger that involves colas -

8     and let's say for the moment that all cola brands are

9     independently owned so I don't have to worry about who is owning

10    which brand - and I'm thinking about a merger between RC Cola

11    and Dr. Pepper, and I say, "Okay" -- I take RC Cola and

12    Dr. Pepper and I add Pepsi to it, and I say, "Well, you know

13    what, there's a test that I can do; if it passes the test,

14    that's going to be my relevant market," and I leave out Coke,

15    you know that you've left out an important dimension of

16    competition in the marketplace.  It might pass a mathematical

17    test, but it doesn't tell you what's important for understanding

18    competition in the marketplace.  And that's at the end of the

19    day what the relevant market test is supposed to do, it's

20    supposed to inform us about what's happening with regards to

21    competition in this marketplace.  So you have to include the

22    closest substitutes.

23    Q.  And this method that you've described that one has to do

24    this in some kind of order, picking the next closest substitute,

25    is that something, to your knowledge, that is an accepted method

1    in your industry?

2    A.  Yes, absolutely.  I mean, we see that everywhere.  The

3    merger guidelines, for example, speak specifically to that.

4    There's literature, there's writings that speak to that, and

5    that's accepted in the industry, yes.

6         MR. ROBERTSON:  If I can approach the witness,

7    Your Honor.

8         THE COURT:  Yes, you may.

9         MR. ROUSH:  May I approach with courtesy copies,

10   Your Honor?

11        THE COURT:  Sure.  Thank you.

12   BY MR. ROBERTSON:

13   Q.  Dr. Meyer, you mentioned that doing this construction of the

14   potential market in a certain order, by adding close and

15   substitutes, is accepted, the accepted method in the industry.

16   And you mentioned a couple of sources for that.  Did you have

17   the opportunity to collect some of those sources for your

18   testimony here today?

19   A.  Yes, I did.

20   Q.  And if you turn to Tab 9, are these the sources you were

21   referencing?

22   A.  Yes, that's correct.  This is certainly not the full

23   universe of sources, but these are three examples of sources,

24   yes.  And good ones.

25   Q.  Okay.  So, for example, can you explain to the Court your

1    understanding of the DX 9805-1 from the 2010 Horizontal Merger

2    Guidelines Section 4.1.1?

3    A.   Certainly.   This comes, as it notes here, from what we call

4    the new horizontal merger guidelines that were introduced in

5    2010, but this same concept is found in earlier versions of the

6    horizontal merger guidelines.   This is not something new or

7    novel.

8         And in particular, you can read this here, but what it

9    says is, if you're going to include Products One and Two in a

10   market, and there's a Product Number Three which is a closer

11   substitute to one of the products that's already in the market

12   than One and Two are to each other, then you have to include

13   Product Three in the market.

14        So in other words, you can't leave out a closer

15   substitute and include a more distant substitute.   That doesn't

16   make any sense, again, because you've missed the whole point of

17   market definition.

18   Q.   And you mentioned that the concept has been there for a

19   while.   On page two, are you familiar with this that you

20   selected, the 2006 commentary on the horizontal merger

21   guidelines?

22   A.   Yes, I am.   Yeah, this comes from -- the previous version of

23   the horizontal merger guidelines had been out for a while, so

24   then there was a commentary that was released to give some

25   more -- as I understand it, some more texture as to how the

1    agencies were actually using the guidelines in their actual

2    work, to provide a little transparency to the firms that were

3    coming in for merger review.

4         And in particular here it mentions to iteratively

5    broaden the market, so to step by step add the next substitute,

6    and then after that the next best substitute.

7    Q.  And then finally, as an example, on page three of DX 9805,

8    something by a Joseph Farrell.  Do you know who he is, ma'am?

9    A.  Yes.  Joseph Farrell is -- I don't know his official title,

10   but he's basically the lead economist at the Federal Trade

11   Commission, which is the other agency besides the Department of

12   Justice which analyzes mergers.  He also mentions to make sure

13   that you include the closer substitutes, because if you don't do

14   that - this is the way he describes the end result of a market

15   that doesn't go step by step and includes the closest

16   substitute, and I think this is a pretty good description -

17   it's just a market consisting of miscellaneous unconnected

18   links.

19   Q.  And what is your understanding of -- or an example of

20   unconnected links?

21   A.  Well, I would say Dr. Warren-Boulton's relevant market is a

22   miscellaneous set of unconnected links, because it doesn't

23   include the closest substitute, which is assisted tax

24   preparation, the closest substitute to H&R Block, which is

25   assisted tax preparation.  It doesn't include pen and paper,

1    which is the closest substitute to TaxACT.

2             And so for both of the merging parties, he has excluded

3    the tax preparation method that's the closest substitute.  So I

4    think that is the definition here of a market of miscellaneous

5    unconnected links.

6    Q.  And just to be clear, is that even using his data?

7    A.  His data would certainly say that you have to include

8    assisted tax preparation.  I've then gone in the previous answer

9    that I just gave you and also used a corrector version data.

10   That also tells you that pen and paper should be in the market.

11   But even using his switching data, which is not diversion data,

12   assisted tax preparation should be in the market.

13   Q.  And just an example, Dr. Warren-Boulton says, well, if you

14   include these other substitutes like assisted preparation or pen

15   and paper, then it's just like defining a market of water, I

16   think, was his example.

17            In your experience, are there cases where you end up

18   defining the market as all the substitutes and methods for doing

19   something?

20   A.  Absolutely.  I mean, the question is, again, what are the

21   substitutes that consumers turn to.  And if they turn to all of

22   the available methods or ways of doing something, then that's

23   the relevant market.

24            I can give you an example.  I mentioned that I did a

25   lot of work in industrial chemicals, and one of the cases

1    involved a chemical that ends up being used to basically make

2    the filling for diapers.  There's really no other way that

3    you're going to fill a diaper other than using this product.

4    It's called a super absorbent polymer, and there's a product

5    called a glacial acrylic acid that goes into making this

6    product.  You know, there is the old style of, I guess, some

7    kind of cloth diaper, but realistically, for all the diapers

8    that most of us have used - including myself - you're going to

9    use these super absorbent polymers that come from this GAA.

10        So any company that made GAA was in that relevant

11   product market.  There's no realistic alternative that a diaper

12   manufacturer is going to turn to, at least not in the near term.

13   Perhaps in the long-term there could be some innovation, no

14   doubt, but in the near term, those were all the alternatives and

15   that was the relevant product market.

16        Similarly, if you think about a drug, a pharmaceutical

17   product that's used to treat a life-threatening disease, and

18   let's say there's only one kind of compound that can treat the

19   disease, and that drug is available as a branded and a generic

20   drug, and let's say that the evidence shows that the branded and

21   the generic drug compete on price - let's say for formulary

22   use - then that's likely to be a relevant product market.  And

23   no one is going to argue that you're not going to take that drug

24   and not save your life in the case of a five to 10 percent price

25   increase.  But that's okay.  If those are the substitutes, then

1      that's what you include in your relevant market.

2                THE COURT:  But Dr. Meyer, I heard you say that you

3      thought the closest substitute for H&R Block's digital

4      do-it-yourself software was assisted, and the closest substitute

5      for TaxACT's digital do-it-yourself software was pen and paper.

6      You don't mean to suggest that you're excluding as substitutes

7      other digital do-it-yourself software, are you?  That's not how

8      I understand your report.

9                THE WITNESS:  Absolutely not.  Absolutely not.  That's

10     not what I'm saying.

11               THE COURT:  Are you saying that you think that pen and

12     paper for TaxACT and assisted for H&R Block are closer

13     substitutes than other digital do-it-yourself software?

14               THE WITNESS:  That's what the data indicates.  Yes, it

15     does.

16               THE COURT:  I just wanted to make sure I understood you

17     correctly.

18               THE WITNESS:  That's exactly what the data indicate.

19     Now, I'm certainly not suggesting that you then leave out the

20     other digital DIY products.  No, not at all.  In fact, when you

21     look at the data, TurboTax, for example, in terms of diversion,

22     is very similar to -- the diversion from H&R Block to assisted

23     and the diversion to (sic) H&R Block and TurboTax is relatively

24     close.  Assisted happens to have a higher diversion ratio than

25     TurboTax, but there's a lot of diversion from H&R Block to

1     TurboTax as well.  So absolutely that should be in the market.

2           And the same on the TaxACT side.  There's a lot of

3     diversion from TaxACT to TurboTax, and a lot of diversion from

4     TaxACT to other digital DIY products like -- the various

5     products like TaxSlayer, FreetaxUSA, in particular.

6           THE COURT:  But you still think the closest substitute

7     to TaxACT is pen and paper?

8           THE WITNESS:  Yes, that's what the data indicate.

9     BY MR. ROBERTSON:

10    Q.  And just so we can maybe make this a little clearer, would

11    you be able to show the Court how you view the market

12    graphically?

13    A.  Certainly.

14          MR. ROBERTSON:  And Your Honor, if we could just borrow

15    one of the working microphones.

16          May I approach the witness, Your Honor?

17          THE COURT:  Yes, you may.

18    A.  I think it would be useful if I use the same starting point

19    as Dr. Warren-Boulton did, so that we're not looking at all

20    kinds of different graphs in different ways and trying to figure

21    out how they all line up.  So let me begin with the same product

22    that he had, and then show you how my market fits in.

23          So he began -- and again, the way -- and I'm happy to

24    do it in the same general way.

25          MR. WAYLAND:  Your Honor, may I just move so I can see

1    what she's drawing?

2              THE COURT:  Absolutely.

3    A.  His depiction started with free and then moved up in terms

4    of pricing.  So I'm going to use that same idea.  So as we go up

5    here, we're going to talk about prices going from free up to

6    higher priced products.

7              So he talked about TaxACT, and then I think he drew

8    something, a bar like this, to indicate that HRB's prices, while

9    starting at free just like TaxACT, their top prices were higher

10   than TaxACT's.  So I'll start there.

11             And now I'll draw in TurboTax.  That has some top end

12   prices that are a bit higher than HRB, and also whose market

13   share is considerably higher than HRB or TaxACT.  So in order to

14   draw them correctly, I'm just going to draw that as a wider bar,

15   so that's going to indicate to me that they have higher sales,

16   higher share.

17             So this is TurboTax - that's Intuit - and then you have

18   assisted tax preparation.  There are some free products, there

19   are some low priced products, and then of course we know that

20   the price can go considerably higher than TurboTax as well, and

21   their market share is about four times or so the market share of

22   TurboTax.

23             So here's the assisted group, and then down at the

24   other end - and I'll draw them to the right of TaxACT - are, of

25   course, TaxHawk and TaxSlayer, who we saw today, and a number of

1    other firms with low price products on the FFA and also on their

2    web sites.  And then, of course, also pen and paper, which for

3    all practical purposes is free.  We can talk about the price of

4    the stamp, but for all practical purposes, I can think about

5    that as being free.

6         So this is the way that I think of the market.  And as

7    I said before, when we think about diversion - I'll use another

8    color - what we see in the data are that the diversion from HRB

9    is first and foremost to assisted tax preparation, also to

10   TurboTax, also to pen and paper.  And then we look at the

11   diversion from TaxACT; it's first to pen and paper, it's also to

12   TurboTax, and it's also to these other digital DIY products.

13        So it's clear when you look at it that there's

14   diversion, that there's movement with response to price all

15   across this market.

16        MR. ROBERTSON:  Your Honor, we will mark that, if the

17   witness could just write on there DTX Number 4.

18   BY MR. ROBERTSON:

19   Q.  Now, Dr. Meyer, what kinds of evidence did you consider when

20   you defined your market as all tax preparation?

21   A.  I took a number of pieces of evidence into account.  One set

22   of evidence had to do with the testimony given by many, many

23   business people in this industry that said that they looked at

24   any tax filer, any potential taxpayer, as a potential customer.

25   I heard both Mr. Kimber and Mr. Rhodes say that this morning; I

 1    saw that in testimony from Mr. Cobb, Mr. Bennett, Mr. Dunn, and

 2    other -- the person who runs on-line taxes said the same thing.

 3    So that's -- as sort of as a starting point, as a way to begin

 4    the conversation, that's what I looked at first.

 5          Then I went and I also saw documents that had the same

 6    concept, that basically they're looking across the board in

 7    terms of competition.

 8    Q.  Now, just to be clear before we go into some of these

 9    examples here, at any time, from the very beginning of your work

10    to now, has anybody, from me to any of my staff, ever given you

11    any direction of what market you should come up with?

12    A.  No.

13    Q.  Now, if you look at the evidence that you just mentioned,

14    some of that is document evidence?

15    A.  That's correct.

16    Q.  And did you gather just a few examples of that for the

17    Court?

18    A.  Yes, I did.

19          MR. ROBERTSON:  And some of these, Your Honor, are

20    going to be -- some of them are confidential and some are not,

21    and those that are confidential, we're going to see if we can do

22    it like counsel did the other day, show them to Your Honor and

23    not go into the details.

24    BY MR. ROBERTSON:

25    Q.  And turning you to Tab 5.

1    A.   (Witness complies.)

2    Q.   And this one has already been used in the public session.

3    Can you just tell the Court what you take to be the relevance,

4    if any, of this document?

5    A.   Absolutely.  On the second page of this document, for

6    example, it talks about expecting the retail business, and by

7    that -- this is an HRB document, so for them, the retail

8    business means the tax stores, assisted tax preparation,

9    essentially, that -- this was written by Mr. Smyth, who was the

10   CEO at the time, and he expects the retail business to

11   aggressively market their services against retail and digital;

12   and likewise, the digital business to aggressively market

13   against retail and digital.

14        So that shows his expectation that there's aggressive

15   marketing between retail and digital DIY.  I think there's

16   another quote on the first page as well.

17   Q.   And let me see if I can go through some of these that are

18   not confidential.  For example, in Tab 2.

19   A.   Yes.

20   Q.   Why did you pick that Tab 2, ma'am?

21   A.   Well, Tab 2 is important.  One of the things that I did --

22   that I did not mention in terms of my review of documents in

23   order to come to my opinion was that I looked at the web pages

24   of all of the major players in this industry - and TurboTax is

25   obviously one of them - and one of the things -- there's a tab

1    at the top of TurboTax's web site that says something to the

2    effect of, "Why choose TurboTax," and when you click on it, I

3    think the third thing that comes up is a comparison between

4    TurboTax and tax stores.  Then, when you in turn click on that

5    comparison, this is the page, essentially, that comes up, which

6    looks at a side-by-side comparison of tax stores and TurboTax,

7    and in particular is talking about, at the top of the page, how

8    switching to TurboTax could save you money.  Which is a

9    particular reference, in my estimation, of competition on price,

10   and suggesting to the consumer that if they make the switch,

11   then they will save some money, they'll get a lower price.

12          It could also refer to -- at the bottom they're talking

13   about saving money by perhaps also getting a good refund from

14   the IRS, or paying less in taxes.

15   Q.  And without going into the details of any of the documents

16   that are in camera or confidential, just generally what if at

17   all is the importance of what Intuit's strategy is in terms of

18   your analysis?

19   A.  Well, Intuit is clearly the largest player in the digital

20   DIY space, and so to look at what Intuit is doing gives you a

21   good sense of what's going on in the market.

22          You know, this is a case like almost every case that

23   I've looked at where different players in the industry have

24   different views on the marketplace.  That's not surprising.

25   Particularly players that are smaller tend to have a pretty

1     narrow focus on exactly what's happening to them day-to-day;

2     companies like Intuit, larger companies, tend to have a little

3     bit of a broader view of the market and a little bit of an all

4     expansive view.  And really that's closer to what I'm looking

5     at.  I'm looking at sort of not down in the weeds, but sort of

6     take a step back and what does competition look like across the

7     market for all of these players.

8              So Intuit, TurboTax, being the largest of the digital

9     DIY players, looking at how they compete, how they market, where

10    they think they're taking customers from, that's critical to my

11    analysis.

12    Q.  And if you turn, please, to Tab Number 1, which is an

13    H&R Block document, "Tax Season '10 Market Dynamics."  Is this

14    one of the documents you selected, Dr. Meyer?

15    A.  Correct.

16    Q.  And can you point the Court to an example of a page here?

17    A.  Yes, there are several pages in here that are relevant.  For

18    example, if you look at page 17, this is certainly not the only

19    relevant page in this document, but this is an example.

20    Q.  And what relevance, if any, is page 17 to the kinds of

21    things that you were looking at?

22    A.  Well, this is -- they're looking at HRB Office, and they're

23    asking, you know, what's the source and destination for those

24    customers.  This is, again, their assisted product.  And you

25    notice that they're not just looking at other assisted tax

1    preparation methods, they're looking across the board at where

2    their customers are coming from in terms of on-line, in terms of

3    software, and all the other methods.

4    Q.  If you could turn to page 13, please.

5    A.  (Witness complies.)

6    Q.  You're familiar with page 13?

7    A.  I am.

8    Q.  Could you explain to the Court what if any relevance this

9    has to the kinds of things that you've been explaining to the

10   Court?

11   A.  Again, this again looks at -- this is switching data, so it

12   certainly is subject to the distinction that I talked about

13   between switching data and diversion data before.  But it looks

14   here at switching by method, and looks at specifically the fact

15   that switching from - and this is in the second bullet point -

16   TaxACT is far lower than other on-line and HRB on-line.  So it

17   specifically talks about switching, and it looks across the

18   board at various methods.

19   Q.  And if you turn to Tab 3, please.

20   A.  (Witness complies.)

21   Q.  And why did you pick Tab 3?

22   A.  Tab 3 is H&R Block's annual report, and in here there's a

23   discussion, and I don't recall the page...

24   Q.  Turn to page 10, please.

25   A.  10?  There's a discussion of competition.

1          MR. ROBERTSON:  And if we could blow up this top

2     paragraph.  It's page 10, but it's marked as DX 358 at 26.  The

3     whole paragraph, please.

4     BY MR. ROBERTSON:

5     Q.  Did I blow up the right one, ma'am?

6     A.  Yes, that is correct.

7     Q.  And explain to the Court what relevance, if any, this has to

8     the kinds of things that you were analyzing.

9     A.  Here again, if you look at the entire section that's blown

10    up, it talks about retail tax business being highly competitive,

11    and that there are a number of tax preparation firms and

12    accounting firms and other firms.  And then they talk about

13    electronic filing, digital tax solutions as well.

14    Q.  And you mentioned other documents.  And without going into

15    the identity of who it is and what is actually in detail here --

16    if we could turn to Tab 4, please.  And you can look in your

17    book, but the rest of us, we don't want to see this on the

18    screen, please.

19          And without identifying anything here, can you point

20    out to the Court some pages that the Court should look at to

21    understand how it fits in with your analysis?

22    A.  Certainly.  Well, the second page, the first page that has

23    writing on it --

24    Q.  Don't read what it says.

25    A.  I won't read what it says.

1    Q.  Point out which bullet point.

2    A.  The first two bullet points, the first two major bullet

3    points, I think are indicative of the type of analysis that I've

4    seen in similar documents from the same firm.

5    Q.  And then on Tab 6, is this another document that you

6    selected?

7    A.  Yes, that's correct.

8    Q.  And without identifying who it is, just give the Court an

9    example of the part of the document that the Court could look at

10   that fits in with what you've been describing.

11   A.  Yes.  For example, on page 16, the second bullet point in

12   the tan box is an example of the type of analysis that I've seen

13   in this firm's documents and other places as well.

14           MR. ROBERTSON:  Your Honor, was that sufficient to

15   point us in the right direction?

16           THE COURT:  Uh-huh.  That's good.

17   BY MR. ROBERTSON:

18   Q.  Dr. Meyer, did you get an opportunity -- and we'll talk

19   about this in more detail later, but the Block pricing simulator

20   from 2009?

21   A.  Yes.

22   Q.  And does that relate at all to what we've been talking about

23   here?

24   A.  Yes, it relates very directly.  The pricing simulator is one

25   of the pieces of evidence in this case, one of the few pieces of

1    evidence that go to a quantification of some of the concepts

2    that are important; in particular, the quantification of

3    diversion ratios.  The pricing simulator was a survey that was

4    conducted by a firm called Directions Research for H&R Block,

5    and Directions Research conducts a lot of research for H&R Block

6    in the ordinary course of business.

7         This particular pricing simulator is very similar to

8    the types of surveys that I would conduct and that I've written

9    about that are useful for antitrust analysis.  And in particular

10   the way that the pricing simulator survey was done was the

11   following:  A respondent sees on a computer a number of

12   different what we call scenarios; usually there are five

13   scenarios or 10 scenarios, depending on the respondent.  So a

14   respondent sits down at the computer and gets a scenario.  And

15   what does this scenario consist of?  Well, a scenario consists

16   of a set of alternatives.  There will be, for example, an

17   HRB Basic alternative, and there will be a particular price

18   associated with that alternative.  And then the respondent was

19   able to click on the icon and bring up more information about

20   that product, some of the important features and so on, so that

21   they could get some sense of what they were comparing.

22        And then there might be an H&R Block Deluxe product at

23   a particular price point in this scenario, and then maybe a

24   TurboTax product at a particular price point, and so on.  There

25   would be assisted tax preparation, maybe there would be a CPA

1   option, there would be an option for a tax store, there would be

2   an option for manual pen and paper.  So there would be a set of

3   alternatives that a respondent would see, but each one only had

4   one price point.

5        And then the question was:  If these were the options

6   that you had available to you, which would you choose?  And then

7   they would click and say:  This is the one I would choose.

8        Then the screen would go blank, come back up with a

9   completely new scenario in which some of the prices may have

10  changed, some of the prices may not have changed.  And again,

11  the same thing would be asked:  If these were the alternatives

12  that you faced, which one would you choose?  And again, that

13  would go through either five times or 10 times, depending on

14  certain respondents.

15       So there were about 6,000 -- over 6,000 respondents in

16  this survey, and so what you have, then, coming from that survey

17  is literally tens of thousands of scenarios and choices.  So

18  there's no one respondent in that survey that's asked sort of a

19  pointed question, like:  Well, if the price went up by five or

20  10 percent, what would you do?  Instead, what you do is you take

21  all of that data and you say:  Well, let's look and compare.

22  There are respondents that saw the low price, let's say; that

23  saw the medium price; that saw the high price.  And, of course,

24  they didn't just see changes in price for one product, they saw

25  changes in price for a number of products.  These were all

1    happening at the same time.  But statistically we're able to

2    separate those out and say:  So statistically, controlling for

3    everything else, what is the effect on the likelihood of

4    choosing a particular product if the price of H&R Block Basic

5    goes from 14.95 to 19.95?  And we can not only see the effect on

6    the percentage of people who chose H&R Basic, but we can also

7    see how that affected the percentage of people who chose

8    assisted or TurboTax or pen and paper.

9         And so what we can get from that survey is really good

10   evidence as to not only what we call the own price elasticity -

11   so if you raise the price of H&R Basic, what happens to the

12   percentage of people, the number of people who choose

13   H&R Basic - but we also get direct evidence on diversion.  If

14   you raise the price of H&R Basic, how many more people choose

15   assisted, how many more people choose TurboTax, how many more

16   people choose pen and paper.

17        So that's why that pricing simulator, if you can't have

18   real world historical data, that something like this pricing

19   simulator - which the type of survey that's done is called a

20   conjoint survey - that's very good evidence for diversion.

21   Q.  And do you know how much of what you've defined as the

22   relevant market here the survey actually addresses?

23   A.  The survey -- as potential?  As potential substitutes, the

24   survey includes all of these products.  I mean, the survey was

25   not limited in any way to say:  Well, you could only switch to

1    digital DIY products, or something like that.  It allowed the

2    respondents to choose between any of the products in my relevant

3    market.

4    Q.  And you mentioned some of the documents you reviewed, and

5    examples from H&R Block, examples from TurboTax and others.

6    What about TaxACT?  Did you get a chance to look at the evidence

7    there in terms of your definition of the market?

8    A.  I did look at TaxACT.  In terms of TaxACT, I certainly saw

9    some testimony by Mr. Dunn in which he mentioned that when he's

10   thinking about competition and price setting and so on, that he

11   considers the fact that pen and paper is free and will always be

12   there, so there's only so high that he can raise his price.  And

13   that's completely consistent with an e-mail that I saw in which

14   there's some discussion back and forth about the potential for

15   raising the State price of TaxACT, and the only concern that's

16   raised in terms of diversion is to pen and paper.

17   Q.  Now, there's this large block on your chart DTX Number 4

18   that has "Assisted."  Do you know from the review of evidence in

19   this case whether this market has been static all the way back

20   to 1998?

21   A.  Well, clearly this market has not been static.  I mean,

22   we're talking -- for example, TaxACT and H&R Block, the products

23   that we're talking about here are software.  We know that

24   software is generally not static.  But other parts of the market

25   as well are changing.  I mean, one of the changes is the sort of

1    blurring of the lines between some of the digital DIY products

2    and the assisted products, but there are a lot of other changes.

3    This is definitely a space that's characterized by a lot of

4    innovation.

5    Q.  Would it surprise you at all if people looked at the market

6    differently back five or six years ago?

7    A.  No, it wouldn't at all.

8    Q.  Now, when you talk about blurring of the lines, can you give

9    us some examples of what you're talking about between assisted

10   preparation and digital, for example?

11   A.  Sure.  There are a number of different products, mostly at

12   this point in time by H&R Block, because obviously they have a

13   particular niche in this industry in which they both have an

14   assisted product and they have the digital DIY product.  They're

15   not the only one to have that, but that's certainly something

16   that they look to to differentiate themselves, and they are

17   trying to use that in bringing out new products such as a

18   product that I believe is called Best of Both, in which you can

19   take your completed digital DIY tax return and submit it to one

20   of their tax pros, and then they'll check it over and submit it,

21   then, under their name.

22        There's also a product called Second Look, I think,

23   where no matter what kind of tax preparation you use, whether

24   you did it by hand, whether you used a digital DIY product,

25   whether you used another assisted product, you can take your tax

1   return into an H&R Block retail location - so in other words, a

2   tax store - and they'll look at it for you.  And if there are

3   any changes in -- substantial changes that need to be made, then

4   I understand that you have to sort of pay more to have those

5   changes made.

6           But that's another example of where there are ways for

7   consumers to get some of the benefits of assisted tax

8   preparation for the consumer that wants that, but then still use

9   digital DIY products and get some of the benefits of the digital

10   DIY product, like being able to do some of these things at the

11   home and so on.

12           I also just recently heard of a new product that

13   H&R Block is thinking about, or is in the process, actually, of

14   bringing out --

15   Q.  If we could just stop you there, because I think that will

16   take us into the confidential section.

17   A.  Got it.  Yes.

18   Q.  And things that are future products for any of these

19   competitors, if they haven't been mentioned publicly, let's keep

20   those in the confidential part.  My fault, I'm sorry.

21           Now, in terms of looking at this diversion issue that

22   you've been describing in order to determine which ones to add

23   into the box of the market definition next, next closest

24   substitute, what types of empirical data, if any, did you

25   consider?

1    A.  As I mentioned before, one of the pieces of empirical data

2    that I looked at is the HRB pricing simulator.  I described

3    before the way that was done.  That's the type of way that I

4    would think about doing a survey in this kind of industry, or

5    for antitrust purposes more generally.

6         I also spoke with the folks at Directions Research to

7    get a sense of how the survey was done so that I had some

8    confidence that it was done in a way that was certainly

9    consistent with the way that I've seen surveys done.  So that

10   was one empirical source of diversion ratio.

11        Another source of data, although it was not a conjoint

12   survey, was a survey done by TaxACT that asked respondents what

13   alternative they would turn to in the event that they were

14   dissatisfied with the price or the quality or the features of

15   their TaxACT product.  And this was a survey of TaxACT customers

16   from the previous year.

17   Q.  And were you able to discover, if at all, any other

18   nonempirical or non-quantitative type of evidence to corroborate

19   what you found in the empirical data?

20   A.  Well, the kind of documents that I was just talking about

21   corroborate what I saw in the empirical data; the high

22   switching, for example, and diversion to assisted tax

23   preparation, the importance particularly for firms like TaxACT

24   of still considering pen and paper, and certainly also robust

25   competition within the digital DIY sector.  The competition is

1    really across the board.  That's what I saw in the documents,

2    and that's certainly what the empirical data shows as well.

3    Q.  Now, you mentioned the pricing simulator and what it is in

4    terms of a conjoint analysis.  Did you look at all at

5    Dr. Warren-Boulton's criticism of the pricing simulator that he

6    put in his reply report?

7    A.  Yes, I did.

8    Q.  And you're familiar with his testimony that he gave in the

9    court here?

10   A.  Yes, I am.

11   Q.  And tell us, do you have any thoughts at all on what you

12   heard Dr. Warren-Boulton say, or what he said in his testimony?

13   A.  I certainly do.  You know, I took his criticism seriously.

14   I went back and I looked at the pricing simulator and the

15   documents that were related to it.

16        So his criticism, as I understand it, basically centers

17   on two things:  One, that in some PowerPoint slides that were

18   taken from the data from the pricing simulator, that if you look

19   at one particular slide you might get one set of answers; you

20   look at another slide, you might get a different answer for

21   diversions.  And the other thing that he pointed out that he

22   seemed to be concerned about was a particular anomaly in the

23   data with one price for one product.

24        So I took those seriously, and I went back and I looked

25   at the spreadsheets, for example, or the PowerPoint slides that

1    he looked at.  And what I had done in my original report was

2    look at the one particular PowerPoint slide, and I focused on

3    the slide that Directions Research thought was the most

4    applicable for reporting diversion ratios to H&R Block.  Since

5    Directions Research thought that was the data upon which to

6    report diversion ratios, that's the data that I looked at in the

7    first instance.  But he was right.  If you look at other slides,

8    you would get different measures of diversion.

9        So what I did was I went back to the underlying data.

10   I went back to an Excel spreadsheet that had all the data from

11   which those slides were derived.  So each of the slides has on

12   the order of 10 scenarios out of the tens of thousands of

13   scenarios.

14       So I went back to the underlying data that the slides

15   were made from, and I said:  Let's not look at one slice or

16   another slice.  I instructed my staff to look at all of the

17   data.  It includes the anomaly, but that anomaly is of the type

18   that would tend to introduce noise to the data, which means I

19   have trouble estimating my diversion ratios precisely, but I

20   still -- it doesn't introduce any kind of bias.  There's no

21   reason to believe that the diversion ratios that come from all

22   of the data are biased; they just may be measured imprecisely.

23   It may be hard for me to get a precise measure, but whatever

24   measure I come up with does not tend to be biased one way or the

25   other.  So I'm not particularly worried about it.  It's not

1   great that there's an anomaly, but it doesn't concern me in

2   terms of giving me the wrong answer.

3          So we looked at all the data and did a regression

4   analysis, basically a statistical analysis of all of the data.

5   What I found was basically the same conclusions that were in the

6   slide that Directions Research chose to present to H&R Block,

7   that the number one diversion from H&R Block was to assisted;

8   that the second highest diversion from H&R Block was to

9   TurboTax; and that the diversion from H&R Block to TaxACT was

10  low, was on the order of five percent.

11         But I did want to make sure that the anomaly -- even

12  though my intuition and my statistical background told me that I

13  shouldn't be worried about including the anomaly, because it's

14  not going to give me the wrong answer, I said:  Let's also do it

15  without the anomaly.  So let's just look at the part of that

16  whole Excel spreadsheet that doesn't include the anomaly and see

17  what we get.  If the anomaly is introducing some sort of bias

18  and giving me the wrong answer, that second analysis should have

19  given me a different answer.

20         So I just looked at the other entries in that

21  spreadsheet, did the same analysis, and came up with essentially

22  the same result, the same conclusions:  Assisted tax preparation

23  is the first highest diversion from H&R Block, TurboTax is

24  second, then there are other -- manual, for example, pen and

25  paper is above the diversion to TaxACT, and the diversion to

1    TaxACT is low, on the order of five percent.

2            But I heard that that still apparently did not satisfy

3    Dr. Warren-Boulton, because he again brought it up in testimony.

4    So I thought to myself:  Is there any other possible way of

5    getting at the question of, you know, is there any flaw in this

6    data?

7            So I went back and I talked to Directions, and I said:

8    Well, do you think there might be an anomaly in the data?  And

9    they said there might be.  Unfortunately, the person who was in

10   charge of pulling this data is currently on medical leave and in

11   the hospital, so we can't get him to redo it.  But this is what

12   we would do:  We would just go back to the simulator that you've

13   been using all along, and we would just pull the data again.

14           So I said:  Well, I have the simulator, I've been using

15   the simulator all along; I'm just going to literally pull the

16   data again.  The simulator is an Excel spreadsheet with a bunch

17   of drop-down menus, so you just say:  Let's look at the price of

18   H&R Block at 14.95, let's look at H&R Block Deluxe at 29.95, and

19   then you pick those from the drop-down menu, and then the

20   spreadsheet just populates the bottom of the spreadsheet with

21   the shares that would result.  So I can just basically go

22   through manually and just pull those all off of the simulator.

23   I said:  Let me just do that.  Let me just see what happens.

24   And I ran the exact same analysis and got the same results.  I

25   also checked, and the anomaly was gone.

1      So there was something anomalous about that Excel

2  spreadsheet.  I still don't know exactly how it entered.  But be

3  that as it may, when I went back and just pulled the data

4  manually, it was the same conclusions:  That assisted tax

5  preparation is the first best substitute for H&R Block's digital

6  products; the second best substitute is TurboTax; manual pen and

7  paper is above TaxACT; and TaxACT has very low diversion from

8  H&R Block.

9      So that certainly, in my mind, exhausts all the

10 possibilities for how to think about that survey, and it gives

11 me complete confidence that that pricing simulator doesn't lead

12 to any sort of incorrect results even because of the anomaly.

13 Because I was able to recreate by just pulling things manually

14 the data without the anomaly, and it gave me exactly the same

15 answer.

16 Q.  And did other evidence that you observed in the case, did it

17 corroborate or not corroborate the types of diversion that you

18 were seeing from Block to assisted?

19 A.  Oh, it absolutely corroborated the evidence of Block to

20 assisted.  I mean, for example, Mr. Smyth's e-mail that we just

21 looked at before that talks about the importance of competition

22 between digital and assisted, for example.  There's a lot of

23 evidence, that being one example of that.

24     THE COURT:  Mr. Robertson, I have to say I'm a little

25 bit confused about the source of the anomaly in the 2009 pricing

1    simulator.  Based on your testing, you haven't figured out

2    exactly what the source of the anomaly is on that.  Am I correct

3    on that?

4              THE WITNESS:  That's correct.

5              THE COURT:  So you don't know whether the anomaly is

6    arising because of a particular version or copy of the pricing

7    simulator that was being used, or whether it was something about

8    a particular data set that is implicated in certain scenarios,

9    or whether it's something in the calculations and operation of

10   the Excel spreadsheet?

11             THE WITNESS:  No --

12             THE COURT:  I mean, is it one of those three things or

13   what?

14             THE WITNESS:  -- that I have some insights on.  Right.

15   Yes.

16             So what we first got was the pricing simulator that I

17   described with the pull-down menus, where you could choose a

18   price for a various product and then -- and that's what the

19   firms have used and what Mr. Newkirk described that was used

20   when making pricing decisions.  They would sit around a table

21   and say:  Well, what would happen if we raised the price of

22   H&R Basic, what would happen if we raised the price of H&R

23   Deluxe?

24             So that is essentially the pricing simulator, and

25   that's perfectly fine.  Because when I pulled the data directly

1    from that, the anomaly was gone and the results were exactly the

2    same.  The anomaly only crept in in an Excel spreadsheet that

3    somehow was created from that pricing simulator, but that's

4    where the person who is in the hospital, he went from the

5    pricing simulator to the spreadsheet, and then the spreadsheet

6    was used to make the PowerPoints.

7            So the pricing simulator is fine.  And that's why I

8    went all the way back to the pricing simulator.  That's fine.

9    This Excel spreadsheet, somehow the anomaly crept in between the

10   simulator and the spreadsheet, and then the spreadsheet was used

11   to make the PowerPoint.

12           THE COURT:  I understand.

13   BY MR. ROBERTSON:

14   Q.  And do you know whether Dr. Warren-Boulton, when he did his

15   review and his testimony here the other day, whether he was

16   using the actual data or he was using just the PowerPoint?

17   A.  As far as I can tell, he didn't go back to the simulator, he

18   was just looking at the anomaly on the Excel and then looking at

19   the PowerPoint.

20   Q.  Now, could you tell the Court what - we've used this term

21   before, and I think us antitrusters use it and nobody else knows

22   what we're talking about - SSNIP.  Can you tell the Court what

23   SSNIP is?

24   A.  Sure.  SSNIP stands for Significant Nontransitory Increase

25   in Price, and what that means is that -- it's the question of,

1    again, in relevant market determination, one of the -- there's a

2    test that says:  Is my relevant market -- does it include

3    enough?  And by including enough, it means, is this market that

4    I'm looking at, this candidate market that I have in mind, is it

5    monopolizable?  In other words, could a monopolist of all of the

6    products in that market raise the test?

7           Now, the SSNIP test is only valuable if you apply it to

8    a market that satisfies the other principles of market

9    definition that I was talking about, like closeness of.

10   Competition, but the SSNIP test specifically talks about a

11   mathematical test for saying:  Is this group of products

12   monopolizable?  Can a monopolist of this group of products raise

13   prices?  It's a small but significant nontransitory increase in

14   price.  I knew I left out an S.

15   Q.  For example, in your Pepsi, RC Cola, and Dr. Pepper example,

16   but you leave Coke out, if the Pepsi, Dr. Pepper, and RC Cola

17   one passes the SSNIP test, does that mean, voila, you have a

18   proper market?

19   A.   No.  Because SSNIP is not the only principle that needs to

20   be factored into a proper relevant market.  Making sure that you

21   have the closest competitors in the market is another principle

22   that needs to be followed when you're looking at relevant

23   market.

24          So just passing a SSNIP test is not sufficient.  In

25   fact, in this case there are many candidate markets that would

1    pass a SSNIP test.  A SSNIP test -- there's no way in which a

2    SSNIP test can even differentiate between different candidate

3    relevant markets.  It can just say, yes, I passed the SSNIP

4    test, or no, I don't pass the SSNIP test.

5            MR. WAYLAND:  Your Honor, may I interrupt for just a

6    moment?  I hesitate to do this, but as Your Honor is aware, when

7    expert witnesses testify, they're required in advance to give

8    the basis of their opinion and tell us what they did.

9            In this case, what we just heard about what the most

10   recent work that she did on the simulator wasn't revealed to us,

11   so can I ask three questions now so our people can start

12   thinking about what it is she did?  It's really three voir dire

13   questions.  Rather than objecting to the admission of the

14   testimony, if I can just ask them now and my economist can think

15   about it, and then I won't object to the fact that she wanted to

16   add to her report, essentially.

17           THE COURT:  Mr. Robertson, do you have any objection to

18   this?

19           MR. ROBERTSON:  No.  I can probably clear it up a lot

20   faster.

21           MR. WAYLAND:  Three questions.  He doesn't know what my

22   questions are, so he can't ask them.  Just let me ask my

23   questions and then we'll move on.  It's three questions, very

24   quick.

25           THE COURT:  I'm going to allow this, although it's very

1    unusual.  And I appreciate your patience, Mr. Robertson.

2                    **VOIR DIRE EXAMINATION**

3    BY MR. WAYLAND:

4    Q.  Just a couple of questions on what you did after you heard

5    Dr. Warren-Boulton's testimony.  That's what I'm focused on.

6              What version of the simulator did you use when you went

7    back and pulled the data again?

8    A.  It's the version of the simulator that we've been using all

9    along.

10   Q.  Did you verify that the version replicates the other data in

11   the data set?

12   A.  What other data do you mean?

13   Q.  The other data in the set.  Did you do any other

14   verification, or just run the new data again?

15   A.  We just took down the data from the simulator and -- what we

16   verified was that the anomaly was gone, but I'm not sure what

17   other data --

18   Q.  Is the version that you cite in your report the one that you

19   ran again?

20   A.  Yes.

21   Q.  Okay.

22             MR. WAYLAND:  That's all.  Thank you, Your Honor.

23             MR. ROBERTSON:  I hope that cleared something up,

24   Your Honor.

25                    **CONTINUED DIRECT EXAMINATION**

1    BY MR. ROBERTSON:

2    Q.  Just to go back and be clear, the regression that you

3    mentioned, do you remember if we turned that over to these

4    folks?

5    A.  Yes.

6    Q.  Did we?

7    A.  Yes, I remember, and yes, we turned it over after my

8    deposition.

9    Q.  That's a famous question of, "Do you know what time it is,"

10   and you go, "Yes."  It's either -- so anyway.

11   A.  Yes.

12   Q.  That's a "West Wing" episode.  Okay.  I was trying to do

13   what was equivalent to Moliere, but I couldn't find anything.

14        Now, did your analysis take into account the idea of

15   the smallest market that Dr. Warren-Boulton described?

16   A.  Yes, it did.

17   Q.  Can you explain how that's supposed to work?

18   A.  Yes.  The smallest market principle is yet another principle

19   that should be followed when you're thinking about a relevant

20   market.  But it goes hand in hand with the principle of

21   including the closest substitute.  You can't choose a relevant

22   market that's small but that omits the important substitutes.

23   That's not what the smallest market principle says.  The

24   smallest market principle says if you include the closest

25   substitutes, then don't go any broader than you need to go while

1       you're including all of the close substitutes.

2               So you can't use the smallest market principle without

3       adhering to the other principles of market definition as well.

4       Q.  And in addition to the 17 or so that Dr. Warren-Boulton had

5       in his smallest market, what other categories did you add to

6       yours, if any?

7       A.  Did I add from?

8       Q.  In addition to the 17 or so that he had in his smallest

9       market.

10      A.  Did I add to his relevant market?

11      Q.  Yes.

12      A.  I also added assisted tax preparation and pen and paper.

13      Q.  Now, have you seen documents in this case that refer to the

14      three competitors on the same piece of paper, like H&R Block and

15      TaxACT and maybe TurboTax, that's on the same piece of paper, in

16      some of the parties' documents?

17      A.  Yes, I have seen documents like that.

18      Q.  And gosh, why didn't you say to yourself:  It must just be

19      those three and nobody else?

20      A.  Well, I certainly looked at those documents and considered

21      those documents.  When I look at documents for an antitrust case

22      like this, and I think about how to factor them into my

23      analysis, I really think about it in three steps.  The first

24      step is the totality of the document.  Sometimes there's a

25      document that on one page will talk, for example here, about

1    three competitors, and on another page will compare the product

2    to a wider range of competitors.  That tells me that I have more

3    work to do.  That tells me that that document is not going to be

4    definitive one way or the other in terms of marketplace

5    definition, for example.

6          The same thing if I see -- this doesn't have to be just

7    within one document.  There can be one document that looks at

8    the world in one way; a different document that looks at the

9    world in another way.  Just as I said before, firms in an

10   industry tend to look at the industry in different ways.  I

11   would be shocked if every player in an industry looked at things

12   exactly the same way, just because they have different

13   experiences, different histories, different products, just

14   different ways they think about the world.

15         So when I see those kinds of different ways of looking

16   at the world, it makes me ask the question, you know:  What else

17   do I have to look at?  What else is going on here.

18         The other thing that I have to look at when I am

19   considering a document is why the document was created; you

20   know, what's the framework behind these companies putting these

21   particular other competitors on this sheet of paper?  For

22   example, I saw a document from another firm in this industry in

23   which it was comparing itself to Google and to Amazon and to

24   Wells Fargo Bank.  Why?  Because it was thinking about how it

25   should design its web site, and it thought that those companies

1     had good web site designs and had good ways of bringing people

2     in through the web site and so on.  That doesn't mean that a

3     digital DIY product is in the same relevant market as Google and

4     Amazon and Wells Fargo Bank, it means that there's a particular

5     purpose for which that document was created.

6          So in this case, for example, if I'm a supplier of a

7     digital DIY software and I'm thinking about what features to put

8     in my product next year, there's no point in putting down pen

9     and paper on that sheet.  The features of pen and paper don't

10    change.  They are -- it's manual tax preparation.  It's a form

11    by the IRS.  That doesn't mean that I don't compete with manual

12    tax preparation on the basis of price, it doesn't mean that I

13    don't feel some constraint against raising my price because my

14    customers would go to pen and paper.  That's the kind of

15    diversion I care about for antitrust purposes.

16         So I have to ask myself whether the document, because

17    of the reason why it was created, maybe doesn't shed light on

18    the important antitrust question.  Then I have to ask myself,

19    again, is this data that is switching data, or the kind of data

20    that's not directly related to price, or is it the kind of data

21    that's directly related to price?

22         So yes, I certainly saw those documents, I took them

23    into consideration, but I think on balance, when you look at the

24    totality of the documents and then you look at specifically the

25    documents and the data that are most relevant to the question of

1     switching based on price, that the clear picture that you get

2     about diversion and responsiveness to price is a broad market of

3     all tax preparation methods, despite the fact that there may be,

4     and there are, certainly, documents in which only three

5     competitors are listed.

6     Q.  What about documents that show that parties consider each

7     other's marketing efforts; for example, web traffic and things

8     like that?

9     A.  Well, that falls into my second category, you know:  Why was

10    the document created?  If you're thinking about web traffic,

11    again, there's no point in putting pen and paper on that

12    document.  Pen and paper doesn't have web traffic, for all

13    intents and purposes, other than perhaps the fillable forms.

14          The same thing with assisted tax preparation.  A lot of

15    assisted tax preparation is CPA's and of course tax stores as

16    well, but a lot of that activity is not web based, per se.  So

17    it makes sense to compare, when you're thinking about the

18    concept of web traffic, to other firms that are going to think a

19    lot about web traffic.

20    Q.  Now, turning to -- you mentioned switching, and have you

21    looked at this concept that we've heard about, net switching, or

22    net-net?  I'm not sure what net-net is, but do you know what

23    they're talking about?

24    A.  I have heard that.  I'm not sure why they feel the need to

25    have two nets either.  I think one net is sufficient.

1          But yes, what I think that refers to is the fact that

2     the share of assisted tax preparation as the share -- and the

3     share of what, you ask?  The share of all tax preparation

4     methods has not changed all that much.  It fluctuates year to

5     year, but there hasn't been a dramatic movement over the last

6     five, six, seven years up or down.  And so there's not, on net,

7     a movement from assisted tax preparation to, for example,

8     digital DIY.

9          However, that doesn't mean that there is no switching

10    between digital DIY and assisted, it doesn't mean that there's

11    no inflows or outflows from assisted, and it certainly doesn't

12    mean that in the case of a price increase on digital DIY

13    products, that consumers wouldn't go to some of the assisted

14    products.

15         And again, it's the question of what's important for an

16    antitrust analysis.  Just because there's no net switching -

17    net-net switching, as people like to call it - does not tell you

18    that there's no diversion based on price.

19    Q.  Did you prepare a demonstrative to help explain this point?

20    A.  Sure, I did.  I'm not sure which tab it is in the binder.

21    Q.  We can put this up on the board, Tab Number 7, identified as

22    a demonstrative as DX 9803, page one.

23    A.  Yes.

24    Q.  Could you walk the Court through your demonstrative here?

25    A.  Sure.  This comes from, as I recall, an HRB document that

1    looks at -- in fact, I think it's the same HRB document we

2    looked at earlier that looks at switching between a lot of these

3    different tax preparation methods.  What you see here between

4    2007 and 2008 is there were five million customers that went

5    from assisted to DIY; there were four million customers that

6    went from DIY to assisted; on net, that's only 1.3 million

7    users.  That's not nothing, clearly, but 1.3 million is not the

8    relevant number to be looking at here.  Frankly, these are all

9    switching numbers, so in some sense none of these are the most

10   relevant.

11        But even in the realm of thinking about switching

12   numbers, looking at the four and five million taxpayers that are

13   moving between the segments certainly is much more relevant than

14   the net switching of 1.3 million users, and clearly diversion

15   data that comes from something like the price simulator is even

16   more indicative of what matters.

17   Q.  And for the switching data that Dr. Warren-Boulton used, do

18   you know what years he picked from switching from one year to

19   the next for his model?

20   A.  My recollection is that he used 2007 to 2008.  I might be

21   wrong on that.

22   Q.  And that's the same data that's reflected on this chart in

23   Tab 7?

24   A.  Correct.

25   Q.  And just out of curiosity, do we have any evidence at all

1     that gives us an idea of whether this market looks exactly the

2     same as it did back in 2008?

3     A.  Whether it looks the same today as in 2008?

4     Q.  Yes.

5     A.  No.  I mean, certainly a lot of firms have grown

6     considerably.  I was in the courtroom this morning and heard

7     about TaxSlayer and TaxHawk's growth.  There certainly have been

8     a lot of innovations and new products developed.  For example,

9     some of the hybrid products have somewhere around I think

10    perhaps in 2007 and 2008, but they have also evolved.  And

11    certainly across the board there's been a lot of innovation

12    since that time.

13    Q.  And do you have any view at all as to whether -- I think we

14    know, but whether Dr. Warren-Boulton's market definition is

15    incorrect or correct?

16    A.  I believe it's incorrect.

17    Q.  And can you tell us why you think that, please?

18    A.  Well, the primary reason -- and you can look at this in two

19    different ways, but it really boils back down to the same

20    problem, is that he's left out products out of his market that

21    compete more closely with the products in the market than do the

22    products that are within the market.  So there are things from

23    the outside that compete more closely than the things on the

24    inside compete with each other.  And it really comes from

25    starting from an assumption of a market, and then just using the

1    SSNIP test to test it, as opposed to building it up by saying:

2    What's the closest substitute, I have to add that in; what's the

3    closest substitute, I have to add that in.

4         So if you start with an assumption and just use the

5    SSNIP test, the SSNIP test can give you lots and lots of

6    answers.  But if you start with the products at issue sold by

7    the merging firms, and then you first add in the closest

8    substitutes, that's when you're going to get to a market that

9    makes sense, and frankly a market that's going to inform the

10   questions that we're asking here.

11        And that's the purpose of relevant market

12   determinations.  It's not just to do an academic exercise, it's

13   to inform us about what's likely to happen to competition.

14   Because we use that market definition to come up with shares and

15   to come up with HHI's that then have presumptions and all of

16   those things, and if we don't define the market right, then it's

17   not a useful tool for us.

18        So we have to do it in the right order, use the right

19   principle, and then it's a useful tool.  Then it's something

20   that we can say:  The market tells us -- the market definition

21   tells us something about shares and HHI's, and that's useful for

22   us in our analysis.

23   Q.  You mentioned earlier that Dr. Warren-Boulton used switching

24   data rather than diversion data for his analysis.  Could you

25   tell from even his data whether -- if you believe switching is

1    the right basis, as he used, whether the closest competitors are

2    evident from that data?

3    A.  Well, even within the switching data -- and you're right, I

4    certainly don't believe that that's the right data to use.  But

5    even if you want to look back at the switching data, the closest

6    competitor -- the number one switch from TaxACT in the switching

7    data is to assisted, and the number one switch from HRB in the

8    switching data is TurboTax, followed closely by assisted tax

9    preparation.

10   Q.  And what you were just pointing out, let's look at them one

11   at a time, which is Tab 16 and 17.  If we could look at Tab 16

12   first, please.

13   A.  (Witness complies.)

14        MR. ROBERTSON:  And if we could blow up the data that's

15   in the middle of the page on DX 9811, page one.

16   BY MR. ROBERTSON:

17   Q.  And what do we see here on this document, ma'am?

18   A.  So this gives us, if I want to be kind to the switching

19   data, three ways of thinking about diversion.  Or let me be more

20   precise:  One way of thinking about diversion and two ways of

21   thinking about switching.  All of this has to do with diversion

22   from TaxACT.  So all of this is saying:  Of the people who leave

23   TaxACT, what percentage go to pen and paper, what percentage go

24   to TurboTax, what percentage go to the other categories that are

25   listed here.  So this is all the base, if you will, what I could

1    call in mathematical terms the denominator.  But the base, the

2    group of people that we're starting with, the 100 percent, are

3    the switchers, are the weavers.

4         So the Column B is based on the TaxACT survey that I

5    described before.  So that indicates -- and this is where I was

6    talking about before, that the data in this case that's closest

7    to diversion data indicates that pen and paper is the next best

8    substitute for TaxACT in the event of a price increase.

9         The Column C and D come from the switching data.  And

10   so Column C is for the entire data set of switching data, and

11   there you can see that of the switchers from TaxACT, 40 percent

12   go to assisted.  So that's the data that Dr. Warren-Boulton

13   would use to talk about diversion.  If you want to call that

14   diversion, then the highest diversion would be to assisted.

15        And then Dr. Warren-Boulton indicated that one of the

16   things he was worried about in the switching data was that

17   people switched from digital DIY products to assisted tax

18   preparation because their tax return became more complex.  So

19   one of the ways to account for that and to sort of take that out

20   of the switching data is just look at switching for people who

21   have no complexity change.

22        The IRS gives us in the data sort of a three-step

23   categorization of complexity.  They have simple, medium, and

24   complex returns.  So if I only look -- this is between 2007,

25   2008.  If I only look at the group of people who don't change

1    their complexity, so that they're simple in '07, they're simple

2    in '08, if they're complex in '07, they're complex in '08 --

3    that, by the way, is about 75 percent of the people.  Most

4    people don't switch their complexity.

5           So if I just look at those people, what is the

6    switching behavior in that group?  You can't say that complexity

7    is the reason they switch.  There's still a lot of other reasons

8    why they switch.  It doesn't have to be price based.  In fact, I

9    don't think it's mostly price based.  Certainly it's not

10   complexity.  And even within that column, which is Column D, the

11   highest switching from TaxACT among people who don't change

12   complexity at all is to assisted tax preparation.

13   Q.  And just to be clear, the switching data from 2007/2008 tax

14   years, that's the same data that you see in Dr. Warren-Boulton's

15   data?

16   A.  Yes, that's my recollection.

17   Q.  Now, as an economist, does it make any sense that with a

18   price change for customers of TaxACT, that they would more

19   likely go to pen and paper versus going upstream to more

20   expensive products?

21   A.  You know, we heard -- I certainly heard from Mr. Dunn, and

22   read in his testimony, that he thinks his customers are very

23   price sensitive.  He thinks he's a value kind of player, and we

24   heard this morning from Mr. Kimber about how price sensitive

25   people at that end of the spectrum are.  That certainly makes

1    sense.  If you're choosing a low end tax preparation product -

2    low end, I mean price wise - then it is completely reasonable to

3    think that those individuals are relatively price sensitive and

4    that they're not going to go all the way up to assisted tax

5    preparation in response to a price change of five or 10 percent,

6    which is what we're talking about.

7    Q.  Let's flip the page in Tab Number 17.

8            THE COURT:  Before you switch off 17, could I just make

9    sure I understand, Dr. Meyer, your reaction to 16?  And that is,

10   there may be different ways to interpret this, but are you

11   saying that there's no difference in reliability, for example,

12   between the TaxACT survey data and the IRS switching data?  I

13   mean, are you making -- what evaluative judgment, if any, are

14   you making in terms of the reliability, in your opinion, on one

15   set of data versus the TaxACT survey data?

16           THE WITNESS:  Yeah, that's a great question.  I mean,

17   the IRS switching data --

18           THE COURT:  You don't have to compliment me.

19           THE WITNESS:  No, I'm in my teaching mode.  That's what

20   you have to do with students no matter what their question is.

21   So that's where that comes from.

22           You know, the IRS switching data I think is reliable,

23   in that I've heard that a lot of companies look at the IRS

24   switching data.  I believe that it's true data on switching.  I

25   have no reason to believe that the data is incorrect.  The

1    question is:  Does it shed light on diversion?  So it's really

2    two separate questions of why do I not look at the switching

3    data.

4           Even if the switching data has not a single error ever

5    in it, it still doesn't shed light on the question that matters,

6    which is diversion.  And that's the difference.

7           THE COURT:  And it's because the TaxACT survey

8    specifically asked about price change, that's why you viewed

9    that as more pertinent to your analysis?

10          THE WITNESS:  Well said.  Yes.

11          THE COURT:  Okay.  Now you can move on.  Can we take a

12   break now?  Is this a good time for a break, so I can give my

13   court reporter some rest on her hands?

14          MR. ROBERTSON:  Yes, Your Honor.

15          (Recess taken at 3:10 p.m.)

16          THE COURT:  Mr. Robertson, please proceed.

17          MR. ROBERTSON:  Yes, Your Honor.  Thank you.

18   BY MR. ROBERTSON:

19   Q.  And we were about ready, Dr. Meyer, to close out on

20   Tab Number 16.  And before we go to the next one, whether you

21   use diversion information from survey or whether you use

22   switching, either way, in either case, whichever one one chooses

23   to use to answer the question, is H&R Block -- do you know

24   whether H&R Block is TaxACT's closest competitor either way you

25   do it?

1    A.  Clearly H&R Block is not TaxACT's closest competitor.

2    Q.  And what relevance, if any, does that have to the way one

3    builds the market as you've described?

4    A.  Well, certainly if you're going to add H&R Block and TaxACT

5    in the market, you have to include also other products, other

6    methods of tax preparation that are closer competitors to TaxACT

7    than is H&R Block.

8    Q.  And what do we see on Tab Number 17, ma'am?

9    A.  So Tab Number 17 is set up quite similarly to Tab 16.  The

10   Column B is based on the price simulator, when I talked about

11   going back to the Excel file - so that was that intermediate

12   step between the simulator and the PowerPoint, and using all of

13   the data - that's what you see in Column B, assisted tax

14   preparation, again, being the closest substitute to HRB.

15           Column C is based on the pricing simulator, but when I

16   did the analysis and excluded -- and the reason it says 19.95,

17   that was the anomalous data.  So this was on the run where I

18   excluded that anomalous data, this is what you get in terms of

19   diversion ratios.

20           And then Columns D and E are really the parallel

21   columns to what we saw in the previous table.  It's all filings

22   from the switching data, and then from the switching data with

23   no complexity changes.

24           THE COURT:  I thought I had understood your testimony

25   about the anomaly that if you're just looking at the pricing

1    simulator, there is no anomalous data; it was just anomalous

2    data in the Excel spreadsheet that had been derived from the

3    pricing simulator --

4              THE WITNESS:  That's correct.

5              THE COURT:  -- what are you talking about?

6              THE WITNESS:  That's right.  You're right.  To be more

7    precise, this should say "based on the Excel spreadsheet," yes.

8    BY MR. ROBERTSON:

9    Q.  And in terms of what H&R Block's closest competitor is, if

10   you base it on any version, whether it's the Excel sheet or

11   PowerPoint or the actual data itself for the pricing simulator,

12   then what ends up being, if any, the closest competitor to

13   H&R Block?

14   A.  Based on the pricing simulator, the closest competitor to

15   H&R Block is assisted tax preparation, followed closely by

16   TurboTax.  The order of those two flips, if you look at the

17   switching data, but even Dr. Warren-Boulton, and using his

18   switching data, would indicate that assisted tax preparation is

19   a closer substitute to HRB than is TaxACT to HRB.

20   Q.  So, for example, with those with no complexity changes - so

21   you've taken the issue of complexity out - and this is using the

22   data that Dr. Warren-Boulton used, then what would H&R Block's

23   closest competitor be, using his data with no complexity change?

24   A.  Using his data, TurboTax is the closest competitor to HRB,

25   followed by assisted tax preparation.

1    Q.  Okay.  And if one includes in a candidate market TaxACT and

2    H&R Block together, then based on the closest substitute rule

3    that you've described, then tell us what one does with this

4    data, if anything.

5    A.  Well, according to this data, and if you look at Column E,

6    then he should have at least included assisted tax preparation

7    in his market.

8    Q.  And you explained earlier, Dr. Meyer, that you could take

9    Dr. Warren-Boulton's SSNIP test, the one that he used here in

10   court, and apply it to different candidate markets and end up

11   with the same answer.  Did I hear you right?

12   A.  Not applied -- well, you could use the SSNIP test by itself

13   without the consideration of a closest substitute principle, and

14   come up with alternative relevant markets.

15   Q.  And what did he use to do what he characterized as a SSNIP

16   test?  Do you know what kind of mathematical analysis he used?

17   A.  He used something called a critical loss analysis.

18   Q.  Could you explain briefly what that is?

19   A.  Certainly.  A critical loss analysis asks the following

20   question, and it does get a little complicated because all of

21   these questions involve diversions and substitutability, so we

22   have to keep them straight.  But what the critical loss test

23   specifically asks is it says:  Consider a candidate relevant

24   market.  Can -- and again, it goes right back to the SSNIP test.

25   It's a way of implementing a SSNIP test.  That's all that a

1    critical loss test is.  It's just the mathematical way of

2    implementing the concept of the SSNIP test.

3           So what you do is you say:  Okay, what would happen if

4    I raised the price of one of the products in that candidate

5    relevant market?  How many of the diverted sales, how many of

6    the lost sales stay within the candidate relevant market and how

7    many go outside the candidate relevant market?

8           So just considering his candidate relevant market,

9    digital DIY, just to have an example, if I raise the price of

10   TaxACT, how many -- what percentage of the lost customers from

11   TaxACT either go to TurboTax or H&R Block, because those are the

12   ones within the market, and how many of the -- what percentage

13   of the lost TaxACT customers go outside the market to assisted,

14   to pen and paper, to something else.  So that's the question

15   that's being asked.

16          So what you have to do is compare the diversion:  How

17   many actually stay within the market.  He calls that the

18   aggregate diversion ratio.  The aggregate just means it's a

19   combination of diversion to, in this case, TurboTax and

20   H&R Block.  That's why it's aggregated; it's diversion to two

21   different companies together.

22          Then what you have to do is compare that to a

23   threshold.  You have to say:  Does it meet a certain threshold?

24   If so, if there's enough diversion that stays within the market,

25   then I pass the SSNIP test.

1           So how do I figure out what the threshold is?  What's

2       the basis of comparison?  Well, that's what's called the

3       critical loss, and that's just a formula that has to do with

4       margins and the percent price increase that you're posturing for

5       this test.

6           So there's a formula - it's just the price increase

7       divided by the margin, plus the price increase; it's pretty

8       simple math - and you just say, if the aggregate diversion

9       ratio, so the percentage of lost TaxACT customers that stay

10      within my market, if that's above this threshold, then it will

11      be profitable for the hypothetical monopolist of all these

12      products to raise the cost of a TaxACT product.

13          And, of course, this test, just like later on talking

14      about a similar type of analysis on unilateral effects, really

15      only considers the math of diverted sales and the

16      profit-maximizing behavior of a static company/firm in one year.

17      It doesn't have any of the nuances of the actual marketplace, so

18      it's not a real world test, in some sense.  It doesn't say,

19      "Well, what would competitors do," or, "Is there a threat of

20      expansion," or, "Are there" -- well, it's not a merger.

21      Efficiencies.  There's nothing else in that test.  It's just a

22      pure mathematical test.

23          I just want to be clear, because we're going to see

24      something similar later on, and I just want to make that

25      distinction.  So that's the critical loss test.  It's comparing

1   the aggregate diversion ratio - what percentage of my lost sales

2   stay within my market - to this threshold that comes from a

3   mathematical formula.

4   Q.  So, for example, so we can get to the analysis here, look at

5   Tab Number 14.

6   A.  (Witness complies.)

7   Q.  And you mentioned thresholds.  And using the simple math

8   that you described, can you just pick 75 percent margin and just

9   explain to the Court what the 6.3 and 11.8 percent are?

10  A.  Sure.  So this is the threshold piece.  This is the formula

11  piece of it.  And as you can see, the formula is just on the

12  bottom.  It's the price increase, as I said.  So that's the

13  five percent.  We put it in as .05, divided by the price

14  increase, plus the margin.  You can see these are margins; by

15  margin we mean incremental profit margin.

16       So if you have an additional dollar of revenue, what

17  percent of that is profit?  One minus this is the cost, so if

18  you have an additional dollar of revenue, there's a part that's

19  cost, because it usually costs you more to make an additional

20  unit of a product.  And then the rest is profit.  So this is the

21  profit piece of an additional dollar of revenue.

22       So you just put that into the formula, and 6.3 percent

23  is just .05, which is the price increase, divided by .05 plus

24  .75, which is the margin.

25  Q.  And so, for example, in the next page, in Tab 15, DX 9800 at

1    page one, with the aggregate diversion ratios at the bottom of

2    TaxACT, H&R Block, and TurboTax, can you identify for the Court

3    what this math here shows?

4    A.   Sure.  Maybe it makes sense to go up to the top first.

5    Because that's really where this begins, at the top of this

6    table.  The numbers in the top section are basically the IRS

7    switching data.  This basically says -- if you look down the

8    column of TaxACT, for example, it said:  Of the people who used

9    TaxACT last year, where did they go in the following year?  So I

10   think this is '07 to '08.  So out of everyone that used TaxACT

11   in '07, where did they go in '08?  Well, 72 percent stayed with

12   TaxACT.  That's not surprising.  You'll see this across all of

13   the firms.  There's relatively high, sometimes people call it

14   stickiness, in this industry.

15        2.7 percent of people who used TaxACT in 2007 used

16   H&R Block in 2008.  And we go on down the list, nine percent of

17   people who used TurboTax -- I'm sorry, who used TaxACT in 2007

18   used TurboTax in 2008.  And I won't bore you with going down

19   this whole list.

20        Here you can see -- for example, this is another way of

21   showing exactly what I showed you before, that even from the

22   switching data, the highest diversion here from TaxACT, for

23   example, is to assisted.  The 11.2 is the highest number within

24   that column.  And you can see for each of the products, even

25   TurboTax, the highest switching is to assisted; TaxHawk, the

1    highest switching is to assisted, and so on.  So that is just

2    IRS switching data.

3          Then what you have to do is pick out the products that

4    are in the candidate relevant market.  So the example on this

5    page is Dr. Warren-Boulton's example, so we can walk through

6    that.

7          So the products in his candidate relevant market are

8    H&R Block -- obviously TaxACT, so we'll start with TaxACT.

9    H&R Block, TurboTax, TaxHawk, TaxSlayer, TaxWise, EZTaxReturn,

10   CCH, and other software.  So that's what you see at the bottom

11   half of that page; you see those same numbers pulled into that

12   table.  So the reason why TaxACT is NA, is because when we're

13   thinking about diversion, we're only looking at the non-loyal

14   customers.  We're only looking at the leavers, the switchers,

15   we're not looking at the stayers. So here are all the switchers.

16         And then you say:  How many total switchers were there?

17   Oh, I should say first:  Then you sum them up.  So these are all

18   the switchers, so 14.7 percent of TaxACT customers in 2007

19   switched to other digital DIY products in 2008.

20         But that's not yet even the kind of switching that

21   Dr. Warren-Boulton would say is diversion, because that kind of

22   switching has to compare that number to the total switching.  So

23   diversion says -- well, diversion says it in terms of price, but

24   the way that he wants to use this as diversion says:  Of those

25   that switch, what percentage stay within the candidate relevant

1    market?  So you have to scale this 14.7 percent by the number

2    who switch, by the percentage that switch.  And we know that

3    72 percent of tax filers who used TaxACT in '07 stayed, so if

4    72 percent stayed, then 28 percent switched.

5              So what I want to say is, of that 28 percent that

6    switched, what does 14 percent represent?  Well, it's about

7    half.  I have 28 percent switched and 14 percent switched within

8    the market, candidate relevant market; it implies that half,

9    about 14 percent, switched outside of the market.

10             So that's the 53 percent that you see at the bottom,

11   that aggregate diversion ratio.  That's just says, of the people

12   who switched away from TaxACT in '07 - they were in TaxACT in

13   2007 but switched away between 2007 and 2008 - what fraction of

14   those switchers stayed within any candidate relevant market?

15   53 percent he says stayed within his candidate relevant market.

16             And you can do the same analysis for H&R Block, which

17   is the second column, and you can do the same thing for

18   TurboTax, which is in the third column.

19             And so in order to implement, then, the critical loss

20   test, you say:  How do I compare these numbers -- he wants to

21   say these are diversions.  Let's compare these diversion ratios.

22   I'm going to call them that just so that I don't every time have

23   to say, "The ones that he calls diversion ratios."  Compare

24   these numbers to those thresholds that we had on the previous

25   page.  And you recall the thresholds for the 75 percent margin,

1    which I think was close to what he testified to here, were six

2    and 11 percent; in his report he talks about 50 percent margins,

3    which give you a threshold of 16 percent.  But in any case, if

4    you look somewhere between six and 16 percent, it's clear that

5    all of these numbers are above that.  Which means sufficient

6    numbers of people stay within the candidate relevant market, so

7    to pass the SSNIP test.  You want enough to stay in the market,

8    and that's how you pass the SSNIP test.

9         And so that's how he says this candidate relevant

10   market passes the SSNIP test.

11   Q.  So, for example, when you talk about those who switch out of

12   the market, where are they going on this chart if they go out of

13   the market?

14   A.  Well, they go out of the candidate relevant market.  Right?

15   And you can see where they go.  Of course you have to go back up

16   to the top part.  They go to assisted and pen and paper.  Those

17   are the only parts of this that are left out of his candidate

18   relevant market.

19   Q.  So, for example, for TurboTax, in the analysis that he did,

20   what percent of the switchers for TurboTax went outside to

21   assisted and pen and paper?

22   A.  Well, since 39 percent of switchers stayed within the

23   candidate relevant market, if my math is right, 61 percent must

24   have switched either to assisted or pen and paper as a result of

25   a -- well, of a price increase on...

1    Q.  And in order to do this test and get a positive result based

2    on the thresholds that you've identified, Dr. Meyer, on

3    Tab Number 14, does it matter how you create the candidate

4    market?

5    A.  Oh, very -- the thresholds don't depend on how you create

6    the candidate market, no.  The thresholds are thresholds based

7    on margins.

8         Now, it's true that you might adjust the margin a

9    little bit, depending on what's in your candidate market, if you

10   have products with very different margins.  But if we talk about

11   a range of somewhere between six and 16 percent, my

12   understanding is all the firms, at least that I've had a chance

13   to look at, have margins in that range.

14        So I think for purposes certainly of this illustration,

15   we can stick with the same thresholds, and then just look at

16   different aggregate diversion ratios based on different

17   candidate relevant markets.

18   Q.  If one didn't really pay any attention to the closest

19   competitor order of march of putting candidates into the

20   candidate relevant market, you mentioned earlier in your

21   testimony that the test that Dr. Warren-Boulton used could come

22   up with a positive result with different types of markets.  Can

23   you give us some examples of that?

24   A.  Sure.  So if you flip the page to the second, I guess it's

25   DX 9802-001.

1    Q.  Correct.

2    A.  This runs through exactly the same analysis.  The top part

3    of this should be exactly the same, and then the only difference

4    is in the bottom it says:  Well, what if I have a candidate

5    relevant market that's H&R Block and TurboTax, just two players,

6    so instead of the seven, eight, nine players that he had before.

7         So this time you're only going to pull one number down

8    from the top, right, because it's only the switchers.  So you're

9    saying:  Of those who leave H&R Block, what percentage go to

10   TurboTax?  11.4 percent.  And then the converse of that for

11   TurboTax.  But again, you compare it to the total switchers,

12   because it's the same -- you go through the same analysis.

13        So what this tells us is that of those who left

14   H&R Block, 38.1 percent stayed within this candidate relevant

15   market.  In other words, they went to TurboTax, because that's

16   the only other player within this candidate relevant market.

17   And you can see that 16.1 percent of the switchers from TurboTax

18   stayed within the candidate relevant market.

19   Q.  And do you know, if you didn't pay attention to the closest

20   substitute order of march in creating the candidate market in

21   the first place, could one use Dr. Warren-Boulton's test and

22   validate a premium versus value market and do-it-yourself

23   digital?

24   A.  Well, if you want to call H&R Block and TurboTax -- I

25   haven't thought about exactly what would be in a premium and

1     value market, but I certainly know that you could support --

2     using that test alone, without considering closest of

3     competitors, support a market of H&R Block and TurboTax.  And

4     that's obviously, as well, smaller than his market.  So in some

5     sense, if you want to apply the smallest market principle as

6     well, that would satisfy that.

7             I also don't think that this is the relevant market,

8     because, well, number one, this is not using the right data for

9     diversion; number two, the top diversion from H&R Block is to

10    assisted.  So I don't think this is -- I just want to be clear,

11    I don't think this is the right relevant market, but it's clear

12    that just using the SSNIP test in the way that he used the SSNIP

13    test would support this market just as well.  There's no way to

14    differentiate, either.  This is supported, and his relevant

15    market is supported as well.

16    Q.  And other examples here on the page - and I don't want to

17    waste time going through them - but on page two and three and

18    four, are these just other examples of combinations that would

19    pass a SSNIP test but not follow necessarily the closest

20    competitor order of march that you described?

21    A.  Correct.

22            THE REPORTER:  I'm sorry, the closest competitor what?

23            MR. ROBERTSON:  Order of march.

24    A.  I would call it the principle of including the closest

25    competitor.

1    BY MR. ROBERTSON:

2    Q.  I would rather have you tell it because I don't know the

3    exact term.

4         Now, what does that tell you, if anything, about how

5    one should actually put this market together?  What should you

6    do first before you do any mathematical test, if anything?

7    A.  Well, it's important to start with a right candidate

8    relevant market.  It's important to start by, as I said at the

9    beginning, including the closest substitutes, then think about

10   doing a SSNIP test.  The SSNIP test is a good check on what

11   you've done, and makes sure that you've gone broad enough, but

12   it's not -- you can't just use any candidate relevant market,

13   say it passes the SSNIP test, and say that's enough.  Because

14   that's not the only principle that you have to follow.

15   Q.  Now, did you follow other principles that you've outlined to

16   the Court in terms of building up your market?

17   A.  Yes, I have.

18   Q.  And after you constructed the candidate market with the

19   closest competitors in it, and did all the things that you've

20   described, does it pass the SSNIP test?

21   A.  Yes.  My relevant market certainly passes the SSNIP test.

22   You remember, what the SSNIP test asks is:  If there was a

23   hypothetical monopolist of all of the products within the

24   candidate relevant market, would they be able to profitably

25   raise price on one of the products?  And again, it comes back to

1    what percentage of the lost sales from that price increase stay

2    within the market and how many leave the market.  And enough

3    have to stay within the market.

4           Well, I don't think anyone has said - I certainly

5    haven't seen any evidence - that an increase on the price of any

6    of the products within the tax preparation market, in response

7    to an increase in that price, that people would leave and go to

8    Canada or agree to go to jail; in other words, not prepare their

9    taxes, which is what we would be talking about, leaving that

10   candidate relevant market.  So it certainly passes the SSNIP

11   test.

12   Q.  Now, have you, after doing this analysis, determined what

13   the market shares are for the candidate market that you

14   evaluated?

15   A.  Yes.  I don't think it's a candidate market, I think it is

16   the relevant market.  And I have analyzed market shares for

17   that, yes.

18   Q.  And that's in -- if you turn to Tab 10, please.

19   A.  (Witness complies.)

20   Q.  And if you just walk the Court briefly through what we have

21   here on Tab 10.

22   A.  Certainly.  So on the left are the pre-merger shares.  I did

23   this in a pie chart just so that I didn't have another table

24   with lots and lots of numbers.  You can see the coding on the

25   right-hand side, so if you're interested in any one particular

1   slice, you can see what it refers to.  And this matches up with

2   the numbers in my report.  So I didn't want to put all the

3   numbers in here, but you can certainly refer back to the report.

4   And I have the report here in case there are any questions about

5   a particular number.

6           What you can see is H&R Block today.  This includes, of

7   course, both its digital, and I've included in this all of its

8   assisted tax preparation tax stores as well.  I should note that

9   my understanding is that -- and from testimony, that a fair

10  number of those tax stores actually price independently, which

11  would mean it's really not correct from an antitrust standpoint

12  to put them together.  Because the question here is:  Over what

13  control -- over what percentage of the market does H&R Block

14  have pricing control?  Because again, we're talking about if

15  they increase price, what would happen.

16          But I didn't have a completely precise way of pulling

17  out the tax franchises that are not under H&R Block's pricing

18  control.  So this is conservative.  This gives H&R Block a

19  higher share than is their true control over pricing.  I think

20  the share of the franchises that are independent are on the

21  order of 40 percent or so.

22          And then you can see TaxACT's share of between five and

23  six percent - 5.7 percent - and then the pie chart on the right

24  just puts those two together.  This is what the world looks like

25  after the merger.

1          Below the pie charts you see what's known as the HHI's,

2     which I think these are measures of concentration that I think

3     have been described before.  You simply take the share -- each

4     of the shares, you square them, you add them together, and then

5     you get your HHI's.  You have a change in the HHI here of 172,

6     and I provide the full detail of how you do that in my report.

7     Q.  And what's the significance, if any, of the post-merger HHI

8     of being at most 792?

9     A.  This is what's considered by the merger guidelines an

10    unconcentrated market.  The merger guidelines has several

11    different categories of HHI groupings, if you will, and markets

12    with HHI's below 1500 are considered an unconcentrated market.

13    And on the bottom you can see a quote coming directly from the

14    merger guidelines that indicates that mergers resulting in

15    unconcentrated markets are unlikely to have adverse competitive

16    effects.

17    Q.  And what's the significance, if any, of the change in HHI of

18    172?

19    A.  The change in HHI is something that we look at.  Typically

20    changes in HHI under 200 are considered the types of changes in

21    HHI where we would not expect anticompetitive effect.

22    Q.  Now, we could stop here, but I want to go a little further

23    and talk about unilateral effects, if we could do that.  And

24    have you analyzed whether in your view there would be any - I'll

25    put it broader - anticompetitive effects as a result of the

1    merger beyond simply HHI calculations?

2    A.  Yes, I have gone further.

3    Q.  And turning to unilateral effects - those that the merged

4    company could do by itself if everybody else did exactly the

5    same thing - have you had an opportunity to look at that?

6    A.  Yes.  And I just want to clarify, by everyone else doing

7    exactly the same thing, that means everyone else doing exactly

8    the same thing that they were doing before the merger.  So

9    everybody else's pricing stays exactly the same, they don't

10   change at all; would the combined entity have the incentive to

11   raise its products.

12        Then in coordinated effects we have the possibility of

13   other firms also reacting.  Those are in some sense, from an

14   economist's standpoint, really artificial.  It's an artificial

15   distinction, but it's the way that it's always been done in

16   antitrust analysis.  And in some sense it's a good theoretical

17   and logical construct to go through, to first think about

18   everything else staying the same, and then just sort of adding

19   everything else.

20   Q.  And when you looked at the unilateral effects issue here,

21   did you make any distinction at all between whether the products

22   were homogenous or differentiated?

23   A.  Yes, I did.  That's a key part of understanding this market,

24   is to understand that the products are what we call

25   differentiated.  Differentiated products simply means that each

1    product within this market - and here I mean the tax preparation

2    market - so whether we're talking about different types of

3    assisted tax preparation offered, for example, by

4    Jackson Hewitt, a particular product offered by Liberty, a

5    particular product offered by HRB Office, a particular product

6    offered by a CPA, and then going on down the line to various

7    digital DIY products offered by the firms, all the way down to

8    pen and paper, each one of those products has a slightly

9    different feature set.  I mean, there might be two products that

10   have the same feature set, but in general they have different

11   sets of features and different sets of prices.

12          And they do that because they appeal to different kinds

13   of consumers.  In a differentiated products market, you can't

14   rank these in a pure hierarchal sort of fashion, like you could

15   with some products, where there's a clear -- you know, like

16   gasoline, for example, where you have a clear good, better,

17   best.  You can't, because different people have different ways

18   of thinking about what's better.  Do I prefer to have someone

19   help me with my taxes or do I find it a waste of time to have to

20   make an appointment to go into a tax store?  Do I like to have,

21   for example, a deduction calculator with my digital DIY

22   software, or do I not have deductions so it's a waste of time

23   for me -- I don't want to waste my money for a product that has

24   a deduction calculator.  You could see how this could go on.

25          But the point is, you can't, just by looking at the

1   market, know right away which products are preferred by which

2   people and which products are closest substitutes for which

3   people.  So what you have to do is you have to look specifically

4   at data that is specific to diversion.

5   Q.  And why do you have to look at diversion to understand

6   unilateral effects?

7   A.  Well, unilateral effects analysis has a couple of parts to

8   it.  The basis of unilateral effects, the starting point, sort

9   of the theoretical, if you just look purely at the simplest

10  static economic model, write this down with mathematical

11  formulas, basically, says that there's an incentive if two firms

12  come together, and if those firms have products that compete

13  with each other -- and by compete, of course I mean compete in

14  the antitrust and the economic sense, which is if I raise the

15  price, some of my customers go to the other product.  That's

16  what I mean by compete when I say compete.  If the two merging

17  parties have products that compete in that way, then when I

18  bring those parties together, because of that particular effect,

19  that particular incentive, gives the party a potential incentive

20  to raise the price.

21          Now, why is that?  Because right now, if -- for

22  example, let's use Coke and Pepsi.  If Coke is thinking about

23  whether to raise the price of its Diet Coke, it's saying to

24  itself:  Well, you know, I'm going to keep -- for those

25  consumers that keep on buying Diet Coke, they're going to pay me

1    a higher price.  That's more profit, that's good; however, I

2    know I'm going to lose a lot of customers.  I'm going to lose

3    them, let's say - and I don't think this is too much of a

4    stretch - to Pepsi.  If I lose enough customers to Pepsi, it's

5    going to make that price increase unprofitable, because not only

6    do I not get the bump-up in price on those customers, I lose all

7    my customers.

8           And that's a calculus any firm does when it's thinking

9    about how to price optimally.  That's why HRB, for example, did

10   the pricing simulator.  That's what's behind the pricing

11   simulator.  It says:  If I raise the price, I get to make more

12   profits on the retained sales, that's good; I lose a lot of

13   sales, that's bad; there's a balancing that takes place, and the

14   best place for me to price is the place where those two things

15   balance out, because that way I have maximized my profits.

16          So what happens in a merger, where there are companies

17   that are close competitors, is some of that competition is

18   internalized.  So go back to Coke and Pepsi.  If those two

19   companies were to merge - and I haven't done an analysis of Coke

20   and Pepsi, but I'm going to just assume for purposes of this

21   example that there would be a lot of diversion between Coke and

22   Pepsi - then post-merger, if the merged entity is saying, should

23   I raise the price of Diet Coke, well, it's going to keep -- you

24   know, it's going to get a higher profit on the sales that it

25   retains of Diet Coke, but the lost sales are no longer lost, at

1        least not a lot of them.  A lot of those previously lost sales

2        that were keeping the lid on the prices are now going to be

3        retained within the merged entity.  And that gives the merged

4        entity some head room, if you will, to raise the price.  That's

5        the theory behind -- the starting point for unilateral effects.

6               So that's where you start.  And that's why diversion is

7        so important.  Because you have to understand whether these two

8        firms, the products sold by these two firms, compete closely,

9        whether there's a lot of diversion.  If there's a lot of

10       diversion, then there is a big incentive to raise price.  If

11       there were no diversion at all, then there's absolutely no

12       internalization of competition, then there's no incentive to

13       raise price.  If there's a little diversion, then that

14       particular piece of the unilateral effects analysis - it's only

15       a piece - but that piece would say, there's an incentive to

16       raise price.

17              Of course, that's not the ending point, though.  That's

18       one element.  Then you have to say:  Are there any other reasons

19       why the firms might not raise price?  So this model that I'm

20       using - and this is essentially the merger simulation model that

21       Dr. Warren-Boulton talks about - that model, which is really

22       just equations that are written down on a piece of paper, this

23       is not a model that goes out and tests what happens in the real

24       world, but this mathematical model says there might be an

25       incentive to raise price.

1          But what else is happening in the real world that might

2     be constraining of firms?  Well, I talked about a couple of them

3     early on.  One is, as I said in this marketplace, the dynamic

4     nature of competition, that if I lose sales today, they're not

5     just lost today - that static model is just one time period at a

6     time, one year at a time you can think about it in this

7     context - but in a dynamic market like this one is, I'm also

8     going to lose sales next year, and then I don't have the chance

9     to keep those customers year after year because we know it's a

10    sticky market.  So that's another element that is not in that

11    unilateral effects -- in the merger simulation type of model,

12    the basic mathematical model.

13         Another element that's not in that mathematical model,

14    at least the way that I described it, are efficiencies.  You can

15    put efficiencies into the model, but the simple model that just

16    says, "Any time you have two entities where there's competition

17    that merge, that leads to an incentive to raise price," that

18    doesn't yet include efficiencies.  So you have to include

19    efficiencies in that model, because efficiencies reduce the

20    costs of the firm.

21         And as I mentioned early in my testimony, costs have an

22    effect on the price at which firms are willing to supply their

23    product, and if the costs to the firm come down, then there's

24    going to be an incentive to lower prices.  That may offset

25    either partially or completely the incentive to raise prices

1      that may have come out of the mathematical model.

2            And then finally - I think I have not left anything

3      out - is the possibility of the competitor's reaction.  You

4      know, we're talking about unilateral effects; however, we don't

5      put blinders on and think that competitors aren't going to do

6      anything.  There's the possibility that competitors would either

7      expand and try and get additional sales -- this offers up a

8      profit opportunity for competitors in this marketplace, because

9      all of a sudden there's been an anticompetitive price increase

10     that we're contemplating, consumers are switching; some of them

11     are retained by the merged entity, but some of them are not

12     retained by the merged entity.

13           So there is now a pool of customers that the other

14     entities in this marketplace want to go after.  There's a profit

15     opportunity.  Would they expand their capacity in order to take

16     advantage of that profit opportunity?  Would they reposition a

17     little bit?  So would they change their marketing strategy a

18     little bit in order to go after those newly released tax filers,

19     if you will?  Maybe.  Or would there be entry by new players?

20     Someone sees this; oh, all of a sudden there are some tax filers

21     who are looking for another alternative, this is a good time to

22     enter the market.

23           So there's the entry expansion repositioning, we sort

24     of put them into one grouping all together because it talks

25     about competitive reactions to this positive potential

1    anticompetitive effect.

2          So it's a long analysis - it doesn't get done in a

3    day - of unilateral effects.  It starts with a mathematical

4    model, but you can't end there.  These other steps are

5    necessary.

6    Q.  You mentioned early in that answer that this is a short form

7    of the model.  Is there a longer way to do it than

8    Dr. Warren-Boulton did it?

9    A.  Well, the way that Dr. Warren-Boulton implemented the

10   mathematical model was to use data like the margins that we see

11   in this industry, the actual prices, and the quantities.  And

12   from that, based on writing down, really, in one equation for

13   each firm what its profit-maximizing condition is, so it just

14   says this is the amount of sales that a firm is going to make,

15   and the sales depend on price, so if it wants to maximize

16   quantity, you can use some pretty simple calculus and figure out

17   what its best option is.

18         Using that, that gives you some theoretical

19   implications of how certain variables are related to each other,

20   certain concepts.  So, for example, that profit maximization

21   math, if you will, posits a particular relationship between

22   what's called elasticity of demand - so if I raise the price,

23   how many customers do I lose - and my profit margin.  That

24   certainly is one way to get at the concept of an elasticity.

25   You need an elasticity.  In this model you need to understand

1    how many customers you're going to lose, and then of course you

2    also need to understand diversion, the same thing that we talked

3    about before.  But you do need to understand, if I raise the

4    price, how many customers am I going to use.

5              The way Dr. Warren-Boulton did this is to say, I'm

6    going to go back to the theory, and I just posit that that's

7    related in a mathematical way to the profit margin.

8              The other way to do it is you gather data on the

9    products and what happened in the industry.  You look

10   historically at what actually happened when prices went up, and

11   how many sales did the firm actually lose when prices went up.

12   He chose the method of using these mathematical relationships,

13   if you will.

14   Q.  And do you know what he calls that?

15   A.  I've seen him refer -- in his testimony I saw him refer to

16   it as a precise mathematical model.  I don't think I would quite

17   call it that.  I've seen him refer to it as a

18   back-of-the-envelope method, and I think that's a better way of

19   describing it.

20   Q.  Now, you mentioned earlier that there was a difference in

21   outcome if the diversion was high versus if the diversion was

22   low.  And you've explained what the actual diversion ranges are

23   here in this case.  Do you have any explanation for why the

24   diversion between Block and TaxACT is what it is?

25   A.  I certainly do.  When I look at the way that TaxACT

1    positions its product, when I look at the pricing of TaxACT,

2    when I look at the marketing efforts of TaxACT, and when I look

3    at the way that, for example, Mr. Dunn and Ms. Greif talk about

4    TaxACT, they think of it as what they call a value type product.

5    It's relatively low priced, the way that they market it is all

6    about -- I've seen the term free, free, free.  I've seen others

7    also refer to TaxACT and similar products as value type

8    products.

9         And that's somewhat distinct from products like HRB and

10   TurboTax, that are generally considered more premium type

11   products.  You know, the way that I have seen people describe

12   the way they think about a premium product is a product in which

13   brand name matters a whole lot more, brand recognition matters a

14   whole lot more.  And so when you see the advertising of

15   H&R Block and TurboTax, you see a lot less emphasis on things

16   like free.

17        And I even saw a comparison of advertising in one of

18   the documents where it specifically said that TaxACT's

19   emphasis - and this was by one of the firms in the industry -

20   was on free, and that TurboTax and H&R Block specifically

21   downplayed free because they wanted to more highlight their

22   brand.

23        So that's the way that the firms in the industry seem

24   to think about this distinction, if you will, between value and

25   premium.  It doesn't mean that there's no competition there, it

1    just means that there is some -- it's the differentiation point

2    that I made before.  These are not -- you know, we're not

3    talking about sellers of wheat from farms in Kansas, where you

4    couldn't tell the wheat apart once it got into the warehouse.

5    These are different products, and the consumers that tend to

6    prefer the value type products tend to be a little bit different

7    than most of the consumers that prefer the premium type

8    products.  But there certainly is some movement to and from.

9    Q.  Now, you mentioned a few moments ago that one of the things

10   in the real world that you want to look at are efficiencies.

11   And without getting into any of the numbers here that are in

12   your report and are confidential, were you able to identify any

13   efficiencies in this case?

14   A.  Yes, I was.

15   Q.  And just quickly tell the Court the difference between

16   variable costs and fixed costs.

17   A.   Certainly.  Variable costs are those costs that vary with

18   output, and fixed costs are costs that don't vary with output.

19   So what that means is, if a firm sells one more unit of a

20   product, what additional costs will they incur?

21        So if TaxACT, for instance, sells one more unit of its

22   software or its on-line product, it's going to incur some costs.

23   Because, for example, some of the customers, some percentage of

24   the customers use and purchase an Emerald Card or some kind of a

25   refund anticipation loan along with that tax product, and that

1   has a cost to them because they have to pay the bank.  That's

2   something that varies one for one with output:  Sell one more

3   unit, you have some more costs.

4          Some of the marketing costs in this space also tend to

5   be variable, because a lot of the marketing is on a

6   cost-per-click basis, which we heard about this morning, and it

7   is now becoming really common in any kind of space where people

8   use the Internet to search for things - and that's probably just

9   about every space nowadays - where every time somebody clicks,

10  and clicks through an advertisement on Google, for example, a

11  Google ad, and then goes ahead and uses the product, that incurs

12  a marketing cost to the firm.  So it's a direct relationship.

13         It doesn't have to be exactly one for one, because not

14  every consumer is going to use a refund anticipation loan, not

15  every user came through a click through ad.  But it doesn't have

16  to be an exact one for one; it's just generally when more sales

17  are made, more costs are incurred.

18  Q.  Now, you mentioned what fixed costs are.  Are fixed costs

19  ever relevant in a unilateral effects analysis, in your view?

20  A.  Yes, I do believe they are relevant.  You certainly have to

21  look at them.  I mean, fixed costs can vary, and there can be

22  different kinds of fixed costs.  One fixed cost is the salary

23  paid to the CEO.  That we don't tend to think is going to vary

24  with output.  You have to pay them.  The same thing about the

25  salary for the administrators, what we call sort of general sort

1       of administrative expenses.  That's an example.

2             But there are certainly examples of times in which

3       fixed cost efficiencies can also lead to pro-competitive

4       effects.  There's an example in this case in which I think it

5       was H&R Block, and it could be TaxACT - I could be mixing up my

6       companies - realized some fixed cost efficiencies, and used

7       those fixed cost efficiencies to do some additional marketing.

8       You know, this is not uncommon, especially we heard this morning

9       how several firms don't want to incur debt, so when you have a

10      little bit of additional cash, they're able to do something with

11      that.  The constraint on them has been loosened.  So there are

12      lots of firms that will use that additional cash to do things

13      like more marketing.  More marketing is still competitive;

14      you're getting your message out there and you're competing more

15      vigorously.

16      Q.  Now, is the use of fixed cost reductions in the way that you

17      described it, is that consistent with the way the agencies have

18      allowed in their own analysis?

19      A.  Yeah, this is a place certainly where there's some

20      discussion in the literature about fixed and variable cost

21      efficiencies.  Variable cost efficiencies, I think across the

22      board everybody agrees that those are the types of efficiencies

23      that without a doubt are going to lead to downward pricing

24      pressure.  Those go directly into a model; for example, a merger

25      simulation type model.  But the agencies recognize that fixed

1    cost efficiencies matter too, they're maybe just not as direct

2    one for one.

3         And you clearly have to study the industry.  There

4    might be some industries in which they're more relevant than

5    others.  But in an industry like this one, where you have seen a

6    fixed cost efficiency leading to a pro-competitive action,

7    that's the place where you would tend to give more credit to

8    fixed cost efficiencies, because that's what the historical

9    record indicates.

10        And the agencies, for example, in the commentary of the

11   merger guidelines that I mentioned previously, in that document

12   they talk about recognizing fixed cost efficiencies.  So they

13   certainly recognize them as well.

14   Q.  Now, when you do a unilateral effects model, and if one were

15   to include efficiencies in it, is it required that there's some

16   empirical proof that all the efficiencies are passed through

17   somehow?

18   A.  No, in the merger simulation model, the efficiencies just go

19   into the model as is, and then the pass-through comes from the

20   model.  You know, it's a mathematical model of how firms behave,

21   so what you do is you just put the efficiencies in, because

22   those are actually reductions in cost, and then the model will

23   predict how much is passed through.

24   Q.  And you mentioned that you've had a chance to look at the

25   model that was used in Dr. Warren-Boulton's testimony.  And just

1    without going into a lot of detail here, do you know what the

2    actual elements are that go into what he described as the

3    back-of-the-envelope type model?

4    A.  Yes, I do.

5    Q.  Can you tell briefly what the elements are, the math that

6    goes into it?  The things one actually puts into the math, I

7    should say?

8    A.  Yeah.  So imagine, as I said, each firm is represented by a

9    mathematical equation.  It's not even that complicated of an

10   equation, it just says -- he used what's called a linear model,

11   so it just has multiplication and addition.  And it basically

12   says the number of products that I sell, the quantity of goods

13   that I sell is equal to a mathematical equation that has to do

14   with my own price - so if my own price goes up, then I would

15   tend to sell less of my own products - and the prices of other

16   products in the marketplace.  So if the price of a competing

17   product goes up, I would expect to sell more of my product,

18   because that competing product loses some sales and I benefit

19   from that.

20         So we have in each equation essentially the price of

21   your own product and the prices of competing products.

22   Q.  Okay.  And there was a term that he used on one of his

23   charts called discounted switching data versus undiscounted

24   switching data.  Do you know what he was talking about?

25   A.  Yes, I understand that.  What that means, that has to do

1   with how he calculated what he's using for diversion ratios in

2   that model.

3           So in that model, right, you have, as I said, this

4   mathematical equation that relates the prices of your own

5   products and the prices of other products to the quantity that

6   you sell.  So how they're related, though, the mathematical way

7   in which they're related - so in other words, if I raise the

8   price of my product by a dollar, how many sales do I lose - that

9   comes from -- and it's a number.  That comes from the diversion

10  ratios -- well, the relationship between others' prices and my

11  product comes from diversion ratios, and the relationship

12  between my own price and my own quantity comes from this

13  relationship of the elasticity that I was describing before,

14  because you have to know, when I raise my own price, how many

15  sales I lose.  So it comes from this mathematical relationship

16  in the model between the profit margin and the elasticity.

17          So the diversions come in to understand, in this

18  mathematical equation, when I raise the price of a competing

19  product, how many additional sales do I gain.  That comes

20  essentially from the diversion ratio.  It's not mathematically

21  exactly the diversion ratio, because you would have to convert

22  it using -- depending on exactly what mathematical formula you

23  use, but the concept is the diversion concept there.

24  Q.  When he does use a switching in order to do this, do you

25  know if he includes assisted prep as a possible choice?

1    A.  Oh, actually, my answer to the previous question wasn't

2    complete.  Because what I wanted to then explain was this

3    discounted switching.  And that goes right to this question,

4    too.

5            So yes, he includes assisted tax preparation in this,

6    but he has to figure out what diversion he's going to allow to

7    and from assisted tax preparation.  And so the discounted

8    switching means he essentially cuts in half the switching that

9    he sees from H&R Block, for example, to assisted, and says:  I'm

10   just going to count half of that as diversion.  So if there's

11   40 percent switching from HRB to assisted, he just cuts it in

12   half and says:  I'm just going to say it's 20 percent.  He has

13   to recalibrate everything then.  But essentially that's what the

14   50 percent discounting means:  He's not going to give the

15   switching the full weight, he's going to cut it in half.

16   Q.  Have you seen anything in the record anywhere that gives

17   anyone a basis for simply not counting half of the 63 percent of

18   the total market in the switching data?

19   A.  No, I haven't seen anything like that.

20   Q.  And what is the effect of kicking out half of the 63 percent

21   of the market from the switching data?

22   A.  Well, what it does is it makes the switching -- his measure

23   of diversion to TaxACT even higher than the switching data would

24   suggest.  Because remember, the switching says, out of the

25   people who we've -- lets's say HRB; what percentage go to

1    TaxACT.

2         Well, in the switching data, people are allowed to go

3    to assisted, pen and paper, TurboTax, and all of the others and

4    TaxACT.  If you take out half of the switching to assisted and

5    say, "That doesn't count, that's not diversion," then you still

6    have to add up to 100 percent.  You know, all the people that

7    leave HRB have to go somewhere, so they just get reallocated to

8    all of the other products.

9         So the diversion -- his diversion rate between HRB and

10   TaxACT is higher than the switching data suggests, and the same

11   thing is true about his diversion from TaxACT to HRB.  It's on

12   the order of, I think, 12 or 14 percent, he says in his report,

13   where even just the switching is only on the order of I think

14   nine percent or so.  And the true diversion, as I said, from the

15   sources that I've looked at, is lower than that.  It's maybe

16   five percent.

17   Q.  By making this change that causes what he calculates as a

18   diversion ratio to increase that much, does that have any effect

19   on the harm to consumer number that he calculated in his model?

20   A.  Yes.  The more diversion there is between the merging

21   parties, the higher the predicted price increase that comes out

22   of his mathematical model, and the consumer harm is directly

23   related to the increased prices.

24   Q.  And do you have any opinion at all as to whether he should

25   have discounted half of the assisted switchers?

1    A.  Well, I think the flaws run far deeper than just discounting

2    the assisted switchers, but I certainly don't think he should

3    have done that, no.  But I think there are other flaws as well.

4    Q.  And what other flaws are there in the model, if you've

5    identified any others?

6    A.  Certainly.  Using switch data in the first place I think is

7    a flaw.  Just for all the same reasons that switching data are

8    not the right data to use for the critical loss analysis,

9    switching data are also not the right data to use for what we

10   call the merger simulation model, which is what he used,

11   unilateral effects mathematical model, for the same reason.

12   Because what leads to this increased incentive in the model to

13   raise prices -- and that's what we want to study is, is there

14   such an incentive.  And then, of course, there are other

15   factors.  But just sticking with the model for a moment, the

16   incentive to raise price depends on diversion resulting from

17   price increases.

18          So if you don't use the right data that is related to

19   diversion that comes from a price increase, then, as I

20   mentioned, I think, in my declaration, it's really a garbage in,

21   garbage out kind of scenario.  You're just not using the data

22   that's going to inform you at all.  So it makes the use of the

23   model just inherently suspect.

24          Now, the model itself I think also has problems in this

25   case.  This certainly is a model that I have used at other

1    points in time.  I never think that it can be a standalone

2    prediction of the future, but in this particular market, I think

3    it's especially problematic.  And that's because, as I mentioned

4    before, it's a static model.  It's a model that just says, "What

5    is my optimal price today," and there's no consideration in the

6    model whatsoever of what my actions today have on my profits

7    tomorrow.  And by today and tomorrow, I'm really thinking this

8    year and next year.

9         So what my actions today -- if I raise the price today,

10   it only asks the question:  How many sales do I lose today, and

11   how much that's bad; how much more revenue and profit do I get

12   by having a higher price on my retained units?  It never asks in

13   that model:  And is there an additional problem because if I

14   lose sales today, especially if I lose free customers that I

15   only hope to monetize next year, then I have lost profits next

16   year as well.  That's just not in the model.

17        That's such an important part of competition in this

18   market.  I mean, I certainly have seen all over the documents

19   this discussion of free, the importance of free; I've seen

20   analysis by several firms in the industry about whether or not

21   it makes sense to offer free, and it's usually in the context --

22   it's always in the context that I've seen of not just making

23   sense this year - it does make sense this year because it brings

24   customers in the door and some of them will move up to higher

25   versions of the software - but it also makes sense because those

1    free customers this year, even if they end up staying totally

2    free this year and they don't pay me a penny, they are much more

3    likely to come back to me next year and pay me for something.

4          In fact, I've seen testimony that the way that the

5    firms in this industry think about that process is as a two-year

6    price, so that it makes -- you know, I have to think about this

7    taking two years from the time the free person comes in for the

8    first time until they actually start -- until the firm starts

9    seeing monetary benefits from them.

10          But according to the unilateral effects model, the

11   mathematical model, that doesn't matter.  Because if I lose a

12   free customer in the mathematical model, gosh, I've just saved

13   myself some costs because that person wasn't going to bring in

14   any revenue this year, wasn't going to add to profits, was going

15   to add to costs, and so that's all good in the unilateral

16   effects model.  It's good to lose a free customer.

17          But of course we know that the firms don't act that

18   way.  We have to look at what they're actually doing, and the

19   analysis that they're doing in terms of what's profit maximizing

20   for them not just for one year.

21          So I think this model for this particular industry is

22   just not appropriate.  But if you want to use it, he has not

23   even implemented the model right, even if someone were to think

24   that it is the right model to use.

25   Q.  Do you know whether he used actual prices for different

1    products in his model?

2    A.  My understanding is he used what's known as an average

3    price.  He sort of looked at each company and looked at the

4    average price across its product line.

5    Q.  Does that include free?

6    A.  Yes, that includes free.

7    Q.  And is there any example anywhere in this case where people

8    pay the average price?

9    A.  You know, typically average prices are not obviously

10   something that someone pays.  They pay the prices of the actual

11   products.

12   Q.  Okay.  Now, not including any of these other things you've

13   mentioned, whether we fix the model or do it properly or test

14   for cost elasticities and go into our dynamic model, any of

15   these other things, did you just have an opportunity to check,

16   if you used the same model, the same diversion-by-switching that

17   he used, to see whether if you put in the efficiencies that

18   you've looked at, what happens even with all those flaws?

19   A.  Yes, I have.

20   Q.  And before we do that, just basically without any numbers

21   here, just tell us what you did to make sure that the

22   efficiencies that you used were reliable enough for you to use

23   for the purpose of your test.

24   A.  Right.  So I received as part of the evidence some

25   spreadsheets that H&R Block had put together related to

1    efficiencies, or sometimes they call them synergies.  And

2    basically the way that the spreadsheets worked were they went

3    line by line of different categories of synergies or

4    efficiencies.

5         So, for example, one was the refund anticipation loans.

6    Right now, as I understand it, TaxACT offers refund anticipation

7    loans; so does H&R Block.  But it's much more expensive for

8    TaxACT to offer them, because H&R Block can offer those refund

9    anticipation loans through its bank.  It has a bank that's

10   associated with H&R Block; whereas TaxACT has to go into the

11   marketplace and source that.

12        So following the transaction, TaxACT would be able to

13   have the advantage -- let's say the TaxACT product, a refund

14   anticipation loan that comes along with the TaxACT product would

15   be able to go through the H&R Block bank as well, and so that

16   element of cost for the product would be reduced.

17        So each one of the -- and there were several lines, and

18   I think Mr. Dunn testified about some of them.  Each one of

19   these lines had some associated backup spreadsheets associated

20   with them.  So, for example, on that particular one, there was

21   discussion of, in the spreadsheet -- or enumeration, I should

22   say, in the spreadsheet, of the cost to TaxACT of providing that

23   service today, the cost for HRB of providing the service today,

24   and then the difference is essentially the efficiency or the

25   synergy.

1          There was something similar - of course, the setup was

2     different - for each one of the synergies, because they were

3     different concepts.  Some of them had to do with, like that,

4     there's a different cost to each of the firms.  There were some

5     other synergies that had to do with the on-line call center, for

6     example, and so how many calls were taken and how expensive is

7     it to field the call.

8          So each one of the synergies was set up a little bit

9     differently because each one was sort of thought about, I think

10    it's fair to say, in its own way.  It wasn't a cookie-cutter

11    type of approach.

12         So we received all of those spreadsheets.  There were

13    probably 10 or so of them in that file.  I may have that number

14    wrong, but around that.  And then we had discussions -- I had

15    discussions both with Mr. Dunn on the TaxACT part of those

16    synergies, and separately with Mr. Bowen about the HRB portion

17    of those synergies, to understand where those numbers came from.

18         And so I was able to follow through the math of where

19    they got the information for these various numbers that came on

20    the spreadsheet.  I had some follow-up questions, particularly I

21    think for Mr. Bowen I recall having some follow-up questions; he

22    sent some additional documents which I reviewed.

23         So that was the process by which I looked at the

24    efficiencies in this matter.

25    Q.  And that's in your report, and I don't want to go through

1   any of the details of that.  It's in your summary.  So let's

2   skip over that.  And again, you mentioned a moment ago that you

3   had actually looked at, by using the variable cost efficiencies,

4   even with all of the flaws of Dr. Warren-Boulton's model that

5   you described, whether you could do the math and see what the

6   answer would be.

7   A.  Yes.

8   Q.  Do you have that depicted here on a tab?

9   A.  Yes, I believe I do.

10  Q.  Turn to Tab Number 12, please.

11  A.  (Witness complies.)

12  Q.  And before considering all these other factors that you

13  mentioned before, can you tell us, for example, on the first

14  line, what the line shows us?  Just basically without a whole

15  lot of -- just quickly run us through it.

16  A.  Certainly.  So what we did was we took the same model that

17  Dr. Warren-Boulton had used, we put it into a mathematical

18  software program that we prefer to use, but we verified that we

19  got the same answers that he got with his tool, and basically

20  said:  If you put in the undiscounted switching data -- so this

21  was in his report.  I believe this was slightly different than

22  what he may have presented here, but this is the undiscounted

23  switching.  So this doesn't lop off the 50 percent of the

24  switching to assisted, it just uses the IRS switching data just

25  as it is.

1          And you include the efficiencies, and here we included

2      the efficiencies in exactly the same way that he included them,

3      so there's no difference in terms of how we looked at

4      efficiencies from the standpoint of this calculation.  I said:

5      What does the model predict the price increase would be for

6      H&R Block and for TaxACT, and for TurboTax as well?  We can

7      expand the model to include TurboTax.

8          And what it shows is that just using those numbers, the

9      HRB price is predicted to go down, the TaxACT price is predicted

10      to go up by a little bit, 4.7 percent, and the TurboTax price is

11      essentially predicted to stay the same.  And that, just running

12      through math of that, would predict a change in consumer welfare

13      of -- a decline in consumer welfare of $2.5 million.

14          If I recall correctly, in his report using this

15      switching data, that would compare with a number that he came up

16      with which would be $16 million or so.

17      Q.  And you used the same margins he did in the model?

18      A.  Used exactly the same margins he used.

19      Q.  Same average prices?

20      A.  Same prices.

21      Q.  Including free?

22      A.  Correct.  Everything else was the same.

23      Q.  Same ignorance of the expansion and reaction of the other

24      competitors?

25      A.  Exactly.  I would never claim that this is a good depiction

1    of what would happen in the real world.  This is simply if you

2    use that same model, and if you just include the efficiencies,

3    this is how much the results would change.  That's all this is

4    saying.

5    Q.  And that was using switching rather than diversion?

6    A.  That was using switching, exactly.

7    Q.  And if you use actual diversion, where do you end up?  Did

8    you try to figure that out?

9    A.  Yes.  So then we went back, and you can see in the second

10   line here what happens if you use diversion data.  And so this

11   is the diversion data from the pricing simulator and from the

12   TaxACT survey that I described before.

13        And in that case, what this model would predict is that

14   H&R Block's price goes down by 1.6 percent, TaxACT's price goes

15   up by one percent, TurboTax lowers its price a little bit in

16   reaction to H&R Block's price decline, and on net consumers are

17   better off after the merger.  Simply from a pricing standpoint,

18   they're better off.

19        Because obviously what you have to do, the way that the

20   model works, is if one price is expected to go down, those

21   consumers are better off; if one price is expected to go up,

22   those consumers are worse off; so you have to do a mathematical

23   balancing and it just comes out of the model, it comes out of

24   the equations.

25        And what this says is that using that model, on

1    balance, consumers are better off after this merger.

2    Q.  Now, after doing all of this, do you think this is the right

3    way to get to an end result of what the predicted effect of the

4    merger is?

5    A.  No, I don't.  Because as I said before, this still only

6    deals with the mathematical model, the same equations that I

7    described before.  None of these lines deal with the concept of

8    the dynamic market, which I think puts an additional constraint

9    on the ability of firms to increase prices, and none of this

10   takes into account any repositioning or expansion by firms.  For

11   example, in the first line, if TaxACT's price goes up by

12   4.7 percent, that model doesn't say anything about whether or

13   not TaxSlayer or TaxHawk would increase their marketing and try

14   and capture some of those customers.

15           So no, I don't think this is -- I'm not putting this

16   forward as a model of what would happen, I just -- you know,

17   it's obviously something that gets used in merger analysis -

18   sometimes incorrectly, but it gets used - and so I just wanted

19   to run the model through its paces, so to speak, and see what it

20   came up with.

21   Q.  And based on where we started off with in terms of the

22   market definition and the actual switching and diversion that

23   you actually looked at - and I should use the word diversion -

24   that you looked at, does it make sense from the perspective of

25   economics that one is likely or not likely to see unilateral

1    effects in a market such as the one you have analyzed?

2    A.  Well, the fact that the merger simulation model does not

3    predict a decline in consumer welfare -- a decline in consumer

4    welfare means an increase in price, because consumers are worse

5    off when the price goes up.  So a model that does not predict a

6    decline in consumer welfare - in fact, it predicts an increase

7    in consumer welfare - is consistent with a merger in an

8    unconcentrated market.  Because we don't expect anticompetitive

9    effects in mergers in unconcentrated markets, we don't expect

10   declines in consumer welfare when we have mergers in

11   unconcentrated markets.

12   Q.  Now, did you also look at the issue of coordinated effects?

13   A.  I have looked at the issue of coordinated effects.

14   Q.  And based on what we've already been through in your

15   testimony, based on what you just said, an unconcentrated

16   market, what is one likely to expect in an unconcentrated market

17   in terms of coordinated effects, if anything?

18   A.  Well, the HHI calculation that we talked about before in the

19   unconcentrated market really is more of a story of coordinated

20   effects than of unilateral effects.  Because in unilateral

21   effects you have this merger simulation model and diversion

22   ratios, and particularly in markets like this, with

23   differentiated products, we typically don't just look at HHI's

24   and shares because we know that there can be competitors even

25   within a relevant market that are closer substitutes and less

1    close substitutes. But the concept of HHI's, and using HHI's to

2    determine whether there's a likelihood of an anticompetitive

3    effect, is really more of a coordinated effects story.

4         And so here, when you have an unconcentrated market and

5    a market that's going to remain unconcentrated after the merger,

6    then we certainly would not expect there to be any

7    anticompetitive coordinated effects.

8    Q.  Now, Dr. Warren-Boulton takes issue with that and says:  Oh,

9    but TaxACT is a maverick.  Have you looked at that issue?

10   A.  I have looked at that issue.

11   Q.  Can you explain to the Court what a maverick is?

12   A.  Certainly.  A maverick has a particular meaning in antitrust

13   analysis, and what a maverick means for antitrust analysis is a

14   firm that is a unique innovator in a marketplace.  It's a firm

15   that is such a unique innovator in a marketplace, that if that

16   firm is eliminated from the marketplace, for example, by a

17   merger - it's subsumed into another firm - that the elimination

18   of that unique innovator is going to allow everyone else to

19   raise their price, everyone together to raise their price.  Not

20   just the merged entity, but it's going to allow others in the

21   industry as well.  Because it was that innovator, that unique

22   innovator alone, essentially, that was keeping a lid on prices.

23   And just the elimination of that innovator is going to allow

24   everyone's prices to increase.

25        So it has to be an innovator that is unique and that

1    after the merger is going to allow prices to go up.  That's what

2    a maverick means from an antitrust standpoint.  I know it gets

3    thrown around in other contexts, but it has a particular meaning

4    here.

5    Q.  And did you see any evidence in this case that if TaxACT is

6    purchased or merged into Block, that people like TaxSlayer and

7    FreeTaxUSA are going to raise their prices because of that?

8    A.  No, I certainly have not seen any evidence of that.

9    Q.  And in your view, is TaxACT still some kind of unique force

10   in the market?

11   A.  You know, this is -- when we're talking about particularly

12   the digital DIY segment of the relevant market, software is a

13   place where there's a lot of innovation.  There's not just

14   innovation in software here, there's also innovation in the

15   assisted side trying to take advantage of new technologies.

16        But certainly on the software side of things here,

17   there's a lot of innovation.  That's not surprising to anyone

18   that looks at software.  There are a lot of firms that are

19   innovators in this marketplace.  I think just about every firm

20   that I've looked at has some sort of innovations in this

21   marketplace.  And the firms obviously all look at each other,

22   and if there's a good innovation that gets made, others say:

23   Yeah, that was a good innovation, I'm going to try that, too.

24   If certain innovations people try and they don't work out,

25   that's expected as well.

1          TaxACT is certainly not a unique innovative force in

2    this marketplace.  The innovations that Dr. Warren-Boulton talks

3    about are innovations regarding the introduction of free back in

4    I think it was tax year '03 and '05.  First of all, my

5    understanding from the evidence is that free was around in this

6    marketplace before TaxACT.  TaxACT may have implemented free in

7    different ways than others had implemented up to that point in

8    time, but there have been additional different implementations

9    of free since that point in time.

10          So it's not unique in offering free, it's not unique in

11   being the last one to do something with free, and the last

12   innovation that is pointed to by Dr. Warren-Boulton is in 2005.

13   And I think certainly when firms in the industry have looked at

14   free today, regardless of the presence or absence of TaxACT,

15   they realize that free is a great way to get the word out, to

16   market their product, to get customers.

17          So there's no sense in which free would go away because

18   TaxACT would be merged into H&R Block.  I mean, everybody knows

19   about free, and there's no reason to believe that free is going

20   to go away or even be curtailed.  Free is too important to these

21   firms to curtail it and not have it be the robust marketing

22   mechanism that it is today.

23   Q.  Were you able to look at some examples of all of the other

24   innovations that you mentioned?

25   A.  Yes.

1    Q.  And if you turn to Tab Number 13, please.

2    A.  (Witness complies.)

3    Q.  Just give the Court some examples that you were able to

4    identify.

5    A.  Certainly.

6    Q.  And what is Tab Number 13, which is DX 9809-1?

7    A.  This tab is just a graphical depiction of some of

8    the innovations that I had mentioned in my report.  There

9    obviously were a whole lot more innovations than just these in

10   the marketplace, but in order to come up with what the most

11   important innovations were, at least for the business people -

12   and that's really what matters - I spoke with Mr. Dunn of TaxACT

13   and I spoke with Mr. Bowen of H&R Block, and I asked each of

14   them to recall, since they were in the industry and since they

15   can remember, what they think the most important innovations

16   are.  And that's what I listed in my report, and that's what I

17   have here in this time line.

18        So this doesn't include all the innovations.  I

19   wouldn't claim that it does.  I haven't made a specific

20   determination of whether or not these are the most important or

21   not; these are the things that the business people think are

22   important innovations.

23        MR. WAYLAND:  On that point I object to this document.

24   It apparently is straight hearsay of people that she is writing

25   down.  You can't use that to put in straight hearsay.

1          THE COURT:  Well, experts do get more leeway in using

2     hearsay --

3          MR. WAYLAND:  They can use it to rely on it, but they

4     can't use it to sponsor on direct testimony.  They had witnesses

5     who they could ask what the most important developments were in

6     the industry, if they can do that, but it's not right to use her

7     to get that in, Your Honor.

8          THE COURT:  But in evaluating and assessing an opinion

9     of whether TaxACT is a maverick, I think her evaluation of her

10    discussions, hearsay though it may be, from people in the

11    industry to help form the basis of her opinion, I mean, I think

12    is probably allowable.

13         But Mr. Robertson, do you have a response to that?

14         MR. ROBERTSON:  I think Your Honor just did it.  I

15    agree, that's the purpose of it.  We have other people who have

16    already testified about what they did, we have other means to

17    get the evidence of the fact in; what's important for this

18    witness is what the relevance is to her antitrust analysis, and

19    that's what it's being offered for and that's what she's talking

20    about.

21         MR. WAYLAND:  Just one point.  I don't object to her

22    testifying as to her basis or why she thinks there was or was

23    not innovation in the market and by whom.  What I object to is

24    this particular document, which is straight hearsay, purports to

25    reflect what people have told her, and that's not appropriate.

1     She can say.  It's this exhibit.  I don't mind if she

2  testifies.  It's not a big point, Your Honor, but it is a pretty

3  clear evidentiary issue, that's all.  You have my objection.

4     THE COURT:  And if I had a jury sitting there, I would

5  probably sustain your objection.  But at this point I've seen

6  it, I've heard her, I can give it the appropriate weight, so I'm

7  going to overrule your objection.

8     MR. WAYLAND:  Okay.

9  BY MR. ROBERTSON:

10 Q.  Now, Dr. Meyer, you mentioned talking with people at TaxACT

11 and also at H&R Block.  Did you also get an opportunity to talk

12 to any of the other competitors in the industry?

13 A.  Yes, I did.

14 Q.  Give us some examples.

15 A.  I spoke with Mr. Kimber of TaxHawk, and I spoke with

16 Mr. Rhodes of TaxSlayer.

17 Q.  And in terms of this one issue of whether those companies

18 would continue or not continue innovating because TaxACT is

19 being bought by Block, did you get any information from talking

20 with them that was relevant to your opinion?

21 A.  Yes, I did.

22 Q.  Just explain it briefly to the Court.

23 A.  Absolutely.  Quite the opposite of what you had sort of

24 posited, which was:  Would it be the case that TaxHawk and

25 TaxSlayer are likely to reduce their innovation or cut back on

1    their competition or raise prices because of this merger, or if

2    TaxACT were eliminated, this so called maverick were eliminated

3    from the marketplace.  Not only did they say to me in my

4    interview with them, but their documents clearly show that they

5    would view any kind of price increase of this -- there was a

6    document that I recall from one of the two parties that didn't

7    have to do with the merger, but just talked generally about if

8    there are price increases for digital DIY products, that's going

9    to give us an opportunity to grow market share and we're going

10   to go after that.  That's the way that these firms view this

11   market.

12           So I don't see any evidence that they would in any way

13   compete less vigorously if TaxACT were eliminated from this

14   marketplace.

15   Q.  And after viewing all the evidence, do you have any view

16   after Block purchases TaxACT and sends all of its digital

17   business to Cedar Rapids, whether they would simply stop

18   competing vigorously out of Cedar Rapids?

19   A.  No, I haven't seen any evidence of that at all.  What I've

20   seen is discussion of their intention to compete more

21   vigorously, because they're able to better set up their product

22   portfolio to target the value -- what they perceive to be as

23   sort of a value product with the TaxACT customer and the premium

24   product with the HRB customer, and to better serve both sets of

25   customers.  I haven't seen any evidence that they intend to

1     compete less vigorously, no.

2     Q.  Now, you mentioned other reasons why coordination was not

3     likely.  Can you give us some other examples?

4     A.  Certainly.  I think first and foremost, coordination is

5     unlikely in a differentiated product industry, and the reason is

6     that there are so many dimensions of competition.  So if you're

7     talking about a product that's homogenous, you're talking about

8     some kind of industrial product where it's all the same, and the

9     only thing that varies, potentially varies, between the firms is

10    price, then one could imagine, and certainly there are

11    instances, in which firms do coordinate.  And it certainly

12    doesn't have to be overt collusion, but can coordinate on price.

13         But let's think about what would happen in this

14    marketplace if what Dr. Warren-Boulton said would happen indeed

15    happened, and that is some coordination on price such that

16    there's either an increase in the price of the paid products or

17    an increase in the price of the free, or maybe a reduction in

18    some of the quality of the free.  That opens up a profit

19    opportunity.  There are some customers who are dissatisfied, and

20    even if it's TurboTax or H&R Block, they all want those

21    customers.

22         So even if the two, perhaps arguably -- just for

23    argument's sake, I should say, would increase the price of some

24    of their products, they're going to try and compete to get those

25    customers who are now looking for a new solution.

1          And there are plenty of ways for them to compete.

2     There's all the various dimensions of product differentiation.

3     In a differentiated products market, this is really not the kind

4     of market that we expect to see coordinated effects, exactly

5     because if there's a profit opportunity that arises, there are

6     other ways.

7          So the competition may shift to some other dimension,

8     but there's still going to be vigorous competition.  In fact,

9     when the competition switches to that other dimension, then the

10    firms who have somehow said to themselves, "I'm going to raise

11    the price," are going to say, "Wait a second, we're losing all

12    of our customers because someone else has come in and competed

13    with a different kind of feature vigorously; we better get that

14    price down, because otherwise we're just going to keep losing

15    customers."

16         So in a differentiated products market, it's not even

17    really possible to think about coordination in the way that you

18    would in a homogeneous product market.  So that's first and

19    foremost.

20    Q.  Is there any way you can talk a little slower?

21         Are there any other structural barriers to coordination

22    besides the ones that you just mentioned?

23    A.  Yes.  There are a couple of other features of this market

24    that make coordination particularly difficult.  One is pricing.

25    You know, some pricing in this marketplace is certainly what we

1    would call transparent, which means others can see pricing.  You

2    know, it's hard to understand how to coordinate on pricing

3    unless you can see the other firm's pricing.  And certainly

4    there are some prices that are easy to observe; you can observe

5    the list prices that are on, let's say, web sites.

6         But that's not the end of the discussion on pricing.

7    Because firms send out, for example -- I mean, I've gotten

8    these, e-mails to existing customers with discounts.  Those are

9    not observable and those are not transparent to the other

10   companies in the industry.  So even if there were some

11   coordination, let's say, just for argument's sake, on some list

12   prices, so the list prices started going up on the web site, if

13   that's undone by increased discounting by sending out more

14   e-mails, then that's not a price increase at all, that's just a

15   shifting around of what you call the list price and what you

16   call the discount.

17        So although some prices are transparent, pricing

18   generally is not fully transparent in this marketplace.  And

19   that also makes coordination difficult.

20        The last point is that there is an entity that cares

21   specifically about keeping low cost tax preparation options

22   particularly for the low end of the income spectrum, and that's

23   the IRS through the FFA.  The IRS appears to care about keeping

24   a lot of tax preparation methods available more generally, not

25   just for lower income individuals - for example, they have the

1    fillable forms that's a free way to fill out your tax forms on

2    its web site as well - but they are also looking to make sure

3    that there are sufficient tax preparation options, as I said,

4    particularly for the low income earners, that are free and cost

5    effective.  So that's another -- I mean, there will always be --

6    no matter what happens on the pricing side outside of the FFA,

7    there will still always be that constraint of the FFA as well,

8    and we know that the FFA brings in new competitors.

9           That brings us again back to new competitors and entry

10   and expansion.  The same constraint that expansion has on

11   unilateral effects - and entry has - can work in coordinated

12   effects as well.  If the coordination is primarily, as

13   Dr. Warren-Boulton has described it, his posited coordinations

14   between the merged entity and TurboTax, as we heard this morning

15   and certainly as I have seen in the documents, there's no sense

16   in which I've seen evidence that TaxSlayer and TaxHawk would go

17   along with that coordination.  So their expansion would thwart

18   coordination as well, because they would reach out with more

19   marketing and they would get more customers from those firms

20   that are attempting to coordinate and increase prices.  They can

21   increase prices, but they won't find it to be very profitable

22   because they'll be losing customers to TaxSlayer and TaxHawk,

23   and that's going to change their calculus.  And I would expect

24   them not to increase prices because of that.

25   Q.  Let me turn to something very briefly, if I can, ma'am.

1          MR. ROBERTSON:  Your Honor, I could tell you where we

2     are in terms of time.

3          THE COURT:  Yes, if you could.  Are you going to be

4     able to finish up in the next 10 or 15 minutes?

5          MR. ROBERTSON:  Yes, Your Honor.

6          THE COURT:  Okay.  Then I think I would like to at

7     least finish direct.

8          MR. ROBERTSON:  And I have very, very, very short, just

9     a couple of points for the closed session, and I'll put it at

10    the very end.

11         THE COURT:  Okay.  Thank you.

12    BY MR. ROBERTSON:

13    Q.  Did you look at the DMA study that Dr. Warren-Boulton

14    described here in court the other day?

15    A.  Yes, I looked at the DMA study, yes.

16    Q.  And just briefly, what are your conclusions, if any, about

17    that?

18    A.  My conclusions are twofold about the DMA study.  Number one,

19    I think it leaves out a lot of important factors.  You know,

20    basically the graph that I saw that was presented in court,

21    similar to what was done in his report, looked at DMA's in which

22    TaxACT did some advertising, and what happened to TaxACT's

23    growth rate in those DMA's versus DMA's where it didn't do

24    advertising.  And then, in those same DMA's, what happened to

25    HRB's growth in the places where TaxACT advertised and the

1    places where it didn't.  And DMA, I think of it basically as a

2    city.  It's a Metropolitan area.

3           It obviously leaves out a lot of important factors.

4    And these are not just hypothetically important factors, these

5    are important factors, or theoretically important factors, I

6    should say.  It leaves out anything else that would have

7    affected the sales or the growth rate of sales of either of

8    those two companies.

9           So it doesn't look at all at pricing.  As we said, a

10   lot of pricing is national, but there is pricing that goes out

11   through targeted ad campaigns.  None of that is in here.  So we

12   don't know whether some of these effects could be the result of

13   changes in pricing.  We just don't know.

14          It doesn't look at advertising by other firms.  In

15   fact, we know that that's an important consideration, and

16   probably I should say in closed session, but there's an

17   aspect --

18   Q.  We'll hold that part.

19   A.  So I think there's a lot that's left out, and I think

20   there's a particular reason that I'll mention in the closed

21   session of why I think it's not just a theoretical problem, it's

22   an actual problem.

23          But even having said that, I think the other problem

24   with this is:  It's simply correlation.  It's just looking at

25   two events that happened, and it's not linking them in any way.

1    So it's not saying, "I know that this is why HRB's sales growth

2    rate was lower in certain DMA's," it doesn't say -- and this

3    goes back to the point of leaving other things out.

4          And then finally, and this is why even if I were to

5    take the DMA study at face value and say, okay, let's say he

6    solved all of those other problems and he controlled for other

7    factors, all this tells us is that there's some competition

8    possibly between TaxACT and HRB.  If I forget about all of my

9    other critiques about the study, that's what it tells us, at its

10   best, and it doesn't put that into any context.  It doesn't say

11   that there's no competition between TaxACT and TurboTax; it

12   doesn't look at how much competition there is between TaxACT and

13   assisted; it doesn't say that the changes that HRB experienced

14   as a result of TaxACT's advertising were more than the changes

15   that TurboTax experienced, more than the changes that assisted

16   experienced, or less.

17         So again, it comes back to this same issue that I have

18   with some of the documents, which is:  You have to ask yourself,

19   what light does this shed on the important question?  I have to

20   look at diversion, which -- and closeness of competition, which

21   by its very nature means you have to consider what happened to

22   the other players.  And that's not in there.

23         So at its best, if I were to give it the complete

24   benefit of the doubt, the best that that DMA study would say --

25   the most that it could ever say is that there is some

1    competition between TaxACT and HRB.  And I've never said there's

2    no competition between the two.  I don't think there's anyone

3    that's ever said there's no competition between the two.  So it

4    really doesn't shed any additional light on any of the important

5    questions in this case.

6    Q.  And do you happen to know when this time period was that he

7    was studying?

8    A.  It was several years ago.  As I recall, the advertising that

9    was done was in the, I want to say, '05 to '07 time frame.  I

10   would have to go back to my report to check for sure.

11   Q.  So back in that time period, do you happen to know whether

12   H&R Block was offering a free product at all?

13   A.  My understanding is it was not offering a free product at

14   that time.

15   Q.  And do you happen to know whether TaxACT was?

16   A.  Yes, I believe TaxACT was offering a free product at that

17   time.

18   Q.  I'll just go to another topic very quickly.  We've already

19   talked a lot about entry and expansion, and do you have any view

20   as to whether expansion has to be at the same size as TaxACT to

21   meet your opinion regarding entry and expansion?

22   A.  No, I don't believe that the expansion would need to -- any

23   particular firm's expansion would need to replicate what TaxACT

24   is today, it just has to be sufficient to discipline a price

25   increase.

Case 1:11-cv-00948-BAH   Document 139   Filed 03/03/20   Page 130 of 153

130

1    Q.  And do you know whether that's consistent with accepted

2    antitrust theory?

3    A.  Yes, that is consistent with accepted antitrust theory, yes.

4    Q.  Do you know whether it's consistent with what the agencies

5    themselves say?

6    A.  Yes, it is.

7    Q.  Now, just briefly, what is your opinion regarding entry and

8    expansion?

9    A.  My opinion regarding entry and expansion is that if, despite

10   all of the other analysis that I've done, I was wrong, and the

11   unilateral -- either the unilateral from coordinated effects

12   standpoint, the merged entity would attempt to raise price, or

13   would raise price, that there would be expansion by players in

14   the marketplace.

15        Now, I've focused mostly on TaxSlayer and TaxHawk in

16   discussing this.  It doesn't have to be limited to those two

17   firms, but certainly those two firms appear poised to expand.

18   They are at about the same position in terms of customer base as

19   TaxACT was in 2002, which was the year before it did the Free

20   For All and the FFA.

21        So they're poised to expand, they're spending a lot of

22   money on marketing.  We've heard about all of their marketing

23   efforts --

24   Q.  Don't go into any details, please.

25   A.  Okay, yes.

*Rebecca Stonestreet*          *(202) 354-3249*     *kingreporter2@verizon.net*

Case 1:11-cv-00948-BAH   Document 139   Filed 03/03/20   Page 130 of 153

130

1    Q.  And do you know whether that's consistent with accepted

2    antitrust theory?

3    A.  Yes, that is consistent with accepted antitrust theory, yes.

4    Q.  Do you know whether it's consistent with what the agencies

5    themselves say?

6    A.  Yes, it is.

7    Q.  Now, just briefly, what is your opinion regarding entry and

8    expansion?

9    A.  My opinion regarding entry and expansion is that if, despite

10   all of the other analysis that I've done, I was wrong, and the

11   unilateral -- either the unilateral from coordinated effects

12   standpoint, the merged entity would attempt to raise price, or

13   would raise price, that there would be expansion by players in

14   the marketplace.

15        Now, I've focused mostly on TaxSlayer and TaxHawk in

16   discussing this.  It doesn't have to be limited to those two

17   firms, but certainly those two firms appear poised to expand.

18   They are at about the same position in terms of customer base as

19   TaxACT was in 2002, which was the year before it did the Free

20   For All and the FFA.

21        So they're poised to expand, they're spending a lot of

22   money on marketing.  We've heard about all of their marketing

23   efforts --

24   Q.  Don't go into any details, please.

25   A.  Okay, yes.

1          MR. ROBERTSON:  Your Honor, I think we can go into

2     closed session and be done.

3          THE COURT:  Okay.  I'll close the courtroom.  Will all

4     the spectators who don't belong here please leave for the closed

5     session?

6          MR. ROBERTSON:  Your Honor, we are now clear on our

7     side.

8          THE COURT:  Mr. Wayland?

9          MR. WAYLAND:  Clear on our side as well.

10         THE COURT:  The courtroom is sealed.  This portion of

11    the transcript will be sealed.

12         **(WHEREUPON, sealed proceedings were transcribed under**

13    **separate cover.)**

14         **(End sealed portion.)**

15         MR. ROBERTSON:  That's all I have on that, Your Honor.

16         THE COURT:  Okay.  Thank you.  We will resume tomorrow

17    at 9:30, and probably go until about 12:30 or 1:00 tomorrow.

18    Okay?  And I apologize for this sort of last second switch in my

19    schedule.

20         MR. ROBERTSON:  And on Thursday, is that a full day or

21    part of a day, or what is that?

22         THE COURT:  On Thursday I will have to step out for a

23    certain period of time for a public meeting at the commission,

24    but I'm going to do that telephonically.  So it will probably be

25    a half-hour break at about 3:00 o'clock.

1                    MR. ROBERTSON:  All right, Your Honor.  Thank you.

2                    THE COURT:  Otherwise it will be a full day on

3        Thursday.  You're all excused.

4                    (Proceedings adjourned at 5:23 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, Rebecca Stonestreet, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9     _____          _____

10    SIGNATURE OF COURT REPORTER                   DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

$16 [1] - 111:16

## '

'03 [1] - 117:4
'05 [2] - 117:4, 129:9
'07 [7] - 66:1, 66:2, 75:10, 75:11, 77:3, 77:12, 129:9
'08 [4] - 66:2, 75:10, 75:11
'10 [1] - 34:13
'87 [1] - 5:16

## 0

05 [3] - 74:13, 74:23

## 1

1 [1] - 34:12
1.3 [3] - 61:6, 61:7, 61:14
1.6 [1] - 112:14
10 [13] - 26:24, 35:24, 35:25, 36:2, 38:13, 39:13, 39:20, 46:12, 67:5, 83:18, 83:21, 109:13, 126:4
100 [2] - 65:2, 103:6
101st [1] - 6:7
11 [1] - 78:2
11-948 [1] - 1:3
11.2 [1] - 75:23
11.4 [1] - 80:10
11.8 [1] - 74:9
12 [3] - 1:5, 103:12, 110:10
125 [1] - 8:3
12:30 [1] - 131:17
13 [4] - 35:4, 35:6, 118:1, 118:6
13th [1] - 1:19
14 [6] - 74:5, 77:6, 77:7, 77:9, 79:3, 103:12
14.7 [2] - 76:18, 77:1
14.95 [2] - 40:5, 48:18
15 [2] - 74:25, 126:4
1500 [1] - 85:12
16 [9] - 37:11, 64:11, 67:9, 68:20, 69:9, 78:3, 78:4, 79:11
16.1 [1] - 80:17
17 [9] - 34:18, 34:20, 56:4, 56:8, 64:11, 67:7, 67:8, 69:8, 69:9
172 [2] - 85:5, 85:18
19.95 [2] - 40:5, 69:16
1992 [1] - 6:15
1995 [1] - 6:16

1998 [1] - 41:20
1:00 [1] - 131:17
1:25 [1] - 1:7

## 2

2 [3] - 32:18, 32:20, 32:21
2.5 [1] - 111:13
2.7 [1] - 75:15
20 [3] - 5:17, 14:1, 102:12
200 [1] - 85:20
2000 [1] - 7:20
20001 [1] - 1:23
20004 [1] - 1:20
2002 [1] - 130:19
2005 [1] - 117:12
2006 [1] - 23:20
2007 [9] - 61:4, 61:20, 62:10, 65:24, 75:15, 75:17, 76:18, 77:13
2007/2008 [1] - 66:13
2008 [10] - 61:4, 61:20, 62:2, 62:3, 62:10, 65:25, 75:16, 75:18, 76:19, 77:13
2009 [3] - 13:5, 37:20, 49:25
2010 [2] - 23:1, 23:5
2011 [1] - 1:5
202 [3] - 1:16, 1:20, 1:23
20530 [1] - 1:16
25 [1] - 9:15
26 [1] - 36:2
28 [3] - 77:4, 77:5, 77:7
29.95 [1] - 48:18

## 3

3 [4] - 2:4, 35:19, 35:21, 35:22
300 [1] - 3:24
3121 [1] - 1:15
354-3249 [1] - 1:23
358 [1] - 36:2
38.1 [1] - 80:14
39 [1] - 78:22
3:00 [1] - 131:25
3:10 [1] - 68:15

## 4

4 [3] - 30:17, 36:16, 41:17
4.1.1 [1] - 23:2
4.7 [2] - 111:10, 113:12
40 [3] - 65:11, 84:21, 102:11

## 5

5 [2] - 1:9, 31:25

5.7 [1] - 84:23
50 [3] - 78:2, 102:14, 110:23
514-1157 [1] - 1:16
53 [2] - 77:10, 77:15
54 [2] - 2:5, 2:6
555 [1] - 1:19
5:23 [1] - 132:4

## 6

6 [1] - 37:5
6,000 [2] - 39:15
6.3 [2] - 74:9, 74:22
61 [1] - 78:23
63 [2] - 102:17, 102:20
637-5774 [1] - 1:20
6511 [1] - 1:22

## 7

7 [2] - 60:21, 61:23
70 [1] - 8:4
72 [3] - 75:11, 77:3, 77:4
75 [5] - 2:4, 66:3, 74:8, 74:24, 77:25
792 [1] - 85:8

## 8

80 [1] - 8:4

## 9

9 [1] - 22:20
950 [1] - 1:15
9800 [1] - 74:25
9802-001 [1] - 79:25
9803 [1] - 60:22
9805 [1] - 24:7
9805-1 [1] - 23:1
9809-1 [1] - 118:6
9811 [1] - 64:15
9:30 [1] - 131:17

## A

ability [1] - 113:9
able [19] - 11:1, 11:7, 17:8, 28:11, 38:19, 40:1, 43:10, 44:17, 49:13, 82:24, 96:12, 98:10, 108:12, 108:15, 109:18, 117:23, 118:3, 121:21, 126:4
above-entitled [1] - 133:5
absence [1] - 117:14
absolutely [10] - 22:2, 25:20,

27:9, 28:1, 29:2, 32:5, 49:19, 90:11, 120:23
absorbent [2] - 26:4, 26:9
academic [1] - 63:12
Academy [1] - 5:23
accepted [7] - 13:13, 21:25, 22:5, 22:15, 130:1, 130:3
according [2] - 71:5, 106:10
account [4] - 30:21, 55:14, 65:19, 113:10
accounting [1] - 36:12
acid [1] - 26:5
acrylic [1] - 26:5
act [1] - 106:17
acting [1] - 20:21
action [2] - 15:10, 99:6
Action [1] - 1:3
actions [4] - 19:12, 20:22, 105:6, 105:9
activity [1] - 59:16
actual [12] - 24:1, 51:16, 70:11, 73:17, 93:11, 94:22, 100:2, 106:25, 107:10, 112:7, 113:22, 127:22
ad [3] - 97:11, 97:15, 127:11
add [15] - 21:12, 24:5, 43:22, 53:16, 56:5, 56:7, 56:10, 63:2, 63:3, 63:7, 69:4, 85:4, 103:6, 106:14, 106:15
added [1] - 56:12
adding [2] - 22:14, 86:18
addition [4] - 15:4, 56:4, 56:8, 100:11
additional [16] - 14:24, 74:16, 74:18, 74:19, 74:21, 92:7, 96:20, 98:7, 98:10, 98:12, 101:19, 105:13, 109:22, 113:8, 117:8, 129:4
addresses [1] - 40:22
adhering [1] - 56:3
adjourned [1] - 132:4
adjust [1] - 79:8
administered [1] - 3:6
administrative [1] - 98:1
administrators [1] - 97:25
admission [1] - 53:13
ADMITTED [2] - 2:9, 2:11
advance [1] - 53:7
advantage [4] - 15:14, 92:16, 108:13, 116:15
adverse [1] - 85:15
advertised [1] - 126:25
advertisement [2] - 17:2, 97:10
advertising [7] - 95:14, 95:17, 126:22, 126:24, 127:14, 128:14, 129:8
affected [2] - 40:7, 127:7

**AFTERNOON** [2] - 1:5, 1:10
**afternoon** [2] - 3:7, 3:8
**agencies** [6] - 4:11, 24:1, 98:17, 98:25, 99:10, 130:4
**agency** [2] - 12:23, 24:11
**aggregate** [7] - 72:18, 73:8, 74:1, 75:1, 77:11, 79:16
**aggregated** [1] - 72:20
**aggressive** [1] - 32:14
**aggressively** [2] - 32:11, 32:12
**ago** [5] - 5:3, 42:6, 96:9, 110:2, 129:8
**agree** [2] - 83:8, 119:15
**agrees** [1] - 98:22
**ahead** [2] - 21:4, 97:11
**aid** [1] - 10:17
**aided** [1] - 1:25
**al** [1] - 1:6
**allegedly** [2] - 12:9, 12:13
**allow** [6] - 53:25, 102:6, 115:18, 115:20, 115:23, 116:1
**allowable** [1] - 119:12
**allowed** [3] - 41:1, 98:18, 103:2
**almost** [2] - 9:20, 33:22
**alone** [2] - 81:2, 115:22
**alternative** [7] - 10:13, 26:11, 38:17, 38:18, 44:13, 71:14, 92:21
**alternatives** [9] - 18:24, 19:6, 19:11, 20:4, 20:13, 26:14, 38:16, 39:3, 39:11
**Amazon** [2] - 57:23, 58:4
**AMERICA** [1] - 1:3
**amount** [1] - 93:14
**analogy** [2] - 21:3, 21:5
**analyses** [1] - 4:12
**analysis** [52] - 8:7, 8:8, 8:11, 8:12, 10:2, 10:4, 10:15, 11:21, 33:18, 34:11, 36:21, 37:3, 37:12, 38:9, 45:4, 47:4, 47:18, 47:21, 48:24, 55:14, 56:23, 60:16, 63:22, 63:24, 68:9, 69:16, 71:16, 71:17, 71:19, 73:14, 74:4, 77:16, 78:19, 80:2, 80:12, 83:12, 86:16, 88:7, 89:19, 90:14, 93:2, 97:19, 98:18, 104:8, 105:20, 106:19, 113:17, 115:13, 119:18, 130:10
**analyze** [3] - 9:18, 10:9, 13:21
**analyzed** [6] - 8:15, 8:16, 9:24, 83:16, 85:24, 114:1
**analyzes** [1] - 24:12
**analyzing** [1] - 36:8
**annual** [1] - 35:22

**anomalous** [5] - 49:1, 69:17, 69:18, 70:1
**anomaly** [22] - 45:22, 46:17, 47:1, 47:11, 47:13, 47:15, 47:16, 47:17, 48:8, 48:25, 49:12, 49:14, 49:25, 50:2, 50:5, 51:1, 51:2, 51:9, 51:18, 54:16, 69:25
**answer** [13] - 18:11, 25:8, 45:20, 47:2, 47:14, 47:18, 47:19, 49:15, 68:23, 71:11, 93:6, 102:1, 110:6
**answers** [2] - 45:19, 63:6, 110:19
**ANTHONY** [1] - 1:14
**anticipation** [6] - 96:25, 97:14, 108:5, 108:6, 108:9, 108:14
**anticompetitive** [13] - 14:3, 14:9, 15:10, 15:15, 15:17, 15:19, 85:21, 85:25, 92:9, 93:1, 114:8, 115:2, 115:7
**antitrust** [22] - 4:7, 4:11, 7:25, 8:2, 11:18, 12:23, 13:2, 38:9, 44:5, 56:21, 58:15, 58:18, 60:16, 84:11, 86:16, 88:14, 115:12, 115:13, 116:2, 119:18, 130:2, 130:3
**antitrusters** [1] - 51:21
**anyway** [1] - 55:10
**apart** [1] - 96:4
**apologize** [1] - 131:18
**appeal** [1] - 87:12
**appear** [2] - 15:13, 130:17
**APPEARANCES** [1] - 1:12
**applicable** [1] - 46:4
**applied** [1] - 71:12
**apply** [3] - 52:7, 71:10, 81:5
**appointment** [1] - 87:20
**appreciate** [1] - 54:1
**approach** [4] - 22:6, 22:9, 28:16, 109:11
**appropriate** [4] - 13:20, 106:22, 119:25, 120:6
**Arabia** [1] - 6:8
**area** [18] - 4:6, 5:12, 5:14, 5:24, 6:19, 7:23, 7:24, 7:25, 11:12, 11:16, 11:18, 12:14, 13:6, 13:14, 14:7, 15:9, 16:11, 127:2
**areas** [3] - 4:7, 6:1, 13:4
**arguably** [1] - 122:22
**argue** [1] - 26:23
**argument** [1] - 18:9
**argument's** [2] - 122:23, 124:11
**argumentative** [1] - 18:8
**arise** [1] - 15:5
**arises** [1] - 123:5

**arising** [1] - 50:6
**Army** [3] - 6:13, 6:14, 6:15
**artificial** [2] - 86:14
**aspect** [2] - 9:20, 127:17
**assessing** [1] - 119:8
**assignment** [1] - 6:6
**Assisted** [1] - 41:18
**assisted** [76] - 16:17, 24:23, 24:25, 25:8, 25:12, 25:14, 27:4, 27:12, 27:22, 27:24, 29:18, 29:23, 30:9, 32:8, 34:24, 34:25, 38:25, 40:8, 40:15, 42:2, 42:9, 42:14, 42:25, 43:7, 44:22, 47:7, 47:22, 49:4, 49:18, 49:20, 49:22, 56:12, 59:14, 59:15, 60:2, 60:7, 60:10, 60:11, 60:13, 61:5, 61:6, 64:7, 64:8, 65:12, 65:14, 65:17, 66:12, 67:4, 69:13, 70:15, 70:18, 70:25, 71:6, 72:13, 75:23, 75:25, 76:1, 78:16, 78:21, 78:24, 81:10, 84:8, 87:3, 101:25, 102:5, 102:7, 102:9, 102:11, 103:3, 103:4, 103:25, 104:2, 110:24, 116:15, 128:13, 128:15
**associated** [4] - 38:18, 108:10, 108:19
**Associates** [1] - 3:21
**assume** [2] - 6:13, 89:20
**assumption** [2] - 62:25, 63:4
**attempt** [1] - 130:12
**attempting** [1] - 125:20
**attempts** [1] - 19:15
**attention** [2] - 79:18, 80:19
**available** [6] - 10:5, 25:22, 26:19, 39:6, 124:24
**Avenue** [1] - 1:15
**average** [5] - 107:2, 107:4, 107:8, 107:9, 111:19
**aware** [1] - 53:6

## B

**back-of-the-envelope** [2] - 94:18, 100:3
**background** [2] - 17:21, 47:12
**backup** [1] - 108:19
**bad** [2] - 89:13, 105:11
**balance** [3] - 58:23, 89:15, 113:1
**balancing** [2] - 89:13, 112:23
**bank** [4] - 97:1, 108:9, 108:15
**Bank** [2] - 57:24, 58:4
**bar** [2] - 29:8, 29:14

**barriers** [1] - 123:21
**base** [4] - 64:25, 65:1, 70:10, 130:18
**based** [20] - 7:8, 50:1, 59:1, 59:16, 60:18, 65:4, 66:8, 66:9, 69:10, 69:15, 70:7, 70:14, 71:2, 79:1, 79:6, 79:16, 93:12, 113:21, 114:14, 114:15
**Basic** [7] - 38:17, 40:4, 40:6, 40:11, 40:13, 40:14, 50:22
**basic** [1] - 91:12
**basics** [1] - 20:6
**basis** [9] - 53:8, 58:12, 64:1, 73:2, 88:8, 97:6, 102:17, 119:11, 119:22
**beauty** [4] - 10:17, 10:19, 10:25, 11:7
**Beauty** [1] - 10:19
**became** [1] - 65:18
**becoming** [1] - 97:7
**beer** [1] - 8:22
**BEFORE** [1] - 1:10
**began** [1] - 28:23
**begin** [3] - 6:15, 28:21, 31:3
**beginning** [2] - 31:9, 82:9
**begins** [1] - 75:5
**behave** [1] - 99:20
**behavior** [2] - 66:6, 73:16
**behind** [3] - 57:20, 89:10, 90:5
**bell** [1] - 6:10
**belong** [1] - 131:4
**below** [2] - 85:1, 85:12
**benefit** [2] - 100:18, 128:24
**benefits** [3] - 43:7, 43:9, 106:9
**Bennett** [1] - 31:1
**Bentley** [1] - 7:1
**BERYL** [1] - 1:10
**Best** [1] - 42:18
**best** [12] - 20:13, 20:15, 24:6, 49:5, 49:6, 65:7, 87:17, 89:14, 93:17, 128:10, 128:23, 128:24
**better** [10] - 87:16, 87:18, 94:18, 112:17, 112:18, 112:21, 113:1, 121:21, 121:24, 123:13
**between** [43] - 12:12, 14:11, 19:19, 21:10, 32:15, 33:3, 35:13, 41:2, 42:1, 42:9, 49:22, 51:9, 53:2, 60:10, 61:2, 61:3, 61:13, 65:24, 67:12, 69:12, 77:13, 78:4, 79:11, 84:22, 86:21, 89:21, 93:21, 94:24, 95:24, 96:15, 101:10, 101:12, 101:16, 103:9, 103:20, 122:9, 125:14, 128:8, 128:11,

128:12, 129:1, 129:2, 129:3
**beyond** [1] - 86:1
**bias** [2] - 46:20, 47:17
**biased** [2] - 46:22, 46:24
**big** [2] - 90:10, 120:2
**billable** [1] - 9:15
**binder** [1] - 60:20
**bit** [14] - 8:8, 11:8, 29:12, 34:3, 49:25, 79:9, 92:17, 92:18, 96:6, 98:10, 109:8, 111:10, 112:15
**blank** [1] - 39:8
**blinders** [1] - 92:5
**Block** [72] - 17:14, 24:24, 27:12, 27:22, 27:23, 27:25, 34:13, 37:19, 38:4, 38:5, 38:22, 40:4, 41:5, 41:22, 42:12, 43:1, 43:13, 46:4, 47:6, 47:7, 47:8, 47:9, 47:23, 48:18, 49:8, 49:18, 49:19, 56:14, 68:23, 68:24, 69:1, 69:4, 69:7, 70:13, 70:15, 71:2, 72:11, 72:20, 75:2, 75:16, 76:8, 76:9, 77:16, 80:5, 80:9, 80:14, 80:24, 81:3, 81:9, 84:6, 84:13, 84:18, 94:24, 95:15, 95:20, 98:5, 102:9, 107:25, 108:7, 108:8, 108:10, 108:15, 111:6, 116:6, 117:18, 118:13, 120:11, 120:19, 121:16, 122:20, 129:12
**BLOCK** [1] - 1:6
**block** [1] - 41:17
**Block's** [8] - 27:3, 35:22, 49:5, 70:9, 70:22, 84:17, 112:14, 112:16
**blow** [3] - 36:1, 36:5, 64:14
**blown** [1] - 36:9
**blurring** [2] - 42:1, 42:8
**board** [7] - 31:6, 35:1, 35:18, 45:1, 60:21, 62:11, 98:22
**boils** [1] - 62:19
**book** [1] - 36:17
**bore** [1] - 75:18
**borrow** [1] - 28:14
**bottom** [8] - 33:12, 48:20, 74:12, 75:1, 76:10, 77:10, 80:4, 85:13
**bought** [1] - 120:19
**Boulton** [29] - 17:24, 18:2, 19:4, 25:13, 28:19, 45:12, 48:3, 51:14, 55:15, 56:4, 61:17, 63:23, 65:12, 65:15, 70:17, 70:22, 76:21, 79:21, 90:21, 93:8, 93:9, 94:5, 110:17, 115:8, 117:2, 117:12, 122:14, 125:13,

126:13
**Boulton's** [10] - 24:21, 45:5, 54:5, 62:14, 66:14, 71:9, 76:5, 80:21, 99:25, 110:4
**Bowen** [3] - 109:16, 109:21, 118:13
**box** [2] - 37:12, 43:23
**branch** [2] - 6:4
**brand** [4] - 21:10, 95:13, 95:22
**branded** [2] - 26:19, 26:20
**brands** [1] - 21:8
**break** [3] - 68:12, 131:25
**BREED** [1] - 1:18
**briefly** [8] - 3:22, 71:18, 83:20, 100:5, 120:22, 125:25, 126:16, 130:7
**brigade** [1] - 6:12
**bring** [3] - 38:19, 88:18, 106:13
**bringing** [3] - 42:17, 43:14, 58:1
**brings** [3] - 105:23, 125:8, 125:9
**broad** [2] - 59:2, 82:11
**broaden** [1] - 24:5
**broader** [3] - 34:3, 55:25, 85:25
**brought** [1] - 48:3
**Budget** [1] - 5:19
**build** [1] - 20:6
**building** [2] - 63:1, 82:16
**builds** [1] - 69:3
**bullet** [5] - 35:15, 37:1, 37:2, 37:11
**bump** [1] - 89:6
**bump-up** [1] - 89:6
**bunch** [1] - 48:16
**business** [11] - 7:22, 30:23, 32:6, 32:8, 32:10, 32:12, 36:10, 38:6, 118:11, 118:21, 121:17
**BUTERMAN** [1] - 1:13
**buying** [1] - 88:25
**BY** [19] - 3:12, 3:16, 13:16, 18:14, 22:12, 28:9, 30:18, 31:24, 36:4, 37:17, 51:13, 54:3, 55:1, 64:16, 68:18, 70:8, 82:1, 120:9, 126:12

---

## C

**calculate** [2] - 19:2, 19:3
**calculated** [2] - 101:1, 103:19
**calculates** [1] - 103:17
**calculation** [2] - 111:4, 114:18
**calculations** [2] - 50:9, 86:1

**calculator** [2] - 87:21, 87:24
**calculus** [3] - 89:8, 93:16, 125:23
**calendar** [1] - 9:15
**camera** [1] - 33:16
**campaigns** [1] - 127:11
**Campbell** [1] - 6:6
**Canada** [1] - 83:8
**candidate** [38] - 52:4, 52:25, 53:2, 71:1, 71:10, 71:23, 72:4, 72:6, 72:7, 72:8, 76:4, 76:7, 76:25, 77:8, 77:14, 77:15, 78:6, 78:9, 78:14, 78:17, 78:23, 79:3, 79:6, 79:9, 79:17, 79:20, 80:4, 80:14, 80:16, 80:18, 80:20, 82:7, 82:12, 82:18, 82:24, 83:10, 83:13, 83:15
**candidates** [1] - 79:19
**capacity** [1] - 92:15
**capture** [1] - 113:14
**Card** [1] - 96:24
**care** [2] - 58:15, 124:23
**cares** [1] - 124:20
**case** [36] - 4:9, 10:15, 12:7, 13:19, 13:25, 15:22, 17:9, 19:7, 19:15, 19:22, 26:24, 33:22, 37:25, 41:19, 49:16, 52:25, 53:9, 56:13, 56:21, 58:6, 60:12, 65:6, 68:22, 72:19, 78:3, 84:4, 94:23, 96:13, 98:4, 104:25, 107:7, 112:13, 116:5, 120:24, 129:5
**cases** [4] - 4:10, 12:7, 25:17, 25:25
**cash** [2] - 98:10, 98:12
**categories** [4] - 56:5, 64:24, 85:11, 108:3
**categorization** [1] - 65:23
**category** [1] - 59:9
**causes** [1] - 103:17
**CCH** [1] - 76:10
**Cedar** [2] - 121:17, 121:18
**center** [1] - 109:5
**centers** [1] - 45:16
**CEO** [2] - 32:10, 97:23
**certain** [10] - 16:9, 22:14, 39:14, 50:8, 72:23, 93:19, 93:20, 116:24, 128:2, 131:23
**certainly** [71] - 13:2, 13:20, 14:19, 15:13, 16:2, 18:16, 18:23, 20:8, 22:22, 23:3, 25:7, 27:19, 28:13, 34:18, 35:12, 36:22, 41:8, 42:15, 44:8, 44:24, 45:2, 45:13, 49:9, 56:20, 58:22, 59:4, 60:11, 61:13, 62:5, 62:7, 62:11, 64:4, 66:9, 66:21,

66:25, 69:4, 71:19, 79:14, 81:1, 82:21, 83:4, 83:10, 83:22, 84:3, 93:24, 94:25, 96:8, 96:17, 97:20, 98:2, 98:19, 99:13, 104:2, 104:6, 104:25, 105:18, 110:16, 115:6, 115:12, 116:8, 116:16, 117:1, 117:13, 118:5, 122:4, 122:10, 122:11, 123:25, 124:3, 125:15, 130:17
**CERTIFICATE** [1] - 133:1
**certify** [1] - 133:3
**chance** [5] - 18:18, 41:6, 79:12, 91:8, 99:24
**change** [28] - 4:18, 4:19, 4:24, 4:25, 12:2, 12:10, 16:18, 16:19, 16:25, 58:10, 65:21, 65:25, 66:11, 66:18, 67:5, 68:8, 70:23, 85:5, 85:17, 85:19, 86:10, 92:17, 103:17, 111:12, 112:3, 125:23
**changed** [4] - 16:25, 39:10, 60:4
**changes** [18] - 13:5, 13:6, 16:20, 39:24, 39:25, 41:25, 42:2, 43:3, 43:5, 69:23, 70:20, 85:20, 127:13, 128:13, 128:14, 128:15
**changing** [2] - 6:21, 41:25
**characterized** [2] - 42:3, 71:15
**charge** [1] - 48:10
**chart** [5] - 41:17, 61:22, 78:12, 83:23, 84:23
**charts** [1] - 85:1, 100:23
**check** [4] - 42:20, 82:10, 107:15, 129:10
**checked** [1] - 48:25
**chemical** [1] - 26:1
**chemicals** [2] - 8:20, 25:25
**choice** [1] - 101:25
**choices** [1] - 39:17
**choose** [11] - 33:2, 39:6, 39:7, 39:12, 40:12, 40:14, 40:15, 40:16, 41:2, 50:17, 55:21
**chooses** [1] - 68:22
**choosing** [2] - 40:4, 67:1
**chose** [5] - 6:4, 40:6, 40:7, 47:6, 94:12
**cHRISTINE** [1] - 2:3
**CHRISTINE** [1] - 3:9
**Christine** [2] - 3:5, 3:18
**cite** [1] - 54:18
**city** [1] - 127:2
**Civil** [1] - 1:3
**claim** [2] - 111:25, 118:19
**clarify** [1] - 86:6

**clear** [16] - 25:6, 30:13, 31:8, 53:19, 55:2, 59:1, 66:13, 73:23, 78:4, 81:10, 81:11, 87:15, 87:16, 120:3, 131:6, 131:9

**cleared** [1] - 54:23

**clearer** [1] - 28:10

**clearly** [7] - 33:19, 41:21, 61:7, 61:14, 69:1, 99:3, 121:4

**Clerk** [1] - 3:6

**click** [6] - 33:2, 33:4, 38:19, 39:7, 97:6, 97:15

**clicks** [2] - 97:9, 97:10

**close** [9] - 14:12, 22:14, 27:24, 56:1, 68:19, 78:1, 89:17, 115:1, 131:3

**closed** [5] - 126:9, 127:16, 127:20, 131:2, 131:4

**closely** [5] - 62:21, 62:23, 64:8, 70:15, 90:8

**closeness** [3] - 8:10, 52:9, 128:20

**closer** [8] - 23:10, 23:14, 24:13, 27:12, 34:4, 69:6, 70:19, 114:25

**closest** [42] - 20:12, 20:15, 20:18, 21:22, 21:24, 24:15, 24:23, 24:24, 25:1, 25:3, 27:3, 27:4, 28:6, 43:23, 52:21, 55:21, 55:24, 63:2, 63:3, 63:7, 64:1, 64:5, 65:6, 68:24, 69:1, 69:14, 70:9, 70:12, 70:14, 70:23, 70:24, 71:2, 71:13, 79:18, 80:19, 81:2, 81:19, 81:22, 81:24, 82:9, 82:19, 88:2

**cloth** [1] - 26:7

**Cobb** [1] - 31:1

**coding** [1] - 83:24

**Coke** [12] - 21:5, 21:14, 52:16, 88:22, 88:23, 88:25, 89:18, 89:19, 89:21, 89:23, 89:25

**cola** [1] - 21:8

**Cola** [4] - 21:10, 21:11, 52:15, 52:16

**colas** [1] - 21:7

**Colgate** [1] - 7:2

**collect** [1] - 22:17

**college** [4] - 5:16, 5:20, 5:21, 5:22

**College** [1] - 7:1

**collusion** [1] - 122:12

**color** [1] - 30:8

**COLUMBIA** [1] - 1:2

**column** [6] - 66:10, 69:15, 75:8, 75:24, 77:17, 77:18

**Column** [7] - 65:4, 65:9, 65:10, 66:10, 69:10, 69:13, 71:5

**Columns** [1] - 69:20

**columns** [1] - 69:21

**combination** [1] - 72:19

**combinations** [1] - 81:18

**combined** [1] - 86:10

**coming** [6] - 10:22, 15:8, 24:3, 35:2, 39:16, 85:13

**commentary** [3] - 23:20, 23:24, 99:10

**Commerce** [1] - 7:11

**commission** [1] - 131:23

**Commission** [2] - 13:4, 24:11

**common** [2] - 8:12, 97:7

**companies** [14] - 8:21, 15:13, 34:2, 57:20, 57:25, 67:23, 72:21, 89:16, 89:19, 98:6, 120:17, 124:10, 127:8

**company** [4] - 6:7, 26:10, 86:4, 107:3

**company/firm** [1] - 73:16

**compare** [13] - 11:2, 11:6, 39:21, 57:1, 59:17, 72:16, 72:22, 76:22, 77:20, 77:21, 77:23, 80:11, 111:15

**comparing** [3] - 38:21, 57:23, 73:25

**comparison** [5] - 33:3, 33:5, 33:6, 73:2, 95:17

**compete** [19] - 14:20, 26:21, 34:9, 58:11, 62:21, 62:23, 62:24, 88:12, 88:13, 88:16, 88:17, 90:8, 121:13, 121:20, 122:1, 122:24, 123:1

**competed** [1] - 123:12

**competing** [6] - 98:14, 100:16, 100:18, 100:21, 101:18, 121:18

**competition** [44] - 8:10, 8:16, 10:23, 10:24, 10:25, 11:8, 11:9, 13:7, 19:23, 20:1, 20:21, 20:24, 21:1, 21:16, 21:18, 21:21, 31:7, 33:9, 34:6, 35:25, 41:10, 44:25, 49:21, 52:10, 63:13, 89:17, 90:12, 91:4, 91:16, 95:25, 105:17, 121:1, 122:6, 123:7, 123:8, 123:9, 128:7, 128:11, 128:12, 128:20, 129:1, 129:2, 129:3

**competitive** [7] - 11:20, 36:10, 85:15, 92:25, 98:3, 98:13, 99:6

**competitor** [12] - 64:6, 68:24, 69:1, 70:9, 70:12, 70:14, 70:23, 70:24, 79:19, 81:20, 81:22, 81:25

**competitor's** [1] - 92:3

**competitors** [24] - 4:24, 14:15, 15:11, 43:19, 52:21, 56:14, 57:1, 57:2, 57:21, 59:5, 64:1, 69:6, 73:19, 81:3, 82:19, 89:17, 92:5, 92:6, 92:8, 111:24, 114:24, 120:12, 125:8, 125:9

**complete** [3] - 49:11, 102:2, 128:23

**completed** [1] - 42:19

**completely** [5] - 39:9, 41:13, 67:2, 84:16, 91:25

**complex** [4] - 65:18, 65:24, 66:2

**complexity** [11] - 65:21, 65:23, 66:1, 66:4, 66:6, 66:10, 66:12, 69:23, 70:20, 70:21, 70:23

**complicated** [2] - 71:20, 100:9

**complies** [8] - 32:1, 35:5, 35:20, 64:13, 74:6, 83:19, 110:11, 118:2

**compliment** [1] - 67:18

**compound** [1] - 26:18

**computer** [4] - 1:25, 8:18, 38:11, 38:14

**computer-aided** [1] - 1:25

**concentrated** [1] - 6:1

**concentration** [4] - 5:24, 6:1, 19:4, 85:2

**concept** [11] - 23:5, 23:18, 31:6, 59:18, 59:21, 72:2, 93:24, 101:23, 113:7, 115:1

**concepts** [4] - 17:6, 38:1, 93:20, 109:3

**concern** [2] - 41:15, 47:1

**concerned** [3] - 10:21, 19:20, 45:22

**conclusions** [5] - 47:5, 47:22, 49:4, 126:16, 126:18

**concrete** [1] - 16:8

**condition** [1] - 93:13

**conditions** [2] - 5:1, 7:16

**conduct** [1] - 38:8

**conducted** [1] - 38:4

**conducts** [1] - 38:5

**confidence** [2] - 44:8, 49:11

**confidential** [7] - 31:20, 31:21, 32:18, 33:16, 43:16, 43:20, 96:12

**confines** [1] - 19:2

**confused** [1] - 49:25

**confusing** [1] - 16:3

**conjoint** [3] - 40:20, 44:11, 45:4

**conservative** [1] - 84:18

**consider** [7] - 15:2, 18:25, 30:19, 43:25, 59:6, 71:23, 128:21

**considerably** [3] - 29:13, 29:20, 62:6

**consideration** [4] - 58:23, 71:13, 105:5, 127:15

**considered** [6] - 16:10, 56:20, 85:9, 85:12, 85:20, 95:10

**considering** [5] - 44:24, 57:19, 72:8, 81:2, 110:12

**considers** [2] - 41:11, 73:15

**consist** [1] - 38:15

**consistent** [7] - 41:13, 44:9, 98:17, 114:7, 130:1, 130:3, 130:4

**consisting** [1] - 24:17

**consists** [1] - 38:15

**consolidated** [1] - 15:5

**constraining** [3] - 20:17, 20:21, 91:2

**constrains** [1] - 19:12

**constraint** [6] - 14:24, 58:13, 98:11, 113:8, 125:7, 125:10

**construct** [1] - 86:17

**constructed** [1] - 82:18

**construction** [1] - 22:13

**consulted** [1] - 7:11

**consulting** [3] - 3:23, 3:24, 7:10

**consumer** [12] - 33:10, 43:8, 97:14, 103:19, 103:22, 111:12, 111:13, 114:3, 114:6, 114:7, 114:10

**consumers** [23] - 4:17, 4:19, 14:15, 16:24, 18:25, 19:7, 19:11, 19:14, 20:3, 25:21, 43:7, 60:13, 87:13, 88:25, 92:10, 96:5, 96:7, 112:16, 112:21, 112:22, 113:1, 114:4

**contemplating** [1] - 92:10

**context** [4] - 91:7, 105:21, 105:22, 128:10

**contexts** [1] - 116:3

**continue** [1] - 120:18

**Continued** [1] - 2:5

**CONTINUED** [1] - 54:25

**control** [5] - 19:25, 84:13, 84:14, 84:18, 84:19

**controlled** [1] - 128:6

**controlling** [1] - 40:2

**conversation** [1] - 31:4

**converse** [1] - 80:10

**convert** [2] - 14:23, 101:21

**cookie** [1] - 109:10

**cookie-cutter** [1] - 109:10

**coordinate** [4] - 122:11,

122:12, 124:2, 125:20
**coordinated** [15] - 8:11, 9:22, 9:25, 14:5, 14:7, 86:12, 114:12, 114:13, 114:17, 114:19, 115:3, 115:7, 123:4, 125:11, 130:11
**coordination** [11] - 122:2, 122:4, 122:15, 123:17, 123:21, 123:24, 124:11, 124:19, 125:12, 125:17, 125:18
**coordinations** [1] - 125:13
**copies** [1] - 22:9
**copy** [1] - 50:6
**COREY** [1] - 1:18
**correct** [15] - 22:22, 31:15, 34:15, 36:6, 37:7, 50:2, 50:4, 61:24, 62:15, 70:4, 80:1, 81:21, 84:11, 111:22, 133:4
**correctly** [3] - 27:17, 29:14, 111:14
**corrector** [1] - 25:9
**correlation** [1] - 127:24
**corroborate** [4] - 44:18, 44:21, 49:17
**corroborated** [1] - 49:19
**cost** [26] - 73:12, 74:17, 74:19, 97:1, 97:6, 97:12, 97:22, 98:3, 98:6, 98:7, 98:16, 98:20, 98:21, 99:1, 99:6, 99:8, 99:12, 99:22, 107:14, 108:16, 108:22, 108:23, 109:4, 110:3, 124:21, 125:4
**cost-per-click** [1] - 97:6
**costs** [22] - 4:24, 74:19, 91:20, 91:21, 91:23, 96:16, 96:17, 96:18, 96:20, 96:22, 97:3, 97:4, 97:17, 97:18, 97:21, 97:22, 106:13, 106:15
**counsel** [1] - 31:22
**count** [3] - 8:1, 102:10, 103:5
**counting** [1] - 102:17
**country** [1] - 6:22
**couple** [6] - 22:16, 54:4, 88:7, 91:2, 123:23, 126:9
**course** [20] - 11:1, 17:4, 17:11, 17:21, 19:20, 29:19, 29:25, 30:2, 38:6, 39:23, 59:15, 73:13, 78:15, 84:7, 88:13, 90:17, 94:1, 104:14, 106:17, 109:1
**courses** [1] - 7:7
**court** [6] - 11:22, 45:9, 68:13, 71:10, 126:14, 126:24
**Court** [28] - 1:21, 1:22, 4:12, 15:25, 18:21, 22:25, 28:11,

31:17, 32:3, 34:16, 35:8, 35:10, 36:7, 36:20, 37:8, 37:9, 51:20, 51:22, 60:24, 74:9, 75:2, 82:16, 83:20, 96:15, 115:11, 118:3, 120:22
**COURT** [43] - 1:1, 3:2, 3:7, 3:15, 13:13, 18:5, 18:10, 22:8, 22:11, 27:2, 27:11, 27:16, 28:6, 28:17, 29:2, 37:16, 49:24, 50:5, 50:12, 51:12, 53:17, 53:25, 67:8, 67:18, 68:7, 68:11, 68:16, 69:24, 70:5, 119:1, 119:8, 120:4, 126:3, 126:6, 126:11, 131:3, 131:8, 131:10, 131:16, 131:22, 132:2, 133:1, 133:10
**courtesy** [1] - 22:9
**Courthouse** [1] - 1:22
**courtroom** [3] - 62:6, 131:3, 131:10
**Courtroom** [1] - 3:6
**cover** [1] - 131:13
**CPA** [2] - 38:25, 87:6
**CPA's** [1] - 59:15
**create** [2] - 79:3, 79:5
**created** [5] - 51:3, 57:19, 58:5, 58:17, 59:10
**creating** [1] - 80:20
**credit** [1] - 99:7
**crept** [1] - 51:2, 51:9
**critical** [9] - 34:10, 71:17, 71:19, 71:22, 72:1, 73:3, 73:25, 77:19, 104:8
**criticism** [3] - 45:5, 45:13, 45:16
**critiques** [1] - 128:9
**CROSS** [1] - 2:2
**cross** [1] - 10:12
**CRR** [1] - 1:21
**curiosity** [1] - 61:25
**curtail** [1] - 117:21
**curtailed** [1] - 117:20
**customer** [6] - 30:24, 106:12, 106:16, 121:23, 121:24, 130:18
**customers** [43] - 16:6, 16:7, 19:16, 34:10, 34:24, 35:2, 44:15, 58:14, 61:4, 61:5, 66:18, 66:22, 72:10, 72:13, 73:9, 76:14, 76:18, 88:15, 89:2, 89:4, 89:6, 89:7, 91:9, 92:13, 93:23, 94:1, 94:4, 96:23, 96:24, 105:14, 105:24, 106:1, 113:14, 117:16, 121:25, 122:19, 122:21, 122:25, 123:12, 123:15, 124:8, 125:19, 125:22

**cut** [2] - 102:15, 120:25
**cuts** [2] - 102:8, 102:11
**cutter** [1] - 109:10

**D**

**D.C** [1] - 1:23
**damages** [1] - 12:6
**data** [143] - 10:4, 10:6, 10:9, 10:11, 10:22, 11:2, 11:3, 11:6, 25:6, 25:7, 25:9, 25:11, 27:14, 27:18, 27:21, 28:8, 30:8, 35:11, 35:13, 39:21, 40:18, 43:24, 44:1, 44:11, 44:19, 44:21, 45:2, 45:18, 45:23, 46:5, 46:6, 46:9, 46:10, 46:14, 46:17, 46:18, 46:22, 47:3, 47:4, 48:6, 48:8, 48:10, 48:13, 48:16, 49:3, 49:14, 50:8, 50:25, 51:16, 54:7, 54:10, 54:11, 54:12, 54:13, 54:14, 54:15, 54:17, 58:19, 58:20, 58:25, 61:15, 61:17, 61:22, 63:24, 63:25, 64:2, 64:3, 64:4, 64:5, 64:7, 64:8, 64:14, 64:19, 65:6, 65:7, 65:9, 65:10, 65:12, 65:16, 65:20, 65:22, 66:13, 66:14, 66:15, 67:12, 67:15, 67:17, 67:22, 67:24, 67:25, 68:3, 68:4, 69:13, 69:17, 69:18, 69:22, 70:1, 70:2, 70:11, 70:17, 70:18, 70:22, 70:23, 70:24, 71:4, 71:5, 75:7, 75:22, 76:2, 81:8, 88:4, 93:10, 94:8, 100:23, 100:24, 102:18, 102:21, 102:23, 103:2, 103:10, 104:6, 104:7, 104:8, 104:9, 104:18, 104:21, 110:20, 110:24, 111:15, 112:10, 112:11
**DATE** [1] - 133:10
**DAVID** [1] - 1:14
**DAY** [1] - 1:9
**day-to-day** [1] - 34:1
**DC** [2] - 1:16, 1:20
**deal** [3] - 12:11, 19:22, 113:7
**deals** [1] - 113:6
**dealt** [1] - 5:16
**debt** [1] - 98:9
**decisions** [4] - 4:21, 4:23, 20:24, 50:20
**declaration** [1] - 104:20
**declarations** [1] - 17:12
**decline** [5] - 111:13, 112:16, 114:3, 114:6
**declines** [1] - 114:10

**decrease** [1] - 14:25
**deduction** [2] - 87:21, 87:24
**deductions** [1] - 87:22
**deeper** [2] - 14:6, 104:1
**DEFENDANT** [1] - 3:9
**defendants** [1] - 3:5
**Defendants** [2] - 1:7, 1:17
**define** [1] - 63:16
**defined** [2] - 30:20, 40:21
**defining** [2] - 25:15, 25:18
**definitely** [1] - 42:3
**definition** [15] - 18:21, 18:23, 20:20, 21:3, 23:17, 25:4, 41:7, 43:23, 52:9, 56:3, 57:5, 62:14, 63:14, 63:20, 113:22
**definitive** [1] - 57:4
**degree** [1] - 8:13
**Deluxe** [3] - 38:22, 48:18, 50:23
**delved** [1] - 14:6
**demand** [10] - 4:16, 4:17, 4:18, 5:1, 5:6, 7:16, 12:2, 12:17, 93:22
**demonstrative** [3] - 60:19, 60:22, 60:24
**denominator** [1] - 65:1
**Department** [5] - 7:11, 9:7, 9:10, 9:16, 24:11
**DEPARTMENT** [1] - 1:14
**depicted** [1] - 110:8
**depiction** [2] - 29:3, 111:25, 118:7
**deployed** [1] - 6:8
**deposition** [2] - 17:12, 55:8
**depositions** [1] - 12:21
**derived** [2] - 46:11, 70:2
**describe** [3] - 7:22, 13:1, 95:11
**described** [21] - 9:17, 21:23, 44:2, 50:17, 50:19, 55:15, 65:5, 69:3, 71:3, 74:8, 81:20, 82:20, 85:3, 91:14, 98:17, 100:2, 110:5, 112:12, 113:7, 125:13, 126:14
**describes** [1] - 24:14
**describing** [4] - 37:10, 43:22, 94:19, 101:13
**description** [1] - 24:16
**Desert** [2] - 6:9, 6:10
**design** [1] - 57:25
**designs** [1] - 58:1
**despite** [2] - 59:3, 130:9
**destination** [1] - 34:23
**detail** [4] - 36:15, 37:19, 85:6, 100:1
**details** [7] - 9:6, 9:12, 13:17, 31:23, 33:15, 110:1, 130:24

**determination** [3] - 8:9, 52:1, 118:20
**determinations** [1] - 63:12
**determine** [2] - 43:22, 115:2
**determined** [1] - 83:12
**developed** [1] - 62:8
**developments** [1] - 119:5
**devices** [1] - 9:4
**diaper** [3] - 26:3, 26:7, 26:11
**diapers** [2] - 26:2, 26:7
**Diet** [4] - 88:23, 88:25, 89:23, 89:25
**difference** [7] - 67:11, 68:6, 80:3, 94:20, 96:15, 108:24, 111:3
**different** [50] - 8:7, 11:8, 12:14, 17:13, 28:20, 33:23, 33:24, 38:12, 42:11, 45:20, 46:8, 47:19, 53:2, 57:8, 57:10, 57:12, 57:13, 57:14, 57:15, 61:3, 62:19, 67:10, 71:10, 72:21, 79:10, 79:16, 79:22, 85:11, 87:2, 87:9, 87:10, 87:11, 87:12, 87:17, 96:5, 96:6, 97:22, 106:25, 108:3, 109:2, 109:3, 109:4, 110:21, 117:7, 117:8, 123:13
**differentiate** [3] - 42:16, 53:2, 81:14
**differentiated** [8] - 86:22, 86:25, 87:13, 114:23, 122:5, 123:3, 123:16
**differentiation** [2] - 96:1, 123:2
**differently** [2] - 42:6, 109:9
**difficult** [2] - 123:24, 124:19
**digital** [40] - 27:3, 27:5, 27:7, 27:13, 27:20, 28:4, 30:12, 32:11, 32:12, 32:13, 32:15, 33:19, 34:8, 36:13, 41:1, 42:1, 42:10, 42:14, 42:19, 42:24, 43:9, 44:25, 49:5, 49:22, 58:3, 58:7, 60:8, 60:10, 60:12, 65:17, 72:9, 76:19, 80:23, 84:7, 87:7, 87:21, 116:12, 121:8, 121:16
**dimension** [3] - 21:15, 123:7, 123:9
**dimensions** [2] - 122:6, 123:2
**dire** [1] - 53:12
**Dire** [1] - 2:4
**DIRE** [1] - 54:2
**direct** [5] - 40:13, 97:12, 99:1, 119:4, 126:7
**DIRECT** [3] - 2:2, 3:11, 54:25
**direction** [2] - 31:11, 37:15
**Directions** [8] - 17:16, 38:4,

38:5, 44:6, 46:3, 46:5, 47:6, 48:7
**directly** [7] - 37:24, 50:25, 58:20, 58:21, 85:13, 98:24, 103:22
**discipline** [1] - 129:24
**discount** [1] - 124:16
**discounted** [4] - 100:23, 102:3, 102:7, 103:25
**discounting** [3] - 102:14, 104:1, 124:13
**discounts** [1] - 124:8
**discover** [1] - 44:17
**discussing** [1] - 130:16
**discussion** [8] - 35:23, 35:25, 41:14, 98:20, 105:19, 108:21, 121:20, 124:6
**discussions** [3] - 109:14, 109:15, 119:10
**disease** [2] - 26:17, 26:19
**dissatisfied** [2] - 44:14, 122:19
**dissertation** [2] - 6:18, 6:19
**distant** [1] - 23:15
**distinct** [1] - 95:9
**distinction** [5] - 35:12, 73:25, 86:15, 86:21, 95:24
**distinguished** [1] - 5:8
**DISTRICT** [3] - 1:1, 1:2, 1:11
**diversion** [118] - 10:12, 14:11, 15:21, 16:5, 16:8, 16:11, 16:15, 16:17, 19:8, 25:11, 27:21, 27:22, 27:23, 27:24, 27:25, 28:3, 30:7, 30:8, 30:11, 30:14, 35:13, 38:3, 40:13, 40:20, 41:16, 43:21, 44:10, 44:22, 46:4, 46:6, 46:8, 46:19, 46:21, 47:7, 47:8, 47:9, 47:23, 47:25, 49:7, 49:17, 58:15, 59:2, 60:18, 61:14, 63:24, 64:19, 64:20, 64:21, 65:7, 65:13, 65:14, 68:1, 68:6, 68:21, 69:19, 72:16, 72:18, 72:19, 72:20, 72:24, 73:8, 74:1, 75:1, 75:22, 76:13, 76:21, 76:23, 76:24, 77:11, 77:21, 77:23, 79:16, 81:9, 88:4, 88:5, 89:21, 90:6, 90:9, 90:10, 90:11, 90:13, 94:2, 94:21, 94:22, 94:24, 101:1, 101:9, 101:11, 101:20, 101:21, 101:23, 102:6, 102:10, 102:23, 103:5, 103:9, 103:11, 103:14, 103:18, 103:20, 104:16, 104:19, 107:16, 112:5, 112:7, 112:10, 112:11, 113:22, 113:23,

114:21, 128:20
**diversion-by-switching** [1] - 107:16
**diversions** [4] - 45:21, 71:21, 77:21, 101:17
**diverted** [2] - 72:5, 73:15
**divided** [3] - 73:7, 74:13, 74:23
**divorce** [1] - 6:21
**DIY** [28] - 27:20, 28:4, 30:12, 32:15, 33:20, 34:9, 41:1, 42:1, 42:14, 42:19, 42:24, 43:9, 43:10, 44:25, 58:3, 58:7, 60:8, 60:10, 60:12, 61:5, 61:6, 65:17, 72:9, 76:19, 87:7, 87:21, 116:12, 121:8
**DMA** [6] - 126:13, 126:15, 126:18, 127:1, 128:5, 128:24
**DMA's** [5] - 126:21, 126:23, 126:24, 128:2
**do-it-yourself** [5] - 27:4, 27:5, 27:7, 27:13, 80:22
**document** [28] - 31:14, 32:4, 32:5, 32:7, 34:13, 34:19, 37:5, 37:9, 56:24, 56:25, 57:3, 57:7, 57:8, 57:19, 57:22, 58:5, 58:16, 59:10, 59:12, 60:25, 61:1, 64:17, 99:11, 118:23, 119:24, 121:6
**documents** [29] - 17:10, 31:5, 32:22, 33:15, 34:14, 36:14, 37:4, 37:13, 41:4, 44:20, 45:1, 45:15, 56:13, 56:16, 56:17, 56:20, 56:21, 58:22, 58:24, 58:25, 59:4, 59:6, 95:18, 105:18, 109:22, 121:4, 125:15, 128:18
**dollar** [4] - 74:16, 74:18, 74:21, 101:8
**done** [21] - 8:17, 8:19, 8:21, 11:15, 38:10, 40:19, 44:3, 44:7, 44:8, 44:9, 44:12, 46:1, 82:11, 86:15, 89:19, 93:2, 104:3, 126:21, 129:9, 130:10, 131:2
**door** [1] - 105:24
**doubt** [3] - 26:14, 98:23, 128:24
**down** [25] - 29:23, 34:5, 38:14, 48:17, 48:19, 50:17, 54:15, 58:8, 60:6, 62:19, 75:7, 75:16, 75:18, 80:7, 87:6, 87:7, 88:10, 90:22, 91:23, 93:12, 111:9, 112:14, 112:20, 118:25, 123:14

**downplayed** [1] - 95:21
**downward** [3] - 15:6, 98:23
**Dr** [60] - 3:5, 3:7, 3:13, 3:17, 13:10, 13:13, 13:17, 17:24, 18:2, 19:4, 21:11, 21:12, 22:13, 24:21, 25:13, 27:2, 28:19, 30:19, 34:14, 37:18, 45:5, 45:12, 48:3, 51:14, 52:15, 52:16, 54:5, 55:15, 56:4, 61:17, 62:14, 63:23, 65:12, 65:15, 66:14, 67:9, 68:19, 70:17, 70:22, 71:8, 71:9, 76:5, 76:21, 79:2, 79:21, 80:21, 90:21, 93:8, 93:9, 94:5, 99:25, 110:4, 110:17, 115:8, 117:2, 117:12, 120:10, 122:14, 125:13, 126:13
**dramatic** [1] - 60:5
**draw** [4] - 29:11, 29:14, 29:24
**drawing** [1] - 29:1
**drew** [1] - 29:7
**drop** [2] - 48:17, 48:19
**drop-down** [2] - 48:17, 48:19
**drug** [5] - 26:16, 26:19, 26:20, 26:21, 26:23
**DTX** [2] - 30:17, 41:17
**duly** [1] - 3:9
**Dunn** [7] - 31:1, 41:9, 66:21, 95:3, 108:18, 109:15, 118:12
**during** [1] - 8:5
**duty** [1] - 6:6
**DX** [8] - 23:1, 24:7, 36:2, 60:22, 64:15, 74:25, 79:25, 118:6
**dynamic** [5] - 14:18, 91:3, 91:7, 107:14, 113:8
**Dynamics** [1] - 34:13

---

**E**

**e-mail** [2] - 41:13, 49:20
**e-mails** [2] - 124:8, 124:14
**early** [3] - 91:3, 91:21, 93:6
**earners** [1] - 125:4
**easy** [1] - 124:4
**economic** [4] - 12:6, 17:22, 88:10, 88:14
**Economic** [1] - 3:20
**economics** [10] - 5:15, 6:1, 6:16, 6:20, 7:1, 7:5, 7:8, 12:15, 113:25
**economist** [3] - 24:10, 53:14, 66:17
**economist's** [1] - 86:14
**economists** [1] - 3:24
**economy** [1] - 5:10

**edible** [1] - 10:17
**education** [1] - 5:20
**effect** [13] - 8:11, 15:6, 33:2, 40:3, 40:5, 85:21, 88:18, 91:22, 93:1, 102:20, 103:18, 113:3, 115:3
**effective** [1] - 125:5
**effects** [46] - 8:11, 9:22, 9:25, 11:20, 14:3, 14:4, 14:5, 14:7, 14:8, 14:9, 73:14, 85:16, 85:23, 85:25, 86:3, 86:12, 86:20, 88:6, 88:7, 88:8, 90:5, 90:14, 91:11, 92:4, 93:3, 97:19, 98:4, 99:14, 104:11, 106:10, 106:16, 114:1, 114:9, 114:12, 114:13, 114:17, 114:20, 114:21, 115:3, 115:7, 123:4, 125:11, 125:12, 127:12, 130:11
**efficiencies** [36] - 8:11, 9:23, 9:25, 15:4, 15:6, 73:21, 91:14, 91:15, 91:18, 91:19, 96:10, 96:13, 98:3, 98:6, 98:7, 98:21, 98:22, 99:1, 99:8, 99:12, 99:15, 99:16, 99:18, 99:21, 107:17, 107:22, 108:1, 108:4, 109:24, 110:3, 111:1, 111:2, 111:4, 112:2
**efficiency** [2] - 99:6, 108:24
**efforts** [3] - 59:7, 95:2, 130:23
**eight** [1] - 80:6
**either** [14] - 39:13, 55:10, 59:25, 68:22, 68:24, 72:11, 78:24, 81:14, 91:25, 92:6, 122:16, 127:7, 130:11
**elasticities** [4] - 10:12, 10:13, 12:17, 107:14
**elasticity** [6] - 40:10, 93:22, 93:24, 93:25, 101:13, 101:16
**electrical** [1] - 7:17
**electronic** [1] - 36:13
**element** [4] - 90:18, 91:10, 91:13, 108:16
**elements** [2] - 100:2, 100:5
**eliminated** [4] - 115:16, 121:2, 121:13
**elimination** [2] - 115:17, 115:23
**elsewhere** [1] - 10:23
**Emerald** [1] - 96:24
**emphasis** [2] - 95:15, 95:19
**empirical** [8] - 10:10, 43:24, 44:1, 44:10, 44:19, 44:21, 45:2, 99:16
**employees** [5] - 17:13, 17:14, 17:15

**encompasses** [1] - 4:8
**End** [1] - 131:14
**end** [17] - 7:21, 21:18, 24:14, 25:17, 29:11, 29:24, 66:25, 67:1, 67:2, 71:10, 93:4, 106:1, 112:7, 113:3, 124:6, 124:22, 126:10
**ending** [1] - 90:17
**ends** [2] - 26:1, 70:12
**engaged** [1] - 12:18
**enter** [1] - 92:22
**entered** [1] - 49:2
**entire** [2] - 36:9, 65:10
**entities** [2] - 91:16, 92:14
**entitled** [1] - 133:5
**entity** [11] - 14:14, 86:10, 89:22, 90:3, 90:4, 92:11, 92:12, 115:20, 124:20, 125:14, 130:12
**entries** [1] - 47:20
**entry** [13] - 8:11, 9:23, 9:25, 15:13, 15:16, 92:19, 92:23, 125:9, 125:11, 129:19, 129:21, 130:7, 130:9
**enumeration** [1] - 108:21
**envelope** [2] - 94:18, 100:3
**episode** [1] - 55:12
**equal** [1] - 100:13
**equation** [7] - 93:12, 100:9, 100:10, 100:13, 100:20, 101:4, 101:18
**equations** [3] - 90:22, 112:24, 113:6
**equipment** [1] - 7:17
**equivalent** [1] - 55:13
**error** [1] - 68:4
**especially** [3] - 99:8, 105:3, 105:14
**essentially** [14] - 12:12, 32:9, 33:5, 47:21, 50:24, 53:16, 90:20, 100:20, 101:20, 102:8, 102:13, 108:24, 111:11, 115:22
**estimating** [1] - 46:19
**estimation** [1] - 33:9
**et** [1] - 1:6
**evaluated** [1] - 83:14
**evaluating** [1] - 119:8
**evaluation** [1] - 119:9
**evaluative** [1] - 67:13
**event** [3] - 14:16, 44:13, 65:8
**events** [1] - 127:25
**everywhere** [1] - 22:2
**evidence** [30] - 14:19, 26:20, 30:19, 30:21, 30:22, 31:13, 31:14, 37:25, 38:1, 40:10, 40:13, 40:20, 41:6, 41:18, 44:18, 49:16, 49:19, 49:23, 61:25, 83:5, 107:24, 116:5, 116:8, 117:5, 119:17,

121:12, 121:15, 121:19, 121:25, 125:16
**EVIDENCE** [1] - 2:11
**evident** [1] - 64:2
**evidentiary** [1] - 120:3
**evolved** [1] - 62:10
**exact** [4] - 8:1, 48:24, 82:3, 97:16
**exactly** [24] - 27:18, 34:1, 49:2, 49:14, 50:2, 51:1, 57:12, 62:1, 75:21, 80:2, 80:3, 80:25, 86:4, 86:7, 86:9, 97:13, 101:21, 101:22, 111:2, 111:18, 111:25, 112:6, 123:4
**EXAMINATION** [3] - 3:11, 54:2, 54:25
**example** [81] - 4:10, 4:19, 4:24, 7:7, 8:21, 10:5, 10:14, 12:2, 12:7, 16:14, 22:3, 22:25, 24:7, 24:19, 25:13, 25:16, 25:24, 27:21, 32:6, 32:18, 34:16, 34:18, 34:19, 37:9, 37:11, 37:12, 38:16, 41:22, 42:10, 43:6, 44:22, 45:25, 47:24, 49:20, 49:22, 49:23, 52:15, 56:25, 57:5, 57:22, 58:6, 59:7, 60:7, 62:8, 67:11, 70:20, 72:9, 74:4, 74:25, 75:8, 75:20, 75:23, 76:4, 76:5, 78:11, 78:19, 87:3, 87:16, 87:21, 88:22, 89:9, 89:21, 93:20, 95:3, 96:23, 97:10, 98:1, 98:4, 98:24, 99:10, 102:9, 107:7, 108:5, 108:20, 109:6, 110:13, 113:11, 115:16, 124:7, 124:25
**examples** [15] - 8:14, 22:23, 31:9, 31:16, 41:5, 42:9, 79:23, 81:16, 81:18, 98:2, 117:23, 118:3, 120:14, 122:3
**Excel** [12] - 46:10, 47:16, 48:16, 49:1, 50:10, 51:2, 51:9, 51:18, 69:11, 70:2, 70:7, 70:10
**excluded** [3] - 25:2, 69:16, 69:18
**excluding** [1] - 27:6
**excused** [1] - 132:3
**exercise** [1] - 63:12
**exhausts** [1] - 49:9
**exhibit** [1] - 120:1
**EXHIBITS** [1] - 2:11
**existing** [1] - 124:8
**expand** [5] - 92:7, 92:15, 111:7, 130:17, 130:21
**expansion** [17] - 15:11,

15:19, 73:20, 92:23, 111:23, 113:10, 125:10, 125:17, 129:19, 129:20, 129:21, 129:22, 129:23, 130:8, 130:9, 130:13
**expansive** [1] - 34:4
**expect** [8] - 85:21, 100:17, 114:8, 114:9, 114:16, 115:6, 123:4, 125:23
**expectation** [1] - 32:14
**expected** [3] - 112:20, 112:21, 116:25
**expecting** [1] - 32:6
**expects** [1] - 32:10
**expenses** [1] - 98:1
**expensive** [3] - 66:20, 108:7, 109:6
**experience** [3] - 7:22, 20:7, 25:17
**experienced** [3] - 128:13, 128:15, 128:16
**experiences** [1] - 57:13
**expert** [4] - 11:22, 13:10, 13:14, 53:7
**experts** [1] - 119:1
**explain** [12] - 15:25, 18:21, 22:25, 35:8, 36:7, 55:17, 60:19, 71:18, 74:9, 102:2, 115:11, 120:22
**explained** [2] - 71:8, 94:22
**explaining** [1] - 35:9
**explanation** [1] - 94:23
**EZTaxReturn** [1] - 76:9

## F

**face** [2] - 18:25, 128:5
**faced** [1] - 39:12
**facing** [1] - 20:25
**fact** [18] - 9:2, 14:19, 15:2, 27:20, 35:14, 41:11, 52:25, 53:15, 59:3, 60:1, 61:1, 66:8, 106:4, 114:2, 114:6, 119:17, 123:8, 127:15
**factor** [2] - 17:4, 56:22
**factored** [1] - 52:20
**factors** [10] - 14:10, 19:21, 104:15, 110:12, 126:19, 127:3, 127:4, 127:5, 128:7
**fair** [2] - 84:9, 109:10
**fall** [1] - 4:1
**falls** [1] - 59:9
**familiar** [4] - 18:13, 23:19, 35:6, 45:8
**famous** [1] - 55:9
**far** [3] - 35:16, 51:17, 104:1
**Fargo** [2] - 57:24, 58:4
**farms** [1] - 96:3
**Farrell** [2] - 24:8, 24:9

**fashion** [1] - 87:14
**faster** [1] - 53:20
**fault** [1] - 43:20
**feature** [3] - 87:9, 87:10, 123:13
**features** [8] - 4:19, 16:19, 38:20, 44:14, 58:7, 58:9, 87:11, 123:23
**Federal** [2] - 13:4, 24:10
**few** [3] - 31:16, 37:25, 96:9
**FFA** [6] - 30:1, 124:23, 125:6, 125:7, 125:8, 130:20
**field** [1] - 109:7
**figure** [5] - 28:20, 73:1, 93:16, 102:6, 112:8
**figured** [1] - 50:1
**file** [2] - 69:11, 109:13
**filer** [2] - 14:22, 30:24
**filers** [3] - 77:3, 92:18, 92:20
**filing** [1] - 36:13
**filings** [1] - 69:21
**fill** [2] - 26:3, 125:1
**fillable** [2] - 59:13, 125:1
**filling** [1] - 26:2
**finally** [4] - 15:9, 24:7, 92:2, 128:4
**fine** [3] - 50:25, 51:7, 51:8
**finish** [2] - 126:4, 126:7
**finished** [2] - 6:23, 6:25
**firm** [27] - 3:23, 4:22, 10:15, 10:18, 10:21, 11:9, 15:10, 17:16, 19:15, 37:4, 38:4, 57:22, 89:8, 91:20, 91:23, 93:13, 93:14, 94:11, 96:19, 97:12, 100:8, 106:8, 115:14, 115:16, 115:17, 116:19
**firm's** [3] - 37:13, 124:3, 129:23
**firms** [59] - 4:10, 4:16, 5:2, 14:20, 14:25, 15:5, 15:8, 17:13, 17:14, 19:13, 20:18, 20:21, 20:23, 24:2, 30:1, 36:11, 36:12, 44:23, 50:19, 57:9, 59:18, 62:5, 63:7, 75:13, 79:12, 86:13, 87:7, 88:11, 88:12, 90:8, 90:19, 91:2, 91:22, 95:19, 95:23, 98:9, 98:12, 99:20, 105:20, 106:5, 106:17, 109:4, 113:9, 113:10, 116:18, 116:21, 117:13, 117:21, 121:10, 122:9, 122:11, 123:10, 124:7, 125:19, 127:14, 130:17
**firms'** [1] - 4:21
**first** [36] - 5:15, 6:6, 6:11, 6:15, 7:1, 9:2, 14:21, 15:17, 18:20, 20:11, 30:9, 30:11, 31:4, 32:16, 36:22,

37:2, 46:7, 47:23, 49:5, 50:16, 56:23, 63:7, 64:12, 75:4, 76:17, 80:21, 82:6, 86:17, 104:6, 106:8, 110:13, 113:11, 117:4, 122:4, 123:18
**fits** [3] - 28:22, 36:21, 37:10
**five** [14] - 26:24, 38:12, 39:13, 39:19, 42:6, 47:10, 48:1, 60:6, 61:4, 61:12, 67:5, 74:13, 84:22, 103:16
**fix** [2] - 5:10, 107:13
**fixed** [16] - 96:16, 96:18, 97:18, 97:21, 97:22, 98:3, 98:6, 98:7, 98:16, 98:20, 98:25, 99:6, 99:8, 99:12
**flaw** [2] - 48:5, 104:7
**flaws** [5] - 104:1, 104:3, 104:4, 107:18, 110:4
**flip** [2] - 67:7, 79:24
**flips** [1] - 70:16
**fluctuates** [1] - 60:4
**focus** [4] - 7:21, 7:24, 8:8, 34:1
**focused** [3] - 46:2, 54:5, 130:15
**folks** [3] - 5:9, 44:6, 55:4
**follow** [6] - 81:19, 82:14, 82:15, 109:18, 109:20, 109:21
**follow-up** [2] - 109:20, 109:21
**followed** [5] - 52:22, 55:19, 64:8, 70:15, 70:25
**following** [5] - 6:5, 38:11, 71:19, 75:9, 108:12
**follows** [1] - 3:10
**FOR** [1] - 1:2
**force** [2] - 116:9, 117:1
**foregoing** [1] - 133:3
**foremost** [2] - 30:9, 122:4, 123:19
**forget** [1] - 128:8
**form** [6] - 18:5, 18:7, 58:10, 93:6, 119:11
**forms** [3] - 59:13, 125:1
**formula** [7] - 73:3, 73:6, 74:3, 74:10, 74:11, 74:22, 101:22
**formulary** [1] - 26:21
**formulas** [1] - 88:11
**forth** [1] - 41:14
**forward** [1] - 113:16
**foundation** [1] - 18:8
**four** [5] - 9:24, 29:21, 61:5, 61:12, 81:18
**fraction** [1] - 77:13
**frame** [1] - 129:9
**framework** [2] - 12:16, 57:20
**franchises** [2] - 84:17, 84:20

**frankly** [2] - 61:8, 63:9
**free** [47] - 14:20, 14:23, 15:1, 29:3, 29:5, 29:9, 29:18, 30:3, 30:5, 41:11, 95:6, 95:16, 95:20, 95:21, 105:14, 105:19, 105:21, 106:1, 106:2, 106:7, 106:12, 106:16, 107:5, 107:6, 111:21, 117:3, 117:5, 117:6, 117:9, 117:10, 117:11, 117:14, 117:15, 117:17, 117:19, 117:20, 122:17, 122:18, 125:1, 125:4, 129:12, 129:13, 129:16
**Free** [1] - 130:19
**FreetaxUSA** [2] - 28:5, 116:7
**Ft** [1] - 6:6
**FTC** [1] - 13:2
**full** [6] - 3:17, 22:22, 85:6, 102:15, 131:20, 132:2
**fully** [1] - 124:18
**furthermore** [1] - 14:6
**future** [2] - 43:18, 105:2

## G

**GAA** [2] - 26:9, 26:10
**gain** [1] - 101:19
**garbage** [2] - 104:20, 104:21
**gasoline** [1] - 87:16
**gather** [2] - 31:16, 94:8
**gender** [1] - 7:8
**general** [4] - 4:1, 28:24, 87:10, 97:25
**generally** [16] - 5:6, 6:11, 8:6, 9:17, 11:12, 11:16, 16:19, 17:7, 33:16, 41:24, 44:5, 95:10, 97:16, 121:7, 124:18, 124:24
**generic** [2] - 26:19, 26:21
**gentlemen** [1] - 17:18
**given** [3] - 30:22, 31:10, 47:19
**glacial** [1] - 26:5
**goods** [2] - 8:20, 100:12
**Google** [4] - 57:23, 58:3, 97:10, 97:11
**gosh** [2] - 56:18, 106:12
**graduate** [2] - 6:15, 7:6
**graduated** [2] - 6:2, 6:3
**graph** [1] - 126:20
**graphical** [1] - 118:7
**graphically** [1] - 28:12
**graphs** [1] - 28:20
**great** [4] - 19:22, 47:1, 67:16, 117:15
**Greif** [1] - 95:3
**group** [6] - 29:23, 52:11,

52:12, 65:2, 65:25, 66:6
**grouping** [1] - 92:24
**groupings** [1] - 85:11
**grow** [1] - 121:9
**grown** [1] - 62:5
**growth** [5] - 62:7, 126:23, 126:25, 127:7, 128:1
**guess** [3] - 5:16, 26:6, 79:24
**guidelines** [11] - 11:19, 22:3, 23:4, 23:6, 23:21, 23:23, 24:1, 85:9, 85:10, 85:14, 99:11
**Guidelines** [1] - 23:2
**Gulf** [2] - 6:11, 6:15

## H

**H&R** [80] - 1:6, 17:14, 24:24, 27:3, 27:12, 27:22, 27:23, 27:25, 34:13, 35:22, 38:4, 38:5, 38:22, 40:4, 40:6, 40:11, 40:13, 40:14, 41:5, 41:22, 42:12, 43:1, 43:13, 46:4, 47:6, 47:7, 47:8, 47:9, 47:23, 48:18, 49:5, 49:8, 50:22, 56:14, 68:23, 68:24, 69:1, 69:4, 69:7, 70:9, 70:13, 70:15, 70:22, 71:2, 72:11, 72:20, 75:2, 75:16, 76:8, 76:9, 77:16, 80:5, 80:9, 80:14, 80:24, 81:3, 81:9, 84:6, 84:13, 84:17, 84:18, 95:15, 95:20, 98:5, 102:9, 107:25, 108:7, 108:8, 108:10, 108:15, 111:6, 112:14, 112:16, 117:18, 118:13, 120:11, 122:20, 129:12
**half** [12] - 76:11, 77:7, 77:8, 102:8, 102:10, 102:12, 102:15, 102:17, 102:20, 103:4, 103:25, 131:25
**half-hour** [1] - 131:25
**hand** [4] - 42:24, 55:20, 83:25
**hands** [1] - 68:13
**happy** [2] - 16:5, 28:23
**hard** [2] - 46:23, 124:2
**hardware** [2] - 8:18, 9:3
**harm** [2] - 103:19, 103:22
**head** [1] - 90:4
**health** [1] - 10:17
**hear** [1] - 71:11
**heard** [23] - 14:18, 15:12, 15:22, 17:1, 27:2, 30:25, 43:12, 45:12, 48:2, 53:9, 54:4, 59:21, 59:24, 62:6, 66:21, 66:24, 67:23, 97:6, 98:8, 120:6, 125:14,

130:22
**hearing** [1] - 12:24
**HEARING** [1] - 1:9
**hearings** [1] - 13:5
**hearsay** [5] - 118:24, 118:25, 119:2, 119:10, 119:24
**help** [3] - 60:19, 87:19, 119:11
**hence** [1] - 5:7
**hesitate** [1] - 53:6
**Hewitt** [1] - 87:4
**HHI** [9] - 85:5, 85:7, 85:11, 85:17, 85:19, 85:20, 85:21, 86:1, 114:18
**HHI's** [9] - 19:3, 63:15, 63:21, 85:1, 85:5, 85:12, 114:23, 115:1
**hierarchal** [1] - 87:14
**high** [6] - 4:12, 39:23, 41:12, 44:21, 75:13, 94:21
**higher** [16] - 27:24, 29:6, 29:9, 29:12, 29:13, 29:15, 29:16, 29:20, 84:19, 89:1, 89:24, 102:23, 103:10, 103:21, 105:12, 105:24
**highest** [8] - 47:8, 47:23, 65:14, 66:11, 75:22, 75:23, 75:25, 76:1
**highlight** [1] - 95:21
**highly** [1] - 36:10
**historical** [3] - 11:6, 40:18, 99:8
**historically** [2] - 17:5, 94:10
**histories** [1] - 57:13
**HOGAN** [1] - 1:19
**hold** [1] - 127:18
**home** [1] - 43:11
**homogeneous** [1] - 123:18
**homogenous** [2] - 86:22, 122:7
**Honor** [31] - 3:4, 3:14, 13:9, 13:12, 13:15, 18:4, 22:7, 22:10, 28:14, 28:16, 28:25, 30:16, 31:19, 31:22, 37:14, 53:5, 53:6, 54:22, 54:24, 68:14, 68:17, 119:7, 119:14, 120:2, 126:1, 126:5, 131:1, 131:6, 131:15, 132:1
**HONORABLE** [1] - 1:10
**hope** [3] - 15:20, 54:23, 105:15
**horizontal** [5] - 11:19, 23:4, 23:6, 23:20, 23:23
**Horizontal** [1] - 23:1
**hospital** [2] - 48:11, 51:4
**hour** [1] - 131:25
**HOWELL** [1] - 1:10
**HRB** [36] - 13:24, 16:8, 16:9, 16:12, 16:15, 16:16, 29:12,

29:13, 30:8, 32:7, 34:22, 35:16, 38:17, 44:2, 60:25, 61:1, 64:7, 69:14, 70:19, 70:24, 87:5, 89:9, 95:9, 102:11, 102:25, 103:7, 103:9, 103:11, 108:23, 109:16, 111:9, 121:24, 128:8, 128:13, 129:1
**HRB's** [3] - 29:8, 126:25, 128:1
**hybrid** [1] - 62:9
**hypothetical** [2] - 73:11, 82:23
**hypothetically** [1] - 127:4

### I

**icon** [1] - 38:19
**idea** [3] - 29:4, 55:14, 62:1
**identified** [3] - 60:21, 79:2, 104:5
**identify** [4] - 19:10, 75:2, 96:12, 118:4
**identifying** [2] - 36:19, 37:8
**identity** [1] - 36:15
**ignorance** [1] - 111:23
**illustration** [1] - 79:14
**imagine** [3] - 21:7, 100:8, 122:10
**impact** [1] - 13:6
**implement** [1] - 77:19
**implementations** [1] - 117:8
**implemented** [4] - 93:9, 106:23, 117:6, 117:7
**implementing** [2] - 71:25, 72:2
**implicated** [1] - 50:8
**implications** [1] - 93:19
**implies** [1] - 77:8
**importance** [4] - 33:17, 44:23, 49:21, 105:19
**important** [30] - 19:10, 20:15, 21:1, 21:15, 21:17, 32:21, 38:2, 38:20, 55:22, 58:18, 60:15, 82:7, 82:8, 90:7, 105:17, 117:20, 118:11, 118:15, 118:20, 118:22, 119:5, 119:17, 126:19, 127:3, 127:4, 127:5, 127:15, 128:19, 129:4
**imprecisely** [1] - 46:22
**INC** [1] - 1:6
**incentive** [17] - 14:13, 15:7, 20:2, 86:10, 88:11, 88:19, 90:10, 90:12, 90:15, 90:25, 91:17, 91:24, 91:25, 104:12, 104:14, 104:16
**include** [23] - 20:14, 21:21, 23:9, 23:12, 23:15, 24:13,

24:23, 24:25, 25:7, 25:14, 27:1, 47:16, 52:2, 55:24, 69:5, 91:18, 99:15, 107:5, 111:1, 111:7, 112:2, 118:18
**included** [6] - 17:10, 17:11, 71:6, 84:7, 111:1, 111:2
**includes** [8] - 24:15, 40:24, 46:17, 71:1, 84:6, 101:25, 102:5, 107:6
**including** [6] - 26:8, 47:13, 52:3, 55:21, 56:1, 81:24, 82:9, 107:12, 111:21
**income** [4] - 6:20, 124:22, 124:25, 125:4
**incorrect** [4] - 49:12, 62:15, 62:16, 67:25
**incorrectly** [1] - 113:18
**Increase** [1] - 51:24
**increase** [45] - 14:17, 14:25, 15:15, 15:17, 15:19, 16:13, 19:7, 19:15, 19:16, 19:17, 26:25, 52:13, 60:12, 65:8, 73:4, 73:6, 73:7, 74:12, 74:14, 74:23, 78:25, 83:1, 83:5, 83:7, 84:15, 89:5, 92:9, 103:18, 103:21, 104:19, 111:5, 113:9, 113:13, 114:4, 114:6, 115:24, 121:5, 122:16, 122:17, 122:23, 124:14, 125:20, 125:21, 125:24, 129:25
**increased** [3] - 103:23, 104:12, 124:13
**increases** [2] - 104:17, 121:8
**incremental** [1] - 74:15
**incur** [3] - 96:20, 96:22, 98:9
**incurred** [1] - 97:17
**incurs** [1] - 97:11
**indeed** [1] - 122:14
**independent** [1] - 84:20
**independently** [2] - 21:9, 84:10
**indicate** [5] - 27:18, 28:8, 29:8, 29:15, 70:18
**indicated** [2] - 18:12, 65:15
**indicates** [5] - 27:14, 65:5, 65:7, 85:14, 99:9
**indicative** [3] - 10:22, 37:3, 61:16
**individuals** [2] - 67:3, 124:25
**industrial** [9] - 4:6, 4:13, 4:15, 7:13, 8:19, 8:20, 13:11, 25:25, 122:8
**industries** [11] - 7:14, 7:17, 7:18, 8:14, 8:16, 8:18, 8:19, 10:7, 10:9, 10:10, 99:4
**industry** [31] - 4:25, 22:1,

22:5, 22:15, 30:23, 32:24, 33:23, 42:13, 44:4, 57:10, 57:11, 57:22, 75:14, 93:11, 94:9, 95:19, 95:23, 99:3, 99:5, 105:20, 106:5, 106:21, 115:21, 117:13, 118:14, 119:6, 119:11, 120:12, 122:5, 124:10
**Industry** [1] - 7:12
**inequality** [1] - 6:21
**infantry** [1] - 6:12
**inflation** [1] - 5:9
**inflows** [1] - 60:11
**inform** [4] - 21:20, 63:9, 63:13, 104:22
**information** [6] - 11:1, 11:11, 38:19, 68:21, 109:19, 120:19
**infringing** [4] - 12:8, 12:9, 12:13
**inherently** [1] - 104:23
**INJUNCTION** [1] - 1:9
**innovating** [1] - 120:18
**innovation** [12] - 26:13, 42:4, 62:11, 116:13, 116:14, 116:17, 116:22, 116:23, 117:12, 119:23, 120:25
**innovations** [12] - 62:8, 116:20, 116:24, 117:2, 117:3, 117:24, 118:8, 118:9, 118:11, 118:15, 118:18, 118:22
**innovative** [1] - 117:1
**innovator** [7] - 115:14, 115:15, 115:18, 115:21, 115:22, 115:23, 115:25
**innovators** [1] - 116:19
**inside** [1] - 62:24
**insights** [1] - 50:14
**instance** [2] - 46:7, 96:21
**instances** [1] - 122:11
**instead** [3] - 19:18, 39:20, 80:6
**instructed** [1] - 46:16
**intellectual** [2] - 4:7, 13:3
**intend** [1] - 121:25
**intention** [1] - 121:20
**intents** [1] - 59:13
**interested** [1] - 83:25
**intermediate** [2] - 8:20, 69:11
**internalization** [2] - 19:23, 90:12
**internalized** [1] - 89:18
**Internet** [1] - 97:8
**internship** [2] - 5:15, 5:19
**interpret** [1] - 67:10
**interrupt** [1] - 53:5
**interview** [1] - 121:4
**INTO** [1] - 2:11

**introduce** [2] - 46:18, 46:20
**introduced** [1] - 23:4
**introducing** [1] - 47:17
**introduction** [1] - 117:3
**introductory** [1] - 7:5
**Intuit** [5] - 29:17, 33:19, 33:20, 34:2, 34:8
**Intuit's** [1] - 33:17
**intuition** [1] - 47:12
**involve** [1] - 71:21
**involved** [4] - 9:3, 9:21, 10:1, 26:1
**involvement** [1] - 8:5
**involves** [3] - 4:15, 8:9, 21:7
**involving** [2] - 8:25, 9:1
**iPhones** [1] - 9:4
**Iraq** [1] - 6:8
**IRS** [12] - 33:14, 58:11, 65:22, 67:12, 67:17, 67:22, 67:23, 75:6, 76:2, 110:24, 124:23
**issue** [13] - 17:17, 43:21, 63:6, 70:21, 86:20, 114:12, 114:13, 115:8, 115:9, 115:10, 120:3, 120:17, 128:17
**iteratively** [1] - 24:4
**itself** [6] - 57:23, 70:11, 71:12, 86:4, 88:24, 104:24

## J

**Jackson** [1] - 87:4
**jail** [1] - 83:8
**job** [1] - 11:4
**Joseph** [2] - 24:8, 24:9
**JOSEPH** [1] - 1:13
**journals** [1] - 11:18
**JUDGE** [1] - 1:11
**judgment** [1] - 67:13
**jury** [1] - 120:4
**Justice** [4] - 9:7, 9:10, 9:16, 24:12
**JUSTICE** [1] - 1:14

## K

**Kansas** [1] - 96:3
**keep** [7] - 43:19, 71:22, 88:24, 88:25, 89:23, 91:9, 123:14
**keeping** [4] - 90:2, 115:22, 124:21, 124:23
**Kentucky** [1] - 6:6
**key** [1] - 86:23
**kicking** [1] - 102:20
**Kimber** [4] - 17:18, 30:25, 66:24, 120:15

**kind** [24] - 12:19, 21:24, 26:7, 26:18, 42:23, 44:4, 44:20, 46:20, 58:14, 58:19, 58:20, 64:18, 66:23, 71:16, 76:20, 76:21, 96:24, 97:7, 104:21, 116:9, 121:5, 122:8, 123:3, 123:13
**kinds** [12] - 4:12, 7:4, 8:20, 17:7, 28:20, 30:19, 34:20, 35:9, 36:8, 57:15, 87:12, 97:22
**knowledge** [1] - 21:25
**known** [2] - 85:1, 107:2
**knows** [2] - 51:21, 117:18

## L

**labor** [1] - 6:20
**large** [2] - 8:21, 41:17
**larger** [1] - 34:2
**largest** [2] - 33:19, 34:8
**last** [6] - 60:5, 75:9, 117:11, 124:20, 131:18
**law** [2] - 12:15, 13:6
**LAWRENCE** [1] - 1:13
**lead** [5] - 14:9, 24:10, 49:11, 98:3, 98:23
**leading** [2] - 20:22, 99:6
**leads** [3] - 19:22, 91:17, 104:12
**least** [8] - 8:4, 26:12, 71:6, 79:12, 90:1, 91:14, 118:11, 126:7
**leave** [19] - 6:14, 16:6, 16:12, 16:15, 16:16, 19:16, 20:18, 21:1, 21:14, 23:14, 27:19, 48:10, 52:16, 64:22, 80:9, 83:2, 83:7, 103:7, 131:4
**leavers** [1] - 16:14
**leaves** [3] - 126:19, 127:3, 127:6
**leaving** [2] - 83:9, 128:3
**leeway** [1] - 119:1
**left** [11] - 6:13, 6:15, 20:1, 21:15, 52:14, 62:20, 78:17, 80:13, 83:22, 92:2, 127:19
**less** [7] - 33:14, 95:15, 100:15, 114:25, 121:13, 122:1, 128:16
**lets's** [1] - 102:25
**level** [4] - 4:13, 5:7, 5:11, 7:6
**Liberty** [1] - 87:4
**lid** [2] - 90:2, 115:22
**life** [2] - 26:17, 26:24
**life-threatening** [1] - 26:17
**light** [5] - 58:17, 68:1, 68:5, 128:19, 129:4
**likelihood** [5] - 14:2, 14:4, 40:3, 115:2

**likely** [11] - 14:16, 15:16, 26:22, 63:13, 66:19, 106:3, 113:25, 114:16, 120:25, 122:3
**likewise** [1] - 32:12
**limited** [2] - 40:25, 130:16
**line** [16] - 28:21, 31:2, 35:2, 35:16, 87:6, 96:22, 107:4, 108:3, 109:5, 110:14, 112:10, 113:11, 118:17
**linear** [1] - 100:10
**lines** [5] - 42:1, 42:8, 108:17, 108:19, 113:7
**linking** [1] - 127:25
**links** [4] - 24:18, 24:20, 24:22, 25:5
**list** [6] - 75:16, 75:19, 124:5, 124:11, 124:12, 124:15
**listed** [3] - 59:5, 64:25, 118:16
**literally** [2] - 39:17, 48:15
**literature** [3] - 17:22, 22:4, 98:20
**litigation** [5] - 3:25, 4:1, 12:18, 17:11, 17:17
**LLP** [1] - 1:19
**loan** [3] - 96:25, 97:14, 108:14
**loans** [3] - 108:5, 108:7, 108:9
**location** [1] - 43:1
**LOGAN** [1] - 1:18
**logical** [1] - 86:17
**long-term** [1] - 26:13
**look** [84] - 4:21, 5:9, 5:11, 10:23, 12:16, 16:12, 17:25, 18:3, 18:16, 18:18, 19:21, 20:15, 27:21, 30:10, 30:13, 31:13, 33:20, 34:6, 34:18, 36:9, 36:16, 36:20, 37:9, 39:21, 41:6, 41:8, 42:16, 43:2, 45:4, 45:18, 45:20, 46:2, 46:7, 46:15, 46:16, 47:15, 48:17, 48:18, 56:21, 57:10, 57:17, 57:18, 58:23, 58:24, 62:18, 64:5, 64:10, 64:11, 65:20, 65:24, 65:25, 66:5, 67:23, 68:2, 70:16, 71:5, 74:4, 75:7, 78:4, 79:13, 79:15, 85:19, 86:5, 88:3, 88:5, 88:9, 94:9, 94:25, 95:1, 95:2, 96:10, 97:21, 99:24, 106:18, 114:12, 114:23, 116:21, 117:23, 126:13, 127:9, 127:14, 128:12, 128:20
**Look** [1] - 42:22
**looked** [39] - 6:20, 8:2, 10:13, 17:22, 18:19, 30:23, 31:4, 32:23, 33:23, 42:5,

44:2, 45:14, 45:24, 46:1, 46:6, 47:3, 47:20, 49:21, 56:20, 57:11, 59:21, 61:2, 86:20, 103:15, 107:3, 107:18, 109:23, 110:3, 111:3, 113:23, 113:24, 114:13, 115:9, 115:10, 116:20, 117:13, 126:15, 126:21
**looking** [33] - 4:15, 4:17, 5:6, 7:15, 8:10, 10:11, 28:19, 31:6, 34:4, 34:5, 34:9, 34:21, 34:22, 34:25, 35:1, 43:21, 51:18, 52:4, 52:22, 57:15, 61:8, 61:12, 69:25, 76:13, 76:14, 76:15, 87:25, 92:21, 122:25, 125:2, 127:24
**looks** [14] - 12:12, 33:6, 35:11, 35:13, 35:14, 35:17, 57:7, 57:8, 61:1, 61:2, 62:1, 62:3, 84:24, 116:18
**loosened** [1] - 98:11
**lop** [1] - 110:23
**lose** [17] - 89:2, 89:4, 89:6, 89:12, 91:4, 91:8, 93:23, 94:1, 94:11, 101:8, 101:15, 105:10, 105:14, 106:11, 106:16
**loses** [1] - 100:18
**losing** [3] - 123:11, 123:14, 125:22
**loss** [8] - 71:17, 71:19, 71:22, 72:1, 73:3, 73:25, 77:19, 104:8
**lost** [11] - 72:6, 72:10, 72:13, 73:9, 74:1, 83:1, 89:25, 90:1, 91:5, 105:15
**LOVELLS** [1] - 1:19
**low** [15] - 14:3, 17:3, 29:19, 30:1, 39:22, 47:10, 48:1, 49:7, 67:1, 67:2, 94:22, 95:5, 124:21, 124:22, 125:4
**lower** [6] - 33:11, 35:16, 91:24, 103:15, 124:25, 128:2
**lowers** [1] - 112:15
**loyal** [1] - 76:13

## M

**ma'am** [8] - 5:18, 15:21, 24:8, 32:20, 36:5, 64:17, 69:8, 125:25
**machine** [1] - 1:25
**machinery** [1] - 7:18
**macroeconomics** [1] - 5:8
**macroeconomists** [1] - 5:8

**mail** [2] - 41:13, 49:20
**mails** [2] - 124:8, 124:14
**major** [2] - 32:24, 37:2
**majority** [1] - 8:4
**majors** [1] - 5:25
**Management** [1] - 5:19
**manual** [5] - 39:2, 47:24, 49:6, 58:10, 58:11
**manually** [3] - 48:22, 49:4, 49:13
**manufacturer** [1] - 26:12
**march** [4] - 79:19, 80:20, 81:20, 81:23
**margin** [11] - 73:7, 74:8, 74:14, 74:15, 74:24, 77:25, 79:8, 93:23, 94:7, 101:16
**margins** [9] - 73:4, 74:14, 78:2, 79:7, 79:10, 79:13, 93:10, 111:17, 111:18
**mark** [1] - 30:16
**marked** [1] - 36:2
**market** [206] - 4:20, 8:9, 9:21, 12:9, 13:21, 13:22, 13:23, 14:1, 14:2, 14:18, 18:21, 18:23, 19:2, 19:3, 19:13, 20:7, 20:9, 20:19, 20:20, 20:22, 21:3, 21:14, 21:19, 22:14, 23:10, 23:11, 23:13, 23:17, 24:5, 24:14, 24:17, 24:21, 25:4, 25:10, 25:12, 25:15, 25:18, 25:23, 26:11, 26:15, 26:22, 27:1, 28:1, 28:11, 28:22, 29:12, 29:21, 30:6, 30:15, 30:20, 31:11, 32:11, 32:12, 33:21, 34:3, 34:7, 34:9, 40:22, 41:3, 41:7, 41:19, 41:21, 41:24, 42:5, 43:23, 52:1, 52:2, 52:3, 52:4, 52:6, 52:8, 52:18, 52:20, 52:21, 52:23, 55:15, 55:18, 55:20, 55:22, 55:23, 55:24, 56:2, 56:3, 56:5, 56:9, 56:10, 58:3, 59:2, 62:1, 62:14, 62:20, 62:21, 62:22, 62:25, 63:8, 63:9, 63:11, 63:14, 63:16, 63:20, 69:3, 69:5, 71:1, 71:7, 71:24, 72:5, 72:6, 72:7, 72:8, 72:12, 72:13, 72:17, 72:24, 73:10, 74:2, 76:4, 76:7, 77:1, 77:8, 77:9, 77:14, 77:15, 78:6, 78:7, 78:10, 78:12, 78:13, 78:14, 78:18, 78:23, 79:4, 79:6, 79:9, 79:20, 80:5, 80:15, 80:16, 80:18, 80:20, 80:22, 81:1, 81:3, 81:4, 81:5, 81:7, 81:11, 81:13, 81:15, 82:5, 82:8, 82:12, 82:16, 82:18, 82:21, 82:24,
83:2, 83:3, 83:6, 83:10, 83:13, 83:15, 83:16, 84:13, 85:10, 85:12, 86:23, 87:1, 87:2, 87:13, 88:1, 91:7, 91:10, 92:22, 95:5, 102:18, 102:21, 105:2, 105:18, 113:8, 113:22, 114:1, 114:8, 114:16, 114:19, 114:25, 115:4, 115:5, 116:10, 116:12, 117:16, 119:23, 121:9, 121:11, 123:3, 123:4, 123:16, 123:18, 123:23
**Market** [1] - 34:13
**marketing** [15] - 32:15, 59:7, 92:17, 95:2, 97:4, 97:5, 97:12, 98:7, 98:13, 113:13, 117:21, 125:19, 130:22
**marketplace** [32] - 14:13, 18:25, 19:19, 20:14, 20:18, 20:23, 21:2, 21:16, 21:18, 21:21, 33:24, 57:4, 73:17, 91:3, 92:8, 92:14, 100:16, 108:11, 115:14, 115:15, 115:16, 116:19, 116:21, 117:2, 117:6, 118:10, 121:3, 121:14, 122:14, 123:25, 124:18, 130:14
**markets** [13] - 4:16, 9:19, 52:25, 53:3, 71:10, 71:14, 79:17, 79:22, 85:11, 85:15, 114:9, 114:11, 114:22
**Massachusetts** [1] - 7:2
**matches** [1] - 84:1
**materials** [2] - 17:7, 17:10
**math** [11] - 73:8, 73:15, 74:7, 75:3, 78:23, 93:21, 100:5, 100:6, 109:18, 110:5, 111:12
**mathematical** [33] - 21:16, 52:11, 65:1, 71:16, 72:1, 73:22, 74:3, 82:6, 88:10, 90:24, 91:12, 91:13, 92:1, 93:3, 93:10, 94:7, 94:12, 94:16, 99:20, 100:9, 100:13, 101:4, 101:6, 101:15, 101:18, 101:22, 103:22, 104:11, 106:11, 106:12, 110:17, 112:22, 113:6
**mathematically** [1] - 101:20
**matter** [8] - 42:23, 67:20, 79:3, 99:1, 106:11, 109:24, 125:6, 133:5
**matters** [6] - 13:3, 61:16, 68:5, 95:13, 118:12
**maverick** [7] - 115:9, 115:11, 115:12, 115:13, 116:2, 119:9, 121:2
**maximization** [1] - 93:20

**maximize** [1] - 93:15
**maximized** [1] - 89:15
**maximizing** [3] - 73:16, 93:13, 106:19
**mean** [33] - 22:2, 25:20, 27:6, 40:24, 41:21, 41:25, 49:20, 50:12, 52:17, 54:12, 58:2, 58:11, 58:12, 60:9, 60:10, 60:12, 62:5, 67:2, 67:13, 67:16, 74:15, 84:11, 87:1, 87:9, 88:13, 88:16, 95:25, 97:21, 105:18, 117:18, 119:11, 124:7, 125:5
**meaning** [3] - 13:25, 115:12, 116:3
**means** [25] - 4:13, 5:6, 14:3, 14:13, 16:5, 32:8, 46:18, 51:25, 52:3, 58:4, 72:18, 78:5, 86:7, 86:25, 96:1, 96:19, 100:25, 102:8, 102:14, 114:4, 115:13, 116:2, 119:16, 124:1, 128:21
**measure** [4] - 19:3, 46:23, 46:24, 102:22
**measured** [1] - 46:22
**measures** [2] - 46:8, 85:2
**measuring** [1] - 10:11
**mechanism** [1] - 117:22
**medical** [1] - 48:10
**medium** [2] - 39:23, 65:23
**meet** [2] - 72:23, 129:21
**meeting** [1] - 131:23
**mention** [2] - 32:22, 127:20
**mentioned** [39] - 5:21, 9:22, 10:5, 12:1, 15:21, 18:20, 22:13, 22:16, 23:18, 25:24, 31:13, 36:14, 41:4, 41:9, 43:19, 44:1, 45:3, 55:3, 59:20, 63:23, 74:7, 79:20, 91:21, 93:6, 94:20, 96:9, 97:18, 99:11, 99:24, 104:20, 105:3, 107:13, 110:2, 110:13, 117:24, 118:8, 120:10, 122:2, 123:22
**mentions** [2] - 24:4, 24:12
**menu** [1] - 48:19
**menus** [2] - 48:17, 50:17
**merge** [2] - 89:19, 91:17
**merged** [12] - 14:14, 86:3, 89:22, 90:3, 92:11, 92:12, 115:20, 116:6, 117:18, 125:14, 130:12
**Merger** [1] - 23:1
**merger** [60] - 4:9, 7:21, 7:23, 7:24, 8:7, 8:8, 9:20, 10:2, 10:4, 10:15, 11:19, 11:21, 13:21, 13:24, 14:8, 14:14, 15:5, 17:25, 18:3, 18:13,

19:5, 19:22, 20:2, 21:7, 21:10, 22:3, 23:4, 23:6, 23:20, 23:23, 24:3, 73:20, 83:22, 84:25, 85:7, 85:9, 85:10, 85:14, 86:1, 86:8, 89:16, 89:22, 90:20, 91:11, 98:24, 99:11, 99:18, 104:10, 112:17, 113:1, 113:4, 113:17, 114:2, 114:7, 114:21, 115:5, 115:17, 116:1, 121:1, 121:7
**mergers** [7] - 7:25, 8:1, 8:3, 8:5, 8:6, 8:13, 9:2, 9:17, 10:5, 10:9, 24:12, 85:14, 114:9, 114:10
**merging** [11] - 14:11, 15:18, 19:19, 20:1, 20:9, 20:11, 20:13, 25:2, 63:7, 88:16, 103:20
**message** [1] - 98:14
**method** [7] - 21:23, 21:25, 22:15, 25:3, 35:14, 94:12, 94:18
**methods** [12] - 13:21, 13:23, 25:18, 25:22, 35:1, 35:3, 35:18, 59:3, 60:4, 61:3, 69:6, 124:24
**Metropolitan** [1] - 127:2
**MEYER** [2] - 2:3, 3:9
**Meyer** [18] - 3:5, 3:7, 3:13, 3:17, 3:18, 13:10, 13:13, 13:17, 22:13, 27:2, 30:19, 34:14, 37:18, 67:9, 68:19, 71:8, 79:2, 120:10
**micro** [1] - 5:7, 5:11
**microeconomics** [15] - 4:2, 5:4, 5:5, 5:7, 5:13, 5:14, 5:16, 6:19, 7:7, 7:14, 11:13, 11:17, 12:19, 13:10
**microeconomist** [1] - 17:22
**microeconomists** [1] - 3:23
**microphones** [1] - 28:15
**middle** [1] - 64:15
**might** [17] - 4:18, 10:22, 19:20, 19:21, 21:16, 38:22, 45:19, 45:20, 48:8, 48:9, 61:20, 79:8, 87:9, 90:19, 90:24, 91:1, 99:4
**Military** [1] - 5:23
**military** [2] - 6:3, 6:4
**million** [8] - 61:4, 61:5, 61:6, 61:7, 61:12, 61:14, 111:13, 111:16
**mind** [5] - 17:20, 17:23, 49:9, 52:4, 120:1
**minus** [1] - 74:17
**minutes** [1] - 126:4
**miscellaneous** [3] - 24:17, 24:22, 25:4

**missed** [3] - 20:19, 21:2, 23:16
**MIT** [2] - 6:16, 6:17
**mixing** [1] - 98:5
**mode** [1] - 67:19
**model** [83] - 17:25, 18:3, 18:13, 18:16, 18:18, 18:19, 61:19, 88:10, 90:19, 90:20, 90:21, 90:23, 90:24, 91:5, 91:11, 91:12, 91:13, 91:15, 91:19, 92:1, 93:4, 93:7, 93:10, 93:25, 94:16, 98:24, 98:25, 99:14, 99:18, 99:19, 99:20, 99:22, 99:25, 100:3, 100:10, 101:2, 101:3, 101:16, 103:19, 103:22, 104:4, 104:10, 104:11, 104:12, 104:15, 104:23, 104:24, 104:25, 105:4, 105:6, 105:13, 105:16, 106:10, 106:11, 106:12, 106:16, 106:21, 106:23, 106:24, 107:1, 107:13, 107:14, 107:16, 110:4, 110:16, 111:5, 111:7, 111:17, 112:2, 112:13, 112:20, 112:23, 112:25, 113:6, 113:12, 113:16, 113:19, 114:2, 114:5, 114:21
**Moliere** [1] - 55:13
**mom** [1] - 10:20
**moment** [6] - 5:3, 7:21, 21:8, 53:6, 104:15, 110:2
**moments** [1] - 96:9
**monetary** [1] - 106:9
**monetize** [1] - 105:15
**monetized** [1] - 15:3
**money** [5] - 33:8, 33:11, 33:13, 87:23, 130:22
**monopolist** [4] - 52:5, 52:12, 73:11, 82:23
**monopolizable** [2] - 52:5, 52:12
**morning** [8] - 15:12, 17:18, 30:25, 62:6, 66:24, 97:6, 98:8, 125:14
**most** [15] - 8:13, 21:1, 26:8, 46:3, 53:9, 58:25, 61:9, 66:3, 85:8, 96:7, 118:10, 118:15, 118:20, 119:5, 128:25
**mostly** [3] - 42:11, 66:9, 130:15
**move** [4] - 28:25, 53:23, 68:11, 105:24
**moved** [1] - 29:3
**movement** [4] - 30:14, 60:5, 60:7, 96:8
**movie** [1] - 8:18

**moving** [1] - 61:13
**MP** [2] - 6:7
**MR** [57] - 3:4, 3:12, 3:14, 3:16, 13:9, 13:12, 13:15, 13:16, 18:4, 18:7, 18:14, 22:6, 22:9, 22:12, 28:9, 28:14, 28:25, 30:16, 30:18, 31:19, 31:24, 36:1, 36:4, 37:14, 37:17, 51:13, 53:5, 53:19, 53:21, 54:3, 54:22, 54:23, 55:1, 64:14, 64:16, 68:14, 68:17, 68:18, 70:8, 81:23, 82:1, 118:23, 119:3, 119:14, 119:21, 120:8, 120:9, 126:1, 126:5, 126:8, 126:12, 131:1, 131:6, 131:9, 131:15, 131:20, 132:1
**multiplication** [1] - 100:11
**must** [3] - 6:13, 56:18, 78:23

## N

**NA** [1] - 76:12
**name** [3] - 3:17, 42:21, 95:13
**namely** [1] - 12:8
**names** [1] - 6:10
**narrow** [1] - 34:1
**National** [1] - 3:20
**national** [1] - 127:10
**nature** [2] - 91:4, 128:21
**near** [2] - 26:12, 26:14
**necessarily** [2] - 14:21, 81:19
**necessary** [1] - 93:5
**need** [9] - 43:3, 55:25, 59:24, 93:25, 94:2, 94:3, 129:22, 129:23
**needs** [2] - 52:19, 52:22
**NERA** [7] - 3:20, 3:22, 3:23, 4:3, 4:5, 7:19, 7:20
**net** [13] - 59:21, 59:22, 59:25, 60:6, 60:16, 60:17, 61:6, 61:14, 112:16
**net-net** [3] - 59:22, 60:17
**nets** [1] - 59:25
**never** [4] - 105:1, 105:12, 111:25, 129:1
**new** [14] - 17:1, 17:2, 23:4, 23:6, 39:9, 42:17, 43:12, 54:14, 62:8, 92:19, 116:15, 122:25, 125:8, 125:9
**New** [1] - 7:3
**Newkirk** [1] - 50:19
**newly** [1] - 92:18
**next** [19] - 3:3, 20:12, 20:15, 21:24, 24:5, 24:6, 43:23, 58:8, 61:19, 65:7, 68:20, 74:25, 91:8, 105:8, 105:15,

106:3, 126:4
**niche** [1] - 42:13
**nine** [3] - 75:16, 80:6, 103:14
**nobody** [2] - 51:21, 56:19
**noise** [1] - 46:18
**non** [2] - 44:18, 76:13
**non-loyal** [1] - 76:13
**non-quantitative** [1] - 44:18
**none** [4] - 61:9, 113:7, 113:9, 127:11
**nonempirical** [1] - 44:18
**Nontransitory** [1] - 51:24
**nontransitory** [1] - 52:13
**note** [1] - 84:8
**notes** [1] - 23:3
**nothing** [2] - 61:7, 73:21
**notice** [1] - 34:25
**novel** [1] - 23:7
**nowadays** [1] - 97:9
**nuances** [1] - 73:17
**number** [30] - 8:2, 9:1, 11:16, 16:9, 17:13, 29:25, 30:21, 36:11, 38:11, 39:25, 40:12, 42:11, 47:7, 61:8, 64:6, 64:7, 75:23, 76:22, 77:1, 80:7, 81:8, 81:9, 84:5, 84:10, 100:12, 101:9, 103:19, 109:13, 111:15, 126:18
**Number** [14] - 23:10, 30:17, 34:12, 41:17, 60:21, 67:7, 68:20, 69:8, 69:9, 74:5, 79:3, 110:10, 118:1, 118:6
**NUMBER** [1] - 2:9
**numbers** [16] - 61:9, 61:12, 75:6, 76:11, 77:20, 77:24, 78:5, 78:6, 83:24, 84:2, 84:3, 96:11, 107:20, 109:17, 109:19, 111:8
**NW** [2] - 1:15, 1:19

## O

**o'clock** [1] - 131:25
**Oath** [1] - 3:6
**object** [4] - 53:15, 118:23, 119:21, 119:23
**objecting** [2] - 18:5, 53:13
**objection** [6] - 13:12, 18:4, 53:17, 120:3, 120:5, 120:7
**observable** [1] - 124:9
**observe** [2] - 124:4
**observed** [1] - 49:16
**obviously** [11] - 20:8, 32:25, 42:12, 76:8, 81:4, 107:9, 112:19, 113:17, 116:21, 118:9, 127:3
**occasion** [1] - 8:24
**OF** [6] - 1:2, 1:3, 1:9, 1:14,

133:1, 133:10
**offer** [3] - 105:21, 108:8
**offered** [8] - 14:22, 20:13, 87:3, 87:4, 87:5, 87:6, 87:7, 119:19
**offering** [5] - 14:20, 117:10, 129:12, 129:13, 129:16
**offers** [2] - 92:7, 108:6
**Office** [3] - 5:19, 34:22, 87:5
**Official** [1] - 1:22
**official** [1] - 24:9
**OFFICIAL** [1] - 133:1
**offset** [1] - 91:24
**old** [1] - 26:6
**omits** [1] - 55:22
**on-line** [6] - 31:2, 35:2, 35:16, 96:22, 109:5
**on..** [1] - 78:25
**once** [1] - 96:4
**One** [2] - 23:9, 23:12
**one** [133] - 7:7, 8:8, 8:12, 8:17, 9:2, 12:6, 14:10, 15:1, 19:10, 20:6, 21:23, 23:11, 25:25, 26:18, 26:23, 28:15, 30:21, 32:2, 32:21, 32:25, 34:14, 36:5, 37:24, 37:25, 39:3, 39:4, 39:7, 39:12, 39:18, 39:24, 41:25, 42:15, 42:19, 44:1, 44:10, 45:17, 45:19, 45:23, 46:2, 46:15, 46:24, 47:7, 49:23, 50:12, 52:1, 52:17, 54:18, 56:25, 57:4, 57:7, 57:8, 59:25, 60:22, 61:18, 64:6, 64:7, 64:10, 64:15, 64:20, 65:15, 65:19, 67:14, 68:20, 68:22, 69:2, 71:1, 71:3, 71:9, 72:4, 73:16, 74:17, 75:1, 79:18, 80:7, 80:21, 81:8, 82:5, 82:25, 83:25, 87:8, 90:18, 91:3, 91:5, 91:6, 91:7, 92:24, 93:12, 93:24, 95:17, 95:19, 96:9, 96:19, 96:21, 97:2, 97:13, 97:16, 97:22, 99:2, 99:5, 99:14, 100:6, 100:22, 106:20, 108:5, 108:17, 108:18, 108:20, 109:2, 109:8, 109:9, 112:15, 112:20, 112:21, 113:25, 114:1, 114:16, 117:11, 119:21, 120:17, 121:6, 122:10, 123:24, 126:18
**ones** [5] - 22:24, 43:22, 72:12, 77:23, 123:22
**opens** [1] - 122:18
**Operation** [1] - 6:9
**operation** [1] - 50:9
**opine** [1] - 13:13
**opinion** [14] - 13:20, 13:22,

17:8, 18:9, 32:23, 53:8,
67:14, 103:24, 119:8,
119:11, 120:20, 129:21,
130:7, 130:9
**opinions** [2] - 13:14, 13:18
**opportunity** [18] - 7:9, 9:7,
9:18, 11:24, 15:14, 17:25,
18:3, 22:17, 37:18, 86:5,
92:8, 92:15, 92:16, 107:15,
120:11, 121:9, 122:19,
123:5
**opposed** [1] - 63:1
**opposite** [1] - 120:23
**optimal** [1] - 105:5
**optimally** [1] - 89:9
**option** [4] - 39:1, 39:2, 93:17
**options** [3] - 39:5, 124:21,
125:3
**order** [24] - 19:2, 21:24,
22:14, 29:13, 32:23, 43:22,
46:12, 47:10, 48:1, 63:18,
70:16, 77:19, 79:1, 79:19,
80:20, 81:20, 81:23, 84:21,
92:15, 92:18, 101:24,
103:12, 103:13, 118:10
**ordinary** [1] - 38:6
**organization** [5] - 4:6, 4:14,
4:15, 7:13, 13:11
**original** [1] - 46:1
**others'** [1] - 101:10
**otherwise** [2] - 123:14, 132:2
**outcome** [1] - 94:21
**outflows** [1] - 60:11
**outlined** [1] - 82:15
**Outlook** [1] - 7:13
**output** [4] - 96:18, 97:2,
97:24
**outside** [6] - 62:23, 72:7,
72:13, 77:9, 78:20, 125:6
**overrule** [1] - 120:7
**overruled** [1] - 18:10
**overt** [1] - 122:12
**overview** [1] - 11:15
**own** [13] - 17:25, 18:3, 40:10,
98:18, 100:14, 100:15,
100:21, 101:4, 101:12,
101:14, 109:10
**owned** [1] - 21:9
**owning** [1] - 21:9

## P

**p.m** [3] - 1:7, 68:15, 132:4
**paces** [1] - 113:19
**page** [31] - 23:19, 24:7, 32:5,
32:16, 33:5, 33:7, 34:16,
34:18, 34:19, 34:20, 35:4,
35:6, 35:24, 36:2, 36:22,
37:11, 56:25, 57:1, 60:22,

64:15, 67:7, 74:25, 75:1,
76:5, 76:11, 77:25, 79:24,
81:16, 81:17
**page..** [1] - 35:23
**pages** [3] - 32:23, 34:17,
36:20
**paid** [2] - 97:23, 122:16
**paper** [36] - 24:25, 25:10,
25:15, 27:5, 27:12, 28:7,
30:2, 30:10, 30:11, 39:2,
40:8, 40:16, 41:11, 41:16,
44:24, 47:25, 49:7, 56:12,
56:14, 56:15, 57:21, 58:9,
58:14, 59:11, 59:12, 64:23,
65:7, 66:19, 72:14, 78:16,
78:21, 78:24, 87:8, 90:22,
103:3
**papers** [1] - 11:16
**paragraph** [2] - 36:2, 36:3
**parallel** [1] - 69:20
**part** [14] - 6:9, 9:11, 37:9,
43:20, 47:15, 74:18, 78:16,
80:2, 86:23, 105:17,
107:24, 109:15, 127:18,
131:21
**partially** [1] - 91:25
**particular** [44] - 4:7, 4:22,
8:17, 12:6, 12:8, 16:6,
18:17, 23:8, 24:4, 28:5,
33:7, 33:9, 38:2, 38:7,
38:9, 38:17, 38:23, 38:24,
40:4, 42:13, 45:19, 45:22,
46:2, 50:6, 50:8, 57:21,
58:4, 83:25, 84:5, 87:4,
87:5, 88:18, 88:19, 90:14,
93:21, 105:2, 106:21,
108:20, 115:12, 116:3,
119:24, 127:20, 129:23
**particularly** [11] - 10:4,
14:12, 33:25, 44:23, 46:25,
109:20, 114:22, 116:11,
123:24, 124:22, 125:4
**parties** [2] - 15:18, 19:19,
20:1, 20:9, 20:11, 20:14,
25:2, 59:6, 88:17, 88:18,
103:21, 121:6
**parties'** [3] - 14:11, 19:24,
56:16
**parts** [3] - 41:24, 78:17, 88:7
**party** [1] - 88:19
**pass** [9] - 21:16, 53:1, 53:4,
72:25, 78:7, 78:8, 81:19,
82:20, 99:19
**pass-through** [1] - 99:19
**passed** [3] - 53:3, 99:16,
99:23
**passes** [6] - 21:13, 52:17,
78:10, 82:13, 82:21, 83:10
**passing** [1] - 52:24
**patent** [2] - 12:7, 13:6

**patentholder's** [2] - 12:10,
12:14
**patience** [1] - 54:1
**pay** [10] - 43:4, 79:18, 80:19,
88:25, 97:1, 97:24, 106:2,
106:3, 107:8, 107:10
**paying** [2] - 14:24, 33:14
**pays** [1] - 107:10
**peer** [1] - 11:17
**pen** [32] - 24:25, 25:10,
25:14, 27:5, 27:11, 28:7,
30:2, 30:10, 30:11, 39:2,
40:8, 40:16, 41:11, 41:16,
44:24, 47:24, 49:6, 56:12,
58:8, 58:9, 58:14, 59:11,
59:12, 64:23, 65:7, 66:19,
72:14, 78:16, 78:21, 78:24,
87:8, 103:3
**Pennsylvania** [1] - 1:15
**penny** [1] - 106:2
**people** [51] - 16:10, 16:12,
16:15, 16:16, 30:23, 40:6,
40:7, 40:12, 40:14, 40:15,
40:16, 42:5, 53:11, 58:1,
60:17, 64:22, 65:2, 65:17,
65:20, 65:25, 66:3, 66:4,
66:5, 66:11, 66:25, 75:8,
75:13, 75:15, 75:17, 77:11,
78:6, 83:7, 87:17, 88:2,
88:3, 95:11, 97:7, 102:25,
103:2, 103:6, 107:7, 116:6,
116:24, 118:11, 118:21,
118:24, 119:10, 119:15,
119:25, 120:10
**pepper** [3] - 21:11, 21:12,
52:16
**Pepper** [1] - 52:15
**Pepsi** [10] - 21:5, 21:12,
52:15, 52:16, 88:22, 89:4,
89:18, 89:20, 89:22
**per** [2] - 59:16, 97:6
**perceive** [1] - 121:22
**percent** [60] - 9:15, 14:1,
26:24, 39:20, 47:10, 48:1,
65:2, 65:11, 66:3, 67:5,
73:4, 74:8, 74:9, 74:13,
74:17, 74:22, 75:11, 75:15,
75:16, 76:18, 77:1, 77:3,
77:4, 77:5, 77:6, 77:7,
77:9, 77:10, 77:15, 77:25,
78:2, 78:3, 78:4, 78:20,
78:22, 78:23, 79:11, 80:10,
80:14, 80:17, 84:21, 84:23,
102:11, 102:12, 102:14,
102:17, 102:20, 103:6,
103:12, 103:14, 103:16,
110:23, 111:10, 112:14,
112:15, 113:12
**percentage** [21] - 9:13,
16:13, 16:15, 16:16, 40:6,

40:7, 40:12, 64:23, 64:24,
72:10, 72:12, 73:9, 74:1,
76:25, 77:2, 80:9, 83:1,
84:13, 96:23, 102:25
**perfectly** [1] - 50:25
**perhaps** [5] - 26:13, 33:13,
59:13, 62:10, 122:22
**period** [4] - 91:5, 129:6,
129:11, 131:23
**person** [5] - 31:2, 48:9, 51:4,
106:7, 106:13
**perspective** [1] - 113:24
**pertinent** [1] - 68:9
**Ph.D** [3] - 6:16, 6:23, 6:25
**pharmaceutical** [1] - 26:16
**pick** [5] - 32:20, 35:21,
48:19, 74:8, 76:3
**picked** [1] - 61:18
**picking** [1] - 21:24
**picture** [1] - 59:1
**pie** [3] - 83:23, 84:23, 85:1
**piece** [9] - 56:14, 56:15,
74:10, 74:11, 74:21, 90:14,
90:15, 90:22
**pieces** [5] - 7:15, 30:21,
37:25, 44:1
**place** [9] - 15:17, 80:21,
89:13, 89:14, 98:19, 99:7,
104:6, 116:13
**places** [4] - 20:3, 37:13,
126:25, 127:1
**player** [4] - 33:19, 57:11,
66:23, 80:16
**players** [10] - 32:24, 33:23,
33:25, 34:7, 34:9, 80:5,
80:6, 92:19, 128:22,
130:13
**plenty** [1] - 123:1
**plus** [3] - 73:7, 74:14, 74:23
**Point** [1] - 5:23
**point** [40] - 6:13, 6:14, 18:20,
18:22, 18:23, 18:24, 19:6,
20:8, 20:20, 21:2, 23:16,
28:18, 31:3, 34:16, 35:15,
36:19, 37:1, 37:11, 37:15,
38:23, 38:24, 39:4, 42:12,
58:8, 59:11, 60:19, 87:25,
88:8, 90:5, 90:17, 96:1,
117:7, 117:9, 118:23,
119:21, 120:2, 120:5,
124:20, 128:3
**pointed** [3] - 39:19, 45:21,
117:12
**pointing** [1] - 64:10
**points** [4] - 37:2, 37:3, 105:1,
126:9
**poised** [3] - 15:13, 130:17,
130:21
**police** [1] - 6:4
**polymer** [1] - 26:4

**polymers** [1] - 26:9
**pool** [1] - 92:13
**pop** [1] - 10:20
**populates** [1] - 48:20
**portable** [1] - 9:4
**portfolio** [1] - 121:22
**portion** [3] - 109:16, 131:10, 131:14
**posit** [1] - 94:6
**posited** [2] - 120:24, 125:13
**position** [1] - 130:18
**positions** [1] - 95:1
**positive** [3] - 79:1, 79:22, 92:25
**posits** [1] - 93:21
**possibilities** [1] - 49:10
**possibility** [4] - 15:9, 86:12, 92:3, 92:6
**possible** [3] - 48:4, 101:25, 123:17
**possibly** [1] - 128:8
**post** [3] - 14:14, 85:7, 89:22
**post-merger** [2] - 85:7, 89:22
**posturing** [1] - 73:4
**potential** [9] - 15:7, 22:14, 30:24, 40:23, 41:14, 88:19, 92:25
**potentially** [1] - 122:9
**PowerPoint** [8] - 45:17, 45:25, 46:2, 51:11, 51:16, 51:19, 69:12, 70:11
**PowerPoints** [1] - 51:6
**practical** [2] - 30:3, 30:4
**pre** [2] - 10:15, 83:22
**pre-merger** [2] - 10:15, 83:22
**precise** [5] - 46:23, 64:20, 70:7, 84:16, 94:16
**precisely** [1] - 46:19
**predecessor** [1] - 9:3
**predict** [6] - 99:23, 111:5, 111:12, 112:13, 114:3, 114:5
**predicted** [5] - 103:21, 111:9, 111:11, 113:3
**prediction** [1] - 105:2
**predicts** [1] - 114:6
**prefer** [4] - 87:18, 96:6, 96:7, 110:18
**preferred** [1] - 88:1
**PRELIMINARY** [1] - 1:9
**premium** [7] - 80:22, 80:25, 95:10, 95:12, 95:25, 96:7, 121:23
**prep** [1] - 101:25
**preparation** [51] - 13:21, 13:22, 24:24, 24:25, 25:3, 25:8, 25:12, 25:14, 29:18, 30:9, 30:20, 32:8, 35:1, 36:11, 38:25, 42:10, 42:23, 43:8, 44:23, 47:22, 49:5,

56:12, 58:10, 58:12, 59:3, 59:14, 59:15, 60:2, 60:3, 60:7, 61:3, 64:9, 65:18, 66:12, 67:1, 67:5, 69:6, 69:14, 70:15, 70:18, 70:25, 71:6, 83:6, 84:8, 87:1, 87:3, 102:5, 102:7, 124:21, 124:24, 125:3
**prepare** [2] - 60:19, 83:8
**presence** [1] - 117:14
**present** [2] - 8:13, 47:6
**presented** [2] - 110:22, 126:20
**president** [1] - 4:4
**pressure** [1] - 98:24
**presumptions** [1] - 63:15
**pretty** [7] - 9:14, 16:3, 24:16, 33:25, 73:7, 93:16, 120:2
**previous** [7] - 7:8, 23:22, 25:8, 44:16, 69:21, 77:24, 102:1
**previously** [2] - 90:1, 99:11
**Price** [1] - 51:25
**price** [158] - 4:23, 10:12, 14:16, 14:25, 15:15, 15:17, 15:19, 16:5, 16:9, 16:13, 16:18, 16:21, 17:3, 19:7, 19:15, 19:17, 20:3, 26:21, 26:24, 29:20, 30:1, 30:3, 30:14, 33:9, 33:11, 38:17, 38:23, 38:24, 39:4, 39:19, 39:22, 39:23, 39:24, 39:25, 40:4, 40:10, 40:11, 40:14, 41:10, 41:12, 41:15, 44:14, 45:23, 48:17, 50:18, 50:21, 50:22, 52:14, 58:12, 58:13, 58:20, 58:21, 59:1, 59:2, 60:12, 60:18, 61:15, 65:8, 66:8, 66:9, 66:18, 66:23, 66:24, 67:2, 67:3, 67:5, 68:8, 69:10, 72:4, 72:9, 73:4, 73:6, 73:7, 74:12, 74:13, 74:23, 76:23, 78:25, 82:25, 83:1, 83:5, 83:7, 84:10, 84:15, 88:15, 88:20, 88:23, 89:1, 89:5, 89:6, 89:9, 89:11, 89:14, 89:23, 90:4, 90:10, 90:13, 90:16, 90:19, 90:25, 91:17, 91:22, 92:9, 93:15, 93:22, 94:4, 100:14, 100:16, 100:20, 101:8, 101:12, 101:14, 101:18, 103:21, 104:16, 104:17, 104:19, 105:5, 105:9, 105:12, 106:6, 107:3, 107:4, 107:8, 111:5, 111:9, 111:10, 112:14, 112:15, 112:16, 112:20, 112:21, 113:11, 114:4, 114:5, 115:19, 121:5,

121:8, 122:10, 122:12, 122:15, 122:16, 122:17, 122:23, 123:11, 123:14, 124:14, 124:15, 129:24, 130:12, 130:13
**priced** [3] - 29:6, 29:19, 95:5
**prices** [44] - 4:18, 14:14, 15:8, 20:23, 29:5, 29:8, 29:9, 29:12, 39:9, 39:10, 52:13, 87:11, 90:2, 91:24, 91:25, 93:11, 94:10, 94:11, 100:15, 100:21, 101:4, 101:5, 101:10, 103:23, 104:13, 106:25, 107:9, 107:10, 111:19, 111:20, 113:9, 115:22, 115:24, 116:1, 116:7, 121:1, 124:4, 124:5, 124:12, 124:17, 125:20, 125:21, 125:24
**pricing** [53] - 12:2, 12:3, 15:7, 29:4, 37:19, 37:24, 38:3, 38:7, 38:10, 40:17, 40:18, 44:2, 45:3, 45:5, 45:14, 45:18, 49:11, 49:25, 50:6, 50:16, 50:20, 50:24, 51:3, 51:5, 51:7, 51:8, 69:15, 69:25, 70:3, 70:11, 70:14, 84:14, 84:17, 84:19, 86:9, 89:10, 95:1, 98:23, 112:11, 112:17, 123:24, 123:25, 124:1, 124:2, 124:3, 124:6, 124:17, 125:6, 127:9, 127:10, 127:13
**primarily** [1] - 125:12
**primary** [1] - 7:24, 62:18
**principle** [13] - 52:19, 52:21, 55:18, 55:20, 55:23, 55:24, 56:2, 63:19, 71:13, 81:5, 81:24, 82:14
**principles** [3] - 52:8, 56:3, 82:15
**pro** [2] - 98:3, 99:6
**pro-competitive** [2] - 98:3, 99:6
**problem** [5] - 62:20, 105:13, 127:21, 127:22, 127:23
**problematic** [1] - 105:3
**problems** [2] - 104:24, 128:6
**proceed** [2] - 3:14, 68:16
**proceedings** [2] - 131:12, 133:4
**Proceedings** [2] - 1:25, 132:4
**process** [3] - 43:13, 106:5, 109:23
**produced** [2] - 1:25, 17:11
**Product** [2] - 23:10, 23:13
**product** [86] - 4:22, 10:8, 10:16, 10:17, 10:18, 12:8,

12:9, 12:10, 12:13, 12:14, 16:6, 16:7, 17:1, 17:2, 17:3, 26:3, 26:4, 26:6, 26:11, 26:15, 26:17, 26:22, 28:21, 34:24, 38:20, 38:22, 38:24, 39:24, 40:4, 42:14, 42:18, 42:22, 42:24, 42:25, 43:10, 43:12, 44:15, 45:23, 50:18, 57:1, 58:3, 58:8, 67:1, 73:12, 74:20, 87:1, 87:4, 87:5, 87:23, 88:15, 91:23, 95:1, 95:4, 95:12, 96:20, 96:22, 96:25, 97:11, 100:17, 100:18, 100:21, 101:8, 101:11, 101:19, 107:4, 108:13, 108:14, 108:16, 117:16, 121:21, 121:23, 121:24, 122:5, 122:7, 122:8, 123:2, 123:18, 129:12, 129:13, 129:16
**production** [1] - 7:18
**products** [97] - 4:18, 8:22, 10:6, 11:10, 14:11, 14:20, 15:1, 16:9, 19:9, 19:25, 20:8, 20:11, 20:13, 23:11, 27:20, 28:4, 28:5, 29:6, 29:18, 29:19, 30:1, 30:12, 39:25, 40:24, 41:1, 41:2, 41:22, 42:1, 42:2, 42:11, 42:17, 43:9, 43:18, 49:6, 52:6, 52:11, 52:12, 57:13, 60:13, 60:14, 62:8, 62:9, 62:20, 62:21, 62:22, 63:6, 65:17, 66:20, 69:5, 72:4, 73:12, 75:24, 76:3, 76:7, 76:19, 79:10, 82:23, 82:25, 83:6, 86:11, 86:21, 86:24, 86:25, 87:7, 87:8, 87:9, 87:13, 87:15, 88:1, 88:2, 88:12, 88:17, 90:8, 94:9, 95:7, 95:8, 95:9, 95:11, 96:5, 96:6, 96:8, 100:12, 100:15, 100:16, 100:21, 101:5, 103:8, 107:1, 107:11, 114:23, 121:8, 122:16, 122:24, 123:3, 123:16
**Products** [1] - 23:9
**proffer** [1] - 13:10
**profit** [21] - 14:21, 15:14, 73:16, 74:15, 74:17, 74:20, 74:21, 89:1, 89:24, 92:8, 92:14, 92:16, 93:13, 93:20, 93:23, 94:7, 101:16, 105:11, 106:19, 122:18, 123:5
**profit-maximizing** [2] - 73:16, 93:13
**profitable** [3] - 19:17, 73:11,

125:21
**profitably** [1] - 82:24
**profits** [6] - 15:20, 89:12, 89:15, 105:6, 105:15, 106:14
**program** [1] - 110:18
**project** [1] - 9:14
**projects** [4] - 3:25, 4:8, 8:2, 9:1
**proof** [1] - 99:16
**proper** [2] - 52:18, 52:20
**properly** [1] - 107:13
**property** [2] - 4:8, 13:3
**pros** [1] - 42:20
**provide** [4] - 14:21, 18:24, 24:2, 85:6
**providing** [2] - 108:22, 108:23
**public** [2] - 32:2, 131:23
**publication** [2] - 7:12, 7:15
**publicly** [1] - 43:19
**pull** [5] - 48:13, 48:15, 48:22, 50:17, 80:7
**pull-down** [1] - 50:17
**pulled** [4] - 49:3, 50:25, 54:7, 76:11
**pulling** [2] - 48:10, 49:13, 84:16
**purchase** [1] - 96:24
**purchased** [1] - 116:6
**purchases** [1] - 121:16
**pure** [2] - 73:22, 87:14
**purely** [1] - 88:9
**purports** [1] - 119:24
**purpose** [5] - 10:4, 58:5, 63:11, 107:23, 119:15
**purposes** [7] - 30:3, 30:4, 44:5, 58:15, 59:13, 79:14, 89:20
**put** [21] - 16:7, 45:6, 58:7, 60:21, 74:13, 74:22, 82:5, 84:2, 84:12, 85:25, 91:15, 92:5, 92:24, 99:21, 107:17, 107:25, 110:17, 110:20, 118:25, 126:9, 128:10
**puts** [3] - 84:24, 100:6, 113:8
**putting** [5] - 57:20, 58:8, 59:11, 79:19, 113:15

## Q

**qualified** [1] - 11:22
**quality** [4] - 15:1, 16:19, 44:14, 122:18
**quantification** [2] - 38:1, 38:2
**quantitative** [1] - 44:18
**quantities** [1] - 93:11
**quantity** [4] - 93:16, 100:12,

101:5, 101:12
**questions** [15] - 12:16, 53:11, 53:13, 53:21, 53:22, 53:23, 54:4, 63:10, 68:2, 71:21, 84:4, 109:20, 109:21, 129:5
**quick** [1] - 53:24
**quickly** [3] - 96:15, 110:15, 129:18
**quite** [4] - 9:1, 69:9, 94:16, 120:23
**quote** [2] - 32:16, 85:13

## R

**race** [1] - 7:8
**raise** [40] - 14:14, 15:7, 20:2, 40:11, 40:14, 41:12, 52:6, 52:12, 72:9, 73:12, 82:25, 86:11, 88:14, 88:20, 88:23, 89:11, 89:23, 90:4, 90:10, 90:13, 90:16, 90:19, 90:25, 91:17, 91:25, 93:22, 94:3, 101:7, 101:14, 101:18, 104:13, 104:16, 105:9, 115:19, 116:7, 121:1, 123:10, 130:12, 130:13
**raised** [4] - 41:16, 50:21, 50:22, 72:4
**raises** [1] - 16:9
**raising** [2] - 41:15, 58:13
**ran** [2] - 48:24, 54:19
**range** [4] - 4:8, 57:2, 79:11, 79:13
**ranges** [1] - 94:22
**rank** [1] - 87:14
**Rapids** [2] - 121:17, 121:18
**rate** [5] - 6:21, 103:9, 126:23, 127:7, 128:2
**rather** [4] - 53:13, 63:24, 82:2, 112:5
**ratio** [10] - 16:15, 27:24, 44:10, 72:18, 73:9, 74:1, 77:11, 101:20, 101:21, 103:18
**ratios** [14] - 38:3, 46:4, 46:6, 46:19, 46:21, 69:19, 75:1, 77:21, 77:23, 79:16, 101:1, 101:10, 101:11, 114:22
**RC** [4] - 21:10, 21:11, 52:15, 52:16
**reach** [1] - 125:18
**reached** [2] - 13:19, 17:8
**reacting** [1] - 86:13
**reaction** [6] - 18:15, 18:17, 67:9, 92:3, 111:23, 112:16
**reactions** [1] - 92:25
**read** [4] - 23:8, 36:24, 36:25, 66:22

**ready** [3] - 3:2, 15:14, 68:19
**real** [7] - 11:6, 40:18, 73:18, 90:23, 91:1, 96:10, 112:1
**realistic** [1] - 26:11
**realistically** [1] - 26:7
**realize** [1] - 117:15
**realized** [1] - 98:6
**reallocated** [1] - 103:7
**really** [32] - 10:10, 12:16, 16:10, 18:23, 19:6, 21:2, 26:2, 34:4, 40:9, 45:1, 53:12, 56:23, 62:19, 62:24, 68:1, 69:20, 73:14, 75:5, 79:18, 84:11, 86:14, 90:21, 93:12, 97:7, 104:20, 105:7, 114:19, 115:3, 118:12, 123:3, 123:17, 129:4
**realm** [1] - 61:11
**reason** [13] - 16:23, 16:24, 46:21, 58:17, 62:18, 66:7, 67:25, 69:16, 76:12, 104:11, 117:19, 122:5, 127:20
**reasonable** [1] - 67:2
**reasons** [4] - 66:7, 90:18, 104:7, 122:2
**REBECCA** [1] - 1:21
**Rebecca** [1] - 133:3
**recalibrate** [1] - 102:13
**received** [3] - 6:16, 107:24, 109:12
**recent** [2] - 9:9, 53:10
**recently** [3] - 10:14, 43:12
**Recess** [1] - 68:15
**recognition** [1] - 95:13
**recognize** [2] - 98:25, 99:13
**recognizing** [1] - 99:12
**recollection** [2] - 61:20, 66:16
**record** [4] - 3:17, 99:9, 102:16, 133:4
**recorded** [1] - 10:8
**recreate** [1] - 49:13
**RECROSS** [1] - 2:2
**REDIRECT** [1] - 2:2
**redo** [1] - 48:11
**reduce** [2] - 91:19, 120:25
**reduced** [1] - 108:16
**reduction** [1] - 122:17
**reductions** [2] - 98:16, 99:22
**refer** [7] - 33:12, 56:13, 84:3, 94:15, 94:17, 95:7
**reference** [1] - 33:9
**referencing** [1] - 22:21
**refers** [2] - 60:1, 84:1
**reflect** [1] - 119:25
**reflected** [1] - 61:22
**refund** [7] - 33:13, 96:25, 97:14, 108:5, 108:6, 108:8, 108:13

**regard** [1] - 16:22
**regarding** [4] - 117:3, 129:21, 130:7, 130:9
**regardless** [1] - 117:14
**regards** [1] - 21:20
**regression** [2] - 47:3, 55:2
**relate** [4] - 5:3, 12:5, 21:7, 37:22
**related** [16] - 3:25, 4:1, 4:9, 5:1, 6:21, 13:5, 45:15, 58:20, 58:21, 93:19, 94:7, 101:6, 101:7, 103:23, 104:18, 107:25
**relates** [4] - 4:16, 12:19, 37:24, 101:4
**relation** [1] - 10:1
**relationship** [6] - 93:21, 97:12, 101:10, 101:11, 101:13, 101:15
**relationships** [1] - 94:12
**relatively** [5] - 13:25, 27:23, 67:3, 75:13, 95:5
**released** [2] - 23:24, 92:18
**relevance** [6] - 32:3, 34:20, 35:8, 36:7, 69:2, 119:18
**relevant** [73] - 8:9, 9:18, 9:21, 13:20, 17:23, 20:7, 20:9, 20:10, 20:19, 21:14, 21:19, 24:21, 25:23, 26:10, 26:15, 26:22, 27:1, 34:17, 34:19, 40:22, 41:2, 52:1, 52:2, 52:20, 52:22, 53:3, 55:19, 55:21, 56:10, 58:3, 58:25, 61:8, 61:10, 61:13, 63:11, 71:14, 71:23, 72:5, 72:6, 72:7, 72:8, 76:4, 76:7, 76:25, 77:8, 77:14, 77:15, 78:6, 78:9, 78:14, 78:18, 78:23, 79:17, 79:20, 80:5, 80:14, 80:16, 80:18, 81:7, 81:11, 81:14, 82:8, 82:12, 82:21, 82:24, 83:10, 83:16, 97:19, 97:20, 99:4, 114:25, 116:12, 120:20
**reliability** [2] - 67:11, 67:14
**reliable** [2] - 67:22, 107:22
**relied** [1] - 17:21
**rely** [1] - 119:3
**remain** [2] - 13:23, 115:5
**remember** [5] - 55:3, 55:7, 82:22, 102:24, 118:15
**replicate** [1] - 129:23
**replicates** [1] - 54:10
**reply** [1] - 45:6
**report** [21] - 27:8, 35:22, 45:6, 46:1, 46:6, 53:16, 54:18, 78:2, 84:2, 84:3, 84:4, 85:6, 96:12, 103:12, 109:25, 110:21, 111:14, 118:8, 118:16, 126:21,

129:10
**reported** [1] - 1:25
**REPORTER** [3] - 81:22, 133:1, 133:10
**Reporter** [2] - 1:21, 1:22
**reporter** [1] - 68:13
**reporting** [1] - 46:4
**reposition** [1] - 92:16
**repositioning** [2] - 92:23, 113:10
**represent** [1] - 77:6
**represented** [1] - 100:8
**required** [2] - 53:7, 99:15
**research** [1] - 38:5
**Research** [8] - 3:20, 17:16, 38:4, 38:5, 44:6, 46:3, 46:5, 47:6
**respondent** [6] - 38:11, 38:13, 38:14, 38:18, 39:3, 39:18
**respondents** [5] - 39:14, 39:15, 39:22, 41:2, 44:12
**response** [8] - 16:13, 16:18, 20:24, 30:14, 67:5, 83:6, 119:13
**responsiveness** [3] - 12:2, 16:20, 59:2
**rest** [3] - 36:17, 68:13, 74:20
**result** [10] - 24:14, 47:22, 48:21, 78:24, 79:1, 79:22, 85:25, 113:3, 127:12, 128:14
**resulting** [2] - 85:14, 104:16
**results** [4] - 48:24, 49:12, 51:1, 112:3
**resume** [1] - 131:16
**retail** [8] - 32:6, 32:7, 32:10, 32:11, 32:13, 32:15, 36:10, 43:1
**retained** [5] - 89:12, 90:3, 92:11, 92:12, 105:12
**retains** [1] - 89:25
**return** [3] - 42:19, 43:1, 65:18
**returned** [1] - 6:14
**returns** [1] - 65:24
**revealed** [1] - 53:10
**revenue** [6] - 14:21, 74:16, 74:18, 74:21, 105:11, 106:14
**review** [7] - 4:11, 17:8, 19:5, 24:3, 32:22, 41:18, 51:15
**reviewed** [4] - 11:17, 17:10, 41:4, 109:22
**Rhodes** [3] - 17:19, 30:25, 120:16
**right-hand** [1] - 83:25
**ring** [1] - 6:10
**ROBERT** [1] - 1:17
**Robertson** [8] - 2:4, 2:6, 3:2,

49:24, 53:17, 54:1, 68:16, 119:13
**ROBERTSON** [44] - 1:17, 3:4, 3:12, 3:14, 3:16, 13:9, 13:15, 13:16, 18:14, 22:6, 22:12, 28:9, 28:14, 30:16, 30:18, 31:19, 31:24, 36:1, 36:4, 37:14, 37:17, 51:13, 53:19, 54:23, 55:1, 64:14, 64:16, 68:14, 68:17, 68:18, 70:8, 81:23, 82:1, 119:14, 120:9, 126:1, 126:5, 126:8, 126:12, 131:1, 131:6, 131:15, 131:20, 132:1
**robust** [2] - 44:24, 117:21
**room** [1] - 90:4
**Room** [1] - 1:22
**ROUSH** [2] - 1:18, 22:9
**RPR** [1] - 1:21
**rubric** [1] - 4:2
**rule** [1] - 71:2
**run** [6] - 18:17, 54:14, 69:17, 104:1, 110:15, 113:19
**running** [1] - 111:11
**runs** [2] - 31:2, 80:2

---

## S

**sake** [2] - 122:23, 124:11
**salary** [2] - 97:22, 97:25
**sales** [29] - 10:18, 12:10, 29:15, 72:5, 72:6, 73:15, 74:1, 83:1, 89:12, 89:13, 89:24, 89:25, 90:1, 91:4, 91:8, 92:7, 93:14, 93:15, 94:11, 97:16, 100:18, 101:8, 101:15, 101:19, 105:10, 105:14, 127:7, 128:1
**Sally's** [1] - 10:19
**satisfies** [1] - 52:8
**satisfy** [2] - 48:2, 81:6
**Saudi** [1] - 6:8
**save** [3] - 26:24, 33:8, 33:11
**saved** [1] - 106:12
**saving** [1] - 33:13
**saw** [21] - 10:21, 11:2, 17:2, 17:3, 29:25, 31:1, 31:5, 39:22, 39:23, 39:24, 41:8, 41:13, 44:21, 45:1, 57:22, 58:22, 69:21, 94:15, 95:17, 126:20
**scale** [1] - 77:1
**scan** [1] - 10:7
**scanner** [1] - 10:8
**scenario** [6] - 38:14, 38:15, 38:23, 39:9, 104:21
**scenarios** [7] - 38:12, 38:13, 39:17, 46:12, 46:13, 50:8

**schedule** [1] - 131:19
**SCICCHITANO** [1] - 1:14
**screen** [2] - 36:18, 39:8
**se** [1] - 59:16
**sealed** [4] - 131:10, 131:11, 131:12, 131:14
**search** [1] - 97:8
**Season** [1] - 34:13
**second** [14] - 32:5, 35:15, 36:22, 37:11, 47:8, 47:18, 47:24, 49:6, 59:9, 77:17, 79:24, 112:9, 123:11, 131:18
**Second** [1] - 42:22
**section** [3] - 36:9, 43:16, 75:6
**Section** [1] - 23:2
**sector** [1] - 44:25
**see** [57] - 8:7, 14:1, 16:22, 17:24, 18:2, 20:22, 22:2, 28:25, 30:8, 31:21, 32:17, 36:17, 39:3, 39:24, 40:5, 40:7, 47:16, 48:23, 57:6, 57:15, 61:3, 64:17, 65:11, 66:14, 69:8, 69:13, 73:23, 74:11, 74:14, 75:12, 75:20, 75:24, 76:10, 76:11, 77:10, 78:15, 80:17, 83:24, 84:1, 84:6, 84:22, 85:1, 85:13, 87:24, 93:10, 95:14, 95:15, 107:17, 110:5, 112:9, 113:19, 113:25, 116:5, 121:12, 123:4, 124:1, 124:3
**seeing** [2] - 49:18, 106:9
**seem** [1] - 95:23
**sees** [3] - 38:11, 92:20, 102:9
**segment** [1] - 116:12
**segments** [1] - 61:13
**select** [1] - 19:11
**selected** [3] - 23:20, 34:14, 37:6
**sell** [6] - 97:2, 100:12, 100:13, 100:15, 100:17, 101:6
**sellers** [1] - 96:3
**sells** [2] - 96:19, 96:21
**send** [1] - 124:7
**sending** [1] - 124:13
**sends** [1] - 121:16
**sense** [22] - 23:16, 33:21, 38:21, 44:7, 59:17, 61:9, 63:9, 66:17, 67:1, 73:18, 75:4, 81:5, 86:13, 86:16, 88:14, 105:21, 105:23, 105:25, 113:24, 117:17, 125:15
**sensitive** [3] - 66:23, 66:24, 67:3
**sent** [1] - 109:22

**separate** [3] - 40:2, 68:2, 131:13
**separately** [1] - 109:16
**September** [1] - 1:5
**seriously** [2] - 45:13, 45:24
**serve** [3] - 6:3, 10:3, 121:24
**served** [1] - 6:11
**service** [2] - 108:23
**services** [1] - 32:11
**SESSION** [2] - 1:5, 1:10
**session** [6] - 32:2, 126:9, 127:16, 127:21, 131:2, 131:5
**set** [15] - 24:22, 30:21, 38:16, 39:2, 45:19, 50:8, 54:11, 54:13, 65:10, 67:15, 69:9, 87:9, 87:10, 109:8, 121:21
**sets** [3] - 87:11, 121:24
**setting** [2] - 20:23, 41:10
**setup** [1] - 109:1
**seven** [2] - 60:6, 80:6
**several** [7] - 14:10, 34:17, 85:10, 98:9, 105:20, 108:17, 129:8
**share** [13] - 29:13, 29:16, 29:21, 60:2, 60:3, 84:19, 84:20, 84:22, 85:3, 121:9
**shares** [10] - 13:24, 19:3, 48:21, 63:14, 63:21, 83:13, 83:16, 83:22, 85:4, 114:24
**shed** [5] - 58:17, 68:1, 68:5, 128:19, 129:4
**sheet** [3] - 57:21, 58:9, 70:10
**Shield** [1] - 6:9
**shift** [1] - 123:7
**shifting** [1] - 124:15
**shocked** [1] - 57:11
**short** [2] - 93:6, 126:8
**shorthand** [1] - 1:25
**show** [6] - 11:7, 28:11, 28:22, 31:22, 59:6, 121:4
**showed** [1] - 75:21
**showing** [2] - 11:5, 75:21
**shows** [6] - 26:20, 32:14, 45:2, 75:3, 110:14, 111:8
**sic** [1] - 27:23
**side** [11] - 4:17, 4:21, 28:2, 33:6, 83:25, 116:15, 116:16, 125:6, 131:7, 131:9
**side-by-side** [1] - 33:6
**Siegwarth** [2] - 3:5, 3:18
**sIGNATURE** [1] - 133:10
**significance** [2] - 85:7, 85:17
**Significant** [1] - 51:24
**significant** [1] - 52:13
**similar** [9] - 19:8, 27:22, 37:4, 38:7, 73:14, 73:24, 95:7, 109:1, 126:21
**similarly** [2] - 26:16, 69:9

**simple** [7] - 65:23, 66:1, 73:8, 74:7, 91:15, 93:16
**simplest** [1] - 88:9
**simply** [8] - 85:3, 86:1, 86:25, 102:17, 112:1, 112:17, 121:17, 127:24
**simulation** [8] - 18:13, 90:20, 91:11, 98:25, 99:18, 104:10, 114:2, 114:21
**simulator** [45] - 17:25, 18:3, 37:19, 37:24, 38:3, 38:7, 38:10, 40:17, 40:19, 44:2, 45:3, 45:5, 45:14, 45:18, 48:12, 48:14, 48:15, 48:16, 48:22, 49:11, 50:1, 50:7, 50:16, 50:24, 51:3, 51:5, 51:7, 51:8, 51:10, 51:17, 53:10, 54:6, 54:8, 54:15, 61:15, 69:10, 69:12, 69:15, 70:1, 70:3, 70:11, 70:14, 89:10, 89:11, 112:11
**single** [1] - 68:4
**sit** [1] - 50:20
**site** [6] - 33:1, 57:25, 58:1, 58:2, 124:12, 125:2
**sites** [2] - 30:2, 124:5
**sits** [1] - 38:14
**sitting** [1] - 120:4
**situation** [3] - 16:25, 19:20
**six** [6] - 42:6, 60:6, 78:1, 78:4, 79:11, 84:23
**size** [1] - 129:20
**skip** [1] - 110:2
**slice** [3] - 46:15, 46:16, 84:1
**slide** [5] - 45:19, 45:20, 46:2, 46:3, 47:6
**slides** [6] - 45:17, 45:25, 46:7, 46:11, 46:14
**slightly** [2] - 87:8, 110:21
**slower** [1] - 123:20
**small** [3] - 13:25, 52:13, 55:22
**smaller** [3] - 5:11, 33:25, 81:4
**smallest** [8] - 55:15, 55:18, 55:23, 55:24, 56:2, 56:5, 56:8, 81:5
**Smyth** [1] - 32:9
**Smyth's** [1] - 49:20
**software** [21] - 8:18, 8:25, 9:2, 9:3, 27:4, 27:5, 27:7, 27:13, 35:3, 41:23, 41:24, 58:7, 76:10, 87:22, 96:22, 105:25, 110:18, 116:12, 116:14, 116:16, 116:18
**sold** [4] - 10:6, 10:16, 63:6, 90:8
**solution** [1] - 122:25
**solutions** [1] - 36:13
**solved** [1] - 128:6

**someone** [5] - 87:18, 92:20, 106:23, 107:10, 123:12
**sometimes** [5] - 14:22, 56:24, 75:13, 108:1, 113:18
**somewhat** [1] - 95:9
**somewhere** [6] - 5:21, 5:22, 62:9, 78:4, 79:11, 103:7
**sorry** [4] - 18:1, 43:20, 75:17, 81:22
**sort** [24] - 10:17, 15:16, 31:3, 34:5, 39:18, 41:25, 43:4, 47:17, 49:12, 65:19, 65:22, 86:18, 87:14, 88:8, 92:23, 97:25, 107:3, 109:9, 116:20, 120:23, 121:23, 131:18
**source** [6] - 34:23, 44:10, 44:11, 49:25, 50:2, 108:11
**sources** [7] - 19:16, 22:16, 22:17, 22:20, 22:23, 103:15
**space** [5] - 33:20, 42:3, 97:4, 97:7, 97:9
**speaking** [1] - 16:20
**specialize** [1] - 8:17
**specific** [3] - 6:5, 88:4, 118:19
**specifically** [13] - 5:2, 11:18, 22:3, 35:14, 35:17, 52:10, 58:24, 68:8, 71:23, 88:3, 95:18, 95:20, 124:21
**spectators** [1] - 131:4
**spectrum** [2] - 66:25, 124:22
**spending** [1] - 130:21
**spent** [1] - 9:13
**sponsor** [1] - 119:4
**spreadsheet** [19] - 46:10, 47:16, 47:21, 48:16, 48:20, 49:2, 50:10, 51:2, 51:5, 51:9, 51:10, 70:2, 70:7, 108:21, 108:22, 109:20
**spreadsheets** [5] - 45:25, 107:25, 108:2, 108:19, 109:12
**square** [1] - 85:4
**SSNIP** [36] - 51:22, 51:23, 51:24, 52:7, 52:10, 52:17, 52:19, 52:24, 53:1, 53:2, 53:3, 53:4, 63:1, 63:5, 71:9, 71:12, 71:15, 71:24, 71:25, 72:2, 72:25, 78:7, 78:8, 78:10, 81:12, 81:19, 82:10, 82:13, 82:20, 82:21, 82:22, 83:10
**staff** [3] - 18:17, 31:10, 46:16
**stamp** [1] - 30:4
**stand** [1] - 3:5
**standalone** [1] - 105:1
**standpoint** [6] - 84:11,

86:14, 111:4, 112:17, 116:2, 130:12
**stands** [2] - 3:20, 51:24
**start** [11] - 7:19, 20:10, 29:10, 53:11, 63:4, 63:6, 76:8, 82:7, 82:8, 90:6, 106:8
**started** [4] - 7:20, 29:3, 113:21, 124:12
**starting** [9] - 18:24, 20:8, 28:18, 29:9, 31:3, 62:25, 65:2, 88:8, 90:5
**starts** [2] - 93:3, 106:8
**State** [1] - 41:15
**state** [1] - 3:17
**STATES** [3] - 1:1, 1:3, 1:11
**States** [2] - 1:13, 5:22
**static** [7] - 41:19, 41:21, 41:24, 73:16, 88:10, 91:5, 105:4
**statistical** [2] - 47:4, 47:12
**statistically** [2] - 40:1, 40:2
**statistics** [2] - 7:1, 7:6
**status** [1] - 14:24
**stay** [11] - 16:10, 72:6, 72:17, 73:9, 74:2, 76:25, 78:6, 78:7, 83:1, 83:3, 111:11
**stayed** [6] - 75:11, 77:3, 77:4, 77:14, 77:15, 78:22, 80:14, 80:18
**stayers** [1] - 76:15
**staying** [2] - 86:18, 106:1
**stays** [2] - 72:24, 86:9
**steel** [1] - 8:21
**step** [10] - 20:11, 24:5, 24:15, 34:6, 56:24, 65:22, 69:12, 131:22
**steps** [2] - 56:23, 93:4
**stick** [1] - 79:15
**stickiness** [1] - 75:14
**sticking** [1] - 104:15
**sticky** [1] - 91:10
**still** [14] - 28:6, 43:8, 44:24, 46:20, 48:2, 49:2, 66:7, 68:5, 98:13, 103:5, 113:5, 116:9, 123:8, 125:7
**STONESTREET** [1] - 1:21
**Stonestreet** [1] - 133:3
**stop** [3] - 43:15, 85:22, 121:17
**store** [3] - 39:1, 43:2, 87:20
**stores** [10] - 10:19, 10:20, 10:25, 11:8, 32:8, 33:4, 33:6, 59:15, 84:8, 84:10
**Storm** [1] - 6:10
**story** [2] - 114:19, 115:3
**straight** [4] - 71:22, 118:24, 118:25, 119:24
**strategy** [2] - 33:17, 92:17
**Street** [1] - 1:19

**stretch** [1] - 89:4
**strong** [1] - 15:9
**structural** [1] - 123:21
**students** [1] - 67:20
**studies** [1] - 6:16
**study** [8] - 99:3, 104:13, 126:13, 126:15, 126:18, 128:5, 128:9, 128:24
**studying** [2] - 7:14, 129:7
**style** [1] - 26:6
**subject** [1] - 35:12
**submit** [2] - 42:19, 42:20
**subsection** [1] - 5:5
**subsequent** [1] - 15:2
**substantial** [4] - 9:14, 10:18, 15:4, 43:3
**substitutability** [3] - 12:12, 19:9, 71:21
**substitute** [28] - 19:11, 20:16, 21:24, 23:11, 23:15, 24:5, 24:6, 24:16, 24:23, 24:24, 25:1, 25:3, 27:3, 27:4, 28:6, 43:24, 49:5, 49:6, 55:21, 63:2, 63:3, 65:8, 69:14, 70:19, 71:2, 71:13, 80:20
**substitutes** [26] - 4:19, 12:17, 14:12, 19:1, 19:14, 20:4, 20:12, 20:19, 21:22, 22:15, 24:13, 25:14, 25:18, 25:21, 26:25, 27:6, 27:13, 40:23, 55:22, 55:25, 56:1, 63:8, 82:9, 88:2, 114:25, 115:1
**substitution** [2] - 19:18, 19:24
**subsumed** [1] - 115:17
**sudden** [2] - 92:9, 92:20
**sufficient** [6] - 37:14, 52:24, 59:25, 78:5, 125:3, 129:24
**suggest** [2] - 27:6, 102:24
**suggesting** [2] - 27:19, 33:10
**suggests** [1] - 103:10
**Suite** [1] - 1:15
**sum** [1] - 76:17
**summarize** [1] - 13:18
**summary** [1] - 110:1
**super** [2] - 26:4, 26:9
**supermarket** [2] - 8:22, 11:2
**supermarkets** [5] - 10:6, 10:16, 10:22, 10:25, 11:5
**supplier** [1] - 58:6
**Supply** [1] - 10:19
**supply** [13] - 4:15, 4:21, 4:22, 4:23, 5:1, 5:6, 7:16, 10:19, 10:25, 11:8, 12:2, 12:17, 91:22
**support** [3] - 81:1, 81:3, 81:13

**supported** [2] - 81:14, 81:15
**supposed** [3] - 21:19, 21:20, 55:17
**surprise** [1] - 42:5
**surprising** [3] - 33:24, 75:12, 116:17
**survey** [27] - 10:23, 10:24, 11:4, 38:3, 38:10, 39:16, 39:18, 40:9, 40:19, 40:20, 40:22, 40:23, 40:24, 44:4, 44:7, 44:12, 44:15, 49:10, 65:4, 67:12, 67:15, 68:7, 68:21, 112:12
**surveys** [8] - 10:1, 10:3, 10:13, 11:20, 11:21, 17:17, 38:8, 44:9
**suspect** [1] - 104:23
**sustain** [1] - 120:5
**switch** [15] - 16:23, 33:10, 40:25, 64:6, 64:7, 66:4, 66:7, 66:8, 67:8, 76:25, 77:2, 78:11, 104:6, 131:18
**switched** [10] - 65:17, 76:19, 77:4, 77:6, 77:7, 77:9, 77:12, 77:13, 78:24
**switchers** [14] - 65:3, 65:11, 76:14, 76:15, 76:16, 76:18, 77:14, 78:20, 78:22, 80:8, 80:11, 80:17, 103:25, 104:2
**switches** [2] - 17:4, 123:9
**switching** [89] - 15:22, 16:22, 17:5, 25:11, 33:8, 35:11, 35:13, 35:14, 35:15, 35:17, 44:22, 58:19, 59:1, 59:20, 59:21, 60:9, 60:16, 60:17, 61:2, 61:9, 61:11, 61:14, 61:17, 61:18, 63:23, 63:25, 64:3, 64:5, 64:6, 64:8, 64:18, 64:21, 65:9, 65:10, 65:16, 65:20, 66:6, 66:11, 66:13, 67:12, 67:17, 67:22, 67:24, 68:2, 68:4, 68:22, 69:22, 70:17, 70:18, 75:7, 75:22, 75:25, 76:1, 76:2, 76:20, 76:22, 92:10, 100:23, 100:24, 101:24, 102:3, 102:8, 102:11, 102:15, 102:18, 102:21, 102:22, 102:23, 102:24, 103:2, 103:4, 103:10, 103:13, 104:7, 104:9, 107:16, 110:20, 110:23, 110:24, 111:15, 112:5, 112:6, 113:22
**sworn** [1] - 3:9
**synergies** [7] - 108:1, 108:3, 109:2, 109:5, 109:8, 109:16, 109:17
**synergy** [1] - 108:25

**T**

**tab** [5] - 32:25, 35:22, 60:20, 110:8, 118:7
**Tab** [27] - 22:20, 31:25, 32:18, 32:20, 32:21, 34:12, 35:19, 35:21, 36:16, 37:5, 60:21, 61:23, 64:11, 67:7, 68:20, 69:8, 69:9, 74:5, 74:25, 79:3, 83:18, 83:21, 110:10, 118:1, 118:6
**table** [5] - 50:20, 69:21, 75:6, 76:12, 83:23
**talks** [9] - 32:6, 35:17, 36:10, 49:21, 52:10, 78:2, 90:21, 92:24, 117:2
**tan** [1] - 37:12
**target** [1] - 121:22
**targeted** [1] - 127:11
**taught** [4] - 6:25, 7:5, 7:6, 7:7
**tax** [74] - 13:21, 13:22, 14:22, 24:23, 24:25, 25:3, 25:8, 25:12, 29:18, 30:9, 30:20, 30:24, 32:8, 33:4, 33:6, 34:25, 36:10, 36:11, 36:13, 38:25, 39:1, 42:19, 42:20, 42:23, 42:25, 43:2, 43:7, 44:22, 47:22, 49:4, 56:12, 58:10, 58:12, 59:3, 59:14, 59:15, 60:2, 60:3, 60:7, 61:3, 64:8, 65:17, 65:18, 66:12, 66:13, 67:1, 67:4, 69:6, 69:13, 70:15, 70:18, 70:25, 71:6, 77:3, 83:6, 84:8, 84:10, 84:17, 87:1, 87:3, 87:20, 92:18, 92:20, 96:25, 102:5, 102:7, 117:4, 124:21, 124:24, 125:1, 125:3
**Tax** [1] - 34:13
**taxACT** [1] - 117:6
**TaxACT** [115] - 13:24, 16:16, 17:15, 25:1, 27:12, 28:2, 28:3, 28:4, 28:7, 29:7, 29:9, 29:13, 29:24, 30:11, 35:16, 41:6, 41:8, 41:15, 41:22, 44:12, 44:15, 44:23, 47:9, 47:25, 48:1, 49:7, 56:15, 64:6, 64:22, 64:23, 65:4, 65:8, 65:11, 66:11, 66:18, 67:12, 67:15, 68:7, 69:4, 69:6, 70:19, 71:1, 72:10, 72:11, 72:13, 73:9, 73:12, 75:2, 75:8, 75:9, 75:10, 75:12, 75:15, 75:17, 75:22, 76:8, 76:12, 76:18, 77:3, 77:12, 94:24, 94:25, 95:1, 95:2, 95:4, 95:7, 96:21, 98:5, 102:23, 103:1,

103:4, 103:10, 103:11, 108:6, 108:8, 108:10, 108:12, 108:13, 108:14, 108:22, 109:15, 111:6, 111:9, 112:12, 115:9, 116:5, 116:9, 117:1, 117:6, 117:14, 117:18, 118:12, 119:9, 120:10, 120:18, 121:2, 121:13, 121:16, 121:23, 126:22, 126:25, 128:8, 128:11, 128:12, 129:1, 129:15, 129:16, 129:20, 129:23, 130:19
**TaxACT's** [10] - 27:5, 29:10, 68:24, 69:1, 84:22, 95:18, 112:14, 113:11, 126:22, 128:14
**taxes** [4] - 31:2, 33:14, 83:9, 87:19
**TaxHawk** [11] - 15:12, 17:19, 29:25, 75:25, 76:9, 113:13, 120:15, 120:24, 125:16, 125:22, 130:15
**TaxHawk's** [1] - 62:7
**taxpayer** [2] - 15:2, 30:24
**taxpayers** [1] - 61:12
**TaxSlayer** [13] - 15:11, 17:19, 28:5, 29:25, 62:7, 76:9, 113:13, 116:6, 120:16, 120:25, 125:16, 125:22, 130:15
**TaxWise** [1] - 76:9
**teach** [2] - 6:25, 7:4
**teaching** [2] - 7:9, 67:19
**technologies** [1] - 116:15
**telephonically** [1] - 131:24
**tend** [12] - 15:6, 33:25, 34:2, 46:18, 46:24, 57:10, 96:5, 96:6, 97:4, 97:23, 99:7, 100:15
**tens** [2] - 39:17, 46:12
**term** [11] - 5:3, 5:7, 15:21, 15:22, 26:12, 26:13, 26:14, 51:20, 82:3, 95:6, 100:22
**terms** [31] - 12:15, 16:8, 20:21, 27:21, 29:3, 31:7, 32:22, 33:17, 35:2, 41:7, 41:8, 41:16, 43:21, 45:4, 47:2, 57:4, 65:1, 67:14, 69:18, 70:9, 76:23, 82:16, 106:19, 111:3, 113:21, 114:17, 120:17, 126:2, 130:18
**test** [56] - 21:13, 21:17, 21:19, 52:2, 52:6, 52:7, 52:10, 52:11, 52:17, 52:24, 53:1, 53:2, 53:4, 63:1, 63:5, 71:9, 71:12, 71:16, 71:22, 71:24, 71:25, 72:1, 72:2, 72:25, 73:5, 73:13,

73:18, 73:21, 73:22, 73:25, 77:20, 78:7, 78:8, 78:10, 79:1, 79:21, 80:21, 81:2, 81:12, 81:13, 81:19, 82:6, 82:10, 82:13, 82:20, 82:21, 82:22, 83:11, 107:13, 107:23
**testified** [7] - 3:10, 12:21, 17:18, 19:4, 78:1, 108:18, 119:16
**testifies** [1] - 120:2
**testify** [4] - 11:24, 12:24, 13:4, 53:7
**testifying** [2] - 12:6, 119:22
**testimony** [26] - 12:3, 14:18, 15:12, 17:12, 18:12, 22:18, 30:22, 31:1, 41:9, 45:8, 45:12, 48:3, 51:15, 53:14, 54:5, 66:22, 69:24, 79:21, 84:9, 91:21, 94:15, 99:25, 106:4, 114:15, 119:4
**testing** [1] - 50:1
**tests** [1] - 90:23
**texture** [1] - 23:25
**THE** [56] - 1:2, 1:10, 3:2, 3:7, 3:8, 3:15, 13:13, 18:5, 18:10, 22:8, 22:11, 27:2, 27:9, 27:11, 27:14, 27:16, 27:18, 28:6, 28:8, 28:17, 29:2, 37:16, 49:24, 50:4, 50:5, 50:11, 50:12, 50:14, 51:12, 53:17, 53:25, 67:8, 67:16, 67:18, 67:19, 68:7, 68:10, 68:11, 68:16, 69:24, 70:4, 70:5, 70:6, 81:22, 119:1, 119:8, 120:4, 126:3, 126:6, 126:11, 131:3, 131:8, 131:10, 131:16, 131:22, 132:2
**theatres** [1] - 8:18
**themselves** [3] - 42:16, 123:10, 130:5
**theoretical** [4] - 86:16, 88:9, 93:18, 127:21
**theoretically** [1] - 127:5
**theory** [4] - 90:5, 94:6, 130:2, 130:3
**thinking** [19] - 19:1, 21:10, 41:10, 43:13, 53:12, 55:19, 57:24, 58:7, 59:10, 59:17, 61:11, 64:19, 64:20, 64:21, 76:13, 87:18, 88:22, 89:8, 105:7
**thinks** [3] - 66:22, 66:23, 119:22
**third** [2] - 33:3, 77:18
**thoughts** [1] - 45:11
**thousands** [2] - 39:17, 46:12
**threat** [1] - 73:19
**threatening** [1] - 26:17

**three** [15] - 22:23, 24:7, 50:12, 53:11, 53:12, 53:21, 53:23, 56:14, 56:19, 56:23, 57:1, 59:4, 64:19, 65:22, 81:17

**Three** [2] - 23:10, 23:13

**three-step** [1] - 65:22

**threshold** [7] - 72:23, 73:1, 73:10, 74:2, 74:10, 78:3

**thresholds** [8] - 74:7, 77:24, 77:25, 79:2, 79:5, 79:6, 79:15

**thrown** [3] - 21:5, 21:6, 116:3

**Thursday** [3] - 131:20, 131:22, 132:3

**thwart** [1] - 15:17, 125:17

**title** [2] - 4:3, 24:9

**today** [21] - 6:10, 9:5, 13:23, 22:18, 29:25, 62:3, 84:6, 91:4, 91:5, 105:5, 105:6, 105:7, 105:9, 105:10, 105:14, 108:23, 117:14, 117:22, 129:24

**together** [13] - 13:25, 15:8, 71:2, 72:21, 82:5, 84:12, 84:24, 85:4, 88:12, 88:18, 92:24, 107:25, 115:19

**tomorrow** [4] - 105:7, 131:16, 131:17

**ton** [1] - 10:9

**took** [6] - 30:21, 45:13, 45:24, 54:15, 58:22, 110:16

**tool** [3] - 63:17, 63:19, 110:19

**tools** [1] - 12:16

**top** [13] - 14:14, 29:9, 29:11, 33:1, 33:7, 36:1, 75:4, 75:5, 75:6, 78:16, 80:2, 80:8, 81:9

**topic** [1] - 129:18

**topics** [1] - 17:23

**total** [5] - 8:2, 76:16, 76:22, 80:11, 102:18

**totality** [2] - 56:24, 58:24

**totally** [1] - 106:1

**Trade** [3] - 7:12, 13:4, 24:10

**traffic** [5] - 59:7, 59:10, 59:12, 59:18, 59:19

**training** [2] - 6:5

**transaction** [1] - 108:12

**transcribed** [1] - 131:12

**transcript** [3] - 1:25, 131:11, 133:4

**TRANSCRIPT** [1] - 1:9

**transcription** [1] - 1:25

**transparency** [1] - 24:2

**transparent** [4] - 124:1, 124:9, 124:17, 124:18

**treat** [2] - 26:17, 26:18

**trouble** [1] - 46:19

**true** [5] - 67:24, 79:8, 84:19, 103:11, 103:14

**try** [8] - 17:1, 17:2, 92:7, 112:8, 113:13, 116:23, 116:24, 122:24

**trying** [5] - 5:10, 28:20, 42:17, 55:12, 116:15

**TurboTax** [59] - 16:14, 27:21, 27:23, 27:25, 28:1, 28:3, 29:11, 29:17, 29:20, 29:22, 30:10, 30:12, 32:24, 33:2, 33:4, 33:6, 33:8, 34:8, 38:24, 40:8, 40:15, 41:5, 47:9, 47:23, 49:6, 56:15, 64:8, 64:24, 70:16, 70:24, 72:11, 72:19, 75:2, 75:17, 75:18, 75:25, 76:9, 77:18, 78:19, 78:20, 80:5, 80:10, 80:11, 80:15, 80:17, 80:24, 81:3, 95:10, 95:15, 95:20, 103:3, 111:6, 111:7, 111:10, 112:15, 122:10, 125:14, 128:11, 128:15

**TurboTax's** [1] - 33:1

**turn** [21] - 14:16, 19:7, 19:14, 20:5, 22:20, 25:21, 26:12, 33:4, 34:12, 35:4, 35:19, 35:24, 36:16, 44:13, 83:18, 110:10, 118:1, 125:25

**turned** [2] - 55:3, 55:7

**turning** [3] - 31:25, 59:20, 86:3

**Two** [2] - 23:9, 23:12

**two** [36] - 14:23, 15:13, 17:18, 19:19, 23:19, 37:2, 45:17, 59:25, 62:18, 64:20, 68:2, 70:16, 72:20, 80:5, 81:9, 81:17, 84:24, 87:9, 88:11, 88:16, 89:14, 89:18, 90:7, 90:8, 91:16, 106:5, 106:7, 121:6, 122:22, 127:8, 127:25, 129:2, 129:3, 130:16, 130:17

**two-year** [1] - 106:5

**twofold** [1] - 126:18

**type** [21] - 7:13, 8:8, 8:22, 10:20, 19:20, 37:3, 37:12, 40:19, 44:3, 44:18, 46:17, 73:14, 91:11, 95:4, 95:7, 95:10, 96:6, 96:7, 98:25, 100:3, 109:11

**types** [11] - 4:8, 8:6, 8:14, 8:19, 38:8, 43:24, 49:17, 79:22, 85:20, 87:2, 98:22

**typically** [5] - 16:18, 19:5, 85:19, 107:9, 114:23

**U**

**U.S** [4] - 1:14, 1:22, 7:11, 7:12

**uncommon** [1] - 98:8

**unconcentrated** [14] - 13:23, 13:24, 14:2, 85:10, 85:12, 85:15, 114:8, 114:9, 114:11, 114:15, 114:16, 114:19, 115:4, 115:5

**unconnected** [4] - 24:17, 24:20, 24:22, 25:5

**under** [6] - 4:1, 19:25, 42:21, 84:17, 85:20, 131:12

**undergraduate** [1] - 7:6

**underlying** [2] - 46:9, 46:14

**understood** [2] - 27:16, 69:24

**undertake** [1] - 15:18

**undiscounted** [3] - 100:23, 110:20, 110:22

**undo** [1] - 15:7

**undone** [1] - 124:13

**unemployment** [1] - 5:9

**unfortunately** [1] - 48:9

**unilateral** [30] - 8:10, 9:22, 9:24, 14:4, 14:7, 14:8, 14:9, 73:14, 85:23, 86:3, 86:20, 88:6, 88:7, 88:8, 90:5, 90:14, 91:11, 92:4, 93:3, 97:19, 99:14, 104:11, 106:10, 106:15, 113:25, 114:20, 125:11, 130:11

**unique** [9] - 115:14, 115:15, 115:18, 115:21, 115:25, 116:9, 117:1, 117:10

**unit** [4] - 74:20, 96:19, 96:21, 97:3

**UNITED** [3] - 1:1, 1:3, 1:11

**United** [2] - 1:13, 5:22

**units** [1] - 105:12

**universe** [1] - 22:23

**University** [1] - 7:2

**unless** [1] - 124:3

**unlikely** [3] - 14:8, 85:15, 122:5

**unprofitable** [1] - 89:5

**unusual** [1] - 54:1

**up** [67] - 12:3, 16:6, 25:17, 26:1, 28:21, 29:3, 29:4, 29:5, 31:11, 33:3, 33:5, 36:1, 36:5, 36:10, 38:19, 39:8, 39:19, 46:24, 47:21, 48:3, 53:19, 54:23, 60:6, 60:21, 63:1, 63:14, 63:15, 64:14, 67:4, 69:9, 70:12, 71:10, 71:14, 75:4, 76:17, 78:15, 79:22, 82:16, 84:1, 89:6, 92:7, 94:10, 94:11,

98:5, 100:14, 100:17, 103:6, 105:24, 106:1, 109:8, 109:20, 109:21, 111:10, 111:15, 112:7, 112:15, 112:21, 113:11, 113:20, 114:5, 116:1, 117:7, 118:10, 121:21, 122:18, 124:12, 126:4

**upstate** [1] - 7:2

**upstream** [1] - 66:19

**US** [1] - 1:19

**useful** [7] - 10:3, 11:9, 28:18, 38:9, 63:17, 63:19, 63:21

**user** [1] - 97:15

**users** [2] - 61:7, 61:14

**uses** [2] - 97:11, 110:24

**V**

**validate** [1] - 80:22

**valuable** [1] - 52:7

**value** [10] - 66:23, 80:22, 81:1, 95:4, 95:7, 95:24, 96:6, 121:22, 121:23, 128:5

**variable** [6] - 96:16, 96:17, 97:5, 98:20, 98:21, 110:3

**variables** [1] - 93:19

**varies** [3] - 97:2, 122:9

**variety** [1] - 3:24

**various** [6] - 28:4, 35:18, 50:18, 87:6, 109:19, 123:2

**vary** [4] - 96:17, 96:18, 97:21, 97:23

**verification** [1] - 54:14

**verified** [2] - 54:16, 110:18

**verify** [1] - 54:10

**version** [8] - 23:22, 25:9, 50:6, 54:6, 54:8, 54:10, 54:18, 70:10

**versions** [2] - 23:5, 105:25

**versus** [7] - 10:25, 66:19, 67:15, 80:22, 94:21, 100:23, 126:23

**vice** [1] - 4:4

**view** [12] - 4:19, 28:11, 34:3, 34:4, 62:13, 85:24, 97:19, 116:9, 121:5, 121:10, 121:15, 129:19

**viewed** [1] - 68:8

**viewing** [1] - 121:15

**views** [1] - 33:24

**vigorous** [1] - 123:8

**vigorously** [6] - 98:15, 121:13, 121:18, 121:21, 122:1, 123:13

**voila** [1] - 52:17

**Voir** [1] - 2:4

**voir** [1] - 53:12

**VOIR** [1] - 54:2

## W

**Wait** [1] - 123:11
**walk** [4] - 20:6, 60:24, 76:5, 83:20
**wants** [4] - 43:8, 76:24, 77:20, 93:15
**War** [2] - 6:11, 6:15
**warehouse** [1] - 96:4
**Warren** [39] - 17:24, 18:2, 19:4, 24:21, 25:13, 28:19, 45:5, 45:12, 48:3, 51:14, 54:5, 55:15, 56:4, 61:17, 62:14, 63:23, 65:12, 65:15, 66:14, 70:17, 70:22, 71:9, 76:5, 76:21, 79:21, 80:21, 90:21, 93:8, 93:9, 94:5, 99:25, 110:4, 110:17, 115:8, 117:2, 117:12, 122:14, 125:13, 126:13
**Warren-Boulton** [29] - 17:24, 18:2, 19:4, 25:13, 28:19, 45:12, 48:3, 51:14, 55:15, 56:4, 61:17, 63:23, 65:12, 65:15, 70:17, 70:22, 76:21, 79:21, 90:21, 93:8, 93:9, 94:5, 110:17, 115:8, 117:2, 117:12, 122:14, 125:13, 126:13
**Warren-Boulton's** [10] - 24:21, 45:5, 54:5, 62:14, 66:14, 71:9, 76:5, 80:21, 99:25, 110:4
**Washington** [3] - 1:16, 1:20, 1:23
**waste** [4] - 81:17, 87:19, 87:22, 87:23
**water** [1] - 25:15
**Wayland** [2] - 2:5, 131:8
**WAYLAND** [14] - 1:13, 13:12, 18:4, 18:7, 28:25, 53:5, 53:21, 54:3, 54:22, 118:23, 119:3, 119:21, 120:8, 131:9
**ways** [16] - 25:22, 28:20, 43:6, 57:10, 57:14, 57:15, 58:1, 62:19, 64:19, 64:20, 65:19, 67:10, 87:17, 117:7, 123:1, 123:6
**weavers** [1] - 65:3
**web** [15] - 30:2, 32:23, 33:1, 57:25, 58:1, 58:2, 59:7, 59:10, 59:12, 59:16, 59:18, 59:19, 124:5, 124:12, 125:2
**weeds** [1] - 34:5
**weight** [2] - 102:15, 120:6

**welfare** [7] - 111:12, 111:13, 114:3, 114:4, 114:6, 114:7, 114:10
**Wells** [2] - 57:24, 58:4
**West** [2] - 5:23, 55:12
**whatsoever** [1] - 105:6
**wheat** [2] - 96:3, 96:4
**whereas** [1] - 108:10
**WHEREUPON** [1] - 131:12
**whichever** [1] - 68:22
**whole** [9] - 20:20, 23:16, 36:3, 47:16, 75:19, 95:13, 95:14, 110:14, 118:9
**wholesaling** [1] - 7:18
**wide** [1] - 4:8
**wider** [2] - 29:14, 57:2
**willing** [1] - 91:22
**Wing** [1] - 55:12
**wise** [1] - 67:2
**WITNESS** [14] - 2:2, 3:8, 27:9, 27:14, 27:18, 28:8, 50:4, 50:11, 50:14, 67:16, 67:19, 68:10, 70:4, 70:6
**Witness** [8] - 32:1, 35:5, 35:20, 64:13, 74:6, 83:19, 110:11, 118:2
**witness** [6] - 3:3, 3:9, 22:6, 28:16, 30:17, 119:18
**witnesses** [2] - 53:7, 119:4
**word** [2] - 113:23, 117:15
**words** [6] - 23:14, 43:1, 52:5, 80:15, 83:8, 101:7
**works** [1] - 112:20
**world** [11] - 40:18, 57:8, 57:9, 57:14, 57:16, 73:18, 84:24, 90:24, 91:1, 96:10, 112:1
**worldwide** [1] - 3:24
**worried** [3] - 46:25, 47:13, 65:16
**worry** [1] - 21:9
**worse** [2] - 112:22, 114:4
**write** [2] - 30:17, 88:10
**writing** [3] - 36:23, 93:12, 118:24
**writings** [2] - 13:3, 22:4
**written** [8] - 11:12, 11:16, 11:18, 11:19, 11:20, 32:9, 38:8, 90:22
**wrote** [1] - 7:14

## Y

**year** [35] - 7:20, 9:11, 9:14, 9:15, 9:16, 14:22, 14:23, 15:1, 16:23, 44:16, 58:8, 60:4, 60:5, 61:18, 73:16, 75:9, 91:6, 91:8, 91:9, 105:8, 105:15, 105:16,

105:23, 106:1, 106:2, 106:3, 106:5, 106:14, 106:20, 117:4, 130:19
**years** [10] - 5:17, 9:18, 14:23, 15:2, 42:6, 60:6, 61:18, 66:14, 106:7, 129:8
**yogurt** [1] - 8:22
**York** [1] - 7:3
**yourself** [8] - 18:18, 27:4, 27:5, 27:7, 27:13, 56:18, 80:22, 128:18